UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CONTOUR IP HOLDING, LLC,

                Plaintiff,

      v.

GOPRO, INC.,

                Defendant.

Case No. 3:17-cv-04738-WHO

**ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, MOTIONS TO EXCLUDE EXPERT TESTIMONY, AND MOTIONS TO SEAL**

Re: Dkt. Nos. 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 378, 379, 389, 391, 393, 395, 398, 400, 402, 403, 413, 415, 418, 420, 422, 431, 433

Before me are five substantive motions by plaintiff and patentee Contour IP Holding, LLC and defendant and alleged infringer GoPro, Inc., along with well over a dozen motions to seal. Both sides move for partial summary judgment and move to exclude testimony by one another's technical and damages experts. As set forth below, I will grant in part and deny in Contour's motion for partial summary judgment and grant GoPro's motion for partial summary judgment. I will deny Contour's motion to strike and deny GoPro's motion to strike the testimony of Contour's technical expert. Finally, I will grant GoPro's motion to strike the testimony of Contour's damages expert but allow Contour a short window to supplement that report.

## BACKGROUND

For purposes of the pending motions, I describe only the broad brushstrokes of the parties' longstanding patent dispute, which has proceeded before the District Court of Utah, the Patent Trial and Appeal Board ("PTAB"), the Federal Circuit, and in this district before me. Contour accuses GoPro of infringing claims 11, 12, 14, 15, 20, and 30 of U.S. Patent Nos. 8,890,954 (the "'954 Patent") and claims 2, 6, and 20 of 8,896,694 (the "'694 Patent"), which was issued on

1  November 18, 2014.  Edwards Decl. Ex. A ('954 Patent).  Both patents relate to mountable and

2  viewfinderless point of view video cameras with capabilities to wirelessly connect to a personal

3  portable device.

4      Contour originally filed claims against GoPro on January 5, 2015, in the District Court of

5  Utah, and that action was later dismissed.  On April 20, 2015, GoPro filed Petitions for Inter

6  Partes Review ("IPR") of both patents-in-suit, asserting that the patents were obvious in view of

7  Boland (U.S. Patent App. Pub. No. 2010/011815) and a GoPro catalog.  Dkt. No. 16-1.  The IPRs

8  were instituted as to 22 claims and denied as to 8 claims on October 28, 2015.  Dkt. Nos. 15, 16-1.

9      On October 26, 2016, the PTAB rejected the IPRs, finding that the GoPro catalog was not

10 prior art and thus declining to reach the issue of whether Boland disclosed generating two video

11 streams of different quality from the video image data.  Dkt. Nos. 78-1, 78-2.  GoPro appealed that

12 determination, and the Federal Circuit held the GoPro catalog was prior art and remanded for

13 consideration on the merits.  On July 31, 2019, the PTAB held that GoPro failed to prove

14 invalidity in view of Boland and the GoPro catalog.  Dkt. No. 289-2.

15     Meanwhile, Contour initiated this action on November 30, 2015.  Dkt. No. 1.  In August

16 2017, the case was transferred to this district and reassigned to me.  Dkt. Nos. 175, 180.  Key to

17 the parties' dispute over Contour's motion for partial summary judgment on infringement is claim

18 11 of the '954 Patent:

19     A portable, point of view digital video camera, comprising:
       a lens;
20     an image sensor configured to capture light propagating through the lens and
           representing a scene, and produce real time video image data of the scene;
21     a wireless connection protocol device configured to send real time image content by
       wireless transmission directly to and receive control signals or data signals by wireless
22         transmission directly from a personal portable computing device executing an
           application; and
23     a camera processor configured to:
24         receive the video image data **directly or indirectly** from the image sensor,
           **generate from the video image data a fire image data stream and a second**
25             **image data stream, wherein the second image data stream is a higher**
               **quality than the first image data stream,**
26         cause the wireless connection protocol device to send the fire image data stream
               directly to the personal portable computing device for display on a display
27             of the personal portable computing device, wherein the personal portable
               computing device generates the control signals for the video camera, and
28

2

> wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting, receive the control signals from the personal portable computing device, and adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device.

'954 Patent 30:57–31:24.  In my Claim Construction Order of July 16, 2018, I construed the "generate" term in claim 11 as, "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream."  Order Regarding Claim Construction ("Claim Construction") [Dkt. No. 251] 9–10.

## LEGAL STANDARD

### I.  MOTIONS FOR SUMMARY JUDGMENT

#### A.  Generally

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B.    Noninfringement

Summary judgment of noninfringement requires a two-step analysis.  "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted).  "The determination of infringement, both literal and under the doctrine of equivalents, is a question of fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003); *see also Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2012 WL 3545286, at *4 (N.D. Cal. Aug. 16, 2012).  Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may show that summary judgment of noninfringement is proper either by producing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to create a material factual dispute as to any essential element of the patentee's case. *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).  "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims." *Id.*  Direct infringement may be proven either by literal infringement or under the doctrine of equivalents.  "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s)." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.*

## II.    MOTIONS TO EXCLUDE

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note.

United States District Court
Northern District of California

United States District Court
Northern District of California

**DISCUSSION**

## I.   CONTOUR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.   Claim 11 of the '954 patent

The parties agree that infringement of claim 11 comes down to the "generate" term, which I construed as "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream."

According to Contour, the report by GoPro's expert Kevin Almeroth does not create a genuine dispute of material fact for two reasons. First, his opinion is wrong as a matter of law because his interpretation reads out another claim term. Second, he improperly delves into claim construction, which is a matter of law for me to decide. GoPro counters that Contour mischaracterizes Almeroth's opinion, which in fact does raise disputes that preclude summary judgment. The two disputes that GoPro asserts both stem from my construction of the "generate" term; according to GoPro, they are distinct because the first relates to the **nature** of the data (material alteration) while the second relates to the **source** of the data (parallel).

Claim construction is a matter of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). Where parties do not seek construction of a term, the words are given their ordinary and customary meaning: "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (internal quotation marks omitted); *see Apple, Inc. v. Samsung Elecs. Co.*, No. 12-cv-00630-LHK, 2014 WL 660857, at *3 (N.D. Cal. Feb. 20, 2014) ("*Apple II*"). To ascertain the plain and ordinary meaning, it is appropriate to look to "[t]he written description and other parts of the specification" for "contextual light." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).

Experts can present evidence about how a POSITA would understand a term, but they may not make claim construction arguments to the jury. *Apple II*, 2014 WL 660857, at *3. "[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1337

1  (Fed. Cir. 2009) (quoting *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172–73

2  (Fed. Cir. 2005)).

3          **1.**     **"from the video image data"**

4        GoPro argues that there is a material dispute of fact over whether the Accused Products

5  generate data "from the video image data" because according to Almeroth, ██████████████

6  ████████████████████████ means that a POSITA would no longer consider it to be

7  "from the video image data." Contour counters that this opinion is wrong as a matter of law

8  because it reads "indirectly" out of claim 11 and that Almeroth delves into claim construction

9  when he opines that the phrase "from the video image data" requires that ████████████

10  ████████████████████.

11        Almeroth reviewed documents reflecting the camera processor pipeline, the source code

12  responsible for the processing, and the results of his own testing. *See* Almeroth Rebuttal ¶¶ 94-

13  162. He opines that "[i]t is not sufficient that CIPH show that this video image data or image data

14  streams ████████████████████████ Almeroth Rebuttal ¶ 57. Instead,

15  "[f]or claims 1 and 3 of the '694 Patent, the 'video image content' must ████████████

16  ████████ *Id.* Almeroth ultimately concludes that before the data gets to the camera

17  processor, it is ██████████ that a POSITA would not consider it to be data "from the

18  video image data." Oppo. 10 (citing Almeroth Rebuttal ☐☐ 96, 193, 237).

19        Contrary to GoPro's arguments, the question presented by Contour's motion is not

20  technical; this is no battle between expert opinions on technical features of the Accused Products.

21  In fact, there is no dispute on this underlying fact about the technology: in the Accused Products,

22  the video image data ████████████████████████

23  ██████ Instead, the question before me is this: are Almeroth's opinions legitimately based

24  on the technology in light of the plain and ordinary meaning of the unconstrued terms?

25        The answer is no. Almeroth's opinion improperly deviates from the plain and ordinary

26  meaning of the term "***from*** the video image data" and instead reads in a new limitation that GoPro

27  failed to seek during claim construction in 2018 or advocate at other stages of the parties' years-

28  long dispute. Almeroth's opinion requires that "from" have a specialized meaning that narrows its

United States District Court
Northern District of California

plain and ordinary meaning; according to him, for the generated data to be "from the video image data," ██████████████████████████████████████████████████████ In so doing, Almeroth's noninfringement opinion implicitly adds a negative limitation to the claim, newly requiring that the video image data not undergo substantial or fundamental changes during processing.[1]  *See* Reply 5 ("In other words, GoPro is seeking to insert an additional claim limitation that would require the processor to 'generate from the video image data *in the exact same format received from the image sensor*' or 'generate from the video image data *which cannot have undergone any image processing*.'") (emphasis in original).  Claim 11 says nothing about processing or alteration, and the plain language of "from the video image data" indicates nothing about processing or alteration.  Yet Almeroth's opinion impliedly adds a processing- and alteration-related requirement.  GoPro cannot obscure the specialized meaning and new claim limitation that underlie Almeroth's opinion behind the label of "POSITA."  *See* Oppo. Contour MSJ 16–17.  Almeroth is not opining that a POSITA would understand the *technology* in a certain way; again, there is no dispute on that question.  Instead he is opining that a POSITA would understand the *claim term* in a certain way.

As further evidence that Almeroth's opinion reads in a negative limitation, Almeroth supports his conclusion by citing extrinsic evidence that Contour purportedly narrowed the meaning of claim 11 during IPR.[2]  But the analysis into patentee disclaimers that have the effect of narrowing the plain meaning of the claim language is precisely the sort of inquiry that occurs during claim construction, not the infringement analysis.  *See MediaTek inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-5341-YGR, 2014 WL 971765, at *5 (N.D. Cal. Mar. 5, 2014) (finding "disingenuous" the argument that an expert's opinions were "within the purview of the plain and ordinary meaning" of terms where he "relie[d] heavily on the prosecution history,

---

[1] GoPro's argument that Contour is trying to read "from the video image data" out of the claim is entirely unpersuasive.  *See* Oppo. 11–12.  Contour's position does not "permit the use of any data whatsoever from being used"; instead, it is grounded in the plain meaning of "from the video image data."

[2] Contour disputes that it took a contrary position during IPR; instead, it argued that Boland prior art was distinct because it *stored* the data before going back to it.

8

specifications, and even provisional applications"). While mere citations to extrinsic evidence are not dispositive, they further support my conclusion that GoPro was obligated to present this question of claim scope during claim construction.

In 2018, neither party asked me to construe the term "from the video image data." If GoPro wanted this term to have a specialized meaning or wanted me to resolve a dispute over its scope, it needed to request and justify such a construction at that stage of the case. I would not grant any such request at the summary judgment stage. As the Honorable Lucy H. Koh detailed when faced with this problem, "[s]ound practical reasons counsel against construing additional terms based on claim construction arguments raised for the first time in summary judgment briefs." *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014) ("*Apple I*"). Judge Koh further explained,

> All this is not to say that the Court refuses to consider the parties' summary judgment arguments merely because an apparent dispute has arisen about the scope of a term's plain and ordinary or construed meaning. The Court does carefully consider these disputes, but does so as "part of the infringement analysis, not part of the claim construction."

*Id.* (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1369 (Fed. Cir. 2012)). The question on summary judgment is "whether a reasonable jury, armed with the Court's claim construction as to certain terms and an instruction that the plain and ordinary meaning controls as to others, could or would necessarily conclude that the asserted claim reads on an accused device." *Id.* at *5. I will strike Almeroth's opinions as improper because they require new claim constructions that are too late and that are a matter of law for me to decide.[3]

Accordingly, Almeroth's first opinion fails to raise a genuine dispute precluding summary judgment. The undisputed fact that the video image data ▮▮▮▮▮▮▮▮▮▮▮ does not mean that any claim limitation is not met.

---

[3] I do not address Contour's additional argument that Almeroth's opinion is wrong as a matter of law because it reads "or indirectly" out of the claim language. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention."); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (rejecting a district court's construction where it "render[ed] other parts of the claim superfluous"). GoPro argues that the routing of the data—directly or indirectly—is a distinct question from the format of the data.

### 2.   "in parallel"

GoPro argues that Almeroth's report introduces a second dispute centered around the "in parallel" language in my construction of the "generate" term. Oppo. Contour MSJ 12–16. According to GoPro, Almeroth relies on the plain meaning of "in parallel" to opine that the Accused Products do not infringe because ██████████████████████████████████ ████████████████████████████████████████ *Id.* at 12. The camera processors ████████████████████████████████████████████████████████████████████ ██████, so the first and second image data streams are not generated "in parallel." *Id.* at 12–13. Contour counters that this argument simply repackages the above non-dispute. Reply Contour MSJ 5. According to Contour, GoPro again inserts a negative, no-processing limitation into claim 11 despite the absence of such language in the claim or its construction. *Id.*

I agree with Contour. Although GoPro uses different claim language as the basis for its argument, it still argues that the manner in which the ███████████████████████ means that its products do not infringe the claim. But GoPro did not request that any processing-related requirements be included in the construction of the generate term. Such a question of scope was proper for resolution at the claim construction stage and is improper now.

Neither of Almeroth's opinions raises a genuine dispute. Accordingly, there is no material dispute of fact preventing a finding that, under the plain meaning of the unconstrued terms, the Accused Products infringe claim 11 of the '954 Patent. Contour is entitled to partial summary judgment.

### B.   Willful Infringement

Contour argues that it is entitled to summary judgment that GoPro willfully infringed claim 11 of the '954 Patent because GoPro has been aware of the patents and Contour's infringement allegations since November 2014, it had cheap non-infringing alternatives, and yet it continued— and continues—to infringe. Contour MSJ 21–25. GoPro responds that: (i) it has numerous remaining defenses that must be litigated before a finding on Contour's claim for willful infringement, namely prior art-based invalidity, prior invention under § 102(g), and § 101 defenses, and (ii) Contour improperly relies on conduct that occurred prior to the issuance of the

patents.[4]  Oppo. 22–25.

Where patent infringement damages are found, "the court may increase the damages up to three times the amount found or assessed."  35 U.S.C.A. § 284.  "District courts enjoy discretion" in deciding whether and in what amount enhanced damages are warranted; "such damages are generally reserved for egregious cases of culpable behavior."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016) (noting that conduct giving rise to enhanced damages under the Patent Act has been described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, [or] flagrant").  Applying *Halo*, the Federal Circuit stated noted the following:

> (i) "[k]nowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages," (ii) "an infringer's subjective bad faith alone may support an award of enhanced damages," and (ii) "we do not interpret *Halo* as changing the established law that the factual components of the willfulness question should be resolved by the jury."

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340–41 (Fed. Cir. 2016); *see Greatbatch Ltd. v. AVX Corp.*, No. 13-cv-723, 2016 WL 7217625, at *2 (D. Del. Dec. 13, 2016), *aff'd*, No. 2019-2314, 2020 WL 3967853 (Fed. Cir. July 14, 2020).  Accordingly, *Halo* did not disturb the Federal Circuit's rule that "there is a right to a jury trial on the willfulness question."  *Id.* at 1341 n.13.

This issue is not appropriate for resolution on summary judgment.  Although raising reasonable defenses does not preclude a finding of willfulness, I agree with GoPro that its defenses should be resolved prior to any such finding.  *See WBIP*, 829 F.3d at 1340 (rejecting a defendant's argument that its defenses were "objectively reasonable," noting that it "[could not] cannot insulate itself from liability for enhanced damages by creating an (ultimately unsuccessful) invalidity defense for trial after engaging in the culpable conduct of copying, or 'plundering'"); *see also Greatbatch*, 2016 WL 7217625, at *2 (distinguishing from *WBIP* because the defendant had "sought and obtained invalidity and non-infringement opinions of counsel before litigation and developed designs and processes to avoid infringement").  Further, the evidence that Contour

---

[4] GoPro also argues that Contour improperly extends the period for willful infringement to November 2014 even though it consistently cited the January 5, 2015 date in its complaint and during discovery.  Although the parties use different pre- and post-suit language given that the original Delaware action was voluntarily dismissed, it appears they agree that January 5, 2015 is the date on which GoPro had notice of the Asserted Patents and Contour's infringement arguments.

1    cites does not establish as a matter of law that GoPro willfully infringed.  The jury must decide the

2    factual components of the willfulness question.

3        Finally, I disagree with GoPro that the timing of Woodman's sale of GoPro stock

4    necessarily makes that evidence irrelevant to the question of willfulness.  *See* Oppo. Contour MSJ

5    24.  The parties will be able to present the jury with evidence and argument regarding each of their

6    versions of events and the inferences that can be drawn from the evidence.

7    **II.    GOPRO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

8        GoPro moves for partial summary judgment on Contour's request for pre-suit infringement

9    damages.  The parties dispute whether GoPro had constructive notice of infringement such that

10   Contour can recover damages for the time between the date the Patents were issued (November

11   2014) and the date Contour first asserted them against GoPro (January 5, 2015).  GoPro asserts

12   that Contour has failed to meet its burden to show it marked substantially all of the four products

13   that allegedly practice the patented claims:  the ContourGPS, Contour+, Contour+2, and Contour

14   4K.  GoPro seeks partial summary judgment and an order that Contour's damages expert Keith

15   Ugone may not offer damages calculations prior to January 5, 2015.

16       A patentee is entitled to infringement damages starting only from the time when the

17   infringer received either actual or constructive notice of the infringement.  35 U.S.C. § 287(a); *see*

18   *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1376 (Fed. Cir. 2008).  Marking patented articles

19   with "patent" or "pat.," along with the patent number or the address of a free internet webpage,

20   constitutes constructive notice.  35 U.S.C. § 287(a).  Where "the character of the article" prevents

21   the inclusion of this information, the patentee can mark the package with "a label containing like

22   notice." 35 U.S.C. § 287(a).  Constructive notice requires a showing that "the patentee

23   consistently mark[ed] substantially all of its patented products."  *SEB S.A. v. Montgomery Ward &*

24   *Co.*, 594 F.3d 1360, 1378 (Fed. Cir. 2010) (internal quotation marks omitted), *aff'd sub nom.*

25   *Glob.-Tech Appliances, Inc.* v. SEB S.A., 563 U.S. 754 (2011); *see also Nike, Inc. v. Wal-Mart*

26   *Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998) (noting that once marking begins, it must be

27   "substantially consistent and continuous").

28       An alleged infringer challenging a patentee's entitlement to pre-suit damages bears "an

initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). "[T]his is a low bar": it is a "burden of production, not one of persuasion or proof." *Id.* at 1367. The purpose of the initial burden is to prevent an "unbounded" universe of products for which the patentee must plead and prove compliance with Section 287(a). *See id.* at 1368 ("Permitting infringers to allege failure to mark without identifying any products could lead to a large scale fishing expedition and gamesmanship"). "Once the alleged infringer meets its burden of production, however, the patentee bears the burden to prove the products identified do not practice the patented invention." *Id.*; *see also id.* at 1367 ("The burden of proving compliance with marking is and at all times remains on the patentee.").

GoPro argues that it has met its low initial burden by identifying four products, the ContourGPS, Contour+, Contour+2, and Contour 4K, and that Contour has insufficient evidence to meet its burden to show those products were marked in compliance with Section 287(a). Contour counters that there are factual disputes over whether these four products in fact practice the patents; because GoPro maintains that they do not, summary judgment is inappropriate. Oppo. 3–4.

Under *Arctic Cat*, "[t]he burden of proving compliance with marking is and at all times remains on" Contour. *Arctic Cat*, 876 F.3d at 1367. All that is required of GoPro is that it identify unmarked products that allegedly fall under the requirements of Section 287(a); it need not concede that these products practice the patents because the purpose of its initial burden is to prevent "a large scale fishing expedition and gamesmanship." *See id.* at 1368; *see also Fortinet, Inc. v. Sophos, Inc.*, 13-cv-05831-EMC, 2015 WL 6513655, at *2 (N.D. Cal. Oct. 28, 2015) (rejecting the patentee's argument that without a concession from the other side that the products practiced the claimed inventions, there remained an issue of fact for the jury).[5] As long as possibly practicing products have been identified, Contour bears the burden of proving compliance with Section 287(a) or, alternatively, of proving that the marking requirements do not apply to the

---

[5] Contour criticizes *Fortinet* for being pre-*Arctic Cat*, but in the latter opinion, the Federal Circuit cited *Fortinet* with approval more than once. *See Arctic Cat*, 876 F.3d at 1367-68.

1    products in question (for example, because they do not practice the patented invention).  *See*

2    *Arctic Cat*, 876 F.3d at 1368 (noting that "the patentee bears the burden to prove the products

3    identified do not practice the patented invention").  Here, Contour seeks to prove that the products

4    *do* practice the patented invention; accordingly, it must show that it either complied with Section

5    287(a)'s requirements or was not obligated to comply for some other reason.  In short, GoPro need

6    not concede that the products practice in order to be entitled to summary judgment on this narrow

7    issue.

8         As described in detail below, Contour has insufficient evidence to allow a fact finder to

9    conclude that it marked "substantially all" of these products as required by section 287(a).

10        **A.  ContourGPS and Contour+**

11        Contour has not demonstrated that it was not obligated to mark ContourGPS and

12   Contour+.  It is not enough for Contour to assert that these products were "end of life" and not

13   sold after November 2014, when the Asserted Patents were issued.  *See* Oppo. 1, 5.  Section

14   287(a) applies to patented articles made, offered for sale, *or* sold; Contour's opposition makes no

15   suggestion that these products were no longer made or offered for sale after the patents were

16   issued.  And GoPro cites evidence suggesting that both of these products remain available for

17   purchase from RageCams, an authorized distributor.  *See* Sun Decl. ISO Reply GoPro MSJ, Exs.

18   3, 4 [Dkt. No. 419-3, 419-4] (Contour+ and Contour GPS listed for sale with reviews from 2015,

19   2016, 2017, and 2019); *see* Section 287(a) (applying to patentees *and* "persons making, offering

20   for sale, or selling").

21        Even in the context of sales alone, Contour's showing is insufficient to meet its burden.  It

22   relies only on GoPro's expert report to show that the ContourGPS and Contour+ were not sold

23   after 2012.  *See* Oppo. 5 (citing expert report of Patrick Kennedy).  But Contour bears the burden

24   of showing that these products do not fall under the statutory requirements for marking; the

25   absence of units sold in GoPro's report—which is based on Contour's production—does not

26   establish that no units were sold (much less, as noted above, that no units were offered for sale).

27   Contour cites no other evidence in support of its contention that these products fall outside the

28   requirements of marking.  Further, Contour makes no suggestion that these products were marked

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1  or that they represented such a small percentage of their overall production/sales that the failure to

2  mark them does not defeat their ability to show marking of "substantially all" practicing products.

3  *Cf. Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1112 (Fed. Cir. 1996) (noting that although the

4  licensee had sold "a numerically large number of shoes" without proper marking because millions

5  of units were sold, 95% of the shoes sold were marked).[6]   Contour's failure of proof on these

6  products alone entitles GoPro to summary judgment.  *Cf. Illinois Tool Works, Inc. v. MOC Prod.*

7  *Co., Inc.*, No. 09-cv-1887, 2010 WL 11442912, at *3 (S.D. Cal. Dec. 6, 2010) (determining under

8  *Maxwell* that marking 60% of covered products was insufficient under Section 287(a)).

9      **B.   Contour+2**

10      Even if Contour could show that it was not required to mark the Contour+ and Contour

11  GPS, its showing with respect to marking the Contour+2 is insufficient to create a material dispute

12  of fact.  Contour does not contend that it fixed the patent number to the Countour+2 camera,

13  instead asserting that it was sufficient that the user manual pointed the public to a website with

14  patent information.  Oppo. GoPro MSJ 7–8.  But per the plain language of Section 287(a), "a label

15  with like notice" is a permissible alternative only in the event that "the character of the article"

16  prevents the notice from being fixed to the product itself.  35 U.S.C. § 287(a); *see Mophie, Inc. v.*

17  *Shah*, No. 13-cv-01321, 2014 WL 12603184, at *3 (C.D. Cal. Aug. 25, 2014) (granting a motion

18  to dismiss where the patentee failed to allege that it could not affix the notice to the product

19  despite asserting that the packaging directed the public to a website).  Contour points to no

20  evidence suggesting that marking the camera itself was not possible, arguing instead that because

21  the cameras were designed to be rugged, I should infer that "it would have been impossible or

22  impractical to mark the camera itself in a meaningful and lasting way."  Oppo. GoPro MSJ 8.

23      Further, Contour relies only on the general testimony of Mooney to show that its efforts to

24  mark were consistent.  Responding to GoPro's challenges to its reliance on that testimony alone,

25

26  _____

27  [6] GoPro's references to "50% of products" are misleading because "substantially all" is measured
   by reference to the percentage of total units produced and sold.  In other words, Contour could
   theoretically prove compliance with Section 287(a) if the sales of ContourGPS and Contour+ were
28  dwarfed by comparison with the sales of products that *were* adequately marked.  Contour presents
   no such evidence and makes no such arguments.

United States District Court
Northern District of California

Contour again incorrectly asserts that it is GoPro's burden to show that Mooney should not be believed rather than its burden to present sufficient evidence to allow a jury to find in its favor. *See* Oppo. GoPro MSJ 6 ("Lacking evidence to support its theories, GoPro speculates with no evidentiary basis at all that Contour might have not included the marked manuals with the products.  GoPro also speculates (again without evidence) that Contour's website might not have functioned continuously during the period it was selling, or offering to sell, the Contour+2 and the Contour 4k."); *see also id.* at 7 ("A manual's purpose is to go with the product. A website's purpose is to be available to provide information.").  Even assuming Mooney's testimony is sufficient to create a triable issue with respect to marking the Contour+2, the failures with respect to the ContourGPS and Contour+ prevent Contour from proving compliance.  GoPro's motion for partial summary judgment is GRANTED.

## III.     CONTOUR'S MOTION TO STRIKE ALMEROTH AND KENNEDY

Contour moves to strike the reports of technical expert Kevin Almeroth and damages expert Patrick Kennedy on the grounds that both improperly rest their opinions on comparisons to GoPro's July 31, 2018 settlement agreement with Monument Peak Ventures, LLC ("MPV") ("MPV Settlement Agreement").  Contour Motion to Strike ("Contour MTS") [Dkt. No. 372, 378-3]; Keville Decl. Ex. A [Dkt. No. 378-4].  As detailed below, Contour argues that these opinions should be stricken because (i) GoPro agreed as part of the MPV Settlement Agreement that the license should not be used for this purpose, (ii) judicial estoppel should apply, and (iii) the opinions based on the Agreement are unreliable.

### A.     Reasonable Royalty Calculations

A patentee who prevails in an infringement action is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  Where an established royalty does not exist, a court may determine a reasonable royalty based on a hypothetical negotiation between the parties. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006).  The hypothetical negotiation is a legal construct that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement

United States District Court
Northern District of California

1   began." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  In

2   other words, the "basic question" answered by a hypothetical negotiation is: "if, on the eve of

3   infringement, a willing licensor and licensee had entered into an agreement instead of allowing

4   infringement of the patent to take place, what would that agreement be?" *LaserDynamics, Inc. v.*

5   *Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012).  While this analysis "requires sound

6   economic and factual predicates," *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311

7   (Fed. Cir. 2002), it also "necessarily involves an element of approximation and uncertainty,"

8   *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001).

9       In determining a reasonable royalty, experts often consider one or more of a nonexhaustive

10  list of fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116,

11  1120 (S.D.N.Y. 1970).  "[C]omparisons of past patent licenses to the infringement must account

12  for 'the technological and economic differences' between them." *Wordtech Sys., Inc. v. Integrated*

13  *Networks Sols.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010).

14      **B.      GoPro's Prior Agreement and Judicial Estoppel**

15      Contour's challenges Almeroth's and Kennedy's reliance on the MPV Settlement

16  Agreement.  GoPro and MPV agreed that their settlement did not "represent a reasonable royalty"

17  because they wished to "resolve a commercial dispute without either Party having the benefit of

18  information that would be required to establish a reasonable royalty in the context of the

19  'Hypothetical Negotiation' standard."  MPV Settlement Agreement at 1.  A provision entitled

20  "Inadmissibility" reads:

> This Settlement Agreement (whether executed or not executed,
> revoked, or made ineffective for any reason) and any proceedings or
> discussions related to this Settlement Agreement are inadmissible as
> evidence of any liability or wrongdoing or as evidence of the value of
> the Licensed Patents or evidence of comparable licenses for patents
> in similar subject matter in any tribunal in any state, territory, or
> jurisdiction.

25  MPV Settlement Agreement § 6.13.  Contour argues that this provision should preclude GoPro

26  from introducing expert reports that rely on the license.

27      Although Contour can rely this provision to undermine Almeroth's and Kennedy's

28  opinions, it does not preclude the experts from relying on the license.  The cases Contour relies on

United States District Court
Northern District of California

present distinct factual scenarios.  In one, the court found that an expert's opinion lacked any methodology and rejected his reliance on licenses that—in the same report—he had found "[in]sufficiently comparable to be probative for his analysis."  *GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK, 2014 WL 1494247, at *5–*6 (N.D. Cal. Apr. 16, 2014) (also noting that the expert provided "little supporting reasoning" to support his comparison of the technologies).  Another court precluded an expert's reliance where there was no dispute that "she affirmatively rejected the licenses as non-comparable."  *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *5 (N.D. Cal. Jan. 23, 2015).  Here, there is no evidence that Almeroth or Kennedy themselves disavowed the comparability of the MPV license.  The admissibility of an expert report depends on the reliability and helpfulness of the expert's analysis and opinions; by contrast with the analysis of Almeroth and Kennedy, the MPV Settlement Agreement expressly states that the parties did *not* have the benefit of information or analysis that would allow them to engage in such analysis.

Finally, judicial estoppel does not apply because no court ever relied on the statement in the MPV Settlement Agreement.  *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) ("This court has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position.").  The cases Contour relies on are inapposite.  *See Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600-05 (9th Cir. 1996) (applying judicial estoppel where the plaintiff, who had previously asserted that she was unable to work during workers' compensation proceedings that resulted in a favorable settlement, later asserted in an age discrimination case that she was performing her job adequately).

### C.    Whether the Opinions are Reliable

Contour next argues that Almeroth's and Kennedy's opinions based on the MPV Settlement Agreement are not reliable because (i) the license relates to distinct technology, (ii) GoPro entered into the MPV Settlement Agreement four years after the November 2014 hypothetical negotiation in this case, and (iii) the experts failed to consider Section 6.13 of the MPV Settlement Agreement in their analysis.

Contrary to Contour's suggestions, the methodology underlying Almeroth's technical and economic comparisons is sound. Rebutting the report of Contour's expert Jing Hu, who opined that the MPV license was not technically comparable to the hypothetical license in this case, Almeroth engaged in a detailed analysis that resulted in the opposite conclusion. *See* Hu Report ¶¶ 636–37; Almeroth Report ¶¶ 364–80. Almeroth described the claims in the patents underlying the MPV license, comparing their subject matter and scope to the Patents-in-Suit. Almeroth Report ¶¶ 367–71. He described similarity and differences and discussed Hu's conclusions. *Id.* ¶¶ 377–80. Kennedy analyzed the economic circumstances and litigation backdrop of the MPV license as compared to the hypothetical license in this case and concluded that the two were economically comparable. *See* Kennedy Report ¶¶ 208–220, 238–44.

As described above, both experts detailed the facts and circumstances that led them to conclude that the MPV license is technically and economically comparable to the hypothetical license in this case. *See GPNE*, 2014 WL 1494247, at *5 (noting that the expert provided very little support for his reliance on a past license). The challenges Contour raises go to the weight, not the admissibility of their reports. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."). The absence of a discussion of Section 6.13 is immaterial to the experts' comparability examination; indeed, Hu did not mention Section 6.13 in her analysis either.

Contour is welcome to cross-examine Almeroth and Kennedy on the appropriateness of their reliance on the MPV Settlement, both in light of GoPro's disavowal and in light of technical and economic differences. But its motion to exclude is DENIED.

## IV.    GOPRO'S MOTIONS TO STRIKE

Finally, GoPro moves to strike the opinions of Contour's technical expert Dr. Jing Hu and its damages expert Dr. Keith Ugone.

### A.    Hu

GoPro moves to strike Hu's opinion that Contour products practice asserted claims along with her opinions that rely on that conclusion. MTS Hu [Dkt. No. 376-3]. Contour counters that

United States District Court
Northern District of California

1    GoPro's challenges go to the weight of Hu's opinions rather than their admissibility.

2              **1.**        **Practicing products**

3            GoPro asserts that Hu's opinions that Contour's products practice the claimed invention

4    are unreliable because she fails to analyze each element of the asserted claims.  Hu MTE 6-7.

5    Contour counters that Hu's report "clearly shows that the Contour products practice at least the

6    independent claims of the invention" and lays out the paragraphs in the report where Hu addresses

7    each limitation.  Oppo. Hu MTE 6-11.  The parties do not dispute that Contour will have to prove

8    that its products practice all of the elements of the claimed invention; the question is whether Hu

9    has reliably concluded that the ContourGPS, Contour+, Contour+2, and Contour 4K cameras do

10   so.

11           As part of her infringement report, Hu analyzes the four Contour products that allegedly

12   practice the patented inventions by relying on documents and deposition testimony from both

13   Contour and Ambarella and by testing the products themselves.  Hu Report [Dkt. No. 367-5] ¶¶

14   610–22.  Her report describes the ways in which she tested the products and which applications

15   she used and includes pictures of her testing.  *See id.*  Hu's report concludes that the Contour

16   cameras "appear to practice the claims of the '954 and '694 patents" and they "include critical

17   features claimed in both the '954 and '694 patents."  *Id.* ¶¶ 621, 622.

18           I agree with Contour that GoPro's challenges go to weight rather than admissibility.  While

19   GoPro criticizes Hu's statement in her deposition that she did not "analyze each and every element

20   of the asserted claims," her report describes the analysis and testing she did perform in order to

21   lead to her ultimate conclusion.  Further, Contour lays out a chart identifying where in her report

22   Hu addressed the various limitations.  If there are gaps in Hu's testimony with respect to any

23   particular limitation, then those gaps go to weight rather than admissibility.  GoPro can cross-

24   examine Hu on the basis of her opinions, and, if necessary, on Contour's characterizations.  In this

25   case, the asserted gaps in Hu's opinions do not make them unreliable such that exclusion is

26   warranted.  Critically, nor do any gaps prevent a finding in Contour's favor.  *See Centricut, LLC v.*

27   *Esab Grp., Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004) ("In many patent cases expert testimony

28   will not be necessary because the technology will be easily understandable without the need for

United States District Court
Northern District of California

United States District Court
Northern District of California

1    expert explanatory testimony.") (internal quotation marks omitted); *see also* Oppo. Hu MTE 12

2    (noting that one of GoPro's challenges is to the asserted failure to address the camera lens element

3    of the claim).

4    **2.    Copying opinions**

5        GoPro next argues that Hu's opinions regarding its alleged copying of Contour's products

6    should be excluded.  Secondary considerations such as copying are relevant facts underlying the

7    obviousness analysis.  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019)

8    ("Evidence of copying may include internal documents, direct evidence such as photos of patented

9    features or disassembly of products, or access and similarity to a patented product.").  But to be

10   "accorded substantial weight" in the analysis, the secondary considerations evidence "must have a

11   nexus to the claims, i.e., there must be a legally and factually sufficient connection between the

12   evidence and the patented invention."  *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324,

13   1332 (Fed. Cir. 2019) (internal quotation marks omitted).  A nexus is presumed "when the

14   patentee shows that the asserted objective evidence is tied to a specific product and that product

15   embodies the claimed features, and is coextensive with them."  *Polaris Indus., Inc. v. Arctic Cat,*

16   *Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (internal quotation marks omitted).  Even where a

17   presumption of nexus is inappropriate, "the patent owner is still afforded an opportunity to prove

18   nexus by showing that the evidence of secondary considerations is the direct result of the unique

19   characteristics of the claimed invention."  *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–

20   74 (Fed. Cir. 2019) (internal quotation marks omitted).

21       GoPro asserts that Contour is not entitled to a presumption of nexus and that Hu has not

22   sufficiently identified evidence that the patented features are relevant to the identified secondary

23   indicia.  As discussed above, I will not strike Hu's opinions regarding the allegedly practicing

24   products.  With respect to whether Hu's opinions can create a presumption of nexus or allow a

25   finding of nexus, GoPro's motion raises questions of fact and issues that go to weight rather than

26   admissibility.  Notably, Hu's report alone need not establish a nexus; Contour is entitled to present

27   additional evidence to tie the evidence to the patented invention.  *See Mformation Techs., Inc. v.*

28   *Research in Motion Ltd.*, No. 08-cv-04990-JW, 2012 WL 1142537, at *5 (N.D. Cal. Mar. 29,

2012) (noting that "clear Federal Circuit precedent" allowed the patentee to rely on additional evidence of nexus declining to exclude testimony where the expert had failed to establish a nexus in his report).  In light of Hu's opinions and the other evidence Contour intends to present, a jury could make a finding that the practicing products are coextensive with the asserted claims, thus creating a presumption of nexus.  GoPro can rely on the evidence cited in its motion to persuade the jury to conclude that the products are not coextensive, but its arguments do not make exclusion appropriate.  *See* Hu MTE 8-9.

### 3.   iON products

Finally, GoPro argues that Hu's opinions with respect to iON products should be excluded because of the absence of a nexus.  But again here, Contour is entitled to, and intends to, present additional evidence to establish a nexus for purposes of secondary considerations.  Accordingly, the issues raised in GoPro's motion go to weight rather than admissibility.

For all of these reasons, GoPro's motion to exclude Hu's opinions is DENIED.

### B.   Ugone

Ugone opines that at the hypothetical negotiation between the parties in November 2014, "Contour and GoPro would have agreed to a reasonable royalty payment in the range of $13.50 to $21.50 per accused camera sold by GoPro, and likely at the upper end of the range (i.e., between $19.00 and $21.50)."  Ugone Report ¶ 10.  GoPro moves to exclude Ugone's report, criticizing both his apportioned profit theory and his per-unit royalty theory of damages.

### 1.   Apportionment

"When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *see Garretson v. Clark*, 111 U.S. 120, 121 (1884).  "Under § 284, damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'"  *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (hereinafter *CSIRO*) (quoting *Ericsson*, 773 F.3d at 1226).

GoPro challenges the reliability both of Ugone's apportionment opinions, arguing that he

United States District Court
Northern District of California

improperly adopted a lay witness's opinion to reach the 80% apportionment and that he

improperly relied on a dependent claim to reach the 67% apportionment.  Further, GoPro asserts

that Ugone silently and unreliably assigned 100% of profits to Contour.

### a.    80% Apportionment

Ugone apportions 80% of the value of WiFi connectivity to the Accused Functionality.

His report indicates that he took the following series of series of steps to arrive at this conclusion[7]:

- He "conservatively apportioned out the [camera] components and limited [his] analysis to

   the value of the Accused Functionality (*i.e.*, the enabling of a live stream of the camera's

   recording and remote control of the camera via a mobile device) within Wi-Fi

   connectivity."[8]  Ugone Report ¶ 95.

- He next determined the value of wireless connectivity in the accused cameras by analyzing

   the price difference between products with and without WiFi capabilities and the gross

   profit difference between products with and without WiFi capabilities.  *Id.* ¶¶ 99–100.

- He then relied on GoPro marketing, documents, and testimony to apportion a value to the

   Accused Functionality within the broader value of WiFi connectivity.  *Id.* ¶¶ 101–03.  He

   opined that the parties would agree at the hypothetical negotiation that "the Accused

   Functionality represents the driver of demand for Wi-Fi connectivity and is the primary

   feature enabled by Wi-Fi connectivity."  *Id.* ¶ 103.

- He describes the 80% figure in the following way:  "As one apportionment negotiating

   position, based upon a discussion with Mr. James Harrison, former CEO of Contour, LLC,

   the Accused Functionality represents no less than 80% of the value of Wi-Fi connectivity.

   In fact, Mr. Harrison stated that between 2012 and 2015, streaming to the web was not

   very popular, and the value of the Accused Functionality during this time (including as of

---

[7] Contrary to Contour's suggestion, the report makes no indication that Ugone adjusted the 67% figure upward to reach 80%.  *Compare* Almeroth Report ¶ 104 (describing 80% as "one apportionment negotiation position") *with id.* ¶ 105 (describing 66.7% as "another apportionment negotiating position").

[8] He also excluded from his analysis the profit GoPro earned from selling ancillary products for use with the accused cameras.  *See* Oppo. 6.

United States District Court
Northern District of California

the date of the hypothetical negotiation) likely was higher than 80%.  As various GoPro marketing materials show GoPro's advertising specifically of the Accused Functionality rather than other features within WiFi connectivity, GoPro likely would concur with Mr. Harrison's evaluation."  *Id.* ¶ 104.

It is far from clear that Ugone reached the 80% apportionment figure independently or with adequate support.  Although he certainly engaged in his own apportionment analysis with regard to the relative importance of the Accused Functionality in the broader context of the Accused Products and the Wifi capabilities, that analysis is untethered to the 80% figure.  As GoPro points out, he calls it "Mr. Harrison's evaluation" in his report.  *Id.* ¶ 104.  At his deposition, GoPro pushed Ugone on the origin of the 80% figure.  He the 80% figure as "an input" he was using from "one of the negotiators."  Ugone Depo. 178: 8–10.  When asked whether he was offering an opinion on the proper apportionment percentage, he replied, "I am triangulating as to what a reasonable royalty would be, which I said all along is a negotiated outcome, and so I'm including in that what one of the negotiators says 80 percent.  I'm also including another analysis and I'm allowing for the fact that, you know, there can be a range in there.  It doesn't have to be, you know, a point estimate."  *Id.* at 179:7–14.  He indicated that Harrison settled on 80% because of his experience.  *See id.* at 179:19–25, 180:14–22.

Approximation is permissible; a figure without economic analysis underlying it is not.  Ugone's economic analysis is not tied to the 80% figure, which instead comes entirely from Harrison.  General opinions on the value of the Accused Functionality do not support the unreliable suggestion that GoPro would have accepted the position of Contour's CEO at a Hypothetical Negotiation.

### b.      66.7% Apportionment

GoPro next argues that Ugone improperly relies on a dependent claim to broaden the scope—and, by extension, value—of an independent claim because he assigns 1/3 of the value of WiFi connectivity to the display and playback feature from dependent claim 14.  Contour counters that Ugone properly assigns a value to the infringing features of the Accused Products, namely the Accused Functionality and the display and playback feature.

United States District Court
Northern District of California

Ugone opined that the parties would analyze three features enabled by WiFi connectivity: (a) the Accused Functionality, (b) streaming to the web, and (c) the ability to view video content on one's smartphone.  Relying on the opinions of Hu, he noted that two of three features—the Accused Functionality and the ability to view video content on a smartphone—infringed on the patented technology.  Ugone Report ¶ 105.  According to Contour, the display and playback feature is found in claim 14 of the '954 Patent.  Assigning equal value to each of the three features, he apportioned 2/3 of the value of WiFi connectivity to the patented invention.

Contour's opposition fails to meaningfully address GoPro's argument that Ugone impermissibly relies on a dependent claim to double the value of an independent claim.  *See* Oppo. 16 ("GoPro's next argument regarding the scope of dependent claims is merely attacking a strawman.").  But notably, Ugone's ultimate opinions do not stem from his conclusion that 67% of the value of WiFi connectivity is attributable to infringing features.

GoPro next argues that Ugone's opinion on the value of the "display and playback" features is tethered enough to Hu's narrow opinion with regard to unconventionality and infringement of claim 14.  Reply 5–8.  I agree.  There appears to be no dispute that certain features of "display and playback" existed in the prior art; Ugone was required to apportion his damages theory to *only* those features *within* "display and playback" that were unconventional.  Yet his apportionment of value instead discusses "display and playback" in an undifferentiated way.  As GoPro explains it, "Here, Dr. Ugone has not apportioned to the value of the patented invention— instead, he takes the full value of any form of playback and display (whether the first video file, second video file, photographs, etc.) in any system, does not remove any value of the feature not attributed to the claimed invention (e.g., value derived from editing, sharing, etc.), and uses it wholesale to calculate CIPH's damages."  Reply 6.

Finally, GoPro criticizes Ugone's report for equally splitting the value between the three features.  This opinion, too, would benefit from more analysis and support in a supplemental report.

### c.     Assignment of Profits between the Parties

Finally, GoPro argues that Ugone unreliably assigns 100% of apportioned profits to

25

United States District Court
Northern District of California

1   Contour without any analysis at all.  Contour counters that the apportionment that Ugone did

2   leading up to the ultimate figures he reached obviate the need for an assignment of profits.

3     I agree with GoPro.  Ugone concluded that the Accused Functionality represented 67-80%

4   of the value of WiFi connectivity.  From there, he was obligated to assign each party a portion of

5   the profits attributable to the infringing features based on a hypothetical negotiation between the

6   two.  Not only does Ugone perform no analysis with regard to assignment of profits, but it would

7   be unreasonable and unreliable for him to conclude that 100% of profits associated with the

8   infringing technology would go to Contour.  *See Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17-

9   cv-04709-JST, 2019 WL 4009263, at *3-4 (N.D. Cal. Aug. 5, 2019) (rejecting an expert's

10  assignment of 100% of cost savings to one side because it was "unsupportable" to assume that one

11  side would leave a hypothetical negotiation with no gain); *see also id.* at *2 ("[A]n expert may not

12  begin 'with the assumption that each party would take 50% of the incremental profits" from the

13  hypothetical license.'") (quoting *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir.

14  2014)).  Contour was the inventor, but GoPro was the maker, designer, marketer, seller, and

15  undisputed market leader; it would not have left a hypothetical negotiation with zero profits

16  derived from the infringing technology.

17    Contour's assertion that Ugone's apportionment analysis was conservative is not a

18  substitute for applying a reliable methodology to assign profits.  *See id.* at *5 (rejecting the

19  assertion that intermediate assumptions were conservative).  It is not enough that, as described

20  above, Ugone assigned profits to GoPro with respect to other features; he was obligated to split

21  profits with respect to the allegedly infringing features themselves.

22      **2.**  **Royalty Rate based on 2018 Contour-iON License**

23    GoPro challenges Ugone's reliance on the 2016 settlement license between iON and

24  GoPro in opining about the royalty rate the parties would have agreed to at a November 2014

25  hypothetical negotiation.  There is no doubt that the license is technically comparable because it

26  involved the Patents-in-Suit, but GoPro argues that it is not economically comparable because it

27  was not the result of an arms-length negotiation.  GoPro MTE 17–23.

28    Contour merged with iON in 2015.  *See* Ugone Report ¶ 28.  As part of that merger,

Contour granted iON an exclusive license for the Patents-in-Suit for a sum of $2 million. *Id.* ¶ 28(a)(iii). After iON failed to make some payments, the parties amended the license agreement and reduced the price to $1.88 million. *Id.* ¶ 28(b). When iON continued to fail to pay, the license terminated and Contour filed suit against iON alleging patent infringement, among other causes of action. *Id.* ¶ 28(c)–(d). In June 2016, Contour and iON split apart and entered into a settlement agreement including a non-exclusive license for iON to use the patented technology in exchange for 5% of the retail price of all licensed products sold. *Id.* ¶ 28(f). iON's payments were deferred for two years. iON-Contour Settlement Agreement [Dkt. No. 371-12]. Under the agreement, iON received a 49.9% interest in Contour and the right to receive up to $28 million "upon the occurrence of certain events," including related to this litigation. *See id.* iON filed for bankruptcy soon after the parties entered into the agreement. Ugone Report ¶ 28(f).

In his report, Ugone declined to rely on the 2015 merger license or amendment because they were not arms-length agreements due to Contour's ownership interest in iON. *Id.* ¶ 72. He did rely on the 2016 settlement license agreement after the two companies had split, finding that it "provides *ex-post* insights into Contour's economic mindset relating to licensing the Patents-in-Suit (in combination with the various qualitative and quantitative considerations present at the time of the hypothetical negotiation), as the Contour-iON license involved the Patents-in-Suit and had the same licensor (i.e., Contour) as would the to-be-negotiated hypothetical license agreement." *Id.*

Ugone relied on the 2016 license to reach his opinion with regard to a royalty rate resulting from the hypothetical negotiation between Contour and GoPro. He contrasted the two in a few respects, including the fact that Contour and iON had a prior relationship whereas Contour would have viewed GoPro as its major competitor. *Id.* ¶¶ 75–76; *see id.* ¶ 107. He discussed Contour's and GoPro's views on the technology at the time, GoPro's negotiating position, and the availability of non-infringing alternatives. *See id.* ¶¶ 77–88. Ugone applied the 5% royalty rate to a weighted average retail price as of the hypothetical negotiation and reached a licensing value of $19.17. *Id.* ¶ 108.

Ugone's 5% royalty rate opinion, which is based entirely on the 2016 settlement license

United States District Court
Northern District of California

agreement with no adjustments, is unreliable.  Contour and iON entered into the agreement in June 2016, a year and a half after Contour first brought claims against GoPro.  According to Ugone's definition of an arms-length negotiation in his deposition, the royalty rate was not the result of an arms-length negotiation because iON had an ownership interest in Contour (and Contour previously had an ownership interest in GoPro).  *See* Ugone Depo. 369:5–11 ("Well, you have got a willing licensor and a willing licensee. You know they're not necessarily compelled to do something that they wouldn't want to do. You know, generally I would say they don't have a financial interest in each other that might alter the outcome relative to where there was not a financial interest.").[9]  I am not persuaded by Contour's attempts to diminish the companies' mutual interest because of the relatively fewer rights iON had under the settlement agreement as compared to the 2015 merger agreement.  Contour and iON were aware at the time of the negotiation that iON intended to file for bankruptcy, and it did so a mere two weeks after the agreement was executed.  Finally, under the terms of the agreement, iON is entitled to a substantial sum of money depending on the results of this litigation.

If there is a principled basis on which to distinguish between the two licenses, Ugone does not describe or apply one.  His acceptance of the second rate with little analysis and no adjustments is unreliable in the context of his wholesale rejection of the first, which appears to have materially the same features.  Finally, GoPro challenges the reliability of Ugone's opinion because he failed to apportion, applying the 5% royalty figure to the value of the entire product rather than to the value attributable to the technology.  A supplemental report should amend or explain Ugone's opinion with respect to the apportionment of any royalty rates he presents.

### 3.     Commercial Acceptability of Non-Infringing Alternatives

GoPro argues that Ugone's opinion about the commercial acceptability of non-infringing alternatives is unreliable because he failed to cite to any market research in support of it.  GoPro MTE 23–25.  Contour counters that Ugone's expertise as a micro-economist, coupled with the other inputs he cites, make his opinion reliable.  Oppo. 23–25.

---

[9] Ugone rejected reliance on the 2015 merger license between Contour and iON because of the absence of an arms-length agreement.

1    There is no doubt that Ugone is not an expert on consumer preferences for action cameras,

2    but he testified at his deposition that as a micro economist, he looks at individual markets and

3    supply and demand and that "[t]he demand side of a market is basically the theory of consumer

4    behavior." Ugone Depo. 25:10–23. He is not a technical expert improperly wading into the world

5    of market predictions. *See Good Tech. Corp. v. Mobileiron, Inc.*, No. 12-cv-05826-PSG, 2015

6    WL 4090431, at *8 (N.D. Cal. July 5, 2015) (excluding opinions of an expert who was "more than

7    qualified technically" but lacked "experience in consumer demand related to [the] non-infringing

8    alternatives"). In addition to his market expertise, his opinion relies on the expertise of Hu, who

9    opined on technical drawbacks to consumers, along with testimony from a GoPro witness, who

10   indicated that the company had not considered alternative technologies. GoPro's challenges go to

11   weight rather than admissibility.

12                              **4.      Leave to Supplement**

13   After hearing my tentative opinion that I would strike a majority of Ugone's report,

14   Contour asked that I grant it a short window of time to supplement his opinions. I have discretion

15   to do so. *See, e.g.*, *MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*, No. 01-cv-4925

16   SBA, 2004 WL 5363616, at *7 (N.D. Cal. Mar. 2, 2004) (ordering a supplement and deferring

17   ruling on a *Daubert* challenge), *aff'd sub nom. MEMC Elec. Materials, Inc. v. Mitsubishi*

18   *Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005).

19   Trial is set to begin on December 14, 2020, which allows more than enough time for

20   GoPro to analyze and respond to a supplement. Further, the deficiencies in Ugone's report are not

21   so severe that supplementation would effectively require a new report. Accordingly, I will grant

22   Contour a short window in which to provide a supplemental report from Ugone. It shall serve a

23   supplement on or by **September 18, 2020**. GoPro may depose Ugone on the supplemental report

24   for no more than three hours within 20 days of the service of his report. If GoPro wishes to raise a

25   further *Daubert* challenge to the supplement, it may do so in the context of a motion in limine

26   prior to trial.

27   **V.      MOTIONS TO SEAL**

28   The Ninth Circuit applies a "compelling reasons" standard for sealing documents where

the "motion at issue is more than tangentially related to the underlying cause of action." *Auto Safety v. Chrysler Group*, 809 F. 3d 1092, 1099 (9th Cir. 2016).  This district's local rules require that sealing requests be "narrowly tailored to seek sealing only of sealable material."  Civ. L. R. 79-5(b).  Contour, GoPro, and third parties request sealing of various categories of information submitted with the pending motions, including:  (i) source code, (ii) information related to internal product development, (iii) patent licensing practices and strategies, (iii) confidential product information, including operating details, design, and development, (iv) sales volume and revenue information, and (v) settlement and license agreements with third parties and descriptions of the terms.

The 18 motions to seal pending before me are deficient in several ways.  As detailed below, I will grant a few limited requests, deny some with prejudice, and deny the remainders without prejudice to allow the parties another opportunity to protect genuinely confidential from public disclosure.  The parties should strictly adhere to the guidance I provide below.

First, the "declaration[s] establishing that the document sought to be filed under seal, or portions thereof, are sealable" cannot come from counsel in this case.  They must come from individuals within each respective company who know and understand the company's practices with respect to confidentiality and can competently assert the harm (competitive or otherwise) that could result from public disclosure of the information.  Only the declarations from iON CEO Giovanni Tomaselli and Ambarella General Counsel Michael Morehead come from an appropriate individual with knowledge.

Second, many of the sealing requests are overbroad.  I understand that the parties were focused on the merits of the five substantive motions resolved in this Order, but the public has a right to be able to access and understand these proceedings.  In rare circumstances are entire documents sealable.  Unless the request is related to a short document that is almost uniformly confidential information like source code or sales data, the parties should request specific redactions rather than that entire pages or entire exhibits be sealed.

Third, a confidentiality designation is not sufficient justification to meet the compelling reasons standard.  Civ. L. R. 79-5(d)(1)(A) ("Reference to a stipulation or protective order that

allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable."). There are not compelling justifications to seal broad and general information about the parties' businesses. *See* Dkt. No. 402. The parties should keep in mind the high bar that the Ninth Circuit has set to withhold information from the public's view.

The following specific information is not sealable. I will not seal information that was discussed in open court at the hearing; that includes iON's identity as Contour's licensee and the royalty rate in the iON agreements. Nor are the marking requirements that were part of those agreements sealable; I cannot imagine any reason why such information becoming public could cause harm to either party to that agreement. Second, evidence that allegedly suggests GoPro sought to disassemble Contour's products is not sealable; not only is there no declaration from GoPro establishing why such information would harm it, but that evidence is required to understand the merits of disputes that I have addressed here and that will be aired at trial.

The information that Ambarella requested be sealed through the declaration of Michael Morehead is narrowly tailored to confidential information; that request is GRANTED and Ambarella need not submit anything new. The information about iON's products, supported by the declaration of its CEO Giovanni Tomaselli, is sealable, and iON need not submit anything new.

Any renewed motion from Contour and GoPro shall be jointly filed within 30 days. In it, the parties should explicitly list docket entries that they no longer seek to maintain under seal. Further, they should explicitly list any docket entries that should be unsealed in their entirety as a result of the guidance I have provided in this Order. There is no need to resubmit the briefs or exhibits themselves until I have reviewed the narrowed requests. The parties should take note of the fact that I have—intentionally—redacted very little information in this Order. Each side should submit a single omnibus declaration from a knowledgeable party. Finally, the parties should jointly submit a proposed order, both in the docket and in Word form in accordance with my Standing Order. The proposed order shall include a table with columns laying out (i) the docket entry of the request, (ii) the specific redactions requested, (iii) the party that originally

31

1   submitted the document, (iv) the subject matter of the sealing request, (v) a citation to the

2   declaration providing compelling reasons for the request.  It should also list all of the docket

3   entries that can be unsealed as described above along with all of the docket entries that require

4   resubmission with only approved redactions.

### CONCLUSION

6   Accordingly, Contour's motion for partial summary judgment is GRANTED IN PART and

7   DENIED IN PART.  GoPro's motion for partial summary judgment is GRANTED.  Contour's

8   motion to strike the opinions of Almeroth and Kennedy is DENIED.  GoPro's motion to strike the

9   opinions of Hu is DENIED.  GoPro's motion to strike the opinions of Ugone is GRANTED IN

10  PART and DENIED IN PART.  Contour shall provide GoPro with any supplemental report on or

11  by **September 18, 2020,** and GoPro may depose Ugone for no more than three hours within 20

12  days of service of the report.  The motions to seal are resolved as set forth above.

13  **IT IS SO ORDERED.**

14  Dated: August 31, 2020



William H. Orrick
United States District Judge