Sean S. Pak (Bar No. 219032)
*seanpak@quinnemanuel.com*
Michelle Ann Clark (Bar No. 243777)
*michelleclark@quinnemanuel.com*
Jordan Jaffe (Bar No. 254886)
*jordanjaffe@quinnemanuel.com*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for Defendant
GOPRO, INC.,

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONTOUR IP HOLDING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOPRO, INC.,<br><br>Defendant. | LEAD CASE NO. 3:17-CV-04738-WHO<br>CONSOL. CASE NO. 3:21-CV-02143-WHO<br><br>**DEFENDANT GOPRO, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON SECTION 101, AND MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:  William H. Orrick<br>Date:  August 4, 2021<br>Time:  2:00 PM<br>Location:  Courtroom 2, 17th Floor |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that Defendant GoPro, Inc. ("GoPro") moves this Court for judgment on the pleadings because the asserted claims of U.S. Patent Nos. 8,890,954 and 8,896,694 recite patent-ineligible subject matter under 35 U.S.C. § 101.  GoPro's motion shall be heard on August 4, 2021 or as soon as this Court deems appropriate, in Courtroom 2, 17th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, California 94102.

GoPro's Motion is made pursuant to Federal Rule of Civil Procedure 12 on the ground that the asserted claims encompass unpatentable subject matter under 35 U.S.C. § 101, and thus CIPH's claims in Consolidated Case Nos. 3:17-cv-04738-WHO (Lead Case) and 3:21-CV-02143-WHO should be dismissed.  This Motion is based upon this Notice of Motion, supporting Memorandum of Points and Authorities, and all declarations and exhibits attached thereto; all pleadings and papers on file in this action, such other evidence or arguments as may be presented to the Court, and such other matters of which this Court may take judicial notice.

DATED: June 30, 2021                          QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                                      By */s/ Michelle A. Clark*

                                                      Attorneys for Defendant GoPro, Inc.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................2

    A.     This Action And The Asserted Claims .....................................................2

    B.     CIPH's Description Of Its Claimed Invention In *CIPH I* ........................4

    C.     CIPH's New Complaint Expands Its Claims To Reach Any Video Camera Processor ................................................................................................7

III.   LEGAL STANDARD ..........................................................................................8

    A.     Section 101 ...............................................................................................8

    B.     Federal Rule of Civil Procedure 12(c) .....................................................9

IV.    ARGUMENT ........................................................................................................9

    A.     The Asserted Claims Fail *Alice* Step 1 As A Matter of law.....................9

        1.     The Asserted Claims are Directed to the Abstract Idea of Viewing And Recording Video Data ..............................................................9

        2.     CIPH'S Counterarguments Lack Merit, and Instead Provide Further Evidence in Support of Invalidity .................................................14

    B.     The Asserted Claims Fail *Alice* Step 2 .................................................16

V.     CONCLUSION ..................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) .................................................................................. 8

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
  838 F.3d 1266 (Fed. Cir. 2016) ................................................................................ 11

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) .......................................................................... 14, 18

*Alice Corp. Pty. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) .................................................................................................. 8

*Alvarez v. MTC Fin. Inc.*,
  No. 3:16-CV-06428-WHO, 2017 WL 3086060 (N.D. Cal. July 20, 2017) ...................... 9

*Am. Title Ins. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ...................................................................................... 9

*Brewer v. New United Mfg. Inc.*,
  No. C-93-3861 WHO, 1994 WL 10020 (N.D. Cal. Jan. 5, 1994) ...................................... 9

*BSG Tech. LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ................................................................................ 16

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019) ................................................................................ 16

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) .................................................................................. 18

*Cisco Sys., Inc. v. Uniloc, 2017 LLC*,
  No. 2019-2048, 2020 WL 2465483 (Fed. Cir. May 13, 2020) ...................................... 15

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) .......................................................................... 13, 18

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
  558 Fed. Appx. 988 (Fed. Cir. 2014) ........................................................................ 13

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) .................................................................. 11, 13, 17

*FullView, Inc. v. Polycom, Inc.*,
  485 F. Supp. 3d 1156 (N.D. Cal. 2020) ................................................................ 8, 12

*In re TLI Commc'ns LLC Pat. Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) .......................................................................... 10, 11

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) ............................................................................ 11, 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ......................................................................................................... 16

*NetFuel, Inc. v. Cisco Sys. Inc.*,
    No. 5:18-CV-02352-EJD, 2018 WL 4510737 (N.D. Cal. Sept. 18, 2018) ......................... 7

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ..................................................................................... 14

*Peviani v. Hostess Brands, Inc.*,
    750 F. Supp. 2d 1111 (C.D. Cal. 2010) ............................................................................ 5

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ..................................................................................... 14

*Thunder Power New Energy Vehicle Dev. Co. Ltd. v. Byton N. Am. Corp.*,
    340 F. Supp. 3d 922 (N.D. Cal. 2018) .............................................................................. 9

*Twilio, Inc. v. Telesign Corp.*,
    249 F. Supp. 3d 1123 (N.D. Cal. 2017) .......................................................................... 18

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ..................................................................................... 13

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018) ....................................................................................... 8

*Youtoo Techs. LLC v. Twitter Inc.*,
    No. 3:16-cv-00764, 2016 WL 7118922 (N.D. Tex. Nov. 10, 2016) ................................. 13

*Yu v. Apple Inc.*,
    No. 2020-1760, 2021 WL 2385520 (Fed. Cir. June 11, 2021) .............................. 11, 12, 15

**Rules/Statutes**

35 U.S.C. § 101 ........................................................................................................................ 8

Fed. R. Civ. P. 12(c) ................................................................................................................ 9

Fed. R. Evid. 201(b) ................................................................................................................ 9

**Other Authorities**

U.S. Patent No. 8,890,954 ...................................................................................................... 17

## I.    **INTRODUCTION**

On June 15, Contour IP Holdings LLC ("CIPH") filed a motion to strike GoPro's inequitable conduct defense on the exclusive premise that everything CIPH received from Ambarella is "publicly available prior art."  *CIPH II* Dkt. 20 at 2.  Taking that premise as true supports the indelible conclusion that CIPH's patents are invalid under 35 U.S.C. § 101.

The culmination of CIPH's over-reaching litigation theories is that, today, under CIPH's interpretation of the claims, they are directed to the abstract idea of a conventional camera processor used in its known and intended manner (*i.e.*, in a camera).  First, CIPH prevailed at claim construction on the position that the "generate" term imposes no temporal limitation on the first and second image data streams.  *CIPH I* Dkt. 251 at 9-13.  Then, CIPH successfully argued at the summary judgment stage that the claims impose no limitations on the manner in which image sensor data is processed by the camera, including any down-sampling or image alteration.  *CIPH I* Dkt. 444.  Finally, when CIPH filed its Complaint in *CIPH II* it went even further and argued that the claims do not require a personal portable computing device that generates the identified control signals – that is, they only read on the camera processor, which CIPH also contends is prior art.  *CIPH II* Dkts. 1, 20.  Stepping through each of these arguments, it is clear that under CIPH's interpretation of the claims, they are directed to nothing more than a conventional camera processor combined in a known manner with generic components like a lens, image sensor, and wireless processor – none of which CIPH invented.  Taking the Court's claim construction, summary judgment ruling, and CIPH's admission that the Ambarella camera processor is conventional prior art together, GoPro respectfully submits that the patent claims cannot be valid.

The asserted claims fail both steps of Supreme Court's two-step *Alice* framework for assessing patentability under § 101.  For Step 1, CIPH's asserted claims are directed to the abstract idea of viewing and recording a video.  In its Complaint, CIPH characterizes its claimed invention as the ability "to both record the high-quality video and, in parallel, generate a lower quality video that could be transmitted wirelessly in real time."  *CIPH II* Dkt. 1 ¶ 15.  But according to CIPH's Motion to Strike, that element can be met by conventional camera processors CIPH admits were commercially available for years before the priority date of its patents.  The ability to perform

known camera functionality with generic components, such as conventional camera processors, image sensors, lens, etc. is an abstract idea that courts have held to be unpatentable in analogous cases.

Under Step 2, the claims do not contain any inventive concept that saves their patentability.  The asserted claims contain no more than generic elements (*e.g.*, a lens, camera, processor and memory) used in their conventional manner to perform the claimed abstract idea. *CIPH II* Dkt. 1 ¶ 14. The entire predicate of CIPH's co-pending motion to strike is that the Ambarella processor and its constituent functionalities were well-known, public prior art. Therefore, the camera processor limitations that CIPH contends are met by the Ambarella chip cannot possibly be the "inventive concept" that salvages the claims' patentability.  And CIPH has never argued that ***any*** of the other limitations in its claims are inventive.  To the contrary, CIPH has affirmatively pleaded that there ***are no other*** meaningful limitations on the claims, since CIPH contends the "wherein" clauses requiring a personal portable computing device that generates certain types of control signals are non-binding.  *Id.* ¶¶ 14-15.  Thus, all that is left of CIPH's claims are generic camera components.  Even considered as an ordered combination, the asserted claims again present no more than conventional hardware and software performing the recited abstract idea.   This arrangement is insufficient to create an "inventive step" as required under Step 2.

All of CIPH's claims for infringement of the asserted patents in both *CIPH I* and *CIPH II* should be dismissed.

## II.      FACTUAL BACKGROUND

### A.      This Action And The Asserted Claims

On March 26, 2021, CIPH filed a follow-on suit, *Contour IP Holdings, LLC v. GoPro, Inc.*, Case No. 3:21-cv-02143 ("*CIPH II*"), in order to accuse newer GoPro products that CIPH had chosen not to add to its already-pending suit against GoPro, *Contour IP Holdings, LLC v. GoPro, Inc.*, Case No. 3:17-cv-04738-WHO (N.D. Cal.) ("*CIPH I*"), at the appropriate time.  *See CIPH II* Dkt. 18.  The cases have been consolidated.  *Id.*  In both actions, CIPH asserts that GoPro infringes certain claims of U.S. Patent Nos. 8,890,954 and 8,896,694.  The '694 is a continuation

of the '954 patent, such that the patent specifications are substantively identical.[1]   Both claim priority to a provisional application filed in Sept. 2010.   Claim 11 of the '954 patent is representative of CIPH's asserted claims for purposes of this motion:[2]

>   11. A portable, point of view digital video camera, comprising:
>
>   a lens;
>
>   an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene;
>
>   a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and
>
>   a camera processor configured to:
>
>   receive the video image data directly or indirectly from the image sensor,
>
>   generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream,
>
>   cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization,

---

[1] For brevity, this motion cites to the '954 specification only, though analogous cites are present in the '694 patent.

[2] All the asserted claims are directed to the same abstract idea described *infra*.  The other claims are similarly directed to the abstract idea with no additions material for patentability under Section 101.  CIPH asserts that Claim 11 is representative of its claimed invention in its Complaint and in its complaint in *CIPH I*.  CIPH's technical expert, Dr. Hu, herself treats claim 11 of the '954 patent as representative in her Section 101 analysis.  *CIPH I* Dkt. 487-7 (Hu Rebuttal Rpt.) ¶ 401 ("*See* '954 claim 11; *see also* all other asserted claims (reciting similar limitations and, for the '694 claims, additionally reciting 'a mounting interface' and 'mount').").   The addition of "mounts" for the '694 claims is not material for Section 101, as this is a well-known and generic feature long known before the claimed invention.  *See, e.g., id.* ¶ 97 (noting Contour's camera sold years before the alleged priority date was "mountable" and alleging how to control "mountable" cameras was a problem in the prior art to the invention).  Neither Dr. Hu nor CIPH have identified any dependent claim or different claim limitations apart from claim 11 as relevant to patentability under Section 101.

remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting,

receive the control signals from the personal portable computing device, and

adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device.

**B.      CIPH's Description Of Its Claimed Invention In *CIPH I***

In *CIPH I*, CIPH described its claimed invention as the ability to record video at a higher resolution while streaming a "wireless preview" of that video at a lower resolution and allowing the user to wirelessly adjust camera settings while viewing the preview.  For example, at the technology tutorial in that case, CIPH's counsel described the idea as follows:

> So the Contour's inventors' [*sic*] idea was to generate two streams of video. One would go to the memory and be recorded, one would go to the phone or the wireless handset device; and the phone or wireless device would be able to adjust one or more of the camera settings while you're looking at what's being recorded.

*CIPH I* Dkt. 243 at 7:12-17.  CIPH has also emphasized the combination of the ability to stream and record in two different qualities with the ability to modify certain camera settings.  *See id.* at 8:8-9 ("The patents that we're talking about, the claims relate to the wireless preview and control of the video streams."), 8:17-19 ("But this patent is directed just to those wireless preview features and some of the mounting features."), 9:12-14 ("So that was one of the things the inventors came up with. We could stream a low resolution video to the remote device, but record the high resolution video."), 10:18-21 ("the prior art could only play back the pre-recorded video or stream without recording.  ***The patented invention can stream the current video <u>while</u> recording and allow control***.").

During claim construction in *CIPH I*, the Court recognized that the patents only briefly mention this alleged invention once in the specification.  Dkt. 251 at 12 ("The specification only discusses the high and low resolution formats once, in the context of recording rather than generating video image content." (citing '954 patent at 20:7-16; '694 patent at 20:9-18)).  That portion of the specification states:

> Alternative implementations of a remote viewer include one or more
> of reduced resolution or frame rate, file sectioning, frame sampling,

> and Wi-Fi to media server. Reduced resolution or frame rate entails recording video in two formats, high quality and low quality, in which the lower quality file is streamed or played back after the recorded action has taken place.  For streaming implementation, wireless connection bandwidth can be monitored to adapt to the available bandwidth the resolution, bit rate, and frame rate on the secondary recording.

'954 patent at 20:7-16.  The specification contains no disclosure of any particular hardware, software or image processing algorithms.  Rather, the patent only discusses "recording video in two formats" for the functional purpose of generating two videos of different qualities—a feature that CIPH admits was derived from known Ambarella prior art products.  *See, e.g.*, *CIPH II* Dkt. 20 at 1 (admitting that "Ambarella provided a ***commercially available prior art product*** to Contour").

Based on the intrinsic record, the Court concluded that the "generating" elements in each of the asserted claims require "record[ing] in parallel" a first and second video image data / video content of different image qualities.  *CIPH I* Dkt. 251 at 9-13.  That is, the Court found that in this context, the term "generate" is synonymous with "record" and, further, because of positions taken by CIPH to distinguish prior art raised during prosecution, the claims require "recording the two formats in parallel, but not necessarily at the same time."  *Id*. at 12-13.  During claim construction, the Court did not further define the phrase "in parallel" or the manner in which it limits the claims, if at all.

Thereafter, the meaning of "in parallel" became the subject of substantial dispute and briefing by the parties.  On one hand, CIPH's technical expert argued that the "in parallel" requirement was a key distinguishing feature that salvaged the patentability of the claims from attack pursuant to Section 101.  *See, e.g.*, *CHIP I* Dkt. 487-7 (Hu Rebuttal Rpt.) ¶ 402 ("In light of this claim language, as construed by the Court (*e.g.* that the generation of the two video streams is done 'in parallel'),[3] a POSITA would understand that the claims recite a specific implementation

---

[3]   The Court may take judicial notice of matters in the litigation record.  *Peviani v. Hostess Brands, Inc*., 750 F. Supp. 2d 1111, 1116 (C.D. Cal. 2010) ("may take judicial notice of matters of public record, including duly recorded documents, and court records available to the public through the Pacer system via the internet.").  Moreover, GoPro does not rely on CIPH's expert (footnote continued)

(*i.e.* generating multiple different streams in parallel) of an existing tool (*i.e.*, action cameras) that improves the functioning of the overall technological process of aligning the camera shot and controlling the proper camera settings for a video recording.").  But on the other, in its motion for summary judgment of infringement, CIPH took the position that the generate term imposes ***no*** limitation on the manner in which video image data is processed.  *See, e.g.*, *CIPH I* Dkts. 376-3; 413-3 at 3 ("The '954 patent does not describe any limitations on whether or how the image sensor data is processed before encoding the two video streams."); *see also id.* at 4 ("As explained in Contour's motion, the mere fact that the image sensor data is processed is not inconsistent with any claim limitation.").  The Court ultimately agreed with CIPH and held "***Claim 11 says nothing about processing or alteration***" of the video image data.  *CIPH I* Dkt. 444 at 8.[4]  Thus, the Court adopted CIPH's interpretation of its claims as reading on any camera processor that creates two image data streams of two different qualities—regardless of the number or nature of intermediate software processing steps, hardware buffers, or transformative modalities applied to the video image data.

---

reports for anything more than context as the ultimate claim scope and patentabiliy are issues of law that can be decided without extrinsic evidence.

[4]  In a footnote to its Order, the Court *sua sponte* raised a potential argument ***never proffered*** by CIPH in its motion for summary judgment.  The Court suggested that the term "in parallel" may mean that the two video contents / image data streams must be created without first storing the image data.  *CIPH I* Dkts. 444 at 8; 510 at 13.  Notably, the terms "store" and "storage" never appear anywhere in CIPH's briefing—thus foreclosing GoPro from having a meaningful opportunity to argue this potential distinguishing feature.  In motions *in limine*, GoPro pointed out that CIPH's summary judgment motion and the Court's order preclude CIPH from arguing a contrary construction that relied on any processing (which would, of course, include buffering in storage) to distinguish the prior art.  *See CIPH I* Dkt. 474 at 17-20.  The Court found that the briefing was insufficient to make a final determination at the motion *in limine* stage on this issue.  *CIPH I* Dkt. 510 at 13.  But the fact remains that if GoPro's image processing pipeline—which relies on multiple storage and processing steps before the preview video of lower resolution is derived from the higher resolution video image data—meets the claim limitations, then those substantively similar storage and processing hardware and software elements cannot be used to distinguish prior art or lend meaning to the claims.

1

2

      **C.**      **CIPH's New Complaint Expands Its Claims To Reach Any Video Camera Processor**

3

In CIPH's new Complaint, CIPH seeks to expand its claim scope even further.  To reach

4

GoPro camera products that CIPH intentionally excluded from *CIPH I*, CIPH adopts an even more

expansive view of its claims that underscores their abstractness:

5

6

    ***First***, CIPH reverses its prior position that the claims require "***stream[ing] the current***

7

***video while recording"*** (*CIPH I* Dkt. 243 at 10) to argue that there is no temporal relationship at

8

all required by the claims.  CIPH accuses GoPro's HERO9 camera, which ***cannot*** generate a

wireless preview while recording, of infringing the Asserted Claims.  *CIPH II* Dkt. 1-8

9

(Infringement Contentions for HERO9 Black) at 27-36.

10

    ***Second***, CIPH argues that any camera processor capable of receiving control signals—

11

whether such control signals are technically feasible or ever generated—infringes.  *See CIPH II*

12

Dkt. 1 ¶ 69.  In other words, CIPH contends that the claims do not require a personal portable

13

computing device capable of generating the enumerated control signals ***at all***.  *CIPH I* Dkt. 529 at

14

10, 14.  CIPH took this position in response to modifications GoPro made to the WSDK code that

15

interfaces between the GoPro App and GoPro cameras – precluding them from generating any of

16

the lighting, color, or audio signals disclosed in the claims.  *Id*.  In an effort to claim post-design

17

around damages, CIPH now argues that the claims do not require a personal portable computing

18

device at all and can be met by the camera alone.

19

    ***Third***, CIPH now argues that the camera processor limitations are not novel or inventive,

20

but are simply part of the prior art in order to evade GoPro's inventorship and inequitable conduct

21

defenses (because, as CIPH readily admits, Ambarella—not CIPH—invented the camera

22

processor that CIPH used and represented to the PTO embody its claims).  *See, e.g.*, *CIPH II* Dkt.

23

20 at 1; *id.* at 7-9 ("contribution by Ambarella was in the prior art"); Ex. A (Prosecution History)

24

at July 23, 2014 IDS; Ex. B (Prosecution History) at July 10, 2014 '954 Applicant Interview

25

Summary) ("Applicant brief[ly] pointed out the unique features of the invention.  According to

26

applicant claimed camera in the instant application performs some ***unique image processing*** and

27

also stores the high quality video image.  Examiner concluded that if ***these features are***

28

1  *incorporated in the claim, then it would overcome prior art* references, curry.") (emphasis

2  added).[5]

3      In sum, CIPH reads out every claim element on the camera processor—save those that its

4  own experts and counsel have admitted are conventional (such as the lens and image sensor).

5  CIPH did not invent and is not entitled to claim a monopoly over video cameras using

6  conventional, well known, and widely commercially available camera processors capable of

7  wirelessly streaming video.  Its claims should be held unpatentable as a matter of law.

8  **III.   LEGAL STANDARD**

9      **A.   Section 101**

10      An invention is patentable if it is a "new and useful process, machine, manufacture, or

11  composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101.  However,

12  the Supreme Court has "long held that this provision contains an important implicit exception:

13  Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v.*

14  *CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  *Alice* endorsed a two-step analysis for determining

15  whether patent claims fall within a patent-ineligible exceptions.  The first step is to "determine

16  whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*. at 217.  "If

17  so, we then ask, '[w]hat else is there in the claims before us?'" *Id*.  If the claims are directed to a

18  patent-ineligible concept under step one, the analysis proceeds to the step two. The Supreme Court

19  has "described step two of this analysis as a search for an 'inventive concept'—*i.e.*, an element or

20  combination of elements that is sufficient to ensure that the patent in practice amounts to

21  significantly more than a patent upon the [ineligible concept] itself." *Id*. at 217-18 (brackets in

22  original, quotations omitted).

23      "Patent eligibility can be determined at the Rule 12(b)(6) stage 'when there are no factual

24  allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'"

25  *FullView, Inc. v. Polycom, Inc.*, 485 F. Supp. 3d 1156, 1160 (N.D. Cal. 2020) (quoting *Voter*

26

27       [5]  The Court may take judicial notice of the prosecution history.  *NetFuel, Inc. v. Cisco Sys.*

28  *Inc.*, No. 5:18-CV-02352-EJD, 2018 WL 4510737, at *2, n.1 (N.D. Cal. Sept. 18, 2018).

*Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 813 (2019)); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)).  "Evaluation of a patent claim's subject matter eligibility under 35 U.S.C. § 101 can proceed even before a formal claim construction."  *Id.*

## B.    Federal Rule of Civil Procedure 12(c)

Under Rule 12(c), after "the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) utilizes the same standard as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)."  *Alvarez v. MTC Fin. Inc.*, No. 3:16-CV-06428-WHO, 2017 WL 3086060, at *2 (N.D. Cal. July 20, 2017).

In deciding a motion for judgment on the pleadings, the Court may consider the pleading itself, material incorporated by reference therein, and those facts for which judicial notice is appropriate.  Fed. R. Evid. 201(b).  The Court may also, at its direction, consider judicial admissions and statements made to the Court by the parties.  *See Am. Title Ins. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).  If the Court finds that a motion for judgment on the pleadings based on § 101 requires consideration of a broader universe of evidence, it may, at its discretion, convert the emotion into one pursuant to Federal Rule of Civil Procedure 56.  *Brewer v. New United Mfg. Inc.*, No. C-93-3861 WHO, 1994 WL 10020, at *1 (N.D. Cal. Jan. 5, 1994) (Orrick, J.).

## IV.    ARGUMENT

### A.    The Asserted Claims Fail *Alice* Step 1 As A Matter of law

#### 1.    The Asserted Claims are Directed to the Abstract Idea of Viewing And Recording Video Data

The asserted claims comprise several well-known and conventional elements—a lens, an image sensor, a camera processor, and a wireless protocol device – that CIPH admits it did not invent.  *See, e.g.*, *CIPH II* Dkt. 20, *passim*.  These generic elements are used to perform an abstract idea—*i.e.* viewing recorded video data at varying image qualities and allowing for some user-

modification of the camera settings.  CIPH itself described the claims as directed to this abstract idea.  *See CIPH I* Dkt. 243 at 7:12-17 ("So the Contour's inventors' idea was to generate two streams of video"); *Thunder Power New Energy Vehicle Dev. Co. Ltd. v. Byton N. Am. Corp.*, 340 F. Supp. 3d 922, 926 (N.D. Cal. 2018), *aff'd* 777 Fed. App'x 517 (Fed. Cir. 2019) (granting motion to dismiss under § 101 "based on [plaintiff's] own descriptions of the patent").

A multitude of cases from the Federal Circuit and this District have held that analogous claims directed to "recording and administering digital image" data are abstract.  *See, e.g.*, *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016).  For example, in *TLI Communications*, the Federal Circuit considered a patent that "'relates generally to an apparatus for recording of a digital image, communicating the digital image from the recording device to a storage device, and to administering the digital image in the storage device."  *Id.* at 609.  The Federal Circuit found the claims "drawn to the concept of classifying an image and storing the image based on its classification."  *Id.* at 611.  In reaching its conclusion, the Federal Circuit found that the "concrete, tangible components" of the claim "merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner" rather than reciting a "specific improvement" over their conventional activity.  *Id.* Absent was any disclosure of "technical details" for improving the tangible components of a digital camera or server.  *Id.*

Here too, CIPH's Patents are devoid of any description in the specification or claims for making a "new" camera or other hardware.  Nor could there be—as CIPH describes its invention as embodied by commercially-available camera components that it purchased off-the-shelf and used in their intended, conventional way.  *See, e.g.*, *CIPH II* Dkt. 1 ¶¶ 13-15; Dkt. 20 at 1, 7-9.  As in *TLI Communications*, the Patents-in-Suit "predominantly describe[] the [claimed] system in purely functional terms" based on what they perform (*e.g.*, generating video image data streams) and not **how** those functions are performed.  *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d at 612.  Indeed, CIPH has actively disclaimed any limitations drawn to particular hardware or software processing features.  *See CIPH I* Dkt. 376-3 at 9-17; Dkt. 444.  "Put differently," the camera processor itself is "merely a conduit for the abstract of idea" of recording and storing image data.

*TLI Commc'ns*, 823 F.3d at 612.  The functions are "described in vague terms without any meaningful limitations," as illustrated by CIPH's ever-expanding interpretation of its claims' scope.  *Id.*  And the resulting "focus of the patentee and of the claims" is not of a tangible improvement to the hardware, but of the performative characteristics of the conventional elements of the claims.  *Id.* at 613.

The "essentially result-focused, functional character of claim language" amply establishes that the asserted claims do not propose a specific solution to a technical problem.  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016).  Under CIPH's interpretation of the Patents-in-Suit, there is no limitation as to how the claimed invention achieves the desired result (of streaming video), and this wide-open space leaves room for "a claim that emcompasse[s] all solutions for achieving a desired result."  *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018).  The "purely functional nature of the claim confirms it is directed to an abstract idea, not to a concrete embodiment of that idea."  *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

*Yu v. Apple et al.* is instructive.  The patent at issue there claimed "an improved digital camera comprising: a first and second image sensor . . . two lens, said first image sensor producing a first image and said second image sensor producing a second image . . . and a digital image processor . . . producing a resultant digital image from said first digital image enhanced with said second digital image."  *Yu v. Apple Inc.*, No. 2020-1760, 2021 WL 2385520, at *1 (Fed. Cir. June 11, 2021).  The district court found, and the Federal Circuit agreed, that the claim was "directed to the abstract idea of taking two pictures (which may be at different exposures) and using one picture to enhance the other in some way."  *Id.* at *2.  The *Yu* claims are closely analogous to the asserted claims—they both are "directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery," reciting generic camera components and unspecified image processing to produce the abstract result.  *Id.*  Indeed, the hardware components recited in the Asserted Claims are nearly identical to those that the *Yu* Court deemed to be "conventional" and "perform[ing] only their basic functions":  image sensors, lenses, and a digital

image processor. *Id.* As in *Yu*, what is "claimed is simply a generic environment in which to carry out the abstract idea." *Id.*

CIPH does not identify any "specific means or method that improves the relevant technology" for using these components. *Yu*, 2021 WL 2385520, at *2. As discussed above, CIPH disclaimed any specificity as to how the two streams are generated (because the means and method to do this were provided by Ambarella). *See, e.g.*, *CIPH II* Dkt. 20 at 1. In *CIPH II*, CIPH has also now disclaimed any specificity to the claims in the implementation of the abstract idea of "a personal device that can allow the user to change settings of the camera and/or adjust the angle of the camera based on the preview." *CIPH II* Dkt. 1 ¶ 14. Indeed, now CIPH contends that the personal device does not have to send control signals ***at all***, nor does the camera have to be configured to receive them in order to infringe, because CIPH wishes to capture GoPro's application and camera products that do not send and receive the claimed control signals. *Id.* ¶ 69. CIPH seeks to rely only on the "functionality of the processors on the" Accused Products (*CIPH II* Dkt. 1 ¶ 69), but CIPH has admitted that the processor for its purported invention was an off-the-shelf prior art product provided by Ambarella and, for purposes of its motion to dismiss, disclaimed any inventive contribution of that processor. *See, e.g.*, *CIPH II* Dkt. 20 at 1. Moreover, even before the expansion of its alleged claim scope in *CIPH II*, CIPH has never identified any specific implementation or limitations that could direct the claims to anything other than the abstract idea of remotely controlling a camera from a personal device. *See CIPH I* Dkt. 487-7 (Hu Rebuttal Rpt.) ¶¶ 400-402. Instead, as in *Yu*, CIPH's asserted claims provide at most "a generic solution" directed at an abstract idea. *Yu*, 2021 WL 2385520, at *2.

Similarly, in *FullView, Inc. v. Polycom, Inc.,* the Court rejected claims directed to "an omni-directional or panoramic viewer" that disclosed the combination of several cameras that could, together, generate a composite view that would allow the user to look at the mage "in any direction." 485 F. Supp. 3d at 1158. The Court granted Polycom's motion to dismiss on the basis that the claims "are not directed at patent-eligible subject matter delineated in 35 U.S.C. section 101." *Id.* at 1160. The Court found that the concept of merging or directing image data to form a user-discernible image, which can then be adjusted by the user, is something that "humans have

1    been creating in their visual cortex since the dawn of humanity." *Id*. at 1163.  If anything, CIPH's

2    patent claims which portend to cover the idea of allowing a user to view video data and then make

3    adjustments to it is an even more basic concept than the composite image creation disclosed in

4    *Full View*.

5         In another case involving video technology, the district court invalidated claims directed to

6    "receiving and distributing user-generated video content for distribution on television broadcasts

7    and the internet." *Youtoo Techs. LLC v. Twitter Inc.*, No. 3:16-cv-00764, 2016 WL 7118922, at *1

8    (N.D. Tex. Nov. 10, 2016).  Even though the claim described "receiving video data, limited to a

9    certain length and frame rate, from a camera, operated by a user, transcoding the video data, and

10   transferring the video data for distribution" the district court found it similar to claims directed

11   toward gathering, processing, and outputting information and therefore abstract.  *Id.* at *2 (citing

12   *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347

13   (Fed. Cir. 2014)); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 Fed. Appx. 988, 992

14   (Fed. Cir. 2014).

15        The same is true of the asserted claims—at bottom they are directed to no more than the

16   gathering, processing, and outputting of information.   The asserted claims recite functional results

17   of "generating," "receiving" and "causing," but do not sufficiently claim ***how*** to achieve these

18   results in a non-abstract way, particularly under CIPH's latest overbroad infringement contentions.

19   *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017),

20   *cert denied*, 139 S.Ct. 378 (2018) (finding "functional results of 'converting,' 'routing,'

21   'controlling,' 'monitoring,' and 'accumulating records,'" of digital information do "not

22   sufficiently describe how to achieve these results in a non-abstract way").   Because the asserted

23   claims do not provide how the desired functional result is achieved, they are directed to an abstract

24   idea.  *Elec. Power Grp*, 830 F.3d at 1355 ("Inquiry therefore must turn to any requirements for

25   how the desired result is achieved.").  Like in *Electric Power*, the asserted claims' invocation of

26   generic components operating in a conventional manner does not transform the claimed subject

27   matter into patent-eligible invention.  *Id.*

28

CIPH seeks to monopolize the broad result of viewing and recording videos while using a processor that potentially could receive instructions to change settings—without disclosing any specific new technology to achieve that.   The claims do not recite any specific software or hardware for implementing the "key elements" of the claims, let alone any specific image-processing software algorithms.   The asserted claims thus are devoid of any patent-eligible improvement to technology and fail to achieve "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."   *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018), *cert denied*, 139 S.Ct. 2747 (2019).

   2. <u>CIPH'S Counterarguments Lack Merit, and Instead Provide Further Evidence in Support of Invalidity</u>

The *CIPH II* Complaint only underscores the abstractness of the asserted claims.   CIPH alleges that the "'954 and '694 Patents are . . . improvements to existing camera processing and computer technology" because "some claims recite a specific solution for generating a second preview stream that can be wirelessly transmitted to a personal device that can allow the user to change settings of the camera and/or adjust the angle of the camera based on the preview."   *CIPH II* Dkt. 1 ¶ 14.   However, wanting to know what a camera will view before recording is a universal challenge for any video camera.   CIPH's claims address nothing more than well-understood, routine, conventional activities in the video technology space in a generic digital camera environment, which does not render the claim patentable.   *See, e.g.*, *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir.), *cert denied*, 577 U.S. 1050 (2015).

CIPH does not identify what "specific solution" to the alleged problem is proffered by its Patents and, to the contrary, has expressly eschewed any limits on the manner in which the "preview stream" is created or transmitted.   *See, e.g.*, *CIPH I* Dkt. 376-3 at 6 ("not a requirement of the claims that the streams generated 'in parallel' must also be also generated at the same time"); *id.* at 13 (disputing that claims "require '*generating directly* from the video image data' or some other direct relationship to the video image data") (original emphasis); *id.* at 16 fn. 7 (no "requirement regarding whether individual frames of a video stream must be generated 'in parallel'" and no "particular serial or parallel relationship with respect to storing video to a

1   memory card"); *Interval Licensing LLC*, 896 F.3d at 1343 (requiring a "concrete solution" with

2   sufficient specificity to "transform a claim from one claiming only a result to one claiming a way

3   of achieving it"); *see also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258

4   (Fed. Cir. 2016); *Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 Fed. App'x 495, 497-98 (Fed. Cir.

5   2020).

6         CIPH's suggestion that its inventions "allow[] the user to change settings of the camera

7   and/or adjust the angle of the camera based on the preview" express the functional purpose of the

8   claims, which are not limited in any way by the claim limitations themselves.  Indeed, according

9   to CIPH, the claims do not require that there be ***any*** technological means for changing settings

10  remotely or adjusting the angle of the camera required to meet these limitations.  *See CIPH II* Dkt.

11  1 ¶ 69.  A camera system whereby the user manually modified the angle of the camera or changed

12  settings with a remote control that had no preview image at all could, under CIPH's articulated

13  infringement theory, meet the claim limitations.  Indeed, CIPH actually accuses such a system of

14  infringement; HERO9 does ***not*** provide a preview image to the user while recording nor is the

15  GoPro App capable of generating any of the enumerated control signals.  Yet, by CIPH's theory,

16  the camera processor alone is sufficient to practice its claims.

17        CIPH also argues that the claims recite "specific architecture for the camera involving,

18  *e.g.*, a 'lens,' an 'image sensor' a 'camera processor,' a 'wireless connection protocol device,' and

19  a 'personal portable computing device.'"  *CIPH II* Dkt. 1 ¶ 14.  Not only is this articulation of its

20  claims internally inconsistent with its position that a personal portable computing device that

21  meets the claim limitations is ***unnecessary*** to practice the claimed invention, but moreover, each

22  of the elements that CIPH relies on is a known, conventional camera component used in its normal

23  way—none of which CIPH invented or improved in any specific manner.  *Compare CIPH II* Dkt.

24  1 ¶ 69.  Thus, these hardware elements cannot, as a matter of law, render the claims patentable.

25  *Yu*, 2021 WL 2385520 at *3-4.  CIPH underscores this conclusion by articulating exactly what the

26  claimed hardware elements allegedly do:

27        The asserted patents also claim specific steps performed by the various
      architectural elements to achieve the technologic improvement, including, *e.g.*, the

28        image sensor "capture[s] light" and "produce[s] real time video image data," the

camera processor "generate[s] from the video image data a first . . . and a second image data stream, wherein the second image data stream is higher quality than the first," the wireless connection protocol device "send[s] the first image data stream directly to the personal portable computing device for display," the personal portable computing device "generates the control signals for the video camera," and the processor "adjust[s] one or more settings of the video camera based . . .\ [on] the control signals." *See* '954 claim 11; *see also* all other asserted claims (reciting similar limitations and, for the '694 claims, additionally reciting the "mount configured to receive the mounting interface for rotatably mounting the camera," and "the preview image allowing the user of the video camera to manually adjust an angle of the video camera").

*CIPH II.* Dkt. 1 ¶ 14.   This recitation illustrates that each hardware component is simply performing the basic, generic functionality for which it was conventionally used—and is not performing any functionality that CIPH invented or specifically improved.   There is nothing in CIPH's asserted claims that is not abstract.

### B.   The Asserted Claims Fail *Alice* Step 2

As discussed above, the asserted claims are directed to an abstract idea at Step 1 of the *Alice* inquiry, and the *CIPH II* Complaint includes little more than a single paragraph to address Step 2—and what is alleged only supports dismissal of CIPH's claims.   Under Step 2, the Court asks "(1) whether each of 'the elements in the claimed product (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field,' and (2) whether all of the steps 'as an ordered combination add nothing to the laws of nature that is not already present when the steps are considered separately.'" *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1349 (Fed. Cir. 2019), *cert. denied,* 141 S. Ct. 241 (2020) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012)) (internal citations and brackets omitted) (italics in original); *see also BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("the relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine").

The Step 2 inquiry asks: beyond the abstract idea, "what elements in the claim may be regarded as the 'inventive concept'?" *Chamberlain Grp.*, 935 F.3d at 1349.   Here, the asserted claims contain no inventive concept apart from the abstract idea.   CIPH and its experts have admitted that the recited hardware elements were all known in the art prior to the alleged

invention.  *See, e.g.*, *CIPH II* Dkt. 20 at 7-9 (admitting that the camera processor used in the alleged invention was prior art developed by Ambarella).  In its *CIPH II* Complaint, CIPH does not (and could not) contend that it invented any new or improved hardware or software.  In fact, the face of the patent itself ***cites as prior art*** image processors that CIPH now contends "generate" two streams "in parallel" as required by the claims.  '954 patent, References Cited, pp. 3-4.  Far from describing "unconventional" use of any image processors or image processing techniques, the face of the patent itself reflects that these image processors were known in the art and their conventional use was to generate two video streams "in parallel" under CIPH's view.  CIPH further relies on the conventionality of the Ambarella technology to attempt to evade GoPro's inequitable conduct defenses.  *See, e.g.*, *CIPH II* Dkt. 20 at 9 ("Ambarella's contribution was merely a publicly available prior art product.").  Because the claims include nothing beyond well-understood routine and conventional hardware used for its intended, known purpose, they contain no inventive concept.  *Elec. Power Grp.*, 830 F.3d at 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information.").

　　CIPH generically pleads that "[g]enerating two video streams of different quality in parallel and wirelessly transmitting the lower quality stream from a camera to a remote computer device, along with the other claimed elements, was a novel idea."  *CIPH II* Dkt. ¶ 15.  But CIPH does not identify any portion of the patent specification or any evidence at all to support this vague allegation—which appears to be nothing more than restatement of the abstract idea itself.  Moreover, this statement ***cannot be reconciled*** with CIPH's position that the camera processor that CIPH told the PTO represented its claim is conventional, prior art and contributed ***nothing inventive*** to the claims.  *See CIPH II* Dkt. 20 *passim*.  Having represented to this Court that the camera processor that embodies its alleged invention is ***not novel or inventive in any way***, CIPH cannot as a matter of law rely on the camera processor's functionality to salvage the patentability of its claims.  *Compare* Ex. B (Prosecution History) at July 10, 2014 '954 Applicant Interview Summary) ("According to applicant claimed camera in the instant application performs some ***unique image processing***") with *CIPH II* Dkt. 20 at 8 ("Ambarella chips were publicly available

1   prior art.").  A "claimed invention's use of the ineligible concept to which it is directed cannot

2   supply the inventive concept that renders the invention 'significantly more' than that ineligible

3   concept."  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019), *cert.*

4   *denied*, 140 S. Ct. 983 (2020).

5           While CIPH contends that "other solutions involved after-the-fact generation of video from

6   previously recorded video or streaming only the high quality video," this scant statement does not

7   characterize the relevant field of art or known conventional methods and tools available at the

8   time.  *CIPH II* Dkt. 1 ¶ 15.  Nor could it—because CIPH has told multiple tribunals, including this

9   Court, that the ability to generate a preview stream at lower image quality is known prior art.

10  *CIPH II* Dkt. 20, *passim.*  That **some**, hypothetical "other solutions" involved streaming high

11  quality video does not mean that streaming a lower quality video preview was not conventional at

12  the time.  *See Affinity Labs of Tex., LLC v. DIRECTV*, 838 F.3d at 1264 (noting "well-known,

13  routine, and conventional functions . . . . constitute particular choices from within **the range of**

14  **existing** content or hardware") (emphasis added); *Twilio, Inc. v. Telesign Corp.*, 249 F. Supp. 3d

15  1123, 1150 (N.D. Cal. 2017) (noting "choosing **one conventional alternative over another** to

16  serve a conventional role . . . is not inventive or transformative—indeed, engineers make these

17  decisions all the time") (emphasis added).  Since CIPH has already taken the position that its

18  claims do not foreclose any type of processing or impose any temporal limitation, whether some

19  unnamed, other solution generated "after the fact" (in time) or from "previously stored video" (as

20  in the accused GoPro system that CIPH has accused of infringement) is untethered to any analysis

21  of patentability of the Patents-in-Suit.

22          Finally, CIPH's Complaint raises no fact issues that preclude dismissal.  CIPH's

23  Complaint identifies a single allegedly "unconventional" element: the generation of two video

24  streams "in parallel."  *CIPH II* Dkt. 1 ¶ 15.  But the camera processor that generates two streams

25  in parallel is cited on the face of the patent as prior art and CIPH has affirmatively argued to this

26  Court that it is not an inventive feature of the claims.  *See CIPH II* Dkt. 20 *passim*; '954 patent,

27  References Cited, pp. 3-4.  And far from being used for an unconventional purpose, the claims

28  describe using the camera processor exactly as it was advertised before the alleged invention and

disclosed in the Patents themselves.  *Content Extraction*, 776 F.3d at 1348 (finding no "inventive concept" in using "generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in the industry").  Thus, the combination of known elements is also insufficient to raise an issue of fact on patentability for none of the constituent, known hardware elements of the claims are used in any novel manner.  Indeed the camera processor that CIPH argues is prior art (Ambarella) is designed to interoperate with the conventional elements recited by the claims like a lens, image sensor, and wireless card.[6]  Thus, dismissal is warranted.

## V.        CONCLUSION

For the foregoing reasons, the asserted claims of the '954 and '694 patents should be deemed invalid.

DATED:  June 30, 2021                                    Respectfully submitted,


                                                        */s/ Michelle A. Clark*

---

[6]      Indeed, CIPH maintains that the claims do not require any personal portable computing device capable of generating control signals at all.  Thus, under CIPH's articulation of its claims, all that is left is a generic camera device compromised of a prior art camera processor, lens, image sensor, and wireless card.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sean S. Pak (Bar No. 219032)
Michelle Ann Clark (Bar No. 243777)
Jordan R. Jaffe (Bar No. 254886)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
Email: seanpak@quinnemanuel.com
Email: michelleclark@quinnemanuel.com
Email: jordanjaffe@quinnemanuel.com

Valerie Lozano (Bar No. 260020)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100
Email: valerielozano@quinnemanuel.com

Counsel for Defendant GOPRO, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on June 30, 2021 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

Executed on June 30, 2021, at Oakland, California.


*/s/ Zachary Flood*
Zachary Flood