1

2

3

4                        UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    CONTOUR IP HOLDING, LLC,                Case No.  3:17-cv-04738-WHO

                    Plaintiff,
8
                                             ORDER ON MOTION TO STRIKE,
9          v.                                MOTION FOR JUDGMENT ON THE
                                             PLEADINGS, AND CLAIM
10   GOPRO, INC.,                            CONSTRUCTION

                    Defendant.               Re: Dkt. No. 535
11

12   CONTOUR IP HOLDING, LLC,                Case No.  3:21-cv-02143-WHO

                    Plaintiff,
13
14         v.

15   GOPRO, INC.,                            Re: Dkt. No. 20

                    Defendant.
16

17

18        Plaintiff and counter-defendant Contour IP Holdings, LLC ("Contour") sued defendant and

19   counter-claimant GoPro, Inc. ("GoPro") for patent infringement, alleging that several of GoPro's

20   products infringe patents that concern point-of-view digital video cameras.  Since then, Contour

21   filed a follow-on suit that asserts the same patents against newer GoPro products.  Three matters

22   are before me: Contour's motion to strike GoPro's inequitable conduct affirmative defense in the

23   second suit, GoPro's motion for judgment on the pleadings that the subject matter is unpatentable,

24   and the construction of two claim terms.  The motion to strike is granted, but GoPro may move for

25   leave to amend in response to specific pleading deficiencies.  The motion for judgment on the

26   pleadings is denied without prejudice to GoPro raising the matter on an evidentiary record at

27   summary judgment.  My construction of the disputed terms is the final section of this Order.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Separately, the parties should from now on adhere to the previous order consolidating the cases, which provided that "the lowest numbered case shall be treated as the docket."  Dkt. No. 532.  They should submit all filings on that consolidated docket for simplicity.

## BACKGROUND

Contour originally filed this suit in 2017.  Dkt. No. 1.[1]  It has an involved history that will not be repeated here.  The present motions stem from a second case that Contour filed in 2021 that asserted the same claims of the same patents against more recent GoPro products.  *See* 2143 Dkt. No. 1 ("Compl.").  I consolidated the cases.  Dkt. No. 532.

The technology is discussed as it becomes relevant to the analysis below.  As a general matter, the patents concern point-of-view digital video cameras.  In the second suit, Contour asserts claim 11 of U.S. Patent No. 8,890,954 ("the '954 Patent") and claim 3 of U.S. Patent No. 8,896,694 ("the '694 Patent").  *See* Compl. ¶¶ 78–123.

Claim 11 of the '954 patent is as follows:

11. A portable, point of view digital video camera, comprising:

a lens;

an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene;

a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and

a camera processor configured to:

receive the video image data directly or indirectly from the image sensor,

generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream,

cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, wherein the personal portable computing device generates the control signals for the video

---

[1] References to the docket are to case 3:17-cv-4738 unless otherwise noted; references to the docket in case 3:21-cv-2143 are preceded by "2143."

> camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting,
>
> receive the control signals from the personal portable computing device, and
>
> adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device.

2143 Dkt. No. 1-1 ("'954 Patent") cl. 11.  Claim 3 of the '694 patent recites a "point of view digital camera *system*."  2143 Dkt. No. 1-2 cl. 3 (emphasis added).  But, as explained below, claim 11 is largely representative of both for present purposes; when there are meaningful differences, they are discussed.

In the initial case, I conducted claim construction in July 2018.  *See* Order Regarding Claim Construction ("Const. Order") [Dkt. No. 251].  Based on those constructions, I granted partial summary judgment to Contour that GoPro's products infringed claim 11.  *See* Order on Motion for Partial Summary Judgment ("SJ Order") [Dkt. No. 445].  The case was set to proceed to trial but was stalled multiple times due to the COVID-19 pandemic.  In March 2021, I denied Contour's motion for an accounting or ongoing royalty to add the new products to the suit, which led to it filing the second suit.  Dkt. No. 524.

## LEGAL STANDARD

### I.   MOTION TO STRIKE

#### A.  Generally

Federal Rule of Civil Procedure ("FRCP") 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation and alteration omitted).  Motions to strike "are generally disfavored [by courts] because the motions may be used as delaying tactics and because of the strong policy favoring resolution on the merits."  *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010)

(citation omitted).  Such motions should only be granted if "the matter has no logical connection to the controversy at issue *and* may prejudice one or more of the parties to the suit."  *New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009).  "Where the moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to strike even though the offending matter literally was within one or more of the categories set forth in Rule 12(f)."  *Id.* (citation and quotation marks omitted).

In resolving a motion to strike, the pleadings must be viewed in the light most favorable to the nonmoving party.  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court."  *Cruz v. Bank of New York Mellon*, No. 12-CV-00846-LHK, 2012 WL 2838957, at *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973).

## B.  Failure to State an Affirmative Defense

### i.  Generally

Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

1       If the court dismisses the complaint, it "should grant leave to amend even if no request to

2   amend the pleading was made, unless it determines that the pleading could not possibly be cured

3   by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In

4   making this determination, the court should consider factors such as "the presence or absence of

5   undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous

6   amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See*

7   *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

8           **ii.  Rule 9(b)**

9       FRCP 9(b) imposes a heightened pleading standard when a claim alleges fraud or mistake.

10  Federal Circuit law governs "whether inequitable conduct has been pleaded with particularity

11  under Rule 9(b)." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009).

12  Under FRCP 9(b), to state a claim for fraud, a party must plead with "particularity the

13  circumstances constituting the fraud."  "[T]he 'circumstances' in Rule 9(b) must be . . . pleaded in

14  detail—this means the who, what, when, where, and how of the alleged fraud." *Exergen*, 575 F.3d

15  at 1327 (some internal quotation marks and alteration omitted).  However, "[m]alice, intent,

16  knowledge, and other conditions of mind of a person may be averred generally," Fed. R. Civ. P.

17  9(b), including knowledge of the withheld information and specific intent to deceive, *Exergen*, 575

18  F.3d at 1327.

19  **II.      MOTION FOR JUDGMENT ON THE PLEADINGS**

20      FRCP 12(c) provides that, "[a]fter the pleadings are closed—but early enough not to delay

21  trial—a party may move for judgment on the pleadings."  A motion for judgment on the pleadings

22  can "raise the defense of failure to state a claim." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802,

23  810 (9th Cir. 1988).  When that is so, the court employs "same test as a motion under Rule

24  12(b)(6)," which is stated above. *Id.*

25  **III.     CLAIM CONSTRUCTION**

26      Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517

27  U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

28  Terms contained in claims are "generally given their ordinary and customary meaning." *Vitronics*,

United States District Court
Northern District of California

90 F.3d at 1582. When determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Vitronics*, 90 F.3d at 1582. "A claim term used in multiple claims should be construed consistently . . . ." *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

"The appropriate starting point [] is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "Claims speak to those skilled in the art," but "[w]hen the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "However, claims are not to be interpreted by adding limitations appearing only in the specification." *Id.* "Thus, although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Id.* Conversely, "where [] the claim language is unambiguous, [the Federal Circuit has] construed the claims to exclude all disclosed embodiments." *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215–

16 (Fed. Cir. 2008).  "[T]he description may act as a sort of dictionary, which explains the invention and may define terms used in the claims," and the "patentee is free to be his own lexicographer," but "any special definition given to a word must be clearly defined in the specification." *Markman*, 517 U.S. at 989–90.

On the other hand, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316.  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

The court may consider the prosecution history of the patent, if in evidence.  *Markman*, 52 F.3d at 980.  The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83); *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes.  *Vitronics*, 90 F.3d at 1583.  However, "it is entirely appropriate . . . for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.  All extrinsic evidence should be evaluated in light of the intrinsic evidence.  *Phillips*, 415 F.3d at 1319.  Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernible from examination of the claims, the written description, and the prosecution history.  *Pitney Bowes*, 182 F.3d at 1308 (citing *Vitronics*,

90 F.3d at 1583). While extrinsic evidence may guide the meaning of a claim term, such evidence is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1318–19.

## DISCUSSION

## I. MOTION TO STRIKE

Contour moves to strike GoPro's twelfth affirmative defense of inequitable conduct.[2] It makes three arguments: (1) GoPro's own pleading shows that the alleged inequitable conduct is not cognizable; (2) GoPro fails to plead "the who" of the conduct with particularity; and (3) GoPro fails to plead intent. I disagree with Contour on the first argument, but agree on the second (a finding that moots the third argument). Its motion is GRANTED. Rather than going through a new filing followed by another potential motion to dismiss, if GoPro wishes to amend the Answer, it must file a motion seeking leave to amend within 21 days (and attach the amended Answer it would file as an exhibit) with the briefing to focus on whether the defense is adequately pleaded. The motion and opposition are limited to 15 pages, the reply to seven.

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). The defendant must show that "(1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the [Patent and Trademark Office ("PTO")]." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009). Inequitable conduct must be pleaded with particularity under Rule 9(b). *Id.* at 1326–27.

### A. The Ambarella Chips

The inequitable conduct that GoPro identifies is, at its core, that: a third-party company, Ambarella, Inc., invented the processor that permitted Contour's technology to perform the "dual-streaming" feature; Ambarella provided that processor to Contour; Contour used the processor in

---

[2] Contour's motion also moved to dismiss a counterclaim it believed was premised in part on inequitable conduct. GoPro's Opposition represents that none of its counterclaims are predicated on inequitable conduct. *See* 2143 Dkt. No. 21 at 5 n.1. Contour relies on that representation in only pursuing the motion to strike, *see* 2143 Dkt. No. 22 at 2, and I now rely on it in ruling.

United States District Court
Northern District of California

1   securing its patent; and Contour failed to disclose to the PTO that it used the processor. *See*

2   Answer [2143 Dkt. No. 19] ¶¶ 138–44. Contour moves to strike because, it argues, GoPro's own

3   pleading shows that the Ambarella chips were publicly available prior art. *See* Motion to Strike

4   and Dismiss ("Strike Mot.") [Dkt. No. 20] 8. As a matter of law, says Contour, someone is not an

5   inventor for patent purposes if they merely contribute prior art. *Id.* The net result, in its view, is

6   that GoPro's own pleading shows Contour's omission of the information cannot have been

7   inequitable.

8       Contour's argument lacks merit. GoPro does not only allege that the inequitable conduct

9   was an incorrect identification of inventorship. It is true, as Contour argues, that "[a] contribution

10  of information in the prior art cannot give rise to joint inventorship because it is not a contribution

11  to conception." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004). But the

12  inequitable conduct defense here is materially different than a pure incorrect-inventorship claim.

13  GoPro's allegation is that Contour was required to inform the PTO of the alleged use of and

14  reliance on the Ambarella chips, not just that it was required to name other inventors. Answer ¶

15  146. Contour did so, on GoPro's account, "to overcome prior art rejections." *Id.* ¶ 145. The

16  materiality of that disclosure may ultimately be impacted—maybe even determined—by whether

17  it was publicly available. But the mere fact that Ambarella's engineers could not have been (on

18  Contour's account) named inventors does not necessarily mean that Contour did not have a duty to

19  disclose its use of Ambarella's chips. That is a factual issue that will be sorted out on an

20  evidentiary record. Contour's only case, in contrast, involved an inequitable conduct claim that

21  turned entirely on the identity of the correct inventors. *See Crocs, Inc. v. Effervescent, Inc.*, 248 F.

22  Supp. 3d 1040, 1050–52 (D. Colo. 2017). (That decision addressed other inequitable conduct

23  theories but found the omitted information not material; that is not the portion Contour relies on.)

24      **B. The "Who"**

25      As noted, Rule 9(b) requires that the answer "identify the specific who, what, when, where,

26  and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575

27  F.3d at 1328. Contour argues that GoPro has not identified the "who." *See* Strike Mot. 9–10.

28      I agree that GoPro has not identified the "who" with sufficient specificity. Its general

9

allegation on this front identifies "Contour and/or the named inventors on the Asserted Patents, or persons acting at their direction on or their behalf, including prosecution counsel and others." Answer ¶ 139.  That is insufficient under Federal Circuit precedent, which requires identification of the "specific individuals" who committed the alleged misconduct, not just formulations like "[patentee], its agents and/or attorneys." *Exergen*, 575 F.3d at 1329 (some internal quotation marks omitted); *see, e.g.*, *BlackBerry Ltd. v. Typo Prod. LLC*, No. 14-CV-00023-WHO, 2014 WL 1867009, at *1–*2 (N.D. Cal. May 8, 2014) (finding allegation that "Griffin, Holmes, Lazaridis, Little, Major and/or Kelly withheld" information insufficient).  The remainder of this part of the Answer is also peppered with allegations that just argue that "Contour" or "the applicant" generally "failed to disclose" information, *see, e.g.*, Answer ¶ 146, which is similarly deficient. *Exergen*, 575 F.3d at 1329.

None of GoPro's other allegations save this vague pleading.  In its Opposition, GoPro identifies the "who" it apparently intended: one of the named inventors, Laura O'Donnell.  *See* Opposition to the Strike Mot. ("Strike Oppo.") [Dkt. No. 21] 8–9.  The Answer itself does not single out O'Donnell in this way; she is referenced a few times, but they tend to be grouped along with other similar allegations about other inventors or Contour more generally.  *See, e.g.*, Answer ¶¶ 140, 143.  If O'Donnell is GoPro's "who," then its pleading is deficient.  The only two allegations about her are: (1) she admitted she received "public and proprietary information from Ambarella" about the A5 and other processors, *id.* ¶ 142, and (2) Contour submitted a declaration from her "in which she attested that she and the other identified inventors are the sole joint inventors of the invention," *id.* ¶ 143.  If this is intended to be an inequitable conduct charge against O'Donnell alone, it fails to spell out the "what, when, where, why, and how" of the information she allegedly withheld.  Instead, it discusses vague information that was withheld by its ever-changing roster of allegedly inequitable actors.

GoPro muddies the waters further by saying that it has adequately identified O'Donnell "for example" and it has pleaded the actions of specific people "including" O'Donnell.  Strike Oppo. 8–9.  Yet its brief only ever identifies a case against her, not anyone else.  And, to top it off, GoPro ends that section of its brief with this enigmatic assertion: "That there are other actors

United States District Court
Northern District of California

1  whose malfeasance might also have constituted inequitable conduct, such as the other inventors,

2  prosecution counsel, and the patentee's agents (such as Jason Green, a former Contour employee

3  who participated in the PTO interview) does not render the pleading deficient . . . ." *Id.* 9.[3]

4  Wrong.  GoPro must plead *all* of the inequitable conduct with particularity, and for every person.

5  Even if it had made out a full case against O'Donnell, it cannot then (as it appears to imply)

6  bootstrap any number of other people in with allegations that would be insufficient on their own.

7         In short, GoPro's pleading is inadequate.  If it amends the defense, it must make clear

8  precisely the "who" it is charging with inequitable conduct.  It must do so for every person so

9  accused.  For each, it must lay out the other elements required by Rule 9(b).  It cannot hide behind

10  "for examples" and "includings."  And all of this must be clear from the face of the Answer, with

11  no strategic ambiguity so it can fill in the blanks later.[4]

12  **II.      MOTION FOR JUDGMENT ON THE PLEADINGS**

13         GoPro moves for judgment on the pleadings because it contends that the asserted claims

14  cover patent-ineligible subject matter.  *See* Motion for Judgment on the Pleadings ("MJP") [Dkt.

15  No. 535].  For the reasons that follow, its motion is DENIED without prejudice to raising it again

16  at summary judgment based on a factual record.

17         35 U.S.C. § 101 restricts the scope of patentable subject matter to "any new and useful

18  process, machine, manufacture, or composition of matter, or any new and useful improvement

19  thereof."  But "laws of nature, natural phenomena, and abstract ideas are not patent-eligible

20  because they represent the basic tools of scientific and technological work."  *Visual Memory LLC*

21  *v. NVIDIA Corp.*, 867 F.3d 1253, 1257 (Fed. Cir. 2017) (internal quotation marks and citation

22  omitted).  In *Alice Corporation Pty. v. CLS Bank International*, 573 U.S. 208 (2014), and *Mayo*

23  *Collaborative Servs. v. Prometheus Lab'ys*, Inc., 566 U.S. 66 (2012), the Supreme Court clarified

24  the two-step framework for determining whether patents claim this type of ineligible subject

25

26  ─────────────────────
[3] This affirmative defense—in fact, the entire Answer—does not ever name Green in the
27  allegations, further illustrating GoPro's problems.

28  [4] Because of this finding there is no need or way to address Contour's other argument that GoPro
has not adequately alleged specific intent to deceive the PTO.

matter.  Because "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas[,] . . . an invention is not rendered ineligible for patent simply because it involves an abstract concept."  *Alice*, 573 U.S. at 217 (internal quotation marks, alteration, and citation omitted).  Certain "applications" of those concepts can be made "to a new and useful end" and be patentable.  *Id.* (internal quotation marks and citations omitted).  Patent eligibility under Section 101 is a question of law and can be determined on a Rule 12(b)(6) motion (and therefore the functional equivalent of this type of Rule 12(c) motion).  *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).

At the first step of the *Alice*/*Mayo* framework, courts must "determine whether the claims at issue are directed to a patent-ineligible concept."  *Alice*, 573 U.S. at 218.  Accordingly, the court must "articulate with specificity what the claims are directed to and ask whether the claims are directed to an improvement to . . . functionality versus being directed to an abstract idea."  *Visual Memory*, 867 F.3d at 1258 (internal quotation marks and citations omitted).  The Federal Circuit has instructed that this inquiry asks "what the patent asserts to be the focus of the claimed advance over the prior art."  *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (internal quotation marks and citations omitted).  The court must "focus on the language of the Asserted Claims themselves . . . considered in light of the specification" and avoid "overgeneralizing" those claims or stating them at too "high [a] level of abstraction."  *Id.* (internal quotation marks and citations omitted).

At the second step, the court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) (internal quotation marks and citations).  The court must "search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Alice*, 134 S. Ct. at 2355 (internal quotation marks and citations omitted).  But this allegedly inventive concept "cannot simply be an instruction to implement or apply the abstract idea on a computer" and "must be significantly more than the abstract idea itself."  *BASCOM Glob. Internet*

United States District Court
Northern District of California

1    *Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

2          Generally, this innovation "must involve more than performance of well-understood,

3    routine, [and] conventional activities previously known to the industry." *Content Extraction &*

4    *Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014). "[T]he

5    mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a

6    patent-eligible invention." *Id.* at 1348. However, "an inventive concept can be found in the non-

7    conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d

8    at 1350.

9          Though GoPro makes several related arguments, it most heavily relies on the Federal

10   Circuit's recent decision in *Yu v. Apple Inc.*, 1 F.4th 1040 (Fed. Cir. 2021). *See, e.g.*, MJP 11–12;

11   Reply ISO MJP ("MJP Reply") [Dkt. No. 543] 5–7. That case came from a motion to dismiss.

12   There, the representative claim recited "[a]n improved digital camera." *Id.* at 1042. That

13   invention comprised, among other things, two image sensors and lenses that would each produce

14   an image. *See id.* One of the image sensors was "sensitive to a full region of visible color

15   spectrum." *Id.* The two images would be digitized and stored. *Id.* Most crucially, the images

16   would be processed to produce a "resultant" image in which the first (without the full spectrum)

17   enhanced the second (with the full spectrum). *Id.*

18         The Federal Circuit affirmed the district court's finding that the claim was directed to an

19   abstract idea. It first explained that the "idea and practice of using multiple pictures to enhance

20   each other has been known by photographers for over a century." *Id.* at 1043. The claim only

21   recited "[c]onventional camera components" to create the enhanced image: the sensors, lenses,

22   converting circuitry, memory, and processor. *Id.* Each of those components, the court said,

23   "perform only their basic function" and were "set forth at a high degree of generality." *Id.*

24   Indeed, the specification discussed a need for a "generic solution" to produce high resolution

25   images. *Id.* (internal quotation marks omitted). And this claim was "simply a generic

26   environment in which to carry out the abstract idea" of using one image to enhance another. *Id.*

27   In making its determination, the court rejected the argument that the claim covered a "specific

28   solution" to particular problems; it held that, instead, the "solution to those problems is the

United States District Court
Northern District of California

13

United States District Court
Northern District of California

abstract idea itself—to take one image and 'enhance' it with another." *Id.* at 1044.  The majority also rejected the argument, advanced by the dissent, that the claim covered a particular configuration of physical devices (like lenses and sensors) and so was not abstract.  *See id.* at 1044 & n.2; *see also id.* at 1046 (Newman, J., dissenting) ("The invention . . . is a digital camera having two lenses mounted in front of separate image sensors, with analog to digital conversion circuitry, a memory that stores the images, and a digital processor that enhances the images.  This camera is a mechanical and electronic device of defined structure and mechanism; it is not an 'abstract idea.'").

Unlike *Yu* or other cases that GoPro cites, I cannot find in its favor based only on the pleadings.  If an abstract idea is applied in a non-generic environment and embodied a functional improvement, it succeeds at step one.  *Alice*, 573 U.S. at 217.  If the claim elements in ordered combination transform the nature of the claim into one that is not abstract, it succeeds at step two.  *Enfish*, 822 F.3d at 1334.  As the Federal Circuit has explained, though these analyses are distinct, they have overlap.  *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).  Here, for the reasons that follow, Contour's well-pleaded allegations (which must be taken as true at this stage) prevent a finding in GoPro's favor on both steps for the same fundamental reason.

Claim 11[5] recites a "point of view digital video camera."  As an initial matter, under well-settled law, that the claim recites a mechanical device is not determinative of whether it is in fact directed to an abstract idea.  *Yu*, 1 F.4th at 1044 & n.2.  Just as the "digital camera" in *Yu* could still be in truth directed at patenting an abstract idea, so can the "digital video camera" here.

Contour pleads that, at the time the patent issued, point-of-view video cameras faced a concrete functional problem: users could not readily see and control the video while using the cameras for their intended purpose (e.g., attached to the body during movement).  Compl. ¶¶ 12, 14.  So, Contour pleads, it came up with an innovative solution: the camera would stream a low

---

[5] Both parties agree that claim 11 of the '954 patent is representative for purposes of the Section 101 analysis.  *See* MJP 3; Dkt. No. 539 at 11 n.7.  Consequently, I discuss only that claim in the body of the Order, but the analysis applies to all asserted claims.  *See Elec. Power*, 830 F.3d at 1352 (treating claim as representative for Section 101 analysis).

quality video to a smartphone so that the user could watch what was being recorded removed from the camera; it would store a high quality video that would be the one ultimately used; and it would receive specified control signals from the smartphone so that users could control the image removed from the camera. *Id.* This is also reflected in the patents. *See generally, e.g.*, '954 Patent.

All this removes the case from the orbit of *Yu* and related cases as a matter of pleading. In *Yu*, the district court made an explicit and uncontested finding that enhancing one image with another was well-known to photographers for a century. *Yu*, 1 F.4th at 1043. Similarly, in another of GoPro's leading cases, the district court made an explicit and uncontested finding that putting together multiple images to form a panoramic one is something that the visual cortex did since the "dawn of humanity." *FullView, Inc. v. Polycom, Inc.*, 485 F. Supp. 3d 1156, 1163 (N.D. Cal. 2020). GoPro offers no basis to make a similar finding here and Contour's pleading forecloses it. Accordingly, I cannot find that this all took place in only a generic environment at step one or was uninventive at step two. *Cf. Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (explaining that concepts may only be found unpatentable as a matter of law when "there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field").

GoPro's remaining arguments may succeed on an evidentiary record, but they do not today. Many depend on material from outside the pleadings—in particular, the briefs and expert reports filed in this litigation. *See, e.g.*, MJP 7. At this posture, I may only look at the pleadings, things incorporated into the pleadings, and matters subject to judicial notice. *See, e.g.*, *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247–48 (9th Cir. 2013).[6] To get around this, GoPro says that I can take judicial notice of all of these litigation matters. MJP Reply 3–4. But that does not mean I can take judicial notice of the *truth* of any statement in them. Similarly, GoPro says that the law of the case enables me to rely on, for instance, what was found at summary judgment. *Id.* That is not fully accurate. That doctrine prevents, in the main, a court from redeciding issues. *Ingle v.*

---

[6] I will not *sua sponte* convert this into a motion for summary judgment.

*Circuit City*, 408 F.3d 592, 595 (9th Cir. 2005).  But GoPro has presented no authority for the view that it displaces normal standards governing different types of motions.  If GoPro's argument were accepted, *any* motion for judgment on the pleadings that took place after summary judgment could rely on anything found as an *evidentiary* matter at summary judgment.  In effect, it would allow a second bite at that apple.

Equally as fundamentally, I am required to credit any well-pleaded allegation that does not contradict a matter subject to judicial notice.  *See Usher*, 828 F.2d at 561.  (And again, GoPro's argument that it can slap the label "judicial notice" on extra-pleadings positions is incorrect.)  While I agree with GoPro that it may be appropriate to take judicial notice of Contour's own positions with respect to the claims (as opposed to other evidence), the only such position that would make a difference is the argument that Contour has admitted the Ambarella chips (discussed above) are prior art.  MJP 11–12.  Yet even that is not sufficient on this record because "the mere fact that something is disclosed in a piece of prior art . . . does not mean it was well-understood, routine, and conventional."  *Berkheimer*, 881 F.3d at 1369.  Soon the parties will have the opportunity to present *evidence* about whether the Ambarella chips so qualify.

GoPro is not foreclosed from raising this argument again at summary judgment.  Then, the evidence can test Contour's allegations of inventiveness and the parties can offer concrete evidence about the state of the ideas at play at the time of invention.

## III.    CLAIM CONSTRUCTION

Claim construction has already been conducted in this case.  *See generally* Construction Order.  Here, because the new complaint was filed, the parties seek construction of two terms, one that was not previously construed, one that was.

### A.  Control Signals

Claim 11 of the '954 recites "[a] portable, point of view digital video camera, comprising" among other things, "a camera processor."  It says that the camera processor is "configured to," among other things,

> cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, ***wherein the personal portable computing device generates the control***

United States District Court
Northern District of California

*signals for the video camera*, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting."

'954 Patent cl. 11 (emphasis added).  Claim 3 of the '694 patent also includes identical language about personal portable computing devices.  The parties' dispute is over the emphasized "wherein" clause:

| Contour's Proposal | GoPro's Proposal | Claim Construction |
|---|---|---|
| The scope of the claim is limited to a point of view digital video camera. The "wherein" clause is part of defining the control signals that the camera processor is configured to receive. | Limiting; plain and ordinary meaning. | The claim is limited to a point of video digital video camera (or camera system). The clause at issue helps define the control signals that the processor is configured to receive. |

The dispute, in other words, is about whether, to infringe, an accused technology needs to include a personal portable computing device (e.g., a smartphone) or whether the reference to such a device is only to define the control signals, but it itself is not claimed.  For the reasons that follow, I agree with Contour.

I start with the plain language and structure of the claims.  *Vitronics*, 90 F.3d at 1582.  By their plain language, the claims are directed toward a video camera (or camera system in claim 3), not toward a video camera plus a personal portable computing device.  That video camera then includes the remaining aspects of the claim as indicated by the use of the common transitional phrase, "[a] portable point of view digital video camera, *comprising*" everything that follows. '954 Patent cl. 11 (emphasis added); *see CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'").  One of the things that the video camera is comprised of is "a camera processor."  And the personal portable device clause at issue here is contemplated in a clause subordinate to that camera processor clause.  The claim states that the camera processor is "configured to" do a series of things (like receive video image data).  In turn, one thing in the list that *the camera processor* is configured to do is to "cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device."  '954 Patent cl. 11.  The "wherein" clause

17

1    follows and modifies that clause.  The plain and ordinary meaning, in context, is that the camera

2    processor sends the stream to the personal portable computing device and receives control signals

3    from it.  Accordingly, as a matter of ordinary meaning, basic grammar, and the claim's structure,

4    Contour's interpretation is correct.

5            Other clues bolster this conclusion.  The claimed video camera comprises four elements: a

6    lens, image sensor, wireless connection protocol device, and camera processor.  Every part of the

7    claim is directed toward one of those.  The remaining parts of the "camera processor" element

8    here likewise are all directed *at the camera processor*.  Aside from the clause in dispute, the claim

9    says that the camera processor is "configured" to (1) receive the video image data, (2) generate a

10   first image and second image stream, (3) receive control signals from the personal portable

11   computing device, and (4) adjust one or more setting of the camera.  It would be unnatural and

12   illogical if the fifth requirement—of which this clause is a part—departed so starkly from the

13   others and was directed at *claiming* an entirely different device.  '954 Patent cl. 11.  Still more, if

14   the patent *did* intend to claim a personal portable computing device, it is difficult to think of a

15   more oblique way of doing so.  On GoPro's account, Contour would have squirreled away its *only*

16   claim of the device at the bottom layer of a Russian-nesting-doll-style element group that is

17   facially addressed to entirely different devices.[7]

18           GoPro's counterarguments are unconvincing.  As an initial matter, while GoPro pays lip

19   service to plain meaning and claim structure, it quickly leaves them behind to highlight other

20   considerations.  *See* Responsive Claim Construction Brief ("Resp. Br.") [Dkt. No. 545] 3–6.  Its

21   only real attempt to show that the plain language supports it is the argument that "wherein"

22   clauses are binding and this claim construction, apparently, would render it not binding.  Resp. Br.

23   3–5.  That does not change the analysis.  No one disputes that the clause is just as binding as any.

24   The question here is what that (binding) clause *means*: does it claim the separate device or

25   describe what the camera processor is configured to do?

26           Turning to GoPro's primary arguments, it first points to a figure from the specification that

27

28   ─────────────────────────
     [7] Because I conclude that the claim itself unambiguously shows that Contour's position is correct,
     there is no need to address its argument about claim differentiation.

United States District Court
Northern District of California

depicts cameras *and* a smartphone.  *Id.* 5–6.  As explained, the specification does include this and a few other similar references.  But that does not offer GoPro any help because it would be virtually impossible to helpfully describe the video camera without referencing how it interacts with the personal portable computing device, which is all the specification shows.  That the specification does so is no surprise and certainly does not show that Contour claimed smartphones despite the plain meaning and clear structure of the claims.

Next, GoPro argues that the prosecution history supports it.  *Id.* 6–7.  In essence, it argues that after a version of the claim was rejected, Contour added the wherein clause at issue to get around prior art.  *Id.*  The evidence it proffers, however, does not support that assertion.  Although the rejected version of the claims did not include the clause, there are a number of changes from the rejected to the accepted claims, including the specificity added by describing what the camera processor is configured to do.  *See* Dkt. No. 545-3.  GoPro offers nothing more than the two different versions.  If there is some evidence that the PTO believed Contour was claiming a personal portable computing device and that somehow saved its patent, GoPro has not presented it.

GoPro asserts that Contour's litigating positions also show that its interpretation is correct.  Resp. Br. 7–9.  I have, however, found that the patent itself unambiguously settles the issue of its meaning, so examining the extrinsic evidence is not warranted.  *Pitney Bowes*, 182 F.3d at 1309.  Nonetheless, to ensure that Contour has not spoken out of both sides of its mouth, I analyze this argument.  GoPro is incorrect.  The "litigating positions" it speaks of are actually a few snippets in reports from Contour's expert.  In the first, Contour's expert was opining about whether GoPro conceived of the "control signals" term and whether it infringed.  As part of that analysis, she stated that "[s]pecifically, each of the asserted claims *requires that the personal device generate controls signals*, including at least one control signals in each of two groups: (1) frame alignment, multi-camera synchronization, remote file access, or resolution; and (2) lighting, color, or audio settings.  [GoPro's expert] never identifies any evidence that GoPro conceived of sending these specific control signals, and thus has failed to show conception of these limitations."  Dkt. No. 545-1 ¶ 142 (emphasis added).  And she said that GoPro's expert "never identifies any evidence

that GoPro reduced to practice sending these specific control signals." *Id.* ¶ 203.

In the context that GoPro tries to remove it from, these cherry-picked lines of expert testimony in one rebuttal report do not transform the claim into something it is not. These statements are at least as consistent with Contour's interpretation as GoPro's. Contour's expert never opined that a personal portable computing device was required to infringe. All she discussed was the signals generated, sent, and received—which are geared toward the camera processor.

GoPro also relies on her infringement analysis, but that is even less helpful to it. All that she said there was that "the accused products allow the user to control various settings of the camera through the GoPro app," that her exemplary citations of accused products included "apps," and that she was "able to control settings of the camera from the phone." *Id.* ¶¶ 453–54. Under the claim construction I adopt, analyzing those settings makes sense because the processor must be configured to control them. That does not mean that the device itself is claimed. Indeed, that GoPro cannot point to a clearer statement from Contour's infringement analysis tends to indicate Contour never adopted this position.

GoPro also relies on several Federal Circuit cases that, in its view, compel reading the claim as it urges. Its leading case is *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006). *See, e.g.*, Resp. Br. 9–10. The patent in *Bicon* claimed a plastic cuff used in dental implants. *Bicon*, 441 F.3d at 947–51. As here, the parties disputed whether that claim also covered another apparatus—an "abutment"—that was referenced in the claim but did not appear in the preamble. *Id.* at 950. The Federal Circuit held that the abutment was indeed claimed. *Id.* at 951–52.

That claim is different from this one in the crucial ways that drove the Federal Circuit's decision. That court explained that there were two broad reasons that it found the abutment to be claimed: "the full text of the claim, read in the context of the entire patent" and "problems presented by [the other] proposed construction." *Id.* at 952. The claim recited "[a]n emergence cuff member for use in preserving the interdental papilla during the procedure of placing an abutment on a root member implanted in the alveolar bone of a patient in which [a] the abutment has a frusto-spherical basal surface portion . . . ." *Id.* at 948. From the start, then, the claim is

structured quite differently from this one.  There are other differences that mattered to the court.  The claim "include[d] a detailed description of the abutment's physical characteristics and define[d] the emergence cuff in a way that depends on those physical characteristics."  *Id.* at 950.  That definition is like the definition by reference here: in *Bicon*, if the claim did not include the abutment, one definition would have "no meaning" and two limitations would be "meaningless."  *Id.* at 950–51.  Here, there is no part of the claim that loses meaning if the personal portable computing device is not claimed.

Finally, GoPro tosses in several citations to its expert report that, according to it, illustrate that a POSITA would understand the claim to require the device itself.  To the extent it relies on this evidence, I reject it.  Under settled Federal Circuit law, extrinsic evidence cannot be used to contradict the plain meaning of a term.

## B.  Generate

The parties' other dispute is over the "generate" term.  As noted, I already construed this term to mean "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" or "record in parallel first video image content and second video image content corresponding to the video image data representing the scene, wherein the second video image content is a higher quality than the first video image content," depending on the precise claim.  Const. Order 9–13.

GoPro now seeks what it labels a "clarification" of the construction.  It describes that clarification as: "the Court's construction . . . permits any level of processing or altering prior to recording, and permits one image data stream/video image content to be generated from the other."  Resp. Br. 12.  This argument comes not from any claim construction but from summary judgment.  There, I found that GoPro's product infringed claim 11 as a matter of law.  That dispute "c[ame] down to the 'generate' term."  SJ Order.  Among other things, GoPro's expert argued that alterations during processing "means that a POSITA would no longer consider [the stream] to be from the video image data'" as the construction required.  *Id.* 7.  I held that "Claim 11 says nothing about processing or alteration, and the plain language of 'from the video image

1    data' indicates nothing about processing or alteration.  *Id.* 8.  Yet, GoPro's expert's opinion

2    "impliedly adds a processing- and alteration-related requirement."  *Id.*; *see also id.* 10.

3         The construction will not be altered.  I recognize that courts *may*, in their discretion, revisit

4    claim constructions, *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed.

5    Cir. 2002), and a genuine dispute between the parties over the meaning of a construction can be

6    one ground for reexamination, *Wi-Lan USA, Inc. v. Apple Inc.*, No. 13CV0798, 2014 WL

7    12789112, at *1 (S.D. Cal. Apr. 11, 2014).  But there is no good reason to do so here and various

8    considerations lean against it.

9         This claim and others were already the subject of an intensive claim construction process.

10   Contour suggested the plain and ordinary meaning of the generate terms.  Many of GoPro's

11   proposals, in contrast, contained the "in parallel" language.  I adopted at least that portion of its

12   proposal.  *See* Const. Order 9–13.  Then, with claim construction settled, the parties carried out

13   discovery, summary judgment briefing, and trial preparation in reliance on it.  At summary

14   judgment, I did what all infringement analyses require: determine whether the claim as construed

15   reads on the accused product.  I did not change the construction (nor do I understand GoPro to

16   argue that I did, otherwise it would not really be a "clarification").  To the contrary, I rejected

17   *GoPro's* attempt to effectively change the construction.  *See, e.g.*, SJ Order 10 ("GoPro did not

18   request that any processing-related requirements be included in the construction of the generate

19   term.  Such a question of scope was proper for resolution at the claim construction stage and is

20   improper now.").  The claim construction speaks for itself.  The summary judgment order speaks

21   for itself.  There is no convincing reason to rewrite the claim construction just because it was

22   applied in a particular way at summary judgment.

23        Several considerations affirmatively counsel against altering the construction.  While a

24   genuine dispute about the meaning of a construction might suggest that clarification is warranted, I

25   do not think it would be a productive development in patent litigation if claim constructions were

26   routinely rewritten in light of their specific application at summary judgment.  At best, it would

27   invite a second round of claim construction via "clarification" after many summary judgment

28   disputes.  Moreover, altering the construction in these circumstances may result in unintended,

United States District Court
Northern District of California

22

undesirable consequences.  For one, application of a claim term at summary judgment may require a detailed and nuanced analysis.  Attempting to capture each application of the term in a distilled, curt construction has potential to invite mischief.  For another, if the claim meaning is unsettled—even in an attempt to align it with what happened at summary judgment—it may invite arguments about how binding rulings on summary judgment really are in light of the changed construction.  In this situation, I believe the better course is simply for GoPro and Contour to make their substantive arguments (e.g., at the next round of summary judgment) relying both on the claim construction and the more robust discussion that occurred at summary judgment, both of which are binding.

## CONCLUSION

The motion to strike GoPro's twelfth affirmative defense is GRANTED; GoPro may move for leave to amend within 21 days on the terms stated in this Order.  The motion for judgment on the pleadings is DENIED.  The claims are construed as described above.

**IT IS SO ORDERED.**

Dated: September 13, 2021

William H. Orrick
United States District Judge