Sean S. Pak (Bar No. 219032)
seanpak@quinnemanuel.com
Michelle Ann Clark (Bar No. 243777)
michelleclark@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Valerie Lozano (Bar No. 260020)
valerielozano@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Defendant,
GOPRO, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONTOUR IP HOLDING, LLC,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>GOPRO, INC.,<br><br>　　　　Defendant. | Case Number: 17-cv-04738-WHO, 21-cv-02143-WHO<br><br>**GOPRO'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: William H. Orrick |

06424-00009/13160285.6

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................................... 1

II.  ARGUMENT .................................................................................................................. 1

    A.   Inventorship ........................................................................................................ 1

        1.   The Undisputed Evidence Demonstrates That Messrs. Ju and LeGall (Ambarella) Contributed Materially Generating The Claimed Image Data Streams / Video Content ................................................................. 2

        2.   CIPH's Arguments Regarding Corroboration And Prior Art Fail To Raise A Material Disputed Fact Regarding CIPH's Failure To Name The Correct Inventors ................................................................................ 5

    B.   Inequitable Conduct ........................................................................................... 7

        1.   The Patentee's Omissions Are Material ............................................... 7

        1.   The Evidence Supports Intent To Deceive ........................................... 9

    C.   The Asserted Claims are Invalid Under 35 U.S.C. § 101 .................................. 9

        1.   The Asserted Claims are Directed to an Abstract Idea ...................... 10

        2.   CIPH Does Not Aptly Distinguish Analogous Case Law .................. 12

        3.   The Asserted Claims Do Not Contain an Inventive Concept and Fail *Alice* Step 2 ................................................................................ 13

    D.   Live streaming Does Not Directly Infringe The Asserted Claims ................... 15

III.  CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016)..................................................................................11, 14

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)..........................................................................12, 13, 14

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018)...................................................................................... 14

*CareDx, Inc. v. Natera, Inc.*,
   No. CV 19-0567-CFC-CJB, 2021 WL 4439600 (D. Del. Sept. 28, 2021)............................ 11

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018)...................................................................................... 11

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
   379 F. Supp. 3d 53 (D. Mass. 2019),
   aff'd, 964 F.3d 1365 (Fed. Cir. 2020)............................................................................2, 3

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016)...................................................................................... 13

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016)...................................................................................... 11

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998)........................................................................................ 2

*In re TLI Commc'ns LLC Pat. Litig.*,
   823 F.3d 607 (Fed. Cir. 2016)..................................................................................12, 13

*In re VerHoef*,
   888 F.3d 1362 (Fed. Cir. 2018)........................................................................................ 3

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015)...................................................................................... 10

*Maatuk v. Emerson Electric, Inc.*,
   781 Fed. App'x 1002 (Fed. Cir. 2019) ............................................................................. 4

*Mattor v. Coolegem*,
   530 F.2d 1391 (CCPA 1976)............................................................................................ 4

*Rsch. Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) .................................................................................. 11

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    812 F.3d 1295 (Fed. Cir. 2016) ................................................................................... 9

**<u>Statutory Authorities</u>**

35 U.S.C. § 101 ................................................................................................................. 9, 10

## I.  INTRODUCTION

CIPH's Opposition rests on the premise that the camera processor functionality contributed by Ambarella is not just prior art—it is immaterial to the claimed invention. CIPH contends that the idea of generating multiple image data streams/video contents of varying qualities was known by not only Ambarella, but by many in the industry including Apple, ARM, Samsung, and the author of the Monroe prior art. Opp. at 7-8, 11. CIPH's position renders its claims invalid.

CIPH admits that it never disclosed Ambarella's contributions to the claimed invention to the Patent Office even though it relied on an Ambarella chip to perform the allegedly "unique image processing" capabilities it later incorporated into its claims (per the Examiner's directive) to overcome multiple pieces of prior art. Yet, it relied repeatedly on that very functionality to distinguish prior art in both original prosecution and the subsequent *inter partes* review (IPR) of the claims. Ambarella's substantial contributions to the wireless implementation of dual-streaming, evidenced by contemporaneous written communications from Ambarella touting use of the second stream as a wireless mobile preview, render the patents both invalid for improper inventorship and unenforceable for inequitable conduct.

Further, CIPH's concession that it did not invent or claim any unique process for generating the high and low resolution streams that did not exist in the well-known, commercially available chipsets eliminates any genuine dispute that the claims are unpatentable. Unable to sustain its inventorship and infringement arguments without conceding that "generating . . . in parallel" a high and low resolution data stream/video content eliminates that claim language as basis for preserving patentability. All CIPH has left is a collection of generic, off-the-shelf components used in their intended manner, as directed by their manufacturers. The idea of a camera capable of recording while generating a wireless preview is an abstract idea, disclosed in the prior art, and unpatentable as a matter of law.

## II.  ARGUMENT

### A.  Inventorship

The defense of inventorship requires that the patents be invalidated because the patentee omitted individual(s) who materially contributed to conception of the claimed invention. To be a

joint inventor, the movant bears of the burden of showing that the omitted individual's contribution "is not insignificant in quality when . . . measured against the dimension of the full invention." *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 379 F. Supp. 3d 53, 82 (D. Mass. 2019), *aff'd*, 964 F.3d 1365 (Fed. Cir. 2020). Here, there is no dispute that Ambarella collaborated with the named inventors to implement Ambarella's image processing chip into Contour products or that the asserted claims include elements directed to the chip's dual-processing feature. *See, e.g.*, Opp. at 3 ("[The named inventors] did not invent generating two video files having higher and lower quality."); *see also* Opp. at 4 (citing Ex. 2 at 38:15, confirming Ms. O'Donnell ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).[1] CIPH further admits that "Ambarella's chips permitted the receipt of control signals to change settings like bitrate and resolution—long before CIPH claimed those features as its own invention." Opp. at 6 (quoting Mot. at 10); *see also* Mot. at 10 (citing Ex. 17 (Mander Tr.) at 108:11-16; Ex. 3 (10.12.2021 LeGall Tr.) at 53:10-15; 55:22-25; 86:6-18; 89:1-90:22; Ex. 14 (AMBR2019-000000199A) at 227A, 230A. The sole dispute appears to be whether the contribution of the claimed image processor is "material" to the asserted claims.

### 1. The Undisputed Evidence Demonstrates That Messrs. Ju and LeGall (Ambarella) Contributed Materially Generating The Claimed Image Data Streams / Video Content

Initially, CIPH argues that Ambarella's dual streaming feature – the generation of a high-quality image data stream / video content and a lower quality image data stream / video content for wireless preview – is not the sole point of novelty of the asserted claims. This is both legally irrelevant and false. There is no requirement in the law that an inventor's contribution be the *sole* point of novelty, only that an inventor propose an idea that becomes "an essential feature of the claimed invention." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998);

---

[1] CIPH cites to non-inventor Marc Barros's testimony for the alleged proposition that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Opp. at 5). This appears to be a tacit admission that CIPH was, in fact, attempting to claim dual streaming as its own invention despite legal argument to the contrary. *See also* Ex. 45 (Green Tr.) at 37:10-38:12 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

*Dana-Farber*, 379 F. Supp. 3d at 82.[2] The claims, as construed, require generating the high and low resolution video streams in parallel. Ambarella undisputedly contributed **all elements** directed to the claimed camera processor – *i.e.*, five elements out of eight in Claim 11 of the '954 Patent – and thus its contributions are material as long as CIPH relies on these elements to distinguish prior art, which it has. *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) (affirming PTO's rejection of claims where an unnamed individual contributed an idea that was "an essential feature of the claimed invention expressly recited in the claims of the [patent] application" and, during prosecution, the patentee argued that the idea distinguished the claimed invention over the prior art); Mot. Ex. 1 (IPR2015-01080, paper 90) at 27-28; Opp. Ex. 11 at -17889.

      Moreover, the evidence also shows that Ambarella made material contributions to the manner in which its chips were used to implement wireless preview. CIPH identifies three alleged points of novelty that Dr. Mander and Ms. O'Donnell contributed to: "real time wireless preview (aka "wireless viewfinder"), wireless setting control, and recording GPS data with the video." But "real time wireless preview" ***is an application of dual-streaming*** and "wireless setting control" is also a feature of the Ambarella chip. Mot. (citing Ex. 14 at AMBR2019-000236A (█████ ██████████████████████████████████████████████); Ex. 3 (LeGall Tr.) at 85:10-101:1 (████████████████████████████████████████████████████████████████████████) As demonstrated in Ambarella's contemporaneous documents, "dual streaming" was designed by Ambarella for the purpose of supporting recording in high resolution while "████████████ ████████████████████████████████████████████████████████████████████." Ex. 46 (AMBR2019-000176) at -179; Ex. 47 (Chien Tr.) at 103:6-20. Thus, if anything, the named inventors worked with Ambarella to reduce Ambarella's innovation to practice, but played no role in conception of the claimed camera processor or application thereof at all.

      The remainder of the testimonial quotes invoked by CIPH support this conclusion. For

---

[2] CIPH asserts that Dr. Hu never identified the dual streaming feature of the camera processor as the point of novelty. But, the point CIPH takes issue with ***is a quote*** from Dr. Hu's report. Moreover, CIPH never addresses its repeated statements to this Court and the PTAB identifying the generate limitation (which is a feature of the claimed camera processor) as the point of novelty. Mot. (citing Ex. 1 (IPR2015-01080, paper 90) at 27-28; Ex. 2 (11.19.2021 Hu Reb. Rpt.) ¶500).

example, CIPH argues that Dr. Mander, after admitting that CIPH did not invent dual streaming, testified that using "[REDACTED]." Opp. at 3. Implementation of the QVGA standard is not a requirement of any of the claims and is, at most, a design choice CIPH made to reduce to practice dual streaming in the Contour product. *See, e.g.,* Dkt. No. 445 at 8. CIPH also identifies the specific resolution (4:3 mode with 1280x960 resolution), inclusion of "GPS data in the video file," selection of Bluetooth over WiFi wireless protocol, and development of drivers to support "transmitting video wirelessly . . . using Bluetooth with Ambarella's processor." Opp. at 5-6. Again, **none of these implementation details are required by the asserted claims** and, thus, cannot disprove that Ambarella contributed the features of the camera processor and wireless preview.[3] *Maatuk v. Emerson Electric, Inc.*, 781 Fed. App'x 1002, 1006 (Fed. Cir. 2019). At most, CIPH's evidence may suggest that some named inventors worked with Messrs. Ju and LeGall to implement ***Ambarella's idea*** for wireless preview; it does not support conclusion that Ambarella's engineers failed to provide material contributions to the claims. As the testimony cited by CIPH from Mr. LeGall provides, Ambarella made the "[REDACTED]" it provided all of the features of the camera processor necessary to support a wireless preview stream and allowed its customers to select the implementations that made the most sense. (Opp. at 6, 9.) In sum, it was Ambarella that provided the claimed idea and the named inventors that followed Ambarella's instructions were "merely a technician" implementing dual streaming in the manner instructed. *Mattor v. Coolegem*, 530 F.2d 1391, 1395 (CCPA 1976).

The remaining cited testimony contradicts CIPH's proposition that it did not rely on the functionality contributed by the Ambarella in its claims. For example, CIPH cites Dr. Mander's

---

[3] CIPH's claim that its contributions were necessary to enable wireless preview is untrue. At most, CIPH relied on Ambarella software that "[REDACTED]" as a basis for Bluetooth drivers it adapted from the SDK. Ex. 48 (10.12.2021 Legall Tr.) at 60:2-14, 89:14-90:22 (control signals). Even if CIPH did implement Ambarella's dual-streaming ideas, that is not an inventive contribution. Opp. at 7. And to the extent it is an inventive contribution, [REDACTED]. Ex. 49 (CONTOUR00102586) at -87-88; Ex. 50 (CONTOUR00103314); Ex. 51 (CONTOUR00103570).

testimony that Ben Bodley contributed the idea of two resolutions. Opp. at 4. Of course, Mr. Bodley has never suggested as much and, instead, despite being retained by CIPH in this litigation, has refused to testify on plaintiff's behalf at all. Dkt. No. 565 at 3-4. Contour's internal emails further elucidate the dependence of its camera design (and claimed inventions) on the material contributions by Ambarella and its A5/A5S chipsets and software development kits.[4] *E.g.*, Ex. 52 (CONTOUR00001948 (          )); Ex. 53 (CONTOUR00002143 (same)); Ex. 54 (CONTOUR00002241 (same)); Ex. 55 (CONTOUR00102875 (          )); Ex. 56 (CONTOUR00102460 (same)). Thus, nothing cited by CIPH is relevant to, much less undermines, Ambarella's contributions to conception.

### 2. CIPH's Arguments Regarding Corroboration And Prior Art Fail To Raise A Material Disputed Fact Regarding CIPH's Failure To Name The Correct Inventors

CIPH's next two arguments are species of the same contention: that the claim requirement of "image processing for generating two video streams in parallel" is divulged in the prior art and thus does not support GoPro's inventorship defense. Again, CIPH's red herring arguments are both factually misleading and legally irrelevant. First, CIPH argues that the defense lacks "corroboration" because "it's an ARM processor that has dedicated custom silicon ASICs . . . designed to do [image processing] in parallel." Opp. at 7 (citing Ex. 1 at 109:15-110:2)). This contention lacks evidentiary support but, even if true, does nothing to undermine GoPro's defense. CIPH has expressly abandoned the argument presented in the IPRs that the manner in which the image data streams / video content are "generated . . . in parallel" is a point of novelty. Now, CIPH contends, "generating . . . in parallel" is a conventional capability well known to market participates

---

[4] Although CIPH relies on Opp. Ex. 5, it also claims that redactions made by Ambarella in its 2019 production pursuant to the subpoena, which CIPH never challenged, are somehow "damning" to GoPro's arguments. Opp. at 7. It is unclear what CIPH is hoping to imply, but the time to challenge Ambarella's redactions has long since passed.

such as Apple, Samsung, ARM, and Ambarella. Opp. at 3, 7-9. Instead, it is the "wireless preview[5]" – that is transmitting the lower resolution stream wirelessly that is the alleged point of its claimed invention. And, here, there is plenty of both testimonial and corroborating documentary evidence that shows that Ambarella published marketing materials and news articles teaching the industry, including the named inventors, about this idea by no later than January 2009. Mot. at 5 (citing Ex. 14 AMBR-000000227A; Ex. 48 (10.12.2021 LeGall Tr.) at 64:25-65:16; 179:15-180:5.); Ex. 46 (AMBR2019-000176); Ex. 47 (Chien Tr.) at 103:6-20. Ambarella also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[6]

Next, CIPH argues that "the A5 chip was prior art, thus explaining how it works is not a contribution to the conception of the invention." Opp at 9. If true, what then is CIPH's alleged invention? Here, again, CIPH has abandoned its prior position that features of the camera processor are points of novelty offering any material distinction over the prior art. *Compare* Mot. (citing Ex. 1 (IPR2015-01080, paper 90) at 27-28.) Now, it contends that the distinction is sending the lower quality image stream to a wireless protocol device (*i.e.*, for wireless transmission). But sending the lower quality image stream with wireless is reflected in Ambarella documents and communications provided to the named inventors and depends entirely on the A5's functionality. *See, e.g.*, Mot. Ex. 14; Ex. 46. Thus, even if the Court countenances CIPH's tardy abandonment of its prior position that the camera processor offers a point of novelty over the prior art – it nonetheless must draw the inevitable conclusion that Ambarella also contributed to CIPH's new focal point, the use of the camera processor to send the lower resolution image wirelessly. And this undisputable conclusion – that Ambarella made material contributions to the claimed camera processor *or* its use to transmit a lower resolution image data stream wirelessly – is all that is required to find the flawed

---

[5] Of note, Claim 11 of the '954 Argument never uses the phrase "wireless preview." The sole requirement is that a camera processor is capable of transmitting a lower quality image data stream to a wireless protocol device for transmission. This set up is undisputedly supported by and shown in Ambarella documents pre-dating the alleged conception. Mot. Ex. 14 at AMBR2019-000236A.

[6] CIPH appears to take issue with the fact that Mr. LeGall did not testify to the legal conclusion that he is an omitted inventor. Opp. at 8. But he is neither an expert witness nor a lawyer and that determination is for the fact finder, not the witness.

inventorship renders the patents invalid.

**B.      Inequitable Conduct**

CIPH attempts to evade GoPro's inequitable conduct defense through attorney argument lacking in any evidentiary support. The material facts are undisputed:

- In the course of original prosecution, CIPH representatives requested an opportunity to demonstrate a "demo unit" that it claimed reflected its invention. Mot. Ex. 20.
- The applicant represented to the Examiner that the demo unit performs "some unique image processing" that distinguished the prior art. Mot. Ex. 22.
- The applicant failed to disclose that the "unique image processing" was actually contributed by Ambarella and its engineers. Mot. Ex. 3 (10.12.2021 LeGall Tr.) at 99:6-10; 111:10-13; 137:9-17; Exs. 4-8.

CIPH makes only two arguments, the veracity of which are belied by the very evidence it cites.

**1.      The Patentee's Omissions Are Material**

CIPH seeks to avoid inequitable conduct by arguing that the patentee's omission was not material because "the 'generate' limitation was never used to overcome art" during prosecution. Opp. at 10. This argument is demonstrably false and cannot raise a genuine dispute of fact.

Starting with original prosecution, CIPH's representative, Mr. Green testified that CIPH talked to the Examiner " █████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████" Ex. 45 at 37:10-38:12. Mr. Green also testified that CIPH told the Examiner how "█████████████
█████████████████████████████████████████████████████████████████████." Mr. Green confirmed that CIPH represented Ambarella's camera processor functionality to be "███" features of the invention. Opp. Ex. 11 at -17889.

Mr. Green's testimony is corroborated by the prosecution history cited by CIPH. As quoted in the Opposition, the prosecution history reflects that the patentee "applicant claimed camera in the instant application performs some ***unique image processing*** and also stores the high quality video image." Opp. at 10. And the Examiner indicated that "if these features are incorporated in the

claim, then it would overcome [certain cited] prior art references." *Id*. Thereafter, CIPH admits that its prosecution counsel did exactly what the Examiner suggested – it incorporated the "image processing" features reflected in the Ambarella demo unit into its claims to overcome cited art. Opp. at 10. Specifically, on August 28, 2014, the patentee submitted amended claims that added the "generate" limitations. *Id*. The claims were thereafter allowed.

The evidence is conclusive and undisputed: CIPH relied on image processing functionality provided by the A5, incorporated that functionality into its claims in order to overcome certain prior art, and ***intentionally failed to disclose that the "unique image processing" came from Ambarella***. CIPH's only rejoinder, that the Examiner in the '694 prosecution found another prior art reference (Monroe) that disclosed the "generating" term, is legally irrelevant because the patentee did rely on the element to distinguish other art – specifically, at least Curry, Dotchevski, Siann, and Anglin by adding claim language directed to image processor functionality that CIPH ***did not invent***. *See, e.g.*, Ex. 57 (CONTOUR_IP002112) at -2125-26.[7] Whether that functionality was in the prior art, constitutes a material contribution by Ambarella, or both does not change the fundamental conclusion that CIPH mislead the Examiner into believing that its inventors came up with "unique image processing" functionality they did not invent (and certainly did not invent alone) in order to avoid prior art rejections.

Finally, CIPH ***never addresses the material misrepresentations it made to the PTAB in the course of the IPRs***. Had Ms. O'Donnell, Mr. Mander, or Mr. Green been truthful in their representations to the PTO – and admitted that Ambarella made material contributions to all of the camera processor claim elements – this prosecution history would have had a material impact on

---

[7] The Examiner expressly found that at least Curry disclosed all of the other claim elements including the "wireless connection protocol device operatively connected to the camera," wireless transmission of real time video image data from the camera, and "and receive control signals or data signals by wireless transmission directly from a wireless connection-enabled controller." Ex. 57 at CONTOUR_IP002125. Thus, it was ***only the addition of the "generate"*** term that foreclosed a § 102 rejection of the claims. There can be no dispute that this element was, thus, material to the prosecution and contribution of this functionality was a key feature of the invention. By comparison, the Examiner found that Monroe only disclosed the "generate" limitation and not the other claims, which the Examiner found failed to support a motivation to combine. *Id*. at -2125-27.

the PTAB's consideration of the patentee's argument that the "in parallel" generation of the two image streams by the camera processor could overcome prior art rejections. CIPH's only rejoinder is that GoPro – not CIPH – selected the art to cite to the PTAB. Opp. at 12. But GoPro's selection of prior art does not absolve CIPH of its duty of candor. If CIPH had never omitted the fact that the demo unit included an Ambarella A5, then GoPro and the PTAB would have considered that in both construing the claim[8] and interpreting the prior art. Instead, it was not until *three years after the IPRs concluded* that CIPH finally revealed that the image processing capabilities it demonstrated to the Examiner were contributed by Ambarella.

### 1. The Evidence Supports Intent To Deceive

CIPH argues that Dr. Mander, Ms. O'Donnell, and Mr. Green would need to *admit* that they willfully misled the PTO and PTAB for inequitable conduct to have occurred. Opp. at 13-14. Not so. Circumstantial evidence suffices to show intent to deceive. *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016) ("[A] court 'may infer intent from indirect and circumstantial evidence' because 'direct evidence of intent is rare.'"). CIPH never addresses the inventors' obvious commercial and strategic motivation to omit Ambarella as an inventor. Mot. at 13-14. Further, Mr. Green testified that CIPH represented to the Examiner that "█████████████████████████████████████████████████████████████████████." Ex. 45 (Green Tr.) at 37:10-38:12. But CIPH didn't ███ dual-streaming; Ambarella created dual-streaming and this was an express, false representation to the PTO. The knowingly false statement is irrefutable evidence of the individuals' intent to deceive.

### C. The Asserted Claims are Invalid Under 35 U.S.C. § 101

Taking CIPH at its word that its claims are *not* about the unique image processing

---

[8] For example, as demonstrated by Ambarella's schematics and testimony, the Ambarella preview stream – which Mr. Green told the Examiner reflected its image processing capabilities – subsamples the higher resolution video image data to create the lower resolution preview stream. Dkt. 445 at 10. Indeed, this Court found that functionality to be undisputed. Dkt. No. 445 Had that been clear in the intrinsic record, CIPH would never have been able to convince the PTAB to adopt a tortured reading of the "generate" term that foreclosed such sub-sampling. Mot. Ex. 1 (IPR2015-01080, Paper 90) at 32.

capabilities of the claimed camera processor, the claims lack any patentable subject matter because CIPH is not entitled to a monopoly on the abstract idea of wireless preview.

### 1. The Asserted Claims are Directed to an Abstract Idea

The parties appear to agree that Claim 11 of the '954 Patent (which both sides treat as representative of all asserted claims) comprises a combination of conventional camera parts used to generate two image data streams, one of which is sent to a wireless protocol device.[9] As *Yu* and *TCL* demonstrate, implementation of conventional parts in their known and intended manner to produce a wireless video stream is an unpatentable abstract idea.

CIPH's rejoinders are inconsistent with its claims and with the law. For example, CIPH argues that "the claims address the unique context of POV cameras at the time of the invention by providing a preview stream to allow users to preview their recordings when previously their cameras did not have a screen or were mounted in such a way that the screen was effectively unusable." Opp. at 16. This is false because the claims are not limited to POV cameras *without screens* and immaterial to the legal standard for patentability. Identifying a unique problem does not turn an abstract idea into a patentable solution. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015). In any event, there is no "unique technological environment" because POV cameras with and without screens were prolific in the prior art and each of the claimed hardware elements were specifically designed – by prior artists – to be used in such cameras. Opp. at 11.

CIPH's own brief is rife with citations to such conventional components. CIPH itself avers that other market participants were providing camera processors with the specific claimed capabilities (dual streaming and setting adjustment) for use by camera companies such as GoPro. *See* Opp. at 7-8; CIPH SJ Mot. at 6. Nor does the addition of a wireless protocol device save the claims from abstractness. Again, the undisputed evidence demonstrates that including wireless capabilities in POV digital cameras was well known (*e.g.*, GoPro SJ Opp. at 13-14 and Mot. Ex. 34 (Prosecution history notice of allowance)) and that Ambarella specifically designed its A5 chip for

---

[9] Of note, the word "preview" does not appear in Claim 11.

the purpose of transmitting a lower resolution video stream that could "fit into the wireless channel." Ex. 47 (Chien Tr.) at 103:6-20. Case law and logic mandate that the addition of wireless capability in a known manner is an abstract idea. *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016).

None of CIPH's cited case law supports its argument that its claims are not abstract merely because the invention can (but is not required to) be used when a camera lacks a screen. *Enfish* and *Core Wireless* (cited at Opp. at 17) require an improvement in the functionality of the claimed components in order to support patentability – and, indeed, expressly distinguish such "improvements" from claims that simply rely on the "ordinary" use of known elements to address a problem in the art. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016) (the *Alice* first step "asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . .or, instead, on . . . tasks for which a computer is used in its ordinary capacity"); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc*., 880 F.3d 1356, 1361–62 (Fed. Cir. 2018) (patentable claims must be "directed to a specific improvement in the capabilities of computing devices"). Similarly, *Research Corp. Tech. v. Microsoft* (cited at Opp. at 17) emphasizes that claims disclosing known hardware elements must "incorporate [specific] algorithms and formulas" that direct the hardware limitations to "specific" and "novel" application, which avoid abstract claiming. *Rsch. Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). No saving limitations appear on the asserted claims here – each element is used in exactly its intended manner, without any disclosure of a specific application (*e.g.*, to POV cameras without screens) much less the requisite detailed algorithm (*e.g.*, elements of the Bluetooth driver CIPH suggests was its actual invention). What is left, then, is nothing more than integration of known camera components in exactly the manner in which their manufacturers directed to produce entirely predictable results. Even if some benefit inures from their use, that does not make the claim patentable as patentability requires that the benefit flow from the specific claimed improvement.[10]

---

[10] CIPH also misstates the law when it argues that the conventionality of claim element is only relevant to Step 2. *CareDx, Inc. v. Natera, Inc*., No. CV 19-0567-CFC-CJB, 2021 WL 4439600, at *9 (D. Del. Sept. 28, 2021). In the very case it cites (*Berkheimer*), the Federal Circuit found the

Nor does the bare conclusions of Dr. Hu salvage the claims. Dr. Hu identifies "existing" hardware components ("lens, image sensor, camera processor, wireless connection protocol device") *but no specific improvement in those components or their functionality* a required by the law. (Opp. at 17, citing Dkt. 487-7 at §§ 400-402.)[11] *Compare TLI*, 823 F.3d at 609 (generating and transmitting digital images constitutes an abstract idea); *Berkheimer v. HP Inc.,* 881 F.3d 1360, 1367 (Fed. Cir. 2018) (claims reciting known software and hardware components were abstract). She identifies one, and only one, claim element that she believes "to recite a specific implementation" and that is the "generating" term of the camera processor. *Id*. But CIPH now recognizes that this element is merely a known functionality provided by a conventional processor, not a specific implementation that it allegedly invented or improved. Dr. Hu's admission shows that CIPH seeks a monopoly over the abstract idea of wireless preview and camera setting control.

### 2. CIPH Does Not Aptly Distinguish Analogous Case Law

CIPH has not identified a single case that it contends is analogous to its claims and supports their patentability. Nor does CIPH aptly distinguish GoPro's cases. For example, CIPH's contention that its claims are distinguishable from those in *TLI* because they address "specific problems in the context of POV that are solved by Contour's inventions" is exactly what *TLI* prohibits – *i.e.*, preserving patentability by arguing that "conventional or generic technology" can be applied in "a nascent but well-known environment." *Compare* Opp. at 20 *with In re TLI Commc'ns LLC Pat. Litig*., 823 F.3d 607, 612 (Fed. Cir. 2016). TLI's patent allegedly resolved limitations in known video conferencing technology by providing a system for creating, transmitting

---

claim at issue was directed to an abstract idea at least in part because the recited components, including the claimed "parser" " existed for years prior to [the inventor's] patent." Opp at 18; 881 F.3d at 1367.

[11] Streaming a low quality video while recording/storing a high quality video and receiving control signals are abstract ideas, not innovative solutions that reflect specific, novel application or improvement in the disclosed computing elements. (Opp. at 18-19.) Each element is an idea or outcome over which CIPH seeks a broad monopoly without disclosing any particularized improvement or implementation details in violation of the *Alice/Mayo* framework. That CIPH had to added descriptions of known processing functionality (generating the dual streams), *it did not invent* to overcome original prosecution supports, rather than undermines this conclusion. (*Id*.)

and organizing different types of image data files wirelessly. *Id.*; U.S. 6,038,295 at 1:23-26, 1:65-2:34. But the Court found that it was, nonetheless, abstract because the claims "are not directed to a specific improvement to computer functionality" – that is, the patent "does not describe a new telephone, a new server, or a new physical combination of the two." *Id.* at 612. Similarly, CIPH fails to tether the alleged "solution" to any particularized improvement and thus fails Step 1.[12]

CIPH's analysis of *Yu* is equally flawed. CIPH acknowledges that *Yu*'s claim recites the same hardware components as the Patents-in-Suit, but contends that *Yu* relates to "mere data processing." Opp. at 21. In reality, both Yu's and CIPH's claims include hardware elements – but they are generic camera components that the patentee did not invent. Moreover, as in *Yu*, the claim limitations CIPH itself identifies as alleged "specific improvements," *i.e.,* "real time," generate "in parallel" and receive "control signals") ***are not CIPH's invention***. They are performance results of known hardware (invented and commercialized by Ambarella) used in its "normal" and intended manner. *Id.*; *see also TLI*, 823 F.3d at 609. CIPH has not identified a claim element that it contends is an "improvement" that it invented.[13]

### 3. The Asserted Claims Do Not Contain an Inventive Concept and Fail *Alice* Step 2

CIPH also fails to defend its claims under Step 2 because it misstates the legal requirements for patentability. While true that Step 2 addresses the claims as an ordered combination, the Federal Circuit nonetheless has clarified that a point of novelty must still be present in the combination that is distinct from the individual functionalities of the components. *Berkheimer*, 881 F.3d at 1370.

---

[12] CIPH also misses the point of *Electric Power*. Opp. at 18. Its claims need not be identical to those at issue in the case in order for its claims to be analogous and the result to be informative. Just as in *Electric Power*, CIPH's claims are directed to "presenting" a particular "type of information" – i.e., video image data. And are thus directed to an "intangible," abstraction unless the patentee can identify a particular improvement in the claimed elements, which it has not. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

[13] As GoPro pointed out in its opening brief —and not meaningfully addressed in rebuttal—CIPH has expressly disclaimed any limits on the manner in which a preview stream is created or transmitted. *See, e.g.*, Dkt. 376-3 at 6, 13, 16 n.7. As such, the asserted claims recite functional results of "generating," "receiving" and "causing," but do not sufficiently claim how to achieve these results in a non-abstract way, particularly under CIPH's most recent complaint.

That is, the alleged point of novelty cannot be the abstract idea itself nor can it be rooted in the deployment of conventional and well-understood "techniques" using conventional hardware components. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018). CIPH does not (now) appear to argue that any of the claimed components are either themselves novel or are used in a novel way. *See, e.g.*, Dkt. 396 at 4-5; Opp. at 21-23. CIPH has not and cannot identify anything beyond the abstract idea as implemented by the conventional camera components and, thus, its claims fail Step 2. Simply put, unlike in cases like *Berkheimer* where an abstract claim is saved by Step 2, CIPH has not identified any element that it contends it is using in any nonconventional or improved way – as *Berkheimer* requires. *Berkheimer*, 881 F.3d at 1370.

At most, CIPH suggests that because the Ambarella chips themselves "did not have wireless capability built in" that their combination with a wireless protocol device is a point of novelty. Opp. at 19. There is no evidence to support this lawyer-driven contention. The undisputed fact evidence shows that wireless cards were integrated into digital video cameras well before the alleged date of conception and that Ambarella designed its chips to integrate with a wireless device. Mot. at 4 (citing Ex. 14 at AMBR2019-000236A); Mot. Ex. 3 (LeGall Tr.) at 85:10-101:1 (█████████ ██████████████████████████████). That CIPH and GoPro experimented with different wireless standards does nothing to support the novelty of the combination because the claims are not limited to a particular wireless standards. If, as CIPH contends, what Contour contributed is a "Bluetooth driver for Ambarella's chip," it should have claimed that innovation and not the generic idea of communication from the Ambarella chip to any wireless device. Opp. at 19. The claims do not reflect the alleged innovation and therefore it is irrelevant to their patentability. The Federal Circuit has repeatedly held that generic wireless limitations do not foreclose a finding of unpatentability under either step of the Alice test. *See BSG Tech*, 899 F.3d at 1290–91; *Affinity Labs*, 838 F.3d at 1258.

Finally, CIPH falls back on reliance on the Court's "in parallel" language to support the narrowness of the claims. (Opp. at 19.) This argument fails as CIPH agrees that the dual streaming (generating two streams "in parallel") is not a point of novelty. Opp. at 7-9. Further, CIPH has prevailed in its position that the claims place no restriction on how the video image data is processed.

D.  **Live streaming Does Not Infringe The Asserted Claims**

It is undisputed that under no permutation of settings (whether user-implemented or not) does the HERO9 Black send image data streams / video content directly to a personal portable computing device that can be displayed. *E.g.*, GoPro SJ Opp. Ex. 6 at ¶ 168; GoPro SJ Opp. Ex. 10 at 18:15-20:3; GoPro SJ Opp. Ex. 11 at 45:7-21; *see also* GoPro SJ Opp. Ex. 12. The functionality is undisputed, but CIPH offers a late-stage claim construction argument that reads out the requirement that the "wireless connection protocol device to send the first image data stream *directly to the personal portable computing device for display on a display of the personal portable computing device*." '954 Patent, Cl. 11. CIPH admits that unless several settings are modified by the user from their factory settings, HERO9 Black *never* sends any image data stream / video content at all from the camera *directly* to the mobile phone while recording. And, even if a user hypothetically modified a device to function in the manner CIPH accuses, the data that is displayed on the GoPro App actually comes from a third party server *and not from the camera*. Under CIPH's reading of the claim, any camera with wireless capability could meet its claims by transferring data to the cloud on the off chance that some user then later chose to download that data onto a device. Such an interpretation is nonsensical.

CIPH also offers no evidence that the accused Livestreaming functionality meets the "real time" requirement. CIPH appears to admit that the claims require that the image be displayed without a user perceptible delay. Opp. at 25; *see also* Ex. 14 (12.14.2021 Hu Tr.) at 118:6-120:19. Yet, GoPro's witnesses state—and CIPH cannot contest—that GoPro's products such as the HERO9 Black have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Mot. Ex. 43 (Lema Tr.) at 172:3-173:4. CIPH's rejoinder that Facebook's platform imposes a delay and does not infringe, but GoPro's does not is neither supported by any evidence (of which CIPH bears the burden of proof) nor reflected in its damages measure, which never apportions live streaming based on the platform used.

III.  **CONCLUSION**

For the foregoing reasons, GoPro respectfully requests that the Court grant its motion for summary judgment.

| | | |
|---|---|---|
| 1 | Dated: January 18, 2022 | */s/ Sean S. Pak* |
| 2 | | Sean S. Pak (Bar No. 219032)<br>*seanpak@quinnemanuel.com* |
| 3 | | Michelle Ann Clark (Bar No. 243777)<br>*michelleclark@quinnemanuel.com* |
| 4 | | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 5 | | 50 California St., 22nd Floor<br>San Francisco, California 94111 |
| 6 | | Telephone:  (415) 875-6600<br>Facsimile:  (415) 875-6700 |
| 7 | | Valerie Lozano (Bar No. 260020) |
| 8 | | valerielozano@quinnemanuel.com<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 9 | | 865 S. Figueroa Street, 10th Floor<br>Los Angeles, California 90017 |
| 10 | | Telephone:    (213) 443-3000<br>Facsimile:     (213) 443-3100 |
| 11 | | |
| 12 | | Attorneys for Defendant<br>GoPro, Inc. |