UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CONTOUR IP HOLDING, LLC,

               Plaintiff,

       v.

GOPRO, INC.,

               Defendant.

Case No.  17-cv-04738-WHO

**ORDER ON THE MOTIONS FOR SUMMARY JUDGMENT, MOTION TO EXCLUDE EXPERT TESTIMONY, AND MOTION TO SEAL**

Re: Dkt. Nos. 606, 609, 611, 696

     Following a reversal of the prior summary judgment order in these consolidated cases, plaintiff Contour IP Holding, LLC ("Contour") accuses defendant GoPro, Inc. ("GoPro") of infringing upon two of its patents, both related to point-of-view digital video cameras.  Because my last order addressed only whether the patents at issue cover patentable subject matter, I now turn to the remaining issues that the parties raised in their second round of summary judgment filings and *Daubert* motions.  As set forth below, I will **grant in part** and **deny in part** Contour's motion for summary judgment and **deny** GoPro's motion for summary judgment.  Finally, I will **grant in part** and **deny in part** GoPro's motion to strike testimony of Contour's damages expert.[1]

## BACKGROUND

     This order assumes familiarity with the background of the case, as laid out in my previous

---

[1] GoPro filed an administrative motion to seal information designated as confidential by another party.  [Dkt. No. 696].  Pursuant to Local Rule 79-5(f), Contour was to file a declaration in support of GoPro's motion 7 days after GoPro's administrative motion.  It did not.  To the extent that Contour wishes to continue to keep that information under seal, it must file a statement or declaration pursuant to Local Rule 79-5(c),(f) within 7 days of this Order.  And, in light of the numerous motions to seal that I have granted thus far in this case, I note that I have temporarily filed this Order under seal.  It is not obvious to me that anything should be sealed at this point.  Within 7 days of the date of this order, parties are to submit a joint proposed redacted version of the Order, along with any supporting declarations, for my review.  I will subsequently unseal the Order in accordance with the Ninth Circuit's "compelling reasons" and this district's "narrowly tailored" standards for sealing documents.  *See Auto Safety v. Chrysler Group*, 809 F.3d 1092, 1099 (9th Cir. 2016).

orders. Contour originally filed a Complaint against GoPro in the U.S. District Court for the District of Delaware on November 30, 2015, following GoPro's initiation of inter partes review against Contour.[2] ("Compl.") [Dkt. No. 1]; Motion to Stay Pending *Inter Partes* Review [Dkt. No. 14]. Contour alleges that GoPro infringes, both literally and through the doctrine of equivalents, upon two patents, Patent No. 8,890,954 (the '954 Patent) and Patent No. 8,896,694 (the '694 Patent), both entitled "Portable Digital Video Camera Configured for Remote Image Acquisition Control and Viewing."[3] Compl. ¶¶ 4, 15–16. The patents concern wearable and gear-mountable cameras containing a wireless component that allow the user to remotely capture, view, and control video images. Compl. ¶¶ 17.

In August 2017, the case was transferred to this district and randomly reassigned to me. ("*Contour I*") Dkt. Nos. 175, 179, 180. Contour filed a second, related, case in 2021, asserting the same claims against more recent GoPro products. *See* ("*Contour II*") 3: 21-cv-02143 [Dkt. No. 1]. I consolidated the cases. Order Consolidating Cases [Dkt. No. 532].

After *Contour II* began, GoPro included thirteen affirmative defenses and four counterclaims in its Amended Answer and Counterclaims. GoPro First Amended Answer and Counterclaims ("GoPro Counterclaims"). [Dkt. No. 559-2] at 12–20. In pertinent part, GoPro alleges that Contour "committed inequitable conduct by intentionally omitting the contributions of [non-party] Ambarella, Inc. to the purported inventions of the [Asserted Patents]," and seeks declaratory judgment of non-infringement and invalidity of the Asserted Patents. *Id.* at 12, 18–20. On August 31, 2020, I partially granted summary judgment to Contour, concluding that there was no dispute of material fact that the Accused Products raised in *Contour I* infringed upon Claim 11 of the '954 Patent. [Dkt. Nos. 444–45].

The parties submitted cross motions for summary judgment concerning the *Contour II*

---

[2] Contour concurrently filed suit against GoPro in the District of Utah, which it dismissed in November 2015, choosing to only pursue the suit filed in the District of Delaware. *See* Go Pro's Motion to Stay Pending *Inter Partes Review* [Dkt. No. 14] at 1.

[3] The '694 Patent is closely related to the '954 Patent. (Together, "Asserted Patents.") Throughout this order, I refer to either the Asserted Patents or to the specific language of the '954 Patent, in line with the parties' references.

United States District Court
Northern District of California

products on December 16 and 17, 2021.  [Dkt. Nos. 606–608].  GoPro also filed a *Daubert* motion, seeking to exclude opinions from Contour's damages expert.  [Dkt. Nos. 609–610].  On March 4, 2022, I granted GoPro's motion for summary judgment on the grounds that Contour's asserted claims were invalid because they covered patent-ineligible subject matter; I dismissed all other issues as moot.  [Dkt. No. 673].  The Federal Circuit reversed, holding instead that the claims "recite[] patent eligible subject matter." *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1380–81 (Fed. Cir. 2024).  Now on remand, I address the remaining issues as raised in the parties' motions for summary judgment and GoPro's motion to exclude.

As before, Claim 11 of the '954 Patent is at issue.  It reads:

A portable, point of view digital video camera, comprising:

a lens;
an image sensor configured to capture light propagating through the lens and
     representing a scene, and produce real time video image data of the scene;
a wireless connection protocol device configured to send real time image content by
     wireless transmission directly to and receive control signals or data signals by
     wireless
     transmission directly from a personal portable computing device executing an
     application; and
**a camera processor configured to:**
     receive the video image data directly or indirectly from the image sensor,
     generate from the video image data a first image data stream and a second
          image data stream, wherein the second image data stream is a higher quality
          than the first image data stream,
     **cause the wireless connection protocol device to send the first image data
          stream directly to the personal portable computing device for display
          on a display of the personal portable computing device, wherein the
          personal portable computing device generates the control signals for
          the video camera**, and wherein the control signals comprise at least one of
          a frame alignment, multi-camera synchronization, remote file access, and a
          resolution setting, and at least one of a lighting setting, a color setting, and
          an audio setting,
     receive the control signals from the personal portable computing device, and
     adjust one or more settings of the video camera based at least in part on at least a
          portion of the control signals received from the personal portable computing
          device.

'954 Patent 30:57–31:24. [Dkt. No. 1-1] 55–56.

United States District Court
Northern District of California

3

**LEGAL STANDARD**

**I.    MOTIONS FOR SUMMARY JUDGMENT**

    **a.    Generally**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324.  The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

    **b.    Noninfringement**

Summary judgment of noninfringement requires a two-step analysis.  "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted).  "[A] determination of infringement, both literal and under the doctrine of equivalents, is a question of fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003); *see also Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2012 WL 3545286, at *4 (N.D. Cal. Aug. 16, 2012).  Because the ultimate burden of proving infringement rests with the patentee,

United States District Court
Northern District of California

4

an accused infringer may show that summary judgment of noninfringement is proper either by producing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to create a material factual dispute as to any essential element of the patentee's case. *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims." *Id.*

Direct infringement may be proven either by literal infringement or under the doctrine of equivalents. "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s)." *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.* "The doctrine of equivalents holds that even if an accused product does not literally infringe the asserted claims of a patent, the product may infringe if the differences between the element of the accused product at issue and the claim limitation at issue are insubstantial." *Kilopass*, 2012 WL 3545286, at *7 (citing *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1015–16 (Fed. Cir. 1998)).

To defeat a defendant's motion for summary judgment of noninfringement under the doctrine of equivalents, the plaintiff must provide "particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a genuine issue of material fact as to equivalents." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328–29 (Fed. Cir. 2007). "Whether equivalency exists may be determined based on the 'insubstantial differences' test or based on the 'triple identity' test, namely, whether the element of the accused device performs substantially the same function in substantially the same way to obtain the same result." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376 (Fed. Cir. 2008). "Whether a claim is infringed under the doctrine of equivalents may be decided on summary judgment if no reasonable jury could determine that the limitation and the element at issue are equivalent." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999).

## II.    MOTIONS TO EXCLUDE

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (internal quotation marks omitted).

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the

1    degree of relevance or accuracy (above this minimum threshold) may go to the testimony's

2    weight, but not its admissibility."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir.

3    2010).  The burden is on the proponent of the expert testimony to show, by a preponderance of the

4    evidence, that the admissibility requirements are satisfied.  *Lust By & Through Lust v. Merrell*

5    *Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory

6    committee's note.

**DISCUSSION**

8        Because of the Federal Circuit's remand, the issues unrelated to the question of patentable

9    subject matter raised in (1) Contour's Motion for Summary Judgment, (2) GoPro's Motion for

10    Summary Judgment, and (3) GoPro's Motion to Exclude are at issue.  Each motion asserts a

11    number of issues.  I consider each below.

12

13    **I.    MOTIONS FOR SUMMARY JUDGMENT**

14        **A.    Infringement**

15        In its motion, Contour asserts that there is no genuine dispute of material fact that GoPro's

16    products raised in *Contour II* infringe upon Claim 11 of the '954 Patent—just as I concluded that

17    those in *Contour I* did.  Contour Motion for Summary Judgment ("Contour MSJ") [Dkt. No. 606-

18    4].  *Contour II* includes six GoPro products released after Contour filed its complaint in *Contour I*.

19    The products fall into three groups based on the infringement contentions raised by Contour: (1)

20    HERO7 Black, HERO8 Black, and Max ("Group One products"); (2) HERO7 Silver and HERO7

21    White ("Group Two products"); and (3) HERO 9 Black ("Group Three product").[4]  Contour MSJ

22

23

24    ────────────

[4] Following the Federal Circuit's remand, I held a case management conference.  In the joint case
25    management statement submitted by the parties, Contour alleged that GoPro has continued to
release products that infringe upon the Asserted Patents.  Joint Case Management Statement [Dkt.
26    No. 690].  GoPro responded that these products could include at least five new products, including
the HERO10, HERO11, HERO12, HERO13, and HERO, and that adding these products to the
27    instant case would be untenable.  *Id.* at 9.  Contour has not yet specified which of GoPro's newly
released products it seeks to include on any infringement claims.  I find GoPro's assertion that it
28    has not yet investigated whether the new products share common characteristics with the matters
being litigated to be disingenuous.  I grant Contour's request to join the new products to this case.

2.  I conclude that the Group One and Two products infringe, and that there is a genuine dispute of material fact whether the Group Three product infringes.  Therefore, Contour's motion for summary judgment is GRANTED with respect to the infringement of the Group One and Group Two products and DENIED for the Group Three product.  GoPro's motion for summary judgment is DENIED concerning its assertion that the HERO9 Black does not infringe.

### i.    Group One: HERO7 Black, HERO8 Black, and Max

After my order on the *Contour I* products, GoPro states that "it has since implemented design changes ensuring that both the products subject to the Court's prior order as well as GoPro's newer products do not infringe any of the asserted claims under that order."  GoPro Opposition to Contour's Motion for Summary Judgment ("GoPro Oppo.") [Dkt. No. 627-3] 3. Principal among these design changes, it explains, is that in January 2021, GoPro modified the GoPro mobile application ("GoPro App") that works in tandem with its products.  *Id.*  To prevent its products from infringing upon Contour's remote control settings as identified by Contour in *Contour I*, GoPro "removed the ability to change certain settings" from the GoPro App.  *Id.*  By removing this functionality, GoPro asserts, its products cannot meet the requirement of Claim 11 that its cameras are comprised of "a camera processor configured to" wirelessly send data "to the personal portable computing device . . . wherein the [] device generates the control signals for the video camera."  *Id.*; '954 Patent 31:1, 19; Almeroth Rebuttal Expert Report [Dkt. No. 606-6] ¶¶ 173–77.  GoPro's expert, Dr. Almeroth, confirmed that GoPro's update to its firmware to prevent its products from infringing upon Claim 11 of Patent '954 "was made to the app, not to the individual accused products' firmware."  Almeroth Depo. [Dkt. No. 606-7] 249–250.

I have already concluded that the claims at issue "are directed toward a video camera . . .

---

("*Contour III*").  The parties should conduct expedited discovery and promptly inform the court of any issues so that the case schedule is not delayed.

not toward a video camera plus a personal portable computing device." Second Order on Claim Construction [Dkt. No.555] 17. Likewise, the claims are not directed toward a video camera plus a mobile application. It does not matter, then, whether the GoPro App no longer supports the infringing capabilities of the Accused Products. The question is whether the Accused Products are "capable of operating in the described mode." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (internal quotation marks and citation omitted). "[A]n accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001). This "reasonably capable" standard applies "only to claim language that specifies that the claim is drawn to capability." *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009).

GoPro asserts that Patent '954's claims "specif[y] a particular configuration," and therefore its accused products are not subject to the "reasonably capable" standard. *Id.* at 994; GoPro Oppo. 10. In its view, Claim 11 requires that a device's "camera processors" be "'configured' to receive the control signals generated by the same 'personal portable computing device' to which the first image stream is sent." GoPro Oppo. 10. Since the Accused Products are "only configured to receive control signals that are generated by the GoPro App" and the Go Pro App no longer has the ability to send those signals to control its devices, the Accused Products cannot infringe.[5]

GoPro's reading of the '954 Patent is overbroad and runs afoul of the conclusions I have already drawn during claim construction in this case and the plain language of Claim 11. I

---

[5] Contour notes, and I agree, that "GoPro never disputes the [Group One] cameras sold prior to its January 2021 app change directly infringe." Contour Reply in Support of Motion for Summary Judgment ("Contour Reply MSJ") 4. There is no dispute that the Group One products infringed before the 2021 changes in the Go Pro App.

United States District Court
Northern District of California

United States District Court
Northern District of California

concluded during claim construction that "the claims are directed toward a video camera . . . not toward a video camera plus a personal portable computing device." Second Claim Construction Order 17. I noted that "if the patent *did* intend to claim a personal portable computing device, it is difficult to think of a more oblique way of doing so." *Id.* at 18. GoPro's attempt to rework the claim so that "the same 'personal portable computing device' to which the first image stream is sent" is a required element of Claim 11 is unavailing. Further, the plain language of Claim 11 states that the claimed "portable, point of view digital video camera" is comprised of "a camera processor configured to" engage in the aforementioned processes. '954 Patent 30:57–31:24. This is clearly "claim language that specifies that the claim is drawn to capability," as contemplated by the Federal Circuit in *Ball Aerosol*, 555 F.3d at 994.

GoPro mistakenly relies on *Ball Aerosol* to support its understanding of the application of the "reasonably capable" standard. In that case, plaintiff Ball Aerosol owned a patent that claimed a candle tin with a removable cover—"[p]utting a candle tin in the configuration claimed in the [patent] . . . minimize[d]" any "scorching or damage" to a table or other surface where the candle holder was placed. *Ball Aerosol*, 555 F.3d at 986. The patent also claimed "protrusions, or feet, on the closed end of the candle holder" that helped to prevent any damage caused by the candle within the tin. *Id.*

The Federal Circuit reversed the district court's grant of summary judgment of infringement because "[t]he claim language clearly specifie[d] a particular configuration in which the protrusions must be 'resting upon' the cover." *Id.* at 994 (citing to the patent at issue). Because the patent required that specific configuration, the district court had erred in holding that because the accused products were *capable* of infringing, they necessarily did. *Id.* at 994–95. When the language of a patent requires such a specific configuration, "infringement requires specific instances of direct infringement or that the accused device necessarily infringes the patent in suit." *Id.* (internal quotation marks and citation omitted). And here, because the language of

the claims require only that the camera is, in part, comprised of "a camera processor configured to" interact with the video image data as described, Claim 11 is "drawn to capability." '954 Patent 30:57–31:24; *Ball Aerosol*, 555 F.3d at 994. Therefore, if an accused device is "reasonably capable" of infringing, it does.

More like this case is *Finjan, Inc. v. Secure Computing Corporation*, in which the Federal Circuit affirmed the district court's verdict of infringement on plaintiff's asserted "system" claims. 626 F.3d at 1200. The court held that "[i]n this case, Finjan's non-method claims describe capabilities without requiring that any software components be 'active' or 'enabled.' . . . Thus, it is undisputed that software for performing the claimed functions existed in the products when sold— in the same way that an automobile engine for propulsion exists in a car even when the car is turned off." *Id.* at 1204–1205. So here. Claim 11 of the '954 Patent describes capabilities of the "portable, point of view digital video camera." '954 Patent 30:57. Therefore, a "device may be found to infringe [Claim 11] if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." *Hilgraeve Corp*, 265 F.3d at 1343.

The Federal Circuit's comments on review are not to the contrary. It held that "the claims are drawn to a 'specific means or method that improves the relevant technology,' and that "[t]he claims are directed to a technological solution to a technological problem." *Contour IP Holding LLC*, 113 F.4th at 1379–1380. In the context of whether a claim is directed towards an abstract, and therefore unpatentable, idea, that a claim is "drawn to a specific means or method that improves the relevant technology" is a requirement for patentability. The "specific means or method" language used by the Federal Circuit does not prohibit Claim 11 from being "drawn to capability."

Both Contour and GoPro's experts noted that it is possible to control infringing settings on the Group One cameras using third-party applications. This demonstrates that GoPro's cameras

United States District Court
Northern District of California

continue to possess the infringing capability to be remotely controlled. And there is no material

dispute that the Group One devices "have the same live preview functionality as the cameras for

which [I] previously granted summary judgment in *Contour I*." Contour MSJ 4. While GoPro

protests this assertion, it argues only that "even if the GoPro cameras could be configured (without

GoPro's consent or knowledge) to be compatible with third party applications, these applications

do not provide for live preview or live streaming functionality and [Contour] has not argued that

they do." GoPro Oppo. 10–11. GoPro's intent is immaterial to my decision on infringement.

Even if GoPro's updated App does not provide a user of the Group One cameras access to the live

preview functionality without the use of (1) "unauthorized reverse engineering and hacking" of

GoPro's App or (2) a third party application, that does not take away from the device's configured

ability to perform that function. GoPro offers no evidence to support its conclusion that third

party applications do not allow for live preview or live streaming in any event.

For these reasons, I GRANT Contour's motion for summary judgment that the Group One

products, the HERO7 Black, HERO8 Black, and MAX cameras, infringe on Claim 11.

### ii.    Group Two: HERO7 Silver and HERO7 White

Contour next argues that a second group of products, the HERO7 Silver and the HERO7

White, infringe Claim 11. *See* Contour MSJ 5–6. For these products, GoPro additionally disputes

that the "generate" limitation can be met.

In pertinent part, this section of the '954 Patent claims: "a camera processor configured to .

. . generate from the video image data a first image data stream and a second image data stream,

wherein the second image data stream is a higher quality than the first image data stream." '954

Patent 31:1-8. At Claim Construction for *Contour I*, I construed the "generate" portion of the

claim to mean: "record in parallel from the video image data a first image data stream and a

second image data stream, wherein the second image data stream is a higher quality than the first

image data stream." First Claim Construction Order [Dkt. No. 251] 9–10.

The products in *Contour I* and in Group One of the *Contour II* products each used an Ambarella and/or an SNI chip to create these parallel recordings. The Group Two cameras instead use a chip generated by Qualcomm. That chip, as used in the Group Two cameras, enables the accused products to record in parallel and create a first and second image data stream. Whether or not the *quality* differences remain, as required by the claim, appears to be in dispute.

Contour asserts that "GoPro's expert could not identify a single factual statement [Contour's technical expert] makes about the Qualcomm product that he disputed in his report," and that, because he "does not dispute any of her factual analysis," GoPro fails to show any material factual dispute. Contour MSJ 6. That is not quite correct. At a high level, Dr. Almeroth repeatedly contests Dr. Hu's conclusions concerning the operation of the Qualcomm source code because her mere statement that "[t]he cameras with Qualcomm chips likewise satisfy the Court's construction," without more, cannot meet the burden required by Contour to demonstrate a lack of material dispute. Hu Infringement Expert Report [Dkt. No. 627-4] ¶ 230; *see also* Almeroth Depo. [Dkt. No. 606-7] 45:4–15 ("[That] the generating limitation was met for Ambarella and Socionext does not allow a transitive-property kind of analysis that says that . . . other chips would meet the limitation without going into the details of how those chips would work in relation to what the requirements of the claim language actually are."), 50:10–23 ("[I]t doesn't describe how the Qualcomm chip works.), 51:4–7 ("It's just that Dr. Hu hasn't pointed to any of the details about how Qualcomm would work in contrast to what she has done for Socionext and Ambarella."). But Dr. Almeroth misrepresents the substance of Dr. Hu's report—she does supply the facts that support her conclusions—and he fails to contradict the material facts that form the basis of her conclusions.

Dr. Hu's report sufficiently addresses the capabilities of the Qualcomm-processor cameras. Her report demonstrates that the Qualcomm-processor cameras infringe on the "generate" limitation just as the Ambarella and/or SNI chips do. Contour Reply MSJ 4 (citing to Hu

Infringement Expert Report [Dkt. No. 606-5] ¶¶ 96, 97, 99, 104–106). Her explanations, including source code in reference to the Qualcomm chip, establish both that the accused products containing the Qualcomm chip record in parallel and can also create two data streams "wherein the second image data stream is a higher quality than the first image data stream." First Claim Construction Order [Dkt. No. 251] 9–10. Dr. Hu's report clearly shows this ability to infringe. And GoPro points to nothing in its expert reports that contests those conclusions. There is no genuine dispute of material fact whether the Group Two products infringe upon Claim 11 of the '954 Patent. I GRANT summary judgment for Contour on those products.

### iii.    Group Three: HERO9 Black

Contour finally asserts that GoPro's HERO9 Black infringes on Claim 11 of the '946 Patent. Contour MSJ 6–7. GoPro seeks summary adjudication for the opposite contention. GoPro Motion for Summary Judgment ("GoPro MSJ") 20–24. All previously discussed products (both the *Contour I* and *Contour II* products), provide the user with the ability to "live preview," where a video image can be sent from the camera processor directly to the user's personal portable computing device for live display and adjustments. For the HERO9 Black, however, "Contour's infringement allegation is based on live streaming," which Contour admits "is similar to live preview" without performing the exact same function. Contour MSJ 6. The main difference between the two is that for live *streaming*, video data is first sent to the cloud instead of to any user device. GoPro Oppo. MSJ 6. Once the video data is in the cloud, a user can download or stream (in this case, view semi-contemporaneously, at a delay of approximately ten seconds) the video content. *Id.* at 8–9.

Contour's arguments for infringement fail for two reasons. First, looking to the plain language of Claim 11, it appears that Contour is looking to extend the benefits of its patent beyond what is claimed. As relevant here, it claims: "a camera processor configured to . . . cause the wireless connection protocol device to send the first image data stream directly to the personal

14

portable computing device for display on a display of the personal portable computing device . . . ." '954 Patent 31:1-11. There is no dispute that, for an individual to stream or download video from a HERO9 Black, the video data stream goes "directly" to the *cloud* and not, as Claim 11 requires, "directly to the personal portable computing device for display."

At the February 12, 2025, hearing on these motions, counsel for Contour clarified that the "Wi-Fi" mode described above is not accused. February 12, 2025 Hearing Transcript at 19–20. To the extent that Contour's assertion that the HERO9 Black infringes upon Claim 11 of the '954 Patent has any merit, then, it is in its arguments related to the device's use of a "hotspot" to transmit data.

Contour contends that GoPro admits that while using a HERO9 Black for live streaming purposes, if a Wi-Fi router is unavailable, "the mobile phone itself can be set up as a hotspot." Contour Reply MSJ 2 (citing to GoPro MSJ). When used in this way, GoPro explains, "[t]he mobile device is merely a pass-through conduit for the video on its way to the streaming service, as the mobile device has no capability to stream video to other users." GoPro MSJ 22. Critically, "[i]n the 'hotspot' scenario, the video content routed through the mobile device to the cloud is ***not*** sent for display on the device. Rather, that video content is sent for transmission to the cloud. The cloud service then modifies the video data and can stream that video to multiple users." *Id.* at 23.

Contour does not contest GoPro's explanation that while video image *data* can be sent to a portable device when in use as a 'hotspot' when a Wi-Fi router is unavailable, no video is transmitted for display on the device. It instead argues that GoPro's understanding of "the terms 'directly' and 'for display' . . . is inconsistent with the plain claim language and untimely." Contour Reply MSJ 2.

As I have discussed, the plain language of the claim requires that the camera processor be configured such that any *video data* must be sent "directly" to the personal portable device.

United States District Court
Northern District of California

Contour contends that the HERO9 Black device meets this requirement "because it sends the video directly to the personal portable computing device (which further transmits the video to a live streaming service)." Contour Reply MSJ 2. GoPro asserts the opposite, explaining that the HERO9 Black device cannot infringe because even when it must use a portable device's hotspot as a "pass-through conduit for the video on its way to the streaming service" it is configured such that "the video content routed through the mobile device to the cloud is ***not*** sent for display on the device. Rather, that video content is sent for transmission to the cloud." GoPro MSJ 23 (emphasis in original). Because the HERO9 Black's camera processor is configured to send video data first (and GoPro says, "directly") to the cloud, one plausible interpretation of the claim is that GoPro does not infringe.

But while there is no doubt that the data may be sent to the cloud for modification, the ultimate purpose of the data is "for display" and Contour's competing position also has merit. In sum, there is a dispute whether the need to send any video data to the phone through use of the portable device as a hotspot qualifies as an infringing use of the device. Neither Contour nor GoPro can meet their burden on summary judgment for GoPro's HERO9 Black device. Whether or not the HERO9 Black device infringes upon the '954 Patent will be a question for trial. Summary judgment is denied on this product.

### B. IPR Estoppel

Contour also contends that GoPro's invalidity theories under 35 U.S.C. §§ 102 and 103 related to Sony, Canon, and Nikon products are barred by IPR estoppel because: (1) GoPro's expert, Dr. Almeroth, relies entirely on printed publications; and (2) GoPro is estopped under 35 U.S.C. § 315(e)(2) from using a physical device to argue invalidity if all the material limitations of the device were disclosed in a patent or printed publication. *See* Contour MSJ 8–10. Because I conclude that Dr. Almeroth's expert report does not substantively rely on physical devices apart

16

1    from the printed publications, and that IPR estoppel under 35 U.S.C. § 315(e)(2) applies, I

2    GRANT Contour's motion for summary judgment on this ground.

3                            **i.    Printed Publications**

4            An inter partes review (IPR) is a procedure established under the America Invents Act

5    (AIA) that allows a third party to challenge the validity of a granted patent based on patents or

6    printed publications under 35 U.S.C §§ 102 and 103.  The process, conducted before the Patent

7    Trial and Appeal Board (PTAB), aims to provide a faster, cost-effective alternative to district court

8    litigation for resolving patent disputes.  *See* 35 U.S.C. § 311(b).  "The petitioner in an inter partes

9    review of a claim in a patent . . . that results in a final written decision . . . may not assert either in

10    a civil action arising in whole or in part under section 1338 of title 28 . . . that the claim is invalid

11    on any ground that the petitioner *raised or reasonably could have raised* during that inter partes

12    review." 35 U.S.C. § 315(e)(2) (emphasis added).  The Federal Circuit has clarified that "estoppel

13    applies not just to claims and grounds asserted in the petition and instituted for consideration by

14    the Board, but to all grounds not stated in the petition but which reasonably could have been

15    asserted against the claims included in the petition." *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th

16    976, 991 (Fed. Cir. 2022).  GoPro previously filed IPRs against Contour in 2015 challenging each

17    asserted patent, and the parties do not dispute that § 315(e)(2) applies to GoPro in this

18    case.  Contour MSJ 14; GoPro Oppo. MSJ 12.

19            The bases for invalidity during IPR are limited to "prior art consisting of patents or printed

20    publications."  35 U.S.C. § 311(b).  Physical products cannot be raised during IPR proceedings

21    under 35 U.S.C. § 311(b).  *See Clearlamp, LLC v. LKQ Corp.*, 2016 WL 4734389, at *9 (N.D. Ill.

22    Mar. 18, 2016) ("[U]nlike in district court litigation, products cannot be offered as prior art during

23    inter partes review.").  However, patents or printed publications that relate to and describe a

24    physical product, like other patents and printed publications, can be raised in an IPR.  *See, e.g.*,

25    *Cobalt Boats, LLC v. Sea Ray Boats, Inc.*, 2017 WL 2605977, at *4 (E.D. Va. June 5, 2017)

26    (estopping former-petitioner from relying on prior art product manuals that reasonably could have

27    been raised in IPR).  That said, several courts have found that "reliance on some printed

28    publications in an overall collection of documents being used to describe a system invalidity

United States District Court
Northern District of California

theory should not lead to estoppel of the overall system invalidity theory itself, nor piecemeal exclusion of the printed publications underlying that system invalidity theory[.]" *SPEX Techs. Inc. v. Kingston Tech. Corp.*, 2020 WL 4342254, at *15 (C.D. Cal. June 16, 2020); *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, 2020 WL 7011768, at *2 (W.D. Tex. Oct. 28, 2020) (finding no IPR estoppel when the expert "does not rely solely on publicly available documents" but "opinions [we]re [also] supported by non-public documents and other information that are not 'printed publications'" that could have been raised in IPR proceeding).[6]

The parties disagree whether Dr. Almeroth relied exclusively on printed publications. Contour asserts that he did and failed to rely on the physical devices. Contour MSJ 15. It emphasizes that Dr. Almeroth's opinions were based entirely on product manuals and publicly available documents, which disclose all the relevant claim limitations and were available during the IPR proceedings. Contour MSJ 7. GoPro responds that Dr. Almeroth relied on the Sony, Canon, and Nikon products themselves for his opinions on invalidity. *See* GoPro Oppo. MSJ 17. GoPro does not respond to Contour's assertion that the manuals are printed publications. Contour Reply MSJ 12.

Before addressing Contour's substantive arguments, I must first decide whether the manuals themselves qualify as "printed publications." Determining whether a reference (here the Sony, Nikon, and Canon manuals) is a printed publication "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, public accessibility has been called the touchstone in determining whether a reference constitutes a printed publication." *Blue Calypso,*

---

[6] In its opposition, GoPro argues that I have already ruled in its favor on the issue of IPR estoppel by allowing it to assert system prior art. This contention is wrong. My ruling was made in the context of a motion to amend invalidity contentions. At that stage, I did not assess whether GoPro had admissible evidence supporting its reliance on physical systems. In contrast, summary judgment requires admissible evidence demonstrating a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c). My prior ruling allowed GoPro to present its theories but did not preclude a later finding that estoppel applies if GoPro fails to substantiate those theories with proper evidence. *See* Order on the Scope of IPR Estoppel and on GoPro's Motion for Leave to Amend Invalidity Contentions [Dkt No. 335].

1    *LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (cleaned up).  For a reference to be

2    publicly accessible, it must be "disseminated or otherwise made available to the extent that

3    persons interested and ordinarily skilled in the subject matter or art, exercising reasonable

4    diligence, can locate it."  *Jazz Pharms., Inc. v. Amneal Pharms., LLC.*, 895 F.3d 1347, 1355 (Fed.

5    Cir. 2018) (internal quotation marks and citation omitted).

6         Here, the manuals were included with the Sony, Canon, and Nikon products that GoPro

7    purchased.  GoPro notes that the manuals are dated before Contour's claimed priority date. GoPro

8    Oppo. MSJ 17.  This timeline demonstrates that the manuals were publicly accessible and

9    therefore must be considered a printed publication.  *See Centripetal Networks, Inc. v. Cisco Sys.,*

10   *Inc.*, 7 847 F. App'x 869, 878 (Fed. Cir. 2021) (holding that a user guide delivered with a product

11   was a printed publication because the guide was publicly accessible once the product was sold).

12        To succeed on its argument that GoPro relies entirely on these printed publications to

13   support its invalidity contentions, Contour first has the burden to "show that each and every

14   material limitation present in the physical device is disclosed in the estopped reference."  *Bos. Sci.*

15   *Corp. v. Cook Grp. Inc.*, 653 F. Supp. 3d 541, 594 (S.D. Ind. 2023).  GoPro must then "point[ ] to

16   a material limitation that is disclosed in the physical device that is *not* disclosed in the estopped

17   reference."  *Id.* (emphasis in original).  Then, if GoPro is able to point to such a limitation, the

18   burden reverts to Contour "to show why said limitation is (1) either *not* material or (2) is in fact

19   specifically disclosed in the estopped reference."  *Id.* (emphasis in original).

20        Contour has shown that the physical devices on which GoPro seeks to rely are cumulative

21   of the printed publications by citing to sections of Dr. Almeroth's deposition where he

22   acknowledged that he could not identify additional functionality in the physical devices not

23   reflected in the printed publications.  *See* Contour MSJ 15; Contour Reply MSJ 11–13.  When

24   asked if there are any features of the Sony camera that are not described in public literature about

25   the Sony camera, Dr. Almeroth replied, "There might be support for each of the limitations in

26   public documents . . ."  Contour MSJ Ex. 3 ¶ 147:24-148:6.  Contour also points out that Dr.

27   Almeroth did not rely on any of the confidential documents and business records declarations that

28   Sony, Canon, and Nikon produced.  Contour Reply MSJ 13.  These confidential documents

United States District Court
Northern District of California

include executable software files, upgrade manuals, software release notes, and internal sales records from Sony.  GoPro Oppo. MSJ 18.  In response, GoPro cites the purchase of the Sony, Canon, and Nikon physical devices, which Dr. Almeroth inspected and disassembled.  *See, e.g.*, GoPro Oppo. MSJ Exs. 17–19.[7]

GoPro has not met its burden to show that that there is a material limitation disclosed in the physical devices that was not disclosed in a printed publication.  That Dr. Almeroth used the physical device to form his opinion does not preclude the possibility that a written material disclosed the same limitations Dr. Almeroth found when examining the physical devices.  For the Sony and Canon devices, Dr. Almeroth stated that he "inspected and disassembled the device and noted that it corresponds to the images and descriptions within the manual, including the physical configuration and layout."  *See* GoPro Oppo. MSJ Ex. 3 (Almeroth Op. Rep.) ¶ 345, 362.  He does not indicate in his expert report that there was a material limitation in the physical device that was not present in the devices' manuals.

Dr. Almeroth's inspections of the software likewise do not disclose any material limitations outside of the descriptions already included in the manuals.  *See* Almeroth Op. Rep. ¶ 350, 507. There is no indication that Dr. Almeroth's findings were influenced by any detailed physical examination of the devices outside of the information disclosed within the printed publications.  Furthermore, there is no evidence to suggest that Dr. Almeroth relied on the confidential documents that GoPro subpoenaed and received from Sony, Canon, and Nikon.  *See generally* Almeroth Op. Rep.  Based on the record, then, it is clear that Dr. Almeroth did not rely on physical devices for his invalidity analysis in any material way.

### ii.    Estoppel

Given that Dr. Almeroth relies on physical devices materially identical to printed publications, I now turn to the question of whether invalidity theories based on those devices are barred by IPR estoppel under 35 U.S.C. § 315(e)(2).  Contour argues that courts increasingly

---

[7] GoPro includes the following labels in its citation to the exhibits: (GOPRO_232267; GOPRO_232263; GOPRO_232259).  I cite to the exhibits on the docket for ease of reference. Contour utilizes similar labeling but has failed to provide the court with the courtesy of including the exhibit numbers along with their unique labels.

United States District Court
Northern District of California

1    apply IPR estoppel to invalidity theories based on physical devices when those devices do not

2    introduce distinct claim limitations beyond those disclosed in printed publications raised in

3    IPR.  *See* Contour's Supplemental Brief in Support of its Motion for Summary Judgment

4    ("Contour Supp.") [Dkt No. 695] ¶ 2:18-4:4.  "There is a split among district courts, however, as

5    to whether IPR estoppel extends to device art that is entirely cumulative of, i.e., materially

6    identical to, prior art in the form of patents or printed publications that were or could have been

7    raised in an IPR."  *Prolitec Inc. v. ScentAir Techs.*, *LLC*, No. CV 20-984-WCB, 2023 WL

8    8697973, at *22 (D. Del. Dec. 13, 2023).  This issue has not yet been addressed by the Federal

9    Circuit.

10         The central disagreement between these two perspectives is the interpretation of the term

11   "ground" as used in 35 U.S.C. § 315(e)(2).  Section 315 bars petitioners from asserting "any

12   ground" they raised or could have raised in an IPR.  Courts applying a broader interpretation

13   define "ground[s]" to refer to the underlying legal theories, incorporating patents, printed

14   publications, and related cumulative evidence, such as physical devices.  *See Wirtgen Am., Inc. v.

15   Caterpillar, Inc.*, No. 117CV00770JDWMPT, 2024 WL 51010, at *9 (D. Del. Jan. 4, 2024)

16   (finding that a party relying on both a printed publication and a physical device relies on the same

17   "ground" if the printed publication and the physical device provide the same information).  Under

18   this view, all physical systems described by printed documentation would trigger estoppel.  Other

19   courts adopt a narrower view, arguing that "grounds" refers exclusively to the "particular patents

20   and printed publications on which invalidity arguments are based, and that the supporting

21   affidavits, declarations, and the like are evidence, not 'grounds.'"  *Prolitec Inc. v. ScentAir Techs.,

22   LLC*, 2023 WL 8697973, at *22.  Under this theory, invalidity arguments based on a physical

23   device would not be estopped even if the accompanying documentation was raised or could have

24   been raised in the IPR.

25         Courts that adopt the view that IPR estoppel is applicable in situations where the physical

26   device is materially identical to patents and printed publications have emphasized that IPR

27   estoppel serves to prevent duplicative litigation and to streamline patent invalidity challenges.  *See

28   Wirtgen Am., Inc. v. Caterpillar, Inc.*, 2024 WL 51010, at *9 (holding that IPR estoppel applies to

21

United States District Court
Northern District of California

physical device art because "[t]o hold otherwise would allow for a mammoth loophole: an IPR petitioner would always add a physical device that is identical to patents or printed publications in the subsequent civil case just to evade estoppel."); *Cal. Inst. of Tech. v. Broadcom Ltd.*, No. CV 16-3714, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019), aff'd, 25 F.4th 976 (Fed. Cir. 2022) (noting the importance of preventing defendants from "simply swapping labels for what is otherwise a patent or printed publication invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel").  Other courts have held similarly. *See, e.g.*, *Wirtgen Am., Inc. v. Caterpillar, Inc.*, 2024 WL 51010, at *9, *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 453 (D. Del. 2020); *Bos. Sci. Corp. v. Cook Grp. Inc.*, 653 F. Supp. 3d 541, 593 (S.D. Ind. 2023); *Avanos Med. Sales, LLC v. Medtronic Sofamor Danek USA, Inc.*, No. 219CV02754JPMTMP, 2021 WL 8693677, at *2 (W.D. Tenn. Oct. 8, 2021); *Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.*, No. 15 C 1067, 2019 WL 861394, at *10 (N.D. Ill. Feb. 22, 2019).[8]  These decisions collectively reflect a trend among some courts to prioritize the policy goals of IPR by preventing relitigation of invalidity arguments.

But other courts have declined to apply IPR estoppel to physical devices when it is materially identical to a patent or printed publication. *See, e.g.*, *Prolitec Inc. v. ScentAir Techs., LLC*, 2023 WL 8697973, at *22; *EIS, Inc. v. IntiHealth Ger GmbH*, No. 19-1227, 2023 WL 6797905, at *5–6 (D. Del. Aug. 30, 2023); *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, No. 17-1612, 2022 WL 2643517, at *2 (D. Del. July 8, 2022); *Willis Elec. Co. v. Polygroup Macau Ltd.*, 649 F. Supp. 3d 780, 813–15 (D. Minn. 2023); *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *4 (N.D. Ill. Sept. 14, 2020).  These courts have relied on statutory interpretation, arguing that the absence of explicit statutory language regarding physical device-based estoppel reflects a legislative intent to treat such systems differently.  *See Chemours Co.*

---

[8] It is worth noting that in *VLSI Tech. LLC v. Intel Corp.*, the court cited only cases that support a finding of IPR estoppel when the physical device is adequately described in printed publications.  706 F. Supp. 3d 953, 967 (N.D. Cal. 2023) (J. Freeman).  The court there did not rule on this issue, instead denying summary judgment because "a genuine dispute of material fact remains with respect to whether [invalidity theory] relies entirely on published prior art or also the [system art]."  *Id.* at 969.  Aside from *VLSI*'s tacit endorsement, no court in this district has ruled on the issue.

*FC, LLC v. Daikin Indus., Ltd.*, 2022 WL 2643517, at *2 (opining that "Congress could have dictated that estoppel applies to products covered by the paper art underlying the IPR where the paper art discloses the same claim limitations as the product. But Congress did not do so.").

I agree with the courts that interpret "grounds" under 35 U.S.C. § 315(e)(2) broadly, encompassing physical devices that are materially identical to a patent or printed publication.  This approach better aligns with the purpose of IPR estoppel as it promotes efficient resolution of patent disputes by preventing repetitive challenges based on slightly rebranded evidence.  *See In re Koninklijke Philips Pat. Litig.*, No. 18-CV-01885-HSG, 2020 WL 7392868, at *27 (N.D. Cal. Apr. 13, 2020) ("If a defendant 'purport[s] to rely on a device without actually relying on the device itself' or maintains identical arguments under an allegedly different statutory prong, the policy behind IPR estoppel may best be served by excluding that reference.").  Accordingly, I GRANT summary judgment for Contour on this issue.

GoPro's prior art theories based on Sony, Canon, and Nikon are barred by IPR estoppel because Dr. Almeroth does not rely on physical device prior art to the extent that it discloses material limitations outside of the printed publications.[9]

### C.  Inequitable Conduct

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011).  Contour asks that I grant summary adjudication in its favor on GoPro's thirteenth affirmative defense—that "any asserted claims of the '954 and '694 Patents are barred by the doctrine of inequitable conduct."  GoPro Counterclaims [Dkt. No. 559-2] ¶¶ 138–149; Contour MSJ 10–18.  GoPro seeks the reverse.  GoPro MSJ 9–14.

In this affirmative defense, GoPro alleges that two named inventors on the Asserted Patents (Contour employees Laura O'Donnell and Richard Mander) along with Contour's Chief Technology Officer Jason Green engaged in inequitable conduct by committing one of two

---

[9] Because I decide that GoPro's invalidity theories based on Sony, Canon, and Nikon prior art are barred by IPR estoppel, I decline to address Contour's auxiliary argument that the physical devices upon which Dr. Almeroth relies are not admissible evidence because GoPro cannot authenticate them.

United States District Court
Northern District of California

omissions: they either (1) omitted "one or more individuals working on behalf of Ambarella as named inventor(s) and joint owner(s) of the '954 and '694 Patents and the applications to which they claim priority," or (2) "omit[ted] the fact that those inventions were embodied in Ambarella products in order to overcome prior art rejections." GoPro Counterclaims ¶ 139. Had O'Donnell, Mander, and Green not engaged in either type of inequitable conduct, GoPro alleges, "the USPTO would not have granted the '954 Patent and/or the '694 Patent." *Id.* ¶ 149.

I conclude that neither Contour nor GoPro has met its burden at summary judgment for either ground of inequitable conduct. There are genuine disputes of material fact concerning the extent of Ambarella's involvement in the inventorship process and whether Contour intentionally omitted required information before the USPTO with an intent to deceive.

### i. Deceptive Inventorship

In reducing its invention to practice, Contour used a chip, designed by Ambarella employees, that had the capability of wirelessly producing a dual stream of both higher and lower quality. Contour MSJ 13. Ambarella's camera processor was prior art—both parties concede that. The question is to what extent Ambarella's engineers participated in the process of devising programming for the chip so that it would perform in accord with the Asserted Patents. In other words, at what point would Ambarella employees necessarily be joint inventors?

> To meet the requirements to be a joint inventor, and individual must:
> (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*Pannu v. Iolan Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998). Mere contribution of the chip, by itself, would not be enough to require any Ambarella employee to be a named inventor. It is a long-standing principle of the patent system that use of prior art does not demand a label of co-inventorship. "If it were otherwise, no patent, in which a combination of different elements is used, could ever be obtained." *O'Reilly v. Morse*, 56 U.S. 62, 111 (1853). As I indicated in an order granting GoPro's motion for leave to file its amended complaint, "[i]f *all* that the Ambarella employees contributed were chips known in the prior art, it seems impossible to call them co-

24

1    inventors."  Order Granting Motion for Leave to File Amended Complaint [Dkt. No. 585] 6.

2        GoPro argues that "Ambarella engineers . . . ***contributed*** at least the dual-streaming

3    concept to [Contour's] claimed invention as well as the process of sending that video wirelessly to

4    the personal portable computing device and receiving and processing wireless control signals."

5    GoPro Oppo. MSJ 17. (emphasis in original).  One of Ambarella's engineers at least partially

6    confirmed that the "dual-streaming concept" "was an Ambarella idea . . . dating back to 2007,"

7    and that he was involved in the development of that concept.  Legall Depo.  [Dkt. No. 627-28] at

8    7–8.  These engineers should at least be joint inventors, asserts GoPro, because each joint inventor

9    "need to perform only a part of the task which produces conception of the claimed invention."

10   *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).

11       But the Federal Circuit in *Ethicon* continued: "On the other hand, one does not qualify as a

12   joint inventor by merely assisting the actual inventor after conception of the claimed invention."

13   *Id.*  Contour argues that Dr. Mander and Ms. O'Donnell "did not invent generating two video files

14   having higher and lower quality," and asserts that "Dr. Mander did testify that the idea of having a

15   lower quality . . . video stream for preview was Contour's idea, and that idea did not come from

16   Ambarella."  Contour Oppo. MSJ 3.  In Contour's view, "Ambarella's engineers, at most,

17   explained how to use the A5 chip to output two streams."  Contour MSJ 12.  And, "a person will

18   not be a co-inventor if he or she does no more than explain to the real inventors concepts that are

19   well known and the current state of the art."  *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473

20   (Fed. Cir. 1997).

21       GoPro additionally argues that Contour has switched its argument from being one

22   highlighting that the Ambarella chip was fully developed prior art used by Contour in such a way

23   that no one at Ambarella could be a joint inventor to one where the named inventors (Contour

24   employees) were the sole ones who conceived of and reduced to practice all steps of the

25   "generate" limitation of Claim 11.  In GoPro's view, the Federal Circuit's holding that the

26   Asserted Patents contained patentable subject matter rested at least in part on Contour's arguments

27   before the Federal Circuit that "[b]ecause Ambarella's unconfigured processor is essentially a

28   blank slate on which programs are written to implement techniques for particular purposes,

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1    Ambarella's processor is a building block that enables others to devise new and improved

2    inventions."  Brief for Plaintiff-Appellant (Contour) on Appeal to the Federal Circuit [Federal

3    Circuit Case No. 22-1654 Dkt. No. 15] 60.

4         GoPro's emphasis on Contour's use of the terms "unconfigured" and "blank slate" are

5    right, I think, as they seem to diminish any of Ambarella's involvement in the creation of the

6    Asserted Patents—including, as Contour has already admitted, Ambarella's prior art invention of

7    the dual streaming capabilities of the chip.  Reviewing all of the evidence presented before me, I

8    cannot definitively conclude either that Ambarella *must* be a named inventor or that it must *not*.

9         A requirement of joint inventorship is not just "information in the prior art," but a

10   "contribution to conception."  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir.

11   2004).  From the evidence presented here, there are disputes of material fact whether and to what

12   extent Ambarella engineers made such a contribution.  I decline to grant summary judgment for

13   either Contour or GoPro on this issue.

14        ii.    **Omission to Overcome Prior Art Rejections**

15        Likewise, neither party has met its burden concerning GoPro's alternative inequitable

16   conduct assertion—that Contour hid the knowledge that its inventions were previously embodied

17   in Amberella products so that it could avoid prior art rejections by the USPTO.  GoPro

18   Counterclaims ¶ 139.  GoPro alleges that "Ambarella provided image processors and image

19   processing information to Contour" and that "one or more Ambarella employees and/or engineers

20   contributed materially to the conception and reduction to practice of one or more claims of each

21   patent."  *Id.* ¶ 140.  GoPro additionally provides what it claims to be a non-exhaustive list of the

22   means by which Ambarella contributed to that conception:

23

24        -    The camera processor claimed in the Asserted Patents and used in each
               generation of Contour's allegedly embodying products;

25        -    Receiving video image data from the image sensor;

26        -    Generating multiple (first/second) image data streams and/or video image
               contents from or corresponding to image data received by the image sensor;

27        -    Generating multiple (first/second image data streams and/or video image
               contents of differing qualities and/or resolutions;

28        -    Causing at least one of the video image data streams and/or video image
               contents to be sent wirelessly, *e.g.*, from the wireless connection protocol

26

device to a remote, personal portable computing device for display;
- Receiving control signals from a remote device, such as a personal portable computing device, that may be used to adjust one or more settings of the video camera;
- Causing the first and second video streams/video image contents to be save to a storage device on the camera.

*Id.* ¶ 141.  GoPro contends that starting on September 20, 2013, Contour submitted an Inventor's Oath on behalf of the named inventors, and falsely and knowingly claimed full ownership of the claimed inventions without disclosing the involvement of Ambarella's engineers.  *Id.* ¶ 144, 147–48.

At summary judgment, GoPro "must prove that [Contour] misrepresented or omitted material information with the specific intent to deceive the PTO . . . by clear and convincing evidence." *Therasense*, 649 F.3d at 1287.  Both elements are required.  I conclude that there is a genuine dispute of material fact whether (1) Contour misrepresented or omitted material information to the PTO and (2) whether any such omission was done "with the specific intent to deceive the PTO." *Id.*  "In a case involving nondisclosure of information . . . the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew it was material, and made a deliberate decision to withhold it." *Id.* at 1290.  Finally, "[w]henever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008).  Because GoPro cannot meet this high burden at least on the "intent to deceive" prong, there are material facts in dispute and I DENY both motions for summary judgement.

### i.   Materiality

Contour asserts that the '954 and '694 Patents each contain 12 references related to Ambarella.  Contour MSJ 14; Hu Rebuttal Expert Report [Dkt. No. 607-10] ¶ 489.  GoPro does not contest this assertion, nor does it contest Dr. Hu's "exemplary disclosures" about what each of those 12 references disclose about Ambarella.  *See* GoPro Oppo. MSJ 18–19.  There is a close relationship between what those references disclose and what, at least in its Amended Counterclaims, GoPro alleges that Contour neglected to clearly present before the USPTO.

27

Contour alleges that "any disclosure about the features and functionalities of the Ambarella chip would have been cumulative to the 12 Ambarella references already disclosed to the Patent Office, and thus not material." Contour is correct insomuch as "[i]nformation cumulative of other information already before the Patent Office is not material." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982 (Fed. Cir. 2007). A reference is cumulative when it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997). In the Patent Office's 2014 notice of allowance, the patent examiner found prior art for each of the submitted claims. 2014 Notice of Allowance [Dkt. No. 607-15] 18–23. And the examiner determined that "in consideration as a whole there is no strong motivation or reasoning at the time of the invention to combine the entire prior art references to arrive at the claimed invention." *Id.* at 23. There is no dispute that the patent examiner was aware of the existence of at least some prior art and considered prior art. Additional information presented by Contour relating to the 12 Ambarella-related references could have been cumulative and, therefore, immaterial.

### ii.    Intent to Deceive

Even if I assume that the above-referenced information concerning Ambarella's alleged involvement with the Asserted Patents was material, and that Contour was aware of the information, GoPro still fails to make an adequate showing that Contour "made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290. While it is possible to infer, as GoPro urges, "intent from indirect and circumstantial evidence because direct evidence of intent is rare," there is simply no definitive indirect or circumstantial evidence raised before me. GoPro Oppo. MSJ 20 (citing *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016), GoPro MSJ 12–13 (same).

In *TransWeb*, the Federal Circuit affirmed a district court's decision to infer that an inventor and attorney acted with intent to deceive the patent office in large part because the district court in that case had determined the testimony of both individuals to be "wholly incredible." 812 F.3d at 1306. I have no such benefit of testimony here. GoPro argues that "[t]he named inventors should have disclosed Ambarella's engineers as inventors given that they repeatedly relied

28

explicitly on the 'unique image processing' provided by Ambarella to secure issuance of its claims.  It is likely that they did not because [Contour] knew that if Ambarella were an inventor on the [Contour] patents, it was unlikely that Ambarella would agree to sue GoPro, which was one of its largest customers."  GoPro MSJ 13. But GoPro has not presented enough evidence to preclude me from making any other "reasonable inference," including, for example, that Contour did not provide additional and detailed background information on Ambarella's work as related to its chip because it considered that by including a dozen references to Ambarella, any patent examiner would sufficiently be able to review the prior art.  That is an "equally reasonable inference."  Accordingly, there is a dispute of material fact that Contour intended to deceive the PTO.  *Scanner Techs. Corp.*, 528 F.3d at 1376.  I DENY GoPro's request for summary judgment on that ground.

Similarly, although Contour offers support to weaken GoPro's position concerning the materiality and the deceptive intent behind any omissions before the PTO, its assertions do not preclude the possibility that GoPro's concerns are valid.  I likewise DENY Contour's motion for summary judgment on this issue.

### D.  Looxcie

Contour finally moves for summary judgment on the ground that there is no material dispute that GoPro's "Looxcie" theory has already been foreclosed by a previous order in this case.  Contour MSJ 19–20.  Contour also contends that all of GoPro's documentary evidence related to the Looxcie theory consists of inadmissible evidence.  Contour is wrong and I DENY summary judgment on both contentions.

#### i.    Remaining Looxcie Theories

On November 22, 2021, I concluded that Dr. Almeroth had advanced an invalidity theory under 35 U.S.C. § 102(g) that had not been disclosed in GoPro's invalidity contentions.  Order on Discovery Dispute [Dkt. No. 591].  The theory related to an alleged prior inventor, another camera company named Looxcie.  I struck the theory.  I specifically noted:

> Almeroth may not use Looxcie for purposes of Section 102(g).  Contour only moves to strike on that particular basis, so whether Looxcie was properly disclosed for other invalidity purposes—Almeroth appears to also use it for Sections 102(a) and 102(b)—is not before me.  To the extent Contour's request to strike seeks to eliminate Almeroth's

discussion of the reference altogether in his report, it is overbroad and denied on that basis. *Id.* at 3.

Contour's efforts to strike all references to Looxcie now on the basis of GoPro's Sections 102(a) and 102(b) arguments are as unpersuasive as they were during discovery. At the February 12, 2025, hearing, Contour explained that its position now "is that there was never a 102(a) or (b) defense to strike, so we [previously] only moved to strike the 102(g) defense." February 12, 2025 Hearing Transcript at 30. It contends that Dr. Almeroth's deposition on the Looxcie theory revealed that "GoPro plainly cannot prove invalidity [because] it cannot identify the art in question or the alleged date of the public use or sale of that art." Contour MSJ 20. But that is not true. Dr. Almeroth's expert report includes sections dedicated to Section 102(a) and 102(b) analyses. *See* Almeroth Report [Dkt. No. 627-5] ¶¶ 690–851. His deposition likewise addresses these issues. *See* Almeroth Depo. [Dkt. No. 627-38] 9–12. That GoPro has evidence in support of its Section 102(a) and Section 102(b) arguments that might overlap with evidence it may have wished to use to support a Section 102(g) argument is of no import. Each falls under Section 102, involving the subjects of patentability and novelty, and overlapping evidence would not be unusual.

### ii. Admissibility of Looxcie Evidence

Contour next tries to remove mention of the Looxcie theories by asserting that any documentary evidence related to the Looxcie theories is inadmissible hearsay. Contour MSJ 20–21. I decline to grant summary judgment on this issue because the business records exception covers the type of documents Contour wishes to exclude.

Here, there is at least a question of whether Mr. Pereira, one of GoPro's primary Looxcie witnesses, has the requisite knowledge to authenticate any documentary evidence, should he testify at trial. *Compare* Pereira Depo. [627-39] 56 (Q: "And, as the CEO in charge of the winddown of Looxcie, did you become the custodian in charge of Looxcie's records at that point?" A: Yes. I was really in charge of everything that was involved in shutting things down. . . .

United States District Court
Northern District of California

1   And part of that is also managing the records and . . . coordinating how to handle those records

2   during the shutdown process.") *with* Pereira Depo. [606-11] 285 (Q: "Do you know when this

3   document was made?" A: "I would have to go with the metadata that's associated with the file

4   saving or the date that is on the cover. That's the extent of my knowledge as well. Same thing that

5   you would have.").  In its motion, Contour downplays the role that Mr. Pereira played at Looxcie.

6   It contends that because Pereira became CEO in November 2009, he lacked "personal knowledge"

7   concerning "the creation of many of the documents that GoPro heavily relies upon and that Dr.

8   Almeroth cites to throughout his opening report on invalidity."  Contour MSJ 21.  Maybe.  But

9   "[c]ourts have made clear, however, that the custodian or other qualified witness who must

10  authenticate business records need not be the person who prepared or maintained the records, or

11  even an employee of the record-keeping entity, as long as the witness understands the system used

12  to prepare the records."  *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996).  The

13  Ninth Circuit "broadly interpret[s] a 'qualified witness' "to require only that the witness

14  understand the record-keeping system."  *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir.

15  1990).

16      Contour may raise evidentiary objections in the normal course at trial.  I will not exclude

17  the records now, as the business records exception may well apply.

18  **II.    GOPRO'S MOTION TO STRIKE**

19      Finally, GoPro moves to strike opinions of Contour's damages expert, Dr. Keith Ugone.

20  Motion to Exclude ("MTE") [Dkt. No. 609].  This is not the first time that GoPro has moved to

21  strike Dr. Ugone's opinions in this case.  *See* [Dkt. Nos. 371, 473].  In my August 31, 2020, order,

22  I allowed Contour to supplement Dr. Ugone's opinions.  Order on Motions for Partial Summary

23  Judgment, Motions to Exclude Expert Testimony, and Motions to Seal.  ("August 2020 Order")

24  [Dkt. No. 444].  GoPro now moves to strike portions of Dr. Ugone's supplemented opinions for

25  the same reasons as before.  *See id.* at 22–29.

26      As is relevant to this motion, Dr. Ugone opines that at the hypothetical negotiation

27  between the parties in November 2014, the parties would have agreed to a reasonable royalty rate

28  of $3.60 per accused camera using a profit-based methodology, or a rate of $9.71 using a

comparable-license methodology for the non-HERO9 cameras.  October 27, 2021 Ugone Expert Report ("October 2021 Report") [Dkt. No. 609-7] ¶ 154; *see also* November 23, 2021 Supplemental Ugone Expert Report ("November 2021 Report") [Dkt. No. 628-10] ¶ 9.  Based on a second hypothetical discussion in September 2020, following GoPro's release of the HERO9 camera with live streaming functionality, Dr. Ugone additionally opines that the parties would have agreed to the same royalty rates for the HERO9 cameras.  October 2021 Report ¶¶ 156–184.

Dr. Ugone uses two methodologies:

**Profit-Based Methodology**

Dr. Ugone's first method to estimate a reasonable royalty for the non-HERO9 products is based on an apportioned profit methodology, resulting in a $3.60 per unity royalty.[10]  With this method, Dr. Ugone identifies three features that add value to the Wi-Fi connectivity of the accused devices, as supported by conversations with Contour's technical expert, Dr. Hu.  Opposition to the Motion to Exclude ("Oppo. MTE") [Dkt. No. 628-5] 11.  These three features are the (1) Live Streaming + Remote Control, (2) Live Preview + Remote Control, and (3) Display and Playback. MTE 11; October 2021 Report ¶ 122.  Dr. Ugone opines that the "Live Preview + Remote Control" feature—what he concludes the parties would have agreed to be "the driver of demand for Wi-Fi connectivity and [] the primary feature enabled by Wi-Fi connectivity"—conservatively accounts for one third of the value of Wi-Fi connectivity.  October 2021 Report ¶ 9(d).  To that end, Dr. Ugone specifically apportions 33.3% of the value of Wi-Fi connectivity to the Live Preview + Remote Control feature.  October 2021 Report ¶ 128.

To arrive at his conclusion that the Live Preview + Remote Control feature is "the driver of demand for Wi-Fi connectivity," Dr. Ugone relies on conversations with Contour's technical expert, Dr. Hu along with GoPro documents and deposition testimony, including:

- Testimony of the founder and CEO of GoPro demonstrating the importance of

---

[10] He notes: "Should a determination be made that the HERO9 still infringes the Patents-in-Suit with respect to the Live Preview + Remote Control functionality, my prior analysis holds.  Should a determination be made that the HERO9 does not embody the Live Preview + Remote Control functionality taught by the Patents-in-Suit, both parties would recognize that the HERO9 still infringes the Patents-in-Suit through its Live Streaming + Remote Control functionality."  October 2021 Report ¶ 156.  I address these conclusions below.

United States District Court
Northern District of California

the Live Preview + Remote Control functionality,

- Testimony of GoPro's Senior Director for Product Management explaining that streaming and control were the top two concerns in development,

- Comments by the CEO of GoPro where he admits that GoPro should have worked to incorporate dualstream into its devices,

- GoPro's 2012 Wi-Fi Combo Kit that advertised the feature,

- GoPro's October 2012 tutorial video that advertised *only* this feature,

- An October 2012 GoPro press release advertising this as the first feature, and
- The former CEO of Contour's comments related to the ability of the feature to capture the type of content users wanted

October 2021 Report ¶¶125–26.

**Comparable License-Based Methodology**

Dr. Ugone's second method for estimating a reasonable royalty relies on a purportedly similar license agreement between Contour and another electronics manufacturer, Element Electronics ("Element") where Element agreed to a 5% running royalty rate for the use of any licensed products. Using this methodology, Dr. Ugone proposes a $9.71 per unity royalty for each accused product. He contends that, given the totality of the circumstances, this methodology (and the higher damages amount it projects) is more reflective of a reasonable royalty rate than the rate produces using the conservative profit-based approach. Ugone December 14, 2021 Depo. [Dkt. No. 609-9] 479: 9-14.

GoPro criticizes both of Dr. Ugone's methodologies, as well as his reliance on the Contour-iON settlement license, and, finally, his application of the income approach royalty rate for the HERO9 Black device. I find that Dr. Ugone has demonstrated by a preponderance of the evidence that his proffered testimony meets the admissibility requirements set forth in the Federal Rules of Evidence. Fed. R. Evid. 702. GoPro's concerns, with the exception of Dr. Ugone's reference to the Contour-iON settlement license, are better addressed at trial.

### A. 33.3% Apportionment

"When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Damages calculated for patent infringement "must reflect the value attributable to the infringing features of the product, and no more." *Id.* "[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product. In short, apportionment." *Commonwealth Scientific and Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks and citation omitted). Importantly, "under this apportionment principle, there may be more than one reliable method for estimating a reasonable royalty." *Id.* (internal quotation marks and citation omitted).

GoPro moves to exclude Dr. Ugone's testimony as it relates to this methodology on three grounds: (1) Dr, Ugone improperly apportions the value of Wi-Fi connectivity to only three features, (2) he lacks foundation for his assertion that each of the three features is equally valuable, and (3) his 33.3% apportionment impermissibly includes unpatented elements. I will address each of these arguments in turn.[11]

### i. Three Features

GoPro argues that Dr. Ugone has no reliable foundation for his assumption that "the value of Wi-Fi connectivity can be fully apportioned between only three features." MTE 10 (cleaned up). These three features are the (1) Live Streaming + Remote Control, (2) Live Preview + Remote Control, and (3) Display and Playback. MTE 11; October 2021 Report ¶ 122. Dr. Ugone

---

[11] I note that GoPro had an opportunity to refute similar arguments in *Contour I*, and it did not. *See* Order on Motions in Limine, Motion to Strike and Exclude, and Motions to Seal [Dkt. No. 510] 18.

asserts that as a result of the 2014 hypothetical negotiation, "[t]he parties . . . would recognize that Live Preview + Remote Control was the most important of the three features."  October 2021 Report ¶ 122.  Contour asserts that the basis for Dr. Ugone's conclusion includes "the value and emphasis that GoPro equally placed on three features in their own documents," and conversations and support from Contour's technical expert, Dr. Hu.  Oppo. MTE 11.  GoPro contests both bases. *See* Reply in Support of the Motion to Exclude ("Reply MTE") [Dkt. No. 641-4] 2–3 ("GoPro emphasizes more than three Wi-Fi related features."); MTE 10.

Dr. Ugone's reliance on conversations with Dr. Hu is thin in light of the lack of documentation.  *See* MTE 11, Reply MTE 3–4 (citing to out of circuit cases to support its contention that courts have excluded expert opinions found to be based on "undocumented conversations").  His report states that he had an interview or discussion with Dr. Hu concerning "[v]arious features provided through Wi-Fi connectivity and their relation to the Patents-in-Suit" and "[t]he increasing importance of Live Preview + Remote Control over time due to increasing resolution demands by consumers," but does not provide details of those conversations.  October 2021 Report ¶ 28.  And he cites his conclusion that "at the time of the hypothetical negotiation, the parties would recognize that two of the three features identified by GoPro concerning Wi-Fi connectivity could not be provided by GoPro to users without a license to the Patents-in-Suit" as "based upon a discussion with Dr. Jing Hu, Contour IP's technical expert."  October 2021 Report ¶ 79 n, 227.  He does not provide further details of that discussion.  *See also* October 2021 Report ¶ 51 n.160 (same).  Nevertheless, it is appropriate for an expert to consult and rely on other experts, and this portion of Dr. Ugone's testimony regarding his conversations with Dr. Hu as support of his decision to apportion the value of the Wi-Fi connectivity between the three aforementioned features can be tested in cross-examination at trial.  *See Primiano*, 598 F.3d at 564; *see also* MTE 11, Reply MTE 3–4; October 2021 Report ¶¶ 28, 51 n. 160, 79 n. 227.

United States District Court
Northern District of California

35

ii.    **Equal Value**

GoPro relatedly opposes what, in its view, is Dr. Ugone's arbitrary distribution of equal value to the three aforementioned features.  MTE 13–14.  In my August 31, 2020 Order, in addressing GoPro's critique of Dr. Ugone's report on similar grounds, I briefly noted that "[t]his opinion, too, would benefit from more analysis and support in a supplemental report."  August 2020 Order 25.  Dr. Ugone specifically addressed my prior concerns in his 2020 report, which acts as a foundation to his October 2021 report.  *See* Dr. Ugone September 18, 2020 Report [Dkt. No. 472-4] ¶¶ 4–5 ("In accordance with this leave [to supplement the damages expert report], I have been asked . . . to address the Court's concerns."), ¶¶ 7–13 (discussing Dr. Ugone's apportionment among the three features); *see also* October 2021 Report ¶ 1 n.2 ("This report relates to both Contour I and Contour II.  As to Contour I, this report incorporates my prior expert reports (for ease of reference purposes) and takes into account the Court's Orders at Dkts. 444 and 510, but otherwise does not add new methodologies other than to address new information."), ¶¶ 122–128 (addressing apportionment among the three features as it relates to the newly raised information in *Contour II*).

GoPro did not contest Dr. Ugone's September 2020 report on these grounds in its motion to strike his amended report, [Dkt. No. 472] (filed November 17, 2020), and so I did not address them in my January 8, 2021 Order concerning that motion.  [Dkt. No. 510].  In any event, Dr. Ugone's report again meets the minimum requirement for his opinions at this stage in that he has demonstrated that it is more likely than not that "the methodology is sound, and the evidence relied upon sufficiently relate[s] to the case at hand."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010).  Dr. Ugone's report indicates that he incorporated evidence to arrive at his conclusion that the Live Preview + Remote Control feature accounted for "a minimum apportionment factor of 33.3%."  October 2021 Report ¶ 126.

Based on the information included in GoPro's documents and deposition testimony

highlighted at the beginning of this Section, Dr. Ugone asserts that "the preponderance of information supporting the fact that applying just one-third is, most likely, a very conservative approach, given the prominence and the importance that GoPro has placed on the live preview . . . plus remote control, especially around the time of the hypothetical negotiation."  Ugone December 14, 2021 Depo. [Dkt. No. 609-9] 674: 19-25.  GoPro contends that this is not enough, citing to caselaw to assert that "Ugone made 'no attempt to investigate whether [these three features] should be assigned equal value" and that, because of Dr. Ugone's admission that "equal weighing involved no quantitative analysis," I should determine, similar to my August 31, 2020, Order, that Dr. Ugone's "analysis is untethered to the [33.3%] figure."  Reply MTE 5 (citing *Finjan, Inc. v. Sophos, Inc.*, 14-cv-01197-WHO, 2016 WL 4268659, *3 (N.D. Cal. Aug. 15, 2016)); [Dkt. No. 444] 24.  I do not.

GoPro does not accurately characterize Dr. Ugone's opinion concerning the value to be apportioned to each of the three features.  It consistently frames his apportionment of the three features as having "equal weight," and admonishes his admitted lack of quantitative analysis in arriving at this apportionment.  MTE 13–14; Reply MTE 5 n.5; *see also* Ugone December 14, 2021 Depo. [Dkt. No. 609-9] 674:16-18 ("I didn't need to do this quantitative aspect that you're talking about, given the wealth of information and the preponderance of information . . . .").  But Dr. Ugone does not posit such a specific understanding of apportionment.  He repeatedly notes that, for the non-HERO9 cameras, the parties would agree that the (1) Live Streaming + Remote Control and (2) Display and Playback features would have little to no value as a result of the 2014 hypothetical negotiation.  A line of questioning at his December 14, 2021, deposition clarifies Dr. Ugone's position:

> Q: I'm asking you if for the purposes of your apportionment [analysis], you treated the three features in your report as equally valued?
> A (Dr. Ugone): I treated the Live Preview + Remote Control as being one-third of the value.

> Q: And what constitutes the other two-thirds of the value?
> A: That would be the other two features we've been talking about.
> Q: And are each of those features valued at one-third?
> A: Actually, I'm valuing them as zero.
> Q: And mathematically, you're not actually apportioning Wi-Fi if you add zero plus zero plus one-third, correct?
> A: No, I've got one divided by three, but I haven't . . . at this point, for the hypothetical negotiation, I haven't said all three were equal to one-third. I talk about the live preview.
> Q: So it's not your opinion that the three features that we've been discussing could be valued equally for negotiation purposes at the hypothetical negotiation?
> A: They could be, but in terms of what the outcome is, I'm assigning zero value to them. But there are three features. But the value tied to the Patents-in-Suit is coming from live preview.

Ugone December 14, 2021 Depo. [Dkt. No. 609-9] 679–680.

In short, Dr. Ugone apportions only the 33.3% for the Live Preview + Remote Control functionality—he does not, as GoPro asserts—attempt to assign each functionality equal value. *Contra Finjan, Inc.*, 2016 WL 4268659 at *3. He had no need to "investigate whether product functions should be assigned equal value." *Id.* GoPro may cross-examine Dr. Ugone at trial to undercut the strength of his opinion before a jury, but at this stage he has adequately demonstrated that his proffered testimony meets the admissibility requirements. Fed. R. Evid. 702.

### iii.    Unpatented Elements

Finally, GoPro wishes to strike Dr. Ugone's opinion concerning the apportioned-profit methodology because it improperly apportions "unpatented features, conventional elements in the asserted claims and captures value related to inventions [Contour] did [not] invent." MTE 14 (cleaned up). GoPro contends that such "features" and "elements" include specific control settings related to the remote control aspect of the accused products, a Wi-Fi remote controller not covered by the patents, and Dr. Ugone's apparent indiscriminate apportionment for the "live preview" functionality, which does not account for differences in what GoPro terms *generic* live preview (which GoPro asserts is not a novel feature and therefore not apportionable) and the *narrow* live preview that is "allegedly novel." MTE 14–16.

As discussed earlier, Dr. Ugone consistently explained in *Contour I* and now that he

38

assigned any auxiliary control settings and external remote control device a value of zero.  *See* Oppo. MTE 12–14.  Regarding GoPro's generic vs. narrow live preview assertions, Contour's view, as reflected in Dr. Ugone's report and its summary judgment papers, *see supra* Discussion Part I, is that it "invent[ed] the live preview of a lower quality video stream of the two [video streams] that are generated in parallel."  Hu June 25, 2020 Depo. [Dkt. No. 628-23] 29:15-17; *see also* October 2021 Report ¶¶ 104(e), 105 (relying on Dr. Hu's technical opinion to assert that any removal of "live preview" from the accused products would necessarily result in a "disabling or degrading [of] a key element of the Accused Functionality.").  In Dr. Ugone's view, the live preview functionality cannot be separated in the way GoPro describes.  That Contour and GoPro differ on this point is expected, and a trial is necessary to resolve it.

Dr. Ugone has demonstrated that it is more likely than not that his testimony will meet the admissibility requirements.  GoPro may challenge each of the aspects of Dr. Ugone's 33.3% apportionment analysis at trial.  Its motion to strike them now is DENIED.

**B.  The HERO9 Black device**

I have denied both parties' motions for summary judgment concerning the HERO9 Black device.  *See supra* Discussion Part I.A.iii.  Whether the HERO9 Black device infringes upon the '954 Patent through use of its live streaming functionality is a matter that will be determined at trial.  GoPro moves to exclude Dr. Ugone's royalty opinions for the HERO9 because, in its view, "they violate basic principles of patent damages law, including the essential requirement that damages 'must reflect the value attributable to the infringing features of the product, and no more.'"  MTE 17 (citing *Commonwealth Scientific and Indus. Research Organisation*, 809 F.3d at 1301).  But it again overstates the conclusions included in Dr. Ugone's report.  Its concerns with Dr. Ugone's analysis are best addressed at trial.

Because the HERO9 was introduced six years after the other *Contour II* devices, Dr. Ugone asserts that the device would be subject to the license agreement resulting from the 2014

hypothetical negotiation.  October 2021 Report ¶ 156.  That license rate would be $3.60 based on the 33.3% apportionment analysis explained above, and $9.71 based on the comparative license analysis explained below.  Dr. Ugone explains that he "understand[s] from my interview with Dr. Hu and reviewing Dr. Hu's report that the underlying infringement is the same for both Live Preview + Remote Control and Live Streaming + Remote Control."  *Id.* ¶ 14.  Dr. Ugone then reviewed how he would understand that the increase in streaming popularity from 2014–2020 would likewise increase GoPro's incremental gross profit attributable to the Live Streaming + Remote Control functionality to $5.67 by the time of the HERO9 Black device's 2020 release.  *Id.* ¶¶ 178–184.  Because of the " 'freedom to operate as to all current and future products' [clause] provided by the November 2014 license," he expects that GoPro would continue to agree to the $3.60 per unit royalty for HERO9 Black sales.  *Id.* ¶ 183.

"When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  *i4i Ltd. P'ship*, 598 F.3d at 852.  Each of GoPro's arguments, at some level, take issue with the accuracy or relevance of Dr. Ugone's analysis.  For example, GoPro asserts that Dr. Ugone did not meet his obligation to split profits when explaining the $5.67 incremental profit analysis.  MTE 18.  But Dr. Ugone's analysis relied on the parties' continued use of the 2014 hypothetical negotiations, which results in a $3.60 per unit royalty for Contour.  October 2021 Report ¶ 183.  GoPro's conflicting analysis may have merit.  *See* Reply MTE 9 ("the resulting per unit royalty would be $2.27.").  Dr. Ugone relies on sound methodology with sufficiently related evidence; the merits of those disagreements are best addressed at trial.

**C.  Royalty Rate based on the Contour-Element License**

GoPro asserts that the Contour-Element license agreement was "not the product of a simple, arm's length negotiation between two parties," and so cannot meet the baseline

requirements illustrated in *Bio-Rad Laboratories v. 10X Genomics Incorporated*. Reply MTE 10; 967 F.3d 1353, 1372–73 (Fed. Cir. 2020). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Laboratories, Inc.*, 967 F.3d at 1372–73. "[T]he issue of comparability is often one of sufficiency of the evidence, not admissibility." *Id.* at 1373. So here.

GoPro bases its assertion on the nature of the relationship between Contour, Element, and non-party video doorbell manufacturer, SkyBell Technologies (which shares a CEO and director of IP with Contour). MTE 7, 22–24. There is no dispute that Contour and SkyBell have both executed licensing agreements with Element. Oppo. MTE 9; Reply MTE 10. And Contour asserts that "SkyBell and Element are separate companies with no prior contractual relationship nor financial or ownership interest in one another," and the same is true for SkyBell and Contour. Oppo. MTE 9–10. Contour is owned by non-party V Eye P, and V Eye P owns no interest in SkyBell. Oppo. MTE 9 n.9.

GoPro agrees with Contour's framing, but highlights that non-party Kensington Capital is a majority owner in V Eye P, and also has some indeterminate stake in SkyBell. *See* MTE 7 (citing to November 17, 2021 Contour CEO Depo. [Dkt. No. 609-14] 60:23-61:12, 63:3-16). In his deposition, the CEO of Contour and V Eye P, when asked whether Kensington Capital owns any equity in SkyBell, responded: "There is a small amount of investment. How it was put in either from [a Kensington affiliate] personally or from a Kensington entity, I do not recall." November 17, 2021 Contour CEO Depo. [Dkt. No. 609-14] 65:13-15. GoPro contends that the terms of the Contour-Element licensing agreement and those of the SkyBell-Element licensing agreement demonstrate an unacceptable relationship between Contour and Element. *See* Reply MTE 10 ("

██████████████████████████████████████.” (emphasis in original)).

GoPro points to *Finjan, Inc. v. Secure Computing Corp.* to support its notion that I should strike Dr. Ugone's opinion for these reasons. 626 F.3d 1197, 1211–12 (Fed. Cir. 2010). But in *Finjan*, the Federal Circuit affirmed the district court's denial of defendants' motions for judgment as a matter of law or a new trial in part on the basis that at trial, plaintiff "noted multiple differences between the [comparable licensing agreement] scenario and a hypothetical negotiation with Defendants." *Id.* at 1212. Those differences included the existence of competition, significant value derived by the plaintiff from the relationship with the comparable licensee, and the use of a lump sum as compared to a running royalty. *Id.* The Federal Circuit held that "[t]hese differences permitted the jury to properly discount the [comparable] license." *Id.*

The same is true here. The relationship between Contour and Element is not *so* intertwined as to be unacceptably close. GoPro's secondary argument, that the Contour-Element license is overbroad when compared to the 2014 hypothetical negotiation between Contour and GoPro, goes directly towards the question of comparability. Both are argumenst better directed towards a jury.[12] MTE 20–22. I DENY GoPro's motion to exclude Dr. Ugone's opinions concerning the comparable license agreement between Contour and Element.

---

[12] This includes GoPro's assertion in its motion that "Element undisputedly makes no Licensed Products." MTE 22. GoPro re-raised this claim in its supplemental briefing before the February 12, 2025, hearing. GoPro Supp. Br. [Dkt. No. 696-4] 5 ("As was the case when GoPro filed its motion in December 2021, based on publicly available information today—over two years after the agreement's execution date—it still appears to be the case that Element has never made a licensed product. Dkt. 609-12 at 2. Element continues to sell TVs, monitors, and household appliances, but not action cameras."). This argument may weaken Dr. Ugone's position on the Contour-Element license agreement, but GoPro's concerns again go to weight, not admissibility. Contour has countered, for instance, that "[s]ince the execution of the Contour-Element license agreement, Element has already started paying Contour non-refundable pre-payments for the [] running royalty and has started developing doorbell cameras and action cameras for launch in 2022." Oppo. MTE 9. At this stage, Dr. Ugone has met his obligations to demonstrate admissibility. Fed. R. Evid. 702.

United States District Court
Northern District of California

1

2

### D.  References to the 2018 Contour-iON License

Finally, I briefly address GoPro's motion with respect to Dr. Ugone's references to the 2018 Contour-iON licensing agreement.  As I have previously held, the royalty rate at issue in that agreement "was not the result of an arms-length negotiation because iON had an ownership interest in Contour (and Contour previously had an ownership interest in GoPro)."  August 2020 Order 28.  That Dr. Ugone uses the Contour-iON settlement agreement now, in an attempt to buoy support for his understanding that the Contour-Element license is an appropriate method of apportioning reasonable royalties, is inappropriate.  I GRANT GoPro's motion to strike Dr. Ugone's report of his discussions of the Contour-iON settlement agreement.[13]

### CONCLUSION

Accordingly, Contour's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  GoPro's motion for summary judgment is DENIED.  GoPro's motion to strike the opinions of Dr. Ugone is GRANTED IN PART and DENIED IN PART.  The outstanding motion to seal is resolved as set forth above.

**IT IS SO ORDERED.**

Dated: March 24, 2025

William H. Orrick
United States District Judge

---

[13] I likewise GRANT GoPro's motion to strike Dr. Ugone's brief reference to Contour's *offer* of a licensing agreement made to non-party CoolTech Acquisition Corporation—an offer that was never, it seems, accepted.  October 2021 Report ¶ 91 n. 284.

43