**Pages 1 - 79**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

CONTOUR IP HOLDING, LLC,     )
                                   )
        Plaintiff,      **)**  **CONSOLIDATED CASES**
                                 )  **NO. 3:17-CV-04738 WHO**
  VS.                    )  **NO. 3:21-CV-02143 WHO**
                                 )
GOPRO, INC.,            )
                                 )
        Defendant.      )
_____)

San Francisco, California
Friday, September 19, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
          845 Texas Avenue, 25th Floor
          Houston, Texas 77002
     **BY:**  **JOHN R. KEVILLE, ATTORNEY AT LAW**
          **MICHELLE C. REPLOGLE, ATTORNEY AT LAW**
          **SUNNY AKARAPU, ATTORNEY AT LAW**

For Defendant:
          ALSTON & BIRD LLP
          One Atlantic Center
          1201 West Peachtree Street
          Atlanta, Georgia  30309
     **BY:**  **JOHN D. HAYNES, ATTORNEY AT LAW**
          **SLOANE S. KYRAZIS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
           CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:
                          ALSTON & BIRD LLP
                          One Atlantic Center
                          1201 West Peachtree Street
                          Atlanta, Georgia  30309
                     BY:  **JOHN D. HAYNES, ATTORNEY AT LAW**
                          **SLOANE S. KYRAZIS, ATTORNEY AT LAW**

                          ALSTON & BIRD LLP
                          55 Second Street, Suite 2100
                          San Francisco, California 94105
                     BY:  **MICHELLE A. CLARK, ATTORNEY AT LAW**
                          **PHILIP C. DUCKER, ATTORNEY AT LAW**


                          ALSTON & BIRD LLP
                          2828 North Harwood Street, Suite 1800
                          Dallas, Texas  75201
                     BY:  **ELLIOTT C. RICHES, ATTORNEY AT LAW**

                          ALSTON & BIRD LLP
                          Vantage South End
                          1120 South Tryon Street, Suite 300
                          Charlotte, North Carolina 28203
                     BY:  **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**


Also Present:            **Sarah Moyer, Paralegal**
                          **Stacy Gunder, Paralegal**

**Friday - September 19, 2025**                                    **1:54 p.m.**

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:**  This court is now in session. The Honorable William H. Orrick presiding.

**THE COURT:**  Afternoon, everybody.

**ALL:**  Afternoon.

**THE COURT:**  Please be seated.

**THE COURTROOM DEPUTY:**  And we are here in Case Number 17-4738, Contour IP Holding, LLC vs. GoPro, Incorporated.

Counsel, if you will at least send your team leader up to introduce the team.

**MR. KEVILLE:**  Good afternoon, Your Honor.  For the plaintiff, John Keville, Michelle Replogle, and Sunny Akarapu.

**THE COURT:**  Great.  Good afternoon, Mr. Keville.  It's been a while.

**MR. KEVILLE:**  It has been.

**MR. HAYNES:**  Good afternoon, Your Honor.  John Haynes, and with me today is Sloane Kyrazis, Karlee Wroblewski, Michelle Clark --

**THE COURT:**  I know her.

**MR. HAYNES:**  -- Phil Ducker and Elliott Riches.

And we also have Sarah Moyer, who's going to help us with our graphics today.

**THE COURT:**  Terrific.

**MR. HAYNES:**  Thank you.

**THE COURT:**  Welcome, everybody.

I'll just say, it still is amazing to me that you-all are proceeding, but I leave that up to the wisdom of you and your clients.  And I'm just here, going to do what I'm going to do, and today we're going to do the pretrial conference.

The first thing we're going to do is go through the various motions that I put out the tentative on.  I'm going to give you the magnanimous amount of 45 minutes each to argue.

And, Mr. Keville, you get to start.

**MR. KEVILLE:**  Thank you, Your Honor.

So, thank you for your tentative.  We were all a little worried that we were just coming in and arguing everything, so we were glad to see that.

On the summary judgment of invalidity, obviously, we have no argument on that.  We'll leave that for opposing counsel.

On infringement, I will say, had there been only one thing that you found dispute of fact on, I would have argued it; but I think with three, we're going to stand on your ruling and we'll take it to trial.  We're happy on that one.

Motion to strike, there is -- obviously, that's been -- you've tentatively denied that.  So where I would start is the motion to strike Dr. Almeroth, and I think two things come into play, and I'm really focused on your ruling [as read]:

"I am inclined to deny the motion as to Dr. Almeroth's opinions concerning:  (1) Dr. Hu's revised infringement theories concerning the 'generate' limitation."

And I think that ties in with Contour's Motion in Limine Number 2, which was granted in part.  So I'll kind of address those --

THE COURT:  Great.

MR. KEVILLE:  -- together.

THE COURT:  Okay.

MR. KEVILLE:  Okay.

All right.  So, Your Honor, there's been this presentation by GoPro as if there is this whole new theory, and there isn't a whole new theory.

If you go to the next slide, Sunny.

What you can see here -- and go to the next slide -- is what we really have -- one more time Sunny; there you go -- is we now have three streams generated in parallel instead of two. The upper two streams are the ones that are in dispute, so to say, and then the phone preview is always there.  That's the purple.

So there is no change in the theory that there is always live preview or live streaming while recording; right?  The issue came because they added this new third stream, and all that really resulted in --

If you would go to the next slide.  Those are streams.  Go to the next slide.

So this is the same theory that you found other cameras infringe.  And there's no dispute that this is what the new processor does.  It meets all these elements.  Okay?

What Dr. Hu said is this new stream, the LRV to SD card -- go ahead, Sunny, one more -- is that, you could look at that as being the first image data stream for purposes of dependent claims 13 and 14.

So if you would put that up.

And so what she's saying is you can look at that third low-resolution stream as being the stream to meet these two claims, and that was a theory that she put forth that was new.

We have heard testimony that came after you ordered they could amend and supplement.

And if you would put that up, Sunny, next slide.

This is her testimony.  She testified [as read]:

"... the live preview during recording and live streaming during recording feature, either one has to be supported..." to infringe.

What they've said is, well, her new opinions say you don't have to have recording while you're doing the preview or streaming, and that's not true.  She's always been consistent, and that's because the same theory applies to those first two streams.  Right?  So that's always the case.

Keep going, Sunny.

She said without live streaming during recording or live preview during recording, any accused camera wouldn't satisfy claim 11 as a whole.  So, no change.

Next one.  She said [as read]:

"... require either live streaming during recording or live preview during recording in order to infringe."

The next one.

[As read]:

"So my opinion has always been that live -- live preview during recording or live preview -- live streaming during recording, either one is necessary for the infringement of claim 11 if we are talking about '954 alone."

So she's been very clear that that's all we're talking about.  Right?

When they brought this up and we ended up in all this briefing about did she have a new theory or did she not, we said, "Look, in order to -- we only have 15 hours per side. We've got all this new issue.  Let's just drop the dependent claims."  So we're dropping, you can see here -- next slide, yeah.  So those claims have been dropped.

So the whole third stream issue is now moot because the dependent claims are dropped.  So there's really no more issue

that really requires that or that she would even talk about that third stream for purposes of infringement of claim 11 -- right? -- or the other claims in the other patent.

So now we're in a position where Dr. Almeroth's opinions are tied to dropped claims, and now he's outside of what we've always understood the generate limitation is and what Dr. Hu's opinions are.

So if you go to the next slide.

See, here is what Dr. Almeroth's opinions are.  They're tied to her supposedly expanding the scope.  Right?  And so he says [as read]:

"To the extent Dr. Hu's interpretations of the claims is correct, Boland discloses a camera processor configured to generate..."

And then goes through the thing.

Now, no one should be able to testify that Boland is covered by the "generate" term.  The PTAB has ruled on that. You have ruled on that.

And so Dr. Hu has said very clearly, "I'm not saying that you do do what they say, that Boland, which has the serial processing, is infringing."  She's never said that.  She's never said the claim scope covers it.  And we've dropped the claims just to avoid any confusion of issues.

Nevertheless, we're now going to have him apparently bringing up, "Well, Dr. Hu's opinion, in my opinion, is broad

enough to cover Boland," which he shouldn't be able to say. Right?

So that's kind of where I think we need to tweak or clarify that.

Same thing, if you go to the next slide.

He says in his July 2025 report, Dr. Almeroth [as read]:

"To the extent that this claim limitation can be met by a lower-resolution file..."

And he basically says Boland discloses this element. Right?

And so he shouldn't be able to say that in reliance on what -- how he interprets what Dr. Hu was saying about the third stream and now, even more attenuated, as to claims that aren't even in issue.  Right?

And one of the reasons that came up is because if you look at MIL 2, you said [as read]:

"A number of facts remain in" --

No, that's not the right one.  Neither side -- right?

You said [as read]:

"Grant in part.  Neither party may re-argue claim construction of the 'generate' term.  But neither is precluded from presenting what it views to be within the scope of the term or inconsistencies in the other side's use."

My worry is now he's saying, "Well, I interpreted what

Dr. Hu said as being outside the claim scope, and therefore, I can bring Boland into this," and we're all kinds of off on side issues.

In addition -- go to the next slide -- you have found in multiple instances, at least two that I remember, that Dr. Almeroth misconstrued the generate limitation.  And I wouldn't be thinking that I'm allowed to bring those in in order to say, "Well, didn't the Court rule you misinterpreted this" on an issue that's been decided and is no longer in dispute.

But now, if he's going to say, "Well, I think Dr. Hu misinterpreted the claim," or, "She's interpreting it this way because of the third stream, and I think she's wrong, but now Boland is considered as prior art that invalidates," I'm going to say, "Well aren't you the one who said you thought the claim term meant this and the Court ruled you were wrong?"

And it just broadens this into an area where I don't think you meant for us to go, nor do I think we should be going.

So that's kind of where I come out on those, and I'm happy to let them address.

**THE COURT:**  Okay.  Excellent.

Ms. Clark, nice to see you.

**MS. CLARK:**  Good afternoon, Your Honor.  How are you?

**THE COURT:**  Good.

**MS. CLARK:**  Quick procedural question.  So if we were

going to argue portions of your tentative as to their motion to strike, do we do it all at once, or do you want me to just respond to Mr. Keville?  Happy to go either way.

**THE COURT:**  I don't care how you argue.  I'm just watching the clock, so...

**MS. CLARK:**  Okay.

**MR. KEVILLE:**  Do it as you need to, and I will respond.

**MS. CLARK:**  Thank you, sir.

All right.  Well, I don't know that there is a lot to say about the reargument on whether or not there was a new infringement theory.  Your Honor already found that there was.

I think we can all agree -- Ms. Moyer, Slide 2 -- that up until Contour III, the plaintiff read the generate limitation as the limitation that disclosed live preview.  That's the first image data stream generated in parallel that was sent wirelessly as live preview.  I mean, Dr. Hu told us back in 2020 that that's what their invention was.

Slide 3.

And that's, in fact, how Contour defined the term "live preview."  It was defined as sending only the first image data stream.  That's the lower-resolution stream.

So Slide 5.

Wirelessly streaming the lower-resolution video rather than recording it and sending it as a file was, in fact, the

key way that Dr. Hu distinguished some of the prior art that we're still talking about today, like Woodman.  And also, that's how they characterized their own invention.  Right?

Next slide.

And then we get here.

Slide 10, please.

And in Contour III, we have Dr. Hu saying that the camera processor limitations actually do not disclose live preview while recording.  They do not provide a technological improvement over the real-time viewing capabilities of a point-of-view camera because they don't have --

**THE COURT:**  You need to slow down a little bit.

**MS. CLARK:**  Sorry.

-- of a point-of-view camera recording because they don't have to be in real time at all.

And while Contour now wants to argue that this argument was really about the dependent claims 13 and 14, we can see that that's not true.  These opinions were offered with respect to claim 11.  And they had to have been -- right? -- because claim 14 depends from claim 13 which depends from claim 11, and they require the same first video image data stream.

So if the first video image data stream of the generate limitation in claim 11 can now be a file that is saved to the camera before it's ever wirelessly transmitted after recording, then that's the same first image data stream that they argued

met claim 13 and 14.  Right?  It can't be different.  It's basic claim construction law.

And so while they may have withdrawn claims 13 and 14, I think that we fairly get to offer responsive opinions and to cross-examine Dr. Hu on the scope of her articulation that there is no real-time requirement -- Slide 13, please -- that there is no real-time requirement built into the camera processor limitations.

So if you put up Slide -- so -- right? -- we have here and then, in Slide 14, it's the same thing.  Right?

At her deposition, she says the first image data stream, it doesn't have to be viewable by the user, nor does it have to be in real time.

So if the first image data stream doesn't have to be the live real-time preview because it's not real-time image content, then what does that leave these claims with?

Slide 15.

So this is the image that Contour provided in its brief and Mr. Keville put up, and I do think that it illustrates the difference between infringement theories.  It shows that -- if anything -- right? -- it shows that they are materially different because on the left-hand side, you have Contour I and Contour II, and that's the old products where Dr. Hu opines that the real-time image content and the first image data stream, they're the same thing.  That's why they're both in

purple.

The first image data stream is generated in parallel with the higher-quality second image data stream, and the first image data stream is then sent directly to the personal portable computing device.

It could -- reserving all rights, it could be reasonable to read that as requiring live preview while recording, but that's not where we're at today.  Right?  Now we're on the right-hand side, and that's where all of a sudden we have this brand-new color.

The new color is that LRV that we know is in the product -- has been in the products -- right? -- for -- since the beginning of this case.  It's not streamed in real time. It's not even available until recording ends.  And that's what Contour is saying meets the camera processor limitation of claim 11.  That's the claim they have up there.

Importantly, you can see they're still purple.  And that's where Contour is saying, "Well, there's still this real-time requirement, and so there's still live preview while recording."  Right?  They're still relying on the purple.

But there's nothing in that element that requires or even speaks to recording.  And, you know, this is the dispute that you saw in MIL 3, our MIL 3, which I'm not covering right now.

But the point is that -- if we'll go to Slide 18 -- it can't be -- right? -- that the wireless connection protocol

device limitation is, as Dr. Hu says, what discloses live preview while recording because it doesn't say anything about recording at all.

And if we accept as a predicate that this, the wireless protocol device, doesn't say anything about live preview while recording and, also, the generating limitation doesn't say anything about live preview while recording, it doesn't have to be live at all, then there is nothing in this claim, Your Honor, that discloses or requires live preview while recording.

And I'm not standing up here challenging and saying they can't say it reads on live preview while recording, but we are very far afield of what they have repeatedly told this Court and the Federal Circuit the invention is, and that's how they distinguished the prior art before, which gets me to the next point.

Can we go to Slide 39.

Contour's motion to strike that counsel just came and talked about, it seeks to strike -- right? -- this huge panoply of paragraphs that it argues are -- 49 paragraphs, actually -- that it argues are inconsistent with the Court's prior construction of the generate limitations.  And I think that's all you get, is the one paragraph.  They don't exactly explain to you how.

But if I can sort of extrapolate, I think that it's

because they think that Your Honor already ruled that the generate limitations can't be met by Boland as a matter of law. And I don't think that's ever been before the Court.

I think -- right? -- what we have is, if we look at Boland in particular --

Let's look at Slide 44.

I'm skipping a bunch of slides that show that this 49-paragraph block of opinions has opinions about Sony, Woodman, et cetera, that really aren't addressed in this motion at all.  Right?  Suffice to say, this is a very overly broad motion.

But if we just look at the handful of opinions about Boland itself, what you can see is that Dr. Hu previously distinguished Boland on the basis that -- Dr. Hu previously distinguished Boland on the basis that Boland created the preview from previously stored data.

And now what you have is Dr. Almeroth coming and saying, "Okay.  But you are also saying that claim limitation can be met by wirelessly transmitting previously stored data."  Right?

So Slide 46 -- 47.  Sorry.

And that's all Dr. Almeroth is doing here -- right? -- is he's pointing out inconsistencies between these positions, and those inconsistencies can't just be erased by dropping claims 13 and 14.  He's not offering new claim construction opinions.

He's actually going through and he's identifying the places where she, Dr. Hu, in 2020 and 2021 said, "This is what Boland discloses.  It discloses a preview that's created from previously stored data."  And he's saying, "Okay, but that's what the LRV is too."  Right?

And I think that if we go to Slide 50 -- a little blast from the past.  I know you mentioned that every time you hear an argument in this case, you have to spend hours getting ready because there's so much history here, and I think that's true.

But, you know, just a quick reminder:  The logical flaw in counsel's argument is that it's predicated on this idea that the Court has already held that Dr. Almeroth is foreclosed from rebutting Dr. Hu's opinions regarding Boland's disclosure, and we actually know it's the opposite.  Right?  We know that this Court has actually said that whether Boland discloses the generate limitations under the Court's construction is a question of fact for the jury.

And I know that because five years ago, I actually asked the Court for a ruling and lost.  I argued then that Contour and its expert should be foreclosed from arguing that Boland does not disclose the generate limitation because its preview is downsampled from previously encoded data.  Right?

Slide 51, we see Contour argued the opposite.  It argued that there's a distinction because Boland's preview is created from video that's been encoded and stored.

I said, well, encoding can't matter because Your Honor already ruled that there's no processing limitation, and encoding is a form of processing.  If all of my other processing steps don't matter, then why does their compression step matter?  So then it's only storage.  Right?

And Your Honor said -- let's see.  This is the next slide that has Docket 510 on it.  I'm not going to reargue that motion unless you invite me to, but -- I mean, I would love to, but suffice to say Your Honor said that it raised a question of fact.  Right?  Your Honor ruled against the motion in limine not because it decided that Contour was absolutely correct that Boland's preview was materially different from the claimed preview, but what the Court found was that there was a factual dispute as to whether -- the distinction between how Boland makes its preview and the claims, and you said both sides have reasonable positions and it's a question for the jury.

And GoPro has every right to point out the incongruity of Contour's position.  Right?  So that's all we're doing here.

First, they said, "Well, Boland's created from encoded data," but then they say, "Processing doesn't matter," and Your Honor agrees.  Then they say, "Well, Boland is created from something that's been stored before."

Now the LRV is something that has been stored before.  And so I think there should be really no argument that we are entitled to offer rebuttal opinions -- right? -- that are in

keeping with what Your Honor previously said was a reasonable dispute between the parties to be presented to the jury.

I do have a couple of things that I'd like to ask Your Honor to think about.

**THE COURT:** Go ahead.

**MS. CLARK:** Okay. So real quick, I understand Your Honor's tentative.

I do want to say one thing because it looks like what I believe happened -- and maybe I'm wrong, but it looks like Your Honor ultimately found that our March 31st, 2025, report was improper, and I just want to clarify a couple of points.

Can we put up Slide 23.

So the first thing that I want to clarify here is that, you know, in serving an invalidity report back in March, we were really working on principles of parity because, following remand by the Federal Circuit, as Your Honor knows, Contour sought leave to add five new products released after GoPro HERO9 in September 2020.

I just want to point out here that that's important because Contour's motion to strike rests really on this idea that we couldn't -- that we could have added our defenses earlier, but they couldn't have added new products earlier. Right? So there's no parity.

That's wrong. Okay? They added Contour -- or they added the HERO10. That came out -- I think I have a timeline up. I

can't see the screen, so I'm just going to assume I have a pretty timeline up.  That came out well before, I want to say six months -- and, again, I can't see the screen -- so that came out well before, I want to say six months before Your Honor's motion for summary judgment order.  It came out --

You broke it, Karlee.

Thank you, but I still can't see it.

THE COURT:  You might have the same technological skills that I do.

MS. CLARK:  Keep on going.

The point here is that there were significant interim steps.  Right?  I believe the parties -- at the time that Contour 10 or HERO10 -- at the time HERO10 came out, the parties were still here in front of you arguing about fact discovery.  Right?  So there is no reason they couldn't have added that product.  We were still taking depositions.  I know it's hard to believe.  We were still taking depositions.  We were still doing fact discovery and then expert discovery, and they didn't add that product.

So when they got leave to add that product, I would argue that the case law, including *Synchronoss* and, you know, the *Facebook* case, in particular, militates in favor of allowing us to argue -- right? -- as a matter of parity and fairness, allows us to bring our invalidity opinions.

And I will also say that -- I think the second point that

I wanted to make is, when the parties were here in January, if I recall, Your Honor recognized that there may be some differences of opinion as to the appropriate scope of expert reports.  And Your Honor told the parties very clearly that if there was such a dispute, they should come back to you and talk about it, and they didn't.

And Contour tells you very clearly why they didn't in their briefing.  Right?  They say that rather than respond or file a motion, they didn't want to risk their trial date, so they just responded.  And that's totally their choice.  It's all well and good.  But now where we're at is they've responded.  Not only did they respond, but they got in their new infringement theory -- right? -- which reads on playback, which has existed since before this case.

And so I think, as a matter of fundamental fairness, if they got to add in their new theory, their new accused products that they could have brought up earlier and they intentionally didn't seek recourse sooner before Your Honor but intentionally decided that they were just going to respond, I ask you:  What is the prejudice?  Right?

It's undisputed that we haven't added any fact evidence to the record.  It's undisputed that they had not one, but two chances at this point to respond to those theories.  And to date, they haven't said anything like, "We need new evidence.  There's" -- right? -- "something in the record that we couldn't

respond to."  It's almost the opposite.  They just say, "Well, you've known about this all along, and so you shouldn't be able to raise it now."

And I think, again, that's not entirely true; but also, it's somewhat irrelevant under the legal -- the correct legal standard, which advocates for parity and fairness between the parties' positions.  And if they were allowed to add not just new products, but also new theories, so too should we have been allowed to.  And that's all that happened.  And having not raised it sooner before Your Honor, I think it's just too late now.  Right?  They chose to respond instead.

As to the 102(g) decision, again, I just want to -- I just want to point out that there really can be no dispute that 102(g) -- right? -- as prior art, a prior invention, would have been foreclosed pre-*Ingenico*.  We know that because Contour moved for summary judgment as to combinations of camera processors, camera products, and Ambarella; and we also know because you can look at Dr. Almeroth's report and see that he relies on documentary evidence to substantiate the 102(g) position.

And, again, I would just submit, Your Honor, we are not -- we have already balanced the scales and avoided any prejudice because we didn't get the chance to go out and do more discovery.  We didn't get the chance to go and issue another subpoena.  Right?  We gave that up.  And that's how we narrowly

tailored our positions, is we mitigated any prejudice by saying, "All right.  We're not starting over.  We'll work with the record that we have."

But we should absolutely have the opportunity to articulate defenses, just like they had the opportunity to articulate infringement theories.  Right?  And, you know, the law doesn't require that they be perfectly tied to something -- right? -- within the scope of the new infringement contentions. This is the *Facebook* case.  It says you don't have to be perfectly tied; it just has to be reasonable.

And I submit that it's reasonable because we kept it within the scope of the fact record and because I don't think that there is a particularly good faith argument that we could have raised this earlier based on the legal standard in *Ingenico*, nor could we have anticipated that Dr. Hu would read out any wireless streaming requirement.  Right?

If you'll recall, that's how they distinguished Ambarella before is, well, it didn't have -- right? -- this wireless streaming capability.  It's not a wireless transmitter.  It didn't have the wireless firmware.  Right?  And I know Your Honor addressed that in the 101 order, but that was the argument.

And so now, once again, all we have is we need a bare camera processor that could be built into any system that can save a file and then wirelessly send it out at some point.

Clearly, Ambarella had thought of that, fully invented and conceived of that, and then worked diligently, internally and with its customers, to reduce it to practice.  Again, I think the material change in the scope of the infringement contentions more than justifies allowing this in.

That's all I had.  I had one quick -- it's a question.  It's not an argument.  I did see that Your Honor was not inclined to allow in the inventorship opinions.  For all the reasons that I just said, I would hope that you would reconsider that tentative.

But even if you don't, I just want to clarify that we still have an inventorship defense.  Right?  So Dr. Almeroth had provided inventorship opinions back in 2021 in his report, and so it's really just whatever the delta is that would be subject to Your Honor's tentative.  Right?

THE COURT:  I think so, yeah.

Mr. Keville?

MR. KEVILLE:  We went far afield of the first issue we were talking about, so I'll try and get back through everything.

So I don't know if Your Honor will be provided the slides, but Slide 10 that they put up did not say what she said.  She said, "Here's Dr. Hu's opinion that says live preview is not required."  And if you read that opinion, it said nothing of the sort in there.  Then they put up her report at

paragraph 231 and said, "This doesn't require live preview while recording."  And it didn't say anything like that in that paragraph.

So what they're doing is they're short -- compressing the words of the claim into just saying "live preview while recording."  Right?  And the claims say what they say.  And Dr. Hu went through the claims and, in this new part of the case, said, "Hey, now, there's a third stream.  There wasn't a third stream before.  Now there's three streams in parallel.  And I think looking at these two claims, 13 and 14, now dropped, I think you could say that third stream is an alternative way to meet those claims."  Right?  Never took out that you have to have two streams generated in parallel.

And that's the whole thing that falls apart in what they're doing, is that they're trying to say, "Well, the fact that she looked at this third stream, that kills everything else."  It doesn't because she still said there are two streams.

Can you put up our Slide 5, Sunny?  5, yeah.

So Boland was always distinguished on that Boland was serial, not parallel processing.  Right?  What you're seeing here is Dr. Hu saying there are three streams in parallel, not two.  There's nothing about serial processing.  There's nothing that she said that could make it read on Boland.  Right?

Perhaps we should have sought leave to amend when she

said, "I have this alternative theory as to claims 13 and 14" and say, "Your Honor, there are new facts, there's a third stream generated in parallel now and there's an alternative theory.  We need leave to amend," in which case they would have had to seek leave to amend to address it or fight it.

We put it in.  It's now been distorted, confused, argued, all this stuff.  We dropped it.  So it's all irrelevant.  And that's a key point that I didn't hear anything about, about:  Why is this still relevant now that those claims are dropped, number one?  Or, number two, the point I said is:  How do we address now if we're going to have them say, on claims that are not asserted, "Dr. Hu rendered an opinion that we think makes the claims cover Boland," which nobody should be able to say?

And then we get up and we say, "We're going to cross-examine you.  You understand those claims aren't at issue."  And the jury's going, "Why are we talking about claims that we're not finding on?"

And then I get to say, "And, Dr. Almeroth, didn't this Court rule that you misinterpreted the claim construction?"

I didn't hear anything about that.  And so that's why all of this should not be in the case anymore.  Right?  And that's my main point on that.

Yeah, she said, "You know, Dr. Hu has this opinion."  And they could have moved to strike it too and said, "Hey, this is

a new opinion. She's expanded the scope. She shouldn't be able to do it." And they're using it as this strawman argument to say, "Well, now we get to bring in a whole lot of other stuff."

Because what I also didn't hear is very much about why many of his opinions, other than on Boland, which is directly contrary to your ruling and the PTAB, why anything else that they talked about, like she talked about inventorship and 102(g), none of that has to do with any of this. Right?

So I think, Your Honor, all of that should be out. If it was, arguably, in when we had claims 13 and 14 in the case, it should definitely be out now because it's just going to create a whole lot of confusion, a whole lot of immaterial testimony that will bring in a lot of things that the jury shouldn't hear. Okay?

On the other things she said, she said, "Well, the HERO10 existed before." I don't think that timing was actually right. There were deadlines that we were dealing with. We were close to trial. But if that's true and I'm off on my timing, they could have moved and said, "Your Honor, HERO10 is waived because they didn't bring it in Contour II and so they shouldn't bring it in Contour III." But they didn't.

But it's not just about a motion to strike on the timing. You know, it's: What was he allowed to opine on? Right? So what they're saying is, "Well, HERO10, Your Honor, we think

they could have argued that in Contour II, and because they didn't, now we get free rein to talk about whatever we want in invalidity."

I didn't hear anything connecting:  It's the HERO10 that brought in these 102(g) arguments.  It's the HERO10 that brought in Dr. Hu's supposed new opinions.  Right?

That's another canard where they're saying, you know, "Here, look at this.  We think they were off on timing, and therefore, you should excuse everything Almeroth did with all these new opinions."  Right?  And there's no connection to it. So it's almost a non sequitur to me.

Yeah, so that's, to me, that whole argument and why that doesn't make sense.

On 102(g), I heard her say on Ambarella, "Well, Your Honor, we tried to even things out because we didn't get to subpoena Ambarella."

Ambarella was deposed, I believe, four times.  I know of three for sure.  I'm pretty sure it was four times in this case.  And I know of at least two times they subpoenaed Ambarella.  I don't know what possible new thing they could have subpoenaed Ambarella for.

But, again, that's not the point.  The issue is, the Court said they get to narrowly supplement based on *Ingenico* or whether Dr. Hu had a new opinion that brought it in.  And the 102(g) Ambarella doesn't fit either one of those in any sense

because they've always had Ambarella in this case. It's always been front and center. And there's never been an argument from anybody that I know of that said system art is out on IPRs -- on IPR estoppel. Right? That's never been the case.

So they've always argued Ambarella is system art, and now they're saying, "Well, now it should come in because of *Ingenico*," but that doesn't make any sense.

And I pointed out, I'm not going to rehash it, but in their motions, they tried to argue that, well, it was because of your summary judgment that they thought these were excluded. Your summary judgment was this year. Previously, you agreed with them. Right?

And we had said in the later briefing, "Look, there's all this new law. More district courts have looked at this," and you agreed with that. So that was a change of position. So they couldn't have been relying on that.

They just chose not to bring all these things. And, candidly, I think what it is, is they wanted Dr. Almeroth to have some things that we didn't have counters to. Right? They wanted to bring in new things, like Ambarella 102(g), that hadn't been heavily litigated. And that wasn't the point of what Your Honor's order allowing him to narrowly supplement was. So...

THE COURT: Okay.

MR. KEVILLE: I want to raise for my next thing, is

the Ambarella -- and this is more of a clarification than anything.  It's on their Motion in Limine 10, which you granted in part.

And, Sunny, if you would put up our Slide 12.

They argued a lot that we had not -- we had conceded in the past that Ambarella was prior art.  And we had because there were chips, and we used a chip in the camera and in development.  So the chip is prior art.  Right?

And that's not the argument.  When you say any argument that Ambarella A5 is not prior art is precluded, fine with that.  That chip, I'm not arguing it's not prior art.

But if you go to the next slide, Sunny.

This is how they defined the Ambarella A5.  Now, Your Honor had said, in granting 10 in part [as read]:

"Argument concerning the prior art status of the Ambarella A5S model, along with related documents and evidence, remains available."

So I understand that.

My question is this:  On the A5, which you didn't have that trailing language, if you look at how they defined it, they defined it as --

**THE COURT:**  So I can cut you short there.  I was trying to define it in the way that you tried to define it in your motion in limine.

**MR. KEVILLE:**  Okay.  So it's the chip.  No argument

the A5 chip is prior art.

THE COURT: Everything else is not.

MR. KEVILLE: We're good. That was all I had on that one, and I'll let them respond.

MS. CLARK: Mr. Keville and I have actually gotten fairly good at working things out. We do not dispute the last bit there. So, we understand. I know that counsel has pointed to something in some very old infringement contentions, but we understood the A5 to be defined as the 102(a)-102(b) system art, the chip as well. So --

THE COURT: Okay.

MS. CLARK: -- that should assuage any concerns about that.

All right. Let's look at Slide 15 again.

So I don't think that -- it's simply untrue that all Dr. Hu did was point out that some third stream existed. Right? That's not true.

What she did was she actually modified the read so that now this claim doesn't just read on two streams; it reads on three streams. And the two streams in the camera's processor limitation can be something totally different than whatever video they're talking about in the wireless transmitter provision.

And it's only salient, Your Honor, because we have to be allowed -- right? -- at this point to cross-examine Dr. Hu and

to offer our own opinions and conclusions and evidence that's responsive to this disaggregation of the claim elements, which, again, if you look at this slide, which they created these images, and they show very clearly that this was not the theory that existed before.  There was no three streams before.

And whether you agree with how that ultimately plays out against the defenses and against the infringement theories, the fact remains that reading this claim now on three completely different types of -- three completely different videos is different.

And we should be allowed to respond to that.  And I think, again, in fairness, we should get to respond to that with theories that speak, in particular, to this new claim, including the Ambarella 102(g).

In our briefing, we have identified very particular paragraphs where Dr. Almeroth offered opinions -- you know, where he offered opinions as to why changes in -- let's go to Slide 54 -- why changes in Dr. Hu's infringement read directly impact the applicability of the ideas and inventions that Ambarella conceived, why that impacts the applicability of those to this case.

And I think the only other point I'd like to address on 102(g) is this idea that Your Honor somehow changed your position in your interpretation of the scope of IPR estoppel between January of 2020 and your resulting summary judgment

opinion this year.  I would submit that that's not true.

If we could look at Slide 68.

My printout is very small.

You'll recall we were all together here in January of 2020, and we were arguing about the IPR estoppel scope.  And while it is true that Your Honor allowed us at that time to proceed with the combination of Boland and the HD Motorsport's camera -- right? -- which is different than trying to rely on, like, a black box of a chip that, according to Contour, it had already disclosed to the Patent Office in the form of publications.  Right?

In an even more extreme example, what did Your Honor say?  Your Honor said, "You can rely on it, assuming you can show me that there's something material in the system art" -- right? -- "that's different from what I could find in publications."  That was the position.

And there was case law going both ways -- right? -- admittedly, but that was the position that Your Honor took.  And Your Honor, I think, recognized that -- and I would say that that's consistent.  Right?

If we go to Slide 69.

That is very consistent with the standard.  And thereafter, plaintiff moved for summary judgment of IPR estoppel of several combinations, including -- right? -- Ambarella with all of the camera systems.

And we don't raise that to say, "Well, we should have been allowed to bring in new art," or, "You know, we should have known that."  I think it's illustrative, it underscores the fact that going into this prior art election in October of 2021, we fully understood that we were at risk of IPR estoppel unless we could show you something physically in the device that wasn't disclosed in a camera.

And that creates real risk on something like Ambarella because, you know, it's a chip.  It's a black box.  It doesn't have a lens or something.  Right?  It's necessarily going to be disclosed in paper, in documents, and including the documents -- right?  You can see where we were all -- and it includes the documents that plaintiff relies on to defeat inequitable conduct and inventorship.

And it says we cited dual recording on the face of the patent.  So we knew, going in, that we had Boland, which everybody agrees is a publication, and we had Ambarella, the relevant functionality of which was also, again, they would argue, in a publication.  That created a genuine risk of IPR estoppel, and when you're making those decisions on a narrowing order, you have to weigh risk.

And Your Honor doesn't have to agree and Contour doesn't have to agree with how that risk all weighed out, but the fact is, as long as our decision was reasonable then and our position is reasonable today, I would ask that we be allowed to

pursue our position today in view of the changed law.

I think that's all I had.

**THE COURT:** Okay.

**MR. KEVILLE:** So counsel went back and argued that they thought they were at risk of not being able to bring in Ambarella as a 102(g). I have two things to that.

Number one, there's no evidence of that. You know, Dr. Almeroth testified, "Well, I never looked at Looxcie until this time because nobody ever asked me to." And then we said, "Okay. Why didn't you look at Ambarella 102(g)?" And they shut it down.

So there's no evidence from any attorney, from anybody, Dr. Almeroth, anyone, that says, "Oh, I actually had a 102(g) opinion for Ambarella, but I didn't think we could present it," number one.

Number two, I have looked and found no case that has this very unique theory that says, "We have a system, a chip, and we're going to say they invented -- they're the prior inventor, and we're going to say they diligently reduced it to practice in a later camera that infringes made by a different manufacturer." Right?

A 102(g) argument is, you have a prior inventor who conceived of the idea and then diligently reduced it to practice without abandoning, suppressing, or concealing.

In this case, as I understand their argument, Ambarella

came up with the idea for the chip, and then GoPro diligently reduced it to practice. That's two prior inventors. You can't have a 102(g) with two prior inventors.

Number two, these are two companies. These aren't two people. I don't even know who I would depose on this new theory if I was to open it up and take discovery on this new theory. Because who is it that conceived of it at Ambarella? And then somebody else conceived of it, I guess, at GoPro. And then did multiple people from both companies reduce it to practice?

So it's a convoluted theory that the law doesn't even support. I've seen no cases that say you can combine two different inventors into one 102(g). So that should remain stricken.

And that's all really I had, Your Honor.

There is one thing I wanted to ask. On their Motion in Limine 13, which you granted in part --

**THE COURT:** Yes.

**MR. KEVILLE:** -- you said [as read]:

"Because the parties have previously agreed to call Mr. Woodman as a fact witness only once, Contour may introduce evidence of secondary considerations during his testimony in its case-in-chief."

Here's the question. Mr. Woodman -- they said they had another 102(g) argument that they've always made. That is

true.  That's Mr. Woodman.  They claim Mr. Woodman invented it first.  So Mr. Woodman is called adversely in our case.  In their direct examination in our case, they say, "Aren't you the true inventor?  Didn't you do this?  Didn't you conceive it?  Didn't you reduce it to practice?"  Right?

Am I then allowed to have my expert rebut that in my case, or does she have to wait till they get all the way through their case and into rebuttal?  It kind of creates this weird position.  So --

THE COURT:  So the cases -- it seems to be general practice that the secondary conditions come in in rebuttal.  And it has to also be true that people need to testify out of order all the time because of business.

And as a, fortunately, usually not patent judge, if it was a regular, real live case that I knew something about, I would have the secondary considerations come in in the main case and not the rebuttal because it just -- it seems artificial.

So there -- so I'm interested in -- I guess I'm interested in GoPro's perspective on this because it does seem -- because Mr. Woodman is going to have to be examined on this, whether it makes sense to separate out this particular secondary consideration or all of them.

MR. HAYNES:  Your Honor, what I heard the argument to be was:  Can Dr. Hu address what Mr. Woodman's going to say about, you know, his invention story because he's going to be

up there testifying?  That is unquestionably invalidity, and having Dr. Hu get up and talk about invalidity in their case-in-chief before we have actually put on our validity case makes no sense whatsoever.

On the very narrow issue of secondary considerations, that really has more to do about copying.  They can cross Dr. Woodman about that issue.

And then to the extent it relates to a secondary consideration, they can deal with that with the rest of the validity case where it makes sense.  Otherwise, you're talking about a secondary consideration before they've ever heard our case-in-chief on validity; and I think that is very prejudicial and I think will be more confusing than just letting Mr. Woodman go with an explanation that he's going to be testifying, you know, beyond the scope of the direct.

**THE COURT:**  Okay.  That makes sense to me.

**MR. KEVILLE:**  Here's my response to that, if I may.

He said, "Having her, Dr. Hu, testify on invalidity before we've put on our invalidity case would be confusing."

I agree with that.  All I'm saying is it won't be before they put on their invalidity case if Mr. Woodman says, "I am the prior inventor."  That's their invalidity case.

Now, if later in their case, Dr. Almeroth is going to say, "Well, if you combined Boland plus Ambarella, that renders it obvious," she would deal with that in rebuttal.

But as to anything Woodman brings up as to invalidity, I think she has to be able to address those things right after that, not to confuse the jury.  Otherwise, we've got to say, "You'll hear about this later in the case," and it just will be disjointed and probably lose understanding.

THE COURT:  Well, the good news is that you only have 15 hours each to put on your case.  Mr. Woodman, I think, is going to be testifying Thursday or Friday, so in the -- sort of in the middle.  So it's not going to be that big a deal. I think you can save Dr. Hu's testimony on this for rebuttal.

MR. KEVILLE:  Okay.

MR. HAYNES:  Thank you.  Thank you, Your Honor.

THE COURT:  Okay.  So I think --

MR. HAYNES:  I can start with our first issue if they're done.

On the motion for summary judgment of infringement, we are happy to rest on the papers with respect to your tentative, but I did want to raise one issue with respect to the HERO 4K.

THE COURT:  Okay.

MR. HAYNES:  And I think in your order, you addressed the HERO 4K with respect to the limitation on generating, and we are prepared to rest on the papers with respect to that issue as well, Your Honor.  However, that does not mean that summary judgment is appropriate on the HERO 4K because all of the arguments that you identified as applying to the other

products other than the HERO 4K also apply to the HERO 4K.

If we can bring up Slide 22.

In our briefing -- and I think we probably could have made this more clear with a heading or something, Your Honor.  But in our briefing, we defined the accused products as being everything, including the HERO 4K.  We then made the arguments about why summary judgment was inappropriate with respect to the accused products, which included all the products, including the HERO 4K.  So the arguments that you said raised issues of fact apply to the HERO 4K as well.

THE COURT:  Oh, then I misread what you wrote.

MR. HAYNES:  I put it on the slide here, Your Honor. Like I said, we could have put it in a heading.

The reason that the HERO 4K got separate treatment was because there was a failure of proof, in our view, on the generate limitation.  There was an additional argument that was unique to that HERO 4K related to the proof on the generate limitation, but that was an additional argument.

All of the other arguments that we made with respect to all the other products apply equally to the HERO 4K, and we did that by including it in the definition of accused products.

And Dr. Hu does the same thing.  She groups the HERO 4K, for purposes of all those other limitations, with all the other products.  She says it's just like the G --

THE COURT:  So Contour argued that with respect to the

HERO 4K, the testimony of Dr. Hu was unrebutted.  What's the --

**MR. HAYNES:**  That was only with respect to the generate limitation, Your Honor.  With respect to the other limitations, the wireless connection protocol device and the field of view, with respect to those, she grouped them together.

**THE COURT:**  I understand what you're saying.  Okay.

**MR. HAYNES:**  Thank you, Your Honor.

**MR. KEVILLE:**  I don't think that's correct.  I think that's why we broke them out.  I think it was undisputed, and I think Your Honor has it the way it was broken out for that reason.  So I do think the only issue has been addressed and the 4K should stand.

**THE COURT:**  Okay.  I'll take a look at that one when I'm off.

So any other argument that GoPro wants to make with respect to the tentatives?

**MR. HAYNES:**  Your Honor, we did want to address a couple of the MILs.

**THE COURT:**  Okay.

**MR. HAYNES:**  If we have any time, we might briefly address the motion for summary judgment of invalidity.  But there's a couple of MILs, and Mr. Riches was going to address those as they relate to damages.

**THE COURT:**  Great.

**MR. RICHES:**  Good afternoon, Your Honor.  Elliott Riches on behalf of GoPro.

So the two MILs I'm going to address are GoPro's MIL Number 6 and GoPro's MIL Number 12.

I'll start with GoPro's MIL Number 6.  This relates to non-comparable licenses.  The first aspect is a point of clarification.  Our MIL went beyond just the iON and CoolTech licenses and licensing offers.  There were other documents, and we noted those exhibits in a footnote.

I don't understand that Contour was disputing that any of those were irrelevant and shouldn't be discussed.  They had listed exhibits for all of GoPro's licenses produced in the case.  My understanding is none of the parties are contending any of those are relevant except the MPV license.  So my understanding is those should still be out because they didn't dispute them.  If they have a different position, I'll let them address that.

I did want to specifically address the iON license.

And if we can pull up Slide 2 from my slides, please, Ms. Moyer.  These are the motion to exclude.

So, Your Honor, the argument that Contour made with respect to the iON license being relevant, a very similar argument was addressed by Judge Sabraw from the Southern District of California in *Qualcomm v. Apple*.  Apple had tried to offer some of Qualcomm's non-comparable licenses.  They said

they were relevant to the context of the dispute, to explaining background information, but they didn't contend that they were comparable.

We have the same situation here. Contour, because of your Court's order, is not contending that the iON license is comparable and relevant to the damages case. Therefore, if you look at the language from the *Qualcomm* case, the court found that the probative value of this evidence is outweighed by the undue prejudice, confusion of issues, use of time.

If Contour is allowed to put the iON license in front of the jury, GoPro is now required to spend time explaining to the jury why this doesn't matter for damages, why this isn't relevant to a reasonable royalty rate, despite the fact that Your Honor has already made that ruling, and there's no dispute that this shouldn't be relevant.

Second, they talked about this should be relevant to secondary considerations.

And we can go to the next slide, please.

So that's also just not true in this case. The case law describing why licenses are relevant evidence as a secondary consideration talk about an independent party has decided to take a license rather than fight the patent on the issue of validity and infringement.

Same thing if you look at the second case here, *Shearing*, the evidence of licenses taken by competitors is relevant to

secondary considerations.  And that's simply not the case with the iON license because there's no dispute at this point that they weren't competitors.  iON had a 49.9 percent interest at the time.  That was the basis for Your Honor's ruling that it should be excluded as relevant to the damages inquiry because it wasn't an arm's length agreement.

And so the motivation for why these licenses may ever be relevant to secondary considerations is simply not present with the iON license because of that.

And so we'd ask on that, that the Court change its tentative and exclude the iON license for all purposes. Your Honor, even if the Court's not inclined to do that, I think it has to be true that any financial terms in the document are redacted before its presented to the jury.  That would simply confuse the jury.  If they see the 5 percent rate in the iON license, they'll assume that's relevant to damages.

So the second MIL I'll address --

**THE COURT:**  So if I don't agree with you, remind me to give a limiting instruction, and you can talk to me about what you think ought to be in that.

**MR. RICHES:**  Yes, Your Honor.

So the second one I'll address is MIL 12, related to total and accused revenues and products -- or profits.

And if we can go to Slide 8, please.  Sorry.  Slide 6.

No.  I apologize.  These got out of order.  Can you go to 5.

It's okay.  I will talk about it regardless.

There we go.

So, Your Honor, the case law from the Federal Circuit on talking about accused product total revenue is very clear; that this cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.  And that if we look at *Uniloc*, the disclosure that a company has made $19 billion in revenue, it's only going to skew the damages horizon.

That's, my understanding, is exactly what's going to happen if Contour is allowed to present the total accused product revenue and profits.  Those are well in excess of a billion dollars.  All that's going to do, if the jury hears that number, is skew the damages horizon and make Contour's ask seem reasonable.

Now, in their briefing, Contour pointed out that they believed these issues were relevant to their damages theory, and I saw that language in Your Honor's tentative.  Respectfully, that's simply not true.

What Dr. Ugone does is he never actually relies on total revenue or total profit for anything.  When he looks at figuring out the $3.60 apportioned profit, he starts with a per-unit profit number.  So he says the per-unit profit is $95,

or along those lines, and then apportions that to Wi-Fi and further down to profit.

Same thing with Element.  He doesn't start with GoPro's total revenues and apply a 5 percent rate to that number. Instead, he says, "What's the average selling price of all the products," comes up with that number, and that's where the 5 percent comes in.

So it's simply not true that Dr. Ugone uses these total accused revenues or total accused profits for anything in his damages model.

We are not seeking to strike, through this MIL, any of Dr. Ugone's damages opinions that he's given.  He can talk about all of those issues, that:  Here's the apportioned profit.  Here's the per-unit profit, per-unit sales.  None of that would be excluded by this MIL.

But what Contour should not be allowed to do is have Dr. Ugone say, "Well, GoPro has made a billion dollars in profit," or, "GoPro has made $5 billion in revenue, and therefore, my numbers are reasonable."  That would violate the entire market value rule, which no one is contending is satisfied in this case.  It's simply not permitted by the Federal Circuit law.

And then, lastly, Your Honor, I don't think I saw in the tentative any issue regarding company-wide revenues and profits.  For the same reasons, those, similarly, are simply

not relevant. That goes to GoPro's corporate wealth, their entire size. I don't think I saw it specifically addressed, so we'd ask that that also be excluded.

THE COURT: Okay. Mr. Keville or...

MS. REPLOGLE: Good afternoon, Your Honor.

So I'll address the MIL 6 issue, and then my colleague over there is going to address the second one. All right?

So you're right, this Court had previously held that Dr. Ugone was not able to rely on the royalty rate from the iON license. While we, you know, respectfully disagree with that decision, of course we're going to abide by that decision. Right?

So we would not be opposed to not showing or redacting the 5 percent, for instance, in that royalty rate of -- there's actually two iON licenses. There's an exclusive one and a non-exclusive one.

But make no mistake, with respect to your tentative ruling, you're exactly correct that that's part of the story. Right? That was actually when Contour's assets were purchased out of receivership, and there were several different steps that took place to try to relaunch and to resell and to market additional camera products. And that was part of the whole story in which they tried to get together with iON, who had its own camera that was out on the marketplace.

There's some documents that will be shown at trial that

they had something like 10 percent of the market share -- right? -- at the time, iON.  And Contour was -- had an agreement with iON to be able to use its manufacturing facilities to be able to make the Roam 4 and an additional upcoming camera product.

So it's part of the story -- right? -- so it needs to come in as far as -- so the jury can understand this sequence of events that Contour went through from the start to the finish of trying to, and did, launch and sell Contour cameras, had hurdles, had significant things to overcome, tried to do it again with iON.  And that evidence should come in.  It's factual evidence, and the jury should be able to hear that.

Like I said, so while the Court made a ruling with respect to Dr. Ugone's damages opinions, the Court did not exclude it for all purposes or any of those documents with respect to that.

It also is relevant to secondary considerations.  And I know counsel kind of threw up really quickly a couple of other cases.  I would just, again, point Your Honor to the cases that we cited in our brief, just saying that, of course, you know, even if it's not a comparable license, it can be relevant to other circumstances, such as secondary considerations, as well as anything else that's just non-damages related.

So nothing in your Court's prior order excluded the licenses for all purposes, and it should be allowed at trial.

THE COURT:  Thank you.

So let's hear about damages first, and then we'll go on.

MR. AKARAPU:  Thank you, Your Honor.

Just on the excluding the total accused product revenues, on that point, just one thing from our briefing, essentially from the *Georgia-Pacific* factors.

Dr. Kennedy discussed the number of product units that were sold from January 5th, 2015, to September 30, 2019, so reiterating our point -- reiterating our point that it's inequitable and unreasonable that Dr. Kennedy is relying on these facts in their report.  And, you know, Dr. Ugone necessarily relying on those facts, not being able to bring that in, we'd just like to reiterate that it's inequitable.

THE COURT:  So what about the point that Dr. Ugone doesn't actually rely on the gross revenue numbers?  He's looking at something else.  So shouldn't I just keep that out?

And then to the extent the report -- GoPro's report's not going to come into evidence.  It's going to be the testimony.  And I doubt that they're going to raise that, but you could always -- if they did, you could always bring it in.  So what would be the harm in that?

MR. AKARAPU:  Your Honor, I couldn't find that point immediately, but, yeah, I -- yeah, I couldn't find back to what they're referring to.

THE COURT:  Okay.

**MS. REPLOGLE:** Your Honor, if I may --

**THE COURT:** Sure.

**MS. REPLOGLE:** -- help him.

So with respect to Dr. Ugone's damages opinions, he does take the average selling price for all of GoPro's accused products. That is the case. But he also does rely on the accused revenue and sales. He does that for the purpose of -- for this point.

So it matters when you have a company that is alleged of infringing and, for example, if you have a company where it's only, like, 10 percent of its total revenues -- right? -- is due to the infringement. In this case, that's not the case. It's high. It's like 85, 90 percent of GoPro's revenues are actually accused of infringing.

So that is how their business is built. That's how their business model is built, is around this act of infringement. And so that makes that relevant to Dr. Ugone's damages opinions to point that out that this is their business, this is what they do, this is -- high amount of their business is due to the infringing sales.

**THE COURT:** And how did he use that in his report to come to the numbers that he came to?

**MS. REPLOGLE:** So in the *Georgia-Pacific* -- well, in the *Georgia-Pacific* factors, in that analysis, the extent of use of the accused infringers of the patented technology is one

of those factors.  Right?

So, like, for example, what's coming to my mind -- I don't have the full report right here in front of me -- is that he has a spreadsheet of the accused revenue with the ancillary sales attributed to that, that sold along with the accused product.

So it's in the context of the *Georgia-Pacific* factors is the short answer to your question there, Your Honor.

THE COURT:  Okay.

MS. REPLOGLE:  With respect --

THE COURT:  Just as general support for the notion -- for whatever other way he got to the number.

MS. REPLOGLE:  That's right.

THE COURT:  I'll go back and take a look at that.

MS. REPLOGLE:  That's right.  The *Georgia-Pacific* factors, one of those factors is the extent of use of the patented technology by the accused infringer, like, for example, that one, as well as others.

THE COURT:  Okay.

MS. REPLOGLE:  Okay.

THE COURT:  Thank you.

MR. RICHES:  Your Honor, just briefly on both of the arguments.

First, with respect to the iON license, I didn't hear anything in the story of the background that said why the jury

needed to see the iON license.

The fact that there may have been a relationship between those two companies and that they were working together, none of that would be precluded by this MIL.  It would be showing the license and saying they took a license to the patents-in-suit that would be prohibited.  I didn't hear any argument from Contour as to why that would be relevant to the issue of the background.

And then on the secondary considerations point, the case law that Contour cited says it may be relevant; but here, because the parties weren't competitors, it isn't.  So I don't read that case as being at all contrary to our position.

Secondly, on the issue of MIL 12 with the total accused revenues and profits, to the point they made right at the end, again, there's no reason they can't say 95 percent, 90 percent. It's the raw values that the EMVR prohibits and that the Federal Circuit law prohibits.

So there's no reason that they should be allowed to do that, nor is there any case law that says the *Georgia-Pacific* factors swallow the EMVR rule such that because you talked about it in *Georgia-Pacific*, it's all of a sudden admissible. The EMVR rule from the Federal Circuit is very clear that going into total accused product revenues and profits simply skews the jury's damages horizon and is prejudicial.

Thank you, Your Honor.

**THE COURT:** Thank you.

**MS. REPLOGLE:** May I respond?

**THE COURT:** You can respond to it and add anything else. You've got a little more time than they do, so...

**MS. REPLOGLE:** All right. Yeah, just briefly.

With respect to the iON license, I would just say that, you know, counsel for GoPro did -- recognized that the case even that they rely on said that it may be relevant. Now, his point is that they were not competitors, but they were competitors, and then they merged and did not. So I'm just saying that, you know, even under his own case, you know, the Federal Circuit recognizes that it certainly may be relevant.

And my point is, is I don't know if we're going to be introducing that particular license or not. I'm not going to preview the case, and we don't know yet. But certainly, it's not at the point where that needs to be excluded entirely. It is clearly relevant to the story and the background of trying to merge those companies together and create a manufacturing platform and all of that.

**THE COURT:** If it was to come in, redacting the 5 percent, redacting any dollars or percentages would be important.

**MS. REPLOGLE:** Yes. And, Your Honor, like I said at the beginning, you know, we don't oppose that at all. Of course we're willing to do that.

And then on the point with respect to MIL 12, again, the emphasis in the cases in this space are really concerned about the situation where you have the case of it's the laptop and you're only pointing to the particular optical disc drive in that laptop and you have it so skewed. Right?

Here, you don't have it skewed. The majority of their revenues are generated by these HERO products that are going to be in front of the jury all day. And of course those sales of those HERO products are going to be before the jury because that's relevant to this case.

**THE COURT:** Okay. Thank you.

**MR. KEVILLE:** Since we have a little bit of time --

**THE COURT:** You have a little more time, yeah.

**MR. KEVILLE:** Yeah, I have one more thing that I forgot to address.

**THE COURT:** Okay.

**MR. KEVILLE:** On your grant of their Motion in Limine 4, Contour may not characterize GoPro as an acuted -- adjudicated infringer -- apologies -- or an infringer. That's fine. Understood.

Here is the issue: What I've seen, Your Honor, in cases I've tried is either the Court gives a preliminary instruction that says the Court has already found that claim 11 is infringed by Cameras A, B, C, D. So that resolves that issue for the jury. Or it's done by saying: The Court has found

that the elements of claim 11 are met by these cameras.  Right? So you don't have to use the word "infringer."  One or the other.  And then the way this MIL is worded -- right? -- and whether they've, you know, infringed, is not part of it.

Let me put it this way:  So the Court has found in its law of the case that all of the elements of claim 11 are met by these cameras.  Now we're going to have those same cameras on some other claims in the other patent, but a lot of the elements overlap.

They should not be able to and can't, I don't think, as a matter of law, argue we don't meet the generate limitation in this claim, even though the Court has found that camera -- right? -- one that is found to meet it does in this claim. That shouldn't be -- we can't relitigate the issues that the Court has decided.

How I've typically seen that is we can say it's been decided that these limitations are met.  And we can -- they can't argue against them, whether it's you say, "You can't contest that limitation" or whether it's through, you know, in putting on our infringement case, it's just a simple matter of saying, "You understand this limitation has been found to be met."  Right?

So that's what I just wanted more to clarify.  I understand your ruling.  I won't call them an adjudicated infringer.  But we do -- it is law of the case that some,

you know, dozen cameras meet all the elements of claim 11, and we should be able to rely on the Court having found those elements are met in putting on the case.  And so that's kind of really the clarification point.

THE COURT:  Okay.  Well, let me hear from GoPro on that point.

MR. HAYNES:  Your Honor, Ms. Wroblewski is going to address the bulk of it because I think it plays into the jury instructions quite a bit --

THE COURT:  Yes, it does.

MR. HAYNES:  -- as opposed to the MIL as much.

But just with respect to the MIL, there was some discussion about other claims for which there is no summary judgment ruling.  We certainly are not going to take a position that is contrary to what you ruled on summary judgment.  But I will note that the language of some of the other claims is not the same.  So if we're talking about a different element, there may be different arguments.

So that's my only concern.  I haven't gone element by element to see which elements that's going to apply to, but I think we have to be very careful by saying you've already ruled on something if the claim language is different.

THE COURT:  Well, so -- yeah, don't go away.

How is this going to play out for the jury?  Because it does -- it comes up -- that's something we have to sort out

now --

**MR. HAYNES:**  I think, Your Honor, that --

**THE COURT:**  -- as opposed to during trial.

**MR. HAYNES:**  -- my suggestion would be, to avoid confusion and avoid the word "infringer" getting thrown out, to substitute their judgment on what they're actually going to decide, is that we can agree that elements are not disputed for purposes of this case and these cameras.

And Your Honor can give an instruction on that at the appropriate time, or they can put on their testimony and say, "There is no dispute on these issues."  And we will not take a contrary position because you have obviously already granted summary judgment on those claim elements.

**THE COURT:**  So my suggestion is -- well, let's call it a direction.  I want you to talk with each other about what the appropriate instruction that I would give -- that I should give on this.  I would think it would make sense to do that at the outset, maybe not with the preliminary instructions but maybe as the case gets under way after opening.  Maybe I need to do it before opening.

So talk to each other about what should be said and when it should be said.  And I can only hope you'll reach agreement; but if you don't, provide me with your perspectives on that. And do that by Tuesday so that I can look at it before our hearing on Wednesday at 11:00.

**MR. HAYNES:**  Okay.  We can do that, Your Honor.

**THE COURT:**  Okay.

**MR. HAYNES:**  That would be great.

**THE COURT:**  Thank you.  Thank you for raising that.

Okay.  And is there anything -- you've got about two minutes left.

**MR. HAYNES:**  I'll be very brief.

Ms. Kyrazis is going to briefly address Your Honor's ruling on MIL 4 relating to Mr. Woodman's stock sales.

**THE COURT:**  Oh, okay.

**MR. HAYNES:**  It will be very short.

**THE COURT:**  Great.

**MS. KYRAZIS:**  Good afternoon, Your Honor.  Sloane Kyrazis for GoPro.

And it's actually GoPro's MIL 8.  So we understand that Your Honor's tentative ruling is to deny MIL 8 and found that the numerical amount of Mr. Woodman's GoPro stock is relevant to Contour's willfulness argument.

And our position, Your Honor, is that the value of these shares, at least the dollar value, is not relevant to the willfulness argument because Contour's able to make the argument that these transactions were significant, especially relative to other transactions, without actually attaching that number to those arguments.

And we're talking about almost $800 million.  This number

is highly, highly prejudicial, and it will tend to skew the damages horizon.  And it's our position that it's not necessary to introduce that number in order to explain the context of Contour's willfulness arguments to the jury.

So we would ask respectfully, Your Honor, that you would flip the tentative and grant our MIL 8.

**THE COURT:**  Mr. Keville?

**MR. KEVILLE:**  Assume for -- well, because it is true, Mr. Woodman sold $800 million of shares in between the time when the patent was given notice of allowance and when they were put on notice of infringement.  Right?

The reason that number matters and you can't just say "Oh, they were significant sales" is because over the next three years, he never sells more than, I believe, 8 million at a time.  Usually, it's in $2 million chunks.  So just to say it was significant what he sold when he had knowledge of the patent and its timing is far removed from the reality of what it is.  So your tentative has to stand.

**THE COURT:**  Okay.

**MS. KYRAZIS:**  So, Your Honor, we would be amenable to agreeing that the unit number could be told to the jury, but excluding the dollar amount associated with those units.

So the point that Mr. Keville just made could be made to the jury, just with the unit value of the shares instead of the dollars.

**THE COURT:** When you say "the unit value of the shares," tell me what that means.

**MS. KYRAZIS:** The number of units, Your Honor.

**THE COURT:** Okay. So the number of shares --

**MS. KYRAZIS:** The number of shares.

**THE COURT:** -- that he has --

**MS. KYRAZIS:** Correct.

**THE COURT:** -- compared to the number of outstanding -- compared to what? Compared to what?

**MS. KYRAZIS:** Right. So the point that Mr. Keville just made, as I understand it, is that there were multiple transactions, and the transaction that he made relative to the timing of the issuance of the patent was significant in comparison to prior transactions.

You could make that same argument by saying that the number of shares that were sold, without saying the dollar amount that were sold, you could make that same point using just that.

**THE COURT:** Well, it's not really the same point, which is why you're making the suggestion. It is extraordinary -- it is -- I get your point about the size of it and why a normal human being would want to keep that private. So I totally get that. And I also get the potential for prejudice. But it also makes the argument that Mr. Keville's going to be making relevant to the jury and material to the

jury.

So I'll think about it when I'm off the bench, but I'm not inclined to change my tentative on that.

**MS. KYRAZIS:**  Okay.  Thank you, Your Honor.

**THE COURT:**  Thank you.

Okay.  Moving on.  So thank you all for your argument, and you're not going to see -- besides -- I'm going to look at all this.  I'll revise some of these tentatives, but you're not going to get more writing on it besides this extensive tentative list that I gave you.

Okay.  So, first, on to jury selection.  The -- did you want to come up?

**MR. HAYNES:**  Your Honor, apologies for interrupting.

**THE COURT:**  Sure.  You better come to the mic.

**MR. HAYNES:**  On the issue of the tentative, as part of your tentative, we need to narrow our prior art elections, which will require certainty on the rulings from the tentative.

Do you have a sense for timing as to when we will get the tentative and when we should be prepared to narrow that list down to six?

**THE COURT:**  Well, you should be prepared -- just -- why don't you just assume that my mind is dull, I'm going to do kind of what I always do, and I would start working on your list.

**MR. HAYNES:**  Yes.

**THE COURT:**  I suspect that I'll finish this Monday, possibly Tuesday, but I think that will be that.

**MR. HAYNES:**  Again, that's very useful.  Thank you, Your Honor.

**THE COURT:**  Sure.

All right.  So with respect to jury selection, I am hopeful that about 40 jurors or more have been contacted for this case; that they have received surveys, which they're filling out; and that you will get those surveys back on Monday afternoon or Tuesday morning.

And we're going to have a hearing on Wednesday at 11:00 to discuss those surveys and whether there are people that, as a result of their answers, you both think should be excused for some reason.  So the Jury Office uses its sort of statutorily required excuses for jurors, and then -- but there may be other reasons why people are inappropriate for this.

I included five case-specific questions in the survey, which I took a few from each of your voir dire questions.  So that'll give -- well, we've had some modest information about people's understanding of patents, experience with patents, and experience with GoPro.

So the hearing Wednesday at 11:00.  You have to agree that somebody should be excused.  I'm not going to -- if one party wants to have the person brought in, I don't excuse people on the basis of the papers.

Jury selection itself will happen on the 29th.  It is my hope that we'll have a jury by the early afternoon and that we will roll into the trial at that point and run till about 4 o'clock.

So, Mr. Keville, I'd have your first witness ready to go. Sometimes we're able to do that; sometimes not.

And then from there on out, the schedule will be that we'll have an attorney conference at 8 o'clock every morning, not on the jury selection day but every other day, and we'll start the jury trial at 8:30.  It'll run till 1:30.  I'll have two 15-minute breaks during the course of the morning, and that should -- and we'll just go Monday through Friday.  So that should get us to concluding the following Wednesday or Thursday.

I think I'm going to select ten jurors.

Okay.  So that's jury selection.

Statement of the case.  Unless you-all give me something that is simpler to use, I'm going to use the positions of the parties as expressed in the Instruction Number 3 and just lay out the case that way.  So you-all have agreed on that -- on Instruction Number 3.  That's what I'm going to do.  But if you have a better statement that you agree on, I'm happy to give that.

All right.  The preliminary instructions, you had a few minor disputes.  I resolved them.  I don't know whether anybody

wants to be heard with respect to that.

**MS. WROBLEWSKI:**  Yes, Your Honor.  Karlee Wroblewski for GoPro.

Generally speaking, we're completely in agreement with your preliminary instructions.  The one addition we did want to consider is with respect to the definition of "Contour."  As it reads now, it says [as read]:

"The parties in the case are Contour IP Holding, which I will refer to as Contour, and GoPro, Inc., which I will refer to as GoPro."

And it then goes on and describes the history of the patents and who they've been owned by, the various Contour entities.

We would like, perhaps, the addition of a sentence that you -- the jurors will hear about multiple Contour entities during the course of the case, but that the plaintiff in the case is only CIPH, or Contour IP Holdings, however you deem it appropriate to phrase, just to prevent any possibility that the jurors themselves think that all of the entities are still at issue and acting as the plaintiff in this matter, so...

**THE COURT:**  They won't know the history, any of it. We say that the parties are Contour IP Holding, LLC.

**MS. WROBLEWSKI:**  Yes.  And then in the next paragraph, it goes on to describe the named inventors being from Contour, LLC, et cetera.

And so we just want to sort of introduce to the jurors that there are multiple Contour entities and that the single plaintiff in this case is Contour Intellectual Property Holdings.  So just a simple additional sentence after the term "GoPro" would be our ask.

**THE COURT:**  Well, I hear you, but I don't understand. I don't actually think that it's an issue, so I don't think I'm going to make that change.  But thank you.

**MS. WROBLEWSKI:**  Understood, Your Honor.

**THE COURT:**  Okay.  Then I am interested in whether the parties think that there's any final instruction that I need to grapple with before we get going.

**MR. KEVILLE:**  I'll leave it to them, Your Honor.  My thought was, once we had the rulings from today, which we now have the tentatives, we would confer and see how that impacts and then get back to you with:  Here's what we think is a dispute that we need to address up-front, if there is anything.

**THE COURT:**  Okay.  Mr. Haynes, does that make sense to you?

**MR. HAYNES:**  That's agreed for us as well, Your Honor.

**THE COURT:**  Okay.  All right.  That's what we'll do.

You'll have to tell me really fast.  It takes me a long time with these cases.

So, I think we'll have -- given the length of the trial, I'll try to have a final instruction conference on Friday

afternoon, October 3rd, so after court.  I think that should give us enough time.

Okay.  Ah, the verdict form.  I had some questions about the distinctions that you-all were making, and I think understanding this will help me, anyway, if not the jury, figure out what the issues are.

So I am looking, first, at -- well, I'm looking at Contour's form, but I have my notes from both.

First of all, with respect to the direct infringement, there's a difference in the way that you-all want me to deal with claim 11.  Contour has a checkbox by "Yes" without a chance to have "No."  GoPro has "Yes" and "No" as if I hadn't ruled on summary judgment.

So maybe I have to -- who has to figure this out for me?

**MR. HAYNES:**  Your Honor, I think some of this may get resolved by what we're going to confer over as to how we deal with claim 11.

**THE COURT:**  Okay.

**MR. HAYNES:**  Our concern with the checkmark here is it's right under infringement, and you're going to have all the same issues we had before, which is why we have a "Yes" and a "No," but I do understand the dilemma of allowing them to check "No" when they really can't.

So I would suggest that the parties try to talk about that as part of the other issue and come back with a solution to

address both.

**THE COURT:**  I think that'd be great.

**MR. HAYNES:**  Okay.  Thank you, Your Honor.

**THE COURT:**  I think that'd be great.

**MR. KEVILLE:**  Happy to do that.

**THE COURT:**  My next question is the placement of the question -- first of all, your general verdict forms are very close, and so that's helpful to me.

But the placement of willful infringement is different in each of your verdict forms.  So Contour has willful infringement after infringement, and GoPro has it after the findings on invalidity.

So talk to me about whether that matters and, if it does, where it ought to be.

**MR. KEVILLE:**  I've always seen it, it follows infringement, willful infringement, validity, damages.  That's the order, and that's the order in which the case will be largely presented.  We'll be putting on our evidence of infringement, our evidence of willful infringement.  They'll get up.  They'll put on their counters to that and then their invalidity case, and we rebut their invalidity case.

So that's the logical order.  I don't see any reason why it would go any other way.

**MR. HAYNES:**  Your Honor, I respectfully have seen it done other ways.  Not surprising to you, I suspect.

The reason we put it at the end is because, while it is willful infringement, it is only relevant to damages, and it's advisory as to whether those should be increased.  It has no relevance at all to liability.  And therefore, there's no reason to answer that question unless there has been a finding of a claim that is both infringed and valid.

And so answering it before you've addressed validity means you're answering a question they don't need to answer if they find -- if they don't find a claim that is both infringed and valid, because it really only goes to damages.  And so it fits at the end with damages, in our view.

Thank you, Your Honor.

**MR. KEVILLE:**  In essence, what they're trying to do is skew it, then, to avoid that.

If this case -- let's say they were to get something on damages that is appealed.  Okay?  Why would we -- or invalidity.  Let's say in their case, they get invalidity; and they say, "Well, you don't now have to rule on willful infringement."  Right?

And then it goes up, and it gets turned around on invalidity, which can happen.

Then it comes back, and now we don't have -- we haven't been able to test the willful infringement verdict on that appeal.

We should be able to address all the issues.  So it should

be infringement, willful infringement, the jury decides that; and then if the case has to go up, the issues are decided and it's not, "Well, you skipped it because there was an invalidity question."

But it goes to also exceptional case.  So it doesn't just go to damages.  It could go to attorneys' fees.  Even if damages were not trebled, it goes to attorneys' fees.

But it's more important, it's really just trying to skew the outcome a little bit and not have that verdict be included, and it's just the normal sequence.  It should be infringement, willful infringement, then validity and damages.

THE COURT:  Okay.  I hear you both.

Let's see.  Ah, okay.  Then findings on invalidity defenses.

Why, Mr. Keville, do -- within each of the questions, you have Theory 1 -- you have different theories that the jury has to make a finding on with respect to each of the claims, and that is not the case as far as GoPro.

MR. KEVILLE:  Yeah.  That's an appellate issue, Your Honor.  If the jury was to find a general verdict, "We find the claim invalid," then there's no ability on appeal to say:  Did this obviousness combination, was there sufficient evidence presented?  Because then GoPro will say, "Well, all they had to do was find any one of our theories.  It doesn't matter which one."  So if we didn't present any evidence on

that, there's no evidence the jury relied on that one.  So it's really -- it's an appellate issue.

THE COURT:  And is it a required -- is that something that is required, unanimity on the theory?

MR. KEVILLE:  Unanimity on the theory.  Yes.  Yes, because to find invalidity by clear and convincing evidence, they would have to say, "We find, as a jury, clear and convincing evidence that this combination renders the claim invalid."

THE COURT:  Okay.  Not this combination or that combination?

MR. KEVILLE:  I mean, they could find two combinations.  Right?  They could but -- you know.

THE COURT:  But not -- you couldn't have six votes for one and four for another that gets you to ten?

MR. KEVILLE:  No.  Yeah, right.  You couldn't have that, no.  No.

THE COURT:  Okay.

MR. KEVILLE:  And that's part of why we -- you know, why you break it out.  So...

THE COURT:  Okay.

MR. HAYNES:  Your Honor, I don't think that it is required to break it out to answer that question.  I think it's much more common in patent cases to ask the question of invalidity under anticipation and obviousness, separate

questions, and then look at the instructions to look at what they have to consider to make those findings.

I don't think it's a necessary issue for appellate purposes to break it out because, as long as there's substantial evidence supporting that verdict, under any theory, that verdict will be upheld.

With respect to your question about unanimity on a given theory, I think you're asking the jurors a lot to sort of parse those out, and you're going to create issues about unanimity if you're -- if they get confused on the different legal wrappings around it.

I think that the much more common approach in patent cases, including in the *Illumina* case that Your Honor did, was to put forth validity in terms of anticipation, obviousness, and inventorship, and then point the jury to the instructions to guide them on how to answer those questions.

**THE COURT:** So I haven't looked at the instructions with respect to these yet, and so how they read, I think, will end up controlling what we do with respect to the verdict.

**MR. HAYNES:** Thank you, Your Honor.

**THE COURT:** And then, Mr. Keville, you have a series of questions for -- on prior invention. So as opposed to the other very clean way that the verdict forms are presented, they look like special interrogatories for the jury with respect to that. Tell me why that's necessary.

**MR. KEVILLE:**  It was the same issue.  I feel probably not as strong on this one because on this one, you'll have the instruction that says, "This is what you must prove for prior inventorship and it has to be all these elements."  So I don't feel as strongly on this one.

But the reason, if you ask why, was the same reason:  To show on appeal, if we had to, was there sufficient evidence for this particular portion.

**THE COURT:**  Okay.  So I won't do that.

**MR. KEVILLE:**  Yeah.  I think it's less important here than it is on the combinations.

**THE COURT:**  Okay.  And then GoPro's form includes inequitable conduct.

**MR. HAYNES:**  Your Honor, the good news on this issue is I think we've resolved it before we got here.  We're happy to remove that instruction.

**THE COURT:**  Okay.  And so you've resolved it because you're going to punt it to me; is that right?

**MR. HAYNES:**  Yeah.  Your Honor, I believe that was -- the parties' suggestion was that Your Honor would deal with that separately --

**THE COURT:**  Okay.

**MR. HAYNES:**  -- rather than for the jury to deal with it.

**THE COURT:**  And so am I going to be dealing with it

based on the other testimony that's gone in in the jury trial, or is there going to be some additional evidence that you're thinking of providing?

**MR. HAYNES:**  Your Honor, I expect that the majority of the factual evidence that that rests on will be presented to the jury under other legal theories or other fact evidence.

In terms of the particular issues of intent, some of that will -- of the facts will probably come in for inferential purposes, but there may need to be some narrow additional piece which may be introduced through additional documentary evidence.

I'm not sure exactly where that line will get drawn right now, but I suspect that once we get through a few witnesses, we'll know exactly whether there's anything in addition you should see other than what the jury could see.

**THE COURT:**  So you're thinking it's primarily a brief -- it'll be a briefing issue at the end of the day as opposed to more testimony, more live testimony?

**MR. HAYNES:**  Yeah, that's my expectation, Your Honor. Obviously, that may be subject to evidentiary rulings as the trial proceeds.

**THE COURT:**  Yeah.  Okay.

All right.  And the final thing that I think you-all know, my expectation is that a witness will testify once, except for if rebuttal is necessary.  So if there's somebody like

Mr. Woodman that you need to address your direct after some adverse cross at the beginning, do it all at once.  I won't -- I'm not going to hold you to any sort of lines on that.

And that's basically what I had on my agenda.

For jury selection, when you come in a week from Monday, there will be a row of chairs in front of the jury box.  The first -- so 21 people will be there.  There will be then another 19, let's say, on the benches to my left.  They're going to be sitting -- they will come in in their randomized order, and so Jurors 1 through 40 will have their seats.

I refer to jurors by their numbers.  I will ask -- I started during the pandemic calling people -- instead of passing the microphone, I now have a microphone set up at the base of the well, and jurors -- I call jurors up there one at a time, and I ask them usually a pretty robust set of questions that hopefully will have completely plowed your ground for the 15 minutes each of follow-up that I will generously provide you.

And I'll finish my questions.  You'll finish your questions.  We'll talk about hardship and cause, and excuse those folks.

I'm going to -- when you're doing the selection itself by passing the paper back and forth, I will not have refilled the jury box.  People will remain seated where they were so that you know who it is that you're dealing with.

So that's, I think, all that I need to tell you, except for I don't like lawyers to get closer to the jury than the corner of the plaintiff's table.  So give them six feet.  Don't scream at them.  I had -- one of my first patent trials, I had a screamer for a trial lawyer, and he scared the jurors.  And I should have stopped him from screaming.  So I don't like that.

I don't like a lot of wandering around, but stay within arm's length of the podium when you're addressing the jury.

And I think those are things that I wanted to tell you.

Mr. Keville, do you have any questions right now?

**MR. KEVILLE:**  Your Honor, how do you handle strikes?

**THE COURT:**  So you will strike -- so, pass the paper back and forth.  I don't need to see it until you're done unless you're having an issue.  Just, you'll start.

**MR. KEVILLE:**  So is it one -- like, we strike; then they strike; then we --

**THE COURT:**  One, one, one, one.  Yes.  Yeah.

**MR. KEVILLE:**  That's what I thought.

**THE COURT:**  So you get to see what's going on.

**MR. KEVILLE:**  Okay.

**THE COURT:**  Mr. Haynes, anything further?

**MR. HAYNES:**  Just two logistical issues.

The first is juror notebooks.  Does Your Honor have a preference for whether the jurors will get a notebook with witness pictures?  I know a lot of courts do that.  In your

prior orders, it looks like you've done it both ways.

**THE COURT:** Yeah. So this is my theory. I'll tell you my theory. If you all agree that you would like that, I'll accede to it.

We do take pictures of the witnesses, and they'll have them when they're doing their deliberations.

My experience in life is that if you give people a notebook and stuff in it, then they'll start looking at it at inappropriate times and they won't be paying attention to you. So I'm not sure it's a good idea.

But if you think there might be a couple of things, like the jury verdict -- if we agreed on the jury verdict in advance, would that be something that would be helpful to the jury? Maybe.

So I'll leave it up to you, but I don't, as a matter of course, use them.

**MR. HAYNES:** Yeah. We'll add that to our list of things to talk about, and if we can reach agreement, we'll --

**THE COURT:** That's fine. Then just make them up, and that'll be fine.

**MR. HAYNES:** The other issue -- and this may be a little premature but I wanted to just raise it -- is confidentiality issues. There's a lot of third-party confidential information in the case.

And in preparation for today's hearing, we did reach out

to a few parties to see whether or not they had concerns about us addressing certain broad topics, and a few of those companies did raise concerns.

I know from reading Your Honor's prior orders that you like to keep a very open courtroom.  Any advice for us on what we should tell third parties if they have an objection to something being shared in open court?

THE COURT:  Well, so, first of all, to the extent -- well, a few things.

One is, you're right.  This is a public proceeding. You-all are deciding to move ahead this way.  Great.  It's open to the public.

If there are exhibits that include confidential information, we can turn off the cameras just so that they're shown only to the jury and parties.

If there is -- if a company is very concerned about being associated with something, you-all can talk about calling it Company A or Company B or Company C; and we can -- to the extent it's relevant and important, we could disclose who that is to the jury, but not to people in public.

If there is a supersecret thing that somebody is worried about being disclosed, they ought to come to me and explain to me what it is and how it ought to be dealt with.  And that's fine, and I'll just deal with whatever it is when it comes up.

But we have the 8 o'clock sessions.  I don't want to

come -- I could come earlier, but I don't think I'm going to make anybody else come earlier. But we can figure out a time -- figure out a time to do it and to look at it.

And perhaps Monday afternoon at the beginning of trial, if there were some issues, they could -- people could come in and we could talk through whatever the issue is.

MR. HAYNES: That's useful guidance. It's premature at this point because I don't know exactly what we want to say that they don't want us to say in public. So I think once we identify those issues, but just having a process that we can explain to them I think will be very useful.

THE COURT: Okay. And you can tell them my perspective is that companies think that there's a lot more stuff that's secret than I think is. And particularly when we're in trial, there's got to be a compelling reason why whatever it is needs to be secret.

MR. HAYNES: Thank you, Your Honor.

THE COURT: Okay. Anything else that you've got a question about?

MR. HAYNES: No further issues from the defendants, Your Honor.

MR. KEVILLE: Not for plaintiff, Your Honor.

THE COURT: Okay. Well, so the one thing, I just -- I want to encourage you. I don't know where you are in your journey with Judge Kang, but I saw something that came today

that you were supposed to meet with him on October 3rd, and I hope you know that that's not the right date, and that you are doing the best you can for your clients because you don't know what's going to happen here.

**MR. KEVILLE:**  Thank you, Your Honor.

**THE COURT:**  It's good to see you all.  Have a good weekend.

**MR. KEVILLE:**  You do the same.

**MR. HAYNES:**  Thank you.

(Proceedings adjourned at 3:51 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Sunday, September 21, 2025




_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter