1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7   CONTOUR IP HOLDING, LLC,

Plaintiff,

8

9           v.

10  GOPRO, INC.,

Defendant.

11

Case No.  17-cv-04738-WHO

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT, MOTIONS
TO STRIKE AND EXCLUDE AND
MOTIONS IN LIMINE**

Re: Dkt. Nos. 768, 771, 772, 775, 795, 797,

12
13

At the pretrial conference in this case, I heard the parties' arguments on their respective

14

motions for summary judgment, motions to strike/exclude portions of three expert witness reports,

15

and motions in limine.[1]  For the reasons explained below, GoPro's motion for summary judgment

16

on invalidity is **denied** and Contour's motion for summary judgment on infringement is **denied**.

17

GoPro's motion to strike Dr. Hu and Dr. Ugone's expert reports is **denied** and Contour's motion

18

to strike Dr. Almeroth's expert report is **granted in part**.

19
20
21
22

[1] Each side has additionally filed a number of administrative motions to seal in connection with
the aforementioned motions, *see* Dkt. Nos. 767, 769, 770, 774, 786, 788, 790, 792, 799, 801, 803,
805, which I shall address in a separate Order.  Similar to my last Order on summary judgment, I
have temporarily filed this Order under seal in light of the numerous motions to seal.  Within 7
days of the date of this Order, parties are to submit a joint proposed redacted version of the Order,
along with any supporting declarations, for my review.  I will then unseal the Order in accordance
with the Ninth Circuit's "compelling reasons" and this district's "narrowly tailored" standards for
sealing documents.  *See Auto Safety v. Chrysler Group*, 809 F.3d 1092, 1099 (9th Cir. 2016).  I
will concurrently file the Order on the Motions to Seal and the redacted version of this Order.  (Or,
if I conclude that no redactions are necessary, I will unseal this Order.)  As I explained to the
parties at the hearing on these motions, to the extent they wish to raise any issues that they wish to
keep secret at trial, they may raise them at the daily 8 a.m. meeting.  I am not inclined to close the
courtroom for any issues raised thus far.

United States District Court
Northern District of California

**BACKGROUND**

The parties by now are well familiar with the facts of this case—now approaching the tenth year since it was filed in the United States District Court for the District of Delaware.  *See* Dkt. No. 1.  To that end, I comment only briefly about the material factual updates since my last summary judgment order in this case.  *See* Dkt. No. 721 ("March 2025 Summary Judgment Order").

In the March 2025 Summary Judgment Order, I granted Contour's request to add new products, released while the case was on appeal to the Federal Circuit, to this case.  *See* March 2025 Summary Judgment Order at 7, n.4 (referring to the new products as "*Contour III*" products).  It did.  Then, following the Federal Circuit's May 2025 decision in *Ingenico v. Ioengine*, GoPro moved for leave to file a motion for reconsideration.  136 F. 4th (Fed. Cir. 2025); Dkt. Nos. 730, 731.  I granted GoPro's motion.  *See* Dkt. No. 733.  As a part of its Motion for Partial Reconsideration, GoPro argued that its expert withheld supplemental opinions that it believed to be foreclosed by my March 2025 Summary Judgment Order in direct contrast with the Federal Circuit's holding in *Ingenico*.  After reviewing briefing and hearing oral argument on the motion, I granted GoPro's Motion for Partial Reconsideration and implemented a new case schedule.  *See* Dkt. Nos. 747, 748.  Specifically, I "allow[ed] GoPro to amend its expert report to narrowly but adequately discuss issues it previously believed to be precluded prior to the *Ingenico* decision."  Dkt. No. 748 at 9.

GoPro also moved to amend the case schedule in its motion because, it argued, Contour's technical expert (Dr. Hu) had offered new opinions in her March 2025 expert report that amounted to never-before-disclosed infringement theories in violation of Patent Local Rule 3.  *Id.* at 10.  Instead of striking Dr. Hu's report at that time, I permitted GoPro the opportunity for its expert (Dr. Almeroth) to address what GoPro viewed to be those "new" infringement theories presented in Dr. Hu's March 2025 expert report.  *Id.* at 12–13.

Because of the new devices and the additional expert reports, I understood the parties would have one final opportunity to file dispositive motions (including *Daubert* motions) prior to the start of trial. They did.

GoPro filed a motion for summary judgment on invalidity, *see* "GoPro MSJ" Dkt. No. 775, and Contour filed a motion for summary judgment on infringement, *see* "Contour MSJ" Dkt. No. 768. GoPro also filed a motion to exclude portions of Dr. Hu's and Dr. Ugone's (Contour's experts) expert reports. "GoPro MTE" Dkt. No. 772. And Contour filed a motion to strike or exclude portions of Dr. Almeroth's (GoPro's expert) expert report. "Contour MTE" Dkt. No. 771. Both parties opposed all motions. *See* "Contour Oppo. MSJ" Dkt. No. 787; "GoPro Oppo. MSJ" Dkt. No. 791; "Contour Oppo. MTE" Dkt. No. 793; "GoPro Oppo. MTE" Dkt. No. 789. In turn, both parties filed reply briefs in support of their varying motions. *See* "GoPro Reply MSJ" Dkt. No. 804; "Contour Reply MSJ" Dkt No. 800; "GoPro Reply MTE" Dkt. No. 806; "Contour Reply MTE" Dkt. No. 802. Prior to the pretrial conference, the parties also submitted Motions in Limine and their corresponding oppositions. *See* "Contour MIL" Dkt. No. 795; "GoPro Oppo. MIL" Dkt. No. 813; "GoPro MIL" Dkt. No. 797; "Contour Oppo. MIL" Dkt. No. 814.

I held a hearing on all the motions on September 19, 2025.

## LEGAL STANDARD

### I.     MOTIONS FOR SUMMARY JUDGMENT

#### a.     Generally

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

3

United States District Court
Northern District of California

1  made this showing, the burden then shifts to the party opposing summary judgment to identify

2  "specific facts showing there is a genuine issue for trial." *Id.* at 324.  The party opposing

3  summary judgment must present affirmative evidence from which a jury could return a verdict in

4  that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

5        On summary judgment, the court draws all reasonable factual inferences in favor of the

6  non-movant. *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the

7  evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

8  judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact

9  and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594

10  F.2d 730, 738 (9th Cir. 1979).

11      **b.      Infringement**

12      "[A] determination of infringement, both literal and under the doctrine of equivalents, is a

13  question of fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed.

14  Cir. 2003); *see also Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2012 WL 3545286,

15  at *4 (N.D. Cal. Aug. 16, 2012).  "Once the claims have been correctly construed to determine

16  their scope, the claims must be compared to the accused device." *Telemac Cellular Corp. v. Topp

17  Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).  "[L]iteral infringement requires that each

18  and every limitation set forth in a claim appear in an accused product." *Frank's Casing Crew &

19  Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).  "Any

20  deviation from the claim precludes . . . a finding [of literal infringement." *Telemac*, 247 F.3d at

21  1330.

22      **c.      Invalidity Pursuant to 35 U.S.C. § 103(a)**

23      35 U.S.C. § 103(a) prohibits the issuance of a patent when "the differences between the

24  subject matter sought to be patented and the prior art are such that the subject matter as a whole

25  would have been obvious at the time the invention was made to a person having ordinary skill in

4

the art to which said subject matter pertains."  35 U.S.C. § 103(a).  Obviousness is a question of law based on underlying factual determinations.  *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 858 (Fed. Cir. 2015).  The underlying factual inquires include:  (i) "the scope and the content of the prior art;" (ii) "the level of ordinary skill in the art;" and (iii) "the differences between the claimed invention and the prior art."  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).  Secondary indicators such as "commercial success, long felt but unsolved needs, [and] failure of others," that can "give light to the circumstances surrounding the origin of the subject matter sought to be patented" should also be considered.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007) (internal citations and quotation marks omitted).  Evidence of secondary considerations "may often be the most probative and cogent evidence [of nonobviousness] in the record."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).  To invalidate a patent on the basis of obviousness, the moving party must prove obviousness by clear and convincing evidence.  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

## II.    MOTIONS TO EXCLUDE

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558,

564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (internal quotation marks omitted).

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note.

## DISCUSSION

I.       **MOTIONS FOR SUMMARY JUDGMENT**

A.  **GoPro's Motion for Summary Judgment: Invalidity**

1      GoPro moves for summary judgment on the grounds that Claims 11, 12, 14, 15, and 20 of

2  Patent No. 8,890,954 ("the '954 Patent") and Claims 4 and 6 of the 8,890,694 ("the '694 Patent")

3  (together, "the Asserted Patents") are invalid under 35 U.S.C. § 103 ("Section 103").

4      Section 103 reads:

5      A patent for a claimed invention may not be obtained, notwithstanding that the claimed
       invention is not identically disclosed as set forth in section 102, if the differences between

6      the claimed invention and the prior art are such that the claimed invention as a whole
       would have been obvious before the effective filing date of the claimed invention to a

7      person having ordinary skill in the art to which the claimed invention pertains.
       Patentability shall not be negated by the manner in which the invention was made.

8

9  35 U.S.C. § 103.  GoPro contends that based on the combination of the "Boland" prior art and the

10 "Ambarella" prior art, both present to some extent since the onset of this case, the Claims at issue

11 would have been obvious at the time each of the Asserted Patents were filed.  GoPro MSJ 11–19,

12 20–22.

       Patents are presumed valid, and it is GoPro's burden to prove otherwise.  It has not done

13 so.  "When the examiner considered the asserted prior art and basis for the validity challenge

14 during patent prosecution, that burden becomes particularly heavy."  *Impax Labs., Inc. v. Aventis*

15 *Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008).  "Where the content of the prior art, the

16 scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and

17 the obviousness of the claim is apparent in light of these factors, summary judgment is

18 appropriate."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).  But, "[d]etermination of

19 obviousness cannot be based on the hindsight combination of components selectively culled from

20 the prior art to fit the parameters of the patented invention.  There must be a teaching or

21 suggestion within the prior art, within the nature of the problem to be solved, or within the general

22 knowledge of a person of ordinary skill in the field of the invention, to look to particular sources,

23 to select particular elements, and to combine them as combined by the inventor."  *Crown*

24 *Operations Int'l Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).  Where there is a clear

25 dispute whether the prior art discloses the claim limitations in the first instance, motivation to

26 combine the prior art is not at issue.  So here.

27

28

United States District Court
Northern District of California

7

GoPro has raised both Boland and Ambarella prior art to some extent since the start of this case. GoPro admits that it previously abandoned an obviousness combination theory concerning Boland and Ambarella during litigation on the *Contour II* products. GoPro MSJ 6. It points out that at the onset of *Contour II*, I provided it the opportunity to raise additional invalidity contentions because it would have been "unfair" to allow Contour to include additional products without affording GoPro the opportunity to do so. Although I tend to agree with Contour that this is not what I had contemplated when I allowed GoPro to file supplemental expert reports, I can only conclude that this is a direct result of Contour's representation to this court that the *Contour III* products would be "insubstantially different from the already-accused products and infringe[] the same claims under the same theories," similar to the addition of the *Contour II* products. But it is uncontested that Dr. Hu added commentary about the functionality of the *Contour III* products that demonstrated colorable differences from the *Contour I* and *Contour II* products. It only makes sense that GoPro should be allowed to raise prior art theories that its expert believes lead to a conclusion of invalidity.

GoPro seeks to include the limited obviousness combination theory of Boland + Ambarella prior art. Although I allow it to do so, too many factual discrepancies exist at this stage to grant GoPro's motion for summary judgment. The parties' experts dispute the scope of Boland and Ambarella prior art and whether either (or both, combined) discloses the claim limitations at issue in this case. GoPro MSJ 11–19; Contour Oppo. MSJ 12–17. Fact issues also exist insofar as whether one chip, the Ambarella A5S chip, is prior art in the first instance. *See* Contour Oppo. MSJ 17–18. And, secondary indicia highlighted by Dr. Hu tends to demonstrate a lack of obviousness. *See* June 2020 Hu Rebuttal Report [Dkt. No. 774-4] 21–45. Dr. Almeroth's disagreement about the supportiveness of GoPro's secondary considerations requires a conclusion that there is a dispute of fact. *See* October 2021 Almeroth Report [Dkt. No. 786-3] 16–30. GoPro's motion is denied.

United States District Court
Northern District of California

### B. Contour's Motion for Summary Judgment: Infringement

Contour moves for summary adjudication of infringement on some, but not all, of the *Contour III* products. Specifically, Contour contends that the Hero 12 Black, Hero 13 Black, and Hero (4k/2024) all infringe on Claim 11 of the '954 Patent, and that the Hero 11 Black and Hero 11 Mini have infringed on Claim 11 of the '954 Patent ("Claim 11") since a firmware update was issued for those two products in March and May 2024, respectively. Contour MSJ 2 n.1. Contour argues that these cameras infringe upon Claim 11 in the same way that I held *Contour I* products and a number of *Contour II* products infringe upon Claim 11. Together, I refer to the products raised in Contour's Motion for Summary Judgment as "Accused Products."

It is undisputed that the *Contour III* products have several new features that make them different from the *Contour II* products. The extent to which those differences are material to infringement on Claim 11 of the '954 Patent is in dispute. The parties have presented three differences for my consideration: (1) Whether the *Contour III* products are "point of view" digital video cameras; (2) Whether the *Contour III* products are comprised of a "wireless connection protocol device" that is "configured to send *real time* image content;" and (3) Whether the camera processor limitations are met for the *Contour III* products. I conclude that each difference presents a dispute of material fact for the jury to consider.

#### i.    "Point of View" cameras

Claim 11 claims "[a] portable, point of view digital video camera, comprising" several components. '954 Patent 30:57–58 [Dkt. No. 1-1] 55. I previously held that no claim construction of "point of view digital video camera" was necessary, because "point of view" was a "readily understood term [that] should be given its plain and ordinary meaning." 2018 Claim Construction Order [Dkt. No. 251] at 7–9. As a part of forming that conclusion, I noted that the first-named inventor of the '954 Patent "highlighted how the invention is person-relative" in that the point of view of the camera "was not taken by a third party." *Id.* at 9.

GoPro contends that the *Contour III* products are different than prior cameras brought in this case because the perspective of the camera is not so limited to be "POV digital cameras." GoPro Oppo. MSJ 10.  Admittedly, the evidence raised by GoPro is thin.  In his August 2025 report, for example, Dr. Almeroth writes only one paragraph before concluding that Dr. Hu's opinion "that the 'user aligns the camera and then it records based on that field of view' is inconsistent with the features of the Accused Products that permit users to select wider (and taller) capture angles than depicted in the Live Preview."  August 2025 Almeroth Report [Dkt. No. 767-4] ¶ 113.  During his 2025 deposition, Dr. Almeroth commented only briefly that, in his view, "the cameras have continued to evolve with respect to what their field of view captures," to explain his opinion that the Accused Products no longer fit within the plain and ordinary meaning of "point of view" as the *Contour I* and *Contour II* accused products.  Almeroth Depo. [Dkt. No. 790-6] 147: 14–20.  Dr. Hu has not meaningfully contested this opinion.[2]  This creates a dispute of fact concerning whether the Accused Products meet the "point of view" limitation required by Claim 11.

### ii.    Wireless Connection Protocol Device

The parties next dispute whether the Accused Products include the recited "wireless connection protocol device."  One of the required components of the claimed "portable, point of view digital video camera" is:

> a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application . . . .

'954 Patent 30:63–67.

---

[2] As I address below in GoPro's eleventh Motion in Limine, Dr. Hu submitted a now withdrawn expert report.  To the extent that Dr. Hu may have raised any objection to Dr. Almeroth's opinion on whether the "point of view" of the Accused Products meets the established claim language in that now withdrawn report, she may not rely on it.

United States District Court
Northern District of California

The first dispute on this claim limitation goes to the "real time" nature of transmitted images. I previously construed "real time" to mean "without perceivable delay." 2018 Claim Construction Order at 5–6. There appears to be no dispute that there is a delay of one frame in the image content sent by the wireless connection protocol device in the Accused Products. GoPro Oppo. MSJ 11. Whether or not that one frame delay is perceivable is in dispute. Contour contends, and Dr. Almeroth appeared to agree in his deposition, that a one frame delay amounts to 1/60th of a second. Contour Reply MSJ 4; Almeroth Depo. 83: 16–84:1 [Dkt. No. 790-6] 5. I doubt that I could perceive such a delay. But, whether there is a perceived delay, generally speaking, is a factual question for the jury.

GoPro also informally raises an untimely issue for claim construction. GoPro would like me to construe the above-claimed language to mean that what is required is "a wireless connection protocol device that is configured to **both** send real time image content **and** receive control signals." GoPro Oppo. MSJ 13 (emphasis added by GoPro). Understanding the meaning of these terms is important, GoPro argues, because the Accused Products include a "modification called the 'New Camera Connection' (NCC) project that shifted certain functionality from Wi-Fi to Bluetooth in order to save power and increase reliability of the wireless connection. As a result, the Accused Products only establish a local Wi-Fi connection if the user wishes to use the Phone Preview feature (or transfer pre-recorded photos or videos from the camera wirelessly to a remote device)." GoPro Oppo. MSJ 14. Because Wi-Fi is used for one feature and Bluetooth is used for the other, no **one** wireless connection protocol device is configured to send real time image content **and** receive control signals in violation of GoPro's understanding of the claim terms.

I decline to construe this claim now: the claim language has been at issue and is relevant to *Contour I* and *Contour II* products that I have already held to infringe. *See* March 2025 Summary Judgment Order [Dkt. No. 721]. What is now relevant, and a dispute for the jury to resolve, is whether GoPro's NCC modification brings the Accused Products outside the scope of the plain

United States District Court
Northern District of California

language of the claim. *See O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co. Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("We . . . recognize that district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims.") (holding that a district court's decision not to construe a claim presented by the parties at the *Markman* stage and relevant throughout the course of the case to be in error).[3]

### iii.    The camera processor limitations

As is relevant to this issue, Claim 11 of the '954 Patent claims:

a camara processor configured to . . .

> generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream.

'954 Patent 31:4–7 [Dkt. No. 1-1] 56.  During claim construction on this limitation, I held the terms to mean: "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream."  Claim Construction Order [Dkt. No. 251] 9–10.

There is no dispute that a main difference from the *Contour I & II* products is that the *Contour III* products each produce *three* video streams as opposed to the two streams produced in the earlier cameras.  The *Contour I* and *II* camera processors each recorded one low resolution live preview video stream in parallel with a higher resolution video stream that was ultimately recorded to the SD card of the device.  Contour MSJ 1.  The *Contour III* products include a low resolution stream (referred to by the parties as the 'Phone Preview Stream'), a higher resolution stream that is recorded to the SD card, and a third, lower resolution, video stream that gets saved to the SD card.  Contour MSJ 5–7.  The functionality and infringement capability of the camera

---

[3] To the extent that it is made clear to me that this issue becomes ripe for claim construction during the course of trial, the parties are welcome to renew their respective arguments in support of any contested jury instruction. *See id.* at 1359.

United States District Court
Northern District of California

processors that produce three video streams is now called into question.

The parties address the Hero (4k/2024) camera separately from the other allegedly infringing *Contour III* products. Unlike the Hero 11, 12, and 13 cameras, which use a GP2 camera processor manufactured by Socionext, the Hero (4k/2024) camera uses an Ambarella H22 processor. GoPro Oppo. MSJ 6–7. I will address each processor in turn.

### 1.    The GP2 Processor Devices

GoPro contends that there is a dispute of whether the Phone Preview Stream[4] in the GP2 processor products is ever "record[ed]" in the first instance and whether there are first and second image data streams that are recorded "in parallel." I agree.

In his updated Rebuttal Expert Report, GoPro's expert Dr. Almeroth opined that the "phone preview" stream (i.e. the "first image data stream" as identified by Contour's expert, Dr. Hu)

> is never being recorded by the camera and therefore cannot meet the Court's construction of 'generating' as requiring recording. . . . Instead, there is a sequential, delayed processing implementation that modifies the video image data to create the recorded medium that is saved to the camera's SD card. . . . The preview that is sent to the phone, is never recorded *but is only streamed.* Then, *at least 1 second later, the higher resolution stream is created* by processing the data sent to the . . . set of buffers.

August 2025 Almeroth Report [Dkt. No. 767-4] ¶ 168 (emphasis added).

Contour argues that GoPro's assertion that the first image data stream undergoes processing and becomes altered and therefore cannot meet the "generate" limitation has already been foreclosed by my first summary judgment Order (concerning *Contour I* products) in this

---

[4] In the context of these motions, the parties refer to the Phone Preview Stream as the "first image data stream" required by Claim 11. Importantly, Contour does not raise what it practically admitted at oral argument to be an alternative theory of infringement, suggesting that perhaps it should have sought leave to amend to include Dr. Hu's alternative theory. It now argues that because it dropped any alternative theory as to claims 13 and 14, Dr. Hu's expert opinion concerning the three streams should no longer be considered. However, a review of Dr. Hu's deposition testimony makes clear that her opinions concerning the function and operation of the three streams continues to be at least relevant for determining factual issues related to infringement of Claim 11 for the *Contour III* products. Dkt. No. 767-6 at 20–29.

United States District Court
Northern District of California

case. *See* Dkt. No. 445. There, I held that "[t]he undisputed fact that the video image is altered during processing does not mean that any claim limitation is not met." *Id.* at 9. Dr. Almeroth does state that the first image data stream is "modifie[d]" as a result of buffering "so that it is not the same data as prior to buffering." August 2025 Almeroth Report at ¶ 161, n. 78. But Contour's preclusion argument does not encompass GoPro's full argument. GoPro acknowledges that the data that goes on to eventually become the first image data stream is buffered and therefore processed in some way but, Dr. Almeroth specifically states that following that buffering event, the first image data steam is *only streamed*, never stored. Dr. Hu, on the other hand, explains that *both* video streams are "saved to the memory of the Socionext chip (i.e. recorded), and then video frames of the low-resolution stream . . . are sent to the phone for live preview." March 2025 Hu Report at ¶ 218 [Dkt. No. 767-05]. There is a dispute of material fact concerning whether the first image data stream in the GP2 *Contour III* Products is ever "recorded" in the sense contemplated by Claim 11 of the '954 Patent.[5]

GoPro's second identified dispute, whether the streams work "in parallel", alsopresents an issue of material fact. Dr. Hu's perspective is that the low resolution video stream and the high resolution video streams at issue are "created in parallel" because they are "both created from the image data output from the [same] CNR block, which is derived from the same source data from the image sensor." March 2025 Hu Report at ¶ 218. And, both streams "are recorded in parallel even if there is a delay in processing the high resolution stream." *Id.* at ¶ 222. Dr. Almeroth

---

[5] Contour argues that GoPro's argument rests on GoPro's understanding that I previously construed the term "record" to mean "store." Contour Reply MSJ 9. Contour is correct that I did not specifically construe the individual term "record," but I did construe the term "prior to recording the scene" for Claims 30 of the '954 Patent and 4 of the '694 Patent to mean "before *storing* the video image data representing the scene." Claim Construction Order at 14. *See Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002) ("A claim term used in multiple claims should be construed consistently."). Further, Dr. Hu's conclusion that both video streams are "saved to memory on the Socionext chip (i.e., *recorded*)" appears in line with GoPro's (and my) understanding of the term "record."

United States District Court
Northern District of California

disagrees. In his view, the fact that there is any processing delay "is the result of the different hardware architecture." Pointedly, he claims that [t]he streams are processed sequentially *because that is the way the hardware is designed – i.e.*, there is no hardware available to generate video in parallel." August 2025 Almeroth Report at ¶ 162. He goes on to say that "while the delay may be evidence that processing in sequence is occurring, a person of ordinary skill in the art would not equate sequential processing to a temporal limitation. Instead, it is the product of the chip's design that intentionally processes the two different videos in materially different ways, at different times." *Id.* This dispute between whether the GP2 chip in the Hero 11, 12, and 13 cameras is capable of "record[ing]" the two video data image streams "in parallel" is fundamental to uncovering whether these products meet the limitations of Claim 11 of the '954 Patent. I cannot grant summary judgment to Contour for these devices.

### 2. The H22 Processor Device

The Hero (4k/2024) meets a similar fate, but for a different reason.[6] As for the Ambarella H22 chip, Contour argues only that there is no material dispute that Dr. Almeroth failed to oppose Dr. Hu's conclusion that the Ambarella H22 processor is "configured to 'record in parallel two video streams substantially similar to the *Contour I & II* accused products.'" Contour MSJ 17 (quoting March 2025 Hu Report at ¶ 214). Specific to that conclusion, Dr. Hu explained that

---

[6] I also acknowledge that, at oral argument, counsel for GoPro clarified that its language asserting that Contour had not met its burden on summary judgment as to the *Contour III* products generally likewise applied to the Hero (4k/2024). *See* GoPro Oppo. MSJ at 1 (defining "the Accused Products" as used throughout its Opposition to include the Hero (4k/2024) camera); *id.* at 10–16 (arguing that the "Accused Products" fail to meet the limitations of Claim 11). It apparently addressed the Hero (4k/2024) separately in its briefing in the context of the camera processor configurations to mirror Contour's arguments concerning failure of proof. This does not perfectly map onto Dr. Almeroth's expert report. For example, in his brief review of his understanding of the "point of view" infringement, Dr. Almeroth specifically and only refers to the Hero10 Black/Black Bones, Hero11 Black/Mini, Hero12 Black and the Hero13 Black as offering the "expanded field of view capabilities. August 2025 Almeroth Report at ¶ 113. His discussion of the image sensor, however, is more inclusive. *Id.* at ¶¶ 114, 122. As a result, my conclusion that there is a dispute of fact concerning the "wireless connection protocol device" elements of the *Contour III* Accused Products fully applies to the Hero (4k/2024) camera.

1   "[t]he Ambarella Product Sheet confirms that the H22 processor generates two streams in

2   [parallel] while recording."  March 2025 Hu Report at ¶ 227.  She also provided opinions about

3   the source code of the H22 processor.  *See id.* at ¶¶ 90–92, 94–98, 113–117, 120, 139, 142–146.

4       Contour is wrong that Dr. Almeroth's August 2025 Report is unresponsive to Dr. Hu's

5   opinion on the Ambarella H22.  He takes issue with her reliance on the H22 Product Sheet and

6   argues that she "offers no analysis regarding the image processing pipeline used by the Ambarella

7   chipset" and that she does not "identify how the chipset records in parallel a first and second

8   image data stream from the video image data."  August 2025 Almeroth Report at ¶145; *see id.* at

9   ¶¶ 145–150.  He opines how, in his view, Dr. Hu's conclusions about the H22 chipset

10  functionality are "unsupported by any source code evidence."  *Id.* at 147.  He then explains why

11  Dr. Hu's review of the Ambarella H22 source code is incorrect.  *See id.* (including opinions not

12  limited to: "Accordingly, it is not possible for Dr. Hu to conclude what the Ambarella firmware

13  API function 'AmpVideoEnc_Create()' does, much less how it operates;" "Here, too, Dr. Hu's

14  analysis falls short.  Nowhere in SC_GOPRO_3319 is it explained what

15  'AmpEnc_StartLiveview()' does, just that it is called.").

16      At Dr. Almeroth's deposition, counsel for Contour appeared to ask only a limited set of

17  questions about the Ambarella H22 chipset functionality:

18
19      Q: Okay.  Does the Hero4K have a camera processor configured to generate two streams in
        parallel, where one stream is a lower resolution than the other stream?
20      A: . . . [T]he answer is there has not been sufficient evidence to establish that that is an
        accurate characteristic of the Hero4K.
21      Q: Okay.  Did GoPro produce in this case the image processing pipeline used by the
        Ambarella chipset for theHero4K?
22      . . .
        A: I don't recall if they did or not.  And I'm not sure what that characterization could
23      specifically encompass in terms of documents.
        . . .
24      Q: Okay.  And have you seen the image processing pipeline documents for the chipset in
        the Hero4K?
25      A: I am not sure what documents that would specifically refer to.  I have seen the
        documents that Dr. Hu relies on.  If they fall within the characterization of your question,
26      then yes.  If your question is about other documents that Dr. Hu did not rely on or have

27
28

16

access to, then the answer would be no.

Almeroth August 15, 2025 Depo. 105:2–17, 106:1–10 [Dkt. No. 767-7] at 45.

Contour is correct that GoPro did not produce "the image processing pipeline used by the Ambarella chipset" that would "contradict the evidence relied on by Dr. Hu." Contour MSJ 17–18. But Contour confuses its burden with GoPro's. Dr. Almeroth agrees that, at least, Contour had met its burden in presenting a prima facie case on how the GP2 products infringed on the Asserted Patents. But he was able to present rebuttal evidence demonstrating the opposite. Here, however, he contends that Dr. Hu has provided no relevant analysis for how the Ambarella H22 chip functions, so he cannot present any rebuttal evidence in the first instance. He can only provide his opinion, as he has, that the source code referenced by Dr. Hu does not say what she says it says. And, he disputes that the H22 Product Sheet referenced by Dr. Hu is enough to form a conclusion that the chip allows the camera to record "in parallel a first and second image data stream from the video image data." August 2025 Almeroth Report at ¶145.

"When a patentee with the burden of proof seeks summary judgment of infringement, it must make a prima facie showing of infringement as to each accused device before the burden shifts to the accused infringer to offer contrary evidence." *L&W, Inc. v. Shertech, Inc.*, 471 F. 3d 1311, 1318 (Fed. Cir. 2006). Here, Dr. Almeroth sufficiently opposes Contour's prima facie case in the first instance. For that additional reason, there remains a genuine issue of material fact as to whether the Ambarella H22 chip as configured in the Hero (4k/2024) camera infringes on Claim 11 of the '954 Patent.

## II.    MOTIONS TO STRIKE AND EXCLUDE

### A. GoPro's Motion to Exclude Portions of Dr. Hu and Dr. Ugone's Expert Reports

GoPro moves to strike portions of Dr. Ugone's (Contour's damages expert) expert report, as well as portions of Dr. Hu's report upon which Dr. Ugone purports to rely. GoPro MTE 1–3.

This is not the first time that GoPro has sought to exclude opinions posited by Dr. Ugone, and GoPro's arguments largely mirror those I have already addressed. For example, GoPro asks that I strike Dr. Ugone's opinions (and Dr. Hu's related opinions) and conclude that the Element license is unreliable. GoPro MTE 12–19. I have already ruled on this issue. *See* Dkt. No. 708 at 40–42 (holding that GoPro's arguments concerning the Element license were "better directed towards a jury"). I have likewise already considered GoPro's apportionment arguments. *See* Dkt. No. 708 at 39–40.

Further, GoPro takes issue with Dr. Ugone's use of the Rubinstein Model because, in its view, Dr. Ugone did not sufficiently tie the facts of this case to the hypothetical negotiation. GoPro MTE 19–22. I disagree. In the report submitted by the parties, Dr. Ugone has considered the facts of this case and provided sufficient analysis of the relevant bargaining positions of Contour, Element, and GoPro. October 2021 Ugone Report ¶¶ 8–12. This is enough for a jury to consider. Nowhere in GoPro's motion did it explain why I should reconsider these re-raised or could-have-been raised arguments. In any event, as I held at the last stage of *Daubert* motions, GoPro has only raised issues of relevance and accuracy. "[D]isputes about the degree of relevance or accuracy . . . may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship*, 598 F.3d at 852. GoPro's motion to exclude is therefore denied.

**B. Contour's Motion to Strike Dr. Almeroth's Supplemental Report**

Contour likewise moves to strike portions of GoPro's expert's supplemental report. For the reasons I have expanded upon above, I DENY Contour's motion to strike Dr. Almeroth's opinions concerning: (1) his understanding of Dr. Hu's supplemental infringement opinions; (2) the Boland + Ambarella obviousness theory; and (3) the application of the Element license to the *Contour III* product functionalities. In light of the ongoing factual disputes related to invalidity and infringement, each of these opinions is admissible pursuant to the Federal Rule of Evidence 702. On Dr. Almeroth's other opinions, however, I agree with Contour that GoPro seeks to assert

18

*new* theories that very well could have been raised prior to the Federal Circuit's *Ingenico* decision or prior to my March 2025 Summary Judgment Order allowing the *Contour III* products into the case.  I therefore STRIKE from Dr. Almeroth's report any *new* opinions related to (1) Ambarella and Looxcie § 102(g) theories; (2) improper inventorship; and (3) adjustment of camera settings during recording.[7]

### III.    MOTIONS IN LIMINE

I do not deviate in large part from my tentative order on the parties' Motions in Limine.  *See* Dkt. No. 825.  For the sake of clarity, I reproduce the contents of my tentative below, offering additional reasoning only to those motions raised by the parties at the pre-trial hearing.

### A.    Contour's Motions in Limine

1. **Motion in Limine No. 1:**  Granted.  Prior art references related to anticipation and obviousness theories are limited to 6 per patent.  As discussed at the pre-trial hearing and above, these references may include Ambarella, Looxcie, and Boland prior art.

2. **Motion in Limine No. 2:** Granted in part.  Neither party may re-argue claim construction of the "generate" term.  But neither is precluded from presenting what it views to be within the scope of the term.

3. **Motion in Limine No. 3:** Denied.  The Skybell-Element license is relevant at least insomuch as it "arises under comparable circumstances" as the Contour-Element license.  *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353 (Fed. Cir. 2020).

### B.    GoPro's Motions in Limine

1. **Motion in Limine No. 1:** Granted.  The motion is substantively unopposed.  Dr. Ugone may opine on the value of live streaming only as it relates to the hypothetical November 2014 discussion—not any subsequent hypothetical September 2020

---

[7] As I explained at the hearing, any of Dr. Almeroth's opinions that are related to these topics that he had previously submitted continue to be admissible at trial.

United States District Court
Northern District of California

discussion.

2. **Motion in Limine No. 2:** Denied. Parties shall follow the law. To the extent that Dr. Ugone refers to conversations with Dr. Hu that go outside the scope of those conversations discussed in his reports, Contour may object on an individual basis at trial.

3. **Motion in Limine No. 3:** Granted. Contour may not refer to the claim limitations of the "wireless connection protocol device," on their own, to require a device to support "live preview while recording" to infringe. Either party may refer to claims or patents as a whole to require the feature.

4. **Motion in Limine No. 4:** Granted. Contour may not characterize GoPro as an "adjudicated infringer" or an "infringer." To do so would be overly prejudicial to a jury. Whether GoPro has previously infringed (albeit has not incurred liability pending the outcome of trial) is immaterial to the jury's deliberation on whether GoPro's devices before them infringe. Parties may raise related concerns at the final jury instructions hearing.

5. **Motion in Limine No. 5:** Denied. GoPro's request is overbroad. To the extent that Contour raises any infringement contention that GoPro has not previously been made aware of, including infringement contentions that were contested in the dispositive motions on the *Contour III* products, counsel may object in the ordinary course.

6. **Motion in Limine No. 6:** Denied. I have previously held certain licenses (i.e. the iON license and the CoolTech license offer) to be inappropriate methods of calculating a royalty rate. They may not be relied upon for that purpose. They are otherwise admissible for introducing background information, secondary considerations for obviousness arguments, or other reasons not related to calculating damages. To the extent that Contour wishes to use these documents in this manner, counsel shall present redacted versions of those documents to counsel for GoPro by 7:00 p.m. the evening before it intends to do so. The court will review disputes the morning of at the attorney conference.

7.  **Motion in Limine No. 7:** Granted.  Contour is precluded from submitting evidence, argument, or testimony that HERO9 infringes on any theory besides "live streaming via a mobile hotspot."  Contour does not oppose.

8.  **Motion in Limine No. 8:** Denied.  The numerical amount of Mr. Woodman's GoPro stock transactions is relevant to Contour's willfulness argument.  The number of transactions Mr. Woodman may have conducted will not support a jury in making a conclusion as to Mr. Woodman's intent, as is required.  *See Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021).

9.  **Motion in Limine No. 9:** Granted in the alternative.  Dr. Kennedy shall not rely on any asserted *lack* of Element payments during his testimony; Contour may not cross-examine him on that issue.  If GoPro desires an amendment to Dr. Kennedy's report responsive to the recently produced Element payments, he may author one by Thursday, September 25, 2025.  Contour shall additionally produce Mr. Helfer and Mr. Mooney for depositions of up to 1.5 hours each by Friday, September 26, 2025 at GoPro's request.

10. **Motion in Limine No. 10:** Granted in part.  Any argument that Ambarella A5 is not prior art, as defined by Contour, is precluded.  Argument concerning the prior art status of the Ambarella A5S model, along with related documents and evidence, remains available.

11. **Motion in Limine No. 11:** Granted.  All evidence, argument, or testimony concerning Dr. Hu's withdrawn August 1, 2025, expert report is precluded.

12. **Motion in Limine No. 12:** Denied.  Go Pro has not provided any examples that Dr. Ugone "repeatedly references GoPro's total revenues and profits."  Contour's submitted documents in opposition to this MIL likewise do not show an exact number of total revenue and profit so much as a basis for determining a royalty rate and percentage of sales.  Dr. Ugone's testimony must rely on the opinions offered in his expert report.

13. **Motion in Limine No. 13:** Granted in part.  GoPro again addresses only "copying" as

21

1   a secondary consideration with any particularity; copying remains relevant to

2   willfulness.  Because the parties have previously agreed to call Mr. Woodman as a fact

3   witness only once, Contour may introduce evidence of secondary considerations during

4   his testimony in its case-in-chief.  Other witness testimony on secondary considerations

5   should be reserved for GoPro's case on invalidity.

6   14. **Motion in Limine No. 14:** Granted.  Jason Fournier's testimony may be admitted by

7   deposition.  Contour has agreed to this MIL.

8

9                                    **CONCLUSION**

10       For the reasons explained above, the parties' respective motions for summary judgment are

11   **DENIED**.  GoPro's Motion to Strike portions of Dr. Hu's and Dr. Ugone's expert reports is

12   **DENIED**.  Contour's Motion to Strike portions of Dr. Almeroth's expert report is **DENIED in

13   part and GRANTED in part**.  The motions in limine are resolved as described.

14       **IT IS SO ORDERED.**

15

16   Dated: September 23, 2025

17

18   _____

19   William H. Orrick
     United States District Judge

20

21

22

23

24

25

26

27

28