# Exhibit 1

**2022-1654, -1691**

# United States Court of Appeals
# for the Federal Circuit

---

CONTOUR IP HOLDING LLC,

*Plaintiff-Appellant,*

— v. —

GOPRO, INC.,

*Defendant-Appellee.*

---

*On Appeal from the United States District Court for the Northern District of California in Nos. 3:17-cv-04738-WHO and 3:21-cv-02143-WHO, Honorable William H. Orrick, III, Judge*

---

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFF-APPELLANT

OF COUNSEL:
RICHARD L. STANLEY
P.O. Box 7967
Houston, Texas 77270
(832) 656-4277

JOHN R. KEVILLE
MICHAEL C. KRILL
SHEPPARD, MULLIN, RICHTER &
  HAMPTON LLP
700 Louisiana Street,
  Suite 2750
Houston, Texas 77002
(713) 431-7100

*Counsel for Plaintiff-Appellant
Contour IP Holding, LLC*

AUGUST 16, 2022



## U.S. Patent No. 8,890,954

**11.** A portable, point of view digital video camera, comprising:

a lens;

an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene;

a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and

a camera processor configured to:
  receive the video image data directly or indirectly from the image sensor,
  generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream,
  cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting,
  receive the control signals from the personal portable computing device, and
  adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-1654, 2022-1691 |
| **Short Case Caption** | Contour IP Holding LLC v. GoPro, Inc. |
| **Filing Party/Entity** | Contour IP Holding, LLC |

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/29/2022

Signature: /s/ John R. Keville

Name: John R. Keville

i

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Contour IP Holding, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Dustin J. Edwards (Winston & Strawn LLP) | David P. Enzminger (Winston & Strawn LLP) | William M. Logan (Winston & Strawn LLP) |
| Matthew R. McCullough (Winston & Strawn LLP) | Erin C. Villasenor (Winston & Strawn LLP) | Gino Cheng (Winston & Strawn LLP) |
| Andrew E. Russell (Shaw Keller) | John W. Shaw (Shaw Keller) | Karen E. Keller (Shaw Keller) |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives**. Continued.

| | | |
|---|---|---|
| Ian B. Brooks<br>(Ropes & Gray) | Nicole M. Jantzi<br>(Ropes & Gray) | Paul M. Schoenhard<br>(Ropes & Gray) |
| Ian B. Brooks<br>(McDermott Will & Emery) | Michael David Hemes<br>(McDermott Will & Emery) | Nicole M. Jantzi<br>(McDermott Will & Emery) |
| Nitin Gambhir<br>(McDermott Will & Emery) | Paul M. Schoenhard<br>(McDermott Will & Emery) | Leigh C. Taggart<br>(Honigman) |
| David L. De Bruin<br>(Honigman) | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS..........................................................................v

TABLE OF AUTHORITIES .................................................................. vii

GLOSSARY.............................................................................................x

STATEMENT OF RELATED CASES ................................................. xiii

JURISDICTION......................................................................................1

INTRODUCTION & STATEMENT OF ISSUES ...................................2

STATEMENT OF THE CASE................................................................9

STATEMENT OF FACTS ....................................................................12

    A.    Contour's Invention..................................................................13

    B.    Ambarella's Camera Processor ...............................................16

    C.    The District Court's Claim Construction ................................20

    D.    The PTAB Rejects GoPro's Unpatentability Challenges ..................21

    E.    The District Court Denies Judgment On The Pleadings Under § 101 .....................................................................................25

    F.    The District Court's Summary Judgment Order ...................27

SUMMARY OF ARGUMENT ..............................................................29

ARGUMENT ........................................................................................33

    A.    Standards Of Review..............................................................33

    B.    Applicable Law ......................................................................33

    C.    Step One: The District Court Erred In Holding That The Claims Were Directed To An Abstract Idea .......................................36

        1.    The Claimed Advance Over The Prior Art Is Not Abstract ....................................................................36

2. The Court Erred By Analyzing The Wrong Claimed Combination .............................................................41

3. The Patents Do Not Merely Claim A Result Or General Function ...................................................................44

4. The Court Drew Inapt Analogies To This Court's Precedents ...................................................................46

D. Step Two: Whether The Claimed Combination Was Well-Understood, Routine, And Conventional At The Time Were Disputed Factual Issues .................................................52

1. The Inventive Concept Lies In The Combination Of Features In The "Generate" Limitation, Not The Listed Camera Components ...............................................................54

2. Use Of A Prior Art Processor Does Not Mean The Claims Lack An Inventive Concept .........................................57

3. The Court Improperly Disregarded Other Disputed Factual Issues .........................................................61

CONCLUSION ...........................................................................63

ADDENDUM TABLE OF CONTENTS

## CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief is subject to a protective order. The confidential information on pages 4, 16, 17, 19, and 61 relates to deposition testimony from a third-party witness on behalf of third-party Ambarella, Inc. regarding Ambarella's products in the 2009–2010 timeframe, which Ambarella has designated as confidential under the protective order in the district court litigation.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
  573 U.S. 208 (2014).................................................................*passim*

*Amdocs (Israel) Limited v. Openet Telecom, Inc.,*
  841 F.3d 1288 (Fed. Cir. 2016) .......................................................49

*American Axle & Mfg., Inc. v. Neapco Holdings LLC,*
  967 F.3d 1285, *reh'g en banc denied,* 966 F.3d 1347 (Fed. Cir.
  2020), *cert. denied,* 2022 WL 2347622 (June 30, 2022)..................35, 42, 44

*Ancora Techs., Inc. v. HTC Am., Inc.,*
  908 F.3d 1343 (Fed. Cir. 2018) ..................................................51, 57

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,*
  569 U.S. 576 (2013)....................................................................34

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility, LLC,*
  827 F.3d 1341 (Fed. Cir. 2016) ..................................................54, 57

*Berkheimer v. HP Inc.,*
  881 F.3d 1360 (Fed. Cir. 2018) ...................................................*passim*

*Bilski v. Kappos,*
  561 U.S. 593 (2010)...........................................................34, 35, 42

*CardioNet, LLC v. InfoBionic, Inc.,*
  955 F.3d 1358 (Fed. Cir. 2020) ......................................................51

*ChargePoint, Inc. v. Semaconnect, Inc.,*
  920 F.3d 759 (Fed. Cir. 2019) ..................................................49, 50

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.,*
  880 F.3d 1356 (Fed. Cir. 2018) ..................................................40, 43

*CosmoKey Solutions GmbH & Co. v. Duo Security LLC,*
  15 F.4th 1091 (Fed. Cir. 2021) ......................................................56

*Data Engine Technologies LLC v. Google LLC,*
  906 F.3d 999 (Fed. Cir. 2018) ...................................................37, 62

*DDR Holdings, LLC v. Hotels.com, L.P.,*
  773 F.3d 1245 (Fed. Cir. 2014) ..................................................43, 49

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980)....................................................................................33

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*,
    261 U.S. 45 (1923)......................................................................................43

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ...........................................................*passim*

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ................................................................40

*In re Hogan*,
    559 F.2d 595 (CCPA 1977).......................................................................60

*In re TLI Communications LLC Patent Litigation*,
    823 F.3d 607 (Fed. Cir. 2016) ....................................................47, 48, 49

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) ................................................................42

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ................................................................63

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) ................................................................63

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) ................................................. 35, 46, 50-51

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019) ................................................................40

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012)..............................................................................34, 63

*McRO, Inc. v. Bandai Namco Games America, Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ...........................................................*passim*

*MyMail, Ltd. v. ooVoo, LLC*,
    934 F.3d 1373 (Fed. Cir. 2019) ................................................................36

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016) ................................................................37

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ................................................................44

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
    873 F.3d 1364 (Fed. Cir. 2017) ...............................................................41, 44

*Solutran, Inc. v. Elavon, Inc.*,
    931 F.3d 1161 (Fed. Cir. 2019) ............................................................. 45-46

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) ...............................................................33, 52

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) .......................................................36, 40, 45

*Thales Visionix Inc. v. United States*,
    850 F.3d 1343 (Fed. Cir. 2017) ...................................................................52

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) .....................................................................63

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
    957 F.3d 1303 (Fed. Cir. 2020) ...................................................................52

*Visual Memory LLC v. NVIDIA Corp.*,
    867 F.3d 1253 (Fed. Cir. 2017) .............................................................48, 52

*XY LLC v. Trans Ova Genetics, LC*,
    968 F.3d 1323 (Fed. Cir. 2020) ...................................................................51

*Yu v. Apple, Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021) .............................................................*passim*

**Statutes and Other Authorities:**

28 U.S.C. § 1295(a)(1) ......................................................................................1

28 U.S.C. § 1338 ...............................................................................................1

35 U.S.C. § 101 .......................................................................................*passim*

35 U.S.C. § 102 .................................................................................................63

35 U.S.C. § 102(b) ...........................................................................................10

35 U.S.C. § 102(g) .............................................................................10, 11, 62

35 U.S.C. § 103 .................................................................................................63

35 U.S.C. § 112 .................................................................................................10

Fed. R. Civ. P. 12 .............................................................................................53

Fed. R. Civ. P. 56(a) ........................................................................................33

# GLOSSARY

| | |
|---|---|
| CIPH | Plaintiff-Appellant Contour IP Holding, L.L.C., a Utah limited liability company and current assignee of the patents-in suit |
| Contour | Contour, LLC, a Utah limited liability company and the original assignee of the patents-in-suit, who is the majority owner of CIPH but a non-party in these cases |
| iON | iON Worldwide, Inc., a Delaware corporation based in New Jersey, named as a plaintiff in the original suit as the exclusive licensee of the patents-in-suit but later dismissed with prejudice for lack of standing after its merger agreement with Contour was dissolved |
| GoPro | Defendant-Appellee GoPro, Inc., a Delaware corporation based in California |
| '954 Patent | U.S. Patent No. 8,890,954 (Appx23-80) |
| '694 Patent | U.S. Patent No. 8,896,694 (Appx81-137) |
| patents-in-suit | the '954 patent and the '694 patent, collectively |
| claim 11 | claim 11 of the '954 patent, which the parties treated as representative for the patent-eligibility issue |
| POV | point-of-view |
| Boland | U.S. Patent Application Publication, US 2010/0118158 A1 (pub. May 13, 2010) (Appx15408-15432) |
| Looxcie | a third-party California company that was the assignee of the Boland application |
| Ambarella | Ambarella, Inc., a third-party company which developed and marketed the camera processor used in Contour's invention |

| | |
|---|---|
| PTO | United States Patent and Trademark Office |
| PTAB or Board | Patent Trial and Appeal Board |
| IPR | *inter partes* review |
| POSITA | person of ordinary skill in the art at the time of the invention |
| SDIO | Secure Digital Input/Output, a type of secure digital card interface |
| 2017 lawsuit | the first-filed of the two cases on appeal, originally filed in 2015 as *Contour IP Holding, L.L.C. v. GoPro, Inc.*, Case No. 1:15-cv-01108-LPS (D. Del.) (filed on Nov. 30, 2015), and as subsequently transferred in 2017 to become *Contour IP Holding, L.L.C. v. GoPro, Inc.*, Case No. 3:17-cv-04738-WHO (N.D. Cal.) (transferred on Aug. 16, 2017). |
| second lawsuit | the second-filed of the two cases on appeal, filed as *Contour IP Holding, L.L.C. v. GoPro, Inc.*, Case No. 3:21-cv-02143-WHO (N.D. Cal.) (filed Mar. 26, 2021) |
| Utah lawsuit | *Contour, LLC v. Cape Saver, LLC*, Civil No. 2:14-cv-00864-PMW (D. Utah) (filed Nov. 25, 2014) (dismissed Nov. 30, 2015)) |
| Cape Saver | Camp Saver, LLC, a Utah limited liability corporation named as a defendant in the Utah lawsuit |
| Appx____ | Page ____ in Joint Appendix |
| Appx____(xx:yy-zz) | Page ____ in Joint Appendix where "xx" represents a column number of a patent, "yy" represents the initial line of cited text, and "zz" represents the ending line of cited text |

Appx____(aa:bb-cc)  Transcript page in Joint Appendix where "aa" represents the page of the transcript, "bb" represents the initial line of cited text, and "cc" represents the ending line of cited text

**NOTE:  All emphasis in the brief has been added unless otherwise indicated.**

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), counsel for CIPH states that this case has not previously been before this Court or any other appellate court. Pursuant to Fed. Cir. R. 47(b), counsel for CIPH states that the following cases and proceedings involved one or more of the patents currently before this Court and, while none of those proceedings are currently pending and therefore should not directly affect or be directly affected by this Court's decision in the present appeal, they are nevertheless summarized below.

*GoPro, Inc. v. Contour IP Holding, L.L.C.*, Nos. 2017-1894, 2017-1936, 908 F.3d 690 (Fed. Cir. 2018) (Judges Reyna, Wallach, and Hughes), involved appeals from Board's decisions in two IPR proceedings involving the same parties and the same patents-in-suit here. This Court reversed the Board's decision that a GoPro catalog did not qualify as prior art under 35 U.S.C. § 102(b), and remanded for the Board to consider the merits of GoPro's unpatentability challenges based on obviousness. *See* 908 F.3d at 693-96. Because the present appeal involves a summary judgment of invalidity granted under 35 U.S.C. § 101, it is not believed that any aspect of this Court's decision resolving those IPR appeals will directly affect this Court's decision in this appeal.

On July 31, 2019, the Board issued its IPR decisions on remand from this Court, concluding that GoPro had failed to show that any of the challenged claims

of either patent-in-suit was unpatentable for obviousness based on any asserted combination, including the combinations including the GoPro catalog as prior art. Appx8714-8760 ('954 patent); Appx8664-8712 ('694 patent).  GoPro did not appeal either of the Board's remand decisions to this Court.

Finally, for sake of completeness and for the convenience of the Court, CIPH observes that before Judge Leonard P. Stark was confirmed as a judge of this Court in 2022, he served as the district court judge who presided over the earlier of the two cases on appeal while that case was pending before the U.S. District Court for the District of Delaware between 2015 and 2017 until it was transferred by Judge Stark to the U.S. District Court for the Northern District of California.  Appx6273-6276; *see* Appx138; Appx169.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1338. CIPH's appeals from final judgments entered March 15, 2022 were timely filed on April 13, 2022. Appx23676-23677; Appx24864-24865. Those appeals were consolidated by this Court. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION & STATEMENT OF ISSUES

Every patent case should not spawn or reward a patent-eligibility challenge. Here, GoPro's briefing offered ten different abstract idea characterizations, each striving to rewrite Contour's specifically-claimed POV video camera as an abstract idea. Rather than simply rejecting them, the court announced its own, unbriefed articulation that paraphrased the claims while omitting specific claim requirements that reflected the real-world solution and elevated the claim language beyond any abstractness. Just because a defendant invokes 35 U.S.C. § 101, courts should not be obligated to articulate an underlying abstract idea where there is none.

Misconstruing and misapplying GoPro's quotations from the recent wave of § 101 invalidity precedents, the court erred in believing that it had to identify an abstract idea, incorrectly articulated the alleged abstract idea, and then analyzed the wrong combination of claim elements as what implemented the abstract idea. The actual limitations here are directed to a specific configuration of required features, and claim a single solution out of multiple possible approaches for overcoming known prior art problems. The claims do not purport to cover all ways of achieving a result, do not preempt any technique or configuration other than the one claimed, and do not merely use a processor to do something already known because the claimed technique was novel and different from anything done before. Simply put, there is no abstract idea here—as confirmed by the invention history.

POV cameras, a/k/a "action cameras," capture a scene from the user's point-of-view rather than from a third-person viewpoint.  POV cameras are typically attached to the user's body or equipment, and used to record and playback live-action activities, like skiing or surfing.  As of the invention, existing cameras "faced a concrete functional problem:  users could not readily see and control the video while using the cameras for their intended purpose."  Appx17547; Appx71(19:35-37).  Often users would complete their activity, attempt playback, and discover that the camera was aimed incorrectly, had the wrong settings, or was turned off.

"[T]o maintain their small size, POV cameras generally lacked a preview screen" and, even with one, it would be "difficult, if not impossible, to see or configure the images captured by the camera."  Appx21264.  Before Contour's invention, users "had to connect to the camera via a wire attached to a laptop to determine what the camera was capturing."  Appx1272-1273; Appx20907-20908; Appx62(1:21-43).  Attempts to develop "hands-free" POV cameras proved "cumbersome" and "impractical" and still suffered from the recording being initiated "too late to capture the entire event as it unfolded in real time."  Appx15419(¶¶4-5); Appx62(1:44-49); Appx28.

During the 2008-2009 period, three companies—Contour, GoPro, and Looxcie (Boland)—independently sought to develop a POV digital video camera with wireless viewing capability.  Each took different approaches, built different

3

CONFIDENTIAL MATERIAL REDACTED

embodiments, and tried multiple techniques.  Notably, all three companies used the same Ambarella camera processor, which could record or output two videos, or replay video through a wired connection, but had no wireless output and did not allow off-camera settings control.   Appx18344(10-12); Appx18562(185:20-22); Appx18346(4-8).  As Ambarella testified, "[Product Capabilities] from a [Product Capabilities] to a [Product Capabilities] in [Product Capabilities] was actually [Product Capabilities] … acquiring a [Product Capabilities] for [Product Capabilities] to a [Product Capabilities] or to an [Product Capabilities] in [Product Capabilities] would be, you know, again, [Product Capabilities] of the [Product Capabilities] This was [Product Capabilities]."  Appx20876-20877(28:12-29:16).

Boland's approach was to simulate preview by extracting a high-resolution clip from previously-recorded video, downgrading its resolution, and transmitting the clip to a remote device.  Appx15407-15432.  Boland labeled playback of the previously-recorded clip as a "preview" but the user was "previewing" already-recorded video files.  Appx15425(¶59); Appx15427(¶69).  Boland alternatively disclosed bypassing recording and streaming only high-resolution video.  Appx15423-15425(¶43, ¶¶58-59).  Boland 's 2010 application was the primary reference in GoPro's unsuccessful IPR challenges, and Boland's "serial" technique was distinguished from Contour's invention both by the PTAB and by the court's claim construction.

In April 2009, GoPro considered sending a single-frame "preview" picture to a remote-control unit, but doubted it would work.  Appx23515.  In August, GoPro

4

established off-camera communication of a picture using radio frequency (RF) transmit-and-receive modules but realized "the key is the protocols and features and porting to Ambarella camera side.  We do not know how to do this."  Appx23512-23513.  In late 2009, GoPro developed a product with "no picture preview" to reduce costs, and stopped researching both RF and Wi-Fi.  Appx23529-23532; Appx23515-23518; Appx23522(18:12-19:11); Appx23483.

Seeking real-time preview video, Contour's approach was to use the two outputs on Ambarella's processor concurrently.  Appx21266(¶8).  In March 2010, Contour's first prototype experienced low data transfer from the chip to a Bluetooth module.  Appx21267-21268(¶¶13-15).  Contour's solution, which surprised Ambarella, was to configure the processor to generate both high and low-resolution video in parallel from the same video data, and to communicate only the low-resolution stream to a wireless device.  Appx21268-21269(¶¶16-17).  By June 2010, Contour established wireless remote control using an iPhone to adjust certain camera settings.  Appx21269-21270(¶19).

Contour's invention allowed users for the first time to preview in real-time the camera's video recordings and adjust the camera settings remotely from a personal computing device (*e.g.*, a cell phone or a tablet) even when the mounted camera could not be seen or accessed by the user.  Contour filed for a patent in

September 2010 and released a commercial product in January 2011 to industry acclaim.  Appx23543-23544; Appx23550-23551.

Soon thereafter, GoPro's CEO (Woodman) recognized the advantages of Contour's "dual-streaming" technique, and lamented that GoPro "should have been smarter and tapped into the fact that they'd be thinking dual stream with this unit." Appx12823-12826.  He told his team to "covertly" obtain some Contour devices to "disassemble and review," later used for "testing and teardown."  Appx12825; Appx12847.  Even then, GoPro did not release a camera with wireless preview video until October 2012.  Appx12631(100:21-101:6); Appx563.  That camera is among the GoPro products already held to infringe claim 11.  Appx14768-14772.

Claim 11 covers a portable, POV digital video camera including a camera processor configured, *inter alia*, to "generate from the video image data a first image data stream and a second video image data stream, wherein the second image data stream is a higher quality than the first image data stream."  Appx77(31:4-7).  As construed by the court (Appx7754-7755), the claims require configuring the processor to do a specific combination of recited features, which both limits how the claimed invention operates and excludes other configurations and techniques.

Over five years into the case, GoPro unsuccessfully moved to dismiss on grounds the claims were directed to abstract ideas, such as "viewing and recording a video" (Appx16613) and "recording and storing image data."  Appx16622.  Three

months later, GoPro sought summary judgment that the claims were directed to a revised abstract idea of "recording video data at varying image qualities and allowing for some user-modification of the camera settings." Appx20439. CIPH's opposition showed that GoPro's overly-broad formulations ignored express claim limitations and the court's construction. Appx21068-21069. The court's order then announced its own never-before-seen abstract idea articulation of "creating and transmitting video (at two different resolutions) and adjusting the video's settings remotely." Appx7.

Having reduced the 247-word claim to a mere 14 words and recast the claimed, real-world technical solution as its abstract idea, the court held the claims encompassed that abstract principle no matter how implemented and merely recited the abstract idea implemented through generic camera components. Appx11-12. The court compounded its error by treating the components comprising the camera as the relevant combination rather than the specifically-claimed configuration for the camera processor that constituted the technological advance over the prior art. When properly analyzed, claim 11 is not directed to an abstract idea at all. Instead, it claims a specific camera and technique for configuring the processor that improved video camera functionality and overcame identified prior art problems. Under this Court's precedent, that establishes patent eligibility as a matter of law.

Hence, the issues are:

1.      Whether the district court erred in holding the claims are directed to an abstract idea by misstating the claim language and by ignoring its own claim construction which determined that the camera processor must be configured to record two image data streams at two different resolutions in parallel from the same video image data?

2.      Whether the court erred in holding the claimed solution is merely an abstract idea performed with generic components by misidentifying the relevant combination as the components comprising the camera rather than the combination of features for configuring the camera processor?

3.      If *Alice* step-two is reached, whether the court erroneously granted summary judgment that the claims did not embody an "inventive concept" by using inappropriate hindsight, ignoring material evidence, and disregarding highly-disputed factual issues concerning what would have been well-understood, routine and conventional to a POSITA as of the invention?

## STATEMENT OF THE CASE

In November 2014, Contour filed the Utah lawsuit asserting the patents-in-suit against Camp Saver (and unnamed Does).  Appx874-889.  GoPro was later added a defendant.  Appx891-910.  In April 2015, GoPro filed two IPR petitions, alleging all independent claims were unpatentable as obvious.  Appx3840-3974.

In May 2015, Contour merged with iON, another camera maker and retailer. Appx13309-13314.  Under that agreement, CIPH was formed and assigned all rights under the patents-in-suit, and iON was granted an exclusive license.  Appx13317-13324.  In October 2015, the Board instituted the two IPRs.  Appx816-872.

On November 30, 2015, Contour voluntarily dismissed the Utah suit (Appx1094-1095) and CIPH and iON sued GoPro in Delaware, a more convenient forum for iON.  Appx229-252.  Disputes later arose between Contour and iON, resulting in separate litigation.  Appx2178-2180.  Ultimately, the Contour-iON merger was undone, and iON's license became non-exclusive.  Appx2178-2180; Appx2191-2198.  iON was later dismissed for lack of standing.  Appx2943.

In July 2016, Judge Stark granted a stay pending the IPR proceedings. Appx2168-2177.  In October 2016, the PTAB denied the IPR petitions because GoPro had not proved that the GoPro catalog was a printed publication.  Appx2301-2364.  A stay pending appeal was denied.  Appx5175.

In July 2017, Judge Stark transferred the case to the Northern District of California. Appx6273-6276. The California court denied another GoPro motion to dismiss (raising no § 101 issue) and required GoPro to answer. Appx6391-6400. On June 14, 2018, the court issued its claim construction which, *inter alia*, construed the "generate" limitation. Appx7746-7767, at Appx7754-7758; Appx7656-7662.

On November 1, 2018, this Court reversed the Board, holding GoPro's catalog was § 102(b) prior art, and remanded for further proceedings. *See* 908 F.3d at 693-96. In December 2018, the case was again stayed pending the remanded IPR proceedings. Appx8632-8641. On July 31, 2019, the Board upheld all challenged claims. Appx8664-8760.

The litigation stay ended on October 1, 2019. Appx8763-8764. Contour sought to add additional GoPro cameras released during the stay, which GoPro opposed. Appx8764-8765. GoPro moved to amend its invalidity contentions (19 months late) to add nine prior art camera systems, a § 112 defense alleging "in parallel" was indefinite, and an expanded § 102(g) defense. Appx9141-9161; Appx10930-10932; Appx16103-16104. No § 101 issue was raised.

To keep the later-postponed August 2020 trial date, Contour agreed to address GoPro's new products separately. Appx10932; Appx11484; Appx16029. The court rejected GoPro's new prior art as untimely, and denied GoPro's proposed indefiniteness defense because it had been GoPro that urged adding "in parallel" to

the court's "generate" construction.  Appx11100-11107.  The amended § 102(g) defense was allowed.[1]  Appx11107-11108; Appx11118.

The parties filed summary judgment motions; no § 101 issues were raised. Appx11522-11532.  On August 31, 2020, the court ruled that GoPro's accused products infringe claim 11.  Appx14768-14772.  CIPH sought a post-trial accounting or ongoing royalty on four later-released GoPro cameras.  Appx16146.  The court denied the motion without prejudice, stating that CIPH could seek equitable post-trial remedies or bring a second suit.  Appx16467-16482.

On March 26, 2021, CIPH filed the second lawsuit alleging that GoPro's latest products infringed the patents-in-suit.  Appx23682-23705.  The court *sua sponte* consolidated the cases, with the 2017 lawsuit "treated as the docket."  Appx16594-16595; Appx24643-24644.  Citations herein are therefore to documents from that docket unless otherwise indicated.

In June 2021, three weeks after this Court issued *Yu v. Apple, Inc*., 1 F.4th 1040 (Fed. Cir. 2021), GoPro moved for judgment that Contour's claims were patent-ineligible under § 101, alleging, *inter alia*, they are "directed to the abstract idea of viewing and recording a video" and required "nothing more than a

---

[1] Despite GoPro's 2009 product having only a *wired* image or video preview, having to "covertly" obtain and review Contour's breakthrough product, and not releasing a product with wireless functionality or preview until 2012, GoPro's § 102(g) defense is premised on Woodman somehow being first to invent Contour's claimed inventions. Appx9186-9187; Appx11182-11184; Appx17052.

conventional camera processor combined in a known manner with generic components like a lens." Appx16613. On September 13, 2021, the district court denied the § 101 motion, struck GoPro's inequitable conduct pleading (with leave to amend), resolved a new construction issue, and again refused to revisit the court's "generate" construction. Appx17467-17468; Appx17534-17556.

On November 8, 2021, the district court allowed GoPro's amended answer alleging Contour failed to tell the PTO that Ambarella invented the processor used in Contour's invention. Appx17931-17940; Appx21047-21049. Although not at issue here, GoPro manufactured its inequitable conduct allegations to backstop its § 101 assertions. Under GoPro's theory, any later-developed system or process using Ambarella's processor was either a routine and conventional use of that prior art or, alternatively, meant Ambarella co-invented any such later invention. Appx17504-17506; Appx17951-17956.

On March 4, 2022, the district court granted summary judgment that the claims are invalid as patent-ineligible. Appx2-16. These appeals followed.

## STATEMENT OF FACTS

The '694 patent is a continuation of the '954 patent. Appx23; Appx81. They have the same title and abstract, virtually identical specifications, but different claims. For § 101 purposes, claim 11 of the '954 patent is representative. Appx7. Unless indicated, this brief cites record documents concerning the '954 patent.

## A.    Contour's Invention

The patents-in-suit disclose "an integrated hands-free, POV action sports video camera or camcorder that is configured for remote image acquisition control and viewing."  Appx62(1:14-17).  "When recording video or taking photographs in a sports application, digital video camera 10 is often mounted in a location that does not permit the user to easily see the camera."  Appx71(19:35-37).  The disclosed camera "includes wireless communication capability to allow another device, such as a smartphone or tablet computer executing application software, to control camera settings in real time, access video stored on the camera, and act as a wireless handheld "viewfinder" to "preview what digital video camera 10 sees" and allow the user to check camera angles and adjust video alignment, light level, and audio settings before beginning the activity to be recorded.  Appx71(19:40-20:47).

Representative claim 11 provides:

**11.** A portable, point of view digital video camera, comprising:

> a lens;

> an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene;

> a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and

a camera processor configured to:

>> receive the video image data directly or indirectly from the image sensor,

>> generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream,

>> cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting,

>> receive the control signals from the personal portable computing device, and

>> adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device.

Appx76-77(30:57-31:24).   By developing a technical solution which included

configuring the camera processor to generate two image data streams at different

resolutions in parallel from the same video data and transmit only the low-resolution

stream, Contour's invention overcame multiple prior art problems, including the

limitations inherent in using wired connections.   Appx19152-19153(¶¶402-403).

Contour's camera won a CES award because "[w]ith Bluetooth enabled, an iPhone

14

can become the viewfinder for a ContourGPS camera. This will allow users to adjust the composition and settings before attempting to capture ….” Appx23543-23545.

CIPH's expert, Dr. Hu, explained why existing approaches did not achieve the same technological and performance advantages of Contour's patents.

> For example, Boland's preview embodiment did not create previews in real-time and so would not be as useful in allowing the user to see the current view of the camera and adjust settings as appropriate. Boland's streaming embodiment [using the high-resolution video stream] … was only feasible in scenarios where there was sufficient bandwidth [but in] the 2009 timeframe, in particular, bandwidth on personal devices was limited and also constrained by battery power limits, so Boland's streaming embodiment was not practical in many circumstances. … A POSITA would recognize the significant difference between Contour's approach and the well-understood, conventional approaches such as used in Boland, and would conclude that Contour's patents involve more than well-understood, routine, and conventional activities.

Appx19153(¶403). Dr. Hu also explained why Contour's and GoPro's competing development efforts showed the claims were not conventional, and required more than using an off-the-shelf camera processor to be able to generate two image data streams at different resolutions in parallel from the same video image data, as required by the claims.

> Contour, when it sought to implement this patent, found that there was no preexisting conventional solution and it had to build its own Bluetooth-based solution to enable transmission of video. GoPro's development involved multiple failed projects … which confirms that there was no conventional, plug-and-play solution. Instead, GoPro was also forced to attempt to create the software for implementing the claimed invention and it failed multiple times before it finally arrived at a working solution in late 2012.

15

CONFIDENTIAL MATERIAL REDACTED

Appx19153-19154(¶404).  Notably, the Ambarella chip by itself does not meet the claimed limitations; that occurs only when the combined system is created and the processor is configured to perform the specifically-claimed combination of recited features that implements Contour's specific solution to specific problems in the art. Appx19154-19155(¶407).

## B.    Ambarella's Camera Processor

To set the proper historical setting, the iPhone was introduced in 2007, and did not have video capability until 2009.  Appx11249-11250.  As explained, Contour's invention was made using Ambarella's then-available camera processor, which could record or output two videos, or replay video using a wired connection, but had no wireless output and did not allow for off-camera settings control. Appx18344(10-12);  Appx18562(185:20-22);  Appx18346(4-8).    As  Ambarella testified, "[Product Capabilities] from a [Product Capabilities] to a [Product Capabilities] [Product Capabilities] was actually [Product Capabilities] … a [Product Capabilities] for [Product Capabilities] to a [Product Capabilities] or to an [Product Capabilities] in [Product Capabilities] would be … [Product Capabilities] of the [Product Capabilities]  Appx20876-20877(28:12-29:16).

Ambarella's unconfigured processor was prior art, and Contour submitted technical Ambarella documents and datasheets during prosecution.  Appx25-26; Appx21316-21317.  The processor was a programmable chip accompanied by a software development kit ("SDK") that allowed users like Contour to write applications to configure the chip to meet their needs.  Appx20030(170:3-13).  In

16

CONFIDENTIAL MATERIAL REDACTED

September 2010, Ambarella's SDK did not support programming the chip for wireless connectivity. Appx20585-20807; Appx21266-21267; Appx21577. For Ambarella's processor to work for Contour's purposes, Contour had to develop its own protocols for sending real-time video wirelessly as well as a Bluetooth driver. Appx21266-21267.

As Contour's founder explained, "the SDK was immature or didn't have everything we needed, so we were helping them to add those features to their chips so that they would work." Appx21128(35:7-11). Ambarella's witness explained that "Ambarella doesn't ███ the ███" (Appx18925(19-20)) and "we don't ███. We ███ with ███ and try to make it ███ for ███ to ███." Appx18926(12-14). He also explained that "Ambarella didn't necessarily provide all the ███ for the ███. … [T]he ███ was to use our ███ to ███ the ███" Appx18919(5-8).

Even GoPro's expert conceded that "just because [Ambarella's A5 chip] existed doesn't mean that someone would have known how to use it" (Appx18567(202:6-7)) and agreed Contour's efforts were "more than just relying on something that was publicly available." Appx18566(199:9-12). While he was trying to support GoPro's theory that Ambarella was a co-inventor because Contour consulted with Ambarella "to understand how that chip could be used and what its

17

functionality would be within the context of what Contour was attempting to do" (Appx18567(202:8-13)), his testimony confirms that Contour did not buy an off-the-shelf camera processor and plug it in.  Instead, Contour determined how to configure the processor to perform functions not available or previously done, *i.e*., functions which were ***not*** well-understood, routine, or conventional.

Ultimately, Contour configured the processor to generate two video streams at different resolutions in parallel from the same video image data as its specific technique for providing a real-time preview image.  However, the processor could have been configured to perform multiple other technical solutions, including:

- Boland's patented "serial" technique (Appx15407-15432));

- streaming the first stream in a "fast photo mode" using photographs taken in succession to simulate video playback (Appx71(19:65-20:6));

- file sectioning the first stream by "breaking a recording into small files and transferring each upon completion to allow for viewing via a wireless device in near real time (Appx71(20:7-20)); or

- creating the first stream using frame sampling, which "entails real time video frame sampling (e.g., video compression intraframes (I-frames) only" (Appx71(20:22-26)).

Other possible solutions included streaming the first video stream in reduced frame rate rather than a reduced resolution (Appx71(20:7-26)), or keeping the first and second video at the same resolution.  Alternatively, two camera processors could have been used, one creating the first stream for wireless transmission and another

CONFIDENTIAL MATERIAL REDACTED

generating the second stream for recording to memory.  Contour did not just claim

an idea no matter how implemented; Contour claimed a specific technique resulting

from configuring the processor in a particular way.

Contour separately configured Ambarella's processor to "cause the wireless

connection protocol device to send the first image data stream directly to the personal

portable computing device."  Appx77(31:8-11).  At that time, the processor could

not do that because Ambarella chips had no wireless antennas or firmware for

driving wireless communication, only a [Product Capabilities] for [Product Capabilities] or

[Product Capabilities].  Appx23501-23502(165:13-166:8).  Contour had to develop

a Bluetooth driver and the interface firmware.  Appx23501-23502(165:22-166:8);

Appx21128-21129(36:18-40-18); Appx21197(166:3-12).  Although Bluetooth was

preferred, Contour recognized that other wireless protocols such as Wi-Fi could also

be used.  Appx23(Abstract); Appx71(19:41-20:26); Appx17903(14-18).

While it may have been technically possible for a camera processor to receive

control signals to operate the camera, Ambarella conceded that it had never seen its

chip used that way (Appx22399(88:22-25)) and Ambarella did not contribute to

Contour's implementation.  Appx20030-20031(170:18-171:14).  As one Contour

inventor explained, before Contour gave Ambarella the required use cases, "there

was no need for an application for dual stream via wireless. … we brought to them

our unique use cases where we wanted to be able to remotely view." Appx21103-21104(45:8-46:25).

## C.    The District Court's Claim Construction

The district court's Markman order construed the "generate" phrase as meaning "**record in parallel from the video image data** a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream." Appx7754-7755. In doing so, the court resolved several disputes.

First, the court held that "'generate' should be defined as 'record'" and rejected GoPro's proposed additional limitation of "after the recorded action has taken place" as unnecessary and potentially confusing. Appx7756-7757.

Second, the court held that CIPH's IPR arguments warranted including the "in parallel" language in the construction. Appx7757-7758; Appx7485. The court agreed with GoPro that CIPH had used "in parallel" to distinguish prior art (Boland) which generated the two resolutions "in sequence," and held that the "in parallel" requirement applied to all claims. Appx7758.

Third, the court held the prosecution history showed that generating the high- and low-resolution video "at the same time" is not required even if generated in parallel. Appx7757-7758; Appx7485. Because only one claim specified generating the video image "simultaneously," Appx134(29:13-19), the court rejected GoPro's

20

attempt to limit the other claims lacking any "simultaneously" requirement. Appx7758.

## D.    The PTAB Rejects GoPro's Unpatentability Challenges

On remand from this Court, the Board viewed the parties as agreeing that the first and second image data streams must be generated "in parallel," but disagreeing "as to the scope of what that means." Appx8730-8731. The Board held the "plain language" showed the two data streams "must be generated 'from' the same source, *i.e.*, 'the video image data,'" which meant that generating the first video image from the second video image, as in Boland, would not meet the claims. Appx8731.

Boland disclosed a headset 100 that "continuously" records video while the user is wearing the device, in communication with wireless communication handset 201 over communication channel 202 (*e.g.* Bluetooth). Appx8734-8735; Appx15410; Appx15421-15422(¶¶30-35). Handset 201 includes "view screen 303 … to serve as a viewfinder for the headset 100 and … further provide for previewing of video recorded by the headset" and keys 307 for controlling operation of the headset. Appx8735-8736; Appx15423-15426(¶¶46, 58, 61, 63).

Video data in Boland was stored and overwritten, in a first-in, first-out manner, in non-volatile recorded video data buffer 229 of storage medium 228 for "continuous video recording." Appx8736; Appx15421-15423(¶¶35, 40-42, 48). The user may select a portion of the recorded video to save as clip file 231, which is

21

"a logical segment of recorded video which has been extracted or logically partitioned from … buffer 229."  Appx8736; Appx15422(¶41).  This capability "enables one to go back in recorded time and produce a video clip as if a record button on the camera was [just] turned on."  Appx8736; Appx15422-15423(¶42).

The Board found that Boland's low-resolution "preview" video did not meet the claimed "same source" requirement because it was generated from video previously recorded and stored at the headset.  Appx8740-8744.  The Board expressly agreed that:

> Boland generates only one stream of encoded video data from the real-time video image data from the image sensor—any other video is then created from that encoded video data, not the real-time video image data.  In other words, Boland's preview is created in serial with the encoded video data from the processor—not in parallel.  Boland thus teaches, at most, generating video image content at one resolution from previously stored video image content at another resolution.

Appx8740-8741.  Adopting CIPH's demonstratives (below) as accurate, the Board found the high- and low-resolution video in Contour's configuration are both generated from the same real-time video image data whereas Boland's low-resolution "preview" video is generated from encoded video data 225 (rather than input image signal 209).  Appx8744.



Contour '954 Configuration



Boland Configuration

Appx8744.  Even GoPro "acknowledge[d] that high resolution video in Boland is generated '*from the image sensors*' and low resolution video is generated '*from the high resolution video content*.'"  Appx8744-8745.  (Board's emphases).  Finding it "important" that the latter two "are not the same data," the Board held that Boland's first and second video image content "are not both generated in parallel from the same source," as required by the claims.  Appx8744-8745.

The Board held GoPro's alternative argument improperly conflated two different Boland embodiments, one generating only a low-resolution "preview" from previously-stored video and the other streaming only a single full-resolution video with no recording.  Appx8740-8741; Appx8746.  The Board also held that GoPro never explained why or how a POSITA would have combined Boland's "preview"

23

video and streaming to achieve the "generating" limitation.    Appx8748-8749.

Rejecting GoPro's position that generating low-resolution video was "well known"

at the time, the Board held "the question is not whether such video in isolation was

known, but rather whether Boland teaches or suggests the specific process recited in

the claim."  Appx8748.

> Boland teaches an embodiment generating low resolution "preview"
> video from video previously stored in the storage medium and a
> separate embodiment bypassing the storage medium altogether to
> stream full resolution video to the handset. … Moreover, when
> operating in the latter embodiment bypassing the storage medium,
> Boland generates only a single video stream, not two streams generated
> from the same source as required by claim 1.

Appx8749-8750.

As to the GoPro Catalog (Appx8039-8042), the Board found it described only

the remote control (not the camera) as transmitting a single image before recording,

and not what is "received" nor by what component from what other component.

Appx8753 (finding what the Catalog disclosed "is not a preview of full motion

video, but rather, is an image that represents a video (e.g., a single frame of the

video))."[2]    Finally, the Board found the Catalog's mention of a "built-in RF

transceiver" related to supporting audio, not video.  Appx8753.

---

[2]  This is confirmed by litigation evidence showing that GoPro could only stream
single photo images, not video, as of Contour's patent filing.  Appx23529-23532:
Appx23515-23518; Appx23522(18:12-19:11).

The Board concluded the "generating" limitation was not taught by Boland alone or combined with the GoPro Catalog. Appx8715-8717; Appx8750-8758. GoPro did not appeal.

### E.    The District Court Denies Judgment On The Pleadings Under § 101

After 5+ years of litigation silence regarding § 101, GoPro moved for judgment on the pleadings that CIPH's claims were patent-ineligible.  Appx16608. As generalized by GoPro, the claims were allegedly "directed to" a plethora of abstract concepts; *e.g*., "viewing and recording a video," Appx16613, "viewing and recording video data," Appx16621, "recording and storing image data," Appx16622, or "viewing and recording videos."  Appx16626.  GoPro even asserted that claims to a POV video camera "at bottom [are] directed to no more than the gathering, processing, and outputting of information."  Appx16625.

The court denied GoPro's motion without addressing GoPro's various abstract idea formulations and without articulating its own.  The court rejected GoPro's reliance on this Court's recently-issued decision in *Yu,* 1 F.4th 1040, which GoPro declared was "controlling authority" (Appx17001), albeit without addressing the obvious differences, such as the described improvement not being claimed and the patentee admitting that its claimed technique had been known for over a century. Appx17546-17547.  Instead, the court concluded that it could not rule for GoPro based only on the pleadings.  Appx17547.

> Contour pleads, it came up with an innovative solution: the camera would stream a low quality video to a smartphone so that the user could watch what was being recorded removed from the camera; it would store a high quality video that would be the one ultimately used; and it would receive specified control signals from the smartphone so that users could control the image removed from the camera. **This is also reflected in the patents.**

Appx17547-17548. Notably, the same innovative solution is still reflected in the patents for purposes of summary judgment.

GoPro argued that the claims are directed to "the abstract idea of a conventional camera processor [being] used in its known and intended manner," and that "perform[ing] known camera functionality with generic components … is an abstract idea." Appx16613-16614. Because whether a claim element or claimed combination was well-understood, routine, or conventional presented factual disputes which "removes the case from the orbit of *Yu* and related cases," the court could not "find" that "this all took place in only a generic environment at step one or was uninventive at step two." Appx17548.

Finally, the court recognized that "the mere fact that something is disclosed in a piece of prior art … does not mean that it was well-understood, routine, and conventional." Appx17549 (quoting *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018)). However, the motion was denied "without prejudice to GoPro raising the matter on an evidentiary record at summary judgment." Appx17534; Appx17544.

**F.     The District Court's Summary Judgment Order**

Three months later, GoPro reraised the § 101 matter on summary judgment, this time trying a new proposed abstract idea of "recording video data at varying image qualities and allowing for some user-modification of the camera settings." Appx20439.  By then, Ambarella had been deposed, both sides exchanged expert reports and depositions, and the same factual disputes remained.

Citing allegedly analogous caselaw, GoPro argued that "viewing and enhancing digital images using conventional camera components are directed to an abstract idea." Appx20439.  GoPro also faulted the claims for not disclosing a "new" camera or any "new" hardware.  Appx20440.  Ignoring the actual limitations and the court's claim construction, GoPro insisted the claims lacked "any meaningful limitations," did not "propose a specific solution to a technical problem," and did not limit "how the claimed invention achieves the desired result (of streaming video)." Appx20440.  While such assertions were lifted from prior cases, they have nothing to do with this case.

After Contour disputed GoPro's various generalizations, the court's tentative ruling announced that the claims appeared "directed to two abstract ideas: (1) generating and streaming video (at two different resolutions) and (2) controlling the specified settings of the video with a personal portable computing device." Appx23458-23459.  By misappropriating a portion of the claim language and thus

27

turning part of the technical solution into the abstract idea, the court declared its formulation was "not stated at too high a level of generality; they are what the claims themselves recite."  Appx23458.

For step two, the court held the claims "lack a sufficiently inventive concept" because, once the court adopted selected claim limitations as its abstract idea, it would follow that those same limitations "do not amount to significantly more than the generic embodiment of the abstract ideas themselves" and because the solution to the problem being solved were the abstract ideas themselves.  Appx23458-23459. Finally, without acknowledging Contour's prosecution disclosures of the Ambarella chip as third-party prior art (Appx25-26; Appx21316-21317), the order seemingly viewed it as a new and nearly-conclusive revelation that "Contour now admits that it did not invent the Ambarella chip and admits that the chip was prior art." Appx23459.

At the hearing two days later, GoPro predictably abandoned its multiple abstract idea proposals and adopted the court's articulation, and shifted its efforts to defending the tentative ruling.  The court's final order maintained the tentative ruling.  Appx2-16.  That order is addressed in the following argument.

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment that Contour's patents-in-suit are invalid under 35 U.S.C. § 101. There is no abstract idea being claimed here. The claims are directed to a specific machine, an improved POV digital video camera in which the camera processor is specifically configured to generate two video streams of different resolutions in parallel from the same video data and wirelessly transmit only the low-resolution stream. In holding Contour's claims patent-ineligible, the court erred in characterizing what claim 11 is allegedly "directed to" by omitting and disregarding specific claim requirements, by ignoring its own clam construction, and by misidentifying which combination of claimed elements was the advance over the prior art.

This is not a case about using a computer to do something previously done in the industry. Contour created and claimed an improved and uniquely-configured camera that presented a technical solution to identified technical problems in the prior art. Contour's inventive solution contrasts with other technical approaches to the same problem, including the one patented by Boland and multiple techniques disclosed but not claimed in Contour's patents. Any concerns over possible preemption of future discoveries were entirely misplaced because the claims are properly limited to what Contour invented and specifically claimed.

The court legally erred in articulating the allegedly abstract idea. By not accepting any of GoPro's multiple proposals and then adopting some of the claim language as the abstract idea, the court's articulation is facially incorrect and ignores the technical solution, the problems solved, and the specific claim requirements established by its own claim construction. The court disregarded that the two video streams required to be generated at different resolutions must also be generated "in parallel" and "from the same video image data," which both distinguishes the prior art and renders the claimed configuration sufficiently concrete to avoid abstractness and thus any patent-ineligibility.

Despite the district court's reliance on inapplicable quotations from this Court's caselaw, the patents do not simply state "record and stream video" in any manner, but specifically claim a particular technique which solved known problems and improved the prior art. The claims also do not just say use a camera processor nor do they purport to cover whatever techniques might be devised to run on the processor. Unlike a claim that is patent-ineligible for describing a known technique and stating "do it with a computer," claim 11 is patent-eligible because it teaches an improved camera configured to perform a new technique to accomplish something never done before.

In addition to its mistaken abstract idea articulation, the court erred in treating the technical improvement as achieved by the components comprising the camera

rather than through the claimed combination of features for configuring the camera processor required by the claim language. By never addressing the specific combination of features in the "generate" limitation, the court never made the correct inquiry. Because the claims are not merely invoking generic machinery to achieve a result and do not encompass generating and streaming video from a camera "no matter how implemented," the court's conclusory analogies to this Court's precedents are factually and legally misplaced.

Configuring a processor to generate two streams of video in parallel from the same data source and wirelessly sending only the low-resolution stream to a personal computing device is the specific way to implement the claimed solution. For example, the claims would ***not*** be met by a processor recording only one video image stream, recording the two video streams serially or any way other than in parallel, generating a low-resolution stream not from real-time video image data, recording two video streams at the same resolution, or sending only the higher-resolution video to the personal portable computing device. Hence, the claims do not cover all digital video cameras which generate and stream video, but only those using the specific combination of features claimed in the "generate" limitation—like the accused GoPro cameras already held to infringe claim 11.

Moreover, even if the technical solution could be viewed as an abstract idea, the district court erred in deciding on summary judgment that the claims did not

embody an inventive concept in 2009 sufficient to show the patent was claiming more than the abstract idea itself.  Not only must the *Alice* step two inquiry not be undertaken in hindsight, but the court improperly resolved highly-disputed factual issues regarding what would have been well-understood, routine, and conventional to a POSITA as of Contour's invention.  The same factual disputes that required denying GoPro's motion on the pleadings were even more hotly-disputed as of GoPro's summary judgment motion due to subsequent discovery.

The court also erred in abandoning its earlier recognition that the mere fact that something is in the prior art does not make it well-understood, routine, and conventional.  Even GoPro's expert agreed that just because Ambarella's chip existed in 2009 did not mean that someone would have known how to use it.  Contour did not simply take a processor off the shelf and insert it into the claimed invention; it had to devise the particular techniques ultimately claimed, which differed from both Boland's and GoPro's approaches, and surprised Ambarella.  Similarly, the court erred in disregarding CIPH's other step-two evidence showing that GoPro and the industry contemporaneously recognized Contour's invention as a new solution using a specific technique that improved upon the prior art.

Simply put, claim 11 is not directed to an abstract idea at all, and the summary judgment of invalidity under § 101 should be reversed.

## ARGUMENT

### A.    Standards Of Review

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under Ninth Circuit law, summary judgment is reviewed de novo, applying the same test as the district court.  *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146 (Fed. Cir. 2016).

Patent-eligibility under § 101 is a legal question reviewed de novo.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).  Whether something was well-understood, routine, and conventional to a POSITA as of the patent is a factual determination, which must be proven by clear and convincing evidence. *Berkheimer,* 881 F.3d at 1368.

### B.    Applicable Law

35 U.S.C. § 101 provides that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be eligible for a patent.  *See Diamond v. Chakrabarty*, 447 U.S. 303, 307-09 (1980) (Congress intended statutory subject matter to "include anything under the sun that is made by man").  But § 101 "contains an important implicit exception: laws of nature, natural phenomena, and abstract ideas are not patentable" because

they represent "the basic tools of scientific and technological work." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013).

For better or worse, the § 101 analysis is governed by the two-step test established by *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012), and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014). Step one of the *Mayo/Alice* test asks whether the claims are "directed to" a law of nature, natural phenomenon, or abstract idea. *Alice*, 573 U.S. at 217. If not, the § 101 inquiry ends. *McRO, Inc. v. Bandail Namco Games America, Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016). But if so, step two asks whether the claims embody some "inventive concept"—*i.e.*, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Alice*, 573 U.S. at 217-18.

The concern underlying the exclusions from patent eligibility is "one of pre-emption" so patent law does "not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.* at 216. However, "too broad an interpretation of this exclusionary principle could eviscerate patent law" because, at some level, all inventions "embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. at 71.

The Supreme Court has not provided any formula or definition "to delimit the precise contours of the 'abstract ideas' category." *Alice*, 573 U.S. at 221; *see Bilski*

*v. Kappos*, 561 U.S. 593, 621 (2010) (Stevens, J., concurring). Even before *Alice*, the Supreme Court invited this Court to develop "other limiting criteria that further the purposes of the Patent Act and are not inconsistent with its text." *Bilski*, 561 U.S. at 613. However, this Court has not accepted that invitation, instead relying on analogies drawn to other cases. *See Enfish*, 822 F.3d at 1334.

As *Alice* recognized, "abstract ideas" underlie every invention. 573 U.S. at 217. But since *Alice*, the "abstract idea" exception has been increasingly invoked to invalidate a wide range of patent claims for reasons seemingly unjustified by the judicially-created exceptions to the statutory patent-eligibility criteria. *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1348-56 (Fed. Cir. 2018) (Plager, J., dissenting). By this Court's own admission, post-*Alice* § 101 doctrine has not yielded coherent, consistent, and predictable precedent. *See American Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1291, *reh'g en banc denied*, 966 F.3d 1347 (Fed. Cir. 2020), *cert. denied*, 2022 WL 2347622 (June 30, 2022); *Yu*, 1 F.4th at 1049 (Newman, J., dissenting). Given the Supreme Court's multiple recent certiorari denials, it is unlikely that additional § 101 guidance will be forthcoming from that Court. Hence, the ball is back in this Court to identify "limiting criteria" to clarify post-*Alice* § 101 precedents and confine the "abstract idea" exclusion to its proper scope. As here, many patent claims are simply not abstract.

**C.    Step One:  The District Court Erred In Holding That The Claims Were Directed To An Abstract Idea**

For the "directed to" inquiry, courts must examine "what the patent asserts to be the 'focus of the claimed advance over the prior art.'"  *TecSec, Inc. v. Adobe Inc*., 978 F.3d 1278, 1292 (Fed. Cir. 2020) (quotations omitted).  Courts "must be careful to avoid oversimplifying the claims" by merely looking at them generally and failing to account for specific claim requirements.  *McRO*, 837 F.3d at 1313.

Describing claims at a high level of abstraction and untethered from the claim language "all but ensures that the exceptions to § 101 swallow the rule."  *Enfish*, 822 F.3d at 1337.  Here, the court both omitted specific language of the "generate" limitation and ignored its own claim construction in holding that claim 11 is directed to an abstract idea.  Appx7.

**1.    The Claimed Advance Over The Prior Art Is Not Abstract**

"Determining patent eligibility requires a full understanding of the basic character of the claimed subject matter."  *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019) (court must either adopt non-movant's claim constructions or resolve the disputes as necessary for the § 101 analysis); *see TecSec*, 978 F.3d at 1294 ("The accuracy of those characterizations is crucial.").  Here, however, the court had already rendered its claim construction (Appx7750-7767) but then failed to follow or even mention it when resolving the § 101 issue.

Any post-Markman motion alleging invalidity under § 101 must be resolved consistent with the court's construction. *See McRO*, 837 F.3d at 1313 (holding district court's construction established the claims are limited to rules with specific characteristics, not all such rules). Here, the court's construction establishes the claims are directed to the specific characteristics recited for configuring the camera processor, not all methods for recording and streaming video. By implementing this specific configuration for the processor, users could preview the recorded video in real-time and adjust the camera settings remotely free from the limitations and drawbacks of existing POV cameras.

At *Alice* step one, "it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018) (quoting *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc*., 827 F.3d 1042, 1050 (Fed. Cir. 2016)). In *Rapid*, this Court held, based on the claim language, that the claim was not "directed to" a patent-ineligible concept but to a new and improved technique for producing a tangible and useful result. 827 F.3d at 1050. Similarly, in *Data Engine*, this Court stressed "[i]t [was] not enough … to merely trace the invention to some real-world analogy" and held the defendant failed to appreciate the functional improvement achieved by the specific technique in the claimed methods. 906 F.3d at 1011.

In its various § 101 motion papers, GoPro offered multiple different generalizations of Contour's claims as the supposed abstract idea. In response, CIPH cited specific claim language and evidence showing why the claims were not abstract under any of GoPro's generalized formulations, only to have the court's final order adopt an articulation which neither the parties nor their experts had ever addressed. Determining whether claims are directed to an unpatentable abstract idea should not involve such moving targets. Not only does that improperly put the burden on the patentee to prove patentability of the issued claims, but to do so without knowing which abstract idea articulation to disprove.[3]

While the court adopted none of GoPro's proposed formulations, the court revised its own tentative articulation (Appx23458), ultimately settling on "creating and transmitting video (at two different resolutions) and adjusting the video's settings remotely." Appx7. However, that characterization is facially incorrect because claim 11 requires a processor configured to generate two video streams at different resolutions *in parallel* and *from the same video image data* but also to

---

[3] This Court should require district courts to limit defendants to putting forward a single abstract idea formulation or to articulate the court's abstract idea articulation before hearing any § 101 motions, much like issuing a Markman order construing all disputed terms before resolving infringement and prior art-based validity motions. More importantly, unlike claim construction where a court still must render its own construction if it does not adopt one party's proposal, a court should not be obligated to fashion its own abstract idea just because the defendant asserts the claims are directed to one, or describes it too broadly. In many cases, like here, the court should simply hold that the claims are not directed to an abstract idea.

transmit **only one** of them (not two) and then adjust the ***camera's*** settings (not the video's) remotely from the phone.

The court next posed a broader generalization that "[t]he functions of receiving, generating, storing, and transmitting video are (without more) abstract concepts." Appx8. Those overly-simplified functions do not reflect the claim requirements. Switching to its other articulation, the court insisted "[t]he important part of this functionality—that it generates *two* streams, one of which is lower quality—does not make it any less abstract." Appx8. Actually, it does.

The claim construction established that the important functionality is the specifically-claimed technique of generating two video streams at different resolutions in parallel and sending only the lower-resolution one to a personal computing device. That is a specific solution using a specific implementation that improved POV video camera functionality and solved identified problems in the prior art. The court's abstract idea articulation ignored that its claim construction requires the two video streams also be generated "in parallel" and from the same video image data. Omitting those key additional requirements while paraphrasing only part of the claim language tainted the court's entire § 101 analysis by "failing to account for the specific [claim] requirements." *McRO*, 837 F.3d at 1313.

The configuration specified by the claim language identifies a single solution developed from multiple possible approaches for solving the identified problems.

*See supra* section IV.B.  Under this Court's precedent, that alone establishes patent-eligibility.  *See TecSec*, 978 F.3d at 1296 (claims improved network security though an identified solution); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) (claims do not merely recite a desired result, but a specific solution for accomplishing that goal); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (claims directed to a particularized manner of implementation that improved over prior systems); *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1304-05 (Fed. Cir. 2018) (claims employed a new file that enables a computer security system "to do things it could not do before" which claimed not just a desired result but the specific steps to accomplish the result); *Enfish*, 822 F.3d at 1336 (claims were directed to a particular improvement in the computer's functionality).

For its award-winning invention, Contour made technical design choices in determining how to configure Ambarella's processor to generate high- and low-resolution video streams in parallel with wireless streaming and claimed that specific resulting configuration.  Appx21194(146:1-148:22):  Appx21196-21197(164:5-167:10).  The court also overlooked that Ambarella's camera processor as of Contour's invention lacked wireless capability for any purpose and in any configuration.  Appx23501-23502(165:13-166:8);  Appx20876-20878(28:12-30:18).  Properly analyzed, claim 11 is not "directed to" any abstract ideas at all.

### 2.    The Court Erred By Analyzing The Wrong Claimed Combination

According to the court, "[the] proffered advance over the prior art is, in truth, 'directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery.'"    Appx7 (quoting *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017)).    As the "generic machinery" supposedly justifying that conclusion, the court cited only the camera's components (*i.e.*, lens, image sensor, wireless connection protocol device, and camera processor).    Appx8.    However, those components alone are not the relevant claimed combination for § 101 purposes.

The relevant combination includes a camera processor configured to perform a combination of specific actions—*i.e.*, (1) generate (2) in parallel (3) two image data streams (4) from the same video image data (5) where one stream has a higher resolution than the other and (6) sending only the lower-resolution stream to the personal portable computing device—as established by the claim construction.    *See McRO*, 837 F.3d at 1313 ("court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps").    That specific combination of features configures the recited camera processor to become more than just a generic computer.    *See Enfish*, 822 F.3d at 1338-39.    It is the combination of specific features that distinguishes the prior art, not just some of them, and certainly not just the elements comprising the camera.    By looking no further than

the four camera components, the court erred by never addressing the significance of the claimed combination of specific features required by the "generate" limitation.

GoPro has cited the principle that "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) (citing *Alice*, 573 U.S. at 223 (quoting *Bilski*, 561 U.S. at 610-11)). However, that rule does not apply where, as here, the initial assumption is false because the claims are not directed to an abstract idea. Here, the claims are a specific technique providing a real-world solution, not simply an idea untethered from a concrete application. *Am. Axle*, 967 F.3d at 1302. Moreover, a nonabstract idea can be claimed in a patent limited to a particular field of use or technological setting where that particular context creates the unique problems that the specifically-claimed invention is solving.

The inability to preview recordings or change camera's settings were problems unique to POV cameras mounted inaccessibly, *e.g.*, on the user's helmet. Such problems did not affect video cameras mounted, *e.g.*, on a tripod, where the user can access and look through the lens, and reach and adjust the camera's settings. Nor did such problems affect video cameras with viewfinders, as used for "on-the-scene" reporting. Due to their size, weight, and power requirements, those types of video cameras could not be mounted on a skier's helmet or a surfer's board, and

using a power cord in the latter settings would be problematic.  Because problems unique to POV cameras did not arise in other contexts, Contour's specific solution is not abstract because it solves problems unique to a particular environment.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014) (claimed solution is necessarily rooted in computer technology to overcome problem "specifically arising in the realm of computer networks").

Improvements to known devices and systems can be patent-eligible despite using the same components as the prior art.  *See Core Wireless*, 880 F.3d at 1362 (and cases cited).  As here, existing technology can be configured in a particular new way or to perform different functions, which improve the prior art and constitute patentable invention.[4]  In *Core Wireless*, this Court held the claims were not directed to the abstract idea of an index, but to an improved user interface.  *Id*.  While the idea of summarizing information existed before the invention, the claims were directed to a particular manner of summarizing and presenting limited information to the user rather than using conventional methods to display a generic index on a computer.  *Id*. at 1362-63.  Likewise here, the claims are directed to a particular

---

[4]  As one famous example, the improvement in *Eibel Process Co. v. Minnesota & Ontario Paper Co*., 261 U.S. 45, 52-69 (1923), changed the elevation of one component of a prior art machine.  Otherwise, no component was modified, yet the machine was much improved.  Under GoPro's view of § 101, Eibel's invention would have been patent-ineligible because every component was already well-understood, routine, and conventional.

arrangement for recording and streaming video from a POV camera that improved conventional prior art approaches through a specific technique performing specific functions in a specific way. As a matter of law, that is not abstract.

### 3. The Patents Do Not Merely Claim A Result Or General Function

A claim must have the specificity required to transform the claim from one claiming only a result to one claiming a way of achieving it to avoid ineligibility. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167-68 (Fed. Cir. 2018) (and cases cited). However, all that is required at the eligibility phase is that the claim itself identify "how" that functional result is achieved by limiting the claim scope to structures specified at some level of concreteness (for a product claim), or to concrete action (for a method claim). *Am. Axle*, 967 F.3d at 1302. That is what claim 11 specifies.

Using "dual-streaming" as generalized shorthand for what the claim is directed to rather than what the full claim construction requires (Appx7754-7755), the court pronounced that "the claim just says that [dual-streaming] occurs—albeit in the 'typically obtuse syntax of patents.'" Appx8 (quoting *Smart Sys.*, 873 F.3d at 1371)). But under the court's construction of the allegedly "obtuse" claim language, the claim not only specifies that the so-called "dual-streaming" occurs but specifies how it occurs—by generating first and second video images at different resolutions where both are generated in parallel from the same source while sending only the

44

low-resolution stream to the computing device.  While the court states that "[t]he patent does not claim a new technical way of achieving any of this" (Appx8), the claims were construed as providing exactly such a technical solution.

Ignoring its claim construction and its "creating and transmitting video (at two different resolutions)" articulation (Appx7), the court's § 101 analysis reverted back to treating the claims as if they were broadly directed to "receiving, generating, storing, and transmitting video."  Appx8.  By generalizing the claims as covering any way of recording video, any way of transmitting the video from the camera to a computing device, and any way of adjusting the video settings remotely, the court incorrectly characterized the claims as covering any way of achieving those results using generic camera components.

Directed to an improved camera, there is nothing wrong with claim 11 generically reciting individual camera components because the claimed invention is not directed to those "unconfigured" components.  Appx8.  In *TecSec*, the defendant never addressed the claimed combination while asserting only the "'common-place' character of the individual component techniques generally" while speaking at a high level of generality regarding the alleged abstract idea.  978 F.3d at 1297.  This Court rejected that approach as insufficient where "it is the combination of techniques that is 'what the patent asserts to be the focus of the claimed advance over the prior art.'"  *Id*. (quoting *Solutran, Inc. v. Elavon, Inc*., 931 F.3d 1161, 1168

(Fed. Cir. 2019)).  Here, the court's analysis emphasized only the alleged genericness of the listed camera components and, without going further, held the claim described its implementation "in purely functional terms" using only "essentially result-focused, functional" language.  Appx8 (quoted citations omitted). However, the claimed combination of processor features is the proper focus of the relevant inquiry, not the individual camera components.

By viewing the claim as just the four "camera" components, the court erroneously mischaracterized the claim as directed to only well-known, conventional components performing their basic functions without any technological innovation to them.  Appx9.  Contour's invention was not a digital video camera with an improved hardware component, but a camera comprising the recited components where the camera processor was configured to do a specific combination of steps to achieve an improved result that solved known problems with the prior art.  When the correct combination that the claims are "directed to" is properly considered, the claims are clearly patent-eligible.

### 4.    The Court Drew Inapt Analogies To This Court's Precedents

Current § 101 doctrine uses an analogy-based inquiry for resolving patent-eligibility determinations.  *Enfish,* 822 F.3d at 1334.  Clearly subjective, it is inherently unpredictable, unreliable, and result-oriented.  *See Interval Licensing*, 896 F.3d at 1351 (Plager, J., dissenting).  As illustrated by this case, the analogy-based

approach does not guide the "abstract idea" inquiry but merely reinforces a conclusion already reached, even when there is no abstract idea there.

To justify its incorrect conclusion that CIPH's claims are described "in purely functional terms" (Appx8), the court cited three precedents where that was determined to be the problem. Appx9-10. Merely quoting holdings from other cases and then declaring the same is true here does not make it so. Nor does transforming the claimed technical advance into the supposed abstract idea. Appx9. The claimed innovation of generating two videos at different resolutions in parallel from the same video data and streaming only the low-resolution video is not abstract, but rather is a specific processor configuration which distinguished and improved the prior art. On that basis alone, the court's analogies are factually and legally inapplicable.

The court first analogized to *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607 (Fed. Cir. 2016), where the claims were held directed to the abstract idea of classifying and storing digital images in an organized manner. Appx9. Those claims recited tangible components, such as "a telephone unit" and "a server," which were deemed just "a generic environment in which to carry out the abstract idea." 823 F.3d at 611. Because TLI's patent did not describe a new telephone or server, the court here relied on claim 11 not claiming any new camera components. Appx9. However, that is where any analogy fails. The court's declaration that CIPH's claims "did not provide any technical details for the tangible

components" (Appx9) ignores that the "generate" limitation provided technical details for how to configure the camera processor, *i.e.*, generate two video streams at different resolutions in parallel from the same video image data. That is a specifically-claimed technique implementing a distinct configuration, not merely "vague terms without any meaningful limitations."[5]  823 F.3d at 612.

The district court's second analogy was to *Yu*, 1 F.4th at 1042-43, which involved "an improved digital camera" with claims deemed directed to "the abstract idea of taking two pictures (which may be at different exposures) and using one picture to enhance the other." Other than also involving a digital camera, *Yu* is readily distinguishable. In *Yu*, the advance over the prior art was a four-lens, four-image-sensor configuration with only one black-and-white sensor, but the representative claim required only a two-lens, two-image-sensor configuration with no color sensors. *Id*. at 1044-45 (claimed advance was not the configuration that allegedly departed from the prior art). Here, the advance was not the camera's

---

[5] If the law requires claims to have greater technical detail, such as reciting Contour's specific program for configuring the processor, then only "picture" claims could be patent-eligible. Even in 2009, other camera processors could output two videos, but no one had used them how Contour claimed. Appx22399(88:22-25). Once the claims taught configuring the processor to generate two video streams of different resolutions in parallel, then any POSITA could implement that technique by programming the particular processor used for a particular camera. *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1260-61 (Fed. Cir. 2017).

hardware, but the particular claimed configuration for the camera processor that departed from the prior art.

Moreover, the patentee in *Yu* conceded that using multiple pictures to enhance each other had been known for over a century.[6] *Id*. at 1043. Here, no one contended there was any such prior usage because the claimed technique was novel in 2010 and improved the prior art. While the court described the camera components in both cases as well-known and conventional (Appx9), the court's analogy still fails because the issue is not whether each component was "carrying out its basic functions without any technological innovation" (Appx9) but whether the separately-claimed combination of features for configuring the processor would have been well-understood, routine, and conventional. *Berkheimer*, 881 F.3d at 1368. Unlike in *Yu*, those unaddressed factual issues are very much disputed, which should have precluded summary judgment for GoPro.

The court's final analogy was to *ChargePoint, Inc. v. Semaconnect, Inc.*, 920 F.3d 759, 767-68 (Fed. Cir. 2019), where the patent covered network-controlled

---

[6] Unlike *TLI* and *Yu*, this case does not involve using a camera processor to implement or automate a well-known technique previously used in the art, with or without a computer. *See McRO*, 837 F.3d at 1314 (no evidence that the process required by the claims had been previously used in the art). As in *McRO*, the technique in the "generate" limitation had never been used before in POV video cameras. Moreover, as established in the IPRs, even if each individual feature or step was in the prior art, the specifically-claimed orderly combination of those features was not. *See Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301-02 (Fed. Cir. 2016) (citing *DDR*, 773 F.3d at 1259)).

charging stations but the claims were held directed to the abstract idea of communication over a network for interacting with network-attached devices. Supporting its analogy by quoting this Court's wording in *ChargePoint*, 920 F.3d at 768, the court assumed "that [Contour] had the good idea of generating videos at two resolutions, streaming one to a smartphone, and adjusting the settings remotely" but repeated "that is where they stopped, and that is all they patented." Appx10. On summary judgment, that is more than enough to satisfy § 101, particularly where the court acknowledged that "the claim helped solve [the] problem" (Appx10) and conceded that CIPH's expert opined that "this is so." Appx11; Appx19152-19153(¶¶400-402).

Nevertheless, the court maintained that claim 11's "solution to those problems is the abstract idea itself" (Appx11 (quoting *Yu*, 1 F.4th at 1044)) but the court's own claim construction establishes that the claims are directed to a specific solution to a specific problem implemented in a specific way and thus are not an abstract idea. Moreover, the claimed technique is distinct from how Boland or any other prior art was configured, and different from what GoPro was trying at that time (using the same Ambarella processor), which further distinguishes *ChargePoint*.

Like this Court in *ChargePoint*, the district court pronounced that claim 11 is also "drafted in such a result-oriented way" that it encompasses "the 'principle in the abstract' no matter how implemented." Appx11 (quoting *Interval Licensing*, 896

50

F.3d at 1343).  But that ignores that the disclosed prior art and Boland in particular were implemented in entirely different ways, from each other and the patents-in-suit, and there were multiple other ways to configure the processor.  *See supra* section IV.B.  Hence, the only thing foreclosed by the "generate" limitation is the specifically-claimed technique recited therein.

The court employed the same circular logic to distinguish CIPH's cases on grounds that they involve technical inventions performing specific techniques to solve particular problems rather than being allegedly "just a recitation of the idea itself with generic components."  Appx11-12 (discussing *CardioNet, LLC v. InfoBionic, Inc*., 955 F.3d 1358 (Fed. Cir. 2020), and *Ancora Techs., Inc. v. HTC Am., Inc*., 908 F.3d 1343 (Fed. Cir. 2018)).  Only by starting from the false premise that the claimed improvement was an abstract idea, and then ignoring the claim construction, could it be concluded that the specifically-claimed technique is not patent-eligible.  Under the correct understanding of what the claims are directed to, the court's own characterization of CIPH's cases as involving "technical inventions performing specific techniques to solve particular problems" confirms why *CardioNet* and *Ancora* truly are the analogous precedents.  Appx11-12.

Moreover, they are not the only ones.  *See XY LLC v. Trans Ova Genetics, LC*, 968 F.3d 1323, 1331-32 (Fed. Cir. 2020) (improved method of operating apparatus more accurately used a processor executing instructions to classify and

sort particles in real time); *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1308-09 (Fed. Cir. 2020) (claims to specific improvement "do not merely recite generalized steps to be performed on a computer using conventional computer activity"); *Visual Memory*, 867 F.3d at 1259 (claims were "directed to an improved computer memory system, not just the abstract idea of categorical data storage"); *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017) (system that reduces errors in an inertial system that tracks object on a moving platform is not abstract idea); *Enfish*, 822 F.3d at 1337-38 (new and useful technique for defining a database that runs on a generic computer is not abstract idea). As in those cases, the claims here are not abstract under *Alice* step one, so there is no need to reach *Alice* step two.

### D.    Step Two:  Whether The Claimed Combination Was Well-Understood, Routine, And Conventional At The Time Were Disputed Factual Issues

Like the "abstract idea" definition, "the contours of what constitutes an inventive concept are far from precise." *Synopsys*, 839 F.3d at 1151. Here, the court improperly resolved highly-disputed factual issues regarding whether Contour's claimed combination would have been "well-understood, routine, and conventional" as of Contour's invention. *Berkheimer*, 881 F.3d at 1368-69.

Doctrinally, avoiding hindsight when identifying an "inventive concept" is equally as important as avoiding hindsight when deciding obviousness. There is a

critical difference between what "is" well-understood, routine, and conventional today and what "would have been" as of the invention. The "inventive concept" inquiry must be made from a POSITA's perspective as of the invention, and not based on what might seem well-understood, routine, or conventional to a judge or jury today. As of Contour's 2009 invention, Apple's iPhone had just added video capability (Appx11249-11250), and Contour's claimed technique to configure the camera processor to generate two video streams of different resolutions in parallel and stream only the lower-resolution video was an inventive concept that improved the prior art and changed the industry.

Yet the court proclaimed "[n]o matter how unconventional Contour's organization of these elements … the inventive and problem-solving concept is the abstract idea, which is insufficient." Appx13. First, it clearly matters that Contour's evidence showed that its organization of the claimed elements was "unconventional" as of the invention. By itself, that unconventionality defeats summary judgment. Second, despite having denied GoPro's Rule 12 motion due to those same disputed issues (Appx17548-17549), the court declared three months later that they had disappeared despite the record now containing additional discovery and conflicting expert evidence. *See* Appx12 n.7. Summary judgment standards cannot be sidestepped so easily.

### 1. The Inventive Concept Lies In The Combination Of Features In The "Generate" Limitation, Not The Listed Camera Components

"[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350-51 (Fed. Cir. 2016) ("inventive concept" where claimed arrangement provided a "technical solution" that overcame "existing problems" in prior art and elevated an otherwise abstract idea to a patentable invention). However, the court rejected *BASCOM* as the "best step-two case" allegedly because "the claim here does not (when viewing its elements in an ordered combination) recite a specific and discrete implementation of the abstract concept at issue; instead, it recites the abstract concept itself implemented only through generic components." Appx15. As shown for Step One, the court erred by examining the wrong combination to determine which claim elements implement the alleged abstract idea.

As in *BASCOM*, the "generate" limitation here recites "a specific and discrete implementation" of a real-world, problem-solving technique. As construed, that limitation requires the recited camera processor be configured to "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream." Appx7754-7755. That specifically-claimed technique was not in the prior art, overcame known shortcomings, and does not cover every way of streaming

54

video to a personal computing device. Given GoPro's CEO's contemporaneous admission that "we should have been smarter and tapped into the fact that they'd be thinking dual stream" (Appx12825), the claimed technique for configuring the processor to do such "dual streaming" was not well-understood or conventional and is more than the alleged abstract idea.

The fundamental problem remains the court's erroneous identification of the alleged abstract idea. But even accepting the court's abstract idea, its circular analysis erroneously concludes that claim 11 does not recite a specific and discrete implementation of how to generate and stream video (at two different resolutions) when the recited "generate" limitation was construed by the court (and the PTAB) to require the specific technique of generating two image data streams in parallel from the same video image data where one stream has a higher resolution than the other. By generalizing the claimed technical solution into its abstract idea and disregarding its own claim construction, the court short-circuited the "inventive concept" inquiry by simply declaring that the claim does not recite a specific technique when the processor limitations clearly do.

The court also erred in concluding that claim 11 only "recites the abstract concept itself implemented only through generic components." Appx15. The claimed camera comprises a lens, image sensor, wireless connection protocol device, and camera processor but that combination of components is not the relevant step-

two focus and ignores the configuration limitations. The inventive concept is the orderly combination of discrete claimed steps for configuring the camera processor; *i.e.*, (1) generate (2) in parallel (3) two image data streams (4) from the same video image data (5) where one stream has a higher resolution than the other and (6) send only the lower-resolution stream to the personal portable computing device. Those specific configuration limitations represent an inventive concept that distinguishes and improves the prior art, not the processor by itself or merely the combination of unconfigured camera components.

In *CosmoKey Solutions GmbH & Co. v. Duo Security LLC*, 15 F.4th 1091, 1098 (Fed. Cir. 2021), claims to a specific improvement to a computer-implemented authentication technique were patent-eligible under *Alice* step two because they contained an inventive concept which increases security, prevents unauthorized access, is easily implemented, and can be advantageously carried out with mobile devices of low complexity. As this Court explained, the claims "require[e] a specific set of ordered steps that go beyond the abstract idea identified by the district court and improve upon the prior art." *Id*. at 1099. As shown, the same is true here because the ordered steps required by the "generate" limitation also represent an inventive concept which goes beyond even the court's misidentified abstract idea to improve upon the prior art.

In *Ancora*, this Court observed that a computer improvement would be non-abstract "if done by a specific technique that departs from earlier approaches to solve a specific computer problem."  908 F.3d at 1349.  Here, the "generate" limitation recites a specific technique for configuring the processor (generating two videos at different resolutions in parallel from the same video data) that departs from prior art approaches (wired connections, infrared signals, Boland's serial recording, etc.) to solve specific problems and which allowed users for the first time to preview their recordings, adjust the camera settings remotely while the camera was inaccessible, and do so without exceeding bandwidth and battery limitations.  Hence, whether or not *BASCOM* is the "best step-two case," it is not the only step-two case that proves claim 11 contains an inventive concept which establishes patent-eligibility as a matter of law.

### 2.    Use Of A Prior Art Processor Does Not Mean The Claims Lack An Inventive Concept

Without any explanation or supporting caselaw, the district court seemingly viewed as conclusive that "the dual-streaming capability, as Contour admits, comes from a chip in the patent that it did not make and was, in fact, prior art."  Appx13.  A processor being prior art does not make every technique for configuring it routine or conventional.  Moreover, the court had treated the chip as prior art when denying GoPro's motion on the pleadings, when the court acknowledged that "the mere fact that something is disclosed in a piece of prior art … does not mean that it was well-

understood, routine, and conventional." Appx17549 (quoting *Berkheimer,* 881 F.3d at 1369). Rather than waiting to resolve those still-disputed factual issues at trial, the court declared the "only factual dispute" arose from Contour inventing a specific driver so that the Ambarella chip could accomplish its intended functions in Contour's invention. Appx13-14. While not the "only factual dispute" (*see infra* section VI.D.3), the court erred in dismissing that dispute as immaterial on grounds that "claim 11 says nothing about" the Bluetooth driver technology referenced in the specification. Appx14.

Contour's Bluetooth driver technology was developed so the claimed camera could wirelessly "send the first image data stream" and "receive the control signal" limitations, and CIPH cited that development to show why specific techniques which the processor was configured to perform in the claimed invention were not well-understood, routine, and conventional at that time, even if Ambarella's chip was prior art. *See* Appx21194(146:1-148:22). Hence, it was error to disregard such evidence on grounds that the driver itself was not claimed.

Nevertheless, the court faulted Contour for allegedly claiming "the much broader universe of *any* technology that performs its abstract idea" because the claims "do not require any particular technology to carry them out … other than the generic components recited." Appx14. The claims include a camera processor, but the "particular technology" required by the claims resides in the specific features

that the processor and wireless device are recited as being configured to accomplish. That is neither an abstract idea nor "result-based, functional" language, but an inventive concept that establishes the claims as patent-eligible.

Contrary to the court's misapprehension, the claims do not cover "any technology" which generates and streams video from a POV video camera, but only that which uses the specific configuration claimed. Those limitations can be satisfied by an accused camera using any camera processor and any Bluetooth driver, provided the camera generates two video images at different resolutions in parallel from the same video data. Conversely, those limitations would not be met, for example, by a camera processor generating only one video image, recording the two video images serially rather than in parallel (Boland), or recording the two video images at the same resolution.

GoPro argued the claims merely involve using "off-the-shelf" components for well-known, routine, and conventional purposes. Appx16613-16614. Yet, Contour's inventors and expert provided directly contrary evidence, as did Ambarella. Appx19152-19154(¶¶400-404); Appx21264-21270; Appx21103-21104(45:8-46:25); Appx21128-21129(36:18-38:2); Appx20876-20877(28:12-29:16); Appx21194(146:1-147:2); Appx21196(164:5-13). Just because a prior art processor exists does not make every system including that processor or every program written to run on that processor into something well-known, routine, and

conventional. Even GoPro's expert conceded that "just because [Ambarella's chip] existed doesn't mean that someone would have known how to use it" (Appx18567(202:6-7)) and agreed Contour's efforts were "more than just relying on something that was publicly available." Appx18566(199:9-12). Indeed, GoPro itself was surprised by Contour's invention, despite working with the same processor. Appx12823-12826. Such evidence highlights the disputed and unresolved fact issues concerning whether the combination of specific steps that the camera processor must be configured to perform, not the processor itself, would have been well-understood, routine, or conventional.

The constitutional purpose for the patent system is to "promote the progress of science and useful arts," which cannot be achieved if prior art devices cannot be configured, used, or combined with other prior art by subsequent inventors to develop new and improved devices or processes. *See In re Hogan*, 559 F.2d 595, 606 (CCPA 1977) ("encouragement of improvements on prior inventions is a major contribution of the patent system and the vast majority of patents are issued on improvements"). Because Ambarella's unconfigured processor is essentially a blank slate on which programs are written to implement techniques for particular purposes, Ambarella's processor is a building block that enables others to devise new and improved inventions. Boland used it one way, Contour another, and GoPro tried others (and eventually adopted Contour's configuration).

CONFIDENTIAL MATERIAL REDACTED

As Ambarella explained, "we don't [REDACTED: Product Capabilities] We [REDACTED: Product Capabilities] [REDACTED: Product Capabilities] with [REDACTED: Product Capabilities] and try to make it [REDACTED: Product Capabilities] for [REDACTED: Product Capabilities] to [REDACTED: Product Capabilities]." Appx18926(12-14). If no one could use Ambarella's processors, or those made by Intel or Apple, to make inventions without foregoing patent-eligibility or without naming those companies as co-inventors, the benefits of those products would be greatly diminished, to society in general and for those companies in particular. They should remain building blocks, not roadblocks, to the progress of science and the useful arts.

### 3. The Court Improperly Disregarded Other Disputed Factual Issues

First, the court erred in disregarding CIPH's evidence that GoPro did not understand Contour's technology, needed to "take apart" a Contour device to learn how to dual-stream, and had tried several failed approaches to achieving wireless streaming. Appx14. The court held that showed only "that GoPro did not understand *how*, in technological terms, Contour was *implementing* the claims." Appx14. GoPro's inability to figure out the claimed invention could be relevant to a non-enablement defense *if* GoPro had been working from Contour's specification, but that first published in 2012. This Court should reject the district court's self-devised rationale for rejecting that evidence showing that Contour's invention was not well-understood, routine, or conventional at that time.

Second, it was error to disregard CIPH's evidence that GoPro's CEO (who claims to have invented GoPro's products) "admitted that the [claimed] combination is an invention." Appx14-15 n.8; Appx23523-23524(81:23-82:6). In the court's view, that did not admit that Contour's claims satisfy the legal framework in *Alice*. Appx14-15 n.8. Even if not binding, it is an evidentiary admission showing that POSITAs recognized the claimed subject matter was not routine or conventional as of Contour's invention, particularly given Woodman's insistence that he was the first inventor under § 102(g)—a jury issue.

Third, the court erred in rejecting CIPH's evidence that its inventive technology won several design awards on grounds that claims can be novel and nonobvious but still cover patent-ineligible subject matter. Appx14-15 n.8. At most, that goes to the weight of such evidence, but does not provide grounds to disregard industry surprise and praise as irrelevant to whether it would have been well-understood, routine, and conventional. *See Data Engine*, 906 F.3d at 1008 (finding claims not directed to an abstract idea where invention was applauded by the industry for improving computers' functionality).

Finally, the district court's view that the claims having been held novel and non-obvious has no weight when identifying an "inventive concept" for *Alice* step-two should be rejected. On summary judgment, it should be presumed that the claims meet the other statutory patentability criteria absent a proper showing

otherwise (which GoPro never offered).  Here, the PTAB held all claims patentable in the now-final IPR proceedings brought by GoPro, which should estop GoPro from even suggesting otherwise.

This Court has stated that "pragmatic analysis of § 101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015), but has cautioned that a finding that "prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question of whether the claims embody an inventive concept at the second step of *Alice/Mayo*."  *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016).  While prior novelty findings may not be dispositive of an inventive concept establishing patent-eligibility, such evidence also should not be dismissed as irrelevant.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (any novelty in implementation of the alleged abstract idea is considered in the second step of *Alice/Mayo*).

## CONCLUSION

The summary judgment of invalidity under § 101 should be reversed and the case remanded for further proceedings.

Dated:  August 16, 2022                    Respectfully submitted,


                                           /s/ John R. Keville
                                           _____

                                           John R. Keville
                                           SHEPPARD, MULLIN, RICHTER &
                                           HAMPTON LLP
                                           700 Louisiana Street, Suite 2750
                                           Houston, Texas  77002
                                           Tel:  (713) 431-7100

                                           *Counsel for Appellant*
                                           *Contour IP Holding, LLC*