# Exhibit 3

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5    CONTOUR IP HOLDING, LLC, )

6              PLAINTIFF,      )

7          VS.                 ) CASE NO. 17-cv-04738-WHO

8    GOPRO, INC.,              )          21-cv-02143-WHO

9              DEFENDANT.       )

10   _____ )

11

12           ** C O N F I D E N T I A L **

13      (FOLLOWING TRANSCRIPT AND EXHIBITS HAVE BEEN

14      DESIGNATED CONTOUR CONFIDENTIAL INFORMATION)

15

16       VIDEOTAPED DEPOSITION OF JING HU, PH.D.

17              THURSDAY, JUNE 26, 2025

18

19

20

21   REPORTED BY:

22   DAYNA HESTER, C.S.R. 9970

23   JOB NO. 7400562

24

25   PAGES 1 - 214

                                        Page 1

1 stream is not used to generate a live preview on the   17:43
2 portable device; correct?   17:43
3    A.  That's correct.   17:43
4    Q.  Now, under that view -- and now I want --   17:43
5 now I want to put aside -- let's put aside the phone   17:43
6 preview stream for now and just talk about what you   17:44
7 have labelled as "X" and "B" in that scenario.   17:44
8       In Claim 11, the wireless connection   17:44
9 protocol device that is configured to send real-time   17:44
10 image content, what you identify as the real-time   17:44
11 image content that is sent by wireless that must   17:44
12 be -- that the -- let me try that again.   17:44
13       The real-time image content for which the   17:44
14 wireless communication protocol device must be   17:44
15 configured to send is in the scenario involving the   17:44
16 LRV stream, different from the first image data   17:44
17 stream; correct?   17:45
18    A.  That's correct except that A is still   17:45
19 there.  So A is the -- real-time image content.   17:45
20 So there is only one feature that's being accused   17:45
21 here, that's live preview during recording.   17:45
22    Q.  But your view is that the first image data   17:45
23 stream that -- that the first image data stream does   17:45
24 not have to be real time; is that right?   17:45
25    A.  That's correct.  It just needs to be   17:45

Page 202

1 generated from -- sorry.   17:46
2       It just has to be generated from video   17:46
3 image data, and the video image data is directly or   17:46
4 indirectly received from the image sensor.   17:46
5       And if we go back to the image sensor,   17:46
6 that video image data of the scene when leaving the   17:46
7 image sensor has to be real time.   17:46
8    Q.  Okay.  So let me see if I understand this.   17:46
9       In your view, Claim 11 requires that the   17:46
10 wireless device be configured to send real-time   17:47
11 image content but that that real-time image content   17:47
12 need not be the first image data stream that is   17:47
13 generated in the generating step; correct?   17:47
14    A.  That's generally correct.   17:47
15    Q.  Okay.   17:47
16       MR. HAYNES:  How much time do we have?   17:47
17       THE VIDEOGRAPHER:  Left time?   17:47
18       MR. HAYNES:  How much time are we on?   17:47
19       THE VIDEOGRAPHER:  Five minutes.   17:48
20       MR. HAYNES:  I've got five minutes left?   17:48
21 He let him go, like, 25 minutes over last   17:48
22 time -- or I guess two times ago.   17:48
23       All right.   17:48
24 BY MR. HAYNES:   17:48
25    Q.  So since the last time you were deposed,   17:48

Page 203

1 you've issued two more reports; is that right?   17:48
2    A.  For this case, yes.   17:48
3    Q.  For this case.   17:48
4       How long did you spend preparing those   17:48
5 reports?   17:48
6    A.  The new reports?   17:48
7    Q.  Yes.  So, basically, from the last time   17:48
8 you were deposed, I don't want to go back over   17:48
9 everything that you were already asked.   17:48
10       Since the last time you were deposed, how   17:48
11 long have you spent working on this case?   17:48
12    A.  I would estimate it would be probably   17:48
13 close to 200 hours.   17:48
14    Q.  Okay.  So I think you said in your last   17:48
15 deposition you spent about 200 hours working on this   17:48
16 case to generate the reports you were deposed on   17:49
17 then, and now you spent an additional 200 hours   17:49
18 since then.   17:49
19       Is that fair?   17:49
20    A.  Those are my rough estimates.  I didn't go   17:49
21 back after previous deposition to double-check the   17:49
22 numbers.  And I haven't tallied up the hours I have   17:49
23 worked since I was -- essentially this year, mostly   17:49
24 this year.   17:49
25    Q.  Okay.  And when you were drafting the   17:49

Page 204

1 reports in Exhibits 1 and 2, did you personally   17:49
2 draft those report -- the first draft of those   17:49
3 reports?   17:49
4    A.  Yes.  A lot of it.   17:49
5    Q.  Okay.  Which parts did you not personally   17:49
6 draft?   17:49
7       MR. KRILL:  I'm instructing the witness   17:49
8 not to answer because you're asking her about draft   17:49
9 reports that are specifically prohibited by federal   17:50
10 rule of civil procedure 26.   17:50
11       MR. HAYNES:  Fair enough.   17:50
12       THE WITNESS:  It was a collaborative   17:50
13 effort.  And -- so I did all of the source code   17:50
14 analysis, and I drafted a lot of the paragraphs as I   17:50
15 flip through here.   17:50
16 BY MR. HAYNES:   17:50
17    Q.  As -- between your opening report and your   17:50
18 rebuttal report, how does the 200 hours break down?   17:51
19    A.  I don't know.  I haven't looked at the   17:51
20 numbers.   17:51
21    Q.  Now, in your Exhibit 2, as it pertains to   17:51
22 certain of your invalidity opinions, you just   17:51
23 incorporated, by reference, your prior invalidity   17:51
24 reports.   17:51
25       Is that fair?   17:51

Page 205

52 (Pages 202 - 205)