```
                              Volume 2

                           Pages 221 - 397

                  UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

CONTOUR IP HOLDING, LLC,        )
                                )
          Plaintiff,            )  CONSOLIDATED CASES
                                )  NO. 3:17-CV-04738 WHO
  VS.                           )  NO. 3:21-CV-02143 WHO
                                )
GOPRO, INC.,                    )
                                )
          Defendant.            )
_____)


                            San Francisco, California
                            Tuesday, September 30, 2025
```

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES**:

For Plaintiff:

          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
          845 Texas Avenue, 25th Floor
          Houston, Texas 77002
     BY:   **JOHN R. KEVILLE, ATTORNEY AT LAW**
          **MICHELLE C. REPLOGLE, ATTORNEY AT LAW**
          **SUNNY AKARAPU, ATTORNEY AT LAW**
          **MICHAEL C. KRILL, ATTORNEY AT LAW**

For Defendant:

          ALSTON & BIRD LLP
          One Atlantic Center
          1201 West Peachtree Street
          Atlanta, Georgia  30309
     BY:   **JOHN D. HAYNES, ATTORNEY AT LAW**
          **SLOANE S. KYRAZIS, ATTORNEY AT LAW**

     **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
          CSR No. 7445, Official United States Reporter

1  **APPEARANCES**:  (CONTINUED)

2  For Defendant:
                       ALSTON & BIRD LLP
3                      55 Second Street, Suite 2100
                       San Francisco, California 94105
4            BY:  **MICHELLE A. CLARK, ATTORNEY AT LAW**
                  **PHILIP C. DUCKER, ATTORNEY AT LAW**
5

6                      ALSTON & BIRD LLP
                       2828 North Harwood Street, Suite 1800
7                      Dallas, Texas  75201
             BY:  **ELLIOTT C. RICHES, ATTORNEY AT LAW**
8
                       ALSTON & BIRD LLP
9                      Vantage South End
                       1120 South Tryon Street, Suite 300
10                     Charlotte, North Carolina 28203
             BY:  **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**
11

12
   **Also Present:**
13                     Robert Mooney, Contour Corporate Rep
                       Pablo Lema, GoPro Corporate Rep
14                     Tyler Gee, Deputy General Counsel, GoPro
                       Jesse Taylor, Trial Technician
15                     Allen Eaton, Trial Technician
                       Luke Arndt, Trial Technician
16                     Sarah Moyer, Trial Technician

17

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2

3     Tuesday, September 30, 2025 - Volume 2

4

5     <u>PLAINTIFF'S WITNESSES</u>                              <u>PAGE</u>   <u>VOL.</u>

6     <u>BARROS, MARC</u>
      By Video Deposition (not reported)             229    2
7

8     <u>HARRISON, JAMES ALEXANDER TOBIAS</u>
      (SWORN)                                        230    2
9     Direct Examination by Mr. Keville              231    2
      Cross-Examination by Mr. Haynes                270    2
10    Redirect Examination by Mr. Keville            289    2

11

12    <u>MANDER, RICHARD IAN</u>
      (SWORN)                                        291    2
13    Direct Examination by Ms. Replogle             292    2
      Cross-Examination by Mr. Haynes                382    2

14

15                        <u>E X H I B I T S</u>

16    <u>TRIAL EXHIBITS</u>                          <u>IDEN</u>   <u>EVID</u>   <u>VOL.</u>

17     1                                                    360    2

18     2                                                    360    2

19     6                                                    301    2

20     8                                                    344    2

21     10                                                   329    2

22     21                                                   338    2

23     26                                                   315    2

24     27                                                   313    2

25     43                                                   244    2

1          **I N D E X**

2        **E X H I B I T S**

3    <u>**TRIAL EXHIBITS**</u>                                    <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

4      442                                              367   2

5      443                                              366   2

6      444                                              369   2

7      454                                              263   2

8      455                                              265   2

9      459                                              259   2

10     463                                              284   2

11     469                                              258   2

12     470                                              238   2

13     579                                              267   2

14     580                                              267   2

15     1079                                             304   2

16     1280                                             321   2

17     1282                                             346   2

18     2010                                             325   2

19     2182                                             336   2

20     2188                                             391   2

21     2200                                             310   2

22     2239                                             252   2

23     3559                                             267   2

24

25

<u>**Tuesday - September 30, 2025**</u>                          <u>**8:02 a.m.**</u>

                    <u>P R O C E E D I N G S</u>

                         ---o0o---

 1   (Proceedings were heard out of the presence of the jury.)

 2          **THE COURT:**  Are there any matters that we need to
 3   discuss?

 4          **MR. KEVILLE:**  Remarkably few, I think, but --

 5          **THE COURT:**  Okay.  Well, I could take zero as an
 6   answer.

 7          **MR. KEVILLE:**  I'm working on it.

 8          **MR. KRILL:**  It's actually pretty close to zero.

 9   Michael Krill for Contour.  So we're going to play the
10   deposition video of Marc Barros.  There's one answer that has
11   an objection, vague, that overlaps, that we cannot cut out
12   because it overlaps with the witness's answer.  And we know
13   Your Honor requires to cut out the objections and we have.  And
14   so we just wanted to notify you.  If, you know, you hear the
15   objection, we couldn't cut it out.

16          **THE COURT:**  Okay.  So the objection's overruled.

17                         (Laughter.)

18          **MR. KRILL:**  Thank you, Your Honor.

19          **MS. KYRAZIS:**  Good morning, Your Honor.

20          **THE COURT:**  Could you state your appearance.

21          **MS. KYRAZIS:**  Sloane Kyrazis for GoPro.

22      First, Your Honor, we understand your ruling from

1    yesterday is that you were inclined to allow documents that we

2    objected to as inadmissible hearsay.  Those documents are

3    certain unauthenticated third-party websites.  We would just

4    like to preserve our objection and our ability to make a live

5    objection.

6         **THE COURT:**  It is preserved.

7         **MS. KYRAZIS:**  Thank you, Your Honor.

8         **THE COURT:**  Okay.

9         **MS. KYRAZIS:**  And next, Your Honor, we understand that

10   Contour is objecting to the -- calling -- well, Laura O'Donnell

11   is a witness that will be called by deposition, and it's our

12   understanding that Contour objects to our counter-designations.

13        **MS. CLARK:**  I'm so sorry.  No, they withdrew that.

14        **MS. KYRAZIS:**  Oh.

15        **MS. CLARK:**  I think we're done.

16        **MS. KYRAZIS:**  Never mind.

17        **MS. CLARK:**  Thank you.

18        **THE COURT:**  Okay.  But, Ms. Clark, I would like you to

19   provide Ms. Davis with an envelope including everything that

20   you sent to Mr. Keville on Sunday night, so copies of all of

21   the jury consultant's stuff and whatever the email was.  Okay?

22        **MS. CLARK:**  I will for sure.

23        **THE COURT:**  Thank you.  And I'd like you to do that by

24   tomorrow.

25        **MS. CLARK:**  Yes, Your Honor.

PROCEEDINGS

 1          **MS. KYRAZIS:**  And, Your Honor, for the record,

 2  apologies.  Those exhibit numbers for Mr. Mander are PTX-267,

 3  PTX-442, PTX-443, and PTX-444.

 4          **THE COURT:**  Okay.  I think I only saw two of those

 5  exhibits, but if they're the same kind of exhibit, I would

 6  probably rule the same way.

 7          **MS. KYRAZIS:**  Okay.

 8          **THE COURT:**  Thank you.

 9          **MS. KYRAZIS:**  Thank you, Your Honor.

10          **THE COURT:**  All right.  So once all the jury gets

11  here -- is there something more?

12          **MS. REPLOGLE:**  Yes, there is, Your Honor.

13      So one or more of our witnesses may be drawing on a big

14  easel with a white pad of paper.

15          **THE COURT:**  Yeah.

16          **MS. REPLOGLE:**  Where is the best place to locate that

17  and not to get too close to the jury?

18          **THE COURT:**  Well, you know, in the past, it would be

19  right where the tech is.  I think the other way you could do it

20  is -- you could set it up here, and then GoPro's counsel can

21  move around to look, and I'll come down and take a look.

22          **MS. REPLOGLE:**  Okay.  So anywhere like right around

23  here would be okay?

24          **THE COURT:**  Yeah, that would be fine.

25          **MS. REPLOGLE:**  All right.  Thank you, Your Honor.

 1          **THE COURT:**  Okay.

 2          **MS. REPLOGLE:**  That's it.

 3          **THE COURT:**  Anything else?

 4      All right.  As soon as the jury's here, we'll get going.

 5               (Recess taken at 8:06 a.m.)

 6               (Proceedings resumed at 8:42 a.m.)

 7      (Proceedings were heard out of the presence of the jury.)

 8          **THE COURT:**  Ready to proceed?

 9          **MR. KEVILLE:**  Yes, Your Honor.

10          **MR. HAYNES:**  Yes, Your Honor.

11      (Proceedings were heard in the presence of the jury.)

12          **THE COURT:**  All right.  Please be seated, everybody.

13      Good morning, ladies and gentlemen.  Welcome.  We're about

14  to commence the evidence in this case.

15      I wanted to tell you one thing.  You may have understood

16  yesterday from the opening statements that there are three

17  different groups of products that you're going to be looking at

18  during the course of this case.

19      Previously, I determined that what's called the

20  Live Preview Group 1 products include each element of Claim 11

21  of the '954 patent.

22      Mr. Keville referenced that in his opening statement.

23      You must accept my ruling, and you won't be -- and you

24  will not be asked to make any further determination on that

25  issue for the Live Preview Group 1 products with respect to

1    Claim 11 of the '954 patent.

2        My determination applies only to the Live Preview Group 1

3    products.  You, the jury, must decide on your own whether the

4    other accused GoPro products include each element of Claim 11,

5    and you should not be influenced one way or another in your

6    decision by my determination with respect to the

7    Live Preview Group 1 products.  My determination that the

8    Live Preview Group 1 products include each element of Claim 11

9    of the '954 patent does not mean that I've determined that

10    Claim 11 of the '954 patent is valid, that damages are

11    appropriate, or that GoPro willfully infringed Claim 11.

12        So I wanted to tell that you before the rest of the

13    evidence gets going.

14        And, Mr. Keville, let's start.

15        **MR. KEVILLE:**  Thank you, Your Honor.  Mr. Krill will

16    introduce our first witness by video.

17        **MR. KRILL:**  Thank you.

18        As its first witness, Contour calls Marc Barros by

19    deposition.

20        Contour is going to play a short clip from Mr. Barros's

21    deposition which includes testimony designated by both parties.

22        Mr. Barros founded and was the CEO of Contour, Inc., until

23    early 2013, and his deposition was taken in 2021.

24        (Video deposition of Marc Barros was played but not

25    reported.)

PROCEEDINGS

```
 1              MR. KEVILLE:  That's complete, Your Honor.  With that,
 2    we call our next witness, James Harrison.
 3     (Witness enters the courtroom and steps forward to be sworn.)
 4              THE COURT:  Come on up, Mr. Harrison.
 5              THE COURTROOM DEPUTY:  Please step up and remain
 6    standing.  I'm going to take your photograph; then I'll swear
 7    you in.
 8                   JAMES ALEXANDER TOBIAS HARRISON,
 9    called as a witness for the Plaintiff, having been duly sworn,
10    testified as follows:
11              THE WITNESS:  Yes, I do.
12              THE COURTROOM DEPUTY:  Be seated.
13       And if you would please state your full name and spell it
14    for the court reporter.
15              THE WITNESS:  James -- well, James Alexander Tobias
16    Harrison.
17              THE COURT:  And can you spell it, for the record,
18    please.
19              THE WITNESS:  Spell it?
20              THE COURT:  Yes.
21              THE WITNESS:  J-a-m-e-s; Alexander, A-l-e-x-a-n-d-e-r;
22    Tobias, T-o-b-i-a-s; Harrison, H-a-double r-i-s-o-n.
23              THE COURT:  Thank you.
24              MR. KEVILLE:  Thank you, Your Honor.  May I proceed?
25              THE COURT:  Yes, please.
```

<u>DIRECT EXAMINATION</u>

**BY MR. KEVILLE:**

**Q.**   So we have your name.  Why are you here?  What is your

role here?  What was your role in this case?

**A.**   I'm the former chief marketing officer and then chief

executive officer of Contour, LLC.

**Q.**   And you said "former."  What do you do now?

**A.**   I'm an owner of Heartland Pharmacy, which is a veterinary

pharmacy, and we do medicine for pets and horses.

**Q.**   You're not employed by Contour anymore?

**A.**   No.

**Q.**   Did you agree to come voluntarily to testify?

**A.**   Yes.

**Q.**   Are you being paid?

**A.**   No.

**Q.**   Why did you come?

**A.**   This is a very important part of my life, something I'm

very passionate about.  I spent a lot of my life trying to get

Contour back to its rightful place.

**Q.**   Let's step back.

     When was the first time you became aware of or knew of

Contour Cameras?

**A.**   So it was back in 2011.  I was still living in London, and

a friend of mine, James Clarke, who's the same James Clarke as

Clarke Capital that you might hear about later, James came to

 1    visit, and he came with a big smile on his face and a present.

 2    And this present was a Contour camera.

 3        And, honestly, I didn't know what it was, but it was cool.

 4    It was really cool.  It was an amazing piece of technology.  It

 5    was very kind of James Bondesque.  It was like, you know, this

 6    cylinder, and it looked amazing.  And, yeah, I'll never forget

 7    it.  And he explained to me the technology and what it could do

 8    and how to work it.

 9        Anyway, in a couple of weeks' time, I was skiing with it

10    and very excited.  It was, you know, amazing to see kind of --

11    the way he explained it was like having a little TV camera

12    inside a tiny little shell.

13    Q.   Do you still have that Contour camera?

14    A.   Yes, I do.

15    Q.   Have you bought others since then?

16    A.   Yeah.  Obviously, yes, I have.

17    Q.   As a user -- well, let me ask this so the jury

18    understands.

19        You mentioned Clarke Capital.  What is Clarke Capital?

20    A.   Clarke Capital -- so James Clarke created a family office.

21    Q.   What is a family office?

22    A.   So it's a -- it's a company or a partnership that's

23    created to look after a family's wealth and investments.  James

24    had sold his business, and he set up this family office called

25    Clarke Capital.

1  Q.   Before Clarke Capital's involvement, you were a user of

2  Contour Cameras; correct?

3  A.   Yes.

4  Q.   Okay.  In that time, what was your understanding of

5  Contour Cameras?

6  A.   Well, I was a big fan, and I just thought the technology

7  was amazing.  Here's something that, you know, I used a lot.

8  I -- I will say skateboard.  And it was just a really cool

9  camera.  And, you know, I realized quite how amazing it was and

10 that it was doing all of these amazing technologies.

11      But then we were beginning to hear about this other

12 company, GoPro, as I became, you know, more involved.

13 Q.   Okay.  Was James Clarke, when -- this original time when

14 you talked, was he an investor in Contour?

15 A.   Yes, he was.

16 Q.   Okay.  Now, you weren't here.  The jury just heard from

17 Marc Barros who said the company went into bankruptcy.  Did the

18 company actually go into receivership?

19 A.   Yes.

20 Q.   And what is receivership?

21 A.   Receivership is sort of a situation when a company has

22 assets and liabilities, but the liabilities are bigger than the

23 assets, and so you have to go into -- you've probably had a

24 Chapter 11 and bankruptcy, and it's kind of similar to that.

25      And the receiver basically becomes the owner of the

1    company and has to find a way to run the -- run it or find a

2    way to get a sale.

3    **Q.**   So what happened with Clarke Capital after that?

4    **A.**   Clarke Capital purchased the assets.

5    **Q.**   Why?

6    **A.**   Because it was a great believer in the technology and it

7    really felt that this was, you know, an asset that should have

8    been incredibly successful.  This was the best technology out

9    there with incredible unique features.  It had actually,

10   you know, at the time got patents; and it was -- it was a

11   cooler form factor.  You know, we thought of it as, you know, a

12   James Bond versus a Teletubby.  We thought we were going to be

13   able to make this company very successful.

14   **Q.**   Having taken the company out of receivership, what was

15   your understanding of what were the issues that put Contour

16   into receivership?

17   **A.**   Well, Contour, you know, had been first to market with so

18   many of these really important features, so it was the first.

19   If you can imagine, like, the first of these things was --

20   actually had wires.  You know, you put a camera somewhere and

21   it had a wire to a battery pack and then a wire to a camcorder.

22   It was a pretty ugly thing.  And so Contour managed to put it

23   all into a really nice package.

24        And it was, you know, the first to have HD and the first

25   to have GPS in it, which is amazing really.  I'll just explain

1    that for a little bit because it's quite a cool technology to

2    be able to, you know, see.  If you're on a motorcycle or if

3    you're skiing or if you're doing anything, it took the video,

4    but it also showed exactly where you were going.  And then it

5    had the unique technology of being able to link to a

6    smartphone.

7    **Q.**   So if the company was so innovative, what did you

8    understand caused it to go into receivership?

9    **A.**   Well, creating a great company isn't easy; and the -- what

10   happened was that GoPro, frankly, copied the technology.  They

11   stole technology, and they used it, and they spent a lot of

12   money on marketing, pretending that these features were

13   invented by them.

14       They grew that market, and they raised a lot of money to

15   be able to exploit just at the time that these action cameras

16   were growing.  And it was really exactly the time.  As soon as

17   the connection with the smartphone happened, that's when really

18   the market exploded.

19       And Contour tried to keep up, but it didn't have the

20   financial structure to do it.  So, unfortunately, when you're

21   selling and you're in consumer electronics, if you don't have

22   the financial structure -- if you don't sell any cameras, you

23   go bust; and if you do sell too many cameras, you go bust

24   because you don't have the financial structure to be able to

25   support that number of sales going through the system.

1  Q.   Okay.  So Clarke Capital intended to get the company back

2  to running?

3  A.   Yes.

4  Q.   Did you rehire some of the Contour employees?

5  A.   Yes.

6  Q.   Which ones?

7  A.   So the first was really important.  Co-founder Jason Green

8  came across as chief technology officer.  And, you know, he

9  brought with him a -- so much knowledge, but also so much

10  passion for the project.

11       Scott Ketchum was head of sales.  And, you know, you've

12  heard a little bit about, you know, spending money.  This is a

13  B-to-C business and a B-to-B business.  That means you go

14  straight to the consumer, but you also go through sales

15  channels.  So having that experience to be able to go to these

16  channels and make sales through -- you know, into the big

17  retailers was really important.

18       We have Michelle, who joined, who was from finance.

19       And, you know, most importantly, the inventor, Richard

20  Mander, who joined the team.

21  Q.   Okay.  What was the Clarke Capital plan for Contour?

22       THE COURT:  Can you tell us when this was?  What year

23  are we talking about?

24       THE WITNESS:  So this is -- so the transaction to

25  purchase the assets was the end of 2013, and then we -- I

1    joined the company on the 1st of January 2014.  And so during

2    that period is what I'm talking about, because we were getting

3    ready to be -- ready to go and relaunch the company.

4         **THE COURT:**  Thank you.

5    **BY MR. KEVILLE:**

6    **Q.**   Okay.  So what was the Clarke Capital plan for Contour?

7    **A.**   So what we knew is we had the camera road map, and that's

8    pretty darn important.  We had all of these cameras, and we

9    were -- so we weren't a start-up anymore; we were a reboot.

10        So the first thing was that, within Clarke Capital, was to

11   protect our intellectual property, you know, to make sure that

12   we were going to look after our inventors and look after the

13   company.

14        And then there were -- you know, there were three things.

15   If you think about a kind of -- a table or a stool, you need to

16   make sure you have finance, quite a lot of it, to be able to go

17   to market; you need marketing; and you need manufacturing.

18        And so those were the key things.  So to protect our IP,

19   and then go out, raise money, get a right manufacturer, and

20   really concentrate on being able to get to market.

21   **Q.**   Okay.  Let's talk about the raise money first.  Can you

22   look at Exhibit 470 in your book.

23   **A.**   In here?

24        **MR. KEVILLE:**  Allen, can you put that up for the

25   witness.

1              THE WITNESS:  Okay.  That's better.

2     BY MR. KEVILLE:

3     Q.   What is Exhibit 470?

4     A.   I live in Miami.  I may not sound it.

5     Q.   Just at a high level, what is it?

6     A.   It's an investor deck for a group of investors down in

7     Miami.

8              MR. KEVILLE:  Your Honor, I'd offer Exhibit 470.

9              MR. HAYNES:  No objection.

10             THE COURT:  It's admitted.

11        (Trial Exhibit 470 received in evidence.)

12    BY MR. KEVILLE:

13    Q.   Okay.  So did you put this investor deck together?

14    A.   Yes.

15    Q.   Okay.  Can you tell us generally what it's about?

16    A.   As I say, we had -- I was living in Miami.  As soon as I

17    mentioned the word "Contour," there was enormous excitement.

18        And I was connected with a group that included a

19    distributor of consumer electronics.  And one of the partners

20    there was Juan Pablo Montoya, who is a Formula One champion,

21    IndyCar champion, super cool dude from Columbia, lived in

22    Miami, and he's --

23             (Reporter interrupts to clarify the record.)

24             THE WITNESS:  I said he was a very cool dude.

25        Sorry.  I'm not quite sure.  I've become quite American.

1        He absolutely was such a fanatic about the camera and,

2    you know, immediately started -- we had a suction cup mount,

3    which we put on his car, and were able to, you know, go and

4    see.  I went to Opa-locka to go around when he was driving.  It

5    was very exciting.

6        And so it was a group that both brought strategic benefit,

7    but also they invested in the company.

8            MR. KEVILLE:  Can we put up page 6, please, Allen.

9    BY MR. KEVILLE:

10   Q.   What does this show?

11   A.   Well, so this is, you know, the heart and soul of Contour.

12   This is a company that was first to market.  I think I

13   explained a little bit of this, you know, the no wires, because

14   it used to have lots of wires.  But then bringing HD to market

15   was a first.  GPS enhanced video, I think I explained that too

16   as being, you know -- I don't want to use the word "cool" too

17   many times, but it's pretty cool.

18       The switch-on recording, so, you know, this is -- this may

19   seem not so amazing; but, actually, you know, with other

20   cameras, you had to press lots of different buttons.  Here, you

21   just switched it on.  That's it.  So if it was somewhere

22   difficult, you could just switch it on, and you could also lock

23   it to make sure that it was kept on or kept off.  So you were

24   kind of in control of it.  So, so much of the design was just

25   well thought through as just a beautiful experience.

 1          And then, of course, mobile integration, which was the

 2     best thing.  And I think sometimes, you know, if you take

 3     yourself back to the 2011, 2012, the idea of being able to,

 4     you know, mount these cameras in multiple different places, but

 5     to be able to view it remotely on your smartphone or on any

 6     handheld device, again, that was just a brilliant, brilliant

 7     piece of technology.  And it opened up the ability for people

 8     to be able to be sure that they were going to get the shot that

 9     they needed.

10          So that is great for individuals and for enthusiasts, but

11     it's also important for professionals.  A lot of the people

12     that were using this were trying to get professional shots, and

13     now they knew where they were looking, what they were going to

14     do.  They could control the settings on the camera and --

15     sorry -- and on the phone or on the tablet, and then they were

16     able to turn it on and turn it off from that device.  It's a

17     really brilliant invention.

18          THE COURT:  Mr. Keville, we need to -- Mr. Harrison

19     referred to a camera that he's got.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  There's no -- I don't know whether you're

22     introducing it into evidence.  The record is not going to be

23     clear about what he was doing.  So why don't you lay a

24     foundation and do something specific with that --

25          MR. KEVILLE:  I will.  Thank you, Your Honor.

1          **THE COURT:** -- camera?

2   BY MR. KEVILLE:

3   Q.   Mr. Harrison, what do you have with you?

4   A.   This is a Contour 4K.

5   Q.   Okay.

6          **MR. KEVILLE:** Your Honor, I'd introduce that as a

7   demonstrative exhibit, the Contour 4K.

8          **THE COURT:** Okay. It's a demonstrative. Fine.

9   BY MR. KEVILLE:

10  Q.   Okay. I lost where we were. Oh. And so, okay. We

11  talked about the first. Let's look at Exhibit 470 at pages 7

12  and 8. What are these showing?

13  A.   So the company did have, you know, a rich history of

14  invention, and it was successful in writing patents and had

15  pending patents as well. And at Clarke Capital, we had a lot

16  of experience within the team, not me personally, in how to

17  protect your IP, and so this was very important to us.

18         **MR. KEVILLE:** Could we put up page 22 of Exhibit 470.

19  BY MR. KEVILLE:

20  Q.   What is this showing?

21  A.   So I think I mentioned in Contour, Inc., so the

22  previous -- the company that, unfortunately, ended up in

23  receivership, that they were not in a financial position to be

24  able to take advantage of the market that was there because

25  they were in debt, they didn't have cash on the balance sheet,

1    and they were losing money, or they had a significant monthly

2    burn rate anyway.

3         Whereas what we did is we tried to set the company up

4    from day one to have a good financial bedrock on which we could

5    build so that we didn't have debt.  And we concentrated on

6    running the company as well as we possibly could so that we

7    would then be able to go and raise the money, get the

8    marketing, and get the manufacturer to be able to make this

9    company into what we believed it could be.

10   **Q.**   Was the 5 million on the balance sheet put in by James

11   Clarke?

12   **A.**   It was Clarke Capital, yeah.

13   **Q.**   All right.  Were you doing any marketing at this time,

14   right when you started in January?

15   **A.**   So the first month was extraordinary.  We needed to get to

16   CES by January, and we got our booth and were ready.  And so

17   the first thing was to show the world that we were back, that

18   we were a running company and that Contour existed.

19        So that then -- we brought all the team there so that they

20   were able to open those -- reopen those sales channels.  And,

21   honestly, it was one of the most exciting times, actually,

22   because we were greeted with such warmth in the market that we

23   were back.  It was great.

24   **Q.**   You mentioned CES.  What is CES?

25   **A.**   Sorry.  Oh, that's the Consumer Electronics Show.  It's in

1   Las Vegas every year, and it's the place to be.  It's the

2   Oscars of consumer electronics, if you will.

3   **Q.**   Is it prestigious to receive awards as CES?

4   **A.**   Yes.

5   **Q.**   Had Contour received awards in the past?

6   **A.**   Yes.  It won in 2011.

7   **Q.**   All right.  Now, let's talk about manufacturing because

8   you mentioned --

9   **A.**   Couple of other things in marketing.  We reopened the

10  website, so we were open for business.  And, you know, we went

11  to ISPO in Munich as well, so, you know, we were right back

12  immediately in and starting to spend -- spend money.

13  **Q.**   Okay.  You mentioned ISPO.  What is that?

14  **A.**   Sorry.  ISPO.  Do you know, I don't know what ISPO stands

15  for.  It's in Munich, and it's an event for -- so it's the kind

16  of European equivalent, and it's for both wearable electronics

17  and apparel, and it's a big event.  So if you want to be in

18  this market, you need to be there.

19  **Q.**   Okay.  Okay.  So you said finance, and you were out trying

20  to get finance.

21  **A.**   Yes.

22  **Q.**   You said manufacturing was important.

23  **A.**   Yes.

24  **Q.**   What was the important thing you needed to do with

25  manufacturing in this time?

1   **A.**   So we were in a lucky position because we already had all

2   the tooling, we had the camera road map.  So our choice of

3   manufacturer was, really the most important thing was to be

4   able to go and get enough finance from them to assist with our

5   growth.

6        And this --

7   **Q.**   Let's look at the road map of what you planned on the

8   growth.  Can you look at --

9        **MR. KEVILLE:**  Allen, can you put up for the witness

10   Exhibit 43.

11   **BY MR. KEVILLE:**

12   **Q.**   Is this another document you prepared early in your time

13   at Contour?

14   **A.**   Yes.

15        **MR. KEVILLE:**  Okay.  Your Honor, I offer Exhibit 43.

16        **MR. HAYNES:**  No objection.

17        **THE COURT:**  It's admitted.

18        (Trial Exhibit 43 received in evidence.)

19   **BY MR. KEVILLE:**

20   **Q.**   All right.  What is Exhibit 43, now that the jury can see?

21   **A.**   This was a portion of a larger presentation, but

22   specifically to be able to lay out our camera road map in

23   conversations with potential manufacturers and potential

24   investors, but particularly manufacturers.

25   **Q.**   Okay.  Let's look at page 2.  What is this about?

1   **A.**   This is the heart and soul of Contour.   The two words that

2   we chose, "Simply Better," I think really encapsulated what we

3   were trying to do.   We were a better camera, so we had better

4   technology, but we were also simple to use, simple and easy to

5   use.   It was something that was at the heart and soul of the

6   company.

7         So I remember in the office I had a big whiteboard, and it

8   had all of the different aspects, from what you would see in

9   the retailer to what you got when you opened the package, to

10  being able to --

11        And may I use this again?

12            **THE COURT:**   Yes.

13            **THE WITNESS:**   So that, you know, you open the package,

14  and out came this beautiful piece of technology.   And you

15  literally would open the back, put an SD card in that was in

16  the box.   Okay?   So that came for free.   Stick it in.   And they

17  were already charged, which is no mean feat when you're sending

18  lots of these cameras out.   So that if you wanted to go skiing

19  or you wanted to go and use it, you could use it straight out

20  of the box.

21        We -- so if you think about the whole of the way that the

22  brand was created about making it as simple and easy to use,

23  you can see why we were so keen on the technology of being able

24  to use your cell phone, your mobile phone, your -- because that

25  made it easy.   That's what we were about.   We were trying to

1   make this really complicated piece of technology as easy as

2   possible.

3        And that was our brand, and that's what we were selling in

4   the market.

5             **MR. KEVILLE:**  If we go to page 3.  Next one.

6   **BY MR. KEVILLE:**

7   **Q.**   It says "Contour vs. GoPro."  And is that what you're

8   trying to explain here on this slide?

9   **A.**   Well, you know, "Contour vs. GoPro," it's -- if I explain

10  the history, you know, from our point of view, Contour had the

11  better technology; and yet, you know, this was a competitor

12  that had spent money pretending that their technology was our

13  technology.  And the -- pretending that our technology was

14  their technology.

15       And, you know, we felt that we had so many better

16  features; and, you know, honestly, we looked at it and went,

17  you know, this is something Q would give to James Bond and

18  that's something that the Teletubby might wear.  So we felt

19  that we had a great opportunity to be able to really get back

20  into the market and be a really successful company.

21  **Q.**   Okay.  Let's look at page 5.  Are these products that

22  Contour was selling in 2014?

23  **A.**   Yes.

24  **Q.**   At a high level, Mr. Harrison, what was the difference

25  between the ROAM cameras and the Contour+ cameras?

1   **A.**   So the ROAM cameras were designed to be entry level, easy

2   to use, as I explained.  Their particular thing was they were

3   waterproof down to 5 meters, so they were very popular with

4   SCUBA divers; and, you know, any water play that you had, this

5   was -- you didn't need a case which was also, like, fantastic.

6   And so that was the ROAM.

7        And then the +2 series was about the connectivity.  So

8   this was about working with things out of the water, although

9   it did have a case so you could take it SCUBA diving as well.

10  However, this was about having the GPS, the remote view, and it

11  had an external microphone jack too so that you could use

12  professional audio.

13  **Q.**   Okay.  Let's look at pages 8 and 9.  Are these showing the

14  future plans you had in early 2014 --

15  **A.**   Yes.

16  **Q.**   -- for the ROAM and Contour+ products?

17  **A.**   Yes.

18  **Q.**   Okay.  And let's look at page 10.  This mentions other

19  future Contour Cameras.  What was the intention of Contour with

20  the Mini and the GPX?

21  **A.**   So the Mini was a concept that, again, we'd inherited from

22  Contour, Inc.  It was called Mowgli internally.  And it was the

23  idea of having a wearable camera in a -- you know, if you could

24  imagine at that time, the idea that you would be able to wear a

25  camera or be able to place small cameras all over the place and

1  be able to then use our technology to be able to see what they

2  see, so a small piece of -- it's, like, this big.

3      And that was a really good use of our technology.  And it

4  seemed to me like a really good idea, and it's something that

5  would take off in a world where everybody was suddenly doing

6  selfies and POVs and wanting to share on social media

7  everything.  So that's what the Mini was.

8      What we also looked at was at the top of the market,

9  because we had such good technology and we were recognized in

10 the market for it, that we wanted to kind of bridge the gap.

11 The most -- the camera above us was a thing called a RED.  It

12 was a 3- to 4,000 dollar camera.  And we wanted to be able to

13 look at what -- look at how the sort of technology is going to

14 be able to come and we can miniaturize them into the Contour

15 range and work with professionals who wanted to use it.  So

16 that was the plan.

17 **Q.**  Did you have every intention at Contour in 2014 for

18 selling cameras for many, many years?

19 **A.**  Absolutely.

20 **Q.**  Did you try to go to Ambarella and get their processors in

21 2014?

22 **A.**  Yes.

23 **Q.**  And what happened?

24 **A.**  I thought we would be greeted with some acclaim returning

25 to Ambarella, but they were lukewarm because, by that time, the

1  action camera market was -- they felt, with their partnership

2  with GoPro, that they had a significant chunk of the market.

3  So, again, we were asked to pay up-front for chips.

4  **Q.**   Was that typical, that you would be asked as a

5  manufacturer to pay up-front?

6  **A.**   You know, it's crucial for a business to ask for terms.

7  We felt that we would get those terms, so we were very

8  disappointed that we didn't.

9  **Q.**   What do you mean "terms"?

10 **A.**   So "terms" means when you -- when you make an order for

11 something, whether you need to pay the day that you make the

12 order or the day that they deliver the product or, even better,

13 the day that you sell the product.  So the terms are how long

14 are those terms.

15 **Q.**   And Ambarella would say only you have to pay up-front?

16 **A.**   They were -- they were pretty keen for us to pay up-front.

17 **Q.**   Okay.  Now, you mentioned earlier there was a manufacturer

18 who had the tooling.  Who was that?

19 **A.**   DXG.

20 **Q.**   And did you try to get running on manufacturing with DXG?

21 **A.**   Yes.

22 **Q.**   And what happened there?

23 **A.**   They didn't want to give us terms, so they wanted us to

24 pay up-front.

25 **Q.**   So what did you do next on the manufacturing side?

1  **A.**   We tried to negotiate as hard as possible, but we knew

2  that we needed to find a new manufacturer.

3  **Q.**   Okay.  Are there a lot of manufacturers that were options

4  for you?

5  **A.**   No.

6  **Q.**   Okay.  Did you end up talking to one particular one?

7  **A.**   Yes.

8  **Q.**   Who was that?

9  **A.**   Jabil.

10  **Q.**   Okay.  And for the jury, who is Jabil?

11  **A.**   Jabil is a U.S.-based manufacturer of cameras.

12       **MR. KEVILLE:**  Okay.  Can you show the witness, Allen,

13  Exhibit 1272.

14  **BY MR. KEVILLE:**

15  **Q.**   What is Exhibit 1272?

16  **A.**   So, early in July --

17  **Q.**   Just what is it, first?

18  **A.**   What is it?  It's a non-disclosure agreement.

19       **MR. KEVILLE:**  Your Honor, I offer Exhibit 1272.

20       **THE COURT:**  Any objection?

21       **MR. HAYNES:**  No objection, Your Honor.

22       **THE COURT:**  All right.  And I'm assuming that that's

23  what you're anticipating when you put the documents on the

24  screen, because they're going right to the jury.

25       **MR. KEVILLE:**  Oh, I thought they could only see --

 1            THE COURTROOM DEPUTY:  I don't think they are.  That

 2    should show you.

 3            THE COURT:  All right.

 4            MR. KEVILLE:  Yeah, I've been asking only the witness

 5    to see it first.

 6    BY MR. KEVILLE:

 7    Q.   Okay.  And let me ask this before we get into this

 8    non-disclosure agreement.

 9         How did you get connected to Jabil?

10    A.   We -- we were actively looking.  We'd had conversations

11    with other -- like Flextronics.  And I was introduced by a

12    colleague in London, who explained to me that Jabil were

13    looking for new partners and that they had a program

14    specifically that would give working capital to companies in

15    order to encourage them to move from their manufacturer to

16    them.  So it was what I was looking for.

17    Q.   Okay.  All right.  So what was the reason -- when did you

18    enter this non-disclosure agreement with Jabil?

19    A.   July the 2nd, 2014.

20    Q.   And is that so you could share information on the products

21    with them?

22    A.   Yes.

23    Q.   Okay.  Were there significant negotiations that happened

24    after July 2014 with Jabil?

25    A.   Yes.  It was my -- my primary function.  I was negotiating

1  two sides of a deal, the marketing -- the manufacturing

2  services agreement, the MSA.  So they were reviewing all of our

3  BOMS, the BOMS -- all of the different things that go into a

4  camera so that they would be able to get their tooling ready

5  and so that they would be able to deliver us a price for

6  manufacturing those cameras.

7        And at the same time, we were negotiating with the

8  treasury side of the business to be able to -- for them to lend

9  us the money to get that tooling in place and that we didn't

10  need to pay them until we started selling cameras.

11        So I was doing two different deals at the same time.

12        MR. KEVILLE:  All right.  Can you show the witness,

13  Allen, Exhibit 2239.

14  BY MR. KEVILLE:

15  Q.   What is this, Mr. Harrison?

16  A.   The camera that we --

17  Q.   At a high level, what is that?

18  A.   I'm sorry.  This is a product spec that we shared with

19  Jabil about the ROAM3.

20        MR. KEVILLE:  Okay.  Your Honor, I'd offer

21  Exhibit 2239.

22        MR. HAYNES:  No objection.

23        THE COURT:  It's admitted.

24        (Trial Exhibit 2239 received in evidence.)

25  \\\

1    BY MR. KEVILLE:

2    **Q.**    Okay.  Why did you share this document with Jabil?

3    **A.**    So we were working with them on what was internally called

4    the Sarge, and that was the next camera above the Contour+2,

5    but that was going to take time for them and they thought that

6    they would be able to deliver that early in 2015.

7          We were currently working with DXG on the ROAM3, and they

8    wanted to take that over so that they would be able to

9    recognize the revenue from selling the ROAM3 to help with

10    developing the new successor to the Contour+2.

11    **Q.**    Okay.  And this is authored by Michael Denton.  Is he one

12    of the inventors on the patents in this case?

13    **A.**    Yes, he is.

14    **Q.**    Okay.  So he was still working.  You had brought him back

15    to Contour as well?

16    **A.**    Yes.

17    **Q.**    Were you also working on a marketing agreement at this

18    same time period in --

19    **A.**    Yes.

20    **Q.**    -- late 2014?

21          Tell us about that.

22    **A.**    So I was introduced to a concept, which, again, suited us

23    perfectly.  If you can travel back a bit and remember,

24    you know, one of the most important things that we knew we had

25    to do was to be able to market.  And not just market, meaning

1    spending 2, 3, 5 million dollars.  No.  We needed to be able to

2    spend $50 million in order to be able to get into the market.

3        So we needed to be able to get into retailers and have

4    endcaps, and we needed -- and the media-for-equity deal was

5    absolutely perfect for us.  We would swap a small amount of

6    equity.  So the media company believed in us enough that they

7    were going to take a share so that they would get a share of

8    the upside in the business in return for heavily discounted

9    media.

10       So we would be able to advertise like mad, particularly in

11   the cities where we were launching, to support, sell through in

12   those retailers.  So, you know, we were basically being given,

13   you know, the ability to spend 40 to 50 million dollars in

14   2015.

15   Q.   Was that contingent on the manufacturing deal getting

16   done?

17   A.   It was contingent on the lead investor signing the

18   paperwork.  So in order for the media-for-equity deal to

19   happen, we needed to get the lead investor, and the lead

20   investor was contingent on us signing the deal with Jabil.

21   That was the way round it was.  So just want to make sure that

22   that's understood.

23       So the manufacturer was absolutely key because it gave us

24   the terms for us to be able to grow.  The -- and the investor

25   would come in on the back of that.  And then the

1   media-for-equity people would then say, "Right, we're in,

2   because we now know you've got the ability to become the

3   company that you told us you can be and that we believe you can

4   be," and they believe we can be.

5   Q.   Did you get to the end of negotiating with Jabil and think

6   you had a final deal done?

7   A.   Yes.

8   Q.   Can you tell us about that?

9   A.   So we negotiated all the way up to the end of October, and

10  I was invited to St. Petersburg to their head office.  It's

11  a day I'm not going to forget.  I got in my car, drove to

12  St. Petersburg, and nobody was there to greet me.

13       So I was a little confused and shocked.  And I was shown

14  to a small room, which wasn't even actually, like, in the

15  building, and I started making calls to find out what had

16  happened.

17       And nobody answered my calls, and I ended up getting back

18  in my car and driving back down to Miami.

19  Q.   Did you learn why that happened?

20  A.   I never heard anything more from them.  The next thing I

21  learned was that they had signed a deal with GoPro.

22  Q.   Jabil had?

23  A.   Yes.

24  Q.   How did you know that?

25  A.   Because it was public knowledge.

1   **Q.**   Okay.

2   **A.**   It was announced in November 2014.

3   **Q.**   Okay.  And Jabil never returned your calls after that,

4   despite all the months of negotiation?

5   **A.**   Never returned my calls.

6   **Q.**   What impact did GoPro's interference on the Jabil

7   manufacturing deal have on Contour?

8   **A.**   It was detrimental.  It was -- as I kind of explained the

9   three legs of the stool as it were, and this was a really

10   important leg.  You could kind of sit on the stool, but,

11   you know, it was going to be pretty -- pretty edgy.

12       So it was a very, very important thing, and it meant that

13   I had to get back to trying to find another partner as quickly

14   as I possibly could.

15   **Q.**   So essentially, you lost a year now?

16   **A.**   Yeah.

17   **Q.**   Okay.  And did the -- you said the lead investor was

18   contingent on the manufacturing and the marketing was

19   contingent on the lead investor?

20   **A.**   Yes.

21   **Q.**   Did all of those fall apart?

22   **A.**   You know, I did my best to keep everybody's spirits up and

23   this is not the end of the world and they're not -- you know,

24   but, yeah, it was a heavy blow.

25   **Q.**   And were you on any -- were you doing any public media,

1   things to announce that prior to November, that you were going

2   to be back in and marketing --

3   **A.**   Yes.   It was very important for us.   We wanted to get the

4   profile of the company back, and I was excited to be on

5   Varney & Co. and on Fox Business.   And I remember showing the

6   camera off and explaining how it worked.   And he was like, "Oh,

7   this is -- this is really good.   This is really good."   So,

8   you know, "What are you going to do next?"

9       And so I explained a little bit what we're going to do

10   next.   He said, "Well, you know, come back when you've got your

11   next announcement."   And I was excited because I was convinced

12   I was going to have a very exciting announcement.

13   **Q.**   And then you didn't, obviously, because of what happened

14   with Jabil?

15   **A.**   No.

16   **Q.**   Okay.   Did you continue to sell cameras as much as you

17   could during this time?

18   **A.**   Yes.

19       **MR. KEVILLE:**   Okay.   Can you put up, Allen, for the

20   witness 469.

21   **BY MR. KEVILLE:**

22   **Q.**   Is this a record of Contour sales?

23   **A.**   Yes.

24       **MR. KEVILLE:**   Your Honor, I offer 469.

25       **THE COURT:**   Any objection?

1          **MR. HAYNES:**  No objection, Your Honor.

2          **THE COURT:**  It's admitted.

3          (Trial Exhibit 469 received in evidence.)

4   BY MR. KEVILLE:

5   **Q.**   Is this a record of Contour Camera sales between 2014 and

6   the middle of 2015?

7   **A.**   Yes.

8   **Q.**   What was the impact of GoPro's use of the patented

9   technology without acknowledging the patent and the blocking of

10  the Jabil deal on Contour during this period?

11         **MR. HAYNES:**  Objection, Your Honor.  Lack of

12  foundation.

13         **THE COURT:**  To the extent you know, you can answer the

14  question.

15         **THE WITNESS:**  It was fundamental.  It was -- and it

16  was detrimental to our ability to build the business that we

17  wanted to build.

18         They had taken and copied and stolen key pieces of

19  technology and then marketed them, pretending that they were

20  their own just at the point -- and using particularly this

21  technology just at the point that sharing all happened and the

22  action camera market really, really took off.

23         So we were hamstrung by their actions.

24         **MR. KEVILLE:**  Okay.  Can you show the witness, Allen,

25  Exhibit 459.

1    BY MR. KEVILLE:

2    **Q.**    Is this a presentation that you made, Mr. Harrison?

3    **A.**    Yes.

4              **MR. KEVILLE:**    Your Honor, I offer Exhibit 459.

5              **MR. HAYNES:**    No objection.

6              **THE COURT:**    It's admitted.

7         (Trial Exhibit 459 received in evidence.)

8    BY MR. KEVILLE:

9    **Q.**    Is this at the very end of November -- at the very end of

10   2014?

11   **A.**    Yes.

12   **Q.**    So after the Jabil deal has fallen apart?

13   **A.**    Yes.

14   **Q.**    Were you still trying to get investors?  Is that what this

15   is?

16   **A.**    Yes.

17   **Q.**    Let's look at page 4.  What are you talking about here?

18   **A.**    So, much as, you know, I described it, that this

19   opportunity was still there, it wasn't too late if we could get

20   the legs of the stool on.  We needed to raise the finance, get

21   the right manufacturer, and we could spend money on marketing

22   because we knew -- we still even -- this is 2014 -- even -- the

23   Contour+2 was still a fantastic camera, and we knew, with the

24   camera road map, that we would be able to try to get back into

25   the market, and we felt that we would be able to.

1   Q.   Is this right around the time that the patents in this

2   case issued?

3   A.   Yes.

4   Q.   Turn to page -- well, it says the company -- go to page 5,

5   please.  It says [as read]:

6        "Contour is positioned to become the clear

7        Number 2 player in the action sports camera market."

8        What do you mean there?

9   A.   In our minds, and in the minds of anybody in the market,

10  Contour was always considered as -- you know, the action camera

11  market really was Contour and GoPro.  Online we had fallen, but

12  we knew that we could reclaim that position, and this market

13  was still growing enormously.

14  Q.   And at the -- does it show actual market data and

15  financials in this slide?

16  A.   Yes.

17  Q.   Okay.  So in this period, right around the time the

18  patents issued, did Contour expect that the market for action

19  cameras would continue to grow at a 26 percent compound annual

20  growth rate?

21  A.   Yes.

22  Q.   All right.  Let's turn to page 11.  This says "Top

23  Competitors"; right?  Is that what you understood the market

24  share was at this time now, at roughly end of 2014, beginning

25  of 2015?

HARRISON - DIRECT / KEVILLE

1   **A.**   These were the best estimates that we could -- we could

2   find from available information.

3   **Q.**   And this is the first time we've seen iON.  Who's iON?

4   **A.**   iON is a camera manufacturer and brand that was a great

5   admirer of Contour because they copied everything, including

6   the cylinder.  But they had managed to get into retail.

7   **Q.**   Okay.  Were GoPro and iON and Contour all direct

8   competitors at this point --

9   **A.**   Yes.

10  **Q.**   -- in late 2014?

11  **A.**   Yes.

12  **Q.**   Okay.  Did you or others on your behalf reach out to GoPro

13  at around this time and inform them about the patents?

14  **A.**   Yes.

15  **Q.**   What happened -- when was this?

16  **A.**   In November 2014.

17  **Q.**   Okay.  Was there a meeting arranged with GoPro?

18  **A.**   Yes.

19  **Q.**   And when was that meeting supposed to happen?

20  **A.**   At CES 2015.

21  **Q.**   And what happened at that meeting?

22  **A.**   They didn't show up.

23  **Q.**   Is that when you filed the lawsuit, after that?

24  **A.**   Yes.

25  **Q.**   Okay.  Now, we're in 2015.  What happened with iON?

1   **A.**   So I met Giovanni Tomaselli, who was the CEO of iON, at

2   a Citibank conference in New York.   And I was introduced by a

3   common distributor of the cameras.   And Giovanni was a great

4   admirer of the camera.   You know, he had copied everything, so

5   he knew exactly what was good about the camera.   And he also

6   was very aware of the patents and very -- he was a great

7   admirer, and he believed that they were very, very strong.

8       And, you know, he was trying to pitch to me that the

9   companies should merge and that with his ability to

10  manufacture, he had a relationship with Skylight, and with his

11  ability to get to market in retail, because he was in big box,

12  Walmart and others, that this could be a really good

13  combination and maybe we could together become a significant

14  competitor once again.

15  **Q.**   So what was the plan with iON that came out of this?

16  **A.**   So, you know, it's funny how meetings like this happen.

17  And, really, that meeting in December, we kind of laid out

18  those key points, and those were the key points that went into

19  the agreement in May when we merged the operations of the

20  company.

21  **Q.**   So iON needed the license to the patent, and you needed

22  the manufacturer.   So you guys joined up?

23  **A.**   Yes.

24  **Q.**   Okay.   Is that when Contour IP Holdings, who is the

25  plaintiff in this case, was formed?

1   **A.**   Yes.

2   **Q.**   Why -- let me look at this.

3          **MR. KEVILLE:**  Allen, can you put up for the witness

4   Exhibit 5 -- 454?

5   **BY MR. KEVILLE:**

6   **Q.**   Is this the assignment of the patents in this case to

7   Contour IP Holdings?

8   **A.**   Yes.

9          **MR. KEVILLE:**  Your Honor, I offer Exhibit 454.

10         **MR. HAYNES:**  No objection.

11         **THE COURT:**  It's admitted.

12      (Trial Exhibit 454 received in evidence.)

13  **BY MR. KEVILLE:**

14  **Q.**   Okay.  So why were the patents assigned to this new

15  Contour entity, Contour IP Holdings?

16  **A.**   To protect the intellectual property.

17  **Q.**   Were cameras using the patented technology made by the

18  combined company of iON?

19  **A.**   Yes.

20  **Q.**   Which ones?

21  **A.**   So the iON range of cameras, they were all using,

22  I think, every one, bar one.  And then we had the Snap Cam,

23  which was the successor to the Mowgli.  The Contour Mini was

24  called a snap cam.  It was a little square thing with a little

25  top.  And the Contour 4K, which went into production.

1   Q.   Okay.  What happened with the merged company?  Where did

2   it go?

3   A.   It didn't work out the way that we anticipated.

4   Q.   Why not?

5   A.   They had more debt and less sales than we were led to

6   believe.  But most importantly, that though they had a piece of

7   paper that gave them the net terms with the manufacturer, the

8   manufacturer wasn't willing to honor them.

9   Q.   So then what happened to this merged Contour-iON?

10  A.   So very quickly, without that, which, as I've explained,

11  is pretty much the fundamental thing that you need to make

12  these companies work, we -- we started -- separated the

13  companies.

14  Q.   Was that an amicable separation?

15  A.   No, it was not.

16  Q.   What did it involve?

17  A.   Six months of negotiation.

18  Q.   Did you negotiate a license to the patents with iON at

19  that time?

20  A.   Yes, reluctantly.

21          MR. KEVILLE:  Okay.  Allen, can you put up

22  Exhibit 455.

23  BY MR. KEVILLE:

24  Q.   Is this the license?

25  A.   Yes.

1          **MR. KEVILLE:**  Your Honor, I offer Exhibit 455.

2          **MR. HAYNES:**  No objection.

3          **THE COURT:**  It's admitted.

4      (Trial Exhibit 455 received in evidence.)

5  **BY MR. KEVILLE:**

6  **Q.**   Okay.  You said "reluctantly."  Why did you say that?

7  **A.**   Well, just, we -- those negotiations, a business divorce,

8  it's not a time that I would like to go back to.  It was a very

9  unpleasant time, and we negotiated through -- it was a very

10 difficult negotiation.

11 **Q.**   Okay.  What did you do next?  Now, the Contour-iON

12 merger has kind of blown up?

13 **A.**   Well, I took a deep breath, and we said:  Right, let's

14 keep going.  You know, we're going to carry on and we're going

15 to look for the right partners.

16     And, you know, a couple of good things had come out of

17 the iON relationship, which was that we did have, you know,

18 cameras nearly ready.  The new camera, the Contour 4K, was

19 practically complete; and so, you know, we were at least now

20 able to try to continue the camera road map.

21 **Q.**   Okay.  Did you try to find new investors?

22 **A.**   Yes.

23 **Q.**   Did you have any luck?

24 **A.**   So we were -- we were approached by a company called

25 Apollo very shortly after iON -- the iON deal had been

1  signed off.  And it was very exciting because it was an

2  opportunity to -- the opportunity was selling around 300,000

3  wearable cameras through Verizon.  They wanted to use our

4  intellectual property because they were going to be wearable

5  cameras, and so, obviously, they needed this technology, and

6  they wanted to use our engineers and our invention to create

7  something.

8      So, obviously, I was excited to look into that more

9  deeply, and this could be the opportunity for Contour to get

10  back in the market, which is what I kept -- you know, that was

11  my passion, to make it happen.

12  **Q.**  So what happened out of that?

13  **A.**  So those negotiations started with a very reputable person

14  who had also been, you know, president of Motorola Mobile

15  Division, so this was, you know, a serious individual.  And we

16  negotiated the terms, and then they came back to us and said,

17  "Actually, we'd like to buy the whole company."

18  **Q.**  Okay.  And did you sell the company?

19  **A.**  Yes, we did.

20  **Q.**  Okay.  Who was the purchaser of the company?

21  **A.**  Kensington Capital.

22  **Q.**  Did you have a camera ready to go for Kensington Capital?

23  **A.**  Yeah.  We had the Contour 4 ready, yes.

24      **MR. KEVILLE:**  Okay.  Can you show the witness, Allen,

25  Exhibits 579 and 580?

 1   BY MR. KEVILLE:

 2   **Q.**   Are these records of Contour's sales in 2018 and 2019,

 3   Mr. Harrison?

 4   **A.**   Yes.

 5            **MR. KEVILLE:**  Your Honor, I offer Exhibits 579 and

 6   580.

 7            **MR. HAYNES:**  No objection.

 8            **THE COURT:**  All right.  They're admitted.

 9        (Trial Exhibits 579 and 580 received in evidence.)

10   BY MR. KEVILLE:

11   **Q.**   And, Mr. Harrison, I'd like to show you Exhibit 3559.

12            **MR. KEVILLE:**  For the witness only, Allen.

13   BY MR. KEVILLE:

14   **Q.**   Do you recognize this document?

15   **A.**   Yes.

16            **MR. KEVILLE:**  Your Honor, I offer Exhibit 3559.

17            **MR. HAYNES:**  No objection.

18            **THE COURT:**  It's admitted.

19        (Trial Exhibit 3559 received in evidence.)

20   BY MR. KEVILLE:

21   **Q.**   Okay.  What is Exhibit 3559?

22   **A.**   They were a company that we worked with quite closely.

23   They were -- they used to buy cameras from us wholesale.  They

24   had a particular audience.  And they liked the Contour camera

25   because they were able to modify them for their particular user

 1   base, and so they were a good -- a good partner.

 2   Q.   And when you say "they," are you talking about RageCams?

 3   A.   Yes, sir, RageCams.

 4   Q.   So still in twenty- -- at the time of this in 2018, you

 5   could still buy Contour 4Ks?

 6   A.   Yes.

 7   Q.   Were you still involved with Contour for a time after the

 8   company was sold?

 9   A.   Yes.

10   Q.   In what capacity?

11   A.   Just, you know, making sure that we handed over the

12   technology and all the relationships for about six months.

13   Q.   Did you become aware of any other licenses that Contour

14   entered?

15   A.   Yes.  I was, you know, still in contact with the team and

16   excited to hear about the -- the next deal that was on the

17   table.

18   Q.   What was that?

19   A.   It was Element.

20   Q.   Okay.  Were you involved with that?

21   A.   No.

22   Q.   All right.  Let me ask a couple of things in conclusion,

23   Mr. Harrison.

24        What has been the impact of GoPro's actions on Contour?

25   A.   Well, they -- you know, they really -- you know, they

1    really destroyed Contour, and they seemed to be fixated on

2    doing it, I mean, over sort of, you know, three time periods.

3        The first time period, they were copying our technology

4    and stealing that technology and then telling the world and

5    pretending it was theirs, just at the point that the market was

6    really growing.

7        They thought we were dead, but we came back to life, and

8    we were a passionate team and we were driving as hard as we

9    possibly could.  But it was like working with a 500-pound

10   gorilla foot on your head, stopping us from being able to work.

11       And, you know, then we, you know, tried to reach out to

12   them and work with them.  And 11 years later, they just dragged

13   it out and dragged out the legal proceedings as long as they

14   possibly could, I think so that they would -- they hoped that

15   we would never see the day that we are today.

16   **Q.**   One last question.  What do you want the jury to do in

17   this case?

18   **A.**   You know, I'm pretty passionate about this.  This has been

19   a huge part of my life and a huge part of the inventors, who

20   created such amazing inventors.  And I'm a proud citizen of the

21   United States; and I came here to -- because of the experience

22   of creating great businesses; and, you know, I have a daughter

23   now who's an American.  And, you know, what this is about is

24   protecting inventors.

25       The inventors create amazing technology.  We don't expect

1  big companies to just to be able to steal that technology and

2  benefit from it and make fortunes out of it.  That's not the

3  way the system is supposed to work.  You're supposed to be able

4  to protect inventors.

5       And in this case, you know, it's just not right; and in

6  this case, it seems very clear to me.  And so, you know, we're

7  here to seek that justice.

8           **MR. KEVILLE:**  I pass the witness.

9           **THE COURT:**  All right.

10      Mr. Haynes?

11                      **<u>CROSS-EXAMINATION</u>**

12  **BY MR. HAYNES:**

13  **Q.**   Good morning.

14  **A.**   Good morning.

15  **Q.**   I want to start by just following up with a couple of

16  points that you made and questions that you were asked.

17      Let me pick up with Ambarella.  You said you had trouble

18  getting Ambarella to give you good business terms; is that

19  right?

20  **A.**   Business terms?

21  **Q.**   In terms of allowing you to pay for their chips further in

22  the future as opposed to paying them up-front.

23  **A.**   Yes.

24  **Q.**   And you wanted Ambarella to allow you to pay later as

25  opposed to having to pay for the chips when you were purchasing

1  them; right?

2  A.   Yeah.

3  Q.   And I believe you said that, you know, something to do

4  with GoPro's partnership with Ambarella that interfered with

5  your ability to get favorable terms.  Is that what you meant?

6  A.   It's more that they, you know -- in the earlier period,

7  Contour and GoPro were competitors and sharing the market; and

8  therefore, an investment in Contour was something important for

9  them to keep the market competitive.

10       Now, GoPro had spent a lot of money to block the market so

11  they were not as forthcoming with us as we expected.

12  Q.   And it's also true that Contour had worked with Ambarella

13  in the past; right?

14  A.   Obviously.

15  Q.   And at that time, GoPro and Contour were both small

16  companies; right?

17  A.   GoPro was always a bigger, but yes.

18  Q.   They were competing head-to-head --

19  A.   They were competing.

20  Q.   -- for those first products; right?

21  A.   Yeah.

22  Q.   And both of them were buying chips from Ambarella; right?

23  A.   Yes.  But I wasn't involved in the company at that time.

24  Q.   But you know that happened; right?

25  A.   I know that they bought chips, but I can't give you any

1    more information than that.

2    **Q.**   Okay.  Do you think that Ambarella's unwillingness to let

3    you buy chips and pay later might have had anything to do with

4    the fact that the original Contour went into receivership and

5    had a lot of debt?

6          **MR. KEVILLE:**  Objection, Your Honor.  Calls for

7    speculation.

8          **THE COURT:**  Overruled.

9          You can answer if you know.

10         **THE WITNESS:**  I don't know the answer to that.

11   **BY MR. HAYNES:**

12   **Q.**   You were talking to them.  Nobody expressed any hesitation

13   that said, "Hey, you bought a bunch of our chips and didn't pay

14   for them last time"?

15   **A.**   I don't know whether that is the case.  I don't know

16   whether there was a debt to Ambarella.

17   **Q.**   Okay.  What about DXG?  You'd been working -- Contour had

18   worked with DXG in the past; right?

19   **A.**   Yes.

20   **Q.**   And DXG didn't want to give you those pay-me-later terms

21   either; right?

22   **A.**   Yes.

23   **Q.**   And did they express to you at any point in time that

24   "Well, Contour went into receivership so we're not so

25   comfortable letting you pay later"?

1   **A.**    In that case, that was part of the conversation, yes.

2   **Q.**    And that's reasonable; right?    Somebody can't pay, they're

3   not going to let you pay later; right?

4   **A.**    Yes.    But you've got to remember as well, though, that

5   both DXG and Contour had invested a lot in the tooling in DXG.

6   And so it didn't seem to us to be a logical decision because

7   they would be, you know, cutting their nose to spite their face

8   in a way because they would lose all of that investment in the

9   tooling.    All we had to do was come to an agreement and they

10  could restart the factory.

11  **Q.**    Have you ever heard of the expression "throwing good money

12  after bad"?

13  **A.**    I've heard of the expression, yes.

14  **Q.**    Do you think that might have been what DXG -- or did DXG

15  express to you that "We're not putting more money into this

16  company after it already went into receivership"?

17  **A.**    They didn't -- they obviously were negotiating extremely

18  tough.    But, you know, the interesting thing that you --

19  you know, we went to go --

20          **THE COURT:**    Mr. Harrison, can you start by answering

21  his question.

22          **THE WITNESS:**    Yes.

23      So, sorry.    Could you repeat the question, then?

24  **BY MR. HAYNES:**

25  **Q.**    Your negotiations with DXG --

1    **A.**    Yeah.

2    **Q.**    -- were definitely influenced by the fact that Contour had

3    failed before --

4    **A.**    Yes.

5    **Q.**    -- when DXG was already a partner; right?

6    **A.**    Yes.

7    **Q.**    Okay.  Now, let's talk about Jabil.  And in the question

8    you were asked, there was a mention -- a statement of GoPro's

9    interference with Jabil.  Do you remember that?

10   **A.**    Yes.

11   **Q.**    Have you seen GoPro's contract with Jabil or any details

12   of that agreement?

13   **A.**    No.

14   **Q.**    And Jabil was aware that Contour had been in receivership;

15   right?

16   **A.**    Yes.

17   **Q.**    And they were aware that going into a company that already

18   had a lot of debt previously and was trying to reboot itself

19   was more risky than going into business with a company that had

20   shown success?

21   **A.**    But the opportunity was also extremely big for them at

22   Contour.

23         **MR. HAYNES:**  Your Honor, move to strike as

24   nonresponsive.

25         **THE COURT:**  Yes.  You should rephrase your question --

```
 1            THE WITNESS:  Sorry.
 2            THE COURT:  -- so it's clear what he knew as opposed
 3   to --
 4            THE WITNESS:  Yeah, I don't know.
 5            THE COURT:  So --
 6            THE WITNESS:  Sorry.  Excuse me.
 7            THE COURT:  Start with the question.
 8            THE WITNESS:  Sorry.
 9   BY MR. HAYNES:
10   Q.   Your Honor -- or, sorry.
11   A.   Yeah, that's very nice of you.
12                       (Laughter.)
13   BY MR. HAYNES:
14   Q.   Jabil --
15   A.   Yes.
16   Q.   -- did they ever express to you at any point concerns that
17   going into business with Contour, while maybe interesting,
18   might be risky because Contour had failed before?
19   A.   So we explicitly started talking to Jabil because of the
20   program that they had introduced exactly for a company such as
21   Contour.  So the answer is no.
22   Q.   So, but Jabil wanted to get into this business; right?
23   A.   With Contour.
24   Q.   But, obviously, not only with Contour, because they signed
25   a deal with GoPro; right?
```

1   **A.**   They were courting us.  They were very keen to work with

2   us, so they must -- so they must have been keen to get into the

3   market, yes.

4   **Q.**   Yes.  And, ultimately, they decided to get into the market

5   with the established player that had not gone into

6   receivership; right?

7          **MR. KEVILLE:**  Your Honor, I object.  The witness can

8   be asked what he knows, but this is speculation.

9          **THE COURT:**  Overruled.

10   You can answer that question.

11          **THE WITNESS:**  Can I ask to repeat the question?

12   **BY MR. HAYNES:**

13   **Q.**   Sure.  Ultimately, what Jabil decided to do was to enter

14   the action sports market with an established successful company

15   rather than take a risk on a company that had previously

16   failed; correct?

17   **A.**   I can't answer for what Jabil's business decisions were.

18   All I know is the conversations and the excitement, the --

19   particularly around the unique features that we had, the patent

20   portfolio that we had, the media-for-equity that we had, the

21   lead investor that we had, that meant that Jabil were extremely

22   excited.  And I honestly mean it when I say that I expected a

23   red carpet when I arrived, and I got a small, boxed room.

24   **Q.**   Right.  And Jabil decided to go with GoPro instead; right?

25   **A.**   That is what I learned later.

**HARRISON - CROSS / HAYNES**

1  Q.    Okay.  Let me back up and cover some different topics.

2        Now, are you still affiliated with Clarke Capital today?

3  A.    I'm an operating partner there.

4  Q.    Operating partner.  And Clarke Capital, as a result of

5  that series of transactions that you described, still retains

6  some equity interest in Contour; right?

7  A.    Yes.

8  Q.    It's about 10 percent?

9  A.    It's about 10 percent.

10 Q.    And that equity -- you own a portion of that equity as a

11 partner of Clarke Capital; right?

12 A.    A small percentage of that.

13 Q.    Okay.

14 A.    Small percentage.

15 Q.    If Contour were to get money in this case, some of that

16 would go to your benefit; right?

17 A.    Yes.

18 Q.    Now, the plaintiff in this case is Contour IP Holdings.

19 Do you understand that?

20 A.    Yes.

21 Q.    And Contour IP Holdings is a holding company for the

22 patent assets; right?

23 A.    Yes.

24 Q.    And Contour IP Holdings doesn't make any products; right?

25 And it has never made any products; right?

**HARRISON - CROSS / HAYNES**

1    **A.**    No.

2    **Q.**    Contour IP Holdings was formed to enforce Contour's

3    patents by suing other companies?

4    **A.**    No.

5    **Q.**    Has Contour IP Holdings conducted any business other than

6    enforcing Contour --

7    **A.**    Can I answer the first question, which is no, but why it

8    was created?

9    **Q.**    Fair enough.  Fair enough.

10    **A.**    To protect the IP.

11    **Q.**    It was created to protect the IP?

12    **A.**    And to protect the IP while we were creating the new

13    combined iON-Contour operating camera company to go and

14    become a significant competitor to GoPro.

15    **Q.**    Okay.  When you say "protect" -- I'm sorry.  Were you

16    finished?  I didn't mean to cut you off.

17    **A.**    Protect the IP.

18    **Q.**    Okay.  When you say "protect the IP," who are you

19    protecting it from?

20    **A.**    So this -- this isn't my -- what do you say? -- area, as

21    it were.  This is an area that was for Rob Mooney.

22    **Q.**    Okay.  Fair enough.

23        Let me switch a little bit and talk about -- you mentioned

24    Contour's invention.

25    **A.**    Yes.

1   **Q.**   Do you recall that testimony?

2      And in your view, Contour's invention was to have the

3   ability to control the camera and to also do a live preview

4   while recording -- a live preview on a remote device while

5   recording; fair?

6   **A.**   Yes.

7   **Q.**   And that feature was something that Contour got using

8   Ambarella chips; right?

9   **A.**   The two things aren't quite the same.  We used Ambarella

10   chips, and then we built -- or then -- this is, again, prior to

11   my involvement -- and then constructed the ability to create

12   the invention.

13   **Q.**   Okay.  So when you joined Contour, Contour had already

14   been competing with GoPro in the market for a number of years,

15   all the way back to 2008 at least; right?

16   **A.**   Yes.

17   **Q.**   And you made several allegations during your testimony

18   that GoPro copied Contour.  That's your belief; right?

19   **A.**   Yes.

20   **Q.**   Now, when you joined Contour, that was in 2014; is that

21   right?

22   **A.**   Yes.

23   **Q.**   And when you joined Contour in 2014, did you do any sort

24   of investigation of the marketplace in 2008 and 2009?

25   **A.**   Not personally.

1    Q.   Did you attempt to investigate whether other people were

2    already using live preview while recording in 2008 and 2009?

3    A.   Not personally.  This is not my -- I'm a marketing and

4    business leader.

5    Q.   Right.  So you don't know what was going on in the 2008

6    and 2009 time frame with respect to this feature of live

7    preview while recording; right?

8    A.   As I say, I'm not an expert -- I'm not a technical expert.

9    I'm not a legal expert.  I'm a marketing expert.

10   Q.   I understand that.  But you understand when you come into

11   a court --

12   A.   Yeah.

13   Q.   -- and you accuse someone of copying, that is a serious

14   allegation; right, sir?

15   A.   Yes.

16   Q.   And to make such an allegation, you didn't do any

17   investigation to determine whether GoPro had already come up

18   with those ideas first, did you?

19   A.   The company had Jason Green, a co-founder, who was part of

20   the company.  We had a really strong history at

21   Clarke Capital -- or they, at Clarke Capital, had a very strong

22   history in patent protection, and I learned from them exactly

23   what the history was.  I spoke to the inventors.  And the

24   conclusion to me was very clear.

25   Q.   Okay.  So others within Contour said, "We think GoPro

1  copied," and you took their word for it.  Is that fair?

2  **A.**   Yes.

3  **Q.**   Did the people at Contour, Jason Green and other people,

4  did they tell you that Ambarella was selling a chip that could

5  output two video streams, one at high resolution for saving to

6  a camera and one at low resolution for transmitting to a mobile

7  device, before Contour came up with its idea?

8  **A.**   No.

9  **Q.**   Were you aware of what Ambarella was doing at the time, in

10  2008 and 2009, and the capabilities of their chips back then?

11  **A.**   No.

12  **Q.**   Now, when you did join Contour, later in time, you went to

13  Ambarella to try to get their chips; right?

14  **A.**   Yes.

15  **Q.**   And you weren't able to get those chips on favorable

16  terms; right?

17  **A.**   Yes.

18  **Q.**   And so is it fair to say that you believed that the

19  ability to use Ambarella chips was important to Contour's

20  success?

21  **A.**   Well, it was one thing or the other, that we were either

22  going to use Ambarella chips or we were going to go to another

23  chip manufacturer and then be able to integrate our technology

24  into a different chip.  But, obviously, it was easier for us to

25  be able to work with Ambarella.

1    Ambarella doesn't -- if you put an Ambarella chip in

2    something, it's not going to deliver immediately this

3    invention.  Otherwise, GoPro would have been able to just take

4    an Ambarella chip.  What they had to do was to rip down the

5    Contour, try and work out how the invention had worked.

6        So, you know, I -- I think it's a misrepresentation to say

7    that putting an Ambarella chip in makes this work because you

8    needed to be able to actually invent the technology to be able

9    to make it work.

10   **Q.**   You're in marketing; right, sir?

11   **A.**   Yes.

12   **Q.**   Not in engineering?

13   **A.**   No.  But you asked me what my knowledge was and what I

14   learned from this, and I'm telling you what I learned from

15   this.

16   **Q.**   Let me ask you this question:  You believe live preview

17   while recording is an important feature?

18   **A.**   Yes.

19   **Q.**   You think it's a necessary feature for a product to

20   succeed in the marketplace?

21   **A.**   Absolutely.

22   **Q.**   When you joined Contour -- after the point you joined

23   Contour, they released two more cameras, the ROAM3 and the

24   Contour 4K; right?

25   **A.**   Yes.

1  Q.   The ROAM3 has no wireless capable; correct, sir?

2  A.   Yes.

3  Q.   So the -- and that was the first product you launched when

4  you got there; right, sir?

5  A.   Yes.

6  Q.   And so the only product -- or the first product that you

7  launched when you got there to try to reboot the company --

8  A.   Mm-hmm.

9  Q.   -- did not have live preview while recording; right?

10  A.   That's correct.

11  Q.   Let's look at one of the documents you looked at.

12       MR. HAYNES:  Could we bring up TX-459, and if we would

13  go to page 11 of this document.

14  BY MR. HAYNES:

15  Q.   You remember this is one of the pages of this document

16  that you testified about?

17  A.   Yes.

18  Q.   Now, GoPro wasn't the only player in the market.  There

19  were other people that were making cameras; right?

20  A.   Yes.

21  Q.   And there were other people that were making cameras that

22  had live preview while recording; right?  In fact, by this

23  time, that was a common feature in most of the cameras in the

24  marketplace; right?

25  A.   It kind of answers your question, which is how important

1    it was.  Everybody used it because it was so important.

2    **Q.**   Sir, it was a common feature; right?

3    **A.**   No, not a common feature.  It was a feature that we had

4    invented.  Just because everybody thinks that it is important

5    doesn't make it common.  I want to use the language perfectly.

6    **Q.**   But you were not around in 2000 and -- 2008, 2009, 2010,

7    so you don't have firsthand knowledge about how common that

8    feature was back then, do you?

9    **A.**   No, I don't.

10         **MR. HAYNES:**  If we could show just the witness TX-463.

11   **BY MR. HAYNES:**

12   **Q.**   Do you recognize this document, sir?

13   **A.**   Yes, I do.

14   **Q.**   What is it?

15   **A.**   It's an internal memo to the team discussing the options

16   that we had post the Jabil breakdown and what could we do next.

17         **MR. HAYNES:**  We offer TX-463.

18         **MR. KEVILLE:**  No objection.

19         **THE COURT:**  It's admitted.

20        (Trial Exhibit 463 received in evidence.)

21   **BY MR. HAYNES:**

22   **Q.**   Now, what you were doing in this document, you were trying

23   to consider what your options were going forward; is that

24   right?

25   **A.**   Yes.

1  Q.   And you were not having success in the marketplace, and so

2  you were attempting to figure out where to take the company

3  next; fair?

4  A.   Yes.  Fair.

5  Q.   And in this document, you actually lay out several

6  different options for where past the company could go; right?

7  A.   Yes.

8  Q.   And there are actually --

9         MR. HAYNES:  If we could scroll down in the document.

10     The next page, where it lists the -- try and get -- yeah,

11  there we go.

12  BY MR. HAYNES:

13  Q.   Do you see there, there's three different routes plus a

14  1b?  Those were the options that you were looking at at this

15  period of time as to where to take the company; fair?

16  A.   Yes.

17  Q.   And Route 1 was that you were considering investing in new

18  camera development and competing in the marketplace --

19  A.   Yes.

20  Q.   -- right?

21     And then Route 2 was to try to cut costs, do no investment

22  in new camera products, and just try to sell out your current

23  inventory so that you could pursue enforcement activities;

24  right?

25  A.   I don't think it says that.

**HARRISON - CROSS / HAYNES**

1   **Q.**   Well --

2   **A.**   It just says cut costs, sell through current inventory

3   to -- we needed to pay our legal fees.

4   **Q.**   Okay.

5   **A.**   Okay?

6   **Q.**   But Route 2, you recognized if you cut costs and you don't

7   invest in new products, that would mean that it would end any

8   chance of raising outside money; fair?

9   **A.**   You know, we were in a position that we were a year and --

10  over a year and a bit into this; and, you know, we were

11  determined to continue to try and make cameras; but I had to

12  lay it out to our team, different options.

13  **Q.**   Sir, if you could just focus.  My question --

14  **A.**   Okay.  Sorry.

15  **Q.**   -- is:  In this document in Route 2 --

16  **A.**   Yes.

17  **Q.**   -- you recognized that if you cut costs and quit investing

18  in new cameras, that would end any chance of raising outside

19  money; correct?

20  **A.**   That was my opinion at the time.  But you have to take,

21  I think, just for the benefit of --

22          **THE COURT:**  I think you've -- have you answered the

23  question?

24          **THE WITNESS:**  Have I?  I think I have.

25          **THE COURT:**  I think you have too.

 1               THE WITNESS:  Okay.  Sorry.

 2    BY MR. HAYNES:

 3    Q.   All right.  You also had another option, Route 1b or the

 4    fudge --

 5    A.   Right.

 6    Q.   -- right?

 7          And under the fudge strategy, what you were going to do

 8    is, you were going to make limited cost savings, invest in some

 9    online channels, make no investments in any new cameras, tell

10    your distribution to prepare for a camera that does not yet

11    exist.  So no investments in new cameras, but lead your

12    distributors to believe that you were working on new cameras.

13    That's what you're saying here; right?

14    A.   Yes.

15    Q.   And the fudge was misleading your distributors that you

16    were doing work you weren't doing; right?

17    A.   I'd like to rephrase that.

18    Q.   Well, sir, it says right here --

19    A.   Yes, I know.  I know, but the point --

20               THE COURT:  It is fair --

21               THE WITNESS:  The point is really --

22               THE COURT:  Hang on just a second, Mr. Harrison.

23               THE WITNESS:  Yeah.

24               THE COURT:  It is fair for you to answer the question.

25    So go ahead.

1          **THE WITNESS:**  My role as chief executive of this

2   company was to keep the company alive.  The day that I would

3   tell my distributors that I am no longer in the market is

4   the day that they leave us forever.

5          How do you expect me to do that, knowing that every single

6   fiber in my body was designed -- was trying to make this

7   company successful, find a way to get the right manufacturer,

8   the right investor so that we could get back in the market?  Am

9   I going to tell my distributors, "Sorry, guys, I'm out"?

10  Because if I do that, I really am out.  I couldn't afford to do

11  that.  I had to keep the business alive.

12  **BY MR. HAYNES:**

13  **Q.**   So under this strategy, the goal was to mislead the

14  distributors so what you described --

15  **A.**   No.

16  **Q.**   -- wouldn't happen?

17          **THE COURT:**  The question's been asked and answered.

18  It's argumentative.  Please go ahead.

19  **BY MR. HAYNES:**

20  **Q.**   Now, what you ultimately chose -- well, sorry.  Route 3

21  was to discuss a merger with iON?

22  **A.**   Yes.

23  **Q.**   And that actually happened?

24  **A.**   Yes.  Well, actually, pretty much at this time -- what's

25  the date on this?

1   **Q.**   We can go to the top of document.

2   **A.**   So by the 22nd of January, we were deep in discussions

3   with iON, and we signed an LOI in early February.

4        **MR. HAYNES:**  Stay on the first page, please.

5   **BY MR. HAYNES:**

6   **Q.**   At the time this email was written in January 22nd, 2015,

7   the option that you decided to take that you were telling the

8   other principals of Contour about was you were going to take

9   Option 1b; correct?

10  **A.**   Yes, until a better deal came.

11       **MR. HAYNES:**  No further questions, Your Honor.

12       **THE COURT:**  All right.

13  Mr. Keville, I'm thinking of taking a break.  How long is

14  your redirect?

15       **MR. KEVILLE:**  Two to three minutes.

16       **THE COURT:**  Come on ahead.

17                     **<u>REDIRECT EXAMINATION</u>**

18  **BY MR. KEVILLE:**

19  **Q.**   The last document you were asked about came right after

20  Jabil backed out of the deal and made a deal with GoPro;

21  correct?

22  **A.**   Yes.

23  **Q.**   And it came right after GoPro agreed to a meeting about

24  the patents and then didn't show up; correct?

25  **A.**   Yes.

HARRISON - REDIRECT / KEVILLE

1    Q.    So you were kind of -- what were you feeling at that time?

2    A.    Beaten up.

3    Q.    And counsel made a point about the ROAM3 not having the

4    live preview while recording.  Why was that?

5    A.    It was a -- it was designed for underwater.  It's

6    30 met- -- it was an underwater camera for divers, and so it's

7    not a necessary item for that particular range of cameras.

8         If you remember, when we started, we had the ROAM cameras,

9    and then we had the connected cameras.  The fact was that we

10   were able to launch the ROAM3, and that was going to give us

11   the cash to come in for us to be able to invest in the

12   successor to the Contour+2.

13   Q.    Can you look at the smartphone and look at a preview while

14   you're SCUBA diving?

15   A.    No.

16        MR. KEVILLE:  No further questions, Your Honor.

17        THE COURT:  All right.  Mr. Harrison, thank you.

18   You're excused.

19                        (Witness excused.)

20        THE COURT:  Ladies and gentlemen, we are going to take

21   a first break of the morning, 15 minutes.  So we will be back

22   at about 25 of.

23        Please remember my admonitions.  Don't talk about the

24   case.  You can talk about anything else.  And I'll see you in

25   15 minutes.

```
 1        (Proceedings were heard out of the presence of the jury.)

 2             THE COURT:  All right.  We're in recess.

 3                  (Recess taken at 10:19 a.m.)

 4                  (Proceedings resumed at 10:34 a.m.)

 5        (Proceedings were heard out of the presence of the jury.)

 6             THE COURT:  Ready for the next witness?

 7             MR. KEVILLE:  Yes, Your Honor.

 8             THE COURT:  Okay.

 9        (Proceedings were heard in the presence of the jury.)

10             THE COURT:  Please be seated.

11        Mr. Keville, who's the next witness?

12             MS. REPLOGLE:  Your Honor, the plaintiffs call Richard

13   Mander as their next witness.

14      (Witness enters the courtroom and steps forward to be sworn.)

15             THE COURT:  Please come on up, Mr. Mander.

16             THE COURTROOM DEPUTY:  If you'll step up and remain

17   standing, I'll take a photograph and then I'll swear you in.

18        Raise your right hand, please.

19                       RICHARD IAN MANDER,

20   called as a witness for the Plaintiff, having been duly sworn,

21   testified as follows:

22             THE WITNESS:  I do.

23             THE COURTROOM DEPUTY:  And then if you would please

24   begin by stating your full name and spelling it for the court

25   reporter.
```

1        **THE WITNESS:**  I'm Richard Ian Mander, R-i-c-h-a-r-d,

2    I-a-n, M-a-n-d-e-r.

3        **MS. REPLOGLE:**  Your Honor, may I approach with these

4    exhibits?

5        **THE COURT:**  Please.

6        **THE WITNESS:**  Thank you.

7                    <u>**DIRECT EXAMINATION**</u>

8    **BY MS. REPLOGLE:**

9    **Q.**   All right.  All right.  Could you introduce yourself to

10   the jury, Mr. Mander?

11   **A.**   Yes.  I'm Richard Mander.  I am the chief technology

12   officer of a company called V1EWPOINT Medical Devices.  And I

13   was the vice president of product management at Contour.

14   **Q.**   Mr. Mander, have you ever testified in trial before?

15   **A.**   No.

16   **Q.**   Okay.  Are you -- fair to say are you a little nervous?

17   **A.**   Yes.

18   **Q.**   Okay.  All right.  Could you just tell the jury a little

19   bit about your education from college onward?

20   **A.**   Yes.  So I grew up in New Zealand, and I wanted to be a

21   psychologist, and so I started on a path to become a teacher,

22   working towards that.  So I attended Christchurch Teachers

23   College and attained a teaching certificate and a teaching

24   diploma.

25        At the same time, I attended the University of Canterbury

MANDER - DIRECT / REPLOGLE

1   and obtained a Bachelor of Arts degree in educational

2   psychology.

3       I then taught for three years as an elementary teacher,

4   and while doing that, I started a master's degree in

5   educational psychology, which I completed.

6       And then I was lucky to get to come to the United States

7   to go to Stanford University and complete a Ph.D. in a branch

8   of educational psychology.

9   **Q.**   All right.  So you do not have a formal degree, then, it

10  appears, in computer science or electrical engineering; is that

11  right?

12  **A.**   That's correct.  I don't.

13  **Q.**   Okay.  Are you an inventor on the two Contour patents that

14  are at issue in this case that are asserted?

15  **A.**   Yes.

16  **Q.**   Okay.  So how does a teacher end up in the tech industry

17  and an inventor on patents related to camera technology?

18  **A.**   So I grew up in a family that -- where my dad was kind of

19  an inventor, and he worked for a company -- an American

20  company, actually, called Burroughs, who developed adding

21  machines and computers.  He had computers at home.  And so I

22  was exposed to those from a very early age.

23      When I went to the University of Auckland, there was -- in

24  1984, IBM had just brought out what was called the IBM PC.  It

25  was the first real desktop computer.  And they donated some to

 1    the University of Auckland, where I was.  And the university

 2    didn't really know what to do with them, so they put them into

 3    the School of Education where I was, and I got to take a class

 4    playing with the computers, really, and figuring out what we

 5    could do with them to use them to help children learn.

 6        And I was really excited about that.  And it led me to,

 7    actually, for my -- in New Zealand, when you do a master's

 8    degree, you have to do a real piece of research as well as

 9    classes.  And so I did a research study where we took computers

10    and Apple computers and put them into classrooms where there

11    were deaf children to see if they could learn -- get better

12    English language skills, in addition to their sign language.

13    And that was considered a very good piece of work and helped me

14    actually get to go to Stanford.

15        So then when I was at Stanford, I -- again, there were

16    computers everywhere at Stanford at that time.  And I had a job

17    looking after computers in the student lab, helping all the

18    different secretaries, if you like, in the School of Education

19    to learn to use their computers.  And I saw a flier, you know,

20    poster on the wall for an internship at Apple Computer, and I

21    thought:  I could do that.

22        And so I applied and I got -- won the position.  And so in

23    June of 1990, there I was at Apple, working as an intern in the

24    advanced technology group, helping to try out future

25    technologies Apple was developing.

1          Eventually -- they actually wanted to hire me full-time,

2     and I ended up working at Apple as a usability engineer and

3     then an interaction designer.  And I was very good at kind of

4     getting things done on time and coming up with innovative ways

5     of, in part, to do with my work with children and trying out

6     little studies in schools and things.  There was a methodology

7     there about how to do things.  And I was selected to be trained

8     as an engineering manager.

9          And so at Apple, I got to spend a year in a training

10    program specifically to help people learn how to manage

11    engineers.  And, surprisingly, it's a lot like being a teacher.

12    And so I learned that, and I became -- at the end of that, I

13    got promoted to become an engineering manager.  And that led me

14    into this new career path of technology management.

15    **Q.**   So what year was that, or thereabouts, that you became an

16    engineering manager at Apple?

17    **A.**   I think it was 1995, yeah.

18    **Q.**   Okay.  Now, while you were at Apple, did you work with,

19    like, Bluetooth or WiFi technology at that point in time?

20    **A.**   No.

21    **Q.**   Why was that?

22    **A.**   There were radio protocols, but Bluetooth and WiFi had not

23    been invented yet.

24    **Q.**   All right.  Did you later -- what did you do next after

25    you worked at Apple?  Where did you go?

1   **A.**   I formed a start-up with some other colleagues who had

2   left Apple and then did that for a couple of years.

3       And then I joined a company called Zanzara, which was

4   actually started by my wife, and spent six years doing --

5   helping companies develop new technologies and make them very

6   usable, and then more -- progressively, more senior jobs in

7   different companies.

8   **Q.**   And while you were at Zanzara, did you work on any mobile

9   products that included Bluetooth and WiFi at that point?

10  **A.**   Yes, I did.

11  **Q.**   And could you just briefly describe what that was?

12  **A.**   So Bluetooth and WiFi were coming to market, and there

13  were a lot of challenges with the usability of those

14  technologies.

15      So I did -- I worked on -- several companies would engage

16  us to help design the user interface and make it simple so

17  people could actually succeed; for instance, pairing, which is

18  how you connect two devices together, so how could you connect

19  your phone to a devi- -- a personal digital assistant,

20  something like that.  And so we worked on making that simple

21  for both WiFi and Bluetooth.

22  **Q.**   And about what year was it while you were at Zanzara and

23  working with Bluetooth and WiFi technology?  How long ago was

24  that?

25  **A.**   It was between 1997 and 2004, sometime in there.

1  Q.   Okay.  And since that time, have you proceeded to continue

2  to work in the technology industry ever since?

3  A.   Yes.

4  Q.   And so at -- today, looking back, how many years have you

5  worked in the tech industry at this point?

6  A.   It's been 35 years now.

7  Q.   Okay.  So I want to just fast-forward just a little bit.

8       How did you come to join Contour, Inc.?

9  A.   We had moved back from New Zealand to Seattle, and I was

10 working as an entrepreneur in residence at the University of

11 Washington.  I received an email from Marc Barros, who was the

12 CEO, and he had found me by doing a search on LinkedIn for

13 QuickTime in Seattle.  So he wanted someone who knew about

14 QuickTime and was in Seattle, and I popped up.  And so I went

15 to meet him.

16 Q.   All right.  And did you end up meeting with Marc Barros,

17 the co-founder?

18 A.   Yes.

19 Q.   And what do you recall about that conversation?

20 A.   It was a strange conversation.  I wasn't really sure what

21 he wanted, but he was probing me on a lot of things about

22 QuickTime and my experience in video and GPS, which is sort of

23 a combination of things I know about, and ended up offering me

24 a job.

25 Q.   All right.  So when did you start at Contour, Inc.?

1    **A.**    In October 2009.

2    **Q.**    Okay.  And what were you asked to do when you joined in

3    October of 2009?

4    **A.**    The main focus at the beginning was to help the team add

5    GPS as a feature into what would be the next camera.

6    **Q.**    Okay.  Was there a particular name for that project at

7    Contour?

8    **A.**    Yes.  It was initially called the HD 60 when I started,

9    and I changed the name, code name to Scout.  Ultimately, it

10    became the ContourGPS camera.

11    **Q.**    And were you asked to lead the Scout team?

12    **A.**    Yes.

13    **Q.**    Okay.  And did you bring anyone specifically to join you

14    to help you with the Scout project?

15    **A.**    I did.

16    **Q.**    And who did you bring?

17    **A.**    I brought in several people.  So Michael Denton, Alan

18    Tompkins, Kelvin Barnsdale, Ben Bodley, Simon Third, Keith

19    Gurganus?

20    **Q.**    And why did you bring in those individuals to help you

21    with the Scout project?

22    **A.**    They have a range of -- I'd worked with them before.  They

23    had a range of unique schools, and they had different areas of

24    engineering:  electrical engineering, radio engineering,

25    software, industrial design, mechanical engineering.  And

MANDER - DIRECT / REPLOGLE

```
 1   they -- I had worked with them before.  They were a really
 2   strong team, and so I engaged them.
 3   Q.   All right.  So let's just kind of just touch briefly on --
 4   you mentioned, I think, Michael Denton.  What was his
 5   particular area of expertise?
 6   A.   Michael was an industrial designer and a mechanical
 7   engineer, and he has a lot of -- I also consider him to have
 8   very good system engineering knowledge.
 9   Q.   And was Michael Denton one of the co-inventors on the two
10   patents that are asserted --
11   A.   Yes.
12   Q.   -- in this case?
13        And what about Alan Tompkins?  What was his particular
14   area, and why did you bring him on?
15   A.   Alan is an electrical engineer with particular expertise
16   in real-time operating systems and how to make GPS work in
17   difficult environments.
18   Q.   And is Mr. Tompkins as well a co-inventor on the two
19   patents asserted in this case?
20   A.   Yes.
21   Q.   Okay.  And Kelvin Barnsdale, why did you bring him on to
22   your team?
23   A.   Kelvin is an expert in radiofrequency engineering and, in
24   particular, how to make GPS work in difficult environments.
25   Q.   Okay.  And Ben Bodley, you mentioned him.  Why did you
```

MANDER - DIRECT / REPLOGLE

1    bring Ben Bodley on board?

2    **A.**    Ben is a software engineer, and I had mentored him and

3    worked with him on several projects over the years at two

4    different companies.  And he had a lot of ability to implement

5    ideas I had to prototype things and to work around problems and

6    be very creative.

7    **Q.**    And for both Kelvin Barnsdale and Ben Bodley, are both of

8    those individuals also co-inventors on the patents that are

9    asserted in this case?

10   **A.**    Yes.

11        **MS. REPLOGLE:**  Allen, can you show the witness only

12   Exhibit 6, please.

13   **BY MS. REPLOGLE:**

14   **Q.**    Mr. Mander, can you identify Exhibit 6?  What is it?  Or

15   just describe it.  Is this an --

16   **A.**    It's an email.

17   **Q.**    -- email between you and Laura O'Donnell?

18   **A.**    Yes.

19   **Q.**    And is the email dated November 23rd, 2009?

20   **A.**    It is.

21   **Q.**    Okay.  And does it relate to the Scout project?

22   **A.**    Yes.

23        **MS. REPLOGLE:**  Your Honor, I move to admit Exhibit 6.

24        **MR. HAYNES:**  No objection.

25        **THE COURT:**  It's admitted.

1          (Trial Exhibit 6 received in evidence.)

2     **BY MS. REPLOGLE:**

3     **Q.**   So at this point in time, November 23rd, 2009, again, what

4     had been the major focus for the Scout project as far as the

5     feature?

6     **A.**   Major feature was improve video and adding GPS.

7     **Q.**   Okay.  And at this point in time, had you decided and

8     found a way to implement the GPS into the new camera?

9     **A.**   Yes.  I had found the general method for doing that.

10    **Q.**   Okay.  So if by November 2009, you decided on a path

11    forward for GPS, why -- what was your understanding as to why

12    Laura O'Donnell would be forwarding you some additional camera

13    specifications for the Scout project?

14    **A.**   Because at this point, Laura wanted me to take on more

15    responsibility and not just add GPS in, but to deliver the

16    whole camera.  And so what she was sharing with me is what's

17    called a SWAG, which -- forgive the term, but it's a

18    sophisticated wild-ass guess.  It's a well-known term in

19    product development.  And so it's a list -- kind of a bucket

20    list, you could call it.

21         "These are a whole bunch of things, Richard, that I'd like

22    you to consider and give me as much of it as you can."

23    **Q.**   Okay.  So what were some of the requirements that

24    Ms. O'Donnell identified to have an improved video feature in

25    the Scout camera?  Down there at the bottom of page 1 where it

1    says "Improve Video," do you see that?

2    **A.**    I'm not seeing it just yet.

3           Can I look at my paper copy?

4    **Q.**    Yes, of course.

5    **A.**    So this is Number -- which one is this?

6           Oh, this is Number --

7               **THE COURT:**  6.

8               **THE WITNESS:**  Okay.  I have it.  Thank you.  Yeah, I

9    see it now.

10           Sorry.  Could you repeat the question?

11   **BY MS. REPLOGLE:**

12   **Q.**    Yes.  So what were some -- what were some of the

13   requirements that Ms. O'Donnell was identifying as it related

14   to the improved video functionality for the new camera?

15   **A.**    So she wanted to see some improvements, if possible, to do

16   with, you know, the lens, a better lens, could we stabilize it,

17   and better lighting.

18           But also, there were some features in the new -- in the

19   process that we were going to be using that, among them was

20   this dual encode aspect, and she wanted me to think of ways to

21   exploit that.

22   **Q.**    Okay.  At this point in time, were you familiar with the

23   A5s processor chip that was going to be provided or launched by

24   Ambarella a little bit later that year?

25   **A.**    Yes.

1  Q.   Okay.  And we'll return back to Exhibit 6 for just a

2  moment.

3      But when you saw "Dual-encode (Capture main video and

4  secondary video file)," what was your understanding as to what

5  she was referring to there?

6  A.   The A5 system on chip had the ability to not just save a

7  video, but to save two versions of the video at the same time,

8  a high-resolution one, that's the high-definition video, but

9  also what could be a very useful lower-resolution file.

10  Q.   By this time frame in November 2009, had you received from

11  Ambarella a datasheet describing the A5s processor --

12  A.   Yes.

13  Q.   -- the system on chip?

14      MS. REPLOGLE:  Okay.  Could you turn to and show the

15  witness, Allen, Exhibit 1079.

16  BY MS. REPLOGLE:

17  Q.   And you can use your book, if you prefer.

18  A.   I see it.

19  Q.   It will also be on your screen.

20      And, Mr. Mander, do you recognize this document as

21  Exhibit 1079?

22  A.   Yes.

23  Q.   Okay.  And is this document the Ambarella datasheet for

24  the A5s30 that Contour received from Ambarella?

25  A.   It is.

1           **MS. REPLOGLE:**  Your Honor, I move to admit this

2     Exhibit 1079.

3           **MR. HAYNES:**  No objection, Your Honor.

4           **THE COURT:**  It's admitted.

5      (Trial Exhibit 1079 received in evidence.)

6     **BY MS. REPLOGLE:**

7     **Q.**   So why -- what was your understanding as to why Ambarella

8     would provide this A5s30 datasheet to Contour?  What was the

9     reason?

10    **A.**   Because -- so we had built our previous camera using the

11    A2.  Ambarella was developing the A5s30, and they wanted us to

12    use it.  And so we needed to understand it, what it could do.

13          And this document provides all of the information about,

14    if you like it, the electrical level, physically what is it,

15    and we would need to understand that to actually decide to use

16    it.

17    **Q.**   If you take a look at page 1079-7, there's a block diagram

18    there on the lower --

19    **A.**   Yes, I see it.

20    **Q.**   -- portion of that.

21          Can you describe to the jury what is that depicting, the

22    block diagram?

23    **A.**   So this is the block diagram for the A5s30.  A block

24    diagram is a simplistic diagram, very high level, that gives

25    you an understanding of the major features of the system.

1  Q.  And there's a blue box in the upper right-hand side of

2  that block diagram, and it says "Video ports."  Do you see

3  that, Mr. Mander?

4  A.  Yes, I see it.

5  Q.  So what is that block functionality discussing?  Can you

6  explain it to the jury?

7  A.  So within the architecture of the A5s30, the -- there are

8  a lot of different parts to it.  And, conceptually, there is a

9  part called the video codec to the left.  And what -- you can

10  see an arrow coming over to the right, to this large blue

11  block.  And this large blue block is describing what are called

12  the video ports.  These are -- if you think of a -- a port is

13  like a path, so a portal.

14      So the video ports are ways that the video can be sent out

15  of the chip electrically with some tiny little electrical

16  connections.  So it's talking about HDMI and MIPI DSI.  And the

17  arrows to the right are indicating that it can output

18  different -- two different kinds of video, meaning through a

19  cable and --

20  Q.  And --

21  A.  Yeah.  Thanks.  That's it.

22  Q.  I didn't mean to interrupt you.

23      That's what I was just wanting to point out, make clear

24  about this.  So on the far right-hand side of that blue box, it

25  looks like to me -- is that like a TV and maybe a display on

1    that far right-hand side --

2    **A.**    Yes.

3    **Q.**    -- where the video output is?

4    **A.**    I would say it's conceptual.  I think those are meant to

5    represent a digital display and probably an analog display.

6    **Q.**    And it is -- it's conceptual, as you understood it?

7    **A.**    Yes.

8    **Q.**    And this is the point.  I see two arrows going from that

9    video output to what's shown there conceptually as a TV and a

10    display.

11        Were those wireless connections, or were those wired

12    connections?

13    **A.**    No.  Those are wired connections.  They're video ports.

14    And it references here HDMI, MIPI.  Those are physical, wired

15    connections.

16    **Q.**    And have you -- over the course of your work on the Scout

17    project, did you review this datasheet in a fair amount of

18    detail?

19    **A.**    Yes.

20    **Q.**    Anywhere in the Ambarella A5s30 datasheet, does it mention

21    or suggest having video streaming in a wireless means?

22    **A.**    No.

23    **Q.**    Nowhere?

24    **A.**    No.

25    **Q.**    Okay.  Let's turn back to Exhibit 6, where we were at with

```
 1   Ms. O'Donnell sending you some requirements for the Scout

 2   project.

 3       So we just had spoken about the video aspect of it with

 4   the dual encode.  I want to move to right in the middle of

 5   page 6-2 where it says "Additional Communication Features."

 6       Are you there?

 7   A.   I see it.

 8   Q.   Okay.  What were some of the requirements for the Scout

 9   project that Ms. O'Donnell had identified for the additional

10   communication features?

11   A.   So the ability to transfer video files possibly through

12   video streaming.  The ability to have a remote connection to

13   the camera, and that would be to configure the camera, like to

14   tell it what kind of video to record.  And to start and stop

15   recording, and potentially that could be done through different

16   mechanisms.

17   Q.   So I see reference here to "Remote for configuring

18   camera," and then she lists several different, video settings,

19   GPS settings, et cetera.

20       What did you understand her to be referring to there for

21   the requirement?

22   A.   So the camera -- at that point, these types of cameras,

23   you would have to change the settings by connecting a laptop or

24   a computer to it with a cable, and this was saying let's have a

25   way to do that with a remote control.
```

1  Q.   And for the implementation options for the remote control,

2  what were the two options that were being considered here?

3  A.   So we were considering a wired option, meaning there's a

4  cable going from the camera to some kind of little remote

5  control device, or a wireless connection, meaning no cable.

6  Q.   And was there a reference, at this point in time,

7  November 2009, between a wired implementation option versus a

8  wireless implementation option?

9  A.   Yes.

10 Q.   What was that preference?

11 A.   There was a very strong preference for it to be wireless.

12 Q.   And why was that?

13 A.   Because -- for two reasons, really.  One of them is that

14 we -- our older cameras used to have cables, and we had moved

15 away from that, so we didn't want to go back to having cables.

16     And, secondly, people using the camera are wearing it

17 typically on their helmet.  They don't want to have wires

18 coming down.  It's just way better to have no wires.  It was

19 dangerous to have wires, yeah.

20 Q.   What company was the first company to release a camera

21 that was totally integrated with no wires hanging down from it

22 that you know?

23 A.   I think Contour was the first.

24 Q.   And do you recall the name of that camera?

25 A.   It was the VholdR.

MANDER - DIRECT / REPLOGLE

1  Q.    The VholdR.    Now look -- when we look at Exhibit Number 6,

2  by the "Wireless:    Bluetooth or WiFi," I see where it says

3  "(priority 2)" in parentheticals.

4       What do you understand that to mean?

5  A.    I took that to mean that with wireless, meaning no wires,

6  meaning radio, there are -- the two obvious choices were

7  Bluetooth or WiFi, and that WiFi was lesser desire- -- less

8  desirable.

9  Q.    Okay.    So when we look at Exhibit Number 6 and where it

10  says "WiFi (priority 2)" -- scratch that.

11       Is it your understanding that "priority 2" was meant to

12  refer to WiFi and not Bluetooth with respect to this

13  implementation option?

14  A.    Yes.

15  Q.    All right.    So what -- let's see.    What did you do next,

16  after November 2009?    Did the project proceed?

17  A.    Yes.

18  Q.    Okay.    Let's take a look just in your book, or up on your

19  screen only, for Exhibit 2200.    We're going to move into

20  December 2009.

21       Okay.    Are you at --

22  A.    Yes.

23  Q.    -- Exhibit 2200?

24  A.    Yes.

25  Q.    And is Exhibit 2200 an email that you sent to

 1   co-inventor -- excuse me.  Is this an email that you sent to

 2   Ben Bodley December 9th, 2009?

 3   **A.**   Yes.

 4          **MS. REPLOGLE:**  Your Honor, I'd move to admit

 5   Exhibit 2200, 2200.

 6          **MR. HAYNES:**  No objection.

 7          **THE COURT:**  It's admitted.

 8      (Trial Exhibit 2200 received in evidence.)

 9   **BY MS. REPLOGLE:**

10   **Q.**   All right.  So, Mr. Mander, once you have a second -- a

11   moment to review it, why were you emailing Ben Bodley on

12   December 9th, 2009?

13   **A.**   Because we got to the point where we needed to set up a

14   contract with Ben to engage him, and I had needed to get --

15   Laura didn't know Ben, and I wanted her to meet him and for him

16   to make a good impression on her and for her to realize Ben

17   knew what he was doing and that he was the right pick.

18          And so I'm emailing Ben, letting him know that we're

19   having this meeting, that I need him to demonstrate that he

20   can -- he knows his stuff and that he's passionate about what

21   we're doing, he's excited about it, because that would be

22   important to Laura.

23          And so I shared with him some questions that Laura and I

24   had that would -- we wanted answers to and we thought he might

25   have expertise in, but also they're ways for him to demonstrate

1    his knowledge to Laura.

2    **Q.**    And, you know, we've heard Laura O'Donnell now a couple of

3    times, but I think I neglected to ask.  Who is Laura O'Donnell?

4    **A.**    So Laura O'Donnell was my boss at -- my manager at -- I

5    worked for Laura.

6    **Q.**    Okay.  And is Laura O'Donnell also an inventor on the two

7    patents that are asserted in this case?

8    **A.**    Yes.

9    **Q.**    Okay.  So I wanted to just touch on a couple of these

10    questions that you forwarded to Mr. Bodley.

11            Looking at Item Number 5, why were you looking for

12    information on what video formats does the iPhone and iPod

13    Touch support at this time in December of 2009?

14    **A.**    So we really wanted to have a remote viewfinder, our

15    remote to include the ability to see what the camera was

16    seeing.  And we wanted to use an iPhone or iPod Touch, so

17    an iOS device from Apple, as that viewfinder.  And so one of

18    the questions we had was:  What kind of video can the iPhone

19    or iPod Touch play?

20    **Q.**    And so as of December of 2009, the idea of having -- using

21    an iPhone or an iTouch as a viewfinder, is that an idea that

22    you had?

23    **A.**    Yes.

24    **Q.**    Looking at Item Number 6, why were you looking for

25    additional information with Ben Bodley as to "Can video or

1   photos be streamed across Bluetooth and is there a standard or

2   specification for that?"

3   **A.**   Because we wanted to -- we wanted to connect to the

4   iPhone wirelessly, and one of the ways to do that would be to

5   use Bluetooth.  And so we wanted to know, does Bluetooth

6   already support that, meaning can it stream video.

7   **Q.**   And what did you find out?  Was there a standard

8   specification that already existed to stream video over

9   Bluetooth?

10   **A.**   We didn't think there was, and Ben confirmed that there

11   was not.

12   **Q.**   And if we turn to Item Number 7, why were you asking if

13   there was a data specification for proprietary data across

14   Bluetooth?  What did that mean?

15   **A.**   Well, this is a sort of progression of questions.  And so

16   at this point, the next question is:  Okay.  If you can't

17   stream video across Bluetooth, is there a way -- does Bluetooth

18   support a way to do things your own way?  And so can you have

19   proprietary data going across Bluetooth?  Because if we could,

20   maybe we could use that as a way to do video ourselves across

21   Bluetooth.

22   **Q.**   And when you say "proprietary way," what do you mean by

23   that?

24   **A.**   So "proprietary" means there's a way to do something that

25   only you know about.  It's sort of like your secret recipe.

MANDER - DIRECT / REPLOGLE

1   Q.   And did you ultimately end up doing just that?

2   A.   We did.

3   Q.   All right.  Let's fast-forward just a few days.  Take a

4   look at Exhibit 27.

5   A.   I see it.

6   Q.   Okay.  And is Exhibit 27 another email from you to

7   Ben Bodley on December 14th, 2009, related to the Scout

8   project?

9   A.   Yes.

10        MS. REPLOGLE:  Your Honor, I would move to admit

11   Exhibit 27.

12        THE COURT:  Any objection?

13        MR. HAYNES:  No objection, Your Honor.

14        THE COURT:  It's admitted.

15   (Trial Exhibit 27 received in evidence.)

16   BY MS. REPLOGLE:

17   Q.   Okay.  And if we look down to -- it looks like Mr. Bodley

18   first emailed you and then you responded.  So if we take a look

19   at what Mr. Bodley relayed, what was he asking you for any news

20   on?

21   A.   He's asking for an update on the viewfinder project.

22   Q.   And so was the viewfinder project part of the Scout

23   project?

24   A.   Yes, it was becoming an effort to add this remote

25   viewfinder to the Scout project.

1  Q.   So as of December 14th, 2009, had you, in fact, decided to

2  proceed on the viewfinder project?

3  A.   We had.

4  Q.   And how do you know that when you're reviewing Exhibit

5  Number 27?  What are you referring to?

6  A.   So up at the top of the email, I say, second line [as

7  read]:

8         "Yes, we do want to proceed."

9     So I'm confirming we want to do it.

10 Q.   And with respect to how you would proceed on the

11 viewfinder project, did you decide at this point in time,

12 December 14th, 2009, to have it to be a wireless option?

13 A.   Yes, that was -- we definitely wanted it to be wireless.

14 Q.   Okay.  And do you see that in Exhibit Number 27, a

15 reflection of that intent?

16 A.   Yes.  And, you know, we're saying we don't want dongles,

17 which is any -- a dongle is like a short wire with a thing on

18 the end.  We don't want that.

19     And I also say [as read]:

20         "We are really looking for the Bluetooth

21     solution," meaning wireless.

22 Q.   All right.  Let's move to just the next day.  If you take

23 a look at Exhibit Number 26.

24 A.   I see it.

25 Q.   Okay.  Is Exhibit Number 26 an email from you to

1    Ben Bodley, and then Laura O'Donnell is included, dated

2    December 15th, 2009, related to the Scout project and the

3    viewfinder project?

4    **A.**   Yes.

5            **MS. REPLOGLE:**  Okay.  I move to admit Exhibit 26.

6            **MR. HAYNES:**  No objection.

7            **THE COURT:**  It's admitted.

8        (Trial Exhibit 26 received in evidence.)

9    **BY MS. REPLOGLE:**

10   **Q.**   So looking at Mr. Bodley's email below, what

11   information -- what was Mr. Bodley conveying to you on

12   December 15th, 2009?

13   **A.**   He's agreeing that wireless is the way forward and that

14   Bluetooth is the obvious choice, but he's just reminding me

15   that we might still want to consider WiFi and, in particular,

16   WiFi direct, which is a way of using WiFi as an option.

17   **Q.**   Okay.  So did you understand Mr. Bodley to be in agreement

18   that wireless was the way forward?

19   **A.**   Yes.

20   **Q.**   Okay.  In the fifth paragraph there at the bottom or the

21   fifth last, like, kind of full paragraph there, what was

22   Mr. Bodley proposing to do for the next steps?

23   **A.**   So where it says, "I would like" -- okay.

24       [As read]:

25           "I would like to propose . . . ."

1    So here, he's wanting us to get moving and commit to,

2  you know, paying him to do work with us.  And so he's saying:

3  Hey, Richard, let's commit to an effort that will be

4  time-bounded, meaning a fixed amount of time.  It'll be six to

5  eight weeks where we can build a prototype and prove out that

6  concept.  It's a way to get moving quickly.

7  **Q.**   Okay.  And how did you respond?  What did you respond?

8  **A.**   I -- I'm just waiting for this to update.

9    I'm thanking him.  And also, I look at the links and that

10 Laura and I are working very closely on this, so he needs to

11 keep her informed as we move forward, and that we're committed

12 to doing this and I'm going to get a contract in place.

13 **Q.**   Okay.  Now --

14 **A.**   I'm saying I'm going to send it tomorrow.

15 **Q.**   Now, Mr. Bodley, down on the -- in this first email to

16 you, does Mr. Bodley kind of express a preference for WiFi

17 direct method of implementation versus Bluetooth?

18 **A.**   I think he's saying WiFi might be -- might be easier,

19 but -- and that, you know, it'll be more complicated to do it

20 with Bluetooth, but he's going to go with what I want.

21 **Q.**   Yeah.  If you go down to the fourth paragraph of

22 Mr. Bodley's email, he does say there [as read]:

23       "The options really do explode . . . ."

24    Is he referring to if he did the WiFi direct, I guess,

25 connection?

MANDER - DIRECT / REPLOGLE

1    **A.**    Yes.

2    **Q.**    But then he says [as read]:

3              ". . . with far less complexity than Bluetooth."

4    What did you understand him to be referring to there?

5    **A.**    He's referencing -- which was what some of these things

6    are about.  He's referencing a sort of industry move to various

7    companies maybe making it easier for you to connect things

8    using WiFi direct but -- and just wanted to be aware of that.

9    **Q.**    Sure.  Why would such a move to WiFi direct be far less

10   complex than Bluetooth at this point in time in December of

11   2009?

12   **A.**    Well, he's getting a little ahead of himself because he's

13   assuming that the industry is going to adopt these things.  And

14   so he's -- he's a little nervous about what it will take to

15   actually get it done with Bluetooth because it isn't supported.

16   We're going to have to invent it.  Yeah.

17   **Q.**    At this point in time, in December of 2009, had anyone

18   streamed video wirelessly from a camera to a phone?

19   **A.**    Not that I was aware of, no.

20   **Q.**    Now, in the next paragraph where he was proposing that

21   prototype phase that we spoke about just a little bit ago, he

22   actually -- he suggests "where we build and implement a

23   viewfinder system based on" -- and he has WiFi, Bluetooth, and

24   then USB.  And he goes on to describe this prototype phase.

25              My question is:  Why the proposal to prototype both a

1   WiFi, Bluetooth, and a USB connection?

2   **A.**   So those slashes between those words, WiFi, Bluetooth,

3   USB, that means "or."  So he's -- I've worked a lot on

4   prototyping things and taught him a lot about prototyping.  And

5   one of the things we believe in is that you -- when you're

6   prototyping, you don't limit yourself to ultimately what the

7   real product might be.  You just build a prototype that lets --

8   provides you with a platform, a way to experiment.

9        And so he's saying:  Let's get on with this, Richard.

10   Let's use WiFi, Bluetooth, USB, whatever we need to do to try

11   this out and prove out the concept.

12   **Q.**   And, again, what was the concept that you had come up

13   with?

14   **A.**   The concept was to be able to send video between a thing

15   we would call a camera and an iPhone wirelessly.

16   **Q.**   So as of -- we've gone through now a few of these emails

17   and also that Ambarella datasheet as well.

18        At this point in time, December 15th, 2009, what were

19   you -- what was your idea and what had formed in your mind as

20   to what you intended to build for the viewfinder project?

21   **A.**   I was very committed to having it be a wireless way they

22   send video to the iPhone and, as well, to provide some

23   ability to change controls on the camera, and I wanted to do it

24   with Bluetooth.

25   **Q.**   Now, we had referenced -- or we'd seen earlier in

1    Ms. O'Donnell's email to you some mentions about remote

2    configuration of camera settings.  Do you recall that?

3    **A.**    Yes.

4    **Q.**    So by this point in time, December 15th, 2009, was that

5    going to be part of your implementation going forward on the

6    viewfinder project?

7    **A.**    So I didn't quite catch that last part.

8    **Q.**    Sorry.  We had seen before in Ms. O'Donnell's summary of

9    some requirements for the Scout project, and she had referenced

10    that remote configuration of camera settings.  Do you recall

11    that?

12    **A.**    Yes.

13    **Q.**    Okay.  And so my question is just simply, that was in

14    November 2009.  Now, we're in December 15th, 2009.  What was

15    also your ideas going forward in how you would build and

16    construct this viewfinder project as part of the Scout camera?

17    **A.**    That we would -- we would build a physical prototype that

18    would have -- would have a camera and that would let us

19    simulate what the ContourGPS camera might be like.  So we would

20    have a camera, and it would attach to a small desktop computer,

21    and then we would build some software on that that would then

22    allow the -- a signal to be sent by -- using Bluetooth

23    wirelessly to an iPhone, using our own protocol we'd have to

24    build.  And on the iPhone, we would have a mobile app that

25    would be able to understand that special protocol and display

1  video and let us ideally change settings on the camera and

2  experience it.

3  Q.  And as to the streaming of the video, what did you know

4  about the Ambarella A5s chip as far as the resolutions of those

5  two outputs?

6  A.  So the Ambarella A5 system on chip was -- had the ability

7  to output a regular high-definition video stream that could be

8  stored or viewed and, at the same time, simultaneously, it

9  could produce a low-resolution stream.  And so that was

10  something Laura had wanted me to take advantage of, like

11  exploit, do something -- some interesting things with.

12      And I could see that that might be a way we could -- we

13  could incorporate some of that into our prototype.

14  Q.  And specifically, how were you going to incorporate the

15  high-resolution video and the low-resolution video and turn it

16  in a wireless fashion with respect to your implementation?

17  A.  So, ultimately, you could potentially send the

18  high-resolution video over radio to another device.  But it's a

19  lot of data.  And it wasn't really, you know -- really, clearly

20  wasn't possible at the time.

21      And so because these -- high-resolution video was new and

22  they have very big files, so that really wasn't a possibility.

23      But the low resolution could be a source for where we

24  could get some video that would be smaller in terms of size and

25  resolution and that we could take that and work with it to

1  create video that would suit our purpose for sending wirelessly

2  to the phone.

3  **Q.**   Let's move forward into 2010.  Take a look at

4  Exhibit 1280.

5       And let me know -- are you there, Mr. Mander?

6  **A.**   Yes.

7  **Q.**   All right.  Is Exhibit 1280 an email from you to

8  Ben Bodley, now into the next year, dated February 8th, 2010?

9  **A.**   Yes.

10       **MS. REPLOGLE:**  Okay.  Your Honor, I move to admit

11  Exhibit 1280.

12       **MR. HAYNES:**  No objection.

13       **THE COURT:**  It's admitted.

14       (Trial Exhibit 1280 received in evidence.)

15  **BY MS. REPLOGLE:**

16  **Q.**   Why were you sending Mr. Bodley some quick thoughts on

17  usage at this time for the viewfinder project?

18  **A.**   So Ben had asked for this.  And it's because, in

19  developing product features -- I learned this at Apple and

20  applied it ever since -- it's really important to think about

21  who's going to use the product and what is it they're trying to

22  get done and to focus your design and engineering around that

23  user and what they're trying to do.

24       And so I'm sharing with Ben who the user is and sort of,

25  high level, what are the main things that matter that we want

1  to do, and that helps focus him.  Otherwise, he's going to go

2  off and do all kinds of crazy stuff.

3        So it's just:  Let's get this done.  All right.  This is

4  what matters -- right? -- this thing.  This is the highest

5  priority.

6  **Q.**   And how -- in that very first full paragraph after you to

7  Ben, you say "our typical camera user."

8        Yeah.  So how do you describe your typical camera user to

9  Ben Bodley at this point in time?

10  **A.**   So in those days -- it's a little different now; but in

11  those days, a lot of people, early adopters of these kinds of

12  cameras were young men.  They were into doing somewhat

13  dangerous things outside:  snowboarding, mountain biking,

14  motorcycle, car racing, skiing, jumping off buildings with

15  parachutes, things like that.  So they're doing very active

16  things, and they want to capture that and they want to share it

17  with their friends, show them these things they've done.

18  **Q.**   Sure.  Now, for the items that you list there for

19  Mr. Bodley, what was the very first one that you identified for

20  him?

21  **A.**   So the first one was something that I discovered myself

22  using the cameras and that I also learned many users had

23  challenges with, and that is that you're attaching this camera

24  to the side of your helmet.  Hopefully, you're wearing a helmet

25  to keep yourself safe, and you attach the camera there.

1    And one of the challenges is when you don't -- you can't

2    see what the camera is seeing till later when you look at the

3    video it's captured.  And so the camera may be -- the view may

4    be obscured by part of the helmet, or you may have the camera

5    mounted in a way where the view is not level.

6    And so that was really problematic because you'd end up

7    doing the thing you were doing and later, when you look at your

8    video, it would be half full of a helmet or not level.

9    So we wanted a way to see what the camera was seeing and

10   catch that, fix it.

11   Q.  Sure.  So was this -- just to be clear, was this the first

12   time that you had thought about that particular use case?

13   A.  No.  This was -- I'm communicating it to Ben to keep him

14   very focused.  I'd thought of this back in October 29.

15   Q.  And let's take a look the Item Number 2.  Could you just

16   describe what Item Number 2, use case, is all about?

17   A.  Yes.  So after the first priority, which is just getting

18   the camera aiming the right way, the next thing is that there

19   are settings on the camera to tell it what kind of video to

20   capture; so, for instance, to say I want video versus I want

21   just a still picture every minute.  So you want to make sure

22   that you've got the camera with the right settings so you're

23   going to end up with the video you want, the type of video.

24   And then, secondly, there are some -- there were some ways

25   to configure the camera, like what kind of exposure is it

using?  How dark is the image?  What is the contrast?  So if

you get those things wrong, then you're going to get

bad-looking video.  So you want to be able to check the

settings and make sure that they're the ones you want without

plugging it into a laptop.

**Q.**   Sure.  And, again, is this the first time that you're

thinking about these considerations at this point in time in

February 2010?

**A.**   No.  It's very similar to the aiming of the camera,

something I became aware of in -- when I first started at

Contour.

**Q.**   And Item Number 3, what are you describing there to

Mr. Bodley?

**A.**   So here, we're saying that it would be very helpful if you

could look at the files, you know, pretty quickly after you've

taken them.

So oftentimes, people are out in a remote place where

they're doing this.  They're on a ski field; they're out in the

forest; they're at a beach.  And it's like, I want to be able

to look at my video now and I may want to share it with

somebody, meaning upload it to someone so they can look, upload

it to a website.

So there's a potential that because there is the

high-resolution file and the QVJ file, which is a smaller file,

that you could play it back right there, maybe on your phone,

1  or you could even upload it to the Contour website before you

2  got home, because it's a smaller file.

3  Q.  All right.  Let's take a look, go a little bit further in

4  time to Exhibit 2010.

5      All right.  Is Exhibit 2010 an email from yourself to an

6  individual at Ambarella and cc'ing Laura O'Donnell, dated

7  March 17th, 2010, related to the Scout project?

8  A.  Yes.

9      **MS. REPLOGLE:**  Your Honor, I'd move into evidence

10 Exhibit Number 2010.

11     **MR. HAYNES:**  No objection.

12     **THE COURT:**  It's admitted.

13     (Trial Exhibit 2010 received in evidence.)

14 **BY MS. REPLOGLE:**

15 Q.  So what were you asking Ambarella about?  What's the

16 context of this email?

17 A.  So Rio is in -- he worked in Taipei, Taiwan, and he was

18 our connection on the Ambarella SDK team, so he was our contact

19 with software questions.

20     And I had heard from Salix, which is the company that was

21 going to manufacture the camera for us.  They had told me that:

22 Hey, here are these -- on the second -- yeah, what Salix had

23 said here is:  We've looked at the video that you get from the

24 samples, and it looks like we're not getting the second stream

25 for some of the videos.  So we're getting the high-resolution

1    video, but not all of those high-resolution videos are coming

2    with the second stream.

3        So I was concerned about that.  So I'm asking Rio, is that

4    the case?  And why -- and can we -- why is that?

5    **Q.**   And so if I'm just looking at --

6    **A.**   So I needed the second video.

7    **Q.**   If I'm looking at 2010-2, the second page there --

8    **A.**   Yes.

9    **Q.**   -- after you list, like, several different video

10   resolutions there, you say [as read]:

11           "In particular, I want to make sure I understand

12       why," in the second bullet point item, "Why we can't

13       have a second stream with the 848 x 480 stream?"

14       Is that what you're referring to about your concern?

15   **A.**   Yes, both of them, the 1280 x 960 and the 848 x 480.

16       We're --

17   **Q.**   Sorry.  I didn't mean to interrupt you.  Are you finished,

18   Mr. Mander?

19   **A.**   Yes.

20   **Q.**   Okay.  I didn't mean to interrupt you at all.

21       All right.  And so what happened?  What did Ambarella

22   confirm as far as the fact of the two different resolutions?

23   **A.**   Well, it was good news.  Rio came back pretty quickly to

24   say:  Right now, the SDK is only providing the 16 x 9 video,

25   that's the certain aspect ratio, which made sense because

MANDER - DIRECT / REPLOGLE

1   that's the higher res- -- high definition.

2       And he said:  We just haven't tested the 4:3 ratio yet.

3   There's no limit to why it couldn't do that, and we will make

4   sure that the -- that we do have those two lower resolutions.

5       So that's good news.

6   **Q.**  Okay.  And your response back to Ambarella, you say in

7   that second paragraph there, you say [as read]:

8           "It is very important for our product that we

9       have a miniature video stream at each 'primary'

10      resolution."

11      Why do you say that?  Why was it very important that you

12  would have that for every single resolution?

13  **A.**  Because Laura wants me to -- made it very clear she wants

14  me to make use of this two-stream capability, and so I want to

15  make sure that our users can do that -- whatever feature I

16  build on top of that capability will be across all the

17  different videos types.

18  **Q.**  Now, obviously, at some point in time, did you convey to

19  Ambarella that you wanted to stream video wirelessly using

20  their A5s chip?

21  **A.**  Yes.

22  **Q.**  Okay.  And what was Ambarella's reaction to your idea of

23  streaming video wirelessly using their A5s chip?

24  **A.**  They thought it was interesting.  They were concerned that

25  we were already -- we had a very tight timeline and that we

1    were already doing a hard thing, which was to get the GPS to

2    work.  And so when we're now wanting to add another complicated

3    feature, they were concerned about whether we could get it done

4    or whether it would even -- could even work, yeah.

5    **Q.**   So they were concerned as to whether it could even work?

6    Is that what you just said?

7    **A.**   Yes.

8    **Q.**   Okay.  Did -- did you at some point convey to Ambarella

9    that you wanted to do it over Bluetooth --

10   **A.**   Yes.

11   **Q.**   -- specifically?

12   **A.**   Yes.

13   **Q.**   And what was Ambarella's reaction to that idea?

14   **A.**   They were a little frustrated.  They felt that that would

15   be very -- it wasn't supported.  No one had ever done it.  And

16   so they didn't think it was a good idea.

17   **Q.**   When you say "it wasn't supported," can you explain what

18   that means to the jury?

19   **A.**   So when you build a camera using something like

20   Ambarella's A5 system on chip processor, there are a bunch of

21   features that they allow -- make it easy for you to do.  And so

22   when they support a feature, that means they're going to make

23   it possible for you to do it.

24       If you want to do something that they don't support,

25   that's a problem.  So what -- what I'm saying is that Ambarella

1   didn't support Bluetooth, meaning they didn't make it easy for

2   you to do that.

3   **Q.**   Let's take a look at Exhibit 10.  Do you have that in

4   front of you, Mr. Mander?

5   **A.**   Yes.

6   **Q.**   Is Exhibit 10 an email chain -- it's over about three

7   pages -- between you, Mr. Mander, and individuals at --

8   individuals at -- let's just see -- Jason Huang?

9        Do you know who Jason Huang is?

10  **A.**   Yes.

11  **Q.**   And who was Jason Huang?

12  **A.**   So Jason is the -- was the manager of the SDK effort --

13  **Q.**   You say the manager?

14  **A.**   -- at Ambarella.

15       At Ambarella.

16  **Q.**   At Ambarella.

17  **A.**   Yes.

18           **MS. REPLOGLE:**  So I'd like to move into evidence

19  Exhibit Number 10.

20           **MR. HAYNES:**  No objection.

21           **THE COURT:**  It's admitted.

22       (Trial Exhibit 10 received in evidence.)

23  **BY MS. REPLOGLE:**

24  **Q.**   Were there -- you just described what it sounded like to

25  me just certainly some resistance that you were receiving from

1    Ambarella.

2         When you look at the back-and-forth that occurs in Exhibit

3    Number 10, is that an example of exactly that?

4    **A.**    Yes.

5    **Q.**    Okay.  And so let's just go all the way back to page

6    Exhibit 10-3.

7    **A.**    I see it.

8    **Q.**    Are you there?

9         And at the very bottom, are you sending an email to

10   Ambarella, Jason Huang?

11   **A.**    Yes.

12   **Q.**    Okay.  And Jason -- what, basically, were you conveying?

13   What were you asking Ambarella in that particular email?

14   **A.**    I'm letting him know that we're advancing with the

15   wireless connection and that we're still deciding whether to

16   use Bluetooth or WiFi and that we -- and, also, which sensor

17   we're going to use.

18        So I'm letting him know there's a lot of balls in the air,

19   if you like.  There's a lot going on.  And we're going to

20   need to -- we want to finalize the decision about Bluetooth or

21   WiFi.

22   **Q.**    And if we look at the email response back from Ambarella,

23   right in the middle of that email, what does Ambarella

24   convey -- what do they say to you?

25   **A.**    So he's trying to be kind of gentle with me, but he -- so

1    he answers -- the first sentence, he's answering a sort of

2    specific question, and then he's -- in the first two sentences.

3         Then he's pointing out that there's a little bit of

4    frustration, that there's too many unfinalized features on this

5    project.  It's hard for Ambarella and WT to -- you know, to

6    devote as much time as he thinks we might need to it because

7    we're not -- we're a small customer.  And he wants me to get a

8    little more focused and -- you know, with the feature set and

9    get those things executed and even consider, you know, maybe

10   using someone other than Salix, someone who would have more

11   capability to help us.  So he's expressing some frustration.

12   Q.   Okay.  And what was --

13   A.   In fact, actually -- I'm sorry.  This is -- oh, sorry.

14   This is Jason, yes.

15   Q.   Okay.  And what was -- what was your reaction to this

16   email chain?  What did you think about what his concerns were?

17   A.   I wanted to -- you know, it's fair.  I wanted to

18   acknowledge his concerns.  And then I wanted to, you know, keep

19   pushing forward.  So I'm -- yeah, yeah.

20   Q.   Were you under a short timeline?  What was the deadline

21   for this project?

22   A.   We needed to ship -- have this camera come to market,

23   meaning someone -- we could announce it and someone could buy

24   it in September of 2010 at the latest.

25   Q.   And at this point, this is April 2010, just a few months

1  before?

2  **A.**    Yes.

3  **Q.**    Okay.  And so if we go to what your response is on 10-2.

4  **A.**    I see it.

5  **Q.**    Mm-hmm.  You state there in that first paragraph

6  [as read]:

7           "We too would like to finalize the feature set."

8     And then you continue onward.  What did you say in

9  response?  What were you conveying to him?

10  **A.**    So I was trying to break it down and make it a little --

11  you know, show him that I think it's doable.  So I'm saying:

12  Hey, number one, we have to pick which of two sensors we're

13  going to use.  Is it the OmniVision or Aptina?  So we're going

14  to make a circuit board for each and we'll test them, and then

15  we'll move forward with one of them.  So that's relatively

16  straightforward.

17     Number two, WiFi versus Bluetooth, I'm acknowledging that

18  Ambarella prefers --

19           (Reporter interrupts to clarify the record.)

20  **BY MS. REPLOGLE:**

21  **Q.**    Slow down.

22  **A.**    Number two, WiFi versus Bluetooth, I'm acknowledging that

23  we need to make a decision between WiFi and Bluetooth.  And I

24  know that Ambarella favors WiFi, but I'm not ready to rule out

25  Bluetooth.

1    And so I'm asking him to, you know, tell me -- you're

2    saying it's hard to commit to help us.  Well, what would the

3    schedule be for doing WiFi?  And what would be the schedule for

4    doing Bluetooth?

5    I've learned that's not a good thing to ask, and you'll

6    see later why.  But it's -- I'm actually asking him to do more

7    work.  Tell me how long it would take to do each one.  So it's

8    like now he has to go do more work.  So -- and we're ready to

9    start designing the circuit board, the PCB.

10   **Q.**   You say in the second paragraph there [as read]:

11            "WiFi versus Bluetooth.  I know you favor WiFi."

12   Did Ambarella favor the WiFi implementation as far as

13   getting them on board to help on that project with respect to

14   their chip?

15   **A.**   Yes.  I think -- they did.

16   **Q.**   Yeah, they did.

17   Okay.  What was Ambarella's response?  I just want to

18   refer you to a couple of things there.

19   In the first paragraph in his email back to you at the

20   lower -- the end of that paragraph, he says [as read]:

21            "I know VholdR has good potential, but as I

22            mentioned above, we do have limited resources and the

23            type of work you mentioned below are normally done by

24            ODM house instead of Ambarella WT staffs.  Please

25            take that into consideration."

1          When he's referring to VholdR, what is he referring to?

2     Your Contour camera?

3     **A.**    No.   VholdR was kind of the company name at the time.

4     **Q.**    And so what did you understand him to be saying here?

5     **A.**    He's saying:  You're going to be developing something on

6     our chip.   Your company has a lot of potential, which basically

7     means we might sell a lot of cameras, and that's good for

8     Ambarella because every camera will have one of their chips in

9     it.   So that's what he means by "you have good potential."   But

10    he's saying:  We have limited resources, and what you're asking

11    for isn't -- wouldn't normally be done by us, so please take

12    that into consideration.

13         So we're sort of pushing a little too hard on what we can

14    expect Ambarella to do for us.

15    **Q.**    Okay.

16    **A.**    Yeah.

17    **Q.**    And, in fact, as he says in that next paragraph, was your

18    project going to be the only one that would be using Bluetooth?

19    **A.**    Yes.

20    **Q.**    All right.   And that's consistent with your knowledge that

21    nobody else had tried to implement wireless using Ambarella's

22    A5 chip or any other chip, for that matter?

23    **A.**    That's right.

24    **Q.**    Okay.   All right.   So just -- taking just a step back for

25    a second because there's a lot in Exhibit Number 10, how did

1  you feel about the interaction between you and Ambarella in

2  trying to go forward with your vision of the viewfinder

3  project?

4  **A.**  How did I feel about it?

5  **Q.**  Yeah.

6  **A.**  I was a little frustrated.  I've been on the other side of

7  these things.  I've been in the position Ambarella was in.  So

8  I understand their viewpoint.

9       But I was going to find a way.  And so at some point,

10  you know, we're going to do it ourselves.  So in some ways,

11  it's helpful that they're saying no, because now I know:  Okay.

12  We're going to have to do it.  Good.  We'll get on with it.

13  **Q.**  So you finally came to the conclusion you had to do it

14  yourself?

15  **A.**  Yes.

16  **Q.**  Okay.  Let's take a look at Exhibit 2182.  And we're

17  moving into -- excuse me.  I said -- did I say 2082?

18       Yeah, 2182.

19       Are you there, Mr. Mander?

20  **A.**  I'm not finding it.  2182?  It's on the screen.  It's

21  okay.

22  **Q.**  And it should be -- it should be in your book as well if

23  you need to reference that copy.

24       But is -- go ahead.  Take your time.

25  **A.**  I'll look at it on the screen.

1  **Q.**   You can see it?  Okay.

2      Is Exhibit 2182 an email from you to Ben Bodley, cc'ing

3  Laura O'Donnell, related to the Scout project?

4  **A.**   Yes.

5          **MS. REPLOGLE:**  Okay.  Move into evidence Exhibit 2182.

6          **THE COURT:**  Any objection?

7          **MR. HAYNES:**  No objection.

8          **THE COURT:**  It's admitted.

9      (Trial Exhibit 2182 received in evidence.)

10  **BY MS. REPLOGLE:**

11  **Q.**   Okay.  And what's the date of this email between

12  yourselves?

13  **A.**   It is April 14th, 2010.

14  **Q.**   At the first email below, so the beginning email from

15  Mr. Bodley to yourself, what is he telling you about?

16  **A.**   So we have a prototype in New Zealand where Ben is, and

17  he's giving me an update about what's happened.  So he's made a

18  lot of progress in the last 48 hours.

19      And he's saying that at this point, you can start the

20  connection between the camera prototype and the phone by

21  pressing a button on the camera.  That's something we knew we'd

22  need to with Bluetooth.  And he's also -- so, that's great.

23      He's also able to send video from the prototype to the

24  iTouch, which is great, over Bluetooth.  So that's incredible.

25  Major success.

1    **Q.**    Yeah.  No, it is.

2        What was your response to him?

3    **A.**    So I'm trying -- saying, you know, good job.  Fabulous

4    progress.  And also saying, you know, this is the value of

5    building a prototyping platform.  Good job.  And then also

6    acknowledging that -- because the other thing he mentioned was

7    the frame rate he's actually getting and that he was able to

8    display on the iPhone video a number, which was how many

9    frames per second is being shown.  And he was getting a really

10   good frame rate, even at this early stage.  We're getting five

11   to seven frames per second.

12       And I knew that was -- worst case, that was fantastic.  We

13   could go to market with that.  I'd be happy with that.  I knew

14   it would probably get better, but this is magic to be at this

15   point.

16   **Q.**    Yeah.  No, it is.

17       So at this point in time, April 14th, 2010, did you have a

18   working prototype of your invention?

19   **A.**    We did.

20   **Q.**    Okay.  Had Contour, by this point in time, made the

21   proprietary protocol as well to communicate over that Bluetooth

22   module?

23   **A.**    Yes.  We had a first version of it.

24   **Q.**    And were you, in fact, able to pair the Bluetooth module

25   to the iPod Touch?

MANDER - DIRECT / REPLOGLE

1   A.   Yes.

2   Q.   And so using the prototype that you had created, that

3   Mr. Bodley had built, was Contour able to stream video

4   wirelessly across a Bluetooth module to an iPod Touch?

5   A.   Yes.

6   Q.   Did Mr. Bodley end up sending you one of these prototypes

7   to the United States?

8   A.   Yes.

9   Q.   Okay.  Take a look at Exhibit 21.

10  A.   I see it.

11  Q.   And is Exhibit 21 an email between yourself and Laura

12  O'Donnell and Ben Bodley dated April 27th, 2010?

13  A.   Yes.

14       MS. REPLOGLE:  Your Honor, I move into evidence

15  Exhibit 21.

16       MR. HAYNES:  No objection.

17       THE COURT:  It's admitted.

18       (Trial Exhibit 21 received in evidence.)

19  BY MS. REPLOGLE:

20  Q.   And looking down at the very first email at the bottom

21  from yourself, had you now received that Orca prototype in the

22  United States?

23  A.   Yes.

24  Q.   And it says "Orca prototype," and I think that's the first

25  time we heard that.  What's it referencing?

**MANDER - DIRECT / REPLOGLE**

1   **A.**   I believe in using code names, and so we had decided to

2   call the prototype of the viewfinder Orca.

3   **Q.**   And let me just make sure I heard you correctly.  Did you

4   just say you decided to call the proprietary portion Orca or --

5   **A.**   It's really the whole -- the whole feature, the viewfinder

6   feature.

7   **Q.**   Okay.

8   **A.**   Orca.  Later we broke it up into parts, but Orca was the

9   higher-level feature.

10   **Q.**   So once you received the Orca prototype, were you able to

11   get it up and running?

12   **A.**   Yes.

13   **Q.**   And you state again at the bottom, that first email, you

14   say [as read]:

15           "It is interesting to hold the webcam up at the

16       side of your head and imagine you are positioning the

17       camera and looking at the viewfinder on the iTouch."

18       Do you see that?

19   **A.**   Yes.

20   **Q.**   All right.  And so I'm trying to kind of picture it and

21   how that actually looked and what does an Orca prototype look

22   like.

23       Can you come on down, if we have time, and --

24   **A.**   Sure.

25   **Q.**   -- and explain it on this right here.

 1              (Witness steps down and walks to easel.)

 2         **THE WITNESS:**  Does this work?  Ah, that's working.

 3      Okay.  I'm going to draw -- attempt to draw what was going

 4  on with the Orca prototype.  And so forgive my not-so-great

 5  drawing skills.

 6      So imagine here's a user.  So this is a person who wants

 7  to do something with an action camera.  And here's their head,

 8  eyes, mouth.  And up on the side of their head is going to be a

 9  camera, an action camera.  So here's their helmet, and here is

10  a camera.  Right?

11      Now, in our prototype, this is actually a Web camera, like

12  you might put on your computer.  So you've got a Web camera

13  with a cable coming down.

14      Now, down here on the table we have the rest of the

15  prototype.  And what that is, is there's a little Windows PC

16  circuit board which you can buy to do this kind of thing, and

17  we plug the Web camera into it.  Right?

18      So now we have some software on here that Ben has created.

19  That's a software application.  And when the Windows machine is

20  running, it's using that software, and it can get the video

21  from the webcam.  So that is kind of like having an action

22  camera on the side of your head and you can hold it there.

23      Now, what we're going to do is we're going to use this to

24  send video to over here.  Imagine this person's other -- so one

25  arm is going up here holding the camera; the other arm is over

1    here holding the iPod Touch.  All right?  And on there,

2    there's another application, some more software that Ben has

3    used to build a mobile app.

4         And what's going to happen is this iPod Touch can do

5    Bluetooth.  So the way you draw that is you show the sort of

6    radio, so that's a Bluetooth radio system.  And over here we've

7    got -- we added in a Bluetooth little dongle, so this has got

8    Bluetooth as well.

9         And what we're going to do is we're going to send -- over

10   this radio, we're going to send video, which is not meant to be

11   possible.

12        So how this works is, there's a little -- a little button

13   here; and you -- and also, there's a special thing which is

14   called the made-for-iPod chip, because Apple at the time --

15   this -- our camera was going to be an accessory that would work

16   with the iPhone or iPod Touch.  And in order to have a

17   device connect to the iPod or iPhone, you had to have a special

18   chip, security chip.  So we happened to have one of those.  So

19   we put them on there.

20        Now, what Ben's software does, and we knew how to do this,

21   it knows how to do all this.  So what happens is, you're now

22   ready to pretend that you're using the ContourGPS camera with

23   Bluetooth to connect to your iPhone and have a viewfinder.

24        So you hold this up here, you press this button.  That

25   causes a signal to go out to say:  Hey, I'm here.  I'm

1   Bluetooth.  I want to connect to somebody.

2       The mobile app sees that and establishes the connection,

3   asks to see -- because it's an iPhone, it says:  Hey, fair

4   enough, but I want to see -- where's the made-for-iPod chip?

5       And so we say:  Hey, here we are.  We've got a

6   made-for-iPod chip.

7       And it says:  All right.  I'm going to connect to you.

8       And now the video coming through from the webcam is going

9   over this connection using our protocol.  So this is the

10  Contour video protocol, our own proprietary protocol coming

11  over here.

12      And on this software on the mobile app Ben created, it

13  knows how to work with it, so we display video.

14      Now, what you can do is you can look around.  And in your

15  hand, you're looking at a viewfinder and seeing what the camera

16  is seeing.  It's an incredible thing.

17      So now you can adjust -- you can say:  Oh, what if it's

18  off?  I can see my helmet.  What if it's not flat?  You can

19  adjust it.

20      And then you could also, later, change settings here and

21  change what the type of video.

22      So that was the Orca.  That's the Orca prototype.  And

23  people were -- it was pretty amazing.  You could really imagine

24  this could work.  Right?  Yeah, sure.

25                  (Witness resumes the stand.)

MANDER - DIRECT / REPLOGLE

1    BY MS. REPLOGLE:

2    Q.    So with the Orca prototype, had you proved your concept?

3    A.    Yes.

4    Q.    All right.  And, to your knowledge, had anyone done that

5    before you did?

6    A.    No.

7    Q.    All right.  So let's turn to kind of some of those next

8    steps.

9          Did you -- upon -- showing and doing the demonstrations of

10   the Orca prototype, did you go and show your prototype to

11   anyone else?

12   A.    Yes.  We showed it to everybody in the office.  There was

13   a lot of excitement.  And then we took it -- or Laura took it

14   to San Jose, California, to show Ambarella.

15   Q.    Was anyone surprised once you did the demonstration to

16   them?

17   A.    I think everybody who saw it was surprised, and in

18   particular, the Ambarella team was surprised.  Yeah.

19   Q.    All right.  And so you said you took it to Ambarella.  Did

20   you attend any of those visits to Ambarella yourself?

21   A.    I didn't go to that visit.

22   Q.    And who was it that did?

23   A.    Laura O'Donnell.

24   Q.    Okay.  Can you take a look at Exhibit Number 8?

25   A.    I see it.

1  Q.   Okay.  Is Exhibit Number 8 an email between yourself and

2  Laura O'Donnell and Ben Bodley dated May 14th, 2010, related to

3  the Orca prototype?

4  A.   Yes.

5       **MS. REPLOGLE:**  Your Honor, I move to admit Exhibit

6  Number 8.

7       **MR. HAYNES:**  No objection.

8       **THE COURT:**  It's admitted.

9       (Trial Exhibit 8 received in evidence.)

10  **BY MS. REPLOGLE:**

11  Q.   Okay.  So is Exhibit Number 8 discussing the demonstration

12  that was done for Ambarella by Laura O'Donnell?

13  A.   Yes.

14  Q.   Okay.  And where do you see that here?  Could you just

15  direct me.

16  A.   So in the middle where Laura says [as read]:

17       "Huge kudos to you both for the Bluetooth demo.

18       It was a big hit and won Didier over the Bluetooth

19       for our product."

20  Q.   Okay.  And who was Didier?  Do you know?

21  A.   So Didier LeGall was one of the founders of Ambarella.

22  And I forget his role, his actual job title at the time, but he

23  was an extremely important person at Ambarella who was going to

24  need to agree to what we were doing.

25  Q.   Right.  Because you were --

1    **A.**    To be allowed to use their chip, basically.

2    **Q.**    And it says -- Ms. O'Donnell says [as read]:

3           "It was a big hit and won Didier over the

4           Bluetooth for our protocol" -- "for our product."

5           Excuse me.  What did you understand her to mean by that,

6    won him over?

7    **A.**    You know, convinced him that this could work.

8    **Q.**    Because --

9    **A.**    Where he had felt it wasn't -- that we were, in a way,

10   wasting our time, that it wasn't possible; that now he had seen

11   it, he was won over.  Like he's a believer now, yeah.

12   **Q.**    And when you say that you understood that he believed that

13   it wasn't possible, what was the "wasn't possible," just to

14   be --

15   **A.**    That Bluetooth didn't support sending video, Bluetooth

16   didn't have a lot of bandwidth, and that, you know, even having

17   any kind of wireless viewfinder was going to be difficult, and

18   that Bluetooth was not going to -- not going to be viable.

19   **Q.**    Up until this point in time, had Ambarella indicated to

20   you, as you understood it, that they believe that a wireless

21   solution of sending video using their A5s chip was possible?

22   **A.**    Sorry.  Could you repeat that?

23   **Q.**    Well, up until this point in time, had Ambarella believed,

24   to your knowledge and how you understood your interaction with

25   Ambarella, had they indicated that they believed that this was

1   going to work?

2   **A.**   They didn't think it would work.

3   **Q.**   Did -- well, let's just turn to the next exhibit, 1282.

4        Are you there?

5   **A.**   Yes.

6   **Q.**   Okay.  Is 1282 an email between yourself, to and from with

7   a Charles Lee and others, dated August 16th, 2010 --

8   **A.**   Yes.

9   **Q.**   -- related to this project?

10  **A.**   Yes.

11       **MS. REPLOGLE:**  Okay.  Your Honor, I'd move to admit

12  Exhibit Number 1282.

13       **MR. HAYNES:**  No objection.

14       **THE COURT:**  It's admitted.

15       (Trial Exhibit 1282 received in evidence.)

16  **BY MS. REPLOGLE:**

17  **Q.**   Now, this email kind of spans a few pages.  I want to go

18  to the very, very back page, so 1282-5.

19  **A.**   I see it.

20  **Q.**   And if we look starting in the middle, the email from

21  Charles Lee, who is Charles Lee?

22  **A.**   Charles was an engineer at WT, which was a company that

23  was kind of in between us and Ambarella.  So they were

24  supporting us.  They were the ones actually using the Ambarella

25  SDK to help us create our camera application that ran on the

1  camera.

2  **Q.**  Had you hired this company WT to build a component or

3  parts of this particular product?

4  **A.**  Yes.

5  **Q.**  Okay.  And so you had hired them in order -- as a --

6  anyway, scratch that.

7      Okay.  So what does Charles Lee -- has he forwarded you a

8  particular email?

9  **A.**  Yes.  He's forwarded what was, in a way, an internal email

10  amongst people at Ambarella that he was copied on.

11  **Q.**  He says in his email [as read]:

12          "Please refer the reply from Ambarella show in

13      below.  Seem like the video frame data size is too

14      huge.  We need to seek other ways."

15      Is that what Mr. Lee conveys to you?

16  **A.**  Yes.

17  **Q.**  Okay.  And so when you look at this internal email that

18  he's copied on at Ambarella, what is Ambarella saying in that

19  particular environment there?

20  **A.**  So, you know, it's a sort of engineer-to-engineer email.

21  And Rio, who we know, is saying [as read]:

22          "I think it is NOT acceptable for video."

23      Not -- when you use capital letters -- it's an email --

24  it's effectively using a loud voice.  It's sort of shouting

25  something.  So he's being very strong [as read]:

1          "I think it is NOT acceptable for video."

2          **PLAINTIFF2:**  And what he's referring to is the second

3    paragraph where he's saying -- Rio is the -- our contact at

4    Ambarella, and he's telling other people at Ambarella and

5    Charles that it's not good for the SDK team to spend time

6    preparing useless test code.  You know, we need to make sure

7    that we can actually do it, that it's deliverable and

8    acceptable before we start doing engineering jobs.

9          And then above, he's saying what he means by that.  He's

10   saying that he basically doesn't think it's going to work to

11   send video over Bluetooth.  And so he's showing some math.

12   He's saying a 320 x 240 video frame has 320 x 240 by 1.5 times

13   8 bits.  That's 921 kilobits.  Bluetooth will be too slow.  It

14   will only be able to -- if you do that, you'd only -- you could

15   only get one frame a second.  And then he's saying, for video,

16   you know, you can't have one frame a second.  You really need

17   like 15 frames a second.

18         So he's expressing frustration, and Charles is sharing

19   that with Ben and myself.

20   **Q.**   And did Mr. Bodley then proceed to try to explain what

21   your idea was --

22   **A.**   Yeah.

23   **Q.**   -- and how they were misunderstanding?

24   **A.**   Yes.  So, you know, these guys are frustrated and upset.

25   And so Ben is trying to explain, because I think there's a

1    misunderstanding.  So he's trying to say:  Wait a second.

2    You know, the math isn't quite right.  You know, we're actually

3    going to make the video smaller.  You know, that's our plan.

4    You know, you're right, you know, the way you're talking about

5    it; but basically, we're going to make the video smaller and

6    that will get us, you know, six to ten frames per second.

7    **Q.**   And so did Mr. Bodley then ask for some example kind of

8    videos?

9    **A.**   Yes.

10   **Q.**   Okay.  And then what was the response, if you're moving up

11   on page 1282-4 to -- what does Charles Lee say in response?

12   **A.**   So there's an exchange where -- because what we need at

13   this point is we need samples of the video coming from the

14   actual Ambarella system on chip.  And so we're asking Charles,

15   who has an Ambarella development system, we're saying:  Could

16   you just please provide us some sample video.

17       And so he's seeking clarification about what do we want.

18   So he's saying there's these different high resolutions, and

19   we'll give you the low resolution ones for them.

20   **Q.**   Okay.  And if you turn to 1282-3, the bottom there,

21   Mr. Bodley's response to Mr. Charles Lee on August 17th, 2010,

22   he says there [as read]:

23          "As Richard just said, we are looking to

24          transfer the QVGA file the A5 generates over

25          Bluetooth."

**MANDER - DIRECT / REPLOGLE**

1        Do you see that?

2   **A.**    Yes.

3   **Q.**    So was he having to try to explain that to the guys that

4   you had hired to help with this project?

5   **A.**    Correct.

6   **Q.**    Okay.  And he goes on further.  What's he describing there

7   as to the QVGA stream?

8   **A.**    He's explaining that it's our intention to use that

9   low-res QVAG stream for things like Web clipping and for our

10  preview over Bluetooth to make the viewfinder work.

11  **Q.**    And so once he explained that, then did he get some sample

12  video files with the dual stream with the low resolution and we

13  can see that at the top there?

14  **A.**    Yes.  So what had happened here is, you know, Ben had

15  asked for something but without saying why.  So once we say

16  why, now Charles understands, and he's going to actually --

17  he's adding value.

18       He's actually saying:  Well, you know what?  There's

19  actually two different aspect ratios of the high-resolution

20  video.  I will send you a sample -- low version of each.

21       That's what's his response is, which is great.

22  **Q.**    If we look at 1282-2, the follow-up email from Mr. Bodley,

23  there at the bottom of the screen where he says [as read]:

24            "Thanks Charles.  Much appreciated."

25       And then under Item 1, he says [as read]

1          "Where we cannot meet the streaming bit rate

2      requirements, can we adjust the second stream to a

3      lower frame rate, for example, 15 frames per second?"

4          What did you understand him to be referring to there?

5  What's he saying?

6  **A.**   So he's saying:  All right, that's great.  We're going to

7  get these samples.  If it turns out that they're still too big,

8  you know, meaning file size, to transmit over Bluetooth, is it

9  possible to have the SDK adjust what that frame rate is or the

10  quality?

11  **Q.**   So is Mr. Bodley just looking for maybe some alternatives

12  or some strategies to troubleshoot this to get it to work?

13  **A.**   He's seeking to learn whether we need to do this ourselves

14  or not, what can the SDK support.

15  **Q.**   Okay.  And what was WT's response to Mr. Bodley's

16  suggestion?

17  **A.**   So he -- they send us the files, and they say -- remind us

18  that you need to actually tell the camera -- you know, tell the

19  SDK to produce the second stream and that the second stream

20  type is MP4 or MOV.

21          And Ben is concerned about that.  So, basically, we learn

22  that they can't give us only 15 frames per second, that we --

23  **Q.**   Right.

24  **A.**   So that's a problem.

25  **Q.**   Right.  So we had just referenced where Mr. Bodley was

1    suggesting that you can adjust the second stream to a lower

2    frame rate like 15 -- like 15 frames per second.  And if you

3    flip to the first page of this email, what does Mr. Lee relay

4    to you both?

5    **A.**    That Ambarella doesn't support the 15 frames per second

6    encoding.

7    **Q.**    Okay.  So what did you have to do next?

8    **A.**    So it just means there's another thing we're going to have

9    to do.  We're going to have to take what is probably their

10   30 frames per second video, and we're going to have to

11   change -- work with that to get it to whatever it is we're

12   going to really need.

13   **Q.**    Okay.  And what -- well, so what were the steps that you

14   took then?  So this is August 16th, 2010.  And, again, what was

15   your deadline to launch the ContourGPS camera?

16           **THE COURT:**  Let me interrupt you for a sec.

17       Is this a good time to take a break?

18           **MS. REPLOGLE:**  Yes, it is.

19           **THE COURT:**  Okay.  Ladies and gentlemen, we'll take

20   our second break of the morning for 15 minutes, and we'll be

21   back at 12:25.

22       (Proceedings were heard out of the presence of the jury.)

23           **THE COURT:**  All right.  We'll be in recess.

24               (Recess taken at 12:09 p.m.)

25               (Proceedings resumed at 12:24 p.m.)

1    (Proceedings were heard out of the presence of the jury.)

2          **THE COURT:**  Are we ready to proceed?

3          **MS. REPLOGLE:**  Yes, Your Honor.

4    (Proceedings were heard in the presence of the jury.)

5          **THE COURT:**  All right.  Please be seated, everybody.

6    Please continue.

7          **MS. REPLOGLE:**  All right.

8    **BY MS. REPLOGLE:**

9    **Q.**  Where we left off, Mr. Mander, we were in the August 2010

10   time frame with that last exhibit, if you recall, where the

11   exhibits say that Ambarella couldn't support the 15 frames per

12   second.  Do you recall that?

13   **A.**  Yes.

14   **Q.**  Okay.  And so you're about a month out from your deadline

15   to release the ContourGPS camera.  Did you have any concerns as

16   the deadline was approaching?

17   **A.**  Yes.  It was definitely a stressful time.

18   **Q.**  And what were some of the concerns that you had at that

19   point in time?

20   **A.**  Well, at this point, we're four weeks away from, you know,

21   the first -- announcing the camera and showing it and people

22   being able to buy it.  And so we're very committed.  You know,

23   circuit boards are being made.  Cameras are being assembled.  A

24   lot of money is moving to make all that happen.

25         And one of the things that's going on is that, while I'm

1   very confident about a lot of the features in the camera, we

2   are literally putting a Bluetooth module into the camera; and

3   we know it's electrically going to work because we've tested

4   that, but we still don't know whether, in the final analysis,

5   will the software work well enough for us to actually use that

6   feature.

7       So, you know, there is a scenario where I get fired

8   because, you know, it turns out it's not working and someone's

9   going to be to blame.

10      So it was stressful, yeah.

11  **Q.**   For sure.  So as you approach that September 2010

12  deadline, was the wireless viewfinder feature, the software,

13  ready by the time you went to launch?

14  **A.**   For September?

15  **Q.**   Yeah, for the software aspect of it.

16  **A.**   No, it wasn't ready.

17  **Q.**   Okay.  So you move forward, though.  Was a camera

18  ultimately released September 2010?

19  **A.**   Yes, it was.

20  **Q.**   Okay.  And can you go ahead and step down just one more

21  time for us.

22  **A.**   Sure.

23  **Q.**   And what I'd like you to show to the jury is what

24  components was in the camera related to the wireless viewfinder

25  project to set that up.

1          (Witness steps down and walks to easel.)

2          **THE WITNESS:**  Do I need to leave this here?

3     **BY MS. REPLOGLE:**

4     **Q.**   Yes.

5     **A.**   Okay.  I'll try to draw from this side.

6          So you're asking me what components were in the camera?

7     **Q.**   That's right.  So the software hadn't been done yet, but

8     you still launched the camera.  What were the component parts

9     related to the wireless viewfinder feature that you would

10    eventually launch?

11    **A.**   Okay.  So -- get a different pen.

12         Okay.  So I'm drawing the camera, and -- I'll just get a

13    bit more of it drawn; then I'll explain what's going on.

14         I know I don't have to get it perfect but...

15         So just sort of generally, here's the camera.  Okay?  So

16    here's the lens, here's the body of the camera, and this is the

17    back of the camera.  And this part here actually opens.  It's a

18    door.  You can flip something and it will fold down.  There's a

19    button here that you can press and that makes the power go on.

20         And I'm going to go through what's inside it, which is

21    pretty interesting.

22         So inside there's quite a -- this is a tiny little thing,

23    but inside it there's several circuit boards.  There's one at

24    the front, which is round.  And that has -- so here's an

25    example, actually.

1      This is the ContourGPS camera, like this.  And so there's

2   a circuit board in the front that has the sensor on it, light

3   comes in, turns into electricity, lots of little amazing cables

4   that come through to a main circuit board that's in here.  And

5   on that is the -- somewhere on there is the Ambarella A5 system

6   on chip.  That's what -- it makes it easier for us to build a

7   camera.

8      There's also memory, and there's a slot on the back where

9   there's a little card, which is actually pretty tiny, but

10  that's where the video ends up.  You can take that out and

11  stick it in your laptop and play it.

12     And up the top, we added in another circuit board that has

13  the GPS on it and an antenna.  And there's another circuit

14  board which we added that sits on top here.  And in the world

15  of circuit boards, that's called a mezzanine board because,

16  just like in a building, it's a smaller upper floor, so it's

17  called a mezzanine board.  We added that in.

18     And on that, we had the Bluetooth module.  So this is the

19  Bluetooth part.  Here's a little antenna.

20     So -- and then another thing is there's a slot in the

21  back.  So the battery sits in here.  Takes up a lot of space,

22  actually.  But next to it on this mezzanine -- actually, on the

23  main circuit board, there's a little area where we have an SD

24  connector, and in that we have a block of plastic.  There's

25  nothing in it.  There's just something, a placeholder thing so

1  you can't see it.  But ultimately, you can take that out and

2  put a little card in that has the made-for-iPod chip in it.

3      So this is the basic concept of the camera.

4      And what happens is -- so when we shipped the camera in

5  September, people could buy it.  They didn't know, but it had a

6  Bluetooth module inside it.  And we didn't talk about the

7  Bluetooth module.  Just, it was there.  And that was all

8  perfectly legal.  But we weren't marketing it yet because,

9  you know, I wasn't convinced yet that it was working well

10  enough.

11      But once we had it working well enough, we could provide

12  people with an update.  Just like on your phone or your

13  computer, you get a update of the software, we could send

14  people an update.  They could update the software, and now that

15  Bluetooth thing would work.

16      Now, there's another thing which is -- if you remember on

17  the prototype, we talked about a button you had to press to

18  make the camera connect.  And that was actually up on the top

19  here.  So up on the top, there was a button, this little, tiny

20  switch underneath a membrane.  And we didn't talk about that

21  button.  No one knew it was actually there.

22      And this is all to do with a really interesting approach

23  that my boss Laura O'Donnell had, which is -- she would often

24  say this, "I want to surprise and delight people."

25      So what we're doing is, in a way, in the tech world, it's

**MANDER - DIRECT / REPLOGLE**

 1   called an Easter egg.  We're providing something that's going

 2   to surprise and delight them that they're going to find, right,

 3   like finding an egg.

 4        And so what happened is later, we could provide the

 5   software update.  We could tell people about the button.  They

 6   had trouble finding it, but we told them it was there.  And we

 7   could sell them this little card, and they could basically make

 8   the camera connect to an iPhone.  And they could get the

 9   Contour Connect mobile app and then, basically, over the

10   Bluetooth, you could see what your camera is seeing.

11        So that was -- it was all going to be -- it was all real.

12   All the magic happened.

13             **MS. REPLOGLE:**  Thank you.

14                  (Witness resumes the stand.)

15   **BY MS. REPLOGLE:**

16   **Q.**   So the ContourGPS camera was released in September of --

17   **A.**   Yes.

18   **Q.**   -- 2010; is that right?

19             **MS. REPLOGLE:**  Your Honor, as a demonstrative, is it

20   acceptable if I see if the jury would like to see it?

21             **THE COURT:**  I'm sorry.  Do you want to pass the

22   camera?

23             **MS. REPLOGLE:**  I would like to pass the camera to the

24   jury.

25             **THE COURT:**  That's okay.

MANDER - DIRECT / REPLOGLE

1          MS. REPLOGLE:  Okay.

2                    (Camera shown to jury.)

3    BY MS. REPLOGLE:

4    Q.    Okay.  So if I understood certainly correctly, that

5    camera, the ContourGPS, was shipped, but you didn't have the

6    software finalized where you felt comfortable to release the

7    wireless viewfinder feature; is that right?

8    A.    That's right.

9    Q.    Okay.  So what steps did you take next?  What happened?

10   A.    So we had to work really hard to solve a number of issues.

11   So Ben was working a lot of hours.  We were doing a lot of

12   testing to ensure that the -- that the video was -- even though

13   we'd shown it in the prototype, we had to make it work properly

14   in the camera now.

15        So we were needing to do all the things, all the steps in

16   the software and get them working well enough that it was a

17   feature that, you know, Laura and Marc Barros, the CEO, and me

18   would be -- I would be happy with.  So a lot of testing, a lot

19   of trying it out and tweaking it.

20   Q.    And did you end up filing any patent applications related

21   to the Scout project and what became the ContourGPS?

22   A.    We did.

23          MS. REPLOGLE:  Okay.  I'd like to show JTX-1, please.

24   And it's in evidence.

25   \\\

1    BY MS. REPLOGLE:

2    **Q.**    JTX-1, could you turn to that?

3    **A.**    Oh, yes, I have it.

4    **Q.**    Tell me when you're there.

5    **A.**    I have it.

6    **Q.**    All right.

7              **MS. REPLOGLE:**  Your Honor, I'd like to move into

8    evidence JTX-1 and JTX-2 if they are not already admitted.

9    It's the two patents assert in this case.

10             **MR. HAYNES:**  No objection.

11             **THE COURT:**  All right.  They're admitted.

12        (Trial Exhibits 1 and 2 received in evidence.)

13   BY MS. REPLOGLE:

14   **Q.**    So taking a look at JTX-1, is this the '954 patent that

15   you are an inventor on?

16   **A.**    Yes.

17   **Q.**    Okay.  There it is.  All right.

18        All right.  So what are we looking at with JTX-1?  What is

19   it?

20   **A.**    This is a patent.

21   **Q.**    All right.  And you see up on the right-hand side, do you

22   refer to this patent as the '954 patent?

23   **A.**    Yes.

24   **Q.**    It's kind of the common way.

25        All right.  And for the inventors, who are the inventors

MANDER - DIRECT / REPLOGLE

1   all listed there?

2   **A.**   Myself, Laura O'Donnell, Michael Denton, Ben Bodley, Alan

3   Tompkins, Kevin -- sorry -- Keith Gurganus, Kelvin Barnsdale,

4   Simon Third, Carm Pierce, Carl Perkins.

5   **Q.**   And many of those individuals we've talked about today and

6   looked at emails?

7   **A.**   Yes.

8   **Q.**   Okay.  If you take a look at the filing date of this '954

9   patent with the provisional application, when was this filed?

10         **THE COURT:**   You know, let's hold on.  Let's wait until

11   the demonstrative has gone through all the jurors' hands

12   because --

13         **MS. REPLOGLE:**   Oh, excuse me.

14         **THE COURT:**   -- you're not getting the attention of.

15         **MS. REPLOGLE:**   Oh.

16         **THE COURT:**   -- everybody.

17         **MS. REPLOGLE:**   All right.  Thank you, Your Honor.

18         **THE COURT:**   And I think we probably ought to mark the

19   exhibit and put it in.

20         **MS. REPLOGLE:**   Is it Demonstrative 1 and then 2 for

21   the second one?

22         **THE COURT:**   You can call it, but I think it's an

23   actual exhibit.

24      Why don't you just grab the camera back.

25   \\\

MANDER - DIRECT / REPLOGLE

1   **BY MS. REPLOGLE:**

2   **Q.**   All right.  So looking at the '954 patent, when did you

3   file this application?  What was the provisional application

4   date shown there?

5   **A.**   September 13th, 2010.

6          **MS. REPLOGLE:**  If you look down to line 60, Allen.

7   Yeah, there you go.

8   **BY MS. REPLOGLE:**

9   **Q.**   So September 13, 2010.  So right around the time frame

10  that the ContourGPS camera was launched; is that right?

11  **A.**   Yes.

12  **Q.**   Okay.  If you take a look at Trial Exhibit -- Joint Trial

13  Exhibit Number 2.

14  **A.**   Yes, I see it.

15  **Q.**   Is this the second patent on which you are an inventor?

16  **A.**   Yes.

17  **Q.**   And do you refer to this patent as the '694 patent, those

18  last three digits?

19  **A.**   Yes.

20  **Q.**   And, again, if you take a look under the "Related U.S.

21  Application Data" line item, underneath there, is this a

22  continuation of the '954 patent that we had just looked at

23  before?

24  **A.**   Yes.

25  **Q.**   Okay.  And can you explain, just plain English for the

**MANDER - DIRECT / REPLOGLE**

1    jury, what is a continuation application off of a patent?

2    **A.**    My understanding is it's when you have some additional

3    claims that you want to add.  So there's a period of time where

4    you're allowed to do that.  So you file a provision, an update,

5    in a way.

6          **MS. REPLOGLE:**    Okay.  And so turning back now, Allen,

7    let's go ahead and just take a harder look -- a little bit

8    harder look at the first patent, the '954 patent.

9    **BY MS. REPLOGLE:**

10   **Q.**    And just, first of all, I just want to get context of how

11   many figures -- if you could scroll, Allen, through the '954

12   patent -- did you include in this patent?  I think I counted

13   something like -- right -- 42 different figures.

14         And then the specification -- right under Figure 42.

15         And then the specification as well, if we scroll right

16   through the specification, does it amount to something like --

17   I think it's around, like, 57 pages long.

18         Suffice it to say it was a really long application; is

19   that right?

20   **A.**    Yes.

21   **Q.**    Okay.  A lot of detail in there.  We're just going to

22   focus on a couple of pieces of that.

23         If you take a look at Figures 3A and 3B.

24   **A.**    Yes, I see them.

25   **Q.**    What are we seeing here at Figures 3A and 3B?

1    **A.**   This is a high-level external view of the ContourGPS

2    camera.

3    **Q.**   And if we take a look --

4           **MS. REPLOGLE:**  Let's turn to an exploded or an

5    expanded view of that.  Can you go to Figure 28.

6    **BY MS. REPLOGLE:**

7    **Q.**   Do you see Figure 28?

8    **A.**   I see it, yeah.

9    **Q.**   What are some of the features that are shown there in

10   Figure 28 that you were drawing here as well and relate to the

11   wireless viewfinder project?

12   **A.**   So here, you see the body of -- the body of the camera,

13   which is 22.  That's the lower right piece.

14          And there's an aluminum tube that's been pulled away,

15   that's 32A, to reveal what's hidden by the tube.

16          And what you can see there is 402, the little box, that's

17   the GPS antenna, and underneath it is the GPS circuit board,

18   and there's a ground plain special piece of metal there.

19          On the left, the part named 400, that's the -- below that

20   is the hidden -- so Number 400, that's the hidden Bluetooth

21   button.

22          And then over the top of that, you can see a sort of a

23   curved thing.  That's the label that had no markings on it that

24   went over the button.

25          And then up above 420, with all those numbers around it,

1    that's a special spring that sits in there and makes the

2    slider, which is 414 at the top, that sort of part, that

3    structure, that slides back and forwards to make the camera go

4    into record, to start recording or stop recording.

5    **Q.**    Mr. Mander, were you proud of the work that you and your

6    team did in creating the inventions that are shown here in the

7    '954 and the '694 patent?

8    **A.**    Yes.  This is some of our -- some of our best work, yeah.

9    **Q.**    So after the launch, I know you went forward with

10    completing the software aspects of it.

11        Did you ultimately complete that work?

12    **A.**    We did.

13    **Q.**    Okay.  And at some point, did you officially announce this

14    feature for the ContourGPS?

15    **A.**    Yes, we did, at the Consumer Electronic Show, which is

16    known as CES.  That's an annual event in Las Vegas in January

17    every year.  That's where we announced it.

18    **Q.**    Right.  And for those that aren't familiar with CES, is

19    that a big deal?  Is that a big event that happens every year?

20    **A.**    It's very big.  It takes over most of the convention space

21    in Las Vegas.  There's tens of thousands of people there.  It's

22    a very-high profile event.  It's a very big deal.

23    **Q.**    Did Contour receive any awards related to this?

24    **A.**    We did.  We won the -- we were given the CES Innovation --

25    I think it's Innovation in Engineering award.

1  Q.   I want you to turn to -- let's take a look at --

2  A.   And I think what's interesting about that award is that

3  it's kind of given by your peers.  It's a recognition by the

4  industry.  So it's kind of special.

5  Q.   Yeah.  Absolutely.

6       Let's take a look first, before we take a look at that

7  award, at 443.  Could you take a look at that exhibit in your

8  binder or on the screen.

9  A.   Yes, I have it.

10 Q.   Okay.  And do you recognize this as a press release -- or

11 it's a press release that's contained in an announcement here.

12 Is that a press release of Contour's announcing the launch of

13 the Connect View card, the mobile app feature of this -- of

14 your work?

15 A.   Yes.

16      MS. REPLOGLE:  I'd like to move into evidence Trial

17 Exhibit 443, Your Honor.

18      MR. HAYNES:  No objection.

19      THE COURT:  It's admitted.

20      (Trial Exhibit 443 received in evidence.)

21 BY MS. REPLOGLE:

22 Q.   And so if we look at Exhibit 443, what is this

23 announcement about?

24 A.   It's announcing the view- -- what we've been talking about

25 as the viewfinder feature.  So it's saying Contour now has a

1    live viewfinder for the ContourGPS helmet cam and that that's

2    going to enable real-time streaming to smart phones.

3    **Q.**  And when was this announced?  You said for the CES, so was

4    that early January?

5    **A.**  Yeah, it was January -- the 5th of January 2011.

6    **Q.**  Okay.  Great.  And now, you've mentioned that you've

7    received some awards.  Let's turn to 442.

8    **A.**  I have it.

9    **Q.**  Do you have it?  And do you recognize what Exhibit 442 is?

10   **A.**  Yes.

11   **Q.**  Okay.  And is 442 an article discussing the fact that you

12   won the CES award in 2011 that you just mentioned?

13   **A.**  Yes.  I think it's more than that.  I think it's also

14   notebooks.com giving us an award for Best Lifestyle -- Best

15   Mobile Lifestyle Accessory at the show.

16   **Q.**  So did you receive additional awards instead of just the

17   CES award?

18   **A.**  Yes.

19   **Q.**  Okay.  And so could you explain what this award -- well,

20   let me first move this into evidence.

21         **MS. REPLOGLE:**  Move into evidence Trial Exhibit 442.

22         **THE COURT:**  Any objection?

23         **MR. HAYNES:**  No objection.

24         **THE COURT:**  It's admitted.

25         (Trial Exhibit 442 received in evidence.)

1    BY MS. REPLOGLE:

2    **Q.**   What is the Best Mobile Lifestyle award that it's talking

3    about here?

4    **A.**   This is where notebooks.com, which I think is an online

5    entity, is -- you know, they would have people at the show, and

6    they would go around and look at things that are new things and

7    highlight things that they thought would be interesting to

8    people who follow their online news.

9        It's saying that this is a really great mobile accessory,

10   "mobile" meaning mobile phone.  So, yeah.

11   **Q.**   So you won the CES 2011 award, and then you won the

12   Best Mobile Lifestyle -- this particular award that we're

13   looking at here for Trial Exhibit 442.

14       Did you win any additional awards as part -- for your work

15   that you did?

16   **A.**   We did.  I was particularly proud of the -- we got a

17   Red Dot Award later in the year in 2011 for the camera and for

18   that feature.

19   **Q.**   And why were you particularly proud of the Red Dot Award?

20   **A.**   Because it's -- it's an international thing.  It's

21   actually a European-based award, and it's very limited, the

22   number they give out, and it's particularly focused around what

23   I would call design.  So it's like this combination of

24   industrial design and features.  And so it's quite an honor to

25   receive that.  I felt particularly good for the team and for

MANDER - DIRECT / REPLOGLE

1    Michael for pulling off -- managing to get all these things in

2    the camera and still keep a really cool form factor.

3    **Q.**    If you'd take a look at PTX 444.

4    **A.**    I see it.

5    **Q.**    Does that appear to be an article reporting on the fact

6    that ContourGPS took home the prestigious 2011 Red Dot Product

7    Design Award?

8    **A.**    Yes.

9           **MS. REPLOGLE:**  Your Honor, I'd like to move into

10   evidence Trial Exhibit 444.

11          **THE COURT:**  Any objection?

12          **MR. HAYNES:**  No objection.

13          **THE COURT:**  It's admitted.

14   (Trial Exhibit 444 received in evidence.)

15   **BY MS. REPLOGLE:**

16   **Q.**    So what were some of the criteria that the ContourGPS

17   camera was evaluated on for this award?

18   **A.**    It was a bit of a surprise to me because I didn't know we

19   had applied for it or how it came about, but -- so it was

20   interesting to hear what they said about it.

21          But they liked the -- you know, industrial design is sort

22   of a nebulous thing.  It's about the look of something, sort of

23   the artistic aspect of it.  And so it was really nice that they

24   liked that.  That's one of the primary things with the award.

25   And then they liked some of the features.  So the ability that,

1    by having GPS, meaning that you could track what you're doing

2    and where you are, and also the wireless viewfinder feature,

3    that they recognized that as being really valuable and

4    well-executed.

5    **Q.**    Yeah.  I see the bullet point there that says "Capture

6    Every Shot" that they're calling out for this award --

7    **A.**    Right.

8    **Q.**    -- that they're calling out in this article.

9          What was that referring to?

10   **A.**    The "Capture Every Shot," I think, is what's highlighted

11   here, saying that you can get up to 32 gigabytes of data, which

12   is quite a lot at that time, using the internal micro SD card.

13         So that basically means you could get up to eight hours of

14   high-definition video, which would -- you know, there's

15   eight hours in a workday.  So it's sort of like if you go do

16   something outdoors for the day, you could probably fit all that

17   onto the card, you know.  So you're capturing everything you're

18   doing.

19   **Q.**    And did the view -- implementing this idea that you had of

20   using a mobile viewfinder, using your iPhone and streaming

21   video from the camera, does that enable one to capture every

22   shot and get it right?

23   **A.**    Yes, definitely, because you're going to be able to know

24   that the camera is set up correctly, that the view, the aim of

25   the camera is good.

1    And people are often doing things that are -- sometimes

2    it's a once-in-a-lifetime thing.  They're getting helicoptered

3    to the top of a mountain; they're going to ski down; they're

4    not going to do it again and the weather is good.  It would be

5    very frustrating -- I've seen it happen where people get to the

6    bottom and they're like:  Hey, guys, my video is terrible.

7    You know, we fixed that for them now.  They're going to

8    know they're getting the shot.

9    **Q.**   Did you receive any feedback from, like, professional

10   camera operators or athletes in the industry about your

11   technology which you had invented?

12   **A.**   Yes.  We started to get -- we had some people who were

13   using it before we released it.  But also, once we released it,

14   people started using it, and people were very excited about it.

15   **Q.**   Did you end up being involved in the release of additional

16   Contour cameras after the ContourGPS?

17   **A.**   Yes.

18   **Q.**   Okay.  And which of those cameras were you involved with?

19   **A.**   I think after the ContourGPS, I was involved in five more

20   cameras.  They were all built on the platform that we had

21   created.

22   **Q.**   And what do you mean by that, all built on the platform

23   that you had created?

24   **A.**   So one of the things I've learned over the years at

25   different companies and then, in particular, working -- I

 1   learned it at Navman, where I met some of the people that I

 2   brought into this project -- was that don't design a product;

 3   design a platform.

 4       So what that means is build the product in a way that it's

 5   going to be really easy to make another version of it.  Right?

 6   So we -- so we were thinking ahead.

 7       And a good example is how we actually added the Bluetooth

 8   WiFinder.  Right?  We shipped that camera, and it was ready for

 9   this new feature.  Right?

10       So we did that with a lot of different features in the

11   camera.  So it was very easy for us to bring out -- for

12   instance, the next camera was the Contour Plus, and that came

13   out very soon after the ContourGPS because we already had

14   thought through what some of those new features were for and

15   partly designed them in.

16       And so we continued that, and that allowed us to -- pretty

17   remarkably, really, to bring out all these cameras very

18   quickly.

19   **Q.**   So is the technology that you invented that's shown in the

20   two patents asserted in this case, was that a new platform

21   technology for your company, Contour?

22   **A.**   Yes.

23   **Q.**   Okay.  So you said that you did the Contour+.

24       What came out -- what other two cameras were you involved

25   with?

1    **A.**    So there was the -- originally the -- first the

2    ContourGPS; then the Contour+, a Contour+2, and another camera

3    that was called the Contour ROAM that was a lower-cost camera,

4    and we produced three versions of that.  So the Contour ROAM1,

5    2, and there was going to be a 3, but it ended up being the

6    Contour 4K, was what its product name was.

7    **Q.**    Now, you mentioned the Contour ROAM cameras.  Did the

8    Contour ROAM have the live viewfinder feature?

9    **A.**    The Contour 1 and 2 did not.

10   **Q.**    For the ROAM product; correct?

11   **A.**    Right.

12   **Q.**    That's right.  And what environment was the ROAM camera

13   intended to be used in?

14   **A.**    Yeah.  So the Contour ROAM was to be a more affordable

15   camera, a lower-cost camera for people to buy.  And also, it

16   had the battery -- was going to have the battery built in.  So

17   there's a -- a major thrust of it was to make it very simple,

18   simple to use.  So no battery to take in and out.  And it

19   had -- I think it had the instant-on feature, and it was also a

20   lot more waterproof and rugged.

21       So -- and there were a lot of little details that we

22   cleaned up, just sort of what's called the fit and function.

23   The slider just was a lot nicer.  We'd learned a lot about how

24   to do that.  So it was a much tidier implementation in a way,

25   you know, yeah, and cheaper.

1     And also, we'd moved to a -- the new manufacturer we were

2    using was able to -- we were able to lower the cost to us of

3    making it.  So there's a lot of cost down involved.

4    **Q.**   We spoke quite a bit about the efforts that you and your

5    team made in developing the software, the source code to run

6    the mobile app and then to run, as well -- connect the

7    Bluetooth module inside your camera.

8    **A.**   Yes.

9    **Q.**   You've drawn two pieces of that previously.

10    Here's my question:  Was that source code proprietary to

11   Contour?

12   **A.**   Yes.

13   **Q.**   Did you ever become concerned that that source code went

14   outside of Contour's possession?

15   **A.**   Yes.

16   **Q.**   And can you describe what that concern was?

17   **A.**   So just to explain, so source code is -- it looks a lot

18   like a cryptic text document.  It's just a whole lot of words,

19   really.

20    And what happens is -- that's what the software developer

21   is working on.  If you look at their screen, you'll just see a

22   whole lot of text, and it's very -- it's hard to understand.

23    And then what happens is you compile it.  So you -- the

24   software goes through a process where it's turned into a file

25   that's called a binary file or a library.  And that -- once

1   that happens, you can't see what's in the software anymore.

2   It's kind of a black box.  It's contained.  It's sealed up.

3        And so when you're developing software, you want to be

4   super careful that -- you're very protective of the source

5   code.  You don't want anybody getting a copy of it.  So you

6   don't leave printouts of it lying around.  You know, you're

7   very careful about controlling those computers it's sitting on.

8        And when you share it, you try to share it as a binary

9   file.  Right?  So in working with our partners, you know, WT,

10  Salix, Ambarella, sometimes we would -- it was necessary

11  sometimes to actually share source code in a way where they can

12  read it -- right? -- and know what it's doing.  And other times

13  you're sharing it in libraries which they can't open up and get

14  inside.

15       So when you're partnering with people, it can be tricky.

16  You want their help, but on the other hand, you also want them

17  to honor your -- you know, what is yours.  And so there's

18  always a concern around that.

19       And so I was concerned that things were getting -- moving

20  very, very quickly; and I wanted to be careful that people

21  understood what was our, what's called, intellectual property,

22  because we invested a lot in paying to develop things and also

23  just the knowledge we put into it.  We wanted to own that.

24  Q.   We've seen and we've walked through several different

25  documents today that also showed a couple things.  It showed

 1    that the Ambarella datasheet, for example, didn't implement a

 2    wireless solution for that A5s30 card; right?  Didn't contain

 3    anything --

 4              **MR. HAYNES:**  Objection.

 5              **MS. REPLOGLE:**  Excuse me.

 6              **THE COURT:**  Sustained.

 7    **BY MS. REPLOGLE:**

 8    **Q.**    Let me ask you this:  So did you have concerns that your

 9    source code had been used by any of those companies that you

10    just named that had access to it?

11    **A.**    There was a concern, yes.

12    **Q.**    What was that specific concern and why?

13    **A.**    Because we were sharing source code with other parties,

14    like Salix, WT, Ambarella, there's the potential that,

15    knowingly or not knowingly, that other people might get access

16    to it or be able to take -- make use of the feature.

17         And so --

18    **Q.**    Do you have any belief that anyone did?

19    **A.**    It's possible, yeah.

20    **Q.**    And why do you -- well, let me scratch that.

21         Did you ever come to a belief that one of those

22    entities -- Ambarella, WT, or Salix -- had used your source

23    code?

24    **A.**    I don't know for sure.

25    **Q.**    Okay.  That's fair.

 1          Fair to say that you were concerned about it?

 2     **A.**   Yes.

 3          **MS. REPLOGLE:**  Can we put up the exhibit -- this is

 4     admitted already -- 470, page 49.

 5     **BY PLAINTIFF2:**

 6     **Q.**   What are we seeing here?  Do you recognize it?

 7     **A.**   I don't think I've seen this before.

 8     **Q.**   Okay.

 9     **A.**   Not recently, anyway.

10     **Q.**   It's says on this slide [as read]:

11               "Military - Contour cameras were used by

12          SEAL Team 6 during the capture of Osama Bin Laden."

13          At any time were you asked to change the firmware of the

14     ContourGPS camera for any entity?

15     **A.**   Okay.  I want to be clear that I'll talk about that, but

16     I'm not going to talk about SEAL Team Six or any specifics

17     of --

18     **Q.**   Okay.

19     **A.**   -- military operations.

20     **Q.**   You don't know about this particular situation?

21     **A.**   There's things I know, and there's things I can talk

22     about.

23     **Q.**   That's fine.

24     **A.**   So in terms of -- so there were -- the camera is an action

25     camera, and it's -- there were a number of -- in addition to

 1    people doing things like mountain biking and skiing and that

 2    sort of thing, there were a lot of -- there were a number of

 3    people who were very interested in using the camera for

 4    professional purposes.

 5        As an example, firefighters were using it on the side of

 6    their helmet in training to be able to look at the video

 7    afterwards and see, like, which way did you look when you got

 8    out of the fire truck.  "Look at that, Susan, you looked to the

 9    left.  You should have looked to the right," things like that.

10    So that was very interesting.

11        And also the military, a number of different military

12    organizations around the world were using the camera and wanted

13    to do more with the camera.  And so one of the things I was --

14    there were two things I was tasked with.

15        One of them was that -- to make a special mount that

16    would -- could be used -- on the side of many military helmets,

17    there's a rail.  It's called a rail.  There's a special

18    universal mounting thing that they can put a flashlight on or

19    other various, radios and things.  I think it's called a

20    Pickatinny Rail.  And they wanted to -- the same rail is

21    actually on a rifle, or it can be on the side of a rifle or on

22    a handgun.  And so they wanted a mount that would let you mount

23    our camera on a Pickatinny Rail.  So we developed that.

24        And then the second thing was they wanted us to be able to

25    produce a version of the camera that would not ever beep or,

1  you know, make a sound or flash its little lights.  And the

2  reason for that is, if you're -- you know, a lot of these

3  things are done in the middle of the night, and you don't want

4  someone seeing your camera flash, you know, little flash come

5  on in the distance because our camera decided its battery is

6  getting low and it's going to start flashing or beeping or

7  something like that.

8      So I made a version of the software which we tested

9  extremely thoroughly and we knew would not beep and would not

10  make lights go.  So we made that available, yeah.

11  **Q.**  And several different times you were saying "they."  I

12  just wanted to clear the record.  Who were you doing those

13  design modifications for?

14  **A.**  For the Department of Defense and some other military

15  organizations outside the U.S.

16  **Q.**  When is the last time -- how long have you been gone from

17  Contour at this point in time?

18  **A.**  I stopped -- I left in -- I think it was 2012, and -- but

19  I kept -- they kept me engaged over the years in various ways.

20  So as an advisor, as a consultant over time.

21  **Q.**  Okay.  And did at some point in time that consultancy or

22  advisor role end at Contour?

23  **A.**  Oh, yes.  So there was a period after I left that

24  full-time job where I was working to still lead the effort to

25  develop the next camera.  I was still working part-time with

1    Contour, and that was okay with my new employer.

2        And so I was the chief technology officer at a company

3    called Vigilant, and we were making a thing that was completely

4    unrelated to cameras.

5        And I had enough time to be able to still help and advise

6    Contour, and so I was -- they were paying me to continue to

7    work on what was called the Calypso Project, which was going to

8    be the ROAM3.  And I carried on doing that up until a sad

9    moment where the company ended.

10   Q.   Understood.  So at this point in time in your career,

11   Mr. Mander, when you look back, are you really -- are you proud

12   of the work that you did?

13   A.   Yeah, definitely.

14   Q.   And we spoke at the beginning of your testimony today that

15   you hadn't testified before.  Why come back today and testify

16   before the jury?

17   A.   Well, in the world of technology development, a very

18   important aspect is the patenting of things.  And, you know,

19   I've been doing this a long time; and I've actually been taught

20   this, first at Apple and then other places, that the point of

21   patents is to protect ideas.

22        But the -- I'm not a lawyer, but the motivation is to --

23   that you can share knowledge of what you're doing.  And that's

24   powerful because it means we can explain to the world -- we can

25   apply for a patent, and in that patent, we can explain how to

1    do something.  Right?  In this case, amongst other things, how

2    to have a wireless viewfinder -- right? -- to stream video over

3    radio.  And so that means other people can learn from that and,

4    you know, the world advances.  Right?

5        And this happens with all kinds of things:  drugs,

6    technology -- medications, I should say, and technology.

7        So the nature of it is that you -- if you're lucky to get

8    a patent, then it's possible for other people to license that

9    patent, you know, for you to give them permission to use it.

10        And it's happened to me.  Places I've worked where I've

11    either licensed someone else's patent or we've allowed someone

12    to license ours.  And that's a virtuous thing.

13        So part of -- long answer, but part of being an inventor

14    and being a professional in the tech space, I believe, is

15    being -- is helping advance that.

16        So I've got about ten or more patents.  And over the

17    years, various times, for instance, when I worked at Apple and

18    even lately, you know, I get called in to explain something

19    about the patent, and that's just being professional.  So

20    that's how I view it.

21    Q.   Do you believe that others should respect patents?

22    A.   Definitely, yes.

23    Q.   And do you believe it's right for other companies to copy

24    the technology that you created?

25    A.   I think it's not okay to copy it.  It's okay to license

1    it.  In fact, I encourage that, you know, yeah.

2         **MS. REPLOGLE:**  No further questions.

3         Pass the witness.

4         **THE COURT:**  All right.

5         Mr. Haynes?

6                    <u>**CROSS-EXAMINATION**</u>

7    **BY MR. HAYNES:**

8    **Q.**    Good afternoon, Mr. Mander.

9    **A.**    Good afternoon.

10   **Q.**    Let me just start by clarifying the scope of your

11   knowledge, if that's all right.

12        Now, you were working with Ambarella in the 2009 to 2012

13   time frame; correct?

14   **A.**    Yes.

15   **Q.**    And when you were working with Ambarella, were you having

16   discussions with Ambarella about what GoPro was doing with

17   Ambarella?

18   **A.**    No.

19   **Q.**    No.  And you wouldn't expect Ambarella to be telling GoPro

20   what you were doing with them; right?

21   **A.**    Correct.

22   **Q.**    So is it fair to say that you don't know what GoPro was

23   doing with Ambarella during that time frame?

24   **A.**    That's correct.

25   **Q.**    Now, we heard a lot about your invention and the

1  challenges of being able to transmit video wirelessly over

2  Bluetooth.  Do you recall that testimony in general?

3  **A.**   Yes.

4  **Q.**   And Bluetooth, that's a wireless protocol; right?

5  **A.**   It's a -- there's many parts to it, but it's basically a

6  method of sending data through radio.

7  **Q.**   Okay.  And that's not the only way to send data

8  wirelessly, though; right?

9  **A.**   Correct.

10 **Q.**   There are several other -- well, actually, lots of other

11 protocols that are out there that you can use to send data

12 wirelessly; right?

13 **A.**   Yes.

14 **Q.**   And Bluetooth, amongst the many protocols, has a

15 relatively low bandwidth for data transmission, particularly

16 back in that time; right?

17 **A.**   Yes.

18 **Q.**   And the WiFi protocol back in that time had more bandwidth

19 for data transmission; right?

20 **A.**   Yes.

21 **Q.**   And so if you had more data to transmit, WiFi had more

22 ability to transmit more data in the same time period; right?

23 **A.**   Yes.

24 **Q.**   Okay.  And you were talking to Ambarella.  When you first

25 started talking to them and had this idea of sending out video

1   wirelessly, they were sort of pushing you to use WiFi; right?

2   A.   That's correct.

3   Q.   And Contour resisted that.  You wanted to use Bluetooth

4   instead; right?

5   A.   Yes.

6   Q.   And one of the reasons you wanted to do that is because

7   Bluetooth -- you'd already been sort of working on that for

8   your GPS concept where you could provide location data; right?

9   A.   No.

10  Q.   Fair to say, though, that you were -- you preferred

11  Bluetooth and that's what you wanted to use; right?

12  A.   Yes.

13  Q.   And we looked at some emails between you and Ambarella

14  where they were actually trying to nudge you away from

15  Bluetooth; right?

16  A.   Yes.

17  Q.   And in one of the emails that we looked at, it actually

18  said:  Contour's the only one looking at Bluetooth.  Our other

19  customers are using other things.  Right?

20  A.   Yes.

21  Q.   And one of the things that --

22  A.   Well, let me correct that.  I'm sorry.  They didn't say

23  our other customers, I don't believe, are using it, because

24  they wouldn't tell us what other customers are doing.

25       What they're saying is:  We, Ambarella, prefer to put

1    effort into WiFi because it's probably going to appeal to other

2    customers, more use for it.

3              **MR. HAYNES:**  If we could bring up Exhibit 10.

4              **THE WITNESS:**  Is that going to be 10 in my binder?

5    **BY MR. HAYNES:**

6    **Q.**  It should be, yes.  The same exhibit you looked at, I

7    hope.

8         And if you'll look at the page 10 -- well, just take a

9    look at this.  You recall testifying about this on direct?

10   **A.**  Yes.

11   **Q.**  Okay.  If you'll turn to the second page of that

12   document -- and if we could blow up the first email at the very

13   top of the page -- if you can look there in the second

14   paragraph -- let me see if I can put the context around it.

15        This email chain follows where you had asked Ambarella:

16   Can you tell us what your development schedule is for both WiFi

17   support and Bluetooth support?  Right?

18        We can scroll down to the email below to orient yourself.

19   **A.**  Yes.

20             **MR. HAYNES:**  Okay.  If we can go back up to the top.

21   **BY MR. HAYNES:**

22   **Q.**  And what Ambarella responded to in that second paragraph

23   is [as read]:

24             ". . . we don't have schedule for Bluetooth as

25        yet due to the fact that your project will be the

1          only one using it . . . ."

2          Right?

3    **A.**    That's what it says.

4    **Q.**    Okay.  So they don't talk about what they're doing with

5    their other customers, but they do tell you:  Contour, you're

6    the only one that wants to use Bluetooth.  Right?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, they didn't say anything about the support for

9    WiFi in this document; right?

10   **A.**    There's -- we're -- there's mention of WiFi throughout the

11   email thread, but not right here, although it says [as read]:

12          "Regarding WiFi versus Bluetooth."

13   **Q.**    But you know, sir, don't you, that Ambarella was

14   supporting WiFi at this time?  Right?

15   **A.**    They had in their road map that they were going to support

16   WiFi in the future.  It wasn't right there in the SDK at that

17   time, to my knowledge.  They had interest in supporting WiFi in

18   the future.

19   **Q.**    Look at Exhibit 10 on -- actually, same exhibit, first

20   page.  And if you could go down to the email at the bottom of

21   this page.  Okay.  This is in the same chain.  It's a little

22   after your inquiry.

23          And in this chain, you are explaining to Jason Huang at

24   Ambarella that you started to design a WiFi board for Scout;

25   right?

1  **A.**    Yes.

2  **Q.**    And Scout was what ultimately -- that was the project that

3  you were working on that ultimately ended up as the ContourGPS?

4  **A.**    Yes.

5  **Q.**    Okay.  So at one point, you were thinking about WiFi too;

6  right?

7  **A.**    Yes.

8  **Q.**    Okay.  And you asked Ambarella a question about WiFi in

9  the next sentence of this document.  You state [as read]:

10         "One specific question is that we will need to

11      be able to support 'Ad-Hoc' mode in Scout.  Can you

12      confirm your" --

13      And "your" is Ambarella there; right?

14  **A.**    Yes.

15  **Q.**    Okay.

16      [As read]:

17         "Can you confirm your Linux driver on the A5 for

18      communication with the Atheros WiFi module will

19      support this?"

20      Do you see that?

21  **A.**    Yes.

22  **Q.**    And so what you're asking is -- well, first of all, does

23  this refresh your memory that Ambarella did, in fact, have

24  software support for WiFi on the A5?

25  **A.**    Not quite, no.

1    Q.   Well, you're asking them about "your Linux driver."  So

2    they had at least a Linux driver at that time; right?

3    A.   No.  They are saying -- look at the sentence, "can you

4    confirm," and at the end it says "will support."  So when you

5    have a driver, will it support ad hoc mode?

6    Q.   Right.  Ad hoc mode of WiFi?

7    A.   Right.

8    Q.   But there's an existing Linux driver for WiFi.  You're

9    asking about a particular mode of WiFi, ad hoc; right?

10   A.   No.  Let me explain.  So the -- when you're working with a

11   company like Ambarella -- and I have been in their position,

12   developing an SDK for other people to use -- you have a road

13   map of features.

14        And they -- an important thing here is that they're

15   referencing Linux.  So -- and I don't quite understand this,

16   but in the software stack of -- you know, that's -- in the

17   board support pack for the A5 system on chip, it had a

18   hypervisor.  And there was a methodology where you could very

19   quickly switch the thing to use Linux instead of micro --

20   micro -- micro I- -- ITRON, micro ITRON.  So these were two

21   operating systems, and you could flip between them.

22        And we had been exploring whether -- and this is getting

23   pretty crazy.  We were looking at whether we were going to -- a

24   way to make Bluetooth or WiFi work, to make a radio module work

25   would be to kind of leave the SDK and go down to a much deeper

1    level, I guess, with the ARM processor to have a driver do what

2    we wanted to do.  So this is getting pretty into the weeds with

3    Ambarella.

4         And they had been talking about how there was an interest

5    that some other company, another customer of theirs, might want

6    to use WiFi for a game controller in the future in their road

7    map; and so they were considering developing, supporting a way

8    to run a WiFi module.

9         And it's in their road map, meaning they're thinking about

10   it.  Right?  It wasn't available.  So I'm -- we're still at a

11   point where -- this is in April -- where if I have to, I might

12   move to using WiFi.  That's why I'm actually investing in

13   developing a circuit board for it, to try it out if I have to.

14   And I'm asking them to clarify some details about, you know, if

15   you're going to have a WiFi driver, tell me more about it, and

16   will it support ad hoc mode.  That was important.

17        And the implementation -- if we went with WiFi -- I forget

18   exactly what ad hoc mode is, but I think it's a way you

19   connect -- it's different from WiFi direct, but it's a way you

20   can connect, like, something to something else with an ad hoc

21   network.

22        So, sorry if I'm straying from your question.  I'm trying

23   to give you a good answer.  But I'm trying to say that they

24   didn't really have a driver we could use.  There was talk about

25   the possibility of a driver.

1   Q.   Okay.  I appreciate the explanation, but if you could, if

2   you don't mind, if we could focus your answers on my questions,

3   just so I have enough time to get done.

4        Let me come back to something you said.  I do appreciate

5   the explanation.

6        You mentioned an Ambarella road map.  So it's true, isn't

7   it, that Ambarella had a road map where they planned to use

8   their A5 chip with WiFi; right?

9   A.   I think it's something they're considering.  Road maps are

10  somewhat nebulous.  And to be honest, I -- Laura was more the

11  keeper of that kind of level of information with Ambarella.  I

12  was very much focused on implementation.  So I couldn't tell

13  you, you know, how firm it was and when it might come.

14  Q.   Okay.  Is it fair to say that Ms. O'Donnell was having

15  more direct contact with Ambarella than you were?

16  A.   At that time, she did.  She had earned more the

17  higher-level relationship.  I was focused more -- a lot more on

18  the near-term implementation.

19           MR. HAYNES:  If we could bring up Exhibit 2188.

20  BY MR. HAYNES:

21  Q.   This is an email from you to Ben Bodley on March 24th,

22  2010.  I believe it's in your binder.

23       Do you have it in front of you?

24  A.   I'm just -- let me just trying to find it.  2188?

25  Q.   Yes.

MANDER - CROSS / HAYNES

1   **A.**   Sorry.  I have it here.

2   **Q.**   Do you have it?

3   **A.**   I do.

4   **Q.**   Do you recognize this document?

5   **A.**   Yes.

6           **MR. HAYNES:**  Okay.  I think this was admitted before,

7   but in case it's not, I would offer it into evidence,

8   Your Honor.

9           **MS. REPLOGLE:**  No objection.

10          **THE COURT:**  It's admitted.

11      (Trial Exhibit 2188 received in evidence.)

12  **BY MR. HAYNES:**

13  **Q.**   Now, this is an email from you to Ben Bodley on March 24th

14  of 2010.  Do you see that?

15  **A.**   Yes.

16  **Q.**   And in the third paragraph down, you say [as read]:

17          "One thing that is interesting is that the A5

18      processor outputs two video streams."

19      Do you see that?

20  **A.**   Yes.

21  **Q.**   And so that's something you learned from Ambarella or by

22  examining Ambarella's materials?

23  **A.**   Yes.

24  **Q.**   And you say that one is a high-definition stream and one

25  is a lower-resolution stream; correct?

1    **A.**    Yes.

2    **Q.**    And the Ambarella chip was capable of outputting both that

3    high-resolution stream and that low-resolution stream; right?

4    **A.**    Yes.

5    **Q.**    Okay.  And just to be clear, Contour is not claiming that

6    they contributed in any way, shape, or form to the ability to

7    generate, using an image processor, a high-resolution stream

8    and a low-resolution stream and output those streams; correct?

9    **A.**    I think they supported it, meaning we made use of it.

10   **Q.**    Right.  But what comes out of that chip, a high-resolution

11   stream and a low-resolution stream, and the manner in which

12   those streams are generated, Contour did not invent that;

13   right?

14   **A.**    Correct.

15   **Q.**    Okay.  What you did is take the outputs and send them

16   wirelessly so that you could look at the low resolution on a

17   mobile device.  Is that your understanding?

18   **A.**    At a very simplistic level, we did that.  We made use of

19   the streams.  But we had to do a lot more than just send them

20   out.

21        **MR. HAYNES:**  And if we could bring up Trial

22   Exhibit 1079.

23   **BY MR. HAYNES:**

24   **Q.**    Now, you were asked about this document, the A5s -- A5s30

25   specification.  Do you recall that?

1    **A.**    Yes.

2    **Q.**    And I think you were asked a question:  Does this document

3    anywhere in it mention wireless capability?  Do you recall

4    that?

5    **A.**    Yes.

6    **Q.**    Okay.  But this isn't the only document that you got from

7    Ambarella; right?

8    **A.**    There are other documents.

9    **Q.**    You got a lot of documents from Ambarella; right?

10   **A.**    I did not.  I had this document, and I didn't have a lot

11   of other documents.

12   **Q.**    Okay.  Well, did you get the product spec sheet for the

13   A5s30, the two-pager?

14   **A.**    I have this document, which is the -- I call it the

15   hardware datasheet.  There was later a product -- what I call a

16   product sheet, which is a -- it was included in the press

17   release later, many months later.

18   **Q.**    Okay.

19   **A.**    That's about it, honestly.

20          **MR. HAYNES:**  Could we bring up Exhibit 3- -- Trial

21   Exhibit 3885 and just show it to him, please, first.

22   **BY MR. HAYNES:**

23   **Q.**    Is this the datasheet that you're referring to?

24   **A.**    Let me take a moment to look at it.

25          (Witness examines document.)  I'm not actually sure if

 1   I've seen this exact document before, but this looks like a

 2   publicly available datasheet you'd expect to be able to get

 3   from the Ambarella website --

 4   **Q.**   Okay.

 5   **A.**   -- once it was public.

 6   **Q.**   And it was for the A5s?

 7   **A.**   Yes, I'd say this is the A5s.

 8   **Q.**   Okay.  Do you recognize -- in your review of it, does this

 9   accurately reflect what you remember of the A5s and what was

10   publicly available?

11   **A.**   I need a moment to look at it.

12       (Witness examines document.)  Yeah, generally speaking.

13   One thing that's a little different is, in the diagram with the

14   A5s with the blue things around it, they have "Mobile."  That's

15   not something they characterized in the datasheet, for

16   instance.

17   **Q.**   Okay.  But these concepts, are they familiar to you or

18   not?  I'm just trying to decide if I can show --

19   **A.**   Yes.

20   **Q.**   -- the jury the whole document.

21   **A.**   Yes, they are.

22       **MR. HAYNES:**  Okay.  I would offer Exhibit 3885.

23       **THE COURT:**  Any objection?

24       **THE WITNESS:**  And, actually, just to correct myself, I

25   just saw at the top, that's what's called a Product Brief.

1    It's labeled that way at the top.  See at the top right, it

2    says "Product Brief"?  Yeah.

3         **MS. REPLOGLE:**  Your Honor, yeah, object.  He's never

4    seen this document before, doesn't recognize it.  He doesn't

5    have any personal knowledge about it.  I haven't heard a date

6    yet even when it was available.  There doesn't appear to be a

7    date on the document.

8         **THE COURT:**  It's sustained.

9    **BY MR. HAYNES:**

10   **Q.**   Let me just ask you this question:  You're aware that

11   Ambarella put a lot of their materials out into the public

12   about their A5 and A5s chips; right?

13   **A.**   No.  They don't put a lot of documentation out.

14   **Q.**   Well, you're aware that they had a product brief, for

15   example?

16   **A.**   Eventually, yes.  I mean, there was a point in time where

17   they put that on their website.

18   **Q.**   Yeah.  And they actually had a press release for both

19   the -- for the A5 chip around -- in CES in January of 2009.

20   Are you aware of that?

21   **A.**   I'm not aware of that.

22   **Q.**   What about the press release -- a press release in January

23   of 2010 for the A5s?

24   **A.**   What time in 2010?

25   **Q.**   January of 2010.

1    **A.**    I don't recall that one.

2    **Q.**    Okay.  So sitting here today, trying to remember back, do

3    you remember Ambarella advertising to its customers the ability

4    to use the A5 and the A5s for wireless capability?

5    **A.**    I saw something later, which I think was more like around

6    May, where there's a -- it's actually a press release,

7    I believe, and they allude to that in there.

8    **Q.**    Okay.  And you joined Contour --

9            **THE COURT:**  So we are close to the end.  If you

10    have -- if you need to follow up on this particular thing,

11    please finish it up.

12            **MR. HAYNES:**  This is a great stopping point,

13    Your Honor.

14            **THE COURT:**  Okay.

15        All right.  Ladies and gentlemen, we're going to stop for

16    today.  So please remember the admonitions that I gave you.

17    There's a long way to go in this case.  There's a lot to learn

18    from a lot of different people.  So don't try and research.

19    Don't try and talk to anybody about any of this.  Just enjoy

20    the afternoon.

21        Come here so that we can get going -- if we can get moving

22    at 8:30, we're going to -- you'll be happier in the long run,

23    and I think it will be a great thing.

24        So have a great afternoon, and I'll see you tomorrow

25    morning.

**PROCEEDINGS**

1    (Proceedings were heard out of the presence of the jury.)

2          **THE COURT:**  Great.  We'll be in recess.  See you in

3    the morning.

4              (Proceedings adjourned at 1:32 p.m.)

5                        ---o0o---

6

7              **CERTIFICATE OF REPORTER**

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:  Wednesday, October 1, 2025

12

13

14

15

16   _____

17          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

18        CSR No. 7445, Official United States Reporter

19

20

21

22

23

24

25