```
                              Volume 7

                              Pages 1176 - 1391

                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

CONTOUR IP HOLDING, LLC,        )
                                )
          Plaintiff,            )   CONSOLIDATED CASES
                                )   NO. 3:17-CV-04738 WHO
  VS.                           )   NO. 3:21-CV-02143 WHO
                                )
GOPRO, INC.,                    )
                                )
          Defendant.            )
_____)

                         San Francisco, California
                         Tuesday, October 7, 2025

              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                    845 Texas Avenue, 25th Floor
                    Houston, Texas 77002
              BY:   JOHN R. KEVILLE, ATTORNEY AT LAW
                    MICHELLE C. REPLOGLE, ATTORNEY AT LAW
                    SUNNY AKARAPU, ATTORNEY AT LAW
                    MICHAEL C. KRILL, ATTORNEY AT LAW

For Defendant:
                    ALSTON & BIRD LLP
                    One Atlantic Center
                    1201 West Peachtree Street
                    Atlanta, Georgia  30309
              BY:   JOHN D. HAYNES, ATTORNEY AT LAW
                    SLOANE S. KYRAZIS, ATTORNEY AT LAW

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

                         ALSTON & BIRD LLP
3                        55 Second Street, Suite 2100
                         San Francisco, California 94105
4                  BY:  **MICHELLE A. CLARK, ATTORNEY AT LAW**
                         **PHILIP C. DUCKER, ATTORNEY AT LAW**
5

6                        ALSTON & BIRD LLP
                         2828 North Harwood Street, Suite 1800
7                        Dallas, Texas  75201
                   BY:  **ELLIOTT C. RICHES, ATTORNEY AT LAW**
8
                         ALSTON & BIRD LLP
9                        Vantage South End
                         1120 South Tryon Street, Suite 300
10                       Charlotte, North Carolina 28203
                   BY:  **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**
11

12   **Also Present:**

                         Robert Mooney, Contour Corporate Rep
13                       Pablo Lema, GoPro Corporate Rep
                         Tyler Gee, Deputy General Counsel, GoPro
14                       Jesse Taylor, Trial Technician
                         Allen Eaton, Trial Technician
15                       Luke Arndt, Trial Technician
                         Sarah Moyer, Trial Technician
16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2

3   Tuesday, October 7, 2025 - Volume 7

4                                              PAGE   VOL.

5   Defense Rests                              1313    7
    Charging Conference                        1361    7
6

7   PLAINTIFF'S REBUTTAL WITNESSES             PAGE   VOL.

8   HU, JING (RECALLED)
    (PREVIOUSLY SWORN)                         1314    7
9   Direct Examination by Mr. Krill           1314    7
    Cross-Examination by Mr. Haynes           1332    7
10

11  DEFENDANT'S WITNESSES                      PAGE   VOL.

12  ALMEROTH, KEVIN CHRISTOPHER (RECALLED)
    (PREVIOUSLY SWORN)                         1184    7
13  Cross-Examination resumed by Mr. Keville  1185    7
    Redirect Examination by Ms. Clark         1213    7
14

15  KENNEDY, PATRICK FITZGERALD
    (SWORN)                                    1233    7
16  Direct Examination by Mr. Ducker          1233    7
    Cross-Examination by Ms. Replogle         1278    7
17  Redirect Examination by Mr. Ducker        1312    7

18

19  DONOVAN, PAUL "NIPPER"
    By Video Deposition (not reported)        1314    7

20

21                    E X H I B I T S

22  TRIAL EXHIBITS                    IDEN   EVID   VOL.

23    JTX-14                                 1184    7

24    TX-3484                                1183    7

25    TX-4778                                1183    7
```

```
 1   Tuesday - October 7, 2025                              8:01 a.m.

 2                          P R O C E E D I N G S

 3                              ---o0o---

 4        (Proceedings were heard out of the presence of the jury.)

 5             THE COURT:  Please be seated, everybody.

 6             MR. KEVILLE:  Please ignore that woman behind the

 7   curtain.

 8             THE COURT:  Good morning, everybody.

 9        A couple of things.  Ms. Davis brought to my attention the

10   math error.  Mr. Keville, I was interested in how you were

11   doing your case, but so we'll add an hour back --

12             MR. KEVILLE:  Okay.

13             THE COURT:  -- to your time because we clearly goofed

14   on the math.  So that's one thing.

15        The second thing pending was the counter-designation issue

16   which was brought up yesterday morning.  I'm going to strike it

17   under 403.  The testimony of Gee didn't say anything relevant

18   to it.  The Ambarella evidence came in through Dr. LeGall at

19   trial.  By that time, the indemnification demand was withdrawn.

20   So I think it's not relevant and would be confusing to the

21   jury.

22             MR. KEVILLE:  I was going to tell you, I think it's

23   moot because I think they've withdrawn Gee as --

24             THE COURT:  Okay.

25             MR. HAYNES:  For time reasons, Your Honor, we've
```

1    decided not to play that at all.

2            **THE COURT:**  Okay.  Well, thank you for letting me do

3    all that work.

4        Then I don't know how long we're going to go, whether

5    we'll fill the day today or not.  If we don't fill the day,

6    we'll do the final instructions at the end of the morning and,

7    if not, be back at 3:00 instead of 3:30.  And, hopefully, I'll

8    be done with my CMCs and we can get at it then.

9            **MR. KEVILLE:**  Judge, how would you like to handle

10    JMOLs on our side?

11            **THE COURT:**  You can -- it's sort of the same thing.

12            **MR. KEVILLE:**  Ours are pretty easy because

13    Dr. Almeroth said, "I'm not contesting infringement for these

14    two other claims in the Group 1 products."  That seems like it

15    should be JMOL.

16            **THE COURT:**  Okay.  You can make the motion when you

17    want to at the end of the case, at the end of GoPro's case.

18            **MR. KEVILLE:**  Okay.  So you want me to do it then.

19    That's all I was asking.  Or did you want me to save it until

20    the jury is out of the --

21            **THE COURT:**  I'm not going to pay attention -- I'm

22    going to allow the jury, basically, to deal with these issues,

23    so...

24            **MR. KEVILLE:**  Okay.  Understood.

25            **THE COURT:**  Okay.  Anything else this morning?

1    **MR. KEVILLE:**  No.

2        Oh, we do have one, Your Honor.  Yesterday there was a

3    question asked of Dr. Almeroth.  And we just raised this with

4    them, so we're going to try and see if we confer on it.  But

5    the question asked, "Does live preview" -- "Does Boland show

6    live preview while recording?" or something to that effect, and

7    he said, "Yes, it does."

8        And that's directly contrary to what the PTAB found in the

9    IPR, which was that it did not show live preview while

10   recording, which I didn't want to go into it without addressing

11   it with you.  I don't want to open the whole door to the IPR

12   proceeding.  I know we're all sensitive to that.  But I think

13   there should be some kind of curative instruction because it's

14   directly contrary to what happened in the PTAB.

15       **MR. HAYNES:**  Your Honor, the PTAB found that it didn't

16   have the record in parallel limitation where you're recording

17   both streams simultaneously, but Boland does disclose having a

18   live preview while recording.  I don't think that's disputed.

19   Right?  Certainly, with full resolution, it discloses live

20   preview while recording.

21       In terms of the claim language of recording in parallel

22   two image streams, one of high quality and one of low quality,

23   that's what the basis of the PTAB decision was, and he did not

24   say anything contrary to that.

25       **THE COURT:**  So I'm not going to be able to make heads

1    or tails of this argument without having some paper in front of

2    me.  So I don't know what -- I don't know what happened in the

3    IPR, and I don't know exactly what it is that Dr. Almeroth

4    would have said that was contrary to it.

5        So if you want to bring it to me and if there is an

6    instruction that would be necessary at the time of when I

7    instruct the jury, I can -- I can say something.

8            **MR. KEVILLE:**  Okay.

9            **THE COURT:**  But you need to give me that information,

10   and we'll need to talk about it.

11           **MR. KEVILLE:**  We'll do it as quickly as we can.

12           **THE COURT:**  Okay.

13       So what else?

14       **MS. CLARK:**  Your Honor, I prepared and the jury

15   consultant prepared declarations addressing our regrettable

16   violation of Your Honor's order on jury research.  I just

17   handed a copy to Mr. Keville.  I would just ask -- wanting --

18   wondering procedurally how you would like us to submit these.

19           **THE COURT:**  So what is that that you have?

20           **MS. CLARK:**  They're just two declarations.

21           **THE COURT:**  Okay.  Hand it to Ms. Davis, and I'm...

22                   (Document handed up to the Court.)

23           **THE COURT:**  Thank you.

24       So I'll take a look at it.  I was planning to deal with

25   this after the case was resolved, but -- and I appreciate these

 1    now, and if I need more information, I'll ask for it.

 2              **MS. CLARK:**  Thank you, sir.

 3              **MR. KEVILLE:**  Thank you, Your Honor.

 4              **THE COURT:**  Okay.

 5              **MR. KEVILLE:**  More.

 6              **MR. RICHES:**  And then, Your Honor, these are just a

 7    couple of procedural issues.

 8         First, previously, during the examination of Mr. Woodman,

 9    there was a physical exhibit.  At the time we had marked it

10    PDX-1000.  My understanding from speaking to the Court's Deputy

11    and court reporter was they requested we give it a normal

12    exhibit number, so we'd like to change that to TX-4778.

13              **THE COURT:**  Okay.

14         (Trial Exhibit TX-4778 received in evidence.)

15              **MR. RICHES:**  And then yesterday we noticed, when

16    reviewing the transcript, there was an Exhibit 3848 that

17    appears as what was admitted on the transcript and the minutes,

18    and it looks like that should have been TX-3484 instead.  So it

19    looks like we just switched a number somewhere.

20              **THE COURT:**  Okay.

21         (Trial Exhibit TX-3484 received in evidence.)

22              **MR. RICHES:**  And then, finally, we talked previously,

23    Your Honor, about the stipulated number of units.  The parties

24    have talked.  We've labeled that JTX-14, and so we'd offer that

25    at this time.

PROCEEDINGS

1      **THE COURT:**  Okay.  All right.

2      **MR. KEVILLE:**  No objection.

3      **THE COURT:**  It's admitted.

4      (Trial Exhibit JTX-14 received in evidence.)

5      **MR. RICHES:**  Thank you, Your Honor.

6      **THE COURT:**  All right.  See you at 8:30.

7                    (Recess taken at 8:08 a.m.)

8                    (Proceedings resumed at 8:35 a.m.)

9      (Proceedings were heard out of the presence of the jury.)

10     **THE COURT:**  All right.  Are we ready to proceed?

11     **MR. HAYNES:**  Yes, your Honor.

12     **THE COURT:**  All right.  Let's get Dr. Almeroth back on

13     the stand.

14     (Proceedings were heard in the presence of the jury.)

15     **THE COURT:**  All right.  Please be seated, everybody.

16     Good morning, ladies and gentlemen.  Thank you for being

17     here.

18     And we're now going to proceed with the remainder of the

19     testimony of Dr. Almeroth.

20     So, Mr. Keville.

21     **MR. KEVILLE:**  Thank you, Your Honor.

22              **KEVIN CHRISTOPHER ALMEROTH**,

23     called as a witness for the Defendant, having been previously

24     duly sworn, testified further as follows:

25     \\\

1    <u>CROSS-EXAMINATION</u>    (resumed)

2    BY MR. KEVILLE:

3    Q.    Dr. Almeroth, when we left off yesterday, we were just

4    about to talk about the Boland patent application.  Do you

5    recall?

6    A.    Yes, sir.

7    Q.    Okay.  And you agree the Patent Office considered the

8    Boland patent application and determined Contour had valid

9    claims?

10   A.    It did.

11   Q.    Okay.  And you agree that the Patent Office considered the

12   Boland patent application at a time when it already had all of

13   the Ambarella patents and product data that we went through

14   yesterday?

15   A.    It did.

16   Q.    And you agree that the Patent Office granted patents to

17   Contour, including the ones in this suit, and the Patent Office

18   granted a separate patent to Boland; correct?

19   A.    That's correct.

20   Q.    And so --

21          MR. KEVILLE:  Can I have the Elmo, please.

22   BY MR. KEVILLE:

23   Q.    Looking at your slide from yesterday, you would agree that

24   Contour's claims were allowed, and Contour and Boland had

25   separate inventions?

1    A.    Partially I would agree with that.

2            MR. KEVILLE:  Okay.  Thank you.  We can switch off.

3            MR. EATON:  It wasn't ever on the screen.

4            MR. KEVILLE:  Oh, it wasn't on the screen?

5            THE COURTROOM DEPUTY:  That's my fault.  Sorry about

6    that.

7            MR. KEVILLE:  Apologies, jury.

8            THE COURTROOM DEPUTY:  Okay.

9    BY MR. KEVILLE:

10    Q.    All right.  So what we talked about just now, you agreed

11    that over Boland, Contour's claims were allowed over Boland?

12    A.    They were.

13    Q.    Okay.  And that Contour and Boland, at least according to

14    the Patent Office, had separate inventions?

15    A.    I partially agree with that statement.

16            MR. KEVILLE:  Okay.  All right.  Now, we can switch

17    back.

18    BY MR. KEVILLE:

19    Q.    Is it your understanding that a system or device qualifies

20    as prior art to the asserted patent if it was in public use

21    before the invention of the asserted patent?

22    A.    It's my understanding of the law that that is one way to

23    establish that something is prior art.

24    Q.    Okay.  When was the first Looxcie product sold in the

25    United States?

1    **A.**    I don't recall.  I think it was September 2010.

2    **Q.**    Yes.  In your timeline, it said September 2010, but do you

3    remember the date in September of 2010?

4    **A.**    I don't remember the specific day.

5              **MR. KEVILLE:**  All right.  Allen, can you put up for

6    the witness GoPro 20541.

7              **THE COURTROOM DEPUTY:**  Is that in?

8              **MR. KEVILLE:**  No, it's not.

9              **THE COURTROOM DEPUTY:**  All right.

10   **BY MR. KEVILLE:**

11   **Q.**    This is a document that you considered; correct?  It was

12   in your list of things considered?

13   **A.**    It does look familiar.

14   **Q.**    Okay.  And this -- the date of this is September 15th,

15   2010; correct?

16   **A.**    It is.

17   **Q.**    And it says [as read]:

18             "Wearable cameras seem to be all the rage

19        these days.  There's one that attaches to bike or ski

20        helmets, Contour, and one that fits in your pocket,

21        uCorder.  Now add Looxcie, a 199 telephone headset

22        that's also a wearable camcorder."

23        Do you see that?

24   **A.**    I do see where you're reading.

25   **Q.**    Does that refresh your recollection that it was

1    September 15th, 2010, when Looxcie first put out the Looxcie

2    camera?

3    **A.**    No.  It would have been earlier than this.  You see there

4    that it was updated on 9/15/2010, so there was an earlier

5    version of this article that came out earlier.

6         And also, this would be an article.  It would have

7    obviously been on sale before this article came out.

8    **Q.**    Okay.  You have no documents or evidence to support that,

9    do you?

10   **A.**    Not in front of me, but this article doesn't support a

11   date of only September 15th.

12   **Q.**    The date of the article is September 15th, 2010, and then

13   it says it's updated at 4:11 p.m. on the same day; correct?

14   **A.**    No.  This is the updated version of the article.  I don't

15   think you've shown me the earlier version of the article.

16        **MR. KEVILLE:**  Okay.  Let's put up, Allen, for the

17   witness GoPro 18373.

18   **BY MR. KEVILLE:**

19   **Q.**    Do you agree this is dated September 14th, 2010?

20   **A.**    Yes, it is.

21   **Q.**    Okay.  And that's a Tuesday.  Happy to have you look it up

22   if you want, but that's a Tuesday.

23        And do you note it says [as read]:

24             "And starting this Wednesday" -- so the

25        next day -- "the device is available on Amazon.com,

1      the Looxcie device, for 199"?

2  **A.**   I do see that.

3  **Q.**   Okay.  So that further supports that it was

4  September 15th, 2010, that the Looxcie device was first

5  available; correct?

6  **A.**   No.  It was first available on Amazon.com.  Obviously,

7  there are other vendors who would sell it, including Looxcie

8  itself.

9  **Q.**   Do you know that Looxcie first put out a press release on

10  September 15th, 2010, saying that they were introducing their

11  Looxcie device?

12  **A.**   That they first put out a press release?  I would say they

13  put out a press release on that date.  I haven't seen any

14  evidence that it was the first press release.

15      **MR. KEVILLE:**  Allen, could you show the witness that

16  press release.

17  **BY MR. KEVILLE:**

18  **Q.**   This is a press release from Looxcie about launching their

19  Looxcie camera on September 15th, 2010; correct?

20  **A.**   The article is dated September 15th, 2010.

21  **Q.**   And it says [as read]:

22      "Looxcie announced today the launch of the

23      Looxcie."

24      Correct?

25  **A.**   Yes, that's what it says.

1    Q.    So all this evidence shows, while you just said it was

2    September, it was actually September 15th, the evidence we saw,

3    or you see now, that says the first Looxcie camera was

4    introduced; correct?

5    A.    I would agree all of the evidence that you showed, and

6    what you didn't show, would suggest that it was on sale as of

7    September 15th, but that's also not the only basis for

8    invalidity.

9    Q.    Well, you know the filing dates of the patents was

10   September 13th, 2010; correct?

11   A.    I believe that is correct.

12   Q.    So if the Looxcie system came out on September 15th, 2010,

13   then it's not prior art; correct?

14   A.    Oh, I disagree.  Under the commercial sale prong of

15   whether or not it's prior art, but known by others,

16   demonstrated, there are several other prongs that would

17   establish that it was prior art and state of the art not

18   dependent solely on sales records.

19   Q.    Your timeline only said September 2010.  That's when you

20   said Looxcie came out in your timeline; correct?

21   A.    I did.  I was being conservative with the date.

22   Q.    Okay.  That's all the evidence we have from you.  And what

23   we've seen today is that it was first commercially introduced

24   on September 15th.

25         Do you promise that when you come up with your counsel, if

1   you have an earlier date, you'll show it to us, that it was

2   commercially released before September 15th, 2010?

3   **A.**   No, I won't promise that.  I think I've established that

4   it was in the state of the art.

5   **Q.**   Okay.  Is it your opinion that the Boland reference is

6   evidence of the operation of the Looxcie system?

7   **A.**   I think it is.  I don't think I've relied on it for that,

8   though.

9   **Q.**   And you understand that GoPro has taken the position the

10  Looxcie system is very closely related to the Boland patent;

11  correct?

12  **A.**   There is a relationship between the two.

13  **Q.**   In fact, GoPro said it was closely related; correct?

14  **A.**   I don't recall what they said.  If you've got a document,

15  then you can show it to me.

16          **MR. KEVILLE:**  Allen, could you put that up, please.

17  **BY MR. KEVILLE:**

18  **Q.**   This is from GoPro's invalidity contentions --

19          **MR. EATON:**  What page?

20          **MR. KEVILLE:**  At 26.

21  **BY MR. KEVILLE:**

22  **Q.**   -- where they said the Boland reference is --

23          **MS. CLARK:**  Objection.  It's improper impeachment

24  material and not in his materials considered.

25          **THE COURT:**  You need to, when you -- please come to

1    the mic.  Thank you.

2         MS. CLARK:  Objection.  It's not in his materials

3    considered and is also improper impeachment.  GoPro's statement

4    is not attributable to Dr. Almeroth.

5         MR. KEVILLE:  It's a party admission, and he said, "If

6    you have a statement, you could show it to me."

7         THE COURT:  Well, that wouldn't get you there, but the

8    admission does.  You can go ahead.

9    BY MR. KEVILLE:

10   Q.   Okay.  All right.  Do you see that GoPro said the Looxcie

11   system is closely related to the Boland patent?

12   A.   I see that.

13   Q.   Okay.  And did you know that also GoPro has said Looxcie

14   was purchasing Ambarella chipsets and design modules and,

15   therefore, considering using and/or currently using the current

16   Ambarella chipsets?

17   A.   Yes, I do remember that.

18   Q.   Okay.  So according to GoPro -- you can take that down,

19   Allen -- in the real world, Boland and Looxcie had the

20   Ambarella chipsets and came up with separate patentable

21   inventions; correct?

22   A.   They did.  They also have separate disclosures.

23        MR. KEVILLE:  Okay.  Can I have the Elmo, again,

24   please.

25   \\\

1    BY MR. KEVILLE:

2    Q.    So you had a slide talking about motivation to combine

3    Boland and Ambarella; right?

4    A.    Yes.

5    Q.    But in real life, Boland and Ambarella, at least according

6    to GoPro, they did combine, they did have those, and they came

7    up with different inventions; correct?

8    A.    No, I don't think that's right.

9    Q.    Well, the Patent Office certainly thought they had come up

10    with different inventions; correct?

11    A.    When it comes to the claims, I think they were different;

12    but with respect to the disclosures, I think they overlap in

13    the way that I described.

14    Q.    Okay.  The Patent Office thought the claims of the Contour

15    patent were different than Boland; correct?

16    A.    Boland by itself?  I think that's correct.

17    Q.    Okay.  And even the Patent Office previously had all the

18    Ambarella references.  We agree on that; correct?

19    A.    But when it first got those, it did not have Boland.

20    Q.    Right.  But it later had all those and considered Boland,

21    the Patent Office, and allowed the claims?

22    A.    What happened later was not a consideration of Ambarella

23    at that point.  It was something else.

24    Q.    Okay.  But you don't dispute that all that evidence was

25    before the Patent Office?

1    **A.**    I'm sorry.  What evidence?

2    **Q.**    All the Ambarella evidence was before the Patent Office,

3    and then the Patent Office also considered Boland later?

4    **A.**    Yes, but not with Ambarella at that point.

5    **Q.**    Okay.  In the real world, from what we've seen and what

6    we've heard about Ambarella, it wasn't obvious to Boland to

7    make the Contour invention because he came up with a separate

8    invention, even though he had Ambarella chips?

9    **A.**    I only agree in part because when you talk about

10   invention, you talk about the claims.

11          **MR. KEVILLE:**  Okay.  Let's put the Elmo up again,

12   please.

13   **BY MR. KEVILLE:**

14   **Q.**    All right.  So this is the state we have.  Boland, Contour

15   claims were allowed, and Contour and Boland had separate

16   inventions.  And then Ambarella, we know Contour claims were

17   allowed when 17 Ambarella patents were considered and

18   12 Ambarella A5, A5s, and A7 data sheets were considered;

19   correct?

20   **A.**    No.  So I disagreed with your lower-left writing on the

21   slide, and I'm now disagreeing with what you have here on the

22   right side.

23   **Q.**    Okay.  You do agree that the Patent Office considered 17

24   Ambarella patents and 12 Ambarella data sheets, including the

25   A5s and the A5, and allowed the Contour claims; correct?

1   A.   Originally, that's correct.

2        MR. KEVILLE:   Okay.   You can take the Elmo down.

3   BY MR. KEVILLE:

4   Q.   Yesterday you said the document that told you Nick Woodman

5   identified recording two streams in parallel was quote [as

6   read]:

7        ". . . the emails where he discussed the use of

8        the A2 or the A5 Ambarella chip.   The A5 Ambarella

9        chip had that capability in it," closed quote.

10  Do you remember that?

11  A.   I do.

12       MR. KEVILLE:   Okay.   Can you put up, Allen,

13  Exhibit 2006, which is in evidence.

14  BY MR. KEVILLE:

15  Q.   And in this email from August 2006, Laura O'Donnell talks

16  about the improvements Ambarella is working on in the A5s chip

17  and about the dual stream that she wants to further develop;

18  correct?

19  A.   I'm sorry.   Where were you reading from?

20       MR. KEVILLE:   And then down below, "the dual stream"

21  and "we can further develop."   Right there.   Last line of that

22  paragraph.   There you go.

23  BY MR. KEVILLE:

24  Q.   Right?

25  A.   Okay.   I see where you're reading from.

1   Q.   Okay.  So this is August 2009; correct?

2   A.   It is.

3   Q.   So using the same approach you took for Mr. Woodman, you

4   agree that Laura O'Donnell had conceived of the invention as of

5   August 2009?

6   A.   I disagree.

7   Q.   Okay.  Let's look at another email and see if we can get

8   to agreement.  Let's look at Exhibit 2007, which is in

9   evidence.

10      In this December 2009 email, Ms. O'Donnell talks about the

11  unique development Contour plans to do on the Ambarella A5s;

12  correct?

13  A.   Again, I'm not sure where you're reading.

14  Q.   It's in that paragraph, "As we discussed, Twenty20," she

15  talks about the A5s, and she talks about "unique development we

16  would desire on your OS."

17  A.   Okay.  Let me read it, please.

18  Q.   Sure.

19  A.   (Witness examines document.)  I see the paragraph.

20  Q.   Okay.  And then she goes on to suggest that the Ambarella

21  SDK, or software development kit, should include a Bluetooth

22  host for communication; correct?

23  A.   Could you go -- I mean, I see it's Number 6 in the list.

24  Yes, I see where she says [as read]:

25          "As a follow-up to our discussion, I have listed

1          below some of the capabilities we would like to see

2          in the A5s SDK."

3               MR. KEVILLE:  Okay.  And let's put up Exhibit 26,

4     which is in evidence.

5     BY MR. KEVILLE:

6     Q.   At the same time, in December 2009, if we look at

7     Exhibit 26, Ben Bodley and Richard Mander discussed building a

8     prototype viewfinder based on WiFi, Bluetooth, USB; correct?

9     A.   Again, I'm not sure where you're reading from.

10         (Witness examines document.)  Yes, I see where it says

11    that.

12    Q.   Okay.  So using the same approach you took for

13    Mr. Woodman, you agree that Laura O'Donnell, Richard Mander,

14    and Ben Bodley had conceived of the invention no later than

15    December 2009; correct?

16    A.   Oh, no, I disagree.  Even if you got close based on those

17    emails, you haven't identified other limitations of the claims;

18    you haven't done the limitation-by-limitation analysis.

19         And, again, there was more support that I provided for

20    Mr. Woodman than just the particular sentences.

21    Q.   And Mr. Woodman, you said disclosing the generate

22    limitation and generating two streams in parallel, all you

23    could point to was that he discussed the A5.

24         You've seen all these documents for Contour, and you take

25    a completely different approach; correct?

1    **A.**    I pointed you to one document.  I didn't point you to all

2    of the support that I identified in my testimony.

3    **Q.**    All we saw in court when you testified was that one

4    document.  I asked you what evidence you had.  You pointed to

5    that one document; correct?

6    **A.**    That was the one I pointed you to.  When I went through

7    the evidence earlier, I pointed you to additional things.

8    **Q.**    Okay.  You're still going to contend, despite what you

9    said yesterday in court, that Contour didn't have the invention

10   by at least December 2009?

11   **A.**    You've shown me a couple of emails.  You haven't shown me

12   the full conception of the invention, the permanent fixed idea.

13   You've really shown me a couple of emails with three or four

14   lines.  If that's sufficient, then that would be sufficient for

15   Mr. Woodman, and the patent would be invalid.

16   **Q.**    That's all I'm saying, is under your -- no, the patent

17   wouldn't be invalid, sir.

18        But under your idea of conception, Contour has a lot more

19   to show that you've shown the jury than Mr. Woodman does;

20   correct?

21   **A.**    Oh, I disagree.  I went through about ten minutes' worth

22   of evidence from the patent -- from the GoPro specification and

23   also from the emails in the context of the history of GoPro.

24   It was much more than just a few sentences from an email.

25   **Q.**    Okay.  You agree that that patent said nothing about

1  having two streams of video; correct?

2  **A.**   I don't recall if it did or not.  I don't have it

3  completely memorized.

4  **Q.**   Okay.  And it only talked about a wrist remote with a

5  button and nothing about streaming low quality and high

6  quality, correct, that Woodman patent?

7  **A.**   Not streaming high quality and low quality.  It did talk

8  about -- actually, it did.  I think it talked about HD and then

9  SD.  And then the SD was VGA, and then it talked about the two

10 different resolution rates.  Now that I remember, I think that

11 was actually something that I put up.

12 **Q.**   Okay.  All right.  Let's talk about secondary

13 considerations.

14      You agree that Contour may rely on secondary

15 considerations of non-obviousness; correct?

16 **A.**   Yes, sir.

17 **Q.**   And those include things like commercial success, failure

18 of others, skepticism by experts, praise by others, things like

19 that; correct?

20 **A.**   Yes, sir.

21 **Q.**   Copying, that's another one that shows non-obviousness;

22 correct?

23 **A.**   It does.

24 **Q.**   Okay.  And do you agree that if the jury finds copying by

25 GoPro, that is an indicator the patents are not obvious?

1   **A.**   No, that is not true for two reasons, the first of which

2   is you actually have to have a nexus to the claims, and the

3   second is you would have to then establish that that evidence

4   would overcome the obviousness that I already presented.

5       So merely showing copying of something at some point is

6   not sufficient to establish the requirements of secondary

7   considerations.

8   **Q.**   If the jury finds that GoPro took the Contour products

9   that practice the invention, the ContourGPS and the Contour+

10  that they knew had the live preview while recording feature and

11  then took them and tore those down to copy them, if the jury

12  finds that, you agree that's an indicator the patents are not

13  obvious?

14  **A.**   Oh, absolutely not.   GoPro had already established those

15  concepts before the teardown happened.

16  **Q.**   Okay.   You heard Mr. Harrison testify that iON copied

17  the Contour invention and admitted infringement.   You were here

18  for that testimony; correct?

19  **A.**   I was.

20  **Q.**   That is also evidence that the patents are not obvious;

21  correct?

22  **A.**   No, not necessarily.   I will have to see what the evidence

23  is other than him just saying it.

24  **Q.**   Okay.   As to skepticism of experts, you were here

25  yesterday, and you heard Mr. LeGall say that in late 2008, the

1    idea of a camera talking to a phone was wishful thinking.  You

2    heard him say that; right?

3    A.    Yes, in 2008, a year before the conception.

4    Q.    Do you recall, as to skepticism by experts, you stated,

5    "Any skepticism that Ambarella expressed towards using

6    Bluetooth was because it already had the capability to use WiFi

7    to stream and transfer video to handheld devices"?  Do you

8    remember saying that?

9    A.    Yes.  That sounds like something I'd say.

10   Q.    And do you also recall that you said Dr. Hu

11   mischaracterized certain things and that Ambarella's chipsets

12   included WiFi compatibility by 2009?  Do you recall you said

13   that?

14   A.    Could you repeat that?

15   Q.    Sure.

16         Do you remember critiquing Dr. Hu in one of your reports?

17   You said the Ambarella chipsets included WiFi compatibility by

18   2009?

19   A.    Yes, that sounds about right.

20   Q.    And both of those statements are inaccurate; correct?

21   A.    I don't think they are inaccurate.

22   Q.    Okay.  Mr. LeGall testified yesterday that the wireless --

23   details for wireless were not resolved prior to December 2009.

24   Do you recall that?

25   A.    I don't think he quite said that.

1  **Q.**   Okay.

2  **A.**   In the context of working with Apple, that's what I think

3  he was talking about.

4       **MR. KEVILLE:**  Allen, can you find that?  I only have

5  the rough cite.

6       Can we have the screen?

7       **THE COURTROOM DEPUTY:**  Oh, you want the document

8  camera?

9       **MR. KEVILLE:**  Yes, please.  Thank you.

10      Oh, no, no, not the document camera.  Sorry.  I need to

11  put it up.

12      Oh, my bad.  It was already on the screen.

13      [As read]:

14      **"QUESTION:**  And did Ambarella" --

15      He was asked, Mr. LeGall [as read]:

16      **"QUESTION:**  And did Ambarella, prior to 2009 --

17      December 2009, have the idea of transmitting the

18      lower-resolution stream wirelessly?

19      **"ANSWER:**  I'm not sure because the detail for the wireless

20      were not resolved."

21  BY MR. KEVILLE:

22  **Q.**   Do you see that?

23  **A.**   I do see that.

24  **Q.**   Okay.  So there is no evidence that Ambarella already had

25  included WiFi compatibility in its chip by 2009; correct?

1    **A.**    Oh, absolutely it did.

2        What he was talking about here and the challenge for doing

3    wireless was to iPods and devices like that, where the

4    environment was closed for Apple.  But being able to wirelessly

5    transmit was something that he specifically described as being

6    available in the A5 by the beginning of 2009.

7    **Q.**    That's your recollection of his testimony?

8    **A.**    Yes, sir.

9    **Q.**    Okay.  Well, we'll deal with that.

10       You agree that Contour, the ContourGPS, won the Red Dot

11   award in 2011; correct?

12   **A.**    Yes.

13   **Q.**    And the ContourGPS won the award for Best Mobile Lifestyle

14   Accessory of 2011; correct?

15   **A.**    Yes.

16   **Q.**    CES 2011?

17   **A.**    Sorry.  Yes, I think there were those two awards.

18   **Q.**    Okay.  You also agree the jury can consider praise by

19   others as evidence the claims are not obvious; correct?

20   **A.**    As long as you establish a nexus to the patent claims.

21          **MR. KEVILLE:**  Okay.  Can you put up for the witness,

22   Allen, Trial Exhibit 3430.

23   **BY MR. KEVILLE:**

24   **Q.**    This is a document you considered in preparing your

25   opinions; correct?

1    **A.**    It does not look familiar to me.

2    **Q.**    Okay.  It's in your list of documents considered in your

3    June 2020 rebuttal report.

4    **A.**    That's probably why.

5    **Q.**    So you just don't remember, but if it's in your report,

6    you don't dispute that you saw it?

7    **A.**    If it was in the report.

8    **Q.**    And this is a Contour press release titled "Contour

9    Launches Connect View Card and Viewfinder App"; correct?

10   **A.**    That's what it says.

11   **Q.**    All right.  So this is the day Contour launched the

12   Connect View and Viewfinder App.

13           **MR. KEVILLE:**  And can we go down to the comments,

14   Allen.  And can you blow up those first three comments.

15   **BY MR. KEVILLE:**

16   **Q.**    Can you read the first comment that was made on the

17   same day as Contour introduced the Connect View Card and

18   Viewfinder App?

19   **A.**    So in 2011 --

20           **MS. CLARK:**  Objection, Your Honor.  This document is

21   not in evidence, and this is not impeachment.

22           **MR. KEVILLE:**  It is impeachment, Your Honor, and it's

23   a document that he considered.  And he said there are no

24   secondary considerations in his direct.  He said there's no

25   secondary considerations, so I'm impeaching him on that.

1          **MS. CLARK:**  He said that he had considered evidence of

2     second indicia that didn't overcome his finding of obviousness.

3     He's never made a contrary statement, nor have we seen any

4     burden of production met by Contour's witnesses yet, I would

5     say, waiting for rebuttal, to address any secondary indicia

6     they may wish to proffer.  But at this time, there is no

7     contradictory statement on the record for which he could be

8     impeached.

9          **MR. KEVILLE:**  I disagree.  He said there were no

10    secondary considerations that he said countered his obviousness

11    conclusion.

12         **THE COURT:**  I'm going to overrule the objection.

13    You can respond to these comments.

14    **BY MR. KEVILLE:**

15    **Q.**   Okay.  Can you read the first comment that was posted

16    after Contour announced the live Connect View Card and

17    Viewfinder?

18    **A.**   So it says [as read]:

19              "I have to say that it is a cool little feature

20         for sure.  The ability to line up is a nice touch,

21         and the GPS feature is actually very good for those

22         people who are out there mapping and making trails."

23    **Q.**   Can you read the next comment that came five minutes

24    later.

25    **A.**   [As read]:

1          "Cool thinking.  Innovative way to let you see

2      what you're shooting."

3   **Q.**   And can you read the next comment that was posted 20 -- or

4   two hours and a little more later.

5   **A.**   [As read]:

6          "I guess this is Contour's take on GoPro's new

7      LCD screen.  The downside of the GoPro screen is that

8      I can't see the shot when it's on my helmet, which

9      makes this app really useful.  I just can't stand the

10     look of the Contour's footage.  So Contour and GoPro,

11     if you're reading this, do a collaboration."

12  **Q.**   Okay.  Now, in fairness, there are many more comments,

13  some saying why they like GoPro, some saying why they like

14  Contour.  But when you reviewed this, did you find there were

15  no comments saying that the Contour invention was not new?

16  **A.**   I don't think so.  It would be an odd comment for there to

17  be something like that.

18  **Q.**   All right.  Whether you agree or not, there are at least a

19  number of factors that the jury could find are secondary

20  considerations; correct?  The jury could find that from the

21  evidence?

22  **A.**   No.  I both don't think this rises to the level of praise

23  by others or any of the other secondary considerations.  It's

24  not particularly tied to the claims.  There's no mention of

25  remote control functionality.  So I don't even think there's a

 1    nexus in those comments.

 2    **Q.**    Okay.  You're being paid $800 an hour by GoPro; correct?

 3    **A.**    Yes.

 4    **Q.**    And you remember the person you say is the actual

 5    inventor, Nick Woodman, said, "I'm not the inventor"?  You

 6    remember that?

 7    **A.**    You mischaracterized what my statement was.  I was talking

 8    about conception.  And then there was the statement right after

 9    that that we read into the record about he was saying he had

10    conceived of everything before the inventors of the Contour

11    patents.

12    **Q.**    There is absolutely nothing that could happen that could

13    change your opinion that the Contour patents are obvious?

14    **A.**    I haven't seen anything yet.  I try and keep an open mind.

15    **Q.**    Okay.

16    **A.**    But based on all the analysis I've done, I do think that

17    the opinions I've reached are accurate.

18    **Q.**    For the new cameras, if you use the same claim scope and

19    interpretation that you used for invalidity to determine

20    whether GoPro's cameras infringe or don't infringe, you agree

21    that all the cameras in this case would actually infringe?

22    **A.**    No, that's not correct.

23    **Q.**    Okay.  You do agree you used a different scope of the

24    claims and interpretation for invalidity than you used for

25    determining whether the GoPro cameras infringe; correct?

1    **A.**    I did back in 2020, when considering the Group 1.  That's

2    not the case for Group 2, live preview and live streaming.

3    **Q.**    Okay.  Let's move on to those cameras then.

4            **MR. KEVILLE:**  Can I have the Elmo, please.

5    **BY MR. KEVILLE:**

6    **Q.**    This is your slide on the basis for why you say the claim

7    limitation regarding the wireless connection protocol device is

8    not met; correct?

9    **A.**    Yes, sir.

10   **Q.**    Okay.  First, you agree that this element must be given

11   its plain and ordinary meaning; correct?

12   **A.**    I believe that's correct.

13   **Q.**    Okay.  And you've highlighted and underlined some things;

14   correct?

15   **A.**    Yes, sir.

16   **Q.**    Okay.  Let's talk about that phrase.

17           You've been an expert in many patent cases; correct?

18   **A.**    I have been.

19   **Q.**    On issues of infringement, validity, and claim

20   construction; correct?

21   **A.**    I have.

22   **Q.**    You agree that, as used in patents, "a" means one or more?

23   **A.**    Yes, that's correct.

24   **Q.**    Okay.  And then you agree that the -- there's a noun in

25   this, a wireless connection protocol device; correct?

1    **A.**    That's what it says.

2    **Q.**    And the head noun in that is "device"; correct?

3    **A.**    That's correct.

4    **Q.**    "Connection," "protocol," and "wireless" all modify

5    "device"; correct?

6    **A.**    That's correct.

7    **Q.**    Okay.  So in this claim element, we need a device, and the

8    device must be a wireless protocol device?

9    **A.**    Wireless connection protocol device.

10   **Q.**    Right.  And you don't dispute that there is a wireless

11   connection protocol device, the QCA9377, in all of the Live

12   Preview Group 2 and live streaming cameras?

13   **A.**    I disagree.

14   **Q.**    Okay.  So you don't think there is a device?

15   **A.**    There is a device, but that's obviously not the claim

16   requirement.

17   **Q.**    Okay.  And understanding, as you just said, that "a" in a

18   patent means one or more, you agree there are one or more

19   wireless connection protocol devices in the accused cameras?

20   **A.**    I disagree because the wireless connection protocol

21   device, each one of the one or more would have to perform both

22   functions.

23   **Q.**    Now, the functions are to send real-time image content by

24   wireless transmission directly to and receive control signals

25   or data signals; correct?

1    **A.**    I see that, yes.

2    **Q.**    Those are the two functions that have to happen; correct?

3    **A.**    In the wireless connection protocol device or in each one

4    of those.

5    **Q.**    Right.  And so we have one or more wireless connection

6    protocol devices in the GoPro cameras that are at issue in the

7    Group 2 and the live streaming; correct?

8    **A.**    I disagree.

9    **Q.**    Okay.

10   **A.**    Not of the type that this claim requires.

11   **Q.**    Now, that's because you're trying to say this claim

12   requires it be limited to just Bluetooth or just WiFi?  That's

13   how you're interpreting this claim; correct?

14   **A.**    No.

15   **Q.**    Okay.  So there's nothing in this claim that says whether

16   it has to be Bluetooth or WiFi or a combination of both, is

17   there?

18   **A.**    Yes, there is something in the claim.  It can't be a

19   combination of the two.  When it says "a wireless connection

20   protocol device," that is for a particular protocol.  That's

21   what that word means as the modifier to "device."  So it can't

22   be your third option of Bluetooth or WiFi in that protocol

23   device.

24   **Q.**    Well, but "a" is one or more.  So if we have one or more,

25   we could have two protocol devices doing these two functions;

1    correct?

2    **A.**    That's not quite right.  If you have one or more wireless

3    connection protocol devices, each of the wireless connection

4    protocol devices would have to be configured to do both things.

5    You can't have one protocol device that does one and another

6    protocol device that does the other.

7    **Q.**    There's nothing in this that says what you're saying now.

8    There's nothing in this claim element; correct?

9    **A.**    I disagree.  That's exactly what the claim element says,

10   as would be interpreted using the plain and ordinary meaning by

11   a person of ordinary skill in the art.

12   **Q.**    You agree that this claim element can be met by any

13   wireless connection protocol device, whether it's WiFi or

14   Bluetooth; correct?

15   **A.**    As long as if it's WiFi, it does both of those things or

16   if it's Bluetooth, it does both of those things, where the two

17   things are send real-time image content and receive control

18   signals or data signals.

19   **Q.**    This is a new approach that you've taken; correct?

20   Previously you said, "This claim element could be met by any

21   wireless connection protocol device, including WiFi, Bluetooth,

22   or others."  Do you recall you said that?

23   **A.**    I did in the context of, for each protocol, it would have

24   to do all of what's required in the claim.

25          **MR. KEVILLE:**  Can you put up, Allen, his 10/27/21

1   report at page 588.

2          Oh, can we have the screen back?

3          All right.  Can you find where he said, "This claim

4   element could be met by any wireless protocol device"?

5          Yeah, okay.

6   **BY MR. KEVILLE:**

7   **Q.**   So here's what you said previously [as read]:

8              "The claimed inventions are not directed to

9           implementing Bluetooth for streaming and transferring

10          video.  Nowhere do the asserted claims mention

11          Bluetooth.  They're directed to a wireless connection

12          protocol device.  This claim element could be met by

13          any wireless connection protocol device, including

14          WiFi, Bluetooth, or others."

15         Yes or no, that's what you said?

16  **A.**   That's what I said, and it's consistent with what I said

17  previously, that that wireless connection protocol device would

18  have to do both functions.

19  **Q.**   Nowhere in here did you say the wireless connection

20  protocol device can only do Bluetooth or only do WiFi?  That's

21  a new thing you're saying now in this trial; correct?

22  **A.**   I disagree.  You're not showing the --

23  **Q.**   All right.

24  **A.**   I disagree.

25  **Q.**   Okay.  Let's go to something else you said in this report.

1        **MR. KEVILLE:**  Can we go to Note 427 at 605 and 606.

2    Okay.  And get the full thing.

3    **BY MR. KEVILLE:**

4    **Q.**  Here, you said [as read]:

5        "Dr. Hu's focus on the alleged invention of a

6    BLE-based wireless preview is immaterial since the

7    claims are not limited to Bluetooth."

8    Is that what you said?

9    **A.**  That's correct.

10   **Q.**  Okay.

11   **A.**  You could use WiFi.

12       **MR. KEVILLE:**  Okay.  Your Honor, pass the witness.

13       **THE COURT:**  Okay.

14       **MS. CLARK:**  Mr. Arndt, can we put up DDX-5.59?

15   That is -- ah, 5.59.

16   There we go.

17             <u>**REDIRECT EXAMINATION**</u>

18   **BY MS. CLARK:**

19   **Q.**  I'm just going to pick up right where Mr. Keville left

20   off.

21   Do you recall your testimony yesterday about Boland's

22   disclosure of the wireless connection protocol device?

23   **A.**  Yes.

24   **Q.**  Does Boland disclose a wireless connection protocol device

25   that both controls the camera and provides preview

1   functionality?

2   **A.**    Yes, and it does so through one protocol.

3   **Q.**    Is there anything that you presented or any evidence from

4   Boland that shows that it's one protocol?

5   **A.**    Yes.  It's going to be in paragraph 74, which is kind of

6   this portion down here.  It says that the computing platform

7   provides Internet connectivity via packet-based protocol which

8   may be wireless or Ethernet.  And then this last piece

9   [as read]:

10          "Any device which uses the same wireless or

11       wired protocol as the headset can replace the control

12       and/or video preview functionality of the handset."

13       So it's saying the headset and the handset use the same

14   protocol to accomplish both of those functions.

15   **Q.**    Is that different from how the accused Group 2 and Group 3

16   products work?

17   **A.**    Yes, it is different.

18   **Q.**    How so?

19   **A.**    So for the Group 2 live preview products and the live

20   streaming products, they use Bluetooth for the control

21   functionality and then they use WiFi to exchange the data.  And

22   I think Mr. Liu's testimony was they establish the Bluetooth

23   connection and do everything over that; and then if there's a

24   need to do any larger file transfer, they do that over the WiFi

25   connection.

1   Q.   Now, in the asserted claims, could there -- could the

2   asserted claims be met by a wireless connection protocol device

3   that used Bluetooth if the Bluetooth transmitter did both

4   preview and remote control?

5   A.   Yes.  That's what I was trying to explain.  You could do

6   Bluetooth if Bluetooth did everything.

7   Q.   Could -- could a device meet the wireless connection

8   protocol device limitation if it used WiFi to do both preview

9   and remote control?

10  A.   Yes.  If both functions were for WiFi, then it could be

11  met by just WiFi.

12  Q.   In your opinion, then, why is it that GoPro Group 2 and

13  Group 3 devices do not meet the wireless connection protocol

14  device requirements of the claim?

15  A.   Because that's not the way they work.  It splits up the

16  functionality among different wireless connection protocol

17  devices.  It uses Bluetooth for one set of functions, and it

18  uses WiFi for the other set of functions.

19       And the claim requires a wireless connection protocol

20  device that does both.  It's not the same to have one do one

21  set of functions and the other do another set of functions.

22  It's really an evolution beyond kind of the concepts that are

23  in the Contour patents.

24  Q.   All right.  Let's step back to your testimony yesterday.

25  I'd like to start with DDX-8.8.

1          Do you recall Mr. Keville asking you about this slide?

2    **A.**   Yes.

3    **Q.**   This is not a slide that you prepared; right?

4    **A.**   That's correct.

5    **Q.**   Do you recall Mr. Keville asking you whether your opinion

6    was that each of the constituent elements of the claimed

7    invention was known in the prior art?

8    **A.**   Yes.

9    **Q.**   Was each constituent element known in the prior art?

10   **A.**   Yes.  Each one was known individually and then also

11   collectively.

12   **Q.**   Right.  So you testified that you are saying more than

13   just each individual element was known in the art, and I'd just

14   like to give you an opportunity to clarify to the jury, if you

15   want, what you were saying the more is.

16   **A.**   Oh, right.  So this was the Edison lightbulb example, and

17   all of the parts of the lightbulb were already known.

18        It's certainly been established that that's the case here,

19   that all of the constituent pieces were known; but it's more

20   than that, that the whole collection was something that was

21   known and that would have been obvious.  It was certainly

22   something that was contemplated by GoPro and Mr. Woodman before

23   the conception date from Contour, and it's also completely

24   disclosed within Boland except for the use of the Ambarella

25   processor.

1    And so it's not just the individual pieces but the whole

2  collection of pieces that was also known in the prior art and

3  would have been obvious to a person of skill in the art.

4  **Q.**    Now, the asserted claims in this case, they don't actually

5  use the words "live preview while recording"; right?

6  **A.**    That's correct.

7  **Q.**    But Contour said that's what its invention was; right?

8  **A.**    That's correct.

9  **Q.**    Was the idea of live preview while recording something

10  that already existed in the state of the art at the time of the

11  invention?

12  **A.**    Yes.  As a concept, that was the case.  The Sony Ipela had

13  that, the swivel camera where you could be on the computer,

14  that had live preview while record.  Looxcie had live preview

15  while record with the headset.  Also the Boland patent had live

16  preview while record.  The Presler patent had live preview

17  while record.  And then certainly GoPro had conceived of live

18  preview while record as well.

19    So that concept, that feature, was something that would

20  have been in the mind of a person of skill in the art based on

21  the state of the art as well as specific prior art references.

22    **MS. CLARK:**  Let's put up DDX-5.59.

23  **BY MS. CLARK:**

24  **Q.**    You mentioned just now that Boland disclosed the concept

25  of live preview while recording; right?

1  **A.**   Yes.

2  **Q.**   Is that in a particular paragraph that you talked about

3  yesterday?

4  **A.**   Yes.   That's at the bottom of paragraph 53, where it's

5  talking about the two kinds of video, and it's that last part

6  that says -- let me actually back up.

7      Let me just read the whole part because I think it's

8  particularly important.

9  **Q.**   I think you meant 73.

10      **MR. KEVILLE:**   I'm going to object.   This is outside

11  the scope of my cross.   They're now going into Boland and what

12  it covered on this claim element, which was not anything I

13  covered in cross.

14      Second of all, I gave her some leeway.   She did this

15  already, and now we're covering ground that's already been

16  covered.   So I object to it as --

17      **THE COURT:**   All right.   Your objection is overruled.

18  Okay.   Proceed.

19      **THE WITNESS:**   It says [as read]:

20       "For embodiments where the wireless connection

21    between the headset and the handset is of sufficient

22    bandwidth, the video data may include video frames

23    streamed from the headset which may be viewed and/or

24    recorded to the handset in substantially real time."

25    So it's viewed and/or recorded to the handset.   That's

1   live preview with record.

2   **BY MS. CLARK:**

3   **Q.**   Did Boland recognize that there needed to be sufficient

4   bandwidth in order to wirelessly send the live preview in real

5   time?

6   **A.**   Yes.  It says those words, if the handset is of sufficient

7   bandwidth.  That's kind of this piece right here.

8   **Q.**   Now, you would agree, right, that Boland discloses

9   recording and viewing the same video stream; right?  One?

10  **A.**   Yes.

11  **Q.**   But you relied on a different reference in order to

12  disclose two streams; right?

13  **A.**   I did.  Ambarella.

14  **Q.**   Okay.  And does Ambarella, through two streams, supply a

15  lower-quality and a higher-quality video generated in parallel?

16  **A.**   Yes, it does.

17  **Q.**   Would the lower-quality video address the bandwidth

18  limitations identified in Boland?

19  **A.**   Yes.  Obviously.  I mean, that's the point.  If you have

20  any sort of bandwidth constraint or limitation, you go with the

21  lower-quality version.

22  **Q.**   Now, would a person of ordinary skill in the art at the

23  time of the invention understand, based on Boland, how to

24  wirelessly stream a preview?

25  **A.**   Yes.  Boland provides you the guidance right here in these

1  paragraphs on what function you need to accomplish, and that

2  turns out to be the exact function that would be provided by a

3  chip like Ambarella.

4  **Q.**   And would a person of ordinary skill in the art understand

5  how to save or record a second video stream of higher quality?

6  **A.**   Yes.  All of the guidance you'd need would be right there

7  in terms of Boland.  It has the figures that I went through,

8  and it describes how to do that.

9  **Q.**   Does Boland disclose functionality present in the headset

10  camera that is amenable to storage and/or transmission of any

11  data?

12  **A.**   Yes.  Well, it says that it needs to be of lower quality

13  for the transmission and then it can be higher quality for

14  what's stored.

15  **Q.**   Do you recall Dr. Hu's prior testimony that the claims do

16  not recite any particular software requirements?

17  **A.**   Yes, that's correct.

18  **Q.**   Would you -- would a person of ordinary skill in the art

19  know the basic programming necessary to implement the claimed

20  hardware components of the claims into a camera?

21  **A.**   Yes.  That's really the understanding a person of skill in

22  the art would have.  They'd have that training.  They'd know

23  how to do programming.  They would have worked with video

24  cameras, image processors.  And so implementing the programming

25  to put these pieces together is something that would have been

1    within the skill of a person of ordinary skill in the art.

2    **Q.**    Is there any barrier that you're aware of that would

3    require undue experimentation in order to use the Ambarella A5

4    or A5s to both record -- to generate both recorded and wireless

5    streams disclosed in Boland?

6    **A.**    No, not from a conceptualization perspective.

7    **Q.**    Is there any particular software or source code disclosed

8    in Contour's asserted patents?

9    **A.**    No, nothing specific.  In fact, I think it was one of --

10   the inventor, Dr. Mander, who said that all of that source code

11   was proprietary and they wouldn't have disclosed it in the

12   patent.

13   **Q.**    Have you compared the disclosure in the asserted patents

14   to the disclosure in Boland relating to implementation of

15   wireless preview?

16   **A.**    Yes.  If you look at the disclosures in the Contour

17   patents, they're at a very similar technical level to the

18   disclosures that are in the Boland patent application.

19   **Q.**    Is there any teaching in Boland that informs your opinions

20   regarding motivation to combine Boland with other camera

21   processors?

22   **A.**    Yes.  That was something that I specifically showed where

23   it said it was using the CoreLogic chip but then it could use

24   any other chips that were available.

25        **MS. CLARK:**  Can we put up DDX-5.70.

1   BY MS. CLARK:

2   Q.   In order for two references to render a patented invention

3   obvious, does someone have to actually combine the references

4   in real life?

5   A.   No.  It's -- that is the question of obviousness, that

6   someone didn't necessarily do it.  So the test is not:  Did

7   somebody commercialize the actual combination?  It's really

8   whether or not it would have been obvious to a person of

9   ordinary skill in the art.  So the test is not:  Did someone

10  already do it?

11  Q.   Now, when Mr. Keville asked you whether you agreed that

12  the Contour patents and Boland disclosed separate inventions,

13  you said you partially agree.  Is there a part that you don't

14  agree with?

15  A.   Yes.  So the key is not what the claims say, and that's

16  really what defines the invention.  I made that as one of the

17  foremost points in my testimony.  It's the claims that define

18  the invention.

19      And so you don't just look at the claims at the end.  You

20  also look at what the disclosures are throughout the

21  specification and the different ideas that were conceived of

22  within the body of the specification and within other

23  documents.

24  Q.   Are Looxcie and Boland the same reference?

25  A.   No.  Looxcie is a commercial product, and then Boland is

1    the patent application that preceded it.

2    **Q.**    If Looxcie was sold in September 2010, in or around or

3    even later than the provisional application -- Contour's

4    provisional application, does that undermine Boland's

5    disclosure as prior art?

6    **A.**    No, absolutely not.

7    **Q.**    You were also asked about what the Patent Office had

8    before it relating to Ambarella.  Do you recall that?

9    **A.**    Yes.

10   **Q.**    Did the patent have Mr. LeGall's testimony?

11   **A.**    No, it did not.

12   **Q.**    Did the Patent Office have all the documents Mr. LeGall

13   provided?

14   **A.**    No.  There were some important documents that describe

15   concepts that were not in the list that Mr. Keville showed me.

16        **MS. CLARK:**  And can we look at -- and I apologize.  I

17   only have the rough transcript number.

18        Can we look at yesterday's trial transcript, the rough

19   version, at 41:12 through 23, please.

20        **THE OFFICIAL REPORTER:**  No.  You have the certified

21   transcript.

22        **THE COURT:**  Take it down, please.

23        **MS. CLARK:**  Okay.  I will just ask the question.

24   BY MS. CLARK:

25   **Q.**    Were you here when Mr. LeGall testified?

ALMEROTH - REDIRECT / CLARK

1    **A.**    Yes.

2    **Q.**    And do you recall him testifying that in 2009, sending

3    wireless video to a phone device would not work but you could

4    at least on paper?  Do you recall that?

5    **A.**    Actually, I think he said a little bit more than that.

6    What he said was, for at least interfacing with Apple, they

7    hadn't worked out the particular details because Apple is a

8    very closed system and, at that time, Apple was not allowing

9    other people to interface, kind of, with their ecosystem.

10   **Q.**    Do you recall him testifying in 2009 you'd send the data

11   over a wireless network; like, for instance, if you had WiFi,

12   you could send it to PCs using WiFi?

13   **A.**    Yes.

14   **Q.**    Is that an example of -- would that inform the use of

15   Ambarella for sending a wireless video?

16   **A.**    Oh, yes, absolutely.

17   **Q.**    Okay.  Were the specific combination of Boland and

18   Ambarella considered by the Patent Office?

19   **A.**    No, not when it had -- when it looked at Boland.

20   **Q.**    Do you recall being asked whether Mr. Woodman's invention

21   anticipates the asserted claim?

22   **A.**    Yes.

23   **Q.**    Do you believe Mr. Woodman's prior invention anticipates

24   the asserted claims?

25   **A.**    Yes, I do believe it does.

1   Q.   Do you believe that Mr. Woodman's invention renders

2   obvious the asserted claims in view of the state of the art?

3   A.   It also does as well.

4          MS. CLARK:   Okay.   Can we put up DDX-5.81.

5   BY MS. CLARK:

6   Q.   Is this a slide that you presented yesterday?

7   A.   Yes, it is.

8   Q.   Does Mr. Woodman's patent disclose the general idea of

9   live preview while recording?

10  A.   Yes.   It says right there on the left side [as read]:

11          "The wireless interface transmits the image

12      currently in view of the camera lens to the remote

13      preview screen for display."

14      So that's -- that's the live preview aspect.

15  Q.   Okay.   And is the Woodman patent prior art to the Contour

16  inventions?

17  A.   Yes, absolutely.   The date is July 7th, 2008, for the

18  Woodman provisional.   That's quite a ways, 18 months almost,

19  before the earliest date for the Contour patents.

20         MS. CLARK:   Can we look at DDX-5.83.

21  BY MS. CLARK:

22  Q.   Is the Woodman patent the only thing that you considered

23  in rendering your opinion that Mr. Woodman conceived the

24  invention prior to Contour's priority date?

25  A.   No.   That was the GoPro spec.   And this was actually the

1    portion I had in mind about the different resolutions.

2    **Q.**    Can you explain what it shows about different resolutions?

3    **A.**    Sure.  So it shows dual record at different resolutions,

4    dual streaming.  The camera can be shooting and saving in HD --

5    so that's the record portion -- high definition to the SD card

6    at the same time as it is outputting 640 by 480 VGA video to an

7    RF transceiver.  That's the low-resolution live preview sent

8    over wireless.

9    **Q.**    I think you also testified that you considered some emails

10   between GoPro and Ambarella; is that right?

11   **A.**    Yes.

12        **MS. CLARK:**  Can we pull up Trial Exhibit 426.  It's

13   been admitted.

14   **BY MS. CLARK:**

15   **Q.**    Is this one of the emails that you considered in rendering

16   your opinions regarding the timing of Mr. Woodman's invention?

17   **A.**    Yes, it is.

18        **MS. CLARK:**  Can we look at the first email at the

19   bottom.  You know, emails are in reverse chronological order.

20   Perfect.

21   **BY MS. CLARK:**

22   **Q.**    It's dated January 21st, 2009?

23   **A.**    Yes.

24   **Q.**    Is --

25   **A.**    Sorry.  It's important to, again, keep in mind the dates.

1  This is nine months before the earliest conception date offered

2  by Contour.  So, you know, this is -- this is work that GoPro

3  is doing.

4  **Q.**  Does this email -- let's see.  I direct your attention to

5  where it says [as read]:

6          "We are so excited to know you and develop our

7      current and future cameras around the A2 and A5 SoC

8      solutions."

9  **A.**  Yes, that's what it says.  That's what I referenced in my

10 testimony.

11 **Q.**  How does that relate to your opinions regarding whether or

12 not Mr. Woodman had conceived of the invention before the

13 priority date?

14 **A.**  Nine months before the Contour patent earliest alleged

15 priority date, GoPro and Mr. Woodman are already considering

16 the use of the A5 SoC solutions in the context of the kinds of

17 products that they want to develop.

18         **MS. CLARK:**  Can you scroll up?

19 **BY MS. CLARK:**

20 **Q.**  There's a response to that email that's also dated

21 January 21st, 2009, from John Ju at Ambarella; right?

22 **A.**  Yes.

23 **Q.**  And what does he say -- I guess, let me ask the question.

24     How, if at all, does what Mr. Ju replies inform your

25 opinions regarding Mr. Woodman's understanding of the claimed

1    invention?

2    **A.**    And this says that even the A2 can output up to SD

3    resolution during HD encoding.  So that's describing, even for

4    the A2, this dual stream with a high resolution and a low

5    resolution.  I think that was something I testified to

6    yesterday.  I didn't remember the document, but this is the one

7    I had in mind.

8    **Q.**    Mr. Keville asked you a lot of questions about

9    Mr. Woodman's testimony where he said he wasn't the first

10    inventor.  Do you recall that?

11    **A.**    Yes.

12    **Q.**    I believe that you directed Mr. Keville to trial

13    transcript at 552, lines 2 through 9.

14            **MS. CLARK:**  Can we put those up, please.

15    **BY MS. CLARK:**

16    **Q.**    Okay.  And you said that this testimony in which

17    Mr. Woodman said, "I believe I had a concept for what is

18    claimed in the patents, but no, I'm not claiming to be the

19    inventor of those concepts," how is that relevant to your

20    analysis of whether or not Mr. Woodman's invention came before

21    Contour's?

22    **A.**    So two things.  Again, it's the second part, he's not

23    claiming to be the inventor of those concepts.  It's kind of

24    like the Edison lightbulb individual components.  But he had

25    the concept for what is claimed in the patents.  So all of

1    those things put together is what he was saying.

2    **Q.**   Did Mr. Woodman ever try to take credit for Ambarella's

3    invention of the A5 or A5s?

4    **A.**   No.  That was one of the components that he recognized was

5    already available from Ambarella.

6    **Q.**   You were asked at the end about secondary indicia of

7    non-obviousness.

8        Are you aware of secondary indicia evidence that has,

9    you know, been disclosed throughout this case?

10   **A.**   Yes.

11   **Q.**   Was any of it sufficient to overcome the showing of

12   obvious in view of Boland and Ambarella?

13   **A.**   No.  There's a two-step process.  One is really to

14   identify the evidence and establish a nexus to the claims.  It

15   has to be to the claims specifically as opposed to, you know,

16   say, the brand or other features.

17       And then the second thing is you consider whether or not

18   it would have overcome the motivation that I relied on to put

19   Boland together with Ambarella.  And you saw that Boland says

20   explicitly to go out and look at other commercial chips.  It

21   identified CoreLogic and then said that other ones could be

22   used as well.

23       So that's a very explicit written motivation that a person

24   of ordinary skill in the art would have seen, and that

25   motivation is not overcome by, say, a 2011 posting from

1  somebody who says, "I like -- I like the Contour camera," or a

2  Dot award or something like that.

3  **Q.**  You keep using this word "nexus."  Can you explain a

4  little bit about what you mean by that?

5  **A.**  Sure.  A nexus -- so you could think about, say, if Apple

6  comes out with a new phone, people will buy that phone because

7  it comes from Apple.  And so that goes to things like branding

8  and why people might buy something.

9      But it has to be a nexus to the claims.  It has to be the

10 live preview with remote control as opposed to something else.

11 Because if it's not tied to the claims, then it could be praise

12 for, you know, "I like the fact that it stays on the side of my

13 head without falling off."  That doesn't tie to the claims

14 specifically.

15     So there's a requirement when you evaluate secondary

16 considerations that there has to be a nexus with the specific

17 elements of the claim and the functionality of the claim.

18 **Q.**  Were you aware -- well, so Mr. -- counsel rec- -- counsel

19 mentioned a company called iON.  Do you recall that?

20 **A.**  Yes.

21 **Q.**  And he said, "Well, iON admitted that it infringed

22 Contour's claims."  Do you recall that?

23 **A.**  Yes.

24 **Q.**  And iON and Contour had a license; right?

25 **A.**  That's my recollection.

1   Q.   At the time that Contour and iON executed that license,

2   they had merged and were a single company; is that right?

3   A.   That's also my understanding.

4   Q.   Does the relationship between iON and Contour say

5   anything about the nexus between iON's statements, iON's

6   license, and the obviousness of the patent?

7   A.   No.  Again, there isn't any nexus established with that it

8   was the patented invention that would establish some nexus as

9   it related to that license or copying.

10  Q.   As opposed to their relationship, for example, their

11  commercial relationship?

12  A.   Their relationship or the need to merge or some other

13  intellectual property assets or particular employees that they

14  wanted to bring into the company, those kinds of things.

15  Q.   One thing that you said towards the end of your testimony

16  was that if Contour's emails are sufficient for conception,

17  then the patent can't be valid.  Could you explain that a

18  little bit more?

19  A.   Sure.  So there's really two questions.  One is whether or

20  not there is evidence that Contour conceived of the patents

21  nine or ten months before the provisional in September 2010,

22  placing that date as December 2009.

23       I don't think we've seen a lot of those emails in detail

24  or all of the requirements of the claims are a mapping; but if

25  Mr. Keville and Dr. Hu are correct that those emails would

1   establish conception and you would use the December 2009 date,

2   then by that standard, then all of what Mr. Woodman was doing

3   before that would certainly be that level of detail and that

4   would demonstrate its sufficiency to anticipate the claims even

5   using the December 2009 date.

6   **Q.**   What is your key opinion, based on all the analysis you've

7   done and all the evidence you've heard, that you would like the

8   jury to take away?

9   **A.**   So, basically, I tried to come in with an open mind and

10  look at the evidence and what it said.  I recognize that the

11  patents were issued by the Patent Office, but I believe it

12  didn't have information that, if it had, might have reached a

13  different decision.

14       And, ultimately, when I looked at the evidence

15  independently, I believe all of the requirements are there to

16  show that the alleged invention is obvious and it's not new.

17            **MS. CLARK:**  Thank you, Dr. Almeroth.

18            **THE COURT:**  All right.  Dr. Almeroth --

19            **THE WITNESS:**  Thank you.

20            **THE COURT:**  -- you can step down.

21                      (Witness excused.)

22            **THE COURT:**  Who's next?

23            **MR. DUCKER:**  Phil Ducker for defendant GoPro.

24       GoPro calls Dr. Patrick Kennedy.

25            **THE COURT:**  All right.  Come on up, Dr. Kennedy.

1          <u>**PATRICK FITZGERALD KENNEDY**</u>,

2     called as a witness for the Defendant, having been duly sworn,

3     testified as follows:

4          **THE WITNESS:**  I do.

5          **THE COURTROOM DEPUTY:**  Be seated, please.

6          If you would please state your full name and spell it for

7     the court reporter.

8          **THE WITNESS:**  Patrick Fitzgerald Kennedy,

9     P-a-t-r-i-c-k, F-i-t-z-g-e-r-a-l-d, K-e-n-n-e-d-y.

10          <u>**DIRECT EXAMINATION**</u>

11    BY MR. DUCKER:

12    **Q.**  Good morning, Dr. Kennedy.  Excuse me.

13          Could you please introduce yourself to the jury?

14    **A.**  My name's Patrick Kennedy.

15          **MR. DUCKER:**  Your Honor, may I approach the witness?

16          **THE COURT:**  Yes.

17    BY MR. DUCKER:

18    **Q.**  Dr. Kennedy, what do you do for a living?

19    **A.**  I'm an economist, and a lot of what I do is what I'm doing

20    today, which is economic loss and damages when there's a

21    dispute.  Some of what I do is outside of disputes, but mostly

22    I do what I'm doing today.

23    **Q.**  Have you created a slide summarizing your education and

24    experience?

25    **A.**  Yes.

1         **MR. DUCKER:**  Could we have Slide 6.2.

2    **BY MR. DUCKER:**

3    **Q.**  Could you describe your education, please?

4    **A.**  I have a bachelor's degree in economics from the

5    University of California San Diego, and then I went to Stanford

6    where I received a Ph.D. in economics.

7    **Q.**  And what did you do after getting your Ph.D. from

8    Stanford?

9    **A.**  I went back East and worked for the Federal Reserve Board

10    of Governors, or the Fed, as an economist.

11    **Q.**  And what did you do for the Federal Reserve?

12    **A.**  I worked in a group that built and then used a model to do

13    forecasts and policy simulations, assisted the chairman with

14    some of his testimony before Congress, and in a small way,

15    tried to help the board figure out what to do with interest

16    rates.

17    **Q.**  And what did you do after working at the Federal Reserve?

18    **A.**  I went to private industry.  I worked in the securities

19    industry, stocks and bonds, where I was a registered

20    representative and a registered principal.

21    **Q.**  And what did you do after that?

22    **A.**  That's when I started doing this work with a firm called

23    Mack Barclay.  Mack Barclay was acquired, then ultimately spun

24    out as a firm called Torrey Partners.  I was there about

25    12 years.  And then Torrey Partners was acquired by Stout a

1  couple of years ago, and that's my current employer.

2  **Q.**   And what kind of cases do you work on?

3  **A.**   Patent cases like this; other intellectual property cases,

4  trade secrets, copyrights, things like that; and then other

5  business disputes, breach of contract and other claims.

6  **Q.**   And how many times have you been retained in patent cases

7  to assess damages?

8  **A.**   Well over 50.

9  **Q.**   And how many times have you testified in court?

10 **A.**   For all matters, over a hundred.

11 **Q.**   And have all of those times been about damages?

12 **A.**   Yes.

13 **Q.**   Do you testify generally for plaintiffs or defendants?

14 **A.**   Both.  It's about 50-50.

15 **Q.**   Dr. Kennedy, is your firm being compensated for your time

16 today?

17 **A.**   Yes.

18 **Q.**   Is your compensation dependent in any way on the outcome

19 of this case?

20 **A.**   No, it's not.

21      **MR. DUCKER:**  Your Honor, at this point we move to

22 qualify Dr. Kennedy as an expert in economics and patent

23 royalties in this case.

24      **MS. REPLOGLE:**  No objection.

25      **THE COURT:**  All right.  Please proceed.

1    BY MR. DUCKER:

2    **Q.**   Dr. Kennedy, what were you asked to do in this case?

3    **A.**   I was asked to determine what a reasonable royalty would

4    be for GoPro to pay for a license to the patents-in-suit.

5    **Q.**   And does the fact that you are discussing an amount that

6    GoPro might pay mean that GoPro believes they owe CIPH any

7    money?

8    **A.**   No.  As a damages expert, I assume liability.  So in this

9    case, I assume valid and infringed patents.  It's just a basic

10   assumption damages experts make.

11   **Q.**   So if the jury finds that the patents are invalid or not

12   infringed, do they need to assess damages at all?

13   **A.**   No.

14   **Q.**   Did you create a slide with the information you considered

15   in forming your opinions?

16   **A.**   Yes.

17           **MR. DUCKER:**  Could we have 6.3.

18   BY MR. DUCKER:

19   **Q.**   What information did you consider?

20   **A.**   A variety of things.  Legal documents, complaint,

21   exchange -- documents exchanged between the parties.  A lot of

22   what I do for damages is the business documents and financial

23   data, and so that's from GoPro, CIPH, Contour, and third

24   parties.  Sales data, pricing, profits, marketing, license

25   agreements, things like that.

**KENNEDY - DIRECT / DUCKER**

1           I also review deposition testimony from both sides and

2    third parties, and then I've attended the entire trial here.

3           I do independent research on the market, products, and I

4    did some hands-on examination of GoPro cameras.

5           And then as a damages expert, I rely upon others.  I rely

6    upon technical opinions.  And then I've also interviewed -- so

7    I have those reports.  And then I've done interviews of the

8    technical expert, Dr. Almeroth, and then also GoPro people.

9    **Q.**   Before this litigation, had you used a GoPro camera?

10   **A.**   Yes.  I've had a number of GoPros.

11   **Q.**   Did your familiarity and use of the GoPro cameras help you

12   in this case?

13   **A.**   It did.  I just -- I have an understanding of the use

14   case, the perspective, actually using a number of different

15   cameras in different circumstances.  Now, that's my personal

16   perspective, but it helps me understand what's at issue.

17   **Q.**   So let's talk a little bit more about your role.

18          As a damages expert in this case, what is your role?

19   **A.**   So the primary thing as a damages expert is to -- in a

20   case like this, is to drill down into what's the incremental

21   value associated with what's been claimed to have been invented

22   in this case, so for the patents-in-suit.

23   **Q.**   And what do you mean by the "incremental value of the

24   asserted patents"?

25   **A.**   There's a lot of discussion about a variety of different

1   features:  live preview, live preview with a remote control,

2   and other things.  But here, you heard Dr. Almeroth provide

3   some foundation for this.  The patents in this suit combine

4   other elements that are known, are previously known, and

5   I think GoPro still disputes that the combination is actually a

6   valid patent.  But I operate under the assumption that it is a

7   valid patent and then say:  In that combination, when you

8   combine these known elements, what extra value is created by

9   combining them?  And that's what I'm trying to get at.

10  **Q.**    Have you heard any testimony from a CIPH witness that

11  identified the incremental value of the patents?

12  **A.**    Yes.

13  **Q.**    Which witness was that?

14  **A.**    Oh, I'm sorry.  CIPH.  No.  I actually haven't -- I'm

15  sorry.  I misheard you.

16      I actually haven't seen anything from CIPH witnesses

17  describing exactly what that incremental value is, and I think

18  Dr. Almeroth said that as well.

19  **Q.**    So how do you determine an amount -- the amount of a

20  reasonable royalty in view of the incremental value of the

21  asserted patents?

22  **A.**    So you try to isolate the increased value associated with

23  the combination.  And to sort of cut to the chase, and what

24  you'll hear from me today, is that you have to look at the

25  words in the claims.  As Dr. Almeroth said, that's important.

KENNEDY - DIRECT / DUCKER

1    And then within those elements that are in the claims, if you

2    pull one piece out of the combination, you have a

3    non-infringing product.  You can compare that non-infringing

4    product without one piece of the combination to an infringing

5    product.  That difference in value is how you drill down to

6    find out what these patents are worth.

7    **Q.**   And is there a construct that you use to determine what

8    GoPro would pay?

9    **A.**   Yes.  That's called the hypothetical negotiation.

10   **Q.**   And could you go into that a little bit more?  What is the

11   hypothetical negotiation?

12   **A.**   So I've got a slide, very simple, but what it is, is it's

13   a construct in -- that's used in cases like this.  It's not --

14   it's not a real-world negotiation.  There are different

15   circumstances.

16        One of the things is that Contour and GoPro, Contour LLC

17   and GoPro, they're assumed to be willing licensors and

18   licensees and they can't walk away from the table.  You have to

19   come to a deal.

20        Another thing that's really important for the hypothetical

21   negotiation is that there's a lot more information here in this

22   hypothetical negotiation than there is in the real world.  We

23   have the benefit of the things that we have now learned, and

24   you get sales data and profitability and expert opinions.

25   There's a lot more that you get in the hypothetical negotiation

1    than you do in the real world.

2    **Q.**    And what would be the date of the hypothetical

3    negotiation?

4    **A.**    November 2014.

5    **Q.**    And what parties would be participating in the

6    hypothetical negotiation?

7    **A.**    Contour, LLC and GoPro.

8    **Q.**    The plaintiff in this case is Contour IP Holding, LLC.

9    Could you just remind the jury who Contour, LLC is?

10   **A.**    So Clarke Capital acquired the assets of a manufacturing

11   company called Contour, Inc., that failed in the marketplace

12   and went into receivership, and they bought the assets for

13   $1.925 million and then later formed Contour, LLC.

14   **Q.**    So in the hypothetical negotiation that we were -- that

15   you were discussing, do you consider the competitive position

16   of the parties?

17   **A.**    Yes.

18   **Q.**    So you were in court last week, I believe, and we heard

19   from Jason Green, who was a former Contour employee.  Do you

20   recall that?

21   **A.**    Yes.

22        **MR. DUCKER:**  Can we put up Slide DDX-6.5.

23   **BY MR. DUCKER:**

24   **Q.**    And you see this is a summary of Mr. Green's testimony.

25        Is Mr. Green's testimony accurate that GoPro and Contour

1    were neck-and-neck, close to 50-50 competitors?

2    **A.**    No.  As I've emphasized in the testimony, he said, "I have

3    no real numbers here," but he had a feeling that they were

4    50-50, and it's not true.

5    **Q.**    Is there data showing how Contour, Inc., compared to GoPro

6    as far as competition?

7    **A.**    Yes.

8              **MR. DUCKER:**  Could we have Slide 6.6.

9    **BY MR. DUCKER:**

10   **Q.**    What are you showing on Slide 6.6?

11   **A.**    GoPro sales versus Contour.  GoPro is in blue.  Contour is

12   in that dark gray.

13   **Q.**    And how does this show the competitive position of the

14   parties?

15   **A.**    So the negotiation's all the way on the right in 2014, but

16   let's start with 2011.

17        2011, Contour's on the market with a wireless-capable

18   action camera.  GoPro is on the market without wireless

19   capabilities in their cameras, but GoPro is not 50-50 with

20   Contour.  Those two lines don't -- aren't equal in 2011.

21   Instead, it's close to 90 percent GoPro, 10 percent Contour.

22   I think the exact number is something like 87 percent.  So

23   GoPro is significantly outselling Contour at that time.  It's

24   not 50-50.

25   **Q.**    So that approximately 10 percent share for Contour as

KENNEDY - DIRECT / DUCKER

1  compared to GoPro, is that before GoPro had any products with

2  wireless capabilities?

3  A.    It is.

4  Q.    And why is that important to your opinion?

5  A.    So GoPro -- it tells me that something else is driving

6  GoPro's success besides wireless connectivity.  It's

7  substantially outselling Contour at this time, even though

8  Contour has a camera with wireless capabilities.  So it has to

9  be something else, like GoPro's marketing, GoPro's investment

10  in new products through research and development.

11  Q.    According to your data on Slide 6.6, were Contour and

12  GoPro ever close competitors?

13  A.    No.  And that's -- 2011 is Contour's best year compared to

14  GoPro.  As I mentioned, you got towards the hypothetical

15  negotiation in 2014, and it's very difficult to see any sales

16  on this chart, but, no, there's no competition from a sales

17  basis.

18  Q.    So Mr. Green also talked about, you know, his view that

19  wireless was a turning point for GoPro in sales.  And do you

20  agree with that?

21  A.    No, I don't.

22  Q.    Why not?

23  A.    Well, you heard this from Mr. Woodman and it's borne out

24  in the data, which is, the real turning point for GoPro as a

25  company was the HERO HD.  When the HERO HD came out, the year

1    before, until 2011, GoPro grew like 30 times.  The

2    2010 to 2011, it had tripled its sales.  And so really, that

3    allowed, then, GoPro to make profits, to pour those profits

4    back into new products and into marketing.  And that's the

5    inflection point, the HERO HD, which did not have wireless.

6    **Q.**    So let's talk about Contour.

7         How did Contour's wireless camera sales compare to its

8    sales of cameras without wireless?

9    **A.**    So I'm breaking down the dark gray bar that I showed you

10   on the last chart here.  Contour sales, and I've put them into

11   two buckets:  those with wireless capabilities and those

12   without.  And in 2011, when there isn't any competition from

13   GoPro with a wireless-enabled camera, Contour's own

14   non-wireless offerings outsold the wireless cameras by two to

15   one.

16   **Q.**    And what happened in 2012?

17   **A.**    2012 it goes to about three to one.  And so what this

18   tells you is that even within Contour's own sales, you have to

19   be cautious in how much value you attribute to the wireless

20   functionality if, even for Contour, it was being outsold three

21   to one.

22   **Q.**    Did you hear testimony that Contour, LLC entered the

23   market -- the action-camera market in late 2014?

24   **A.**    Yes.

25   **Q.**    And did they introduce any new cameras in 2014?

KENNEDY - DIRECT / DUCKER

1    **A.**    They did.

2         **MR. DUCKER:**  Could we put up Slide 6.8.

3    **BY MR. DUCKER:**

4    **Q.**    What camera did Contour, LLC introduce in 2014?

5    **A.**    So there was testimony about this introduction.  This puts

6    some data on that testimony, and it shows that -- when it

7    launched the ROAM3 as a non-wireless product in 2014.

8    **Q.**    And how many units did it sell?

9    **A.**    In the first month, it sold 30 cameras.  And then I think

10   it was an October 2014 launch.  And for the full year, it sold

11   1,218.

12   **Q.**    Is that a successful launch?

13   **A.**    No.

14   **Q.**    And then did you hear some testimony about the 4K Contour

15   camera that was released in 2018?

16   **A.**    Yes.

17   **Q.**    Did that have wireless capability?

18   **A.**    It did.

19   **Q.**    Do you know how many units of that Contour sold?

20   **A.**    The chart shows the data.  144 units.

21   **Q.**    And is 144 a successful product?

22   **A.**    No.

23   **Q.**    Do you recall some testimony about Project Cyclops?

24   **A.**    Yes.

25   **Q.**    What was Project Cyclops?

1    **A.**    So Clarke Capital, or Contour, LLC, hired a firm called

2    UBS to shop the firm, either the licenses or sell the firm

3    outright.  This slide here shows that 29 potential buyers were

4    contacted.

5    **Q.**    And did anyone buy the company?

6    **A.**    No.

7    **Q.**    Did anyone, to your knowledge, make an offer for the

8    company or any of its assets?

9    **A.**    I haven't seen any evidence indicating that any of these

10   companies -- Apple, DJI, Canon, Sony, GoPro -- made an offer.

11   **Q.**    Is there any objective evidence from which you can

12   conclude that Contour and GoPro were competitors in 2014?

13   **A.**    No.  I know what the testimony was, but the data says a

14   different story.  I can't find any objective evidence, as an

15   economist, to look at the two companies and say that they were

16   in a competitive position by the time of the hypothetical

17   negotiation.  That includes Contour, Inc.'s prior activity, its

18   current status at that time, and this potential reboot that was

19   discussed.  There just isn't anything indicating in an

20   objective way that you could call them competitors as

21   manufacturers at that time.

22   **Q.**    Let's turn back to your reasonable royalty analysis.

23       What steps did you take to determine what GoPro would pay

24   as a result of the hypothetical negotiation?

25   **A.**    So this slide summarizes three high-level approaches or

1    positions that I examined in the hypothetical negotiation.  The

2    first is GoPro's position, and I'll describe that.  I sort of

3    introduced that earlier.  It's -- GoPro's position is that it

4    could remove certain functionality and that the royalty should

5    be based on the total cost of removing that functionality.

6         The second piece is market value.  Are there market

7    indicators that say what comparable technology, adjusted for

8    economic conditions, what should you pay?

9         And then, finally, I'm adopting an analysis of Contour's

10   position, and so I'm not bringing in their specific numbers

11   from Dr. Ugone, but I'm trying to apply the method that he

12   identified to see if I give some credit to that approach.  I

13   disagree with it, but if I want to see in the negotiation what

14   their position would be as adjusted, I've got that as well.

15   **Q.**   And so based on these three considerations, what is your

16   opinion on what a reasonable royalty should be should the jury

17   award any damages?

18   **A.**   So this slide shows a total of $4,659,213.  And then I've

19   got it broken out into three groups of camera models that have

20   been discussed.  The Group 1 live preview products is

21   3,379,226.  Group 2 live preview products is 329,978.  And

22   then, finally, live streaming products are $950,009.

23   **Q.**   And if the Group 2 live preview products are found not to

24   infringe any valid claim, how much would GoPro pay, in that

25   circumstance, for the Group 2 live preview products?

KENNEDY - DIRECT / DUCKER

1    **A.**   Zero for that category.

2    **Q.**   And then let me ask about the live streaming products.  If

3    the live streaming products are found not to infringe any valid

4    claim, how much would GoPro pay for the live streaming

5    products?

6    **A.**   Zero.

7            **THE COURT:**  So would this be a good place to take a

8    break?

9            **MR. DUCKER:**  Yes.

10           **THE COURT:**  All right.  Ladies and gentlemen,

11   15 minutes, and then we'll come back with the rest of the

12   testimony.

13      (Proceedings were heard out of the presence of the jury.)

14           **THE COURT:**  All right.  We're in recess.

15                      (Recess taken at 10:00 a.m.)

16                 (Proceedings resumed at 10:17 a.m.)

17      (Proceedings were heard in the presence of the jury.)

18           **THE COURT:**  All right.  Please be seated, everybody.

19      Mr. Ducker, go ahead.

20   **BY MR. DUCKER:**

21   **Q.**   Dr. Kennedy, before the break, you had testified that

22   Dr. Almeroth had identified certain functionality that could be

23   removed to avoid infringement.  Do you recall that?

24   **A.**   Yes.

25   **Q.**   Why is that ability to remove that functionality important

1  to your damages opinion?

2  **A.**    It's really central because that's the basic tool that, in

3  a complicated case like this with many claim elements, that's

4  how you drill down and identify the incremental value of the

5  combination of features.

6  **Q.**    And what functionality, if you recall, did Dr. Almeroth

7  say you could remove?

8  **A.**    So what I have here in this slide is a summary of the

9  claims in the '954 patent, and I've got -- I crossed out the

10  red part there with the strike-through, at least one of a

11  lighting, color, or audio setting.

12  **Q.**    Could you still change lighting, audio, and color settings

13  without a phone or the app?

14  **A.**    Yes.    So my understanding is that this -- removing this

15  functionality, I think it technically has to be done at the

16  camera level.    But from a consumer standpoint, you can't change

17  those three settings via the app, but you can change it either

18  physically on the camera, on the back of the camera, for

19  example, with the LCD screen, or through a physical remote.

20  **Q.**    Is changing lighting, audio, and color settings the only

21  wireless features that GoPro markets?

22  **A.**    No.

23  **Q.**    What features could GoPro market if its cameras could not

24  change lighting, audio, and color settings wirelessly with the

25  phone or the app?

1   **A.**   So the things that would not be impacted -- if we go back

2   just for a second before we get there, this is -- this is a

3   GoPro catalog describing the app and the features and benefits

4   of the app.  It coincides with the video that you saw in the

5   opening, a YouTube video demonstrating some of the features.

6   So this is 2016, right about the same time.

7        There are a lot of things that appear on here.  You see in

8   the lower left a couple that have been talked about a lot:

9   "Live Preview" and "Control Your GoPro Remotely."

10       And then to answer your question, what we're talking about

11  is not everything on this page with the exception of removing a

12  portion of "Control Your GoPro Remotely."

13            **MR. DUCKER:**  Could we go to Slide 6.17.

14  **BY MR. DUCKER:**

15  **Q.**   Could you explain what you're showing in this slide?

16  **A.**   So this is an example of functionality that would remain

17  in this exercise I'm talking about.  This is, again, I think,

18  from the opening.

19       You have a skier that is intending to have the camera

20  point down and it's pointing up.  It's called -- I think it was

21  referred to as framing the shot.  You can still do this with

22  what I'm talking about.  You can still have live preview.  You

23  still clearly have the camera, the lens, the processor, all the

24  functionality of a GoPro.

25       The only thing that you don't have is the ability to

1    change lighting, color, and audio.  And specifically that

2    sounds broad, but on the GoPro, the settings that you're

3    allowed to do are change what's called ISO min/max.  So you can

4    change the sensitivity range of the sensor.  You can change the

5    white balance, and you can turn on and off the auto color and

6    the auto sound corrections made by GoPro.  And there's also an

7    exposure EV function that will slide it up and down.  So

8    it's -- it's -- that's the set we're talking about.

9         And we're talking about removing the ability to change

10   those settings via the app.  You still have it on the camera.

11   You still can do it on the remote, but just through the app,

12   that's all that you'd remove.

13        In everything I'm going to be talking about, that's the

14   scope of the feature set from the consumer standpoint that's

15   being removed.

16   **Q.**   So, in your opinion, is it appropriate to base the value

17   of CIPH's patents on the ability to do live preview or live

18   streaming while recording?

19   **A.**   No.  We've heard a lot about that and about the benefits

20   of live preview as a feature, remote control generally, or, as

21   Dr. Ugone does, combine the two, adding them together.  That's

22   not how you do patent damages, in my opinion, in this case.

23        Because of the specific nature of the patent as described

24   to me by Dr. Almeroth, all you need to do in this big

25   combination of all these things is pull out that one feature.

**KENNEDY - DIRECT / DUCKER**

1    You don't have to pull out the lens.  You don't have to pull

2    out the processor.  You just have to pull out the ability to

3    control those -- that small group of settings.

4    **Q.**   Let's go to the hypothetical negotiation in November 2014.

5        If Contour, LLC had come to GoPro and said they should pay

6    175 million to license these two asserted patents, what would

7    GoPro have done?

8    **A.**   Okay.  So the hypothetical negotiation is supposed to

9    reflect business sense and common sense as well.  And I think

10   GoPro testified to this, but if you're presented with an ask

11   like that, a big number, the first thing you're going to do is

12   go to your engineers and say, "What alternatives do we have?

13   Is there something that I can do that will no longer infringe?

14   What's it going to cost and how will it impact customers?"

15       That's the basic thing you'll do here is -- in my mind,

16   that's the driver, is:  With all these things that are in

17   this -- in these claims, what can I pull out and still have a

18   function -- you know, have a functioning camera or not?

19       This is not like the lightbulb we were talking about.  In

20   the lightbulb, you get rid of the glass, you don't have a

21   lightbulb.  You get rid of the filament, you don't have a

22   lightbulb.  You get rid of the vacuum, you don't have a

23   lightbulb.

24       That's not what we're talking about here.  We're not

25   talking about pulling the lens out.  We're talking about

KENNEDY - DIRECT / DUCKER

1  changing a small feature.  And that's what GoPro is going to

2  think about in that hypothetical negotiation when presented

3  with this because they now know the actual claims and what you

4  would have to do to no longer infringe.

5  **Q.**  Is there a formal term for this approach?

6  **A.**  It's called assessing a non-infringing alternative under

7  the cost approach.

8  **Q.**  And would GoPro have to pay a royalty at all if its

9  products did not infringe?

10  **A.**  No.

11  **Q.**  Does Dr. Hu agree that if GoPro removed the camera's

12  ability to receive control signals from a phone that could

13  change lighting, audio, and sound settings, GoPro's cameras

14  would not infringe?

15  **A.**  On the slide, I show her testimony; and I read this as,

16  yes, she says, if you do what I described, which is change the

17  camera's ability to receive signals for lighting, color, and

18  audio settings, that it will no longer infringe.

19  **Q.**  And would it have been difficult, in your opinion, for

20  GoPro to make this change?

21  **A.**  As you heard GoPro testify, GoPro's engineers, no, it

22  would not.  And Mr. Lema and then Mr. Liu testified to this.

23  Mr. Liu said it would not be terribly difficult to change.

24  Mr. Lema said you could make the changes and it would not have

25  a significant impact on demand.

1    Q.    And did you figure out how much it would cost to make the

2    change?

3    A.    Yes.

4    Q.    And how did you go about figuring out that?

5    A.    I talked to GoPro and consulted with Dr. Almeroth about

6    what would be required in terms of engineering and quality

7    assurance to implement the change and got an estimate of that.

8    I compared the hours that would be required.  You have hours

9    and then you need a rate as well, hourly rate.

10           So I went to two sources.  A software package that pulls

11   market surveys on what you pay engineers and the bonuses they

12   get, I marked that up as if GoPro would have to go out and get

13   those resources externally.  So I took their basic

14   compensation, multiplied it by three.

15           I did the same thing for GoPro, looking at their salaries.

16   What do they pay their engineers?  They pay their engineers a

17   little more than market.  So I've used that, GoPro's rates that

18   they pay their engineers, I increased it three times that to

19   reflect the fact they might have to go outside of GoPro to pay

20   people like that, and then multiplied it by the hours, and that

21   got me the cost to implement these changes.

22   Q.    And what was -- what cost did you come to?

23   A.    It's about 300- to $360,000, low and high range, on how

24   many hours.  That comes out to about 2 to 3 cents per camera.

25   Q.    So you testified earlier that users would still have the

**KENNEDY - DIRECT / DUCKER**

1  ability to change color, lighting, and audio settings on the

2  camera even if that ability was removed from, you know, the

3  app.  Why is that important?

4  **A.**   I'm looking at the consumer demand.  Part of what I talked

5  about in GoPro's thought process in the hypothetical

6  negotiation is going to be:  Okay.  What does it cost me to

7  change?  Just address that.  2 to 3 cents.

8      And then also:  Is this going to impact my consumers?  And

9  one of the important things is, I'm not pulling out -- in this

10 experiment, I'm not pulling out all of the ability to change

11 those settings.  You can still do it through the camera and on

12 the remote.  So it's only one portion, one use case that this

13 impacts.

14 **Q.**   Is stopping the camera's ability to receive control

15 signals that change color, lighting, and audio settings from an

16 app or mobile phone important to GoPro customers?

17 **A.**   I don't think it is for a number of reasons.

18 **Q.**   And what are some of those reasons?

19 **A.**   Well, you heard testimony about this from Mr. Lema, and

20 I've seen data supporting what he was describing.  It's a --

21 the settings -- you know, some of them you'll see under

22 ProTunes -- they are for a niche, you know, more

23 professional-oriented crowd.  They are used, but they're used

24 pretty infrequently.  If you actually look at the data on how

25 people use their GoPros, a very small percentage actually use

KENNEDY - DIRECT / DUCKER

1    the app and use, you know, an iPhone or an iPad to initiate

2    a video.

3         And then of those that initiate the video, the question

4    is:  How many are likely to be using, adjusting their ProTunes

5    settings?  And so we know also that ProTunes is not adjusted

6    very much.  The particular things I talked about, the

7    ISO min/max and things like that, are pretty infrequently

8    changed.  And so you get to this concept -- and you've heard

9    this term -- "use case."  The use case for changing those

10   settings on the phone or tablet to control your camera is

11   relatively small.

12   **Q.**   Let's look at the app data.  What did the data on the app

13   use show to you?

14   **A.**   So we have a couple measures.  Some are in the 4 percent

15   range.  Some are in the 8 percent range.  But this is from

16   Dr. Almeroth's presentation.  5.74 percent of videos were

17   captured via the GoPro app from 2021 through 2024 for the

18   cameras listed there.

19        So that's a small percentage.  It may sound like it's a,

20   you know, useful, frequently used feature, but most people

21   don't use the app to capture video.  And that's the -- that's

22   the population that you first have to look at and drill down to

23   and say, "Okay.  Now, how many actually change settings?"

24   **Q.**   Yeah.  So do all 5.74 percent of the people who use the

25   app to start videos actually change the lighting, color, and

1    audio settings?

2    **A.**    No.    The data shows that the vast majority shoot in

3    default.

4              **MR. DUCKER:**    So if we could pull up 6.22.

5    **BY MR. DUCKER:**

6    **Q.**    What does the data show about how users change camera

7    settings?

8    **A.**    So here are a couple of GoPro documents, you know, normal

9    business records, talking about people don't change camera

10   settings.    86 percent shoot in default at the bottom.

11             This is a summary of the data really that you saw from

12   Mr. Lema.    He had the bunch of pie charts showing, I think, the

13   biggest, most highly used feature was increasing the ISO max,

14   was like 80 percent.    Most of the features were -- sorry.

15   80 percent don't change it.    And then the other ones were in

16   the, say, 5 to 10 percent range.

17             So that data tells you -- now, that's for all cameras; but

18   it tells you that whatever GoPro population you're looking at,

19   people just don't change the features that much.

20             You heard about one of the things that's good about a

21   GoPro and its selling points is all the things that they do to

22   make it easy.    They -- you know, the GoPro color setting we're

23   talking about turning off, people use that, and there's a lot

24   of R&D that went into making that, and so that's one of the

25   things that works.

1          It's the more professional crowd, a more niche crowd may

2     want to change those other settings in different circumstances.

3     And then of that crowd, how many are doing it on the app?

4     That's the question.

5     **Q.**    So, in your opinion, how is it -- how important is it to

6     the consumer population that they're able to change the color,

7     lighting, and audio settings using the phone or an app?

8     **A.**    I think the use case is small.  A small percentage of

9     people do this.  And if you take it away, they still can do it

10    on the camera or through the remote.  So I think it's pretty

11    insignificant.

12    **Q.**    So we heard last week about various complaints that

13    GoPro's customers made when ProTunes was removed from the app.

14    Do you agree that a lot of customers were upset?

15    **A.**    It depends what you mean by "a lot."  And I think with all

16    this, you have to put it into context.

17         This was used as evidence of how important ProTunes were

18    when, from the consumer side, it wasn't available via the app.

19    I see it as exactly the opposite.  There were 941, they're

20    called, ProTune complaints; but really, it's 941 reviews that

21    were -- averaged about 1.1 stars.  So that's not a happy

22    customer, but ProTune was ranked low, low in January and

23    February of 2021, and then it decreased over time and went

24    away.

25         The question that I'm addressing on this chart is:  How

1    big is 941?  There were 4 million monthly active users on the

2    app at this time.  It's .02 percent of the individuals using

3    the app at this time for this blip in negative reviews.  That's

4    the scope of it.

5        To me, it's the opposite of saying that this is a very

6    important feature.  If I had a thousand customers and 941

7    complained, I would be worried.  .02 percent of the population

8    of my users, that's a very small number .

9    Q.   Did removing the ability to control ProTunes via the app

10   have any impact on sales?

11   A.   It didn't.  So part of this is, let's look at some data

12   that shows the number of complaints.  The second thing I'm

13   showing you here is sales.  Right?  It's not on this chart, but

14   GoPro's market share, after it removed the capability to change

15   ProTunes from the app, was higher than before.  So as an

16   economist, I look at things and say:  You know, with and

17   without; before and after.  You can use those sort of events to

18   identify an impact.

19       Here, I ask:  Okay.  HERO8 and 9 were launched with the

20   ability to use ProTunes on the app.  It was removed in,

21   I think, January 7th of '21, and then I look at the sales that

22   followed.  Were the sales that followed the removal lower or

23   higher than expected?  The blue bar on this chart tells you

24   that they were higher than expected.

25       So I looked at the same thing:  launch versus

1  nine months for all these cameras.  And the fact that the blue

2  bar is above everything else tells you that there were more

3  sales following the removal of ProTunes than I would have

4  expected if I looked at all the previous six generations of

5  cameras over six years.

6      And it's not because of a change in the market.  GoPro's

7  market share actually went up.  So the combination of those two

8  tell me there's nothing in the sales data that indicates any

9  kind of impact on GoPro's ability to sell cameras.

10 **Q.**   So what is your overall opinion on what the cost to GoPro

11 would be of removing the camera's ability to receive the

12 control setting -- the control, lighting, and sound settings

13 via the app?

14 **A.**   It's insignificant from the consumer-demand side, small

15 but vocal complaints from a very narrow use case.  So from

16 GoPro's position, they're going to look at that when faced with

17 a $175 million request for a license.  They're going to say:

18 No.  I think I'll do something else.  I'll incur those

19 engineering costs.  And I've looked and I don't think it's

20 going to impact my consumers.  So from my position as GoPro,

21 I'm going to say 2 to 3 cents per camera.

22 **Q.**   Let's turn to the second market -- second value indicator

23 you considered, which you said was what the market would pay.

24 What do you mean by that?

25 **A.**   So this is under the market approach to valuation, and so

1    I look to comparable transactions in the marketplace to see if

2    there's a comparable price for the technology.

3    **Q.**    And what specifically were you looking for?

4    **A.**    I was looking for, first, a technically comparable

5    underlying technology being licensed; and then, second,

6    economic comparability.

7    **Q.**    Did you hear Mr. -- Dr. -- sorry.  I'm having trouble with

8    that.

9        Did you hear Dr. Almeroth's testimony yesterday that in

10   his opinion, the MPV license was technically comparable to the

11   hypothetical license?

12   **A.**    Yes.

13   **Q.**    What do you do with the MPV license now that you

14   understand it is technically comparable?

15   **A.**    Then it's on me.  I do what's called economic

16   comparability.

17   **Q.**    And what does that involve?

18   **A.**    You look at the conditions under this license, GoPro's

19   license to the Kodak patents, and then you compare that to the

20   hypothetical negotiation for Contour's patents.

21   **Q.**    And who was the licensee in the MPV agreement?

22   **A.**    GoPro.

23   **Q.**    And who was the licensee in the hypothetical negotiation?

24   **A.**    GoPro.

25   **Q.**    So that condition, then, is the same?

**KENNEDY - DIRECT / DUCKER**

1    **A.**   That's a simple example of economic comparability, yes.

2    **Q.**   And how do the licensors in the MPV agreement compare to

3    Contour, LLC, in the hypothetical negotiation?

4    **A.**   Not exact but similar.  MPV, Monument Peak Ventures, is

5    what's called a non-practicing entity.  They're seeking value

6    in the market by trying to license patents as opposed to

7    producing products.

8        I went through some of that discussion about what was

9    happening right around the hypothetical negotiation in

10   November 2014 to give some context in part for this.  What was

11   Contour, LLC, at that time?  Formerly, they were looking to

12   reboot.  They were trying to find manufacturers.  They just

13   launched the ROAM3; but within two months, they had moved into

14   a licensing-only mode, they were no longer developing cameras,

15   and they had moved away from being a manufacturer.

16       So it's not exact, but within two months, they're very

17   similarly situated.

18   **Q.**   How much did GoPro pay for a license to the Kodak patents?

19   **A.**   $295,000.

20   **Q.**   And so what do you do with that $295,000?

21   **A.**   So with a market transaction, I look at what's the

22   consideration, what was paid, and what was licensed.  And so

23   here, I know what was licensed were GoPro action cameras, and I

24   know what was paid.

25       The -- I use the date from -- over which there were actual

1  sales of the HERO5 and 6 -- you see that up above -- leading up

2  to the date of the agreement.  So I take a relatively narrow

3  look at the total sales of those two models.  It's about

4  1.1 million units.  So I take the $295,000, I divide it by

5  1,143,213 cameras, and I get 26 cents per camera.

6  **Q.**   And what does your review of the MPV agreement tell you

7  about the market value of the asserted patents?

8  **A.**   So this is a price actually paid by GoPro to Monument Peak

9  Ventures for what Dr. Almeroth tells me is comparable

10 technology.  You heard him testify that it's also broader than

11 the patents in this suit, so it has more value.  So I --

12 that's -- but that's fundamentally what's driving it.

13 **Q.**   So this agreement also mentions that the payment terms are

14 based on a 2 1/2 percent of net revenues for a specific period

15 of time.  How did you use that 2 1/2 percent in the agreement

16 in calculating the reasonable royalty?

17 **A.**   So I reviewed it, but I didn't use it.

18 **Q.**   And why not?

19 **A.**   GoPro testified, and I confirmed this with GoPro, that

20 that 2.5 percent rate was something that Monument Peak Ventures

21 insisted on.  It was an important deal term for them.

22       But GoPro, their perspective throughout was as I described

23 it:  How much do I have to pay to license these products,

24 specific cameras in issue here?  And that's the math that they

25 did.  And what I described about take the dollar amount paid

1  and divide by units, GoPro testified to that as well.  So

2  that's what's driving this deal.

3      The 2.5 percent rate was not negotiated.  It was a term

4  that MPV asked to include.  And you see this in particular when

5  I see non-practicing entity licenses where they're trying, as I

6  mentioned, to license their patents to others and they're

7  concerned about what looks -- what's in the agreement.

8      And so I've considered it, but I don't use that rate.  The

9  math doesn't work on it as well.

10 **Q.**  How many patents were licensed in the MPV agreement?

11 **A.**  14.

12 **Q.**  Did you adjust your reasonable royalty calculation based

13 on the fact that the MPV license covered 14 patents but the

14 license that you're talking about today, in the hypothetical

15 negotiation, covers only two?

16 **A.**  I didn't.  That's something that you could do.  If I were

17 to do that, though, it would lower the royalty rate.  And so I

18 know if I just maintain that assumption and don't make an

19 adjustment, it's an assumption that's to the benefit of

20 Contour.  It results in a higher rate without that adjustment.

21 **Q.**  Does it matter to your opinion that the MPV license was

22 the result of a litigation settlement?

23 **A.**  I mean, it matters.  It's something that I consider.

24 **Q.**  And -- but did it affect your overall view of the

25 comparability of the MPV agreement?

**A.**    No.  Here's what I did with that, is I said:  Okay.
There's disputed -- it's a settlement agreement.  So underlying
that, there's -- it's not just a normal license without any
kind of litigation.  So there's an underlying dispute about
invalidity and infringement.  But then I -- the question is:
To what extent?

I mean, we've been here for years over those issues in
this case.  Back then, I looked at the record and I talked to
GoPro, and GoPro moved pretty quickly to pay this.  They saw
these as the Kodak patents.  They saw this as applicable to
their software and their products, and they said, "Okay.  How
much should I pay?"

So you could look at that and, as a settlement agreement,
argue that that pushes the rate up a little bit because there's
a discount for that, maybe a discount for litigation costs.

But as I mentioned, 14 versus two, there's seven times as
many patents; and Dr. Almeroth said that the patents that are
being licensed from the Kodak patents are broader than the
patents here.

So I've got an upward influence on the rate from
settlement, and I've got two downward influences from the
breadth of the patents and the number, and so those are
counterbalancing.  Probably more would push the rate down on
balance, but I've maintained the rate without -- with those two
offsetting adjustments.

1    **Q.**    Let's look at some other language in the MPV agreement.

2              **MR. DUCKER:**    If you could pull up TX-495.  And the

3    first page, there's the third "whereas" clause.

4    **BY MR. DUCKER:**

5    **Q.**    This "whereas" clause says that the agreement was not

6    negotiated under the hypothetical negotiation standard, and it

7    says that the statement does not represent a reasonable

8    royalty.  Do you see that?

9    **A.**    Yes.

10   **Q.**    Did this language impact your reasonable royalty analysis?

11   **A.**    It didn't.  (A) it's language I understand that MPV wanted

12   to insert in here.  Also, it says the agreement has not been

13   negotiated under the hypothetical negotiation standard, and

14   that's sort of a little bit like of course not.  That's what

15   we're doing here in court.  As I mentioned, that's not a real

16   negotiation.  That's a construct that you use as a damages

17   expert to figure out what the royalty rate should be.

18         Also, reasonable royalty, you don't see people in

19   agreements, particularly between, you know, a manufacturer and

20   an inventor, saying, "The reasonable royalty is X."  They say,

21   "The royalty rate is this.  The lump sum is that."  And those

22   are the terms you see.

23         So this is -- again, it's in a whereas introductory part

24   of the contract, and I just don't see it as relevant to what

25   really is relevant:  What did you pay and what did you license?

1    Q.   Could we turn to Section 6.12 of this agreement.  And this

2    discusses the admissibility.  Did this section have any impact

3    on your opinions?

4    A.   No.

5    Q.   And why not?

6    A.   This answer is simpler.  I don't see admissibility of this

7    as a matter for either party of this litigation.  I see that as

8    a matter for the Court.

9    Q.   Thank you, Dr. Kennedy.

10        So do you recall last week Dr. Ugone discussed an Element

11   license?

12   A.   Yes.

13   Q.   Do you agree with Dr. Ugone's use of the Element license?

14   A.   I don't.

15   Q.   Who is Element?

16   A.   Element is a consumer electronics firm out of Minneapolis.

17   Q.   And what kinds of products does Element make?

18   A.   Element makes televisions, smart TVs, and that was their

19   primary product; but they've moved into appliances:

20   air conditioners, washing machines, grills.

21   Q.   Does Element make any action cameras?

22   A.   No.

23   Q.   Have you seen any evidence that Element has ever made an

24   action camera?

25   A.   No.

1  Q.   What rights did Element receive in the agreement it signed

2  with CIPH?

3  A.   So the right-hand side in blue, you see the intellectual

4  property being exchanged.  It got the asserted patents; 30

5  other additional patents and patent applications; an exclusive

6  license in the Element field, which I believe was smart TVs;

7  and then something called related intellectual property, which

8  is a defined term in the agreement.

9       And then from other documents and information, I

10  understand that there was assistance from CIPH engineers, boots

11  on the ground, terms that were used like a quasi-partnership

12  between the companies to -- so it's broader than you would see

13  on the left-hand side in the hypothetical negotiation, which is

14  just what's called a bare patent license for the two.  There's

15  no additional know-how or intellectual property.

16  Q.   So why does the fact that Element got so much more matter

17  to the hypothetical negotiation?

18  A.   You have to figure out -- in making this economically

19  comparable, I have to take the right-hand side and try to make

20  it look like the left-hand side of this chart.  And there's

21  just a lot more exchange.  And I didn't see any analysis by

22  Dr. Ugone taking this out.

23  Q.   So, now, Dr. Ugone also pointed to a 5 percent rate in the

24  Element license as evidence of what the parties agreed to value

25  these licensed patents for.  And do you agree with that?

1   **A.**   No.   Here's why.   As a damages expert, I can't just lift a

2   rate out of an agreement and say that applies here and I'm

3   going to apply it to the entire product in the license and I'm

4   going to apply it to the entire value of the camera here.

5   That's a leap.

6        I think what's missing here is being able to see:  Okay.

7   What is being licensed?  What is the licensed product actually

8   licensed by Element?  What are they making?

9        And then I can look at that rate and I can see:  Okay.  I

10  can consult with a technical expert to tell me how the

11  technology is being used.  I can look at pricing and profits

12  and other features, the kind of things that I've already talked

13  about for GoPro.

14       None of that is available because there isn't a licensed

15  product.

16  **Q.**   Have you seen any evidence that Element ever made a

17  licensed product under this agreement?

18  **A.**   No.

19  **Q.**   Have you seen any evidence that Element has ever paid

20  5 percent of net sales for a single product?

21  **A.**   No.

22  **Q.**   Were you here when Mr. -- they played Mr. Kazhdan's

23  deposition?

24  **A.**   Yes.

25  **Q.**   Did you hear him testify that the reason the 5 percent

1  rate was assigned to just the Exhibit A patents was that CIPH

2  wanted to do that for legal reasons?

3  **A.**   Yeah, and I think he may have also talked about the

4  breakout.   There's a $2 million payment that was broken out

5  between Exhibit A, the patents here, and Exhibit B patents; but

6  I think that he characterized that as a request for legal

7  reasons.

8  **Q.**   And why is that important to your opinion?

9  **A.**   I'm not here for legal reasons.   I'm here for economic

10  reasons.   What -- you know, how does that 5 percent apply?   How

11  does it apply in -- in -- sorry -- in Element's circumstance?

12        Everything Dr. Ugone talked about was from GoPro's

13  perspective and how GoPro saw the features to be valuable.

14        There's nothing I can do on this case with Element.   Okay?

15  What did Element think the features were?   How did Element buy

16  those?   Why were they willing to pay 5 percent?   What was the

17  product?   All that's missing.

18        And so part of my job is not just to look at an agreement,

19  but to make it economically comparable.   Without that

20  information, you just can't.

21  **Q.**   Are there any other circumstances that suggest that the

22  Element license is an unreliable data point?

23  **A.**   There's -- it's a complicated transaction in this way:

24  You see from the slide, Mr. Garriques, as CEO, and Mr. Helfer,

25  as director of IP for both companies, simultaneously negotiated

1    agreements with Element.  $2 million was to flow from Element

2    to Contour IP Holding, and then 2.25 million was to flow from

3    SkyBell to Element as a $2.25 million payment.  It was called a

4    tooling payment.  Both of these payments were listed as

5    non-refundable and unconditional.

6         And so I mentioned earlier, it confuses the circumstances

7    because I don't know what the actual payment was made.  I don't

8    know what the licensed product is.  I told you about the MPV

9    agreement.  I know what was paid.  I know what the licensed

10   product was.  I know units.  I can get you a rate.  This sort

11   of -- it's difficult to see the net consideration paid and what

12   was paid for.

13   **Q.**   And when these two licenses were signed -- or these two

14   agreements were signed, who owned SkyBell and

15   Contour IP Holdings?

16   **A.**   VIP Holdings had an ownership interest in each, I believe.

17   **Q.**   So taking all of this into consideration, do you find the

18   Element license to be relevant here?

19   **A.**   I don't.

20   **Q.**   Okay.  So in conclusion, based on your review of the

21   evidence, what would the royalty rate be for CIPH's technology

22   based on the market value perspective?

23   **A.**   I'd say no more than 26 cents per camera.

24   **Q.**   Let's move on to the last part of your valuation,

25   Contour's position.  Why did you consider that?

1   **A.**   I mentioned this earlier.  GoPro's assessment is that

2   there wouldn't be any impact.  There'd be an insignificant

3   impact on its users from pulling out the ability to change

4   lighting, control -- lighting, auto -- sorry -- lighting,

5   audio, and color via the app.  But as you heard from Dr. Ugone,

6   Contour saw value in those features, and it approached it as

7   dividing up the profit that it attributed to WiFi for various

8   features.

9        And so I'm taking that approach and that position and

10  seeing what the contrary position would be by Contour in a

11  negotiation, but I do make adjustments.

12  **Q.**   Do you agree with how Dr. Ugone performed his analysis?

13  **A.**   I don't on a fundamental level in terms of the approach.

14  And I keep saying this, but the -- really, because of the

15  nature of this patent, the claims as I get them from

16  Dr. Almeroth, Dr. Hu's opinion, you just have to pull one piece

17  of the combination out; and if you do that, it's no longer an

18  infringing product.  So it's -- the comparison is, you know,

19  full product infringing with every feature versus product that

20  doesn't have that particular functionality use through the app.

21       That's how you identify the value, the additional

22  incremental value, of the combination.  You don't go to look at

23  what's feature X worth, what's feature Y worth.  You don't go

24  to say what's live preview worth, what's remote control as a

25  whole worth, and then add them together.

1    So that's a completely different approach, but I'm going

2    to at least entertain what -- how would you do that if you

3    focus on just what's being removed.

4    **Q.**   So is it a problem that Dr. Ugone focused on the Live

5    Preview + Remote Control feature in valuing the hypothetical

6    negotiation?

7    **A.**   I think so.  I think it misses the mark.  And what it does

8    for damages is it extends the royalty beyond the footprint of

9    the patent, beyond the incremental value that's at issue here.

10   It comes from sort of general references to features that I

11   understand are -- is not how you do it.

12   **Q.**   So you mentioned some corrections you had to make to

13   Dr. Ugone's analysis.  What were the primary corrections you

14   made?

15   **A.**   I've got a slide with those.  The first, he talked about a

16   profit margin on the HERO+ versus the HERO with wireless and

17   without.  I think that's overstated.

18       The second is similar to what I just talked about.  In

19   comparing the HERO+ to the HERO, he includes value associated

20   with other features that I don't think have been claimed in any

21   way in this case to be infringing.

22       And that sort of overreaching and pulling in other

23   features and adding that into the reasonable royalty is

24   generally -- I think he hasn't accounted for all of the other

25   WiFi features that are available.

KENNEDY - DIRECT / DUCKER

1    Q.   So let's start with the profit margin.

2         How did Dr. Ugone calculate the wrong profit margin?

3    A.   So this is a measurement issue.  There's not a lot of sort

4    of economics or expert opinion here.  It's Dr. Ugone used the

5    quarter before the HERO+ was launched to establish its

6    profitability.  I have data showing what HERO+ profits actually

7    were versus HERO when both were sold.

8         In my mind, that's the right way to do it.  If you do just

9    that alone and use what I think is a more reasonable measure

10   using the data, it drops the profitability about $8 a unit.

11   Q.   Now let's talk about the differences between the HERO and

12   the HERO+.

13        What corrections did you make there?

14   A.   So I know that the HERO+ had an 8 megapixel sensor versus

15   a 5 megapixel.  It could shoot in HD 1080p at 60 frames a

16   second, not 30.  It had twice the storage, the memory storage,

17   capability.  Those are all features that are not claimed to be

18   infringing features in this case, and I think you shouldn't

19   include them.

20   Q.   Are those features valuable -- are those feature

21   differences valuable to the consumer?

22   A.   Yes.

23   Q.   And how do you know that?

24   A.   I know that from looking at, you know, the pricing across

25   GoPro models in any vintage and across time.  They are valuable

**KENNEDY - DIRECT / DUCKER**

1  features.  And here's a survey, I think this is for the HERO6,

2  and it shows, in highlighted yellow, wireless capabilities, the

3  relative attribute importance.  And that's in the 2, 6, and

4  9 percent range.

5      And then highlighted in blue are the features that

6  Dr. Ugone includes in profit:  memory, video resolution, and

7  frame rate.  And those are, from this survey, more valuable

8  than wireless, but he still does not account for that.

9  **Q.**  And how did you adjust for this error in Dr. Ugone's

10  analysis?

11  **A.**  So it's -- you have to unwind a lot of things that are

12  changing.  The simplest way that I looked at this was to say:

13  What's the price of the WiFi BacPac versus this price premium

14  for the HERO versus the HERO+?  And I used that difference to

15  get a clean measure.  I think it probably understates the value

16  of these features, but it was about $10 a unit difference.

17  **Q.**  And why did you use the WiFi BacPac rather than the HERO+?

18  **A.**  It's just WiFi capabilities.  It doesn't have resolution

19  or frame rate or memory itself.  It just enables WiFi, so it

20  was a clean measure.

21  **Q.**  Let's look at the last correction you mentioned.

22      How does Dr. Ugone turn the premium for WiFi into a

23  royalty?

24  **A.**  So he described here -- this is his slide.  He identified

25  three features.  We talked about the first.  He also calls it

1    live streaming plus remote control and display and playback and

2    basically said that the Live Preview & Remote Control would be

3    no less than 33.3 percent.  So he takes three features and --

4    or divides by 3.

5    **Q.**    And do you agree with that analysis?

6    **A.**    I don't.

7    **Q.**    Why not?

8    **A.**    I've probably said it too many times, but I don't think

9    it's the right approach, and then it also doesn't include all

10   of the features that are available for wireless.

11   **Q.**    And what other features does GoPro market for wireless?

12   **A.**    The next slide is the same chart that I showed earlier.

13   2016 marketing from the GoPro catalog describing wireless

14   features, and there you see live preview and complete control

15   of the camera in the lower left.  There are clearly other

16   features that are being marketed, and I think Dr. Ugone talked

17   about partly basing his analysis on what GoPro marketed.  So

18   here it is, and this is not a complete set.

19   **Q.**    Does Dr. Ugone's method include the value of those

20   non-patented wireless features in his royalty?

21   **A.**    I think it does.  I think there are other things in there

22   that have to -- that are included and shouldn't be.

23   **Q.**    And so based on your adjustments to his approach, what

24   would Contour's position be at the hypothetical negotiation on

25   the value of the invention?

**A.**    So if I adjust for those things that were in that bullet point earlier, measure profit the right way, pull out other features, it comes out to 24 to 27 cents for the value of the feature being removed, and then another 2 to 3 cents for the cost, and that puts it at 26 to 30 cents.

The other thing I didn't mention, though I should have, is that within remote control, there are things like turning the camera off and on, starting and stopping the shutter, changing modes, very obvious valuable features that -- within that functionality of remote control.  Those are also not adjusted for, so I may have missed that last piece if there's a third prong.  But the net-net is 26 to 30 cents per camera.

**Q.**    Dr. Kennedy, can you summarize the three value indicators you walked through today?

**A.**    GoPro's position, the sort of commonsense approach I described earlier, 2 to 3 cents per camera to implement the non-infringing alternative identified by Dr. Almeroth and confirmed by Dr. Hu.  Market value is 26 cents per camera.  Contour's position is 26 to 30.

**Q.**    So now that you've looked at these three market indicators, are there any other steps you go through as a damages expert in this kind of a case?

**A.**    The last step is a lot of steps, but it's something you saw from Dr. Ugone.  It's what damages experts do in these kind of cases, is I take these sort of quantitative indicators of

1    profit and value and run them through a *Georgia-Pacific*

2    analysis, and it includes things which I'll highlight off this

3    list.

4         I considered all of them in detail, but it includes things

5    like the commercial relationship between Contour and GoPro,

6    Number 5.

7         Important ones, 9 and 10, the advantages of the patented

8    product, the nature of the patented invention and the benefits

9    to users.

10        13, the portion of profits credited to the patented

11   technology.

12        All of those things, those are key drivers.  What does --

13   what is the incremental value?  And if you run it through this

14   negotiation and you consider these factors and also the

15   respective bargaining power of the parties at that time, if you

16   run it through there, that gets me to the ultimate conclusion

17   for me, after all the quantitative analysis and then the

18   *Georgia-Pacific* analysis, is 26 cents per unit.

19   **Q.**   So based on your review of the *Georgia-Pacific* factors,

20   who would ultimately have the better bargaining position at the

21   hypothetical negotiation?

22   **A.**   I think GoPro would.  I mean, we talked about the scale

23   that was involved in terms of the relative position of the

24   parties, so I -- and lack of competition.  I think it's GoPro.

25        **MR. DUCKER:**  Can we pull up DDX-6.45.

1  BY MR. DUCKER:

2  **Q.**   And can you remind the jury of your -- what your ultimate

3  opinion is on royalties?

4  **A.**   For all groups, it's 4,659,213.

5  **Q.**   And does this represent what you consider to be the most

6  GoPro would pay?

7  **A.**   Yes.  I think, as I mentioned earlier, you could take the

8  units times 2 to 3 cents, and that would be the GoPro's primary

9  position.  But through the bargaining process and through the

10  hypothetical negotiation, I think the most they would pay is

11  this.

12  **Q.**   Thank you, Dr. Kennedy.

13       **MR. DUCKER:**  No further questions.  I pass the

14  witness.

15       **THE COURT:**  All right.  Ms. Replogle.

16       **MS. REPLOGLE:**  Yes.

17            **CROSS-EXAMINATION**

18  BY MS. REPLOGLE:

19  **Q.**   Good afternoon, Dr. Kennedy.

20  **A.**   Good morning -- afternoon.  Sorry.

21  **Q.**   Good morning, afternoon.

22       All right.  You started working on this case in December

23  of 2019?

24  **A.**   That's right.

25  **Q.**   Just six months later, as of June 2020, you had invoiced

1    GoPro, for your work to date, for in excess of a half a million

2    dollars?

3    **A.**    Okay.

4    **Q.**    Since that time, you have now served seven expert reports

5    in this case?

6    **A.**    Yes.

7    **Q.**    And another five and a half years have gone by?

8    **A.**    Correct.

9    **Q.**    Yeah.  So fair to say, GoPro has spent millions on your

10   fees alone in this case?

11   **A.**    Did you say millions?  No.

12   **Q.**    Well, over a million?

13   **A.**    Maybe.  Most of the work came in that first report, and

14   then there are supplements and updates, but it's possible.

15   **Q.**    Okay.  So your first report was dated June 16th, 2020.  Do

16   you recall that?

17   **A.**    Yes.

18   **Q.**    And you don't recall that in November 19th, 2021, it was a

19   fairly substantial report as well?

20   **A.**    I don't remember but, sure.

21   **Q.**    Okay.  So you don't remember?

22   **A.**    It's a supplement --

23   **Q.**    All right.

24   **A.**    -- but there's been a lot of work.

25   **Q.**    That's fine.

1      So, but fair to say that GoPro has spent at least a

2  million dollars of fees on your --

3  **A.**   I don't know, but --

4  **Q.**   -- matter?

5  **A.**   I don't know, but I wouldn't be surprised.

6  **Q.**   Okay.  So to be clear, you're an expert witness in this

7  case; correct?

8  **A.**   Correct.

9  **Q.**   You're coming in as an economist after the fact?

10  **A.**   Correct.

11  **Q.**   Okay.

12  **A.**   After?

13  **Q.**   You're coming in as an economist after the fact, after the

14  time that the documents and the witnesses and the information

15  that they've been talking about the last week.

16  **A.**   It's -- like you said, it's been evolving.  I've been

17  doing this for six years, so -- I mean, I was writing reports

18  very recently, so facts have been evolving.

19  **Q.**   All right.  Now, Dr. Ugone has a $9.71-per-unit royalty

20  that's based on the Element license; correct?

21  **A.**   Correct.

22  **Q.**   Okay.  Now, to be clear, you were not there when the

23  Element license was negotiated?

24  **A.**   Correct.

25  **Q.**   And you didn't draft the Element license?

1   **A.**   Correct.

2   **Q.**   And you didn't participate in the negotiations between

3   Element and Contour?

4   **A.**   Correct.

5   **Q.**   And instead, there are fact witnesses that have testified

6   at trial here that were there at the time?

7   **A.**   Yes.

8   **Q.**   Okay.  And those fact witnesses include Ross Helfer for

9   Contour?

10  **A.**   Yes.

11  **Q.**   And Vlad Kazhdan of Element as well?

12  **A.**   Yes.

13  **Q.**   Okay.  And the jury has heard both of those witnesses

14  through their deposition testimony at trial?

15  **A.**   Correct.

16  **Q.**   Okay.  Now I want to turn to the Element license.

17          **MS. REPLOGLE:**  Can you put up DTX-702.  It's admitted.

18  **BY MS. REPLOGLE:**

19  **Q.**   So this is the Element license that Dr. Ugone relies on;

20  correct?

21  **A.**   I think so.  I don't see the whole thing, but I assume

22  it's the right one.

23          **THE COURT:**  You can put it up.

24          **MS. REPLOGLE:**  DTX-702, it's admitted.

25  \\\

1   BY MS. REPLOGLE:

2   **Q.**   All right.  This license agreement, it's titled "License

3   Agreement"; correct?

4   **A.**   Correct.

5   **Q.**   And it was executed on about October 10th, 2021?

6   **A.**   Yes.

7   **Q.**   All right.  And let's turn to the definition of "licensed

8   patents" on 702-2 under (h).  And the definition of "licensed

9   patents" means the patents listed in Exhibit A and Exhibit B?

10  **A.**   Correct.

11  **Q.**   And if we turn to Exhibit A, those are the patents that

12  are asserted in this case; correct?

13  **A.**   Right.

14  **Q.**   And those patents relate to portable point-of-view digital

15  video cameras?

16  **A.**   I think that's the title.  Are you asking what the titles

17  of the patents are?

18  **Q.**   The patents that are asserted in this case claim portable

19  point-of-view digital video camera with additional elements?

20  **A.**   I'm going to defer on what -- when you start using the

21  word "claim," I get careful because I think that's a technical

22  thing, but I know they relate to action cameras.

23  **Q.**   Okay.  So they relate to action cameras.

24       No other patents are identified in Exhibit A; correct?

25  **A.**   Correct.

1    Q.    All right.  Let's take a look at the definition of

2    "licensed products" that's at 702-2.

3         And the licensed products under the Element license,

4    that's defined as products or devices which would infringe at

5    least one claim of a licensed patent in the absence of a

6    license.

7    A.    I see that.

8    Q.    Okay.  Let's turn to Section 2(a).  And under

9    Section 2(a), Contour granted Element an exclusive license in

10   the Element field and a non-exclusive license in all other

11   fields; correct?

12   A.    Correct.

13   Q.    Okay.  And that non-exclusive license included a worldwide

14   license under the licensed patents and related intellectual

15   property to make, sell, import licensed products; correct?

16   A.    Right.

17   Q.    Okay.  Now I want to turn to what the payment was for

18   this.

19        If you take a look at Section 3(a)(1).

20        All right.  And 3(a)(1) states [as read]:

21             "In consideration for the license and

22        rights" -- let's see where we are? -- "for the

23        patents listed in Exhibit A, Element shall pay a

24        non-refundable, up-front, lump-sum prepaid royalty

25        license payment of $1.5 million."

1          Do you see that?

2    **A.**   I do.

3    **Q.**   Okay.  And in this payment provision, 3(a)(1), that

4    $1.5 million is for the patents listed in Exhibit A; correct?

5    **A.**   That's what it says.

6    **Q.**   And as we saw before, the patents listed in Exhibit A are

7    the patents that are asserted in this case?

8    **A.**   Correct.

9    **Q.**   Okay.  Let's turn to 3(a)(2).

10          And under 3(a)(2), if you go to the second sentence --

11   yep -- for the licensed products covered by the patents listed

12   in Exhibit A, for products sold by Element outside the Element

13   field, Element shall pay a running royalty of the greater of,

14   and then it's either 5 percent of net sales or $5 per licensed

15   product sold; correct?

16   **A.**   So outside of -- I think it's smart TVs.  That's the

17   Element field, if I remember.

18          So in the exclusive area, I don't see a royalty rate, but

19   here it says for everything else it's 5 percent of net sales.

20   **Q.**   Let me -- so this Section 3(a)(2) states that [as read]:

21          "For licensed products outside the Element field

22          for the patents identified in Exhibit A, Element

23          shall pay a running royalty of the greater of

24          5 percent of net sales or $5 per licensed product."

25          That's what it says?

1    **A.**    It does.  And then up above it's 5 percent for TVs.

2    **Q.**    All right.  So up above, you're pointing to the first

3    sentence.  That relates to licensed products that are sold

4    within the Element field; correct?

5    **A.**    Right.  So no difference whether it's exclusive or not,

6    correct.

7    **Q.**    Okay.  Yeah.  With respect to the first sentence, that

8    deals with licensed products that are sold within the Element

9    field, and the second sentence deals with licensed products

10   that are sold outside the Element field?

11   **A.**    Agreed.

12   **Q.**    Okay.  And with respect to the royalty payment that's

13   identified here, as stated in this document, it states that

14   that royalty payment is for licensed products covered by the

15   patents listed in Exhibit A; correct?

16   **A.**    Right.

17   **Q.**    And, again, when we looked at Exhibit A, those are the two

18   patents that are asserted in this case; correct?

19   **A.**    That's right.

20   **Q.**    All right.  Let's take a look at the term provision here.

21        If you take a look at 702, page 5, the first provision,

22   the term of this Element license is for -- is for the date

23   of -- the effective date until the expiration of the last to

24   expire patents; correct?

25   **A.**    Correct.

1    Q.    Okay.  And under Section 4(b)(4), that provides that

2    Element can terminate the agreement at any time with written

3    notice if Element is not disposing of licensed products any

4    longer.

5    A.    Okay.

6    Q.    Is that what it says?

7    A.    That's what it says.

8    Q.    Okay.  And you've seen no evidence that Element has sent

9    any notification or termination notice under this license?

10   A.    I haven't.  I haven't seen -- and there are other terms

11   that haven't been fulfilled, 1.5 out of 2 million, things like

12   that.  I haven't seen --

13   Q.    Sorry.

14   A.    -- really any communications.

15   Q.    Perhaps my question wasn't clear.

16       You've seen no evidence that Element has terminated this

17   license agreement at all in this case?

18   A.    Correct.

19   Q.    And, in fact, if you recall, you were here when

20   Mr. Helfer's deposition testimony was played?

21   A.    Yes.

22   Q.    And do you recall him saying that he had not received any

23   written notification of termination from Element?

24   A.    I don't think he had any communications, that's correct.

25   Q.    Okay.  Now, do you recall as well that Mr. Helfer also

1  testified in this courtroom that he expected that Element would

2  be releasing a licensed product?  Do you recall that?

3  **A.**   Mr. Helfer expected Element would?

4  **Q.**   Yeah.  His deposition testimony that was played here in

5  court, that he discussed that he expected they would be

6  releasing a licensed product.

7  **A.**   I think he said that.

8  **Q.**   Okay.  And do you recall Mr. Helfer also testified that

9  there was nothing unusual in the fact that Element has not yet

10 released a licensed product even though the agreement was

11 signed in 2021 and we're here in 2025?  Do you recall that?

12 **A.**   Sure.

13 **Q.**   Okay.  And do you also recall that Mr. Helfer testified

14 that once Element released a licensed product, he expected them

15 to pay the 5 percent royalty?  Do you recall that testimony

16 coming in?

17 **A.**   Sure.  I don't know what the basis was for any of that,

18 but he heard him testify to that.

19 **Q.**   Okay.  I want to turn to one of your demonstratives, and

20 let's talk about SkyBell.

21       **MS. REPLOGLE:**  And can I have the Elmo, please, as

22 well.

23 **BY MS. REPLOGLE:**

24 **Q.**   Can you see that okay?

25 **A.**   Yes.

1   Q.   Okay.  Great.  We'll talk about that in a little bit.

2        Now, you -- in your testimony on direct, you talked about

3   this demonstrative.  And on the right-hand side under

4   "SkyBell," you referred to a tooling payment.  Do you see that?

5   A.   Yes.

6   Q.   Okay.  And that's a reference to the supply agreement

7   that's signed between SkyBell and Element; correct?

8   A.   Correct.

9   Q.   Okay.  There is also an IP license and supply agreement

10  executed between those two parties as well.  Do you recall

11  that?

12  A.   I do.

13  Q.   Okay.  So Element and SkyBell Technologies also entered

14  into an IP license and supply agreement; correct?

15  A.   Correct.

16  Q.   SkyBell owns, I think, several patents.  Do you recall

17  that?

18  A.   I think more than several.

19  Q.   Mm-hmm.

20       And do you recall that the licensed patents are defined in

21  that agreement as all patents and patent applications owned by

22  SkyBell and any of its affiliates as of the effective date, and

23  then there's like an Exhibit A that was attached to that IP

24  license agreement?  Do you recall that?

25  A.   I -- I don't recall the language, but I remember seeing an

1  Exhibit A.

2  **Q.**  Okay.

3       **MS. REPLOGLE:**  Why don't we put in front of the

4  witness -- I don't think this has been admitted --

5  Exhibit 4378.

6  **BY MS. REPLOGLE:**

7  **Q.**  Do you have that?  Can you see it, 4378?

8  **A.**  On the screen, you mean?

9  **Q.**  Yeah.  Could you -- sorry.  Oh, okay.  Excuse me.  I think

10  we're still on the Elmo.  Apologies.  Apologies.  I didn't give

11  you very good directions on that.

12                      (Pause in proceedings.)

13  **BY MS. REPLOGLE:**

14  **Q.**  Do you have in front of you Trial Exhibit 4378?

15  **A.**  I do.

16  **Q.**  And is that an IP license and supply agreement between

17  SkyBell and Element?

18  **A.**  Yes.

19  **Q.**  And did you review that in the process of forming your

20  opinions in this case?

21  **A.**  I did.

22  **Q.**  Okay.

23       **MS. REPLOGLE:**  I'd move to admit into evidence

24  Exhibit 4378.

25       **MR. DUCKER:**  We'd object, Your Honor.

1            THE COURT:  This objection has been made before the

2    other way.  So, yeah, sustained.

3            MS. REPLOGLE:  Okay.  That's fine.

4    BY MS. REPLOGLE:

5    Q.   Do you recall the fact -- well, we can do it another way,

6    actually.

7         All right.  The licensed patents, as we just discussed,

8    included -- and they were identified in Exhibit A -- of the

9    IP license and supply agreement between Element and SkyBell?

10   A.   I have that general recollection.

11   Q.   Okay.  And do you recall that Exhibit A to the agreement

12   identifies 107 issued U.S. patents that relate to cameras and

13   video cameras, display screens, doorbells, and doorbell

14   communication systems and methods, among other applications?

15   Do you recall that?

16   A.   Not the 107 but there was a lot in there, sure.

17   Q.   Okay.

18            MS. REPLOGLE:  So can we return back to the Elmo,

19   please.

20   BY MS. REPLOGLE:

21   Q.   So a lot of doorbell and related patents in the IP license

22   and supply agreement.

23        Take a -- do you recall that as consideration for the

24   license granted, Element agreed to pay SkyBell a royalty of

25   5 percent of net sales of the licensed products inside or

1  outside of the Element field pursuant to that IP license

2  agreement?

3  **A.**    Yeah.   I think you have to be careful, though, in pulling

4  that term out.   It doesn't really reflect the actual economic

5  circumstances of this combined agreement.   So the numbers are

6  there, but it's not -- it's not what this agreement's about.

7  **Q.**    Pursuant to the payment provision and the IP license and

8  supply agreement between SkyBell and Element, you agree that

9  Element agreed to pay a royalty of 5 percent of net sales as

10  stated in that provision?

11  **A.**    No.   I can't agree with that.   Element would have paid

12  that if they used doorbells that were outside of the supply

13  agreement.   The supply agreement between SkyBell and Element

14  was that SkyBell was going to provide doorbells to Element at

15  cost, so no profit.

16      So SkyBell's giving doorbells to Element if Element -- at

17  cost, doesn't make any money on them; and if Element uses those

18  doorbells, they don't pay a royalty.

19      So these agreements are intertwined and complicated, and

20  that's a perfect example of reading a rate in an agreement and

21  you just can't lift it and say that applies.

22          **MS. REPLOGLE:**   Can we put in front of just the witness

23  only 4378 to see if it refreshes his recollection?   And I want

24  you to put --

25          **THE COURT:**   Take off the Elmo.

1          MS. REPLOGLE:  Yeah, off the Elmo for a moment.

2    BY MS. REPLOGLE:

3    Q.   All right.  Do you have it in front of you, Section 3(a),

4    consideration of the IP license and supply agreement?

5          THE COURT:  Not yet.

6          THE WITNESS:  So which agreement are we in?

7    BY MS. REPLOGLE:

8    Q.   The same one.  IP license and supply agreement that I've

9    been asking you several different questions about.

10   A.   Okay.

11   Q.   Okay.  Under 3.a for consideration, do you recall that as

12   part of the consideration, that beginning on the effective date

13   and through the term for licensed products covered by the

14   patents listed in Exhibit A that are sold by Element or its

15   affiliates, inside or outside of the Element field, Element

16   shall pay, and there's two subsections:  No royalties if

17   products include any SkyBell supplied parts; or, under

18   subsection (2), in the event no SkyBell-supplied parts are used

19   in such products, 5 percent of net sales of such products?  Do

20   you recall that?

21   A.   Exactly.  This is what I was describing.

22   Q.   Right.  So if non-SkyBell parts are used in those

23   products, Element agreed to pay 5 percent of net sales.  Do you

24   agree with that?

25   A.   Sure.

1         **MS. REPLOGLE:**  Can we return to the Elmo, please.

2    **BY MS. REPLOGLE:**

3    **Q.**  All right.  So when you put up this demonstrative earlier

4    today, you showed the supply agreement, which we're going to

5    get to in a second, but you didn't show the fact that SkyBell

6    and Element had also executed an IP license and supply

7    agreement in which Element would pay SkyBell 5 percent of net

8    sales for non-SkyBell-supplied products, did you?

9    **A.**  Because I wouldn't do that for the reasons you just showed

10   me.  It's --

11   **Q.**  It was just a simple question.  You did not, did you?

12   **A.**  Right, I did not.

13   **Q.**  All right.  Now, let's turn to the supply agreement.

14       I think you testified that you didn't know what the actual

15   payment was made.  I think you must have been referring to the

16   2.25 tooling payment -- was that right? -- when you said that?

17   **A.**  Correct.

18   **Q.**  Okay.  So let's take a look at TX-4157.  That's the supply

19   agreement.  It's been admitted.

20       And now to be clear, under the supply agreement, Element

21   was the supplier and SkyBell was the purchaser; is that right?

22   **A.**  Yes.

23   **Q.**  Okay.  And if we turn to 4157-3, so page 3, you have a

24   definition of "tooling" provided there.  Do you see that?

25   **A.**  Yes.

1  Q.   Okay.  And, again, because under this agreement, Element

2  was going to be making products and SkyBell was purchasing

3  those products; correct?

4  A.   That's what it describes.

5  Q.   Okay.  And so under "Tooling," it's defined as different

6  tools, tooling equipment, and fixtures that will be required to

7  manufacture the products; is that right?

8  A.   Yes.

9  Q.   Okay.  And it further says at that second sentence

10  there -- let's see, hold on.  Where is it at? -- the parties

11  agreed that the supplier -- let's see, yeah, right in the

12  middle -- the supplier will own and hold all the rights, title,

13  and interest to the tooling.  Do you see that?

14  A.   I do.

15  Q.   Okay.  And then it further goes that the tooling will only

16  be used for purchasers, products, or suppliers and affiliates.

17  Do you see that?

18  A.   Yes.

19  Q.   Okay.  Now if we turn to Section 3.3, which is the payment

20  provision under this supply agreement -- do you see that?

21  A.   Yes.

22  Q.   Okay.  And under the payment provision, we have -- yeah --

23  [as read]:

24       "Unless otherwise set forth on the purchase

25       orders or otherwise agreed to in writing, the

1           purchase price will be due and payable 30 percent

2           with each purchase order and 70 percent upon delivery

3           of the products."  Do you see that?

4    **A.**    Yes.

5    **Q.**    Okay.  So Element would not be paid until a purchase order

6    was made; is that correct?

7    **A.**    Element would not be paid?

8    **Q.**    Yeah.

9    **A.**    Do you mean SkyBell?

10   **Q.**    Sorry?  What?

11   **A.**    What do you mean?  SkyBell or Element?

12   **Q.**    No.  Well --

13   **A.**    Because this is talking about purchasing doorbells made by

14   SkyBell, and this is like those manufacturer's terms that you

15   heard testimony about.

16   **Q.**    No.  So we have in this agreement that Element is the

17   supplier and SkyBell is the purchaser; correct?  In the supply

18   agreement.

19   **A.**    Can we go back to the top?

20   **Q.**    Mm-hmm.

21   **A.**    Maybe I just got this wrong.

22           **MS. REPLOGLE:**  And go to the very first paragraph of

23   the supply agreement and blow that up.

24           **THE WITNESS:**  Huh.  This is Element supplying to

25   SkyBell.  Okay.

1   BY MS. REPLOGLE:

2   Q.   Okay.  So now if we go back to -- if we go back to

3   Section 3.3 under "Payments," and so my question was simply:

4   Element would not be paid for the products that they made until

5   a purchase order was made because 30 percent is paid upon the

6   purchase order and then 70 percent later when it's --

7   A.   If anything was actually made, that's right.

8   Q.   Okay.  Now let's turn to Section 3.4, and let's see if we

9   can clear up the 2.25 million that you referenced earlier in

10  your direct.

11       You see under Section 3.4 it states that the purchaser,

12  which is SkyBell, agrees to pay the supplier, which is Element,

13  an unconditional non-refundable upfront lump-sum fee of

14  $2.25 million.  Do you see that?

15  A.   I do.

16  Q.   And the first sentence states exactly what that payment

17  was for.  It was for maintaining the tooling, setting up and

18  arranging the manufacturing facilities, and incurring

19  non-recurring engineering costs, foregoing other manufacturing

20  opportunities, et cetera.  That was what the $2.25 million

21  payment was for; correct?

22  A.   That's what the words say.  I think it's also

23  unconditional, non-refundable, and payable within six months or

24  eight months.

25  Q.   Yeah.

1    **A.**   But I don't see any requirement that that actually occurs,

2    and I haven't seen anything indicating it did occur.

3    **Q.**   So I understand we have obviously differences of opinions,

4    and you're an expert witness that's testifying on behalf of

5    GoPro in this case, but just what the document says here is

6    that in consideration for the supplier providing and

7    maintaining the tooling, setting up and arranging the

8    manufacturing facilities, incurring non-recurring engineering

9    costs, foregoing other manufacturing opportunities, incurring

10   other costs that are not included in the unit prices for the

11   products and for other good and valuable consideration, then

12   the purchaser agrees to pay the supplier for that

13   $2.25 million.  That's what it says?

14   **A.**   That's what the words say, correct.

15   **Q.**   All right.

16          **MS. REPLOGLE:**   Let's turn to one last thing on this

17   supply agreement under Section 7.2.  Can you blow that up?

18   **BY MS. REPLOGLE:**

19   **Q.**   Okay.  So under 7.2, that section actually references the

20   grant of the license to the cameras and video cameras, display

21   screens, doorbells, and doorbell communication systems that we

22   were talking about earlier in the IP license and supply

23   agreement.  Do you see that reference?

24   **A.**   Where's that?

25   **Q.**   Do you see Section 7.2?  It says [as read]:

1              "In connection with this agreement, purchaser

2        has granted to supplier a license and right to use

3        various patents and patent applications (owned or

4        controlled by the purchaser" -- which is SkyBell --

5        "and all" -- and it goes on -- "continuations,

6        divisionals, et cetera, pursuant to the provisions of

7        an IP license and supply agreement."

8        Right there, do you see that?

9    **A.**    I do.  I thought you were saying something about tooling.

10   Sorry.  I missed it.  But okay, I see that.

11   **Q.**    Yeah.  That's referring to the IP license and supply

12   agreement that we talked about just a few minutes ago; correct?

13   **A.**    I think so.

14   **Q.**    Okay.  And that's the same IP license and supply agreement

15   that you didn't put on your demonstrative, but we put it on

16   there just a second ago today?

17   **A.**    Because if there's supplied product, there's no royalty,

18   correct.  That's why I wouldn't put it on there.

19   **Q.**    Okay.  Now, again, with respect to the evidence that

20   you've heard at trial because you've been here every

21   single day, do you recall that Mr. Kazhdan testified that

22   Element has never had any financial or ownership interest in

23   Contour IP Holdings?

24   **A.**    Yes.

25   **Q.**    Do you recall that he also testified that he's never had

1    any financial or ownership interest in Contour?

2    **A.**    Yes.

3    **Q.**    And do you recall that prior to the license agreement, the

4    testimony came in from Mr. Helfer that Contour likewise had no

5    ownership interest in Element?

6    **A.**    Correct.

7    **Q.**    And Element had no ownership interest in Contour,

8    backwards the other way; right?

9    **A.**    Correct.

10    **Q.**    And did you further hear the testimony from Mr. Helfer

11    that SkyBell had no financial interest in Contour?

12    **A.**    Yes.

13    **Q.**    And Contour had no financial interest in SkyBell.  Do you

14    recall that?

15    **A.**    Correct.  Backward.  I recall that.

16    **Q.**    Okay.  So if we take a look again one last time, I

17    promise, on the Elmo for this demonstrative anyway --

18    **A.**    Can you just -- I think you might want to be backing that

19    out a little bit, yeah.

20    **Q.**    Got it.  All right.

21        All right.  So if we can just make sure we have this all

22    clear here, we have SkyBell was the purchaser; correct?

23    **A.**    Correct.

24    **Q.**    And Element was the supplier; correct?

25    **A.**    Correct.

1    Q.    Okay.  And over here for the Contour Element license, that

2    related to action cameras.  You agree with that?

3    A.    No.  We don't know what it relates to.

4    Q.    Okay.  We'll get to that in just a second.

5          Okay.  Lastly, for the 2.25 million tooling payment,

6    you've seen no evidence that that was ever paid; correct?

7    A.    Correct.

8    Q.    For the Element license, you have seen evidence and you've

9    heard testimony that $1.5 million has, in fact, been paid?

10   A.    Out of the lump sum of $2 million, correct.

11   Q.    Okay.  Let's move on.

12         All right.  You've also -- you've relied on the MVP

13   settlement agreement; is that correct?

14   A.    Yes.

15              MS. REPLOGLE:  Let's put that up on the screen,

16   please.  I think it's 2498, admitted.

17   BY MS. REPLOGLE:

18   Q.    All right.  And this is the one license or settlement

19   agreement that you rely on; correct?

20   A.    Correct.

21   Q.    Okay.  And it's titled "Settlement Agreement"; right?

22   A.    Correct.

23   Q.    Because it resulted from a litigation between Monument

24   Peak Ventures and GoPro?

25   A.    Yes.

1  Q.   It's not a license agreement.   It's a settlement

2  agreement.

3  A.   Correct.

4  Q.   And Monument Peak Ventures owned a patent portfolio;

5  correct?

6  A.   Yes.

7  Q.   And Monument Peak Ventures had actually bought that patent

8  portfolio from another entity called Intellectual Ventures.   Do

9  you recall that?

10  A.   I remember getting some questions about that.   I can't --

11  I don't remember if that's true or not, but I'll assume it is.

12  Q.   Okay.   Monument Peak Ventures was never a camera company?

13  A.   Correct.   They're a non-practicing entity.

14  Q.   All right.   So Monument Peak Ventures, unlike Contour

15  here, has not and does not manufacture cameras and never has in

16  the past?

17  A.   Which Contour?

18  Q.   Let me just rephrase it.

19      Monument Peak Ventures has not and does not manufacture

20  cameras?

21  A.   Correct.

22  Q.   Okay.   Monument Peak Ventures was not a competitor to

23  GoPro?

24  A.   Correct.

25  Q.   And in this settlement agreement, Monument Peak Ventures

1  granted a license to GoPro to a Kodak portfolio of patents; is

2  that right?

3  **A.**    That's right.

4  **Q.**    And you haven't seen evidence one way or the other of

5  whether Kodak sold cameras practicing the Kodak patents?

6  **A.**    I know Kodak made cameras, but I haven't seen evidence

7  that they actually practiced, made a lot of cameras.

8  **Q.**    And Kodak has not been a competitor to GoPro either;

9  correct?

10  **A.**    Correct.

11  **Q.**    Now, to be clear, this settlement agreement resulted from

12  settlement of a litigation in which validity and infringement

13  were disputed; correct?

14  **A.**    Correct.

15  **Q.**    And do you agree that in general, the royalty would have

16  to be adjusted upward to account for the assumption of validity

17  infringement in the hypothetical negotiation?

18  **A.**    As I testified, yes.  It's a matter of degree but, yes.

19  **Q.**    Okay.  Now, the licensed patents in the MPV agreement

20  included 14 different patents that you testified about;

21  correct?

22  **A.**    Correct.

23  **Q.**    And just to be clear for the jury, none of those 14

24  patents are the patents asserted in this case; correct?

25  **A.**    That's correct.

1   Q.   Okay.  And none of those 14 patents are Contour patents?

2   A.   That's correct.

3   Q.   Okay.

4        MS. REPLOGLE:  Now let's turn to the grant clause at

5   2498, page 4, Section 3.1, and pull that up.

6   BY MS. REPLOGLE:

7   Q.   Okay.  And you testified about this on direct, about the

8   2.5 percent.  You said you reviewed it but you didn't consider

9   it.  You didn't use it going forward.  Is that right?

10  Something like that?

11  A.   I definitely didn't use it, the 2.5 percent.

12  Q.   Okay.  Well, understood.

13       GoPro disputed that particular provision, but let's just

14  look at what the actual language says.  Okay?

15       Under 3.1, the payment provision, it states, as additional

16  consideration of the license release covenant granted by

17  plaintiff and the dismissal by plaintiff of the litigation

18  hereunder, defendant, while disputing the rate, agrees to pay

19  to plaintiff 2.5 percent, which is 2 1/2 percent, of all net

20  revenue for the sale of the HERO5 and 6 cameras from March 16,

21  2018, through -- through May 31st, 2018; correct?

22  A.   Correct.

23  Q.   So it's, like, about a two-and-a-half-month window of

24  time?

25  A.   Right.

1    Q.    Right.  And this is what the agreement said when both

2    parties signed this agreement and agreed to dismiss this

3    litigation.  That's the language they agreed to?

4    A.    So all the language.  And as I testified, the language

5    that's really driving GoPro's willingness to enter this

6    agreement and pay for a license is the part you didn't

7    highlight.

8    Q.    Well, I'm just looking at the actual words that are in

9    this provision.  That is the language that GoPro agreed to with

10   respect to the payment provision in the MPV settlement

11   agreement?

12   A.    Yeah.  The 2.5 percent disputed rate, this artificially

13   narrowed two-and-a-half-month period for two products, that's

14   what the words say.  That's -- but that's why I call them into

15   question and why I asked GoPro about them.  They don't make

16   sense and the math doesn't work.

17   Q.    And I understand that you have your explanation for what

18   your opinions are and how you interpret this, and I'm just

19   making a distinction between what the document says versus what

20   your testimony is.

21   A.    I disagree with that.  It's -- I'm sort of saying the

22   facts I got from GoPro, not my interpretation.  So it's in

23   here.  It's weird.  I asked GoPro about it.  They said this

24   provision was something that MPV wanted.  And what drove GoPro

25   is $295,000 for all the licensed products, and it was pretty

1  clear that GoPro was like, "This is not for two and a

2  half months and two products."  They would not pay 295 for

3  that.

4  **Q.**  Okay.  That's fine.  I understand that's what your

5  testimony is.

6      Let's take a look too, just briefly, at the whereas

7  clause, the third whereas clause.

8      Okay.  And you testified about this third whereas clause

9  on your direct and your interpretation of that clause, but

10 let's take a look at it.

11     This whereas clause, it says that -- that this agreement

12 has not been negotiated under the hypothetical negotiation

13 standards and the parties have not negotiated and agreed this

14 settlement does not represent a reasonable royalty.  Do you see

15 that?

16 **A.**  I do.

17 **Q.**  Okay.  And in the Element license that we just looked at

18 and that Contour's relying on, there's no similar whereas

19 clause as we see here in this MPV agreement?

20 **A.**  That's right.  This is the only time I've seen this

21 language in any agreement, you're right.

22 **Q.**  All right.

23      **MS. REPLOGLE:**  Let's take a look at the

24 inadmissibility clause in this agreement at Section 613 at

25 2498-3 and blow that up.

1    It is page 11.  Yeah, there you go.  And blow that up.

2  BY MS. REPLOGLE:

3  Q.  All right.  And you talked about this on direct, about

4  this inadmissibility clause.  And if we look at the language

5  here, it says, "This settlement agreement," and it goes on,

6  "and any proceedings or discussions related to this settlement

7  agreement are inadmissible as evidence."  And then it lists

8  several things, "including as evidence of comparable licenses

9  for patents in similar subject matter in any tribunal in any

10  state, territory, or jurisdiction."

11    That's what the MPV agreement states that you rely on in

12  this case; correct?

13  A.  The MPV agreement that's in evidence in this case and was

14  admitted, that's correct.

15  Q.  And the Element license that Contour is relying on has no

16  such similar provision as this one; correct?

17  A.  Correct.

18  Q.  All right.  Let's take a look -- all right.  I want to

19  turn to, actually, your demonstrative, one more slide.

20    MS. REPLOGLE:  Okay.  Could you put up his

21  Demonstrative Slide 17.

22  BY MS. REPLOGLE:

23  Q.  Do you recall testifying about your demonstrative slide

24  that you presented today?

25  A.  Yes.

1    Q.    Okay.  And you were, I think, discussing about the change

2    of settings on the camera that GoPro could make?

3    A.    Correct.

4    Q.    Do you recall that?

5          Okay.  And to be clear, the change in the camera that you

6    were speaking about is taking out a lighting setting in a video

7    camera; right?

8    A.    No.  More than that.  Lighting, audio, and color within --

9    access to that within the app and not the camera or the remote.

10   Q.    Yeah, I just want to be clear.

11         You are discussing about changing and taking out the

12   lighting setting in a video camera as well as a color setting

13   and an audio setting; correct?

14   A.    I don't think --

15   Q.    One or the other?

16   A.    I don't think -- I don't think so.  I don't think

17   that's -- I'd go back to Dr. Almeroth and Dr. Hu, and it's --

18   I'm not trying to be technical, but I think it's the camera's

19   ability to receive a signal from, say, an iPad or a phone

20   that is controlling lighting, color, or audio.

21   Q.    All right.  Okay.  So that's fine.

22         Here's my question:  If -- just to be clear, if GoPro

23   loses a sale because -- I think you said like a small

24   percentage of users in the use case had changed the lighting

25   settings, according to your testimony; right?  Do you recall

1  that small percentage?

2  **A.**  Correct.

3  **Q.**  Okay.  If GoPro loses a sale of even a small percentage of

4  users, that does mean that GoPro has lost the sale and the

5  profits of the entire -- of that camera?  It's lost the sale of

6  the camera if they lose the customer?

7  **A.**  Right.

8  **Q.**  Okay.  And in the context of this case, for the sales and

9  revenue and profits generated from the accused products, you

10 agree that even a small percentage of a loss to its customers

11 would result in millions of dollars?

12 **A.**  .002 percent for two months.  941 is almost like an

13 immeasurably small percentage of GoPro's sales.

14 **Q.**  So you've reviewed the profitability of the accused

15 products in this case; correct?

16 **A.**  Correct.

17 **Q.**  Okay.  So would it surprise you that even a loss of

18 3.4 percent sales would result in a loss of over 60 million

19 profits generated from the accused products in this case?

20 **A.**  A loss of 3.4 sales...  Tell me what you're trying to get

21 at there.

22 **Q.**  You don't know, sitting here?

23 **A.**  I don't really understand the way you phrased it, so I was

24 trying to see if I could help.

25 **Q.**  If GoPro loses even just a few percentages of sales of the

1  accused products, it would have resulted in over $60 million of

2  profits from the sales of the accused products that are at

3  issue in this case?

4  **A.**    It depends what you mean "a small percentage."  The

5  percentages we've seen in the data are very small, and I

6  haven't seen anything indicating that it would be something

7  larger than that, certainly not the percentage that you were

8  referring to.

9  **Q.**    Okay.  You don't know.  You're not aware then or you don't

10  recall that even a loss of over 9 percent or 10 percent of the

11  sales would result in hundreds of millions of dollars of losses

12  of profits?

13  **A.**    Well, I think that's the inherent problem, is that GoPro

14  would be presented with an ask that's the equivalent of what?

15  In profit 1.75 million customers or something like that?  Wait.

16  175,000.  I got the digit wrong.

17      So there's tens of thousands of customers, when you have

18  941 complaints.  That just doesn't -- it doesn't make sense.

19  There isn't objective data supporting that.

20  **Q.**    So, Dr. Kennedy, let me ask you, if it's such a small

21  percentage in how you are characterizing and how you're

22  understanding it, then why is it the case that GoPro has never

23  made that change in over ten years of litigation?

24  **A.**    This is a little bit what I talked about earlier.  We know

25  now a lot more than we knew or GoPro would have known in 2014.

 1   We now have both experts that have put tons of work into this

 2   case, and they say:  All you need to do is remove that red line

 3   that I removed there.

 4       We now know that if you do, in fact, remove the customer's

 5   ability to access ProTune settings via the app, it's a small

 6   transitory blip in sales.  There are expectations of that, but

 7   we now know how much, with the data we have and you can

 8   incorporate in the hypothetical negotiation.  That's why we're

 9   so much better informed.  Here.

10   **Q.**   Yeah.  I -- that's fine.  That's your testimony.

11           **MS. REPLOGLE:**  Let's take a look at DT- -- his

12   demonstrative at slide -- I think it's 19.

13           **THE COURT:**  Ms. Replogle, are we at a good time for a

14   break?

15           **MS. REPLOGLE:**  Oh, sure.  Yes, Your Honor.

16           **THE COURT:**  Okay.  So, ladies and gentlemen, we'll

17   take our second break of the day, 15 minutes.

18       (Proceedings were heard out of the presence of the jury.)

19           **THE COURT:**  Please be seated, everybody.

20           **MR. KEVILLE:**  I thought we would be done with this

21   witness by the next break, and then I could raise JMOLs.  How

22   do you want me to handle that when this witness is done?  This

23   is their last witness.

24           **THE COURT:**  The -- I'm going to assume you're making

25   it, and you can do it after either -- we'll do it during the --

1   at the beginning of the jury instruction conference.

2            **MR. KEVILLE:**  Understood.  Thank you, Your Honor.

3            **THE COURT:**  Okay.

4                    (Recess taken at 11:45 a.m.)

5                (Proceedings resumed at 12:02 p.m.)

6        (Proceedings were heard in the presence of the jury.)

7            **THE COURT:**  All right.  Please be seated, everybody.

8   **BY MS. REPLOGLE:**

9   **Q.**   Dr. Kennedy, both you and Dr. Ugone have derived per unit

10  royalty rates in this case; correct?

11  **A.**   Correct.

12  **Q.**   And Dr. Ugone has derived a $3.60 per unit rate as well as

13  a $9.71 per unit rate; correct?

14  **A.**   Correct.

15  **Q.**   And you derived a 26 cents per unit rate; correct?

16  **A.**   Correct.

17  **Q.**   And you derived that 26 cent per unit royalty rate based

18  on a hypothetical negotiation that took place in 2014; correct?

19  **A.**   Correct.

20  **Q.**   Now, by using a per unit rate, you've effectively limited

21  that rate to the patents-in-suit in that hypothetical

22  negotiation that took place and what that valuation was;

23  correct?

24  **A.**   I'm not sure why you're saying the per unit rate did that.

25  It's all the other analysis that limits it to the footprint of

1    the patent.

2    **Q.**    Did you answer that question differently at your

3    deposition?

4    **A.**    I don't know.

5           **MS. REPLOGLE:**    Allen, can you play his August 6th 2025

6    deposition at page 115, line 7 through 13.

7                (Video was played but not reported.)

8    **BY MS. REPLOGLE:**

9    **Q.**    You said, right before our break, that "We know a lot more

10   than in 2014, and if GoPro removed the ability to access

11   ProTune settings, it would be a blip."

12        But we are in 2025 in the seventh day of trial, and GoPro

13   has not made that change to date; correct?

14   **A.**    So consumers' ability to change ProTunes via the app was

15   removed for a period of time, but not the actual -- as I

16   understand it, technical issue, but the actually infringing

17   aspect of it.

18           **MS. REPLOGLE:**    Pass the witness.

19           **THE COURT:**    We're going off the record for a second.

20        Mr. Ducker, you can get ready for when Ms. Dub is ready

21   for you.

22           **THE COURT:**    We're good.  Go ahead, Mr. Ducker.

23                    <u>**REDIRECT EXAMINATION**</u>

24   **BY MR. DUCKER:**

25   **Q.**    Dr. Kennedy, you were asked on cross a lot of questions

1    about the SkyBell supply agreement.  Do you recall that?

2    **A.**    Yes.

3    **Q.**    Have you seen any evidence that Element has spent any

4    money under that agreement on tooling?

5    **A.**    No.

6    **Q.**    You were also asked about the Element agreement.  Do you

7    recall that?

8    **A.**    Yes.

9    **Q.**    Have you seen any evidence that Element has made a single

10   camera of any type under that agreement?

11   **A.**    No, nothing indicating that.

12   **Q.**    So we looked at a lot of words on paper.  Is there any

13   evidence of real-world transactions supporting any of the words

14   on those pieces of paper?

15   **A.**    In the Element agreement, I don't think so.

16          **MR. DUCKER:**  No further questions, Your Honor.

17          **THE COURT:**  All right.  You can step down.  Thank you,

18   Dr. Kennedy.

19                     (Witness excused.)

20          **MR. HAYNES:**  Your Honor, that concludes GoPro's

21   case-in-chief.  I believe it now goes to the rebuttal case.

22          **THE COURT:**  All right.  Mr. Krill?

23          **MR. KRILL:**  Contour calls as its first rebuttal

24   witness Mr. Paul Donovan by deposition, who was a contractor

25   for GoPro.  The clip includes testimony from both parties, and

 1    his deposition was taken in April 2019.

 2            THE COURT:  And how long is it?

 3            MR. KRILL:  13 minutes.

 4            THE COURT:  Okay.

 5        (Video deposition of Paul "Nipper" Donovan was played but

 6    not reported.)

 7            MR. KRILL:  Your Honor, as its next witness, Contour

 8    calls Dr. Jing Hu.

 9                            **JING HU**,

10    called as a witness for the Plaintiff, having been previously

11    duly sworn, testified further as follows:

12            THE COURT:  And, Dr. Hu, you're still under oath.

13            THE WITNESS:  I understand.  Thank you.

14                     **DIRECT EXAMINATION**

15    BY MR. KRILL:

16    **Q.**  Good afternoon, Dr. Hu.

17    **A.**  Good afternoon.

18    **Q.**  Were you here when Dr. Almeroth rendered his

19    non-infringement opinions yesterday and today in rebuttal to

20    your opinions?

21    **A.**  Yes, I was.

22            MR. KRILL:  Allen, can you pull up Dr. Hu's

23    infringement slides from last week, PDX2 at Slide 97?

24    BY MR. KRILL:

25    **Q.**  There are 27 accused products in this case; correct?

1    **A.**    That's correct.

2    **Q.**    How many products did Dr. Almeroth dispute infringement

3    of?

4    **A.**    He disputed only the remaining seven cameras.

5    **Q.**    So he did not dispute anything for your -- he did not

6    dispute your opinions for any of the 20 cameras and the

7    Live Preview Group 1; is that correct?

8    **A.**    That's correct.

9    **Q.**    Now let's briefly look at Dr. Almeroth's opinions for the

10    remaining seven products, which, by the way, for Live Preview

11    Group 2, Dr. Almeroth included the HERO4K in that group, did he

12    not?

13    **A.**    He did.

14    **Q.**    Okay.

15          **MR. KRILL:**  Allen, can you pull up DDX-5,

16    Dr. Almeroth's demonstratives, at Slide 107?

17    **BY MR. KRILL:**

18    **Q.**    Do you recall Dr. Almeroth's testimony -- okay.

19        Do you recall Dr. Almeroth's testimony regarding the

20    wireless connection protocol device limitations in these

21    asserted claims here?

22    **A.**    Yes, I do.

23          **MR. KRILL:**  Allen, can you go to Slide 108?

24    **BY MR. KRILL:**

25    **Q.**    According to Dr. Almeroth, how does the configuration of

1    the wireless connection protocol device in the HERO7, HERO8,

2    and HERO MAX cameras on the left compare to the wireless

3    connection protocol device in the remaining seven cameras on

4    the right?

5    **A.**    So Dr. Almeroth at least agreed with me that it is the

6    same QCA9377 wireless chip that is in most of the products

7    listed on this slide.

8        But his opinion is that the configuration has changed

9    between these two groups of product.  So on a high level for

10    video, it's WiFi for both groups.  So that hasn't changed in

11    the configuration.

12        What has changed is for control signals, right, CS here.

13    For the cameras on the left, it was either WiFi or Bluetooth

14    that was configured to carry the control signals.  But for the

15    cameras on the right is Bluetooth that is used to carry the

16    control signals.  But for video, it has always been WiFi, and

17    that hasn't changed in the configuration.

18    **Q.**    So for the products on the left side of the screen,

19    control signals were sent over WiFi and/or Bluetooth, and there

20    is no dispute that those products include a wireless connection

21    protocol device as claimed?

22    **A.**    That's correct.  The cameras on the left are among the 20

23    cameras that the Court has found to include this particular

24    element.

25    **Q.**    For the seven products on the right hand of the screen

1    that we're now talking about, Dr. Almeroth now contends that

2    the same QCA9377 device is now two wireless connection protocol

3    devices because the control signals are only sent over

4    Bluetooth instead of Bluetooth and/or WiFi; is that correct?

5    **A.**    That's correct.

6    **Q.**    How can Dr. Almeroth's opinions be correct?

7    **A.**    First of all, if WiFi and/or Bluetooth includes the

8    element as has been found by the Court, then if you just use

9    Bluetooth, then that should include the same claim element for

10   the same reasons.

11   **Q.**    Can -- well, let me back up.

12        **MR. KRILL:**    Allen, could you go back to the prior

13   slide?

14   **BY MR. KRILL:**

15   **Q.**    Do the claims say a wireless connection protocol or a

16   wireless connection protocol device?

17   **A.**    Both claim elements say a wireless connection protocol

18   device.

19   **Q.**    Can WiFi be considered a protocol?

20   **A.**    Yes.

21   **Q.**    Can Bluetooth be considered a protocol?

22   **A.**    Yes.

23   **Q.**    Can the same wireless connection protocol device support

24   both Bluetooth and WiFi protocols under the asserted claims?

25   **A.**    Yes.

1   **Q.**   So if the jury finds that the remaining seven accused

2   products include this wireless connection protocol device

3   element, are there any other elements that the jury needs to

4   consider for infringement of the Live Preview Group 2 cameras,

5   including the HERO4K?

6   **A.**   No.  That's the only one.

7   **Q.**   Let's go to live streaming.

8          **MR. KRILL:**  And, Allen, if you could go to the same

9   presentation, at Slide 114.

10  **BY MR. KRILL:**

11  **Q.**   Did Dr. Almeroth dispute any additional elements for the

12  live streaming group of cameras?

13  **A.**   Yes, and those two elements are shown on this slide.

14         **MR. KRILL:**  Allen, could you go to Slide 115?

15  **BY MR. KRILL:**

16  **Q.**   Do you recall Dr. Almeroth's opinions regarding this

17  slide?

18  **A.**   Yes, I do.

19  **Q.**   How do you respond?

20  **A.**   I talked to you about this slide last week when I

21  testified as well, and I explained that what was missing --

22  what is still missing from this diagram is that the video also

23  comes back through the cell tower, goes back to the cell tower,

24  and then to the user's smartphone, and that's when the user can

25  view the live streamed video.  And all of this part is in

1  relation to the audience that is not the user themselves.

2  **Q.**   So is the first video stream wirelessly sent directly to

3  the phone?

4  **A.**   Yes.   That's this connection that we focus on.

5  **Q.**   Is the first video stream sent directly to the phone for

6  display?

7  **A.**   Yes.

8  **Q.**   Yesterday Dr. Almeroth testified that this accused

9  scenario was, I think, kind of bizarre, were his words, because

10 one of those people watching the live streaming is the person

11 giving the live stream.   Do you recall that?

12 **A.**   I do.

13 **Q.**   Do you consider this to be a bizarre scenario?

14 **A.**   No, not at all.

15 **Q.**   Why would a user want to preview the scene being live

16 streamed as it's being live streamed?

17 **A.**   If you're live streaming to an audience that can be tens,

18 hundreds, and maybe even thousands of people, wouldn't you want

19 to see what is being live streamed yourself, if the shot is

20 right, if you look good?   And, if not, maybe you can adjust --

21 the shot is not right, then you can adjust the angle of the

22 camera, for example, as taught by the claims of the asserted

23 patents.

24 **Q.**   And, by the way, if the live streaming while recording

25 functionality was removed such that it was just live streaming

1    and no recording, would you be able to preview the stream being

2    recorded, or would you have to stop your live stream?

3    **A.**    Could you repeat your question?

4    **Q.**    Sure.

5        So if you were unable to live stream while recording and

6    only live stream, would you have to stop the live stream to

7    check the angle?

8    **A.**    Yes, you would.

9            **MR. KRILL:**  And, Allen, if you'd go back to Slide 119

10    of that same deck.

11    **BY MR. KRILL:**

12    **Q.**    So what is your opinion as to whether these limitations

13    disputed by Dr. Almeroth are met for the live streaming group

14    of cameras?

15    **A.**    So I disagree with Dr. Almeroth's opinion here.  So my

16    opinion is that these two elements are met by the live

17    streaming via hot spot feature that are on some -- on the live

18    streaming group cameras.

19    **Q.**    Now I want to shift gears a little bit to invalidity.

20        You've sat through this trial and you've worked on this

21    case for a number of years.  What is your opinion as to whether

22    or not the claimed invention would have been obvious?

23    **A.**    Contour's invention is not obvious.

24    **Q.**    Can you explain?

25    **A.**    Of course.

 1          We've said many times by many people in this trial that

 2     there are three key components in Contour's invention.  One is

 3     the generate term, record two videos in parallel, one of a

 4     higher quality than the other.

 5          The second is wirelessly transmit the lower-quality video

 6     directly to the smartphone.

 7          And the third component is to adjust the camera settings

 8     remotely from that same smartphone.

 9          So these three components, when you think about it,

10     they're also -- they're novel on its own, but also they work

11     together in the way to enable each other.

12          Why is important to have two videos of different qualities

13     generated in parallel?  So that you could make a video that is

14     of a small bandwidth that can fit through the wireless

15     connection while you have a higher-quality video that is stored

16     more permanently on the camera that you can then later use.

17          And then why is it important to wirelessly transmit video

18     directly to the phone?  Why not going through a home router?

19     Because when you're out and about, using your action cameras,

20     there's no WiFi router out there from your home or from a

21     Starbucks.  So that direct wireless connection is very

22     important.

23          And the third component, after you've seen your video,

24     what can you do to enhance your video?  You can adjust the

25     remote settings such as color, light, and audio and you can

1    change the resolution.

2        So those key components are novel and they are -- they

3    work together.  But even if we just take one of them, the

4    generate term, we've heard that the A5 chip with dual encoding

5    capability on the hardware itself was available in 2009.  Okay.

6    And we've seen evidence that -- from Dr. LeGall himself, who is

7    a co-founder of Ambarella, that Ambarella was going around to

8    all these different companies -- Canon, Samsung, Zoom,

9    Premier -- to tell them that we have this chip that can do dual

10   encoding.

11       However, based on all evidence that I have seen in this

12   case, the first -- forget about wireless part -- the first POV

13   camera that could generate two videos in parallel, one of a

14   higher quality than the other, was ContourGPS.

15       And now none of the other companies that had the A5 chip

16   and the know-how about the dual encoding came up with that

17   feature alone.

18       So it is my opinion that the inventors at Contour

19   conceived a complete and definite idea of the invention in

20   December 2009; but when they set out to implement their

21   invention, there were challenges.  If there weren't challenges,

22   then maybe one can argue it was obvious, but there were

23   challenges.  One that GoPro talked about, which is true, is

24   that one had to overcome the restriction that Apple puts on

25   Apple devices, how other devices can talk to Apple.

1        But another very important and universal challenge was

2   that how do you set up this direct connection wirelessly

3   between the camera and the phone without going through a router

4   at all?  And that connection has to have enough bandwidth to

5   support video.

6        Back then there were two technologies people considered.

7   One was called WiFi Direct and the other called Bluetooth.

8   WiFi Direct as a concept was known in 2009, and you have seen

9   that coming -- come up in the testimony and documents a little

10  bit, but the standard itself wasn't set up or launched until

11  October 2010.  That was after the provisional application date

12  of the two Contour patents and also after ContourGPS, the

13  product, was launched.

14       That's why Dr. LeGall, the co-founder of Ambarella,

15  testified himself that at Ambarella, they didn't consider the

16  wireless obvious addition to the A5 chip.  He testified that

17  because of WiFi Direct, wireless at Ambarella was shelved for

18  two, three years, until 2011.

19       So that was one technology considered.

20       **MR. HAYNES:**  Your Honor, I object.  I'm not sure

21  there's been a question in quite some time.  It makes it very

22  hard for me to object to new information.

23       **THE COURT:**  I couldn't agree more.  So let's go by

24  questions and answers and not by lectures.

25       **MR. KRILL:**  I understand, Your Honor.

1  BY MR. KRILL:

2  **Q.**   Now, in forming your -- so ultimately what was your

3  conclusion as to obvious?  Were the claims obvious or

4  non-obvious?

5  **A.**   My ultimate conclusion is that the claims were not

6  obvious.  They are a novel invention.

7  **Q.**   And in forming that opinion, did you consider Boland?

8  **A.**   Yes, I have.

9  **Q.**   Did you consider the Looxcie device?

10  **A.**   Yes, I have.

11  **Q.**   Did you consider the Looxcie device in combination with

12  Ambarella chip?

13  **A.**   Yes, I have.

14  **Q.**   Did you consider Looxcie with Boland in combination with

15  Ambarella?

16  **A.**   Yes, I have.

17  **Q.**   And your obviousness opinions stayed the same; correct?

18  **A.**   That's correct.

19  **Q.**   Now, aside from your opinions and Dr. Almeroth's opinions,

20  are there any other -- is there any other evidence supporting

21  your opinions that the jury should consider?

22  **A.**   Yes.

23  **Q.**   What are those?

24  **A.**   Those are secondary considerations.

25  **Q.**   Has the jury seen any evidence of the failure of others

1   discussed at this trial?

2   **A.**   Yes.

3   **Q.**   Who is one example?

4   **A.**   One that at front center of this case or this trial is

5   GoPro's own failure of implementing, either in their product or

6   the alleged prototype, a live preview while recording feature.

7           **MR. KRILL:**  Allen, can you pull up PTX-426?

8   **BY MR. KRILL:**

9   **Q.**   And at the bottom there -- actually, at the top of the

10  second paragraph in the email, do you see Mr. Woodman referring

11  to the A2 and the A5 chips?

12  **A.**   Yes, I do.

13  **Q.**   And this email is January 21, 2009?

14  **A.**   Yes.

15  **Q.**   So no question that Nick Woodman and GoPro knew of the

16  Ambarella A5 in January 2009, according to this email?

17  **A.**   Yes.

18          **MR. KRILL:**  Allen, can you pull up PTX -- or Trial

19  Exhibit 2383?

20  **BY MR. KRILL:**

21  **Q.**   This is a document dated April 23rd, 2009.  Do you see

22  that?

23  **A.**   Yes.

24          **MR. KRILL:**  And, Allen, if you go a little further

25  down.

1  **BY MR. KRILL:**

2  **Q.**   Do you see Point Number 2, "Picture Preview," and at the

3  end it says "TBD"?

4  **A.**   I see that.

5  **Q.**   So despite knowing of the A5, Nick Woodman was focused on

6  making a camera with a picture preview?

7          **MR. HAYNES:**  Objection.  Leading.

8          **THE COURT:**  It's a witness.  You can answer.

9          **THE WITNESS:**  This shows that the HERO HD was being

10 designed to only provide picture preview or still image

11 preview, not a video preview.

12 **BY MR. KRILL:**

13 **Q.**   And this is after the email that we just looked at in

14 January 2009?

15 **A.**   That's correct.

16 **Q.**   And picture preview, what type of file would that be?

17 **A.**   That would be a JPEG.

18 **Q.**   Do you remember when we discussed Motion JPEG and JPEG in

19 your direct?

20 **A.**   Yes, I -- yes, I remember.

21 **Q.**   I think you said the inventor of Motion JPEG would be

22 offended if you called JPEG and Motion JPEG the same?

23 **A.**   Yes.

24 **Q.**   Was one of the people who worked in the group that

25 developed Motion JPEG in this Court?

1    **A.**    The group is called MPEG, which stands for Motion Picture

2    Expert Group; and during his testimony, Dr. LeGall, who was

3    co-founder of Ambarella, he explained that he was part of

4    the -- that expert group.

5    **Q.**    Did GoPro ask Dr. LeGall any questions about whether JPEG

6    and Motion JPEG were the same?

7    **A.**    I don't think they did.

8    **Q.**    Now, did GoPro develop a working POV camera that included

9    a processor configured to generate two streams in parallel

10    while wirelessly streaming a preview stream before

11    September 2010?

12    **A.**    No, they did not.

13    **Q.**    What about a working POV camera with a picture preview?

14    Did GoPro develop a working embodiment before September 2010?

15    **A.**    At least that was what they could do at the time.

16    **Q.**    Now, was there a -- have you seen evidence of a physical

17    prototype that had a working embodiment with a picture preview

18    in this case?

19    **A.**    I have seen pictures of a prototype that has been

20    produced -- pictures that have been produced in this case.

21    **Q.**    And were those the --

22         **MR. KRILL:**    Allen, can you bring up 1294 and 1295?

23    1294 and 1295 trial exhibit.

24    **BY MR. KRILL:**

25    **Q.**    Have you seen these pictures before?

1    **A.**   Yes, I have.

2    **Q.**   Are these the same two physical devices that were

3    discussed in Mr. Donovan's deposition?

4    **A.**   Yes.  Exhibit 7 on the left and Exhibit 8 on the right.

5    **Q.**   Did you discuss these photographs in any of your reports

6    in this case?

7    **A.**   Yes.  I included these two photographs and also noted that

8    the date doesn't agree with Mr. Donovan and Mr. Woodman's

9    testimony that they were from 2008 and 2009 time period.  And

10   my first expert report, I believe, was served in June 2020.

11   **Q.**   Now, in the photograph on the right, from Mr. Donovan's

12   deposition, do you have any understanding if that would be

13   before or after the one on the left?

14   **A.**   Yes.  So the one on the left was an EVT prototype, which

15   stands for engineering validation testing; and the one on the

16   right was labeled a PVT, which stands for product validation

17   testing, so generally in production, the one that's product

18   validation comes after the one that would be used for

19   engineering validation.

20        So the one on the right that has the foam covering the

21   date, where we think the date is, should come later than the

22   one on the left that we do see the date on.

23   **Q.**   Do you have any understanding as to why we cannot see the

24   date in the photograph on the right?

25   **A.**   I believe that GoPro's counsel stopped Contour's counsel

 1    from removing the foam on the right.

 2              MR. HAYNES:  Objection, Your Honor.  Move to strike

 3    that.  That's not in evidence.

 4              THE COURT:  Yeah, sustained.  And the jury will

 5    disregard that last statement.

 6    BY MR. KRILL:

 7    Q.   Have you seen evidence during this trial that GoPro

 8    abandoned its attempts to develop a camera with live video

 9    preview?

10    A.   Yes, I did.

11              MR. KRILL:  Allen, can you pull up Trial Exhibit 3116?

12    BY MR. KRILL:

13    Q.   And at page 1, the first and second paragraph, this is an

14    email dated October 26, 2009.  Do you see that?

15    A.   Yes, I do.

16    Q.   And in the second paragraph, do you see a reference to "No

17    picture preview ETC to keep costs down," the second paragraph

18    of the email, Point Number 1?

19    A.   (Witness examines document.)  Yes, I do in the second row.

20              MR. KRILL:  Allen, can you pull up Trial Exhibit 405?

21    BY MR. KRILL:

22    Q.   And do you see the date at the top?  What is that?

23    A.   That's November 16, 2010.

24              MR. KRILL:  And, Allen, can you show the gray, what

25    the gray means?

1    BY MR. KRILL:

2    Q.    What does the gray highlighting mean in this document?

3    A.    That means the idle projects at that time, means the

4    projects that weren't being actively worked on.

5              MR. KRILL:  And, Allen, if you go to page 7.

6    BY MR. KRILL:

7    Q.    By point XVI, what does this indicate here?

8    A.    That there's another piece of evidence that showed that

9    GoPro abandoned the work on the wireless remote or the wireless

10   BacPac at that time.

11   Q.    And have you seen other evidence at this trial supporting

12   your opinions?

13   A.    Yes, I have.

14   Q.    So ultimately, in your opinion, does the Woodman prior

15   invention theory invalidate any claim in the Contour patents?

16   A.    My opinion is that GoPro's alleged GoPro prior invention

17   does not invalidate Contour's two patents at issue in this

18   case.

19   Q.    And did you also consider the Woodman prior invention in

20   the context of your obviousness discussion that you provided

21   earlier?

22   A.    Yes.

23   Q.    After this 2009-2010 time period, what happened next in

24   GoPro's development of a live preview camera?

25   A.    Next time we see the feature comes up is when we saw that

1   Mr. Woodman instructed employees at GoPro to covertly acquiring

2   ContourGPS units, and sounds like the record shows that the

3   secret shopper did acquire those units.

4         **MR. KRILL:**  Allen, could you bring up Trial

5   Exhibit 2833?

6   **BY MR. KRILL:**

7   **Q.**   And what was the date of that email that you were

8   referring to?

9   **A.**   That would be January 5th, 2011.

10  **Q.**   And when did Con- -- or excuse me.  Strike that.

11        When did GoPro ultimately release a camera that had live

12  preview while recording?

13  **A.**   I believe that was not until 2012, when they released the

14  GoPro HERO2 with WiFi BacPac.  That is the first of the 20

15  cameras in Group 1 that the Court has found to include all

16  elements of Claim 11.

17  **Q.**   So ultimately what is your conclusion as to whether

18  GoPro's own experience in developing a POV camera with wireless

19  preview supports or does not support your opinion of

20  non-obviousness?

21  **A.**   So GoPro's own failure of developing this feature supports

22  my opinion that Contour's invention is not obvious.

23  **Q.**   Were there any other companies that failed and tried in

24  this time period?

25  **A.**   Yes.  And we could see that A5 chip was provided to many

1  companies, and they didn't come up with a product that does

2  live preview while recording.

3  **Q.**  And did you mention some of those companies earlier in the

4  context of Ambarella?

5  **A.**  Yes.  For example, Samsung, Canon, Looxcie, to name a few.

6  **Q.**  So in view of all of this evidence, including the evidence

7  of what actually happened in the real world, what is your

8  ultimate opinion as to whether the asserted claims are valid or

9  invalid over the prior art in this case?

10  **A.**  My opinion is that Contour's claims are valid.

11          MR. KRILL:  Pass the witness.  Thank you, Dr. Hu.

12                    <u>**CROSS-EXAMINATION**</u>

13  **BY MR. HAYNES:**

14  **Q.**  Good afternoon, Dr. Hu.

15  **A.**  Good afternoon.

16  **Q.**  Let me pick up right where you left off.

17          Let's talk about these allegations of copying.  You just

18  talked about that; right?

19  **A.**  Yes.

20  **Q.**  Okay.  You agree that there's been no evidence that GoPro

21  ever had access to Contour's confidential documents; correct?

22  **A.**  I believe that's the case.

23  **Q.**  And you agree that it's not copying for GoPro to go out

24  and use Ambarella's commercially available chip and put that

25  into a product; right?

1    **A.**    By itself, that's correct.

2    **Q.**    Okay.  And you were here in the courtroom when Dr. Mander

3    talked about how their solution for how to implement Bluetooth

4    was in proprietary source code that was not made available to

5    the public or disclosed to the Patent Office; right?

6    **A.**    I think that's largely true.  Dr. Mander might have some

7    doubt of what was being shared with other companies.

8    **Q.**    Well, you were here, weren't you, when I asked him that

9    exact question?  I was curious about that because there was

10   this concern, and I asked him directly:  You're not saying that

11   GoPro took this?  And his answer was:  I hope not.  That's what

12   he said; right?

13   **A.**    That's correct.

14   **Q.**    Okay.  So you're not saying something different.  You're

15   not here to say that somehow GoPro got ahold of this

16   proprietary source code.  You're not making that allegation,

17   are you, ma'am?

18   **A.**    That's correct, I'm not.

19   **Q.**    Okay.  Now let's talk about whether GoPro reduced it to

20   practice.

21        Dr. Hu, you know for a fact that GoPro released the HERO2

22   camera and the WiFi BacPac; correct?

23   **A.**    That's correct.

24   **Q.**    And you agree 100 percent, without any doubt in your mind,

25   that the combination of the WiFi BacPac, when I snap it on the

1    back of a HERO2 camera, meets every single limitation disclosed

2    in every asserted claim; correct?

3    A.    That's correct.  That's part of my infringement opinions.

4    Q.    So in the WiFi BacPac in the HERO2 camera, unquestionably

5    reduces to practice everything in Contour's patents; correct?

6    A.    It meets the elements that's -- of the Contour's patent

7    claims.  That's why it infringe.

8    Q.    Right.  But you agree that if GoPro had the ideas for that

9    WiFi BacPac and the HERO2 camera before Contour, and then they

10    launched those ideas in the WiFi BacPac and HERO2 after

11    Contour's commercial release, that still invalidates; right?

12    A.    I disagree with that.

13    Q.    Well, as long as GoPro was diligent in that reduction to

14    practice, you agree that would invalidate; right?

15    A.    I disagree with that.

16    Q.    Have you ever heard the legal tenet of that which

17    infringes if later anticipates if earlier?

18    A.    The fact is that GoPro didn't have a complete and definite

19    conception of the invention.

20    Q.    I'm going to get to that part.  Maybe that's where we're

21    not connecting.

22         So let's just -- all right.

23         You agree that there was a reduction to practice with the

24    WiFi BacPac and the HERO2 camera; right?

25    A.    At most, that was reduction to practice of Contour's

1    invention because GoPro didn't have such invention to start

2    with.

3    Q.   If we could just focus on my questions.  I'm going to get

4    to conception.  Don't worry.

5         My question is simple:  that the WiFi BacPac, combined

6    with the HERO HD2 camera, was a reduction to practice of the

7    ideas set forth in every asserted claim in this case; right,

8    Dr. Hu?

9    A.   Yes, it's reduction to practice of Contour's invention in

10   Contour's claims.

11   Q.   As recited in the claims; right?

12   A.   Yeah.

13   Q.   Okay.  And you agree with me that if GoPro had those

14   ideas -- and I'm not asking for your opinion on whether it had

15   them or not, just confirming the structure -- if GoPro had

16   those ideas before Contour in December 2009, if they had those

17   in their mind and they diligently reduced the WiFi BacPac to

18   practice, that would invalidate every asserted claim in this

19   case; correct?

20   A.   To clarify, you are asking me about a hypothetical

21   situation, if GoPro had the idea?

22   Q.   We're going to get to what GoPro knew, but I'm just asking

23   you:  If the jury were to conclude, based on the evidence

24   they've seen in this case, that GoPro had the ideas set forth

25   in Contour's patents before December of 2009 and GoPro then

1  reduced those ideas to practice in the WiFi BacPac plus the

2  HERO HD2, Contour's patents are invalid?

3          **MR. KRILL:**  Objection, Your Honor.  It's an improper

4  statement of law, and it's also a statement of law, which is

5  improper.

6          **THE COURT:**  Overruled.

7      You can answer if you know.

8          **THE WITNESS:**  If GoPro indeed had a definite and

9  permanent idea of a complete and operative invention, then

10  it's -- the product that, in my opinion, does infringe

11  Contour's patents would be a reduction to practice also if they

12  hadn't abandoned, suppressed, or concealed such reduction to

13  practice.  But that's not my opinion; that's the case.

14  **BY MR. HAYNES:**

15  **Q.**    Okay.  I'm going to get to those other elements in a

16  second.

17      But just so the jury's clear, if they conclude that GoPro

18  had the ideas firmly in their mind prior to December 2009 and

19  then they reduced those ideas to practice in the WiFi BacPac

20  plus the HERO HD2 camera, as long as they diligently reduced to

21  practice and did not abandon, suppress, or conceal, Contour's

22  patents are invalid; correct?

23  **A.**    Yes, if the conception is a definite permanent idea of the

24  complete and operative invention.

25  **Q.**    Okay.  So let's just talk about what you identified as the

1  three key elements in Contour's patent earlier this morning --

2  or this afternoon, I guess.  Do you recall those?  Do you have

3  those in mind?

4  **A.**    Yes, of course.

5  **Q.**    Okay.  One of those was to adjust the camera remotely.  Do

6  you recall that?

7  **A.**    Yes.

8  **Q.**    Okay.  You agree with me 100 percent, no question,

9  Mr. Woodman, prior to December 2009, had in his mind adjusting

10  the camera remotely from a remote device; correct?

11  **A.**    Yes, but not the claimed invention.

12  **Q.**    I'm just talking about the key concepts that you

13  identified.

14      You agree with me that Mr. Woodman had in his mind, well

15  before December of 2009, the concept of remotely adjusting

16  camera settings; correct?

17  **A.**    That's not correct.

18  **Q.**    Just to be clear about your testimony, you don't believe

19  that prior to December 2009, Mr. Woodman had in his mind the

20  ability that you could adjust camera settings remotely?

21  **A.**    That's -- that's correct.  I do not agree that he had that

22  idea.

23  **Q.**    Okay.  We'll look at that in a second.  Let me see if we

24  can agree on the next one.

25      Do you agree that Mr. Woodman, prior to December of 2009,

1    had the idea of wirelessly transmitting a live preview video to

2    a remote device?

3    **A.**    He had some portion of that idea, but he didn't know how

4    to do it.

5    **Q.**    Well, you were here when we heard testimony about

6    Mr. Woodman's July 2008 patent.  Do you recall that?

7    **A.**    Yes, of course.

8    **Q.**    And you agree that that July 2008 patent was discussing

9    the ideas that Mr. Woodman had in his mind with respect to the

10   WiFi BacPac product that eventually launched in 2012; right?

11   **A.**    I agree that he had the idea in his mind; but based on

12   their development work on the HERO and the alleged prototype,

13   it's my opinion that Mr. Woodman and GoPro didn't know how to

14   do it.

15   **Q.**    Okay.  I'm just focusing on what ideas were in

16   Mr. Woodman's mind.  Because that's what's required for

17   conception; right?

18   **A.**    At a high level, that's true.

19   **Q.**    Okay.  Let's look at that 2008 patent.

20           **MR. HAYNES:**  And, actually, why don't we bring up

21   DDX-11.17.

22   **BY MR. HAYNES:**

23   **Q.**    And what I've done here is sort of put three things up on

24   the screen, and I want to focus for now on the Woodman patent

25   excerpt that's on the left.  And this is from PTX-313.

1          You're familiar with the Woodman '251 patent; right?

2    **A.**    Yes, I am.

3    **Q.**    Okay.  And you'll agree with me that in this description,

4    it's discussing a wireless module 430.  Do you see that?

5    **A.**    Yes.

6    **Q.**    Okay.  And that wireless module 430, if you look a little

7    bit further down, three-quarters of the way down, it says [as

8    read]:

9              "The wireless module 430 may also allow a user

10         to wirelessly control the operation of the camera."

11         Do you see that?

12   **A.**    Yes, I see that.

13   **Q.**    Okay.  So you would agree with me -- and you see down here

14   we've got a remote down here on the wrist in the Figure 2 --

15   sorry -- Figure 6?

16   **A.**    Yes, I see that.

17   **Q.**    Okay.  So you agree with me that in July of 2008,

18   Mr. Woodman had in his mind the concept of remotely controlling

19   the camera from a portable device; right?

20   **A.**    That's true.  But as he explained in his patent, that

21   remote control here is like a start-stop recording; it's not

22   about changing camera settings or resolution and the like.

23   **Q.**    Well, you see there it says "to wirelessly control

24   operation of the camera"; right?

25   **A.**    That means start and stop the camera.  I recall elsewhere

1    in Mr. Woodman's patent he spelled that out.

2    **Q.**   Okay.  So you're drawing a distinction between whether he

3    only thought of controlling start and stop as opposed to being

4    able to adjust other camera features?  Is that the distinction

5    you're saying he did not have in his mind?

6    **A.**   That's correct.  I believe there are only two or three

7    buttons on the remote control.

8    **Q.**   We'll come back to that.

9        Let me ask you this question:  If somebody were to have in

10   their mind, "Hey, I want to remotely control the camera

11   operations," is it your view that if they had that idea,

12   they're thinking "I only want to start and stop it," or do you

13   think they might want to change some other features too?

14   **A.**   If there are only two buttons on the remote control, I

15   would conclude that they were only think -- they were only

16   thinking about simple camera operation such as start and stop.

17   **Q.**   Okay.  Did you ever use an Apple TV remote control?

18   There's only two buttons on that; right?

19   **A.**   I don't have Apple TV at home.

20   **Q.**   Okay.  You agree with me it's possible to have a remote

21   control that can operate a lot of features with just two

22   buttons; right?

23   **A.**   In the absent sense, yes -- abstract sense, but not in

24   Mr. Woodman's patent.

25   **Q.**   Okay.  While we're still looking at the patent, let's see

1  if we can get some agreement on other ideas that were clearly

2  in his head because he wrote them down in his patent.  Okay?

3       You agree with me that Mr. Woodman had in his head the

4  idea that the wireless module could be used to allow a user to

5  wirelessly download stored images and/or video from the camera

6  to a personal computer, for example, server computer, desktop

7  computer, or a smartphone?  Do you see that?

8  **A.**   I see -- I see that sentence.

9  **Q.**   Okay.  So he had it in his mind, at least by July of 2008,

10 that you could wirelessly download video to a remote device;

11 correct?

12 **A.**   This excerpt appears to suggest that this is to download

13 previously generated images or video.

14 **Q.**   I agree a hundred percent.  Let's look at the very next

15 sentence.

16 **A.**   Okay.

17 **Q.**   If you look at the very next sentence, it says [as read]:

18          "Alternatively, images and/or video can be

19       captured and wirelessly downloaded in real time from

20       the camera."

21       Do you see that?

22 **A.**   I see that.

23 **Q.**   Okay.  So you agree with me, July 2008, Mr. Woodman had in

24 his mind the idea of wirelessly transmitting real-time video

25 for live preview on a remote device; correct?

1    **A.**    I agree that he had that concept at the time.

2    **Q.**    Okay.  And you also are aware that he actually described

3    different wireless protocol devices that could be used to send

4    that video and receive control signals in July of 2008;

5    correct?

6    **A.**    He did mention those protocols in the same paragraph.

7    **Q.**    Okay.  And those protocols included using WiFi to do that;

8    correct?

9    **A.**    That's correct.

10   **Q.**    And also he had it in his mind that you could use

11   Bluetooth to do that; right?

12   **A.**    That's correct.

13   **Q.**    Okay.  Now, the third -- so coming back to your list of

14   key features, adjusting the camera remotely, Mr. Woodman had

15   that in his mind; right?

16   **A.**    If we're talking about just start and stop camera

17   recording, yes.

18   **Q.**    Okay.  Wirelessly transmitting video, he had that in his

19   mind; right?

20   **A.**    The concept, I agree.

21   **Q.**    Okay.  And you were here when Mr. Woodman testified, and I

22   asked him [as read]:

23         "Now, you didn't describe in your July 2008

24     patent that that wirelessly transmitted video would

25     be at a lower quality?"

1      Do you recall I asked him that question?

2   **A.**   I think so.

3   **Q.**   Do you recall his answer was, "Yeah, I didn't describe it

4   because that was obvious"?

5   **A.**   Yeah.  That too -- maybe not the exact words, but to that

6   effect, yes.

7   **Q.**   You actually would agree with Mr. Woodman that in this

8   time frame, the wireless capabilities that were available at

9   the time were known to be limited; right?

10  **A.**   Yes.

11  **Q.**   And one of the things that was known that was very hard to

12  do was to send high-resolution video over those limited

13  bandwidth resources; right?

14  **A.**   Not just high-resolution video but uncompressed video at

15  any resolution.  Even standard resolution will be difficult.

16  **Q.**   Okay.  So you would agree with me that a person of

17  ordinary skill in the art at the time would know that if I want

18  to send video to a portable device, I'm going to need to send

19  it at a lower quality than I might be able to record it on the

20  phone that I don't want to send it wirelessly?  You agree with

21  that; right?

22  **A.**   A skilled artisan at the time would understand that.

23  **Q.**   Okay.  So you would agree with me that looking at

24  Mr. Woodman's July 2008 patent, a person of ordinary skill in

25  the art would have found it obvious that when you wanted to

1  send that wireless video preview, it's going to be a lower

2  quality than what you might want to record on the camera

3  itself; fair?

4  **A.**   No.

5  **Q.**   You disagree with that?

6  **A.**   I disagree with that.

7  **Q.**   Okay.  Now, the other thing that you mentioned was this

8  notion of record in parallel.  Do you remember that?  That was

9  the third key feature that you identified.  Do you recall that?

10 **A.**   Yes.

11 **Q.**   Okay.  And that record in parallel is what you're talking

12 about is the patent requires generating two image -- two video

13 streams, one high quality and one low quality, and those have

14 to be recorded in parallel under the Court's construction;

15 correct?

16 **A.**   That's correct.

17 **Q.**   Okay.  Now, what does that in Contour's product that they

18 first launched is an Ambarella A5 or A5s chip; right?

19 **A.**   That's correct.

20 **Q.**   Okay.  And I think we've heard lots of testimony in this

21 case, but let me see if you agree with this.

22      Contour did not invent the concept of generating a

23 high-quality stream and a low-quality stream that are recorded

24 in parallel; correct?

25 **A.**   For that component alone, that's correct.

**HU - CROSS / HAYNES**

1  Q.   Right.  And we know that because we saw Mr. LeGall testify

2  and we saw lots of documents where Ambarella was telling the

3  whole camera industry, "Hey, we have a chip that can record two

4  streams, one in high definition and one in lower-quality lower

5  definition that we can send for mobile."  Do you recall that?

6  A.   At the time of A5 chip, "mobile" didn't mean wireless.

7  Just means a lower resolution for Internet sharing, but I agree

8  with your -- the rest of your statement.

9  Q.   Right.  So certainly, you'll agree with me that the A5 and

10  A5s chips, prior to December 2009, had the ability to generate

11  a higher quality high-resolution stream and a lower quality

12  lower-resolution stream simultaneously?

13  A.   I agree with that with regard to A5.  I think there is a

14  dispute when A5s was first launched.

15  Q.   Okay.  Well, we know when it was first sold.  We looked at

16  the sales records with Mr. LeGall.  Were you here for that?

17  A.   Yes, I was.

18  Q.   And we know that it was sold, by November 2009, to

19  multiple customers.  You know that; right?

20  A.   Right, but not made known to the public.

21  Q.   Okay.  To the public at large, you mean excluding those

22  customers?

23  A.   That's correct.

24  Q.   Fair enough.

25       Okay.  So let's just focus on the A5.  You certainly know

1    and you just put up a document that said Mr. Woodman was aware

2    of the A5.  Do you recall that?

3    **A.**    Oh, yes.

4    **Q.**    Okay.  And were you here when Mr. Woodman testified that

5    not only was he aware of the A5, he was aware that it could

6    generate a high-resolution stream and a low-resolution stream?

7    Do you recall that?

8    **A.**    Yes.

9    **Q.**    Okay.  And he was aware of that prior to December of 2009;

10    right?

11    **A.**    Yeah, that's fair.

12    **Q.**    Okay.  So you agree with me, prior to December 2009,

13    Mr. Woodman had in his mind that he wanted to send a wireless

14    preview to a remote device and that he was looking at using

15    Ambarella chips that he knew to be capable of generating a

16    high-quality stream and a lower-quality stream in parallel;

17    right?

18    **A.**    I disagree with that.

19    **Q.**    Well, what we do know is that when Mr. Woodman actually

20    finished the work on the WiFi BacPac, it had an A5s chip in it;

21    right?

22    **A.**    That was much later in 2012.  That, I agree with.

23    **Q.**    Okay.  And you agree that the work on that WiFi BacPac, it

24    started around the same time that he filed his patent in July

25    of 2008; right?

1    **A.**   But it was on a different -- using a different chip.  They

2    did want the feature back in the 2008 and 2009 time frame.

3    **Q.**   And what happened was they started to see if they could

4    get that capability using the Ambarella A2 chip.  Do you recall

5    that?

6    **A.**   I recall that, and that shows how they didn't know how to

7    implement it at all.

8    **Q.**   Well, you saw Mr. Woodman's testimony.  The A5 chip was

9    relatively new.  Their vendor, Skylight, preferred to work with

10   the A2 chip because they had already done a lot of work on it

11   over the last two years.  Do you remember that?

12   **A.**   I do remember that.

13   **Q.**   Okay.  But when they tried to build it out with the A2,

14   they weren't getting the video that they wanted wirelessly.  It

15   was only two frames per second or something like that.  Do you

16   remember that?

17   **A.**   I remember that testimony, but as Dr. LeGall said, A2

18   wasn't capable of dual encoding at all, so they couldn't have

19   generated the second video stream.

20   **Q.**   Right.  Now, that prototype was actually an RF board that

21   was actually on and inside the camera; right?

22   **A.**   The Nordic RF chip was inside the camera.

23   **Q.**   Okay.  And that chip that was inside the camera, that

24   wasn't the work that was being done on the WiFi BacPac; right?

25   That was an integrated camera, not an external BacPac; right?

1    **A.**    You mean with the integrated WiFi chip?   Integrated RF

2    chip not on the BacPac, yes, that's correct.

3    **Q.**    Okay.   But you know in parallel to the work on that

4    prototype, when they were testing out the ability to transmit

5    from an integrated camera, they were also developing the

6    BacPac; right?

7    **A.**    With WiFi capability?

8    **Q.**    Yes.

9    **A.**    I don't recall evidence showing that.

10   **Q.**    Do you remember the camera that we just saw in the video

11   that Mr. LeGall held up?   It had that little port on the back

12   there, the RF bus that we've heard about?

13   **A.**    You mean the prototype that had a November 2010 date on?

14   **Q.**    The camera that was held up in Mr. LeGall's deposition.

15   Do you remember that?

16   **A.**    I don't know if I have seen that recently.

17   **Q.**    Well, were you here when that was played?   Or I'm not sure

18   if you were in the courtroom when we played that video.

19          **THE COURT:**  Are you referring to Mr. Donovan?

20          **MR. HAYNES:**  I'm sorry.   I said LeGall.   I meant

21   Mr. Donovan.   Thank you, Your Honor.

22   **BY MR. HAYNES:**

23   **Q.**    Were you here when Mr. Donovan showed that prototype that

24   was a camera that he held up and it said -- he said it's got

25   everything but the battery?

1    **A.**    I believe he held up two camera prototypes during his

2    deposition, and those were Exhibit 7 and Exhibit 8 to his

3    deposition.

4    **Q.**    Now, in the WiFi BacPac, the way that attached to the

5    camera is you had that bus that would actually clip onto the

6    back of a camera; right?  Do you remember that?

7    **A.**    I don't remember the detail; but if you put that picture

8    in front of me, I can try to remember.

9    **Q.**    Well, what I'm trying to get at is, even when they were

10   developing that integrated RF chip, they were, in parallel,

11   developing the BacPac that would have WiFi capability; right?

12   **A.**    But the physical prototypes that Dr. -- sorry --

13   Mr. Donovan held up in his deposition are the ones that I have

14   shown pictures of with a November 2010 date or maybe even later

15   date.

16   **Q.**    Yeah, let me see if I can put this -- some more detail on

17   this issue of prototypes.

18       We've seen a couple of pictures of prototypes in this

19   case; right?

20   **A.**    In this trial, yes.

21   **Q.**    But you're aware that in this case, there have been a lot

22   of pictures of prototypes that have been produced and cited

23   both in your report and in Dr. Almeroth's report; right?

24   **A.**    I think that's the case.

25   **Q.**    And you know for a fact, don't you, Dr. Hu, that many of

1    those prototypes actually have a date on them from 2009; right?

2    **A.**    If you show me, maybe I can see if I remember them.    But

3    the two that I showed had a much later date on them -- on one

4    of them and the other one was covered by foam.

5    **Q.**    All right.

6           **MR. HAYNES:**    Well, let's bring up and just show Dr. Hu

7    this first, DDX-11.7, but this is from TX-2426.    Just to Dr. Hu

8    at this point.

9    **BY MR. HAYNES:**

10   **Q.**    Now, Dr. Hu, this is one of the pictures that you have

11   seen of a prototype that had been -- was in development by

12   GoPro; right?

13   **A.**    Yes, I believe so.

14   **Q.**    Okay.    And this prototype, you agree with me, has a date

15   of April 27th, 2009; right?

16   **A.**    I've been shown a blown-up version of this picture.

17   That's not my area of expertise, but it appears that the date

18   we see on the top picture might have been Photoshopped.

19          **MR. HAYNES:**    Your Honor, I move to strike that answer

20   for lack of foundation and also outside the report.

21          **THE COURT:**    Sustained.    And the jury will disregard

22   that answer.

23        Do you have other photographs to show her?

24   **BY MR. HAYNES:**

25   **Q.**    Before we leave this photograph, Dr. Hu, you agree that

1   the date on this prototype is April 27th, 2009; correct?

2   **A.**   That's correct.

3   **Q.**   Okay.  And you've seen other prototypes and pictures of

4   prototypes in this case that have dates in 2009 on them; right?

5   **A.**   I don't recall.

6   **Q.**   You don't recall.  Well, what we do know from

7   Mr. Woodman's testimony was that there were about 400 prototype

8   boards that were built; right?

9   **A.**   That's true.

10  **Q.**   Okay.  And we know that they were working on this

11  prototype in the 2009 time period.  We just saw an example of

12  that; right?

13  **A.**   Yeah, that's true.

14  **Q.**   Okay.  And what we also know is that when they got ready

15  to launch that internal RF board, they pulled it out of

16  production at the last minute.  Do you recall that testimony?

17  When they launched the HERO HD, it did not have that RF chip in

18  it?

19  **A.**   That's correct, yeah, I recall that.

20  **Q.**   But that same board without the RF chip, they actually

21  kept selling that in the HERO HD camera.  It just didn't have

22  the RF chip on it anymore; right?

23  **A.**   That's true.  But not only that it didn't have the RF

24  chip, what it had was an A2 chip that wasn't capable of doing

25  dual encoding.  So that's not part of any reduction to practice

1  with regard to this case.

2  Q.   You agree with me that during this time period, GoPro was

3  working on, "How do we wirelessly transmit a live preview to a

4  remote device?"  You agree with that; right?

5  A.   I agree that I see that in their failed attempt to bring

6  up that feature.

7  Q.   Well, they also actually succeeded in launching that

8  feature with the WiFi BacPac; right?

9  A.   Again, that was done in 2012, and that is an infringing

10 product that I have opined on myself.

11 Q.   Now, you put up a document, maybe we'll take a look at it,

12 2383.

13      Now, you were here when Mr. Woodman testified; is that

14 right?

15 A.   Yes, I was.

16 Q.   Okay.  And you heard Mr. Woodman talk about, "We were

17 developing multiple different products in parallel"?  Do you

18 recall that?

19 A.   Yes.

20 Q.   Okay.  One of those products was a battery BacPac that

21 wasn't about wireless at all.  Do you remember that?

22 A.   Yes, I remember that.

23 Q.   Do you remember one of them was an LCD BacPac that wasn't

24 about wireless at all; right?

25 A.   Yes.

1  Q.   And all three of those things are actually described in

2  Mr. Woodman's July 2008 patent; right?

3  A.   That's correct.

4  Q.   Okay.  Now, the other thing that they were working on at

5  the same time was a simplified remote control that would just

6  allow you to control the camera but would not have sort of an

7  advanced display.  Do you recall that?

8  A.   Without the screen to display any video image.

9  Q.   Well, you know that GoPro launched what they called the

10 remote, and that did not allow you to display images or video

11 or anything else.  It was just a small remote control.

12 A.   That's correct.

13 Q.   Right.  So you know that was a product that they were

14 working on in this time frame as well; right?

15 A.   Yeah, that's fair to say.

16 Q.   Okay.  Look at the top of the document that you were

17 talking about.  It says, "GoPro remote control product

18 specification."  Do you see that?

19 A.   Yes, I see that.

20 Q.   Okay.  Do you think it's possible, Dr. Hu, that this

21 statement about no preview image might refer to the remote

22 control product they sold and not the development of the WiFi

23 BacPac where you could do wireless video preview?

24 A.   What's the date of this document?

25 Q.   You introduced it, Dr. Hu.  I don't know if it's on there

1    or not.

2    **A.**    To answer your question, I understand that they abandoned

3    their effort to try to bring out live video preview or, later,

4    live picture preview.  So it's possible that then at this time

5    they said, "Okay.  That's done.  No picture preview going

6    forward.  Just the simple remote."

7    **Q.**    Well, this -- you understand that what they might also

8    have been doing is developing a WiFi BacPac product and a

9    remote.  Those could be different things; right?

10   **A.**    Outside of the remote, also used to view live picture, I

11   haven't seen evidence of such separate effort to develop a WiFi

12   BacPac.

13   **Q.**    Well, we know for a fact that they actually launched

14   separate products.  They launched a remote with no image or

15   video preview at all and a WiFi BacPac that had live preview of

16   video; right?

17   **A.**    Right.  Again, in 2012.

18   **Q.**    But those projects didn't magically materialize out of

19   thin air.  They worked on them for some period before that to

20   develop a product and write specifications for each of the

21   separate products; right?

22   **A.**    That could be true but we're focusing on the time period

23   before -- between 2009 or 2008 and up to 2012, and we didn't

24   see much evidence in the majority of that time period.

25   **Q.**    Okay.  We'll get to that as well.

1        Dr. Hu, let me just close out with this document.

2   All right?  Sitting here today, this document doesn't say

3   "specification for expansion module," does it?

4   **A.**    I don't believe that it does.

5   **Q.**    Okay.  And you were here when Mr. Woodman testified he

6   actually showed you some specifications for the expansion

7   module, which is the WiFi BacPac; right?

8   **A.**    That would be the same YHDC5170HD cameras shown here.

9   **Q.**    Right.  But we're talking about a remote control that can

10  control that camera; right?

11  **A.**    Right.  So they're the two -- two components at two ends

12  of the connection.

13  **Q.**    Right.  So you've got the HERO HD camera, and you've got a

14  remote with basic control functions.  That was one product that

15  ultimately got launched; right?

16  **A.**    That's correct.

17  **Q.**    And then you have a separate product, which was the WiFi

18  BacPac, that allowed you to wirelessly transmit video.  That

19  ultimately got launched; right?

20  **A.**    My understanding is that they originated from the same

21  effort, which was the YHDC5170HD cameras.

22  **Q.**    Right.  And that effort branched into multiple products;

23  right?

24  **A.**    The wireless part was abandoned.

25  **Q.**    Well, it wasn't abandoned because we launched the WiFi

1    BacPac.

2    **A.**   Again, that was after Contour's GPS was launched in 2011,

3    and then GoPro released their first infringing camera, HERO HD

4    with WiFi Pac in 2012.

5         **MR. HAYNES:**  Let's bring up PTX-0304.

6    **BY MR. HAYNES:**

7    **Q.**   Do you recall some testimony about this document?

8    **A.**   Yes.

9    **Q.**   This is January of 2009.  Do you see that?

10   **A.**   I do.

11   **Q.**   Okay.  And in January of 2009, is it your opinion that

12   GoPro had abandoned development of a wireless expansion module

13   that became the WiFi BacPac?

14   **A.**   No.  I believe it was later that year, after May.  That's

15   when they -- between May and September, that was when they

16   abandoned the idea.

17   **Q.**   Okay.  Thank you for that clarification.

18        So while we've got this open, let's just take a look,

19   though, in terms of making sure we knew what Mr. Woodman had in

20   his mind in at least January of 2009, which is well before

21   Contour's alleged conception.  Okay?

22   **A.**   Okay.

23        **MR. HAYNES:**  Let's turn to -- actually, let's just

24   bring up DDX-11.4.  And I just want to focus on what's on the

25   right here.

1    BY MR. HAYNES:

2    Q.    Do you see on the right, there is a description of -- at

3    this point in time in January, they're looking at a repeat

4    module with a 2-inch LCD display and stereo micro speakers that

5    could receive a video signal; right?  So they were thinking

6    about putting -- having video on the portable device at this

7    point in time.  Do you see that?

8    A.    I see that.

9    Q.    And in terms of the remote control functionality at that

10   time, they were considering controlling various camera

11   functions; right?

12   A.    Right, such as power on/off, remote select.

13   Q.    Right.  But also digital volume, possible frequency

14   binding that meets back with the camera.  So not just on/off;

15   right?

16   A.    I think that will be the volume on the remote control

17   itself.  It's not controlling the volume on the camera.

18   Q.    Let me ask you this question:  Dr. Hu, if I had in my mind

19   the idea to remotely control camera operations, do you think it

20   would be obvious for that idea to include functions such as

21   lighting?

22   A.    No.

23   Q.    Okay.  If I had in my mind the idea to remote control a

24   camera, do you think it would be obvious to include functions

25   such as choosing the resolution?

1    **A.**    No, especially if your idea is to do that on a two-button

2    or three-button device remotely.

3    **Q.**    So if we look at the document you pointed to for Contour's

4    conception, I assume we would see explicit detail about the

5    camera functions that are being controlled?

6    **A.**    I would -- I would think so, but also inventor's

7    testimony, both through deposition and trial, I will look at

8    the body of those types of evidence.

9    **Q.**    Let me just close real quick by coming back to this

10    discussion of JPEG.

11        Do you recall that Dr. Mander was asked a question about

12    whether or not displaying a series of JPEGs in sequence

13    constituted video?

14    **A.**    At trial or during his deposition?

15    **Q.**    At trial.

16    **A.**    Yes, I do.

17    **Q.**    And you recall Mr. -- or Dr. Mander testified that if I

18    display a sequence of JPEG images, that's video?  Do you recall

19    that?

20    **A.**    I don't remember the exact words.

21    **Q.**    Well, do you agree that if I display a series of JPEG

22    images in sequence, that constitutes video?

23    **A.**    No, I don't agree with that at all.

24    **Q.**    So if Dr. Mander said that -- here we go.  Let's just show

25    you what Dr. Mander said.

1          **MR. HAYNES:**  If we can have the Elmo.

2   **Q.**   I asked him [as read]:

3          **"QUESTION:**  In that early version where you may have been

4          sending JPEG images and playing them in sequence, you

5          still considered that to be video; right?

6          **"ANSWER:**  Yes."

7          You were here for that testimony; right?

8   **A.**   Yes.

9   **Q.**   Okay.  So you disagree with Dr. Mander; correct?

10  **A.**   No.  He said in the early versions, that's when they

11  trans- -- as part of prototyping, they transmitted JPEG images

12  first.  And then later on, as we could see in ContourGPS, they

13  transmitted Motion JPEG video.  So that's the distinction.  And

14  as I understand, that is the context of the Q&A we're seeing

15  here.

16  **Q.**   Okay.  But you just said you think that's what is written

17  on this page means?

18  **A.**   Yes.

19  **Q.**   They don't say anything about Motion JPEG in that

20  question, do they?

21  **A.**   It doesn't.

22  **Q.**   Okay.  The question says [as read]:

23          **"QUESTION:**  Sending JPEG images and playing them in

24          sequence, you still considered that to be video; right?"

25          And his answer was, "Yes."  Do you see that?

1  **A.**    Yes, but I do see --

2  **Q.**    Hold on.  Do you see that?

3  **A.**    Yes, I do.

4  **Q.**    Do you agree, Dr. Hu, that sending JPEG images and playing

5  them in sequence is still considered video?  Yes or no.

6  **A.**    No.

7              **MR. HAYNES:**  Okay.  Your Honor, I'm right at 1:30?

8              **THE COURT:**  Okay.  Don't -- that'll be it then.

9        So, ladies and gentlemen, we are at the end of testimony

10  for today.  There's a teeny bit left for tomorrow, I think, but

11  we're going to go ahead and -- you-all can sit down.  There's

12  no reason to be up.

13        We're still -- we will be proceeding with instruction and

14  argument tomorrow, and then the case will be going to you

15  probably early afternoon, would be my guess, and then it'll be

16  up to you to set the timing for your deliberations.

17        I'll give you a bunch of instructions tomorrow about how

18  to do the deliberations.  I'll be giving you instructions on

19  what the law is, which take a while, I've got to say.  And then

20  the lawyers will summarize what they hope you learned, and

21  they'll have very different perspectives on what they hope you

22  learned during the course of the trial.

23        So it's still very important that you keep an open mind to

24  this.  You don't know what the law is.  You will get the

25  lawyers' perspectives.

1        So with all of that, go about your business.  I'll look

2  forward to seeing you in the morning, and we'll conclude the

3  trial at that point.

4      (Proceedings were heard out of the presence of the jury.)

5          **THE COURT:**  All right.  We'll be in recess and,

6  I think, come back at 3 o'clock.  Hopefully, I'll be done with

7  CMCs by then.  If I'm later, I'll be later.

8          **MR. HAYNES:**  Thank you, Your Honor.

9          **MR. KEVILLE:**  Thank you, Your Honor.

10         **THE WITNESS:**  Thank you, Your Honor.

11            (Luncheon recess was taken at 1:30 p.m.)

12  **Afternoon Session**                              **3:10 p.m.**

13      (Proceedings were heard out of the presence of the jury.)

14         **THE COURT:**  All right.  Is Mr. Keville around, not

15  around?  Do you want to handle this?  What's the story?

16         **MS. REPLOGLE:**  I am going to be handling this.

17         **THE COURT:**  Excellent.

18      So did you -- tell me -- I guess there are two things.

19  One is, I saw this motion, which came in while I was on the CMC

20  calendar.  I expect -- I don't know whether GoPro wants to make

21  a response now, whether you'd like to consider it and file

22  something.  What's your pleasure?

23         **MR. HAYNES:**  So we did just get the motion and are

24  just reviewing it.  I actually think that the testimony that

25  was given sort of resolves the issue; but if you're inclined to

1   give a curative instruction, I think we'd like an opportunity

2   to respond in writing and spell it out in the same level of

3   detail they did.

4        But I do believe if you look at what Dr. Almeroth actually

5   said -- right? -- his theory, which I think is clearly

6   articulated, is Boland for everything but the camera processor

7   limitations where he relies on Ambarella.  And so he did not

8   say that Boland discloses the camera processor limitations,

9   which are the generating limitation.  What he said was Boland

10  discloses live preview while recording.

11       Well, you can do live preview while recording without

12  doing the generating limitation because you can send out serial

13  streams.  Right?  That's what the Federal Circuit said in the

14  101 motion.

15       So we don't believe a curative instruction is necessary

16  because I think his testimony did not say that Boland discloses

17  the generating limitation or that it records in parallel.  He

18  actually said the opposite, that Boland discloses everything

19  but the generating limitation, which is in the Ambarella chip.

20            **THE COURT:**  All right.  Mr. Krill?

21        **MR. KRILL:**  So, Your Honor, it came in originally,

22  "Did you hear Dr. Hu's testimony and how it's characterized?"

23  And in the transcript it says, "Yes, she characterized it as

24  generating two streams."

25       And then at the end, after going through Boland, he was

1    asked, "According to Dr. Hu's characterization of live preview

2    while recording, which she defines as the accused functionality

3    of generating two streams in parallel and wirelessly streaming

4    the second stream," he said, "Yes, Boland discloses that."

5         And I agree, during his direct, he was walking through it,

6    and he relied on the combination of Boland and Ambarella, but

7    his testimony was that Boland discloses live preview while

8    recording, which, in this case, has always been defined by

9    Dr. Hu and how she used it during her entire testimony and by

10   Dr. Almeroth as generating two streams in parallel, a

11   high-resolution one and a low-resolution one and streaming the

12   low-resolution one.

13        So for that reason we believe a curative is required,

14   especially if the question on the verdict form is just going to

15   be anticipation, are the claims anticipated.

16        **THE COURT:**  Okay.  So why don't you provide -- I'm

17   interested in your response.  I'm interested in the transcript

18   that is of concern.

19        I have to say what Mr. Haynes was describing was the thing

20   that came through to me about Dr. Almeroth's testimony, but

21   that doesn't mean that I wasn't drinking coffee or something

22   when I should have been listening more closely.

23        I'm happy to take a look at what was said and think about

24   if there's a way of stating a curative instruction that

25   clarifies the theory or that it's in the jury instruction

1    itself.  I'm happy with that too.

2        So I don't want to -- I will make a decision based on

3    what's there; but if there's a way of compromising that doesn't

4    impact badly either of your cases, think about that too.

5            **MR. KRILL:**  Okay.

6            **MR. HAYNES:**  We'll put this in the motion, Your Honor;

7    but obviously, our concern with a curative instruction is it's

8    more emphasis on what the Patent Office found and the Patent

9    Office found.

10       And their theory all along in the case is:  Don't make

11   your own decision.  The Patent Office has looked at everything.

12       And I think a curative instruction is going to sort of

13   create prejudice for us that the jury should not use their own

14   mind.

15           **THE COURT:**  So, I mean, it's fine.  Whatever -- if

16   there's no way of resolving it between the two of you, I'll

17   just decide it one way or another.

18           **MR. KRILL:**  And if it helps advance, we're fine

19   striking "the Patent Office found" and just "Boland does not

20   disclose," but we can talk.

21           **THE COURT:**  Okay.

22           **MR. KRILL:**  Thank you, Your Honor.

23           **THE COURT:**  All right.  Let's go to the jury

24   instructions.  And did you make progress that you'd like to

25   tell me about?

1    **MR. HAYNES:**  I'm going to defer and let them talk

2    about the progress.  I think there's good news coming, though,

3    Your Honor.  I think we've resolved almost everything.  Well,

4    I'll let them address it.

5            **THE COURT:**  Excellent.  Okay.

6        **MR. HAYNES:**  We may ask Your Honor's indulgence to

7    submit something to show we've agreed because we've been sort

8    of scrambling to agree.

9            **THE COURT:**  Okay.

10       **MS. REPLOGLE:**  I'll go ahead and start.  So we have

11   been working, and I think it's pretty limited to what the

12   issues are.

13           **MS. WROBLEWSKI:**  Yeah, we're close.

14       **MS. REPLOGLE:**  We're really, really close.  I think

15   the first issue that we have is your proposal to describe the

16   particular references in the 103 obviousness section.

17       **MS. WROBLEWSKI:**  Yep.  So, as Your Honor knows, we've

18   proposed laying out the specific grounds in the instructions

19   themselves to articulate which anticipation grounds, which

20   obviousness grounds, and I think you're referring to

21   Instruction 20 --

22           **MS. REPLOGLE:**  Number 26.

23       **MR. KRILL:**  Yeah.  And I'm not sure you had the

24   benefit of our response to that.

25           **MS. REPLOGLE:**  Yeah.

1    **MR. KRILL:** So to clarify --

2    **MS. WROBLEWSKI:** Yeah.

3    **MR. KRILL:** -- one of them is the combination of

4    Boland and the A5/A5s camera processors.  We believe that needs

5    to be separated out.  A5 and A5s are two different ones.  So if

6    they want to put the combination of Boland and the A5 and then

7    the combination of Boland and the A5s, that's okay with us.

8    **MS. WROBLEWSKI:** So from our perspective, with respect

9    to Boland and the combination of Ambarella A5/A5s, throughout

10   the case the parties have been treating the functionality and

11   capabilities of various iterations of the Ambarella chipsets

12   sort of synonymously both on infringement and on invalidity.

13       The Ambarella A5/A5s documentation has all been

14   established to be before the claimed conception date -- the

15   earliest claimed conception date, and the evidence has been

16   presented in a way that we are relying on the combination of

17   the two as one particular ground.  So I don't think it's

18   necessarily proper, in light of the evidence, to break those

19   into different grounds.

20   **MR. HAYNES:** I think we might be able to compromise,

21   Your Honor, by just putting "A5 or A5s" in the same --

22   **MR. KRILL:** That's fine.  That's fine.

23   **MR. HAYNES:** I think that will solve that one.

24   **MR. KRILL:** And then --

25   **MS. REPLOGLE:** This one.

1    **MR. KRILL:**  So we didn't have the benefit of talking

2    about this one, but for the first one, Karlee, if it just says

3    "the Nick Woodman prior invention," or something, we're okay

4    with that, or something along those lines.  But it introduces

5    conception, reduction to practice when it's already been

6    discussed.  That's the main issue.

7    **MS. WROBLEWSKI:**  It's, I guess, the concern with

8    respect to the statutory-type language?

9    **MR. KRILL:**  Right.  So if it's just Nick Woodman.

10    **MS. REPLOGLE:**  The way it was proposed to us,

11   Your Honor -- and, again, admittedly, this was just -- we've

12   been trying hard the last 30 minutes to get this narrowed.

13   GoPro's proposal in its description to describe its

14   reference as to the prior invention is this [as read]:

15        "Conception and reduction to practice by or at

16        the direction of Nicholas Woodman at GoPro in the

17        form of the HD HERO2 and WiFi BacPac."

18   That interjects and, in fact, omits the concept of

19   diligence, for example, and it interjects conception and

20   reduction to practice as if it has been shown in effect.

21   I think it's misleading.  It just should -- it should just be a

22   description of what their allegation is, and that's the prior

23   invention of Nick Woodman is one of the references that --

24   references that they're relying on as a prior invention theory.

25    **MS. WROBLEWSKI:**  So the language and the basis for the

1  ground is under 102(g), and this is the language.  You know, we

2  can go back and make sure it tracks exactly what is laid out in

3  102(g), but it's not establishing that those elements have been

4  met but, rather, laying out the requirements of what they're

5  labeling as the prior invention of Nick Woodman.  So I --

6      **THE COURT:**  So let me tell you.  I've never come to a

7  final instruction conference -- I appreciate that you've been

8  working through --

9      **MS. WROBLEWSKI:**  Yes.

10      **THE COURT:**  -- these issues right up until this

11  moment.  So I'm really glad about that.

12      But I have no -- I don't know what you're talking about.

13  I don't have -- I don't know where the -- I don't have the

14  language in front of me to tell me what this -- if there is a

15  disagreement, what it is and whether it matters.

16      And it's -- so it's really unhelpful, I have to say.  I

17  appreciate that you're resolving this and that you have good

18  news for me, but I don't even understand that.

19      So this is my -- are you going to be able to -- do you

20  think you have an agreement on this, these instructions, or do

21  you think that there is sort of a fundamental issue that I need

22  to weigh in on?

23      **MR. HAYNES:**  So I think we probably can reach

24  agreement, Your Honor, with a little guidance from you.

25      **THE COURT:**  Okay.

1    **MR. HAYNES:**  Maybe I can frame what I think would help

2    in terms of guidance, and then we can work on the actual words

3    to put in there.

4           **THE COURT:**  Okay.

5           **MR. HAYNES:**  The disagreement over the obviousness

6    instruction is we're trying to list the grounds under which it

7    could be found obvious.

8           **THE COURT:**  Yes.

9           **MR. HAYNES:**  And one of those grounds is Mr. Woodman's

10   prior work, where we say he conceived of the invention and

11   reduced it to practice in the form of the WiFi BacPac.

12          **THE COURT:**  Yes.

13          **MR. HAYNES:**  I think the dispute here is how we

14   describe that series of actions.  Do we say, "Mr. Woodman's

15   prior invention," which I think they want very much to say that

16   because Mr. Woodman testified that he didn't think he was the

17   first inventor of that, and they want to put that quote up and

18   say, "You have to find he was the inventor"; and therefore, the

19   instruction is framed to say "prior invention."  That will lead

20   the jury to just draw the conclusion without considering his

21   prior conception and later reduction to practice and diligence

22   along the way.

23       So we have framed our instruction to refer to

24   Mr. Woodman's invention as his conception and reduction to

25   practice in the form of the WiFi BacPac.  And so that, I think,

 1    is the fundamental dispute over this issue.

 2         **THE COURT:**  Okay.

 3         **MR. HAYNES:**  So any guidance you could provide on that

 4    may help us work it out.

 5         **THE COURT:**  Okay.

 6         **MS. REPLOGLE:**  If I can respond.

 7      If they would propose to phrase it just as they have in

 8    the prior invention instruction, which I'll read it to

 9    Your Honor, it starts [as read]:

10          "The Nicholas Woodman at GoPro in the form" --

11      yeah.

12         **MR. KRILL:**  It cuts off.

13         **MS. REPLOGLE:**  It cuts off.

14         **MR. KRILL:**  So just the issue, Your Honor, is the

15    prior invention instruction on the Nicholas Woodman 102(g)

16    invention, and then it gets into obviousness, and then it sort

17    of redefines conception and reduction to practice by Nick

18    Woodman.

19      And it's following the lengthy instruction, somewhat, on

20    prior invention, and we don't see the point of repeating

21    conception and reduction to practice when describing Nick

22    Woodman's invention as if that was good enough for obviousness

23    but not prior invention.

24      And that is really the only issue.  And it's not a matter

25    of defining it as Nick Woodman's prior invention.  If they want

1    to call it Nick Woodman's HD HERO2 --

2         MS. REPLOGLE:  With WiFi BacPac, that's fine too.

3         MR. KRILL:  -- WiFi BacPac.  It's just that --

4         MS. REPLOGLE:  It's supposed to be just a listing of

5    the prior art references there, not a characterization of the

6    conception or reduction to practice of that particular

7    allegation.

8         MR. HAYNES:  What if we just got it out of the legal

9    concepts altogether and said, "Mr. Woodman's development of

10   the" --

11        MS. REPLOGLE:  Totally fine.

12        MR. HAYNES:  -- "WiFi BacPac and" --

13        MR. KRILL:  Okay.  I think we can work it out.

14        MR. HAYNES:  Would that be acceptable to you?  Sorry.

15        THE COURT:  That sounds perfect.

16        MR. HAYNES:  All right.  Let us work on that language.

17        THE COURT:  Okay.

18        MS. REPLOGLE:  And then I -- just before Your Honor

19   came in, I think we worked out a proposal for the reasonable

20   royalty instruction.

21       As I understand it, both parties are in agreement to adopt

22   the Northern District of California's model instruction for the

23   entirety of the instruction.

24        THE COURT:  Okay.

25        MS. REPLOGLE:  We're just going to work amongst

```
 1   ourselves real quick and make sure it matches up with some

 2   changes.

 3              MS. WROBLEWSKI:  And we are in agreement with that.

 4              THE COURT:  Great.

 5              MS. WROBLEWSKI:  We have conferred accordingly.

 6              THE COURT:  Okay.

 7              MS. WROBLEWSKI:  All right.

 8              THE COURT:  Are we -- uh-oh.

 9              MS. WROBLEWSKI:  Do we have additional?

10              THE COURT:  I assume we don't need the interrogatory

11   instruction.

12              MR. HAYNES:  We do not.

13        And the other thing we should point out, Your Honor, is we

14   have elected not to present improper inventorship to the jury.

15   So there's one instruction on that that we can remove.

16              THE COURT:  Okay.

17              MR. HAYNES:  So that's not related to the Woodman

18   activities.  It just is whether or not they should have named

19   Ambarella as an inventor on the patent.

20              THE COURT:  Okay.

21              MR. HAYNES:  We're going to --

22              THE COURT:  You're going to take that out.

23              MR. HAYNES:  -- drop that defense and take it out of

24   the instructions.

25              THE COURT:  Okay.
```

1    **MS. REPLOGLE:**  And so, Your Honor, I would suggest,

2    before we move on from the jury instructions, obviously, that

3    the parties get together and we'll file with the Court.  Is

4    that what you would like us to do?

5    **THE COURT:**  Yes.  So with respect to the instructions,

6    I would like that almost immediately so that we can incorporate

7    it.  I'd like to be able to post the final instructions soon so

8    that if there are any further tweaks, we'll have them at 7:30.

9    How much longer is the testimony going to be?  How long

10    will testimony be tomorrow?

11    **MR. HAYNES:**  I expect we're going to be very short,

12    Your Honor.  We -- I'm guessing 15 to -- I hope it's 15 to

13    20 minutes of completing up Dr. Hu's cross.  And then we may,

14    depending on what is said in that, call Dr. Almeroth for

15    surrebuttal.

16    **THE COURT:**  Okay.

17    **MR. HAYNES:**  I'm not sure we're going to need to do

18    that.  It sort of depends on what else gets said.  But no more

19    than 30 minutes, I think, of testimony total from us.  I don't

20    know how much time they have left for that.

21    **THE COURT:**  Seconds.

22    Okay.  So what's next?

23    **MR. RICHES:**  Next, Your Honor, this also does relate

24    to the jury instructions, and we emailed about this just

25    prior --

1          **MS. REPLOGLE:**  Yeah.

2          **MR. RICHES:**  -- to.

3      This was really responsive to something that I think

4  became most clear during the cross-examination of Dr. Kennedy,

5  which it appears to be CIPH's position that because GoPro has

6  never implemented its proposed non-infringing alternative, it

7  can't be proper or considered.

8      That's simply not the law.  So we propose that the Court

9  either include, just in the instructions, or a separate

10 curative that says along the lines of [as read]:

11          "GoPro has presented evidence regarding

12      non-infringing alternatives to be relevant to a

13      reasonable royalty analysis.  GoPro does not need to

14      show that its proposed alternative was actually

15      implemented or sold during the damages period."

16     And that comes from the *Grain Processing* Federal Circuit

17 case, and the citation for that, Your Honor, is 185 F.3d 1341.

18 And then the *Grain Processing* case, it's primarily a lost

19 profits case, which I recognize is different.  District courts

20 have looked to *Grain Processing* and talked about how that

21 analysis is still appropriate in a reasonable royalty context.

22     One, for example, is *Salazar v. HTC Corp.*, which is 2018

23 Westlaw 2033709.  It talks about the fact that in a reasonable

24 royalty analysis, the burden for an NIA is even lower.  You

25 don't even have to show it's acceptable.  It just needs to be

 1   the next best.

 2       And so we'd request that something be added to the

 3   instructions in light of the evidence that was elicited by CIPH

 4   today.

 5            MS. REPLOGLE:  Well, in light of -- I'm just now

 6   hearing a couple of these cases here.  Obviously, I'm familiar

 7   with *Grain Processing* and quite familiar with the fact that in

 8   order to be a non-infringing alternative, it needs to be

 9   commercially acceptable.  That's well-known standard textbook

10   damages law.

11       The new case that he's saying that says something a little

12   bit different than that, I need the opportunity to review that

13   if that, in fact, is the case.

14       But this actually illustrates a couple points because,

15   again, black-letter law is -- it has to be acceptable.  It

16   can't just be an alternative that you tweak and have it go

17   forward as far as your damages case.  Certainly not for lost

18   profits and I don't believe that's the case for reasonable

19   royalty, and I believe he just cited a district court case on

20   that point.

21       But it raises a separate issue.

22       Mike, could you put up that slide.  Could we --

23            MR. KRILL:  It's up.  We just need to switch.

24            MS. REPLOGLE:  So their proposed curative instruction

25   on this point doesn't incorporate the concept of acceptability.

1    Right?

2         And so it's, again, subject to my review of this district

3    court case.  But it's an incorrect proposition of law, and it

4    came up in Dr. Ugone's testimony yesterday.  If --

5         Is the slide on?  Sorry.  I'm just trying to show you a

6    demonstrative that they showed today to Kennedy.

7         They put up this demonstrative slide of Dr. Ugone's

8    testimony from yesterday, and so the jury got to see it again.

9         And while we have that being put up, I'll just remind,

10   perhaps, Your Honor, a couple of different times Dr. Ugone, in

11   response to counsel for GoPro's questions, would say something

12   to the effect of, "I can't quite answer that question the way

13   it's phrased."  And it was because, and I can illustrate it

14   with Q&As, repeatedly GoPro's counsel was asking him about

15   design changes, this changing of the settings, by not including

16   the word "acceptable" in it, just only asking it for

17   non-infringing.

18        And that's why he was having trouble answering that

19   question, because he wanted to explain that he needed to have

20   that acceptable -- you know, it needs to be acceptable and not

21   just non-infringing.

22        So that's my point, is that they're kind of lopping out

23   that point of the law.  And they put up the slide of his

24   testimony in which it was, like, the third time he was asked

25   the question in that way without -- it's not showing?

1          Okay.  Well, anyway, I think Your Honor hopefully
2    understands the point.  It's Slide DDX-619, Slide 19, that they
3    put up today where he is answering a question about the
4    non-infringing alternatives without having -- being able to
5    explain that alternative, and so we just would ask that the
6    curative instruction -- I don't think there's a need for one,
7    first of all, and certainly it would need to be in accordance
8    with the law.
9          THE COURT:  Yeah, that's a good idea.
10         MS. REPLOGLE:  Yeah.
11         THE COURT:  I can't deal with this on the fly.  So if
12   there is an instruction that you're -- that you'd like, put it
13   in writing.  Just give me, you know, a page or two that
14   explains why it's necessary so that then I can get a response,
15   and we'll just deal with it that way, and I'll deal with it in
16   the morning.
17         MR. RICHES:  Yes, Your Honor.  We'll get something
18   done very quickly on that.
19         THE COURT:  Okay.  Great.
20         MS. REPLOGLE:  Did Your Honor want us to state for the
21   record our JMOL motions today or tomorrow morning?
22         THE COURT:  Oh, yeah, I do.  And let me just pass on
23   one thing that I'd like you to pass on to Mr. Keville.
24         I don't want there to be any inference in closing of
25   improper conduct during discovery or by counsel or anything

1    like that.  I think it's just -- if that was an issue, that

2    should have been raised and flagged and discovered, and it's

3    really inappropriate to be coming now.  So I want to make sure

4    that Contour understands that.  Okay?

5            MS. REPLOGLE:  Yes, Your Honor.

6            THE COURT:  Okay.  So go ahead.

7            MR. HAYNES:  The --

8            THE COURT:  I am interested in your motion.

9            MR. HAYNES:  I'm sorry.  I didn't mean to interrupt

10   you.

11        Before -- the verdict form, did you want any further input

12   from us on the verdict form?

13           THE COURT:  Well, thank you for raising that.  I

14   was -- nobody's given me anything, so I was just going to go

15   ahead and do what I was intending to do.

16           MS. REPLOGLE:  So, Your Honor, we had sent -- and

17   maybe it was just missed -- we sent you proposed revisions to

18   the verdict form this morning and we hadn't heard back.

19           MR. HAYNES:  I don't know if -- I mean, I've been in

20   court, so I'm not sure I've seen the revisions.  We can take a

21   look at that, Your Honor, and see if there's some agreement.

22        I think we are still not aligned in terms of whether or

23   not -- I think, tell me if I'm wrong, but the last version I

24   saw, their verdict form wanted to list all of the grounds for

25   separate jury findings.

1    We don't believe that's appropriate.  What the jury

2    actually has to consider, the two grounds are going to be

3    described now in the instructions, and we believe that's the

4    appropriate way to deal with it.

5         The other issue -- and I'm not sure if this is still in

6    there, but correct me if I'm wrong -- but the last version I

7    saw, they actually put back in the claims that you had already

8    ruled on summary judgment had been met as well as I think some

9    of the claims you hadn't ruled on summary judgment had been

10   met.

11        So we think that with respect to summary judgment, it

12   should be with what your tentative was, that that's not

13   mentioned at all and the jury should make a finding on anything

14   you didn't rule on.

15        **MS. REPLOGLE:**  So what I would propose, because as

16   I believe conveyed by Mr. Keville before, that if the

17   identification of the particular references comes in on the

18   instructions, we were amenable to go ahead and go forward with

19   a general verdict form with respect to that.

20        So we're going to narrow these issues, is what I fully

21   expect.  So I would just suggest that you take a look at the

22   revisions that we had forwarded to you-all and see where we can

23   come to some agreement, and we refile those along with the jury

24   instructions at the same time.  And so you'll have them both

25   and you could -- if there's still a dispute, you could resolve

1    it.

2        **THE COURT:**  Okay.  You know, this is -- this really

3    would have been the right time to be discussing all of that

4    with all of this in front of us, but here we are.

5        So, yes, as fast as you can and thoughtfully as you can,

6    file the instructions that -- why don't you file the complete

7    instructions that you want from -- we're going to do -- we're

8    going to put in my instruction with Claim 11 of the '954 patent

9    that I gave before.

10       Everybody was in agreement through the infringement

11   instructions.

12       The invalidity instruction we discussed before, and so --

13   so from anticipation through reasonable royalty, if you would

14   provide the instruction that you-all have agreed to; and if

15   there is any further dispute, just do it in a track change and

16   I will -- I'll address it first thing.

17       **MR. HAYNES:**  Okay.  With respect to the improper

18   inventorship instruction, Your Honor, it has its own

19   instruction.  I think we can just cross it out.

20       **THE COURT:**  It's gone.

21       **MR. HAYNES:**  Okay.

22       **THE COURT:**  Consider it gone.

23       **MR. HAYNES:**  Okay.

24       **THE COURT:**  So let's see...

25       So you're going to take the entire inventorship.

1          **MR. HAYNES:**  Well, the improper inventorship.  It's a

2    separate instruction.

3          What's the number?  I want to say it was 17 before,

4    Your Honor.

5          **THE COURT:**  Oh, okay.  So it's earlier.

6          **MR. KRILL:**  No.  It was later back.

7                         (Pause in proceedings.)

8          **MS. WROBLEWSKI:**  I thought it was somewhere around 28,

9    but these --

10         **THE COURT:**  So --

11         **MR. HAYNES:**  It was, I think, a fairly short

12    instruction.  We can flag it with the numbers.  The problem is

13    we've revised it.

14         **THE COURT:**  Okay.  Well, why don't you revise that one

15    as well?

16         **MR. HAYNES:**  Okay.  And do you want us to show that in

17    redline, that it's disappeared and renumber?

18         **THE COURT:**  Provide me what you have agreed.  Just,

19    say, show me stipulation and attach the jury instructions that

20    you've agreed to.

21         **MR. HAYNES:**  Okay.  Great.  Thank you, Your Honor.

22         **MS. REPLOGLE:**  Yes, Your Honor.

23         **THE COURT:**  Okay.  Now the JMOL.

24         **MS. REPLOGLE:**  All right.  So Contour moves for a

25    judgment as a matter of law that the Group 1 cameras infringe

1  the '954 patent, Claim 12, and '694 patent, Claim 6.

2      Dr. Hu put in evidence that every element was met.  GoPro

3  expressly stated it was not contesting infringement of those

4  particular claims.  So on this record, no reasonable jury could

5  find that GoPro did not infringe Claims 12 and 6.

6      Second, Contour moves for judgment as a matter of law on

7  GoPro's defense of improper inventorship.  GoPro had claimed

8  that one or more individuals working on behalf of Ambarella,

9  including at least Mr. LeGall, should have been named as an

10 inventor.

11     In Dr. LeGall's testimony, he was asked [as read]:

12     "QUESTION:  You have no opinion as to whether someone from

13     Ambarella should or should not have been identified as an

14     inventor on Contour's patents?"

15     And he answered [as read]:

16     "ANSWER:  I don't have an opinion, no."

17     That's at Trial Transcript 1044, at lines 1 through 4.

18     There was no opinion that came in from Dr. Almeroth and

19 there's no other evidence on that issue, so we move for JMOL as

20 to that ground.

21     We also move for a judgment as a matter of law on GoPro's

22 102(g) defense that Nick Woodman is the prior inventor of the

23 claims at issue.  Nick Woodman testified when he was asked [as

24 read]:

25     "QUESTION:  And you are not contending that you are the

1    first inventor -- that you are the first inventor of what

2    is claimed in these patents?"

3    And he answered [as read]:

4    **"ANSWER:** No, I am not the inventor."

5    Dr. Hu also testified that Nick Woodman did not conceive

6    of and did -- or if he did, he abandoned his invention.  That's

7    at Trial Transcript page 551, at lines 19 through 21.

8    Further, next, Nick Woodman was asked [as read]:

9    **"QUESTION:** You are not claiming that you invented first

10   what is claimed in the patents in this case?

11   **"ANSWER:** I believe I had a concept for what is claimed in

12   the patents but, no, I'm not claiming to be an inventor of

13   these concepts."

14   That testimony was relied on by Dr. Almeroth to interpret

15   what Mr. Woodman understood or knew in his mind as referring --

16   and actually how Dr. Almeroth actually presented this is that

17   he referenced that Nick Woodman must have been referring to or

18   was referring to not inventing prior art concepts, that it was

19   already in the prior art.

20   But next on cross for Dr. Almeroth, the following day he

21   was asked [as read]:

22   **"QUESTION:** So the Woodman invention, you agree, is not

23   the same as the Contour invention?"

24   And he admitted, "That's correct."

25   Dr. Almeroth testified and tried to interpret the

1   testimony of Nick Woodman, but that's not -- that's certainly

2   not adequate.  That particular portion of the trial transcript,

3   which I'm referencing for Dr. Almeroth for the record, is at

4   page 594, lines 15 through 17.

5        So to find Nick Woodman conceived of the invention,

6   despite Nick Woodman's testimony, the jury would have to find

7   Woodman was either, you know, not forgetting or mistaken as to

8   what he believed in at that time, and that is not the proper

9   role for a particular jury to play.

10       Dr. Almeroth's attempt to reinterpret Woodman's testimony

11  is unavailing; and so like I -- like said, Your Honor, we would

12  move for judgment as a matter of law as to that ground.

13       The last motion for judgment of matter of law is for the

14  fact that the Live Preview Group 2 and live streaming cameras

15  meet the wireless connection protocol device limitation and,

16  thus, the cameras infringe patent '954, Claims 11 and 12.

17  Dr. Hu had explained that all elements are met, including the

18  wireless communication protocol device limitation.

19       Dr. Almeroth performed, in effect, in his testimony

20  earlier today an improper claim construction-type argument to

21  argue a non-infringement basis on that.  GoPro had not

22  previously asked for the claim term "wireless communication

23  protocol device" to be construed, and so that was -- came in

24  with Dr. Almeroth's interpretation of how he read that claim.

25       If the Court does not grant JMOL, we will need -- need to

 1    actually have a construction on that particular phrase and an

 2    instruction before charging the jury on that particular issue.

 3         I'm sure the Court is familiar with the Federal Circuit

 4    case of *O2 Micro*.  And in the *O2 Micro* case, which the cite is

 5    521 F.3d 1351, and in that case, the Federal Circuit said

 6    basically, when the parties have a fundamental dispute as to

 7    the reading of the scope of a claim term, it is the Court's

 8    duty to resolve it.

 9         And so given that this -- and I will say too, Your Honor,

10    this is an issue that we did preview and that we raised in

11    briefing in 2025.  And at your order, Docket 851 at page 12,

12    you said -- in your ruling on the pretrial motions that we had

13    filed, you said depending on the testimony as it came in at

14    trial, parties could reraise the need for claim construction.

15    And so we are reraising this now as either a JMOL motion on the

16    evidence that's made of record or, in the alternative, a

17    request for a claim construction on that claim term.

18         **THE COURT:**  Okay.

19         **MS. WROBLEWSKI:**  With respect to the first motion made

20    by plaintiff with respect to Group 1 of infringement, we

21    disagree and there's evidence within the record that a

22    reasonable jury could find infringement -- or could find for

23    non-infringement of the remaining claims of the Group 1

24    products based on failure of proof.

25         With respect to the second motion, improper inventorship,

1    as we articulated with respect to the jury instructions, we

2    have withdrawn that particular defense.

3        Turning next to 102(g) of Nick Woodman and the prior

4    invention, there's sufficient and substantial evidence in the

5    record that demonstrates both conception and diligent reduction

6    to practice of the WiFi BacPac and in conjunction with the HD

7    HERO2 by June of 2012.

8        So -- and then, finally, with respect to the Group 2

9    products and the discussion related to the wireless connection

10   protocol and the non-infringement position that was presented

11   there, we believe there is substantial evidence with respect to

12   the lack of a wireless connection protocol or a device within

13   the products as established by testimony of several

14   individuals.  And Dr. Almeroth explicitly stated that he did

15   apply the plain and ordinary meaning of the term, and we don't

16   believe that an additional claim construction is necessary or

17   appropriate at this time.

18           THE COURT:  All right.  And so what -- if I was to

19   give a construction of that term, what are you proposing that

20   I --

21           MS. REPLOGLE:  Yeah.

22           THE COURT:  -- say?

23           MR. KRILL:  Your Honor, just something along the lines

24   of the claim --

25           THE COURT:  Don't give me something along the lines.

PROCEEDINGS

1         **MR. KRILL:**  Okay.  Okay.  Then I'll express, the plain

2    and ordinary meaning allows for a wireless connection protocol

3    device to be configured to carry more than one protocol -- or

4    is not limited to one protocol.

5         **MS. WROBLEWSKI:**  With respect, Your Honor, I think the

6    language, you know, "a wireless connection protocol device,"

7    the "device" being the operative term there, is in and of

8    itself limited to a singular device.  So we would not agree

9    with that construction as proposed.

10        **THE COURT:**  All right.  Well, thank you for those fine

11   suggestions, and I'll give it some thought.

12        **MS. WROBLEWSKI:**  And with respect to our 50(a)

13   motions, would you like me to make those now?

14        **THE COURT:**  Yes, go ahead.

15        **MS. WROBLEWSKI:**  Okay.  At the outset, I would like to

16   renew everything that we made at the close of plaintiff's

17   case-in-chief.

18        And then we move for judgment as a matter of law that the

19   asserted patents are invalid under 102(g) based on the prior

20   invention of Mr. Nicholas Woodman at GoPro in the form of the

21   HD HERO2 and WiFi BacPac.

22        We move for judgment as a matter of law that the asserted

23   patents are invalid as obvious under the pre-AIA 103 based on

24   the conception and reduction to practice of the HD HERO2 and

25   the combination of the WiFi BacPac by Nicholas Woodman at

 1   GoPro.

 2        We move for judgment as a matter of law that the asserted

 3   patents are invalid as obvious under pre-AIA 103 based on the

 4   combination of the Boland reference -- that's U.S. Patent

 5   Publication Number 2010/0118158 -- and Ambarella's A5/A5s

 6   chipset processors.

 7        We move for judgment as a matter of law that plaintiff has

 8   not established that they're entitled to an earlier conception

 9   date or a date of priority other than that on the face of the

10   patents.

11        We move for judgment of law that there is no entitlement

12   to damages in this case.

13        And we move for judgment as a matter of law that there's

14   no support for willfulness.

15             **THE COURT:**  Okay.

16             **MS. REPLOGLE:**  Okay.  Yes, so with respect to their

17   JMOL on the 102(g) defense, for the reasons I just articulated

18   on the record in our affirmative JMOL motion as to Nick

19   Woodman's factual testimony as well as Dr. Almeroth's

20   interpretation of that testimony, there's certainly factual

21   evidence that would certainly warrant that, actually, JMOL

22   should be granted in the inverse favor.  So, yes, we oppose

23   that.

24        With respect to the 103 grounds of the motion that she

25   raised, again, same particular evidence that I cited previously

1    as to the basis of 103 based on Woodman's invention defense.

2         And then with respect to Boland and Ambarella, Dr. Hu

3    provided detailed testimony today as to why the evidence on the

4    record requires a conclusion, in fact, the obvious -- the

5    opposite, that it was not rendered obvious in the combination

6    of Boland with Ambarella.

7         With respect to your grounds, I think your motion as to

8    prior conception date for Contour's invention, the Court heard

9    from Richard Mander and he walked through his documents in

10   detail starting from November 2009 and December 2009 and laid

11   out for the record exactly all the steps he took in the

12   formation, in his mind, of the complete and operative invention

13   that he could construct it and explain it to someone.

14        That was also further then explained by Dr. Hu, who from

15   an expert opinion's perspective, as opposed to the inventor and

16   factual testimony, also explained exactly that, that she said

17   and testified today that he had a conception date as of

18   December 2009.

19        With respect to their motion for JMOL as to damages,

20   the Court has and the jury has heard evidence presented by

21   Dr. Ugone as to what the reasonable royalty and the appropriate

22   amount of form of damages would be.  There is evidence in the

23   record with respect to all of his testimony that he provided

24   that would warrant denial of that.

25        And then the last one was a JMOL as to willfulness.  And,

1    again, the jury has heard evidence and has seen documents of

2    exactly when GoPro was on notice of Contour's allegations of

3    patent infringement.  They were on notice January 5th, 2015,

4    many, many years ago, ten years ago, and have not made a change

5    to their device, to any of their camera products since that

6    time.

7        They've also seen evidence as -- in the record as far as,

8    like I said, knowledge of the patents, negotiations, the

9    factual testimony, and the history of the dispute between the

10   parties too.

11       So for all those reasons, we would say that that should be

12   denied.

13       **THE COURT:**  All right.  Thank you for the motions.  I

14   look forward to reading all about them after trial.

15       I do -- I think it would be -- after things close but

16   before the jury comes back, you might start talking to each

17   other about what kind of a schedule would make the most sense

18   for the motions, and I think it's best to do that in a vacuum

19   where you don't know whether you've won or lost and just try

20   and figure out what the best way is to take at this before

21   the Court.

22       And don't make it too leisurely.  One thing I find in many

23   of these cases is that I'm not seeing -- I'm not hearing the

24   motions until six months after the verdict, and that's not good

25   for me.  It may be better for you.  I don't know.  But I don't

**PROCEEDINGS**

 1   want -- I think something half that would be a lot better and

 2   even less than that.  That would be okay by me.

 3          **MS. WROBLEWSKI:**  It's still fresh in our minds.

 4          **THE COURT:**  Yes, exactly.

 5          **MS. WROBLEWSKI:**  I think I have one additional thing.

 6          **THE COURT:**  Okay.

 7          **MS. WROBLEWSKI:**  Can I confer with my colleague?

 8          **THE COURT:**  Yes, absolutely.

 9                    (Pause in proceedings.)

10          **MS. WROBLEWSKI:**  I have nothing further.

11          **THE COURT:**  Okay.

12      All right.  So I am a little unsettled because I'm going

13   to go home at some point.  I won't have what you have done.

14   I'd really like this wrapped up sooner, so I really want you to

15   get this to me as quickly and correctly as you can.  Okay?

16          **MS. WROBLEWSKI:**  Yes, Your Honor.

17          **MS. REPLOGLE:**  We will.

18          **THE COURT:**  All right.  Thank you.

19                  (Proceedings adjourned at 3:52 p.m.)

20                        ---o0o---

21

22

23

24

25

1

2                   **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:  Wednesday, October 8, 2025

7

8

9

10                          *Ana Dub*

11   _____

12          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13      CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25