JOHN D. HAYNES (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone:    404-881-7000
Facsimile:    404-881-7777
john.haynes@alston.com

PHILIP DUCKER (State Bar No. 262644)
MICHELLE CLARK (State Bar No. 243777)
**ALSTON & BIRD LLP**
55 Second Street, Suite 2100
San Francisco, CA 94105
Telephone:    415-243-1000
Facsimile:    415-243-1001
phil.ducker@alston.com
michelle.clark@alston.com
dana.zottola@alston.com

*Attorneys for Defendant GOPRO, INC.*

*Additional counsel on signature page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CONTOUR IP HOLDING, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>GOPRO, INC.,<br><br>            Defendant. | LEAD CASE NO. 3:17-cv-04738-WHO<br>CONSOL. CASE NO. 3:21-cv-02143-WHO<br><br>**GOPRO'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR NEW TRIAL**<br><br>Judge: William H. Orrick<br>Hearing Date: March 11, 2026<br>Time: 2:00 PM |

## NOTICE OF MOTION & MOTION

**PLEASE TAKE NOTICE** that on March 11, 2026, at 2:00 PM, before Judge William H. Orrick in Courtroom 2, 17th floor of the United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant GoPro, Inc. ("GoPro") will move and hereby moves for an order entering judgment as a matter of law of invalidity against Plaintiff Contour IP Holding LLC ("CIPH") pursuant to Rule 50(b).  GoPro moved for judgment as a matter of law that the Asserted Claims are invalid as obvious under 35 U.S.C. § 103 based on the combination of Boland and Ambarella and moved for judgment as a matter of law that the Asserted Claims are invalid under 35 U.S.C. § 102(g) based on the prior invention of Mr. Nicholas Woodman at GoPro in the form of the HD HERO2 and WiFi BacPac before the case was submitted to the jury pursuant to Fed. R. Civ. P. 50(a).  Dkt. 876, 1387:18-1388:6.

As set forth in the Memorandum of Points and Authorities below, GoPro hereby files this renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and alternatively requests a new trial under Fed. R. Civ. P. 59.   GoPro respectfully submits that Claim 11 od the U.S. Patent No. 8,890,954 is invalid. Alternatively, GoPro respectfully requests a new trial on invalidity.

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................2

    A.    The Court Construed the Asserted Claims Based on CIPH's Characterization of the Claims During IPR....................................................................2

    B.    The Court Concluded that GoPro Products That Include Ambarella Prior Art Camera Processors Generate The First And Second Image Data Streams In Parallel As A Matter Of Law .....................................................................3

    C.    CIPH Filed a Third Lawsuit, Resulting in Further Claim Construction and Summary Judgment Orders..........................................................................5

    D.    Post-Remand, CIPH Argued a Different, More Expansive Claim Scope in an Effort to Capture Additional Accused Products ..........................................6

    E.    At Trial, CIPH Presented No Evidence Refuting GoPro's Showing of Invalidity ....................................................................................................8

III.  LEGAL STANDARD...........................................................................................10

    A.    Judgment As a Matter of Law ...................................................................10

    B.    Obviousness Is Reviewed De Novo...........................................................11

    C.    Motion For a New Trial .............................................................................11

IV.   ARGUMENT ......................................................................................................11

    A.    The Jury's Verdict Is Inconsistent as a Matter of Law ...............................11

    B.    The Unrebutted Evidence Demonstrates Clearly and Convincingly That Claim 11 of the '954 Patent Is Obvious as a Matter of Law ...................................13

        1.    The Disclosure of the Boland in View of Ambarella Is Unrebutted...............14

        2.    The Motivation To Combine Is Unrebutted.....................................18

    C.    The Trial Record Requires a Finding That Claim 11 Is Anticipated and/or Obvious in View of Woodman ..................................................................19

        1.    The Evidence of Prior Conception Is Unrebutted............................20

        2.    GoPro Introduced Substantial Evidence of Diligence .....................21

        3.    There Is No Basis to Find Abandonment or Concealment of the Woodman Invention.........................................................................22

    D.    There Is No Secondary Indicia Evidence That Overcomes Obviousness...................23

    E.    In The Alternative, The Court Must Order a New Trial on Invalidity .......................25

V.     CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*,
    949 F.3d 1366 (Fed. Cir. 2020) ............................................................................ 19

*Agrizap, Inc. v. Woodstream Corp.*,
    520 F.3d 1337 (Fed. Cir. 2008) ............................................................................ 11

*Alves v. Cty of Riverside*,
    135 F.4th 1161, 1169 (9th Cir. 2025)..................................................................... 12

*Apotex USA, Inc. v. Merck & Co.*,
    254 F.3d 1031 (Fed. Cir. 2001) ............................................................................ 23

*Asyst Techs., Inc. v. Empak, Inc.*,
    544 F.3d 1310 (Fed. Cir. 2008) ...................................................................... 17, 25

*Asyst Techs., Inc. v. Empak, Inc.*,
    No. C 98-20451, 2007 U.S. Dist. LEXIS 59100 (N.D. Cal. Aug. 3, 2007)................. 10, 17, 18, 19

*Callaway Golf Co. v. Acushnet Co.*,
    576 F.3d 1331 (Fed. Cir. 2009) ..................................................................... 11, 12, 13, 25

*Callicrate v. Wadsworth Mfg., Inc.*,
    427 F.3d 1361 (Fed. Cir. 2005) ............................................................................ 11

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988) ............................................................................ 24

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
    267 F.3d 1334 (Fed. Cir. 2001) ............................................................................ 23

*Eurand, Inc. v. Mylan Pharms., Inc.*,
    676 F.3d 1063 (Fed. Cir. 2012) ............................................................................ 24

*Graham v. John Deere Co.*,
    383 U.S. 1, 17-18 (1966) ....................................................................................... 11

*Henny Penny Corp. v. Frymaster LLC*,
    938 F.3d 1324 (Fed. Cir. 2019) ............................................................................ 24

*Illumina, Inc. v. BGI Genomics Co.*,
    No. 19-cv-03770, 2022 U.S. Dist. LEXIS 54832 (N.D. Cal. Mar. 27, 2022) ............................... 11

*Impinj, Inc. v. NXP USA, Inc.*,
    No. 19-cv-03161-YGR, 2023 U.S. Dist. LEXIS 236150 (N.D. Cal. Sep. 28, 2023) ..................... 11

*In re Jolley*,
    308 F.3d 1317 (Fed. Cir. 2002) ............................................................................ 22

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ......................................................................... 10

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007) .......................................................................................... 23

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001) ......................................................................... 11

*Metso Minerals, Inc. v. Powerscreen Int'l Distribution*,
    526 F. App'x 988 (Fed. Cir. 2013) ............................................................... 11, 18

*Osseo Imaging, LLC v. Planmeca USA Inc.*,
    116 F.4th 1335 (Fed. Cir. 2024) ........................................................................ 11

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) ......................................................................... 17

*Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*,
    774 F.3d 968 (Fed. Cir. 2014) ........................................................................... 22

*Western Union Co. v. MoneyGram Payment Sys., Inc.*,
    626 F.3d 1361 (Fed. Cir. 2010) ......................................................................... 23

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ............................................................................. 10

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) .................................................................... 18, 24

**Statutes**

35 U.S.C. § 102(g) ...................................................................................................... 20

**Rules**

Fed. R. Civ. P. 50(c) .................................................................................................. 25

Fed. R. Civ. P. 59 ...................................................................................................... 25

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| **Ex. A** | Record of Oral Hearing in Case IPR2015-01078, IPR2015-01080 held June 22, 2016 (excerpted) |
| **Ex. B** | GoPro, Inc. v. Contour IP Holding, LLC, Case No. IPR2015-01080, Patent Owner's Response (excerpted) |

1    **I.    <u>INTRODUCTION</u>**

2        Defendant GoPro, Inc. ("GoPro") moves for entry of judgment of invalidity of Claim 11 of the

3    '954 Patent.  The jury's verdict held Claim 12 of the '954 Patent and Claim 6 of the '694 Patent invalid

4    as both anticipated and obvious.  The jury, however, found Claim 11 of the '954 Patent valid.  Claim

5    11 substantially overlaps with the invalid claims and CIPH offered no unique validity evidence

6    directed to Claim 11, nor did it identify any aspect of Claim 11 that distinguished it from those found

7    invalid.  The only way to countenance the jury's verdict and reconcile it with the evidence presented

8    at trial is to find Claim 11 invalid as well.  In the alterative, GoPro moves for a new trial.

9        A finding that Claim 11 is invalid is also the only conclusion supported by the evidence.  GoPro

10   presented unrefuted evidence that every claim element is disclosed in the combination of Boland and

11   Ambarella.  And an express motivation to combine is articulated in the Boland reference itself as well

12   as prolific in the state of the art.  At trial, CIPH did not challenge any of the disclosures in Boland or

13   Ambarella, or the motivation to combine the two references.  Its technical expert did not address the

14   substance of this combination at all – as she was foreclosed from doing so because CIPH chose to

15   withdraw her expert report addressing the combination.  In the face of unrebutted fact evidence, the

16   question of obviousness becomes a legal one for the Court and the only reasonable finding on this

17   record is that Claim 11 is invalid as obvious.

18       Additionally, the jury's finding that the other asserted claims are invalid as anticipated and

19   obvious based on Mr. Woodman's prior invention pursuant to 35 U.S.C. § 102(g) provides an

20   alternative, independent ground for concluding that Claim 11 is invalid.  At trial, CIPH did not dispute

21   that each element of Claim 11 was disclosed in Mr. Woodman's prior invention.  Instead, CIPH argued

22   exclusively that Mr. Woodman's invention could not be considered prior art because GoPro had either

23   abandoned the invention or could not show sufficient diligence.  The jury rejected CIPH's arguments

24   and found that the Woodman prior invention is prior art that anticipates the narrower asserted claims.

25   Having established that Woodman is prior art, there is nothing in the record that would rebut the

26   conclusion that it anticipates and/or renders obvious Claim 11.

27       Finally, there is no relevant evidence of secondary indicia of nonobviousness in the record –

28   and certainly not sufficient evidence to overcome the strong showings of invalidity based on

Woodman and the combination of Boland with Ambarella. At trial, CIPH identified only two secondary indicia-- failure of others and copying. That evidence, however, was untethered to the claimed invention and CIPH's own expert admitted that any failure or copying stemmed from unclaimed features, such as challenges in implementing certain wireless standards, developing driver software, or inter-operating with Apple's largely closed ecosystem. Since the Court already held that the claims do not have any particular software requirements nor are they directed to a specific wireless standard, CIPH's only proffered evidence and expert opinions are irrelevant as a matter of law.

The only rational conclusion that can be drawn from the evidence presented at trial is that Claim 11 is invalid. If Claim 11 is not found invalid as a matter of law, the only other legally allowable outcome is a new trial on invalidity.

## II.    FACTUAL BACKGROUND

Plaintiff Contour IP Holding, LLC ("CIPH" or "Plaintiff") brought suit against defendant GoPro, Inc. ("GoPro" or "Defendant") on January 5, 2015, when it joined GoPro in litigation pending before the United States District Court for the District of Utah. Dkt. 11 at 3CIPH asserted infringement of U.S. patent Nos. 8,890,954 (the "'954 Patent") and 8,896,694 (the "'694 Patent") (collectively the "Asserted Patents"). *Id.* The Asserted Patents claim priority to provisional application No. 61/382,404, filed on September 13, 2010. They share a common specification and most of the elements of the asserted claims are identical.[1] Dkt. 872 456:23-457:3; Dkt. 875 1106:16-25.

### A.    The Court Construed the Asserted Claims Based on CIPH's Characterization of the Claims During IPR

On October 28, 2015, the Patent Trial and Appeal Board ("PTAB") granted GoPro's petitions for *inter partes* review ("IPR") of the asserted claims of the '954 and '694 Patents. Dkt. 262 at 2. GoPro's IPR petitions relied on U.S. Pub. Pat. App. No. 2010/0118158 ("Boland," Dkt. 881-92) in combination with a GoPro July 2009 Sales Catalog (the "Catalog") and U.S. Patent No. 7,362,352 ("Ueyama"). To distinguish Boland from the Asserted Patents, CIPH argued the claimed video streams/content must "be created in parallel from the same source," but not necessarily "at the same

---

[1]On multiple occasions the parties and courts have characterized the claimed inventions of the '954 and '694 patents as "substantially similar" and found that Claim 11 of the '954 Patent is "largely representative" of Claim 3 of the '694 Patent. Dkt. 555 at 11 n.5; Dkt. 673 at 6.

time." Dkt. 376-3 at 5 (citing IPR2015-01080, Record of Oral Hearing (Paper 54) at 15:4–10; 24:17–19, 78:11-19). CIPH maintained that in Boland, the preview of the higher resolution recorded video "is created in serial with the encoded data from the processor – not in parallel." Ex. B at 33. When asked, at the hearing, when "the video image data that gets produced from the image sensor . . . ceases to" meet the claim language, CIPH argued that it was when "you have made some modifications to it." Ex. A at 80-81. That is, the only alleged difference between Boland's preview and the claimed preview was that Boland's preview was created after the image sensor data "had some modifications" – "once it has been encoded, it is now something else, it is a different set of data." *Id*.; Dkt. 376-3.

On October 2016, the PTAB issued a final decision that GoPro had not proven that the Catalog was prior art but did not reach the merits of GoPro's unpatentability claims. Dkt. 286 at 2 (citing IPR2015-01080, Paper 55, at 27–28). While the IPR appeal was pending, this Court issued an initial claim construction order. Dkt. 251. The Court construed the "generate" limitation as "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" based on CIPH's statements during the IPR. Dkt. 251 at 12 (citing Ex. J (Dkt 235-13) at 78).

On July 27, 2018, the Federal Circuit vacated and remanded the PTAB's final written decision. *Id*. On remand, the PTAB issued a decision concluding that neither Boland nor the secondary references taught generating the recited first and second image data streams "in parallel" from "the same source, i.e., the 'video image data.'" Dkt. 289–2 at 18.

## B. The Court Concluded that GoPro Products That Include Ambarella Prior Art Camera Processors Generate the First and Second Image Data Streams in Parallel as a Matter of Law

Following the PTAB's decision on remand, the Court lifted the stay of litigation. After fact and expert discovery, CIPH filed a motion for partial summary judgment of infringement of Claim 11 of the '954 Patent. Dkt. 376-3. In its Motion, CIPH argued that HERO2 with the WiFi BacPac met every element of Claim 11 of the '954 Patent because it "'could do the functionality of generating higher and lower quality video streams, saving the higher quality stream to the camera storage and streaming the lower quality video to an external device.'" Dkt. 376-3 at 7 (quoting Woodman Dep. Tr. at 111:13-113:6.). CIPH attributed the "generating" of multiple streams "in parallel" to prior art

1    Ambarella chipsets, known as the A5 and A5S systems.[2]  Dkt. 413-3 at 6.  CIPH recognized GoPro's

2    defense that its CEO, Nicholas D. Woodman, invented the claimed system before the named inventors,

3    but CIPH argued that defense meant there was no dispute that the GoPro cameras accused at the time

4    (*Contour I* cameras) practiced the asserted claims.  *Id.* at 8; *see also id.* at 8 n.3.

5         CIPH's Motion rested on its argument that the "generate" limitations of the Asserted Claims

6    require only that the claimed "image data streams" be "derived from what is captured at the [image]

7    sensor."  Dkt. 376-3 at 11-12; Dkt. 413-3 at 3.  That is, neither the plain language of the claim nor the

8    Court's construction foreclose any processing of the video image data so long as the two resulting

9    streams are from the same ultimate source (*i.e.*, the same image sensor data).  Dkt. 413-3 at 5.  The

10   Court agreed, finding that the "generate" limitations impose "no negative limitation . . . requiring that

11   the video image data not undergo substantial or fundamental changes during processing."  Dkt. 445 at

12   8 ("Claim 11 says nothing about processing or alteration, and the plan language of 'from the video

13   image data' indicates nothing about processing or alteration"); Dkt. 445 at 9; *see also* Dkt. 413-3 at 1-

14   2.  Similarly, the Court recognized that GoPro's accused "camera processors down-sample" "the high-

15   resolution video to create the low-resolution video," but again found that neither processing nor

16   buffering of the image video data forecloses meeting the claim language.[3]  Dkt. 445 at 10.

17        At the motion *in limine* stage, GoPro pointed out the facial incongruity between CIPH's

18   infringement and validity positions.  Dkt. 474 (MIL No. 10).  For infringement, CIPH argued its claims

19   do not foreclose any form of processing of the video image data.  Dkt. 445 at 7.  Yet, to dispute validity

20   of the Asserted Patents, CIPH argued that Boland "does not relate to generating two streams in parallel,

21   but instead describes creating a preview [i.e., low resolution stream] from the previously-recorded

22   high quality video."  Dkt. 474 at 20.  In other words, the only distinction CIPH raised between Boland

23

24   ─────────────────────
     [2] Both Contour and GoPro used the A5 and A5S in their allegedly practicing products.
25   [3] The Court found that "in the [then] Accused Products the video image data undergoes processing
     that has the effect of changing its format and appearance." *Id.* at 8.  Despite the substantial processing
26   and buffering steps that the video data goes through, the Court found the cameras at issue infringed.
     Dkt, 445; Dkt. 474 at 19 ("GoPro pointed out *numerous* buffering and compression steps present in
27   the image processing pipeline before the .lrv is generated form the full resolution data.") (collecting
     evidence).  The Court did not reconcile its decision with the PTAB Order (or CIPH's arguments
     against the Boland reference), which rested exclusively on the prior encoding/compression (*i.e.*,
28   processing) and storing of the video image data before the first and second image data streams are
     saved/transmitted.  *Compare* Dkt. 445 at 8 n.2 *with* Ex. A at 76, 80-81.

and its claimed invention is the idea that Boland's preview embodiment encodes (i.e., processes) the video data and stores it (*e.g.*, in "the recorded video data buffer") before creating the lower resolution preview video. *Id.* (collecting citations); Dkt. 510 at 13. Applying the Court's construction equally to GoPro's Accused Products and CIPH's validity positions, there was no material distinction between the practicing products and the prior art as a matter of law. Dkt. 474 at 19.

In ruling on GoPro's motion *in limine*, the Court found that the "issue is not ideal" for resolution at that stage of litigation because the "arguments are technical and of the type that would normally be thoroughly ventilated in robust adversarial briefing." Dkt. 510 at 13. The Court found both parties' arguments "reasonable," but found that CIPH should be allowed to proceed to trial on its argument that Boland is distinct because "the lower quality video stream is generated from previously ***stored*** high-quality video." *Id.* at 13 (emphasis original). With respect to this limited distinction, the Court noted that "it may or may not ultimately be convincing to a fact finder, but it is not so plainly inconsistent with Contour's previous arguments as to require judicial estoppel." *Id.* at 13.

### C. CIPH Filed a Third Lawsuit, Resulting in Further Claim Construction and Summary Judgment Orders

Following delays in trial scheduling caused by COVID-19 (Dkt. 508), on March 26, 2021 CIPH filed another lawsuit asserting the same claims against products released after 2017. The Court consolidated the cases (Dkt. 532), leading to further fact and expert discovery as well as another round of claim construction and dispositive motions. In the second round of claim construction proceedings, the Court held that CIPH's claims are "limited to a point of view digital video camera (or camera system)," and do not include any limitations requiring a personal portable computing device. Dkt. 555 at 17. GoPro, again, laid out the facial inconsistency between CIPH's infringement and validity theories and asked for clarification on claim construction. Dkt. 545. GoPro asked the Court to hold that the Court's statements regarding the scope and meaning of the claims set forth in the Court's Summary Judgment Order are binding on both parties, which the Court provided. *See* Dkt. 545 at 17; Dkt. 555 at 23. The Court did not issue any further construction of the "generate" limitations.

On December 16, 2021, the parties filed a second round of dispositive motions. On March 4, 2022 the Court granted GoPro's motion for summary judgment of unpatentability of the Asserted Patents pursuant to 35 U.S.C. § 101. Dkt. 673. The Court found that the broad, functional language

of the claims was directed to an abstract idea that could not be saved by Step Two of the *Alice* test because "the dual-streaming capability, as Contour admits, comes from a chip in the patent that it did not make and was, in fact, prior art." Dkt. 673 at 12. The Court further found Contour's argument that it had to develop firmware (a Bluetooth driver) to make the hardware components work as claimed in the Asserted Patents irrelevant because "none of this is claimed." Dkt. 673 at 13. Instead, the "claims themselves do not require any particular technology to carry them out," but are limited to the "generic components recited" in the claim language. *Id.*[4] Based on its finding that the Asserted Patents were directed to unpatentable subject matter, the Court declined to address the remainder of the issues presented by the Parties' dispositive motions. *Id.* at 1.

On appeal, the Federal Circuit reversed the decision of unpatentability based on its finding that the claims are not abstract and remanded for further proceedings on the merits of CIPH's claims. The Federal Circuit did not address Step Two of the *Alice* test.

### D. Post-Remand, CIPH Argued a Different, More Expansive Claim Scope in an Effort to Capture Additional Accused Products

Following remand, the Court addressed the remaining issues presented in the Parties' 2021 dispositive motions. Dkt. 721. The Court also allowed CIPH to add additional accused products to the case including HERO10 Black and HERO10 Black Bones (both of which were commercially sold before the parties filed their summary judgment motions in 2021) as well as HERO11 Black, HERO11 Black Mini, HERO12, HERO13, and HERO 4k (2024),[5] which were commercially introduced during

---

[4]The Court also rejected CIPH's argument that GoPro had "taken apart" one of Contour's cameras "to make use of the dual-streaming capability." Dkt. 673 at 13. The Court found that, even if true, "all that shows is that GoPro did not understand ***how***, in technological terms, Contour was ***implementing the claims,***" it did not show copying of the claimed invention because the claims themselves are devoid of any implementation details. *Id.*

[5]CIPH's effort to contort its infringement theories to fit materially different products led it to characterize the claim language in several ways that are germane to their scope. For example, CIPH argued that nothing in the language of Claim 11 of the '954 Patent requires that the "real time image data" be generated in any particular manner nor do the "generate" terms require that the lower resolution video be transmitted as a "live preview" in real time (but could be met, for example, by saving a file to camera memory that could later be wirelessly transmitted post-recording). Dkt. 748 at 9-10; *see also id.* at 11 ("[CIPH's expert, Dr. Hu's] report therefore includes an opinion that a product infringes upon the asserted patents even when a user views a video file *after* the file has been recorded."); Dkt. 767-3 at 7-8. CIPH also argued that there is nothing in the claims that requires that the control signals be capable of being modified while recording. Dkt. 771 at 4. And the Court found, as a matter of law, that nothing in the "wireless protocol device" claim limitation (which is the only one that discloses "real time" video content) discloses live preview either. Dkt. 843 at 20.

the pendency of appeal.  Dkt. 691.  Over GoPro's opposition, the Court allowed CIPH to add these products based on its representation that the products (and the infringement theories relating thereto) were the same as the previously accused products.  Dkt. 690; 691; *see also* Dkt. 721 at 7-8, n.4. However, this turned out to be untrue.  Recognizing that the newly-accused products are materially different from those previously accused by CIPH as well as changes to the law of IPR estoppel,[6] the Court granted GoPro leave to supplement its expert reports.  Dkt. 748 at 1.

On March 31, 2025 and July 23, 2025, GoPro served supplemental opening reports from Dr. Kevin Almeroth addressing the invalidity of the Asserted Claims.  CIPH served rebuttal reports from its expert, Dr. Jing Hu, on May 2, 2025 and August 1, 2025, but ultimately withdrew its August 1 report to avoid having Dr. Hu deposed again.  The Court held that CIPH was therefore foreclosed from relying on any evidence, argument, or testimony concerning Dr. Hu's withdrawn August 1, 2025 expert report.  Dkt. 843 at 21.  As a result of withdrawing Dr. Hu's August 1, 2025 expert report, CIPH has no admissible opinions or evidence against the motivation to combine Boland with Ambarella's A5 prior art system—a combination uniquely presented in Dr. Almeroth's July 23, 2025 expert report.

On August 19, 2025, GoPro moved for summary judgment of invalidity based on the combination of Boland with Ambarella chipsets sold prior to December 2009 with the "dual encoding" feature that CIPH admits embodies the "generate" limitations of the Asserted Patents ("Ambarella"). Dkt. 774-3.  In its Opposition, CIPH did not dispute that Boland discloses all limitations except the generate limitations and that Ambarella discloses the generate limitations – i.e., that all claim elements are disclosed in the combination of prior art presented by GoPro.[7]  However, the Court found that there was a material dispute as to whether Ambarella's A5S platform (which was not at issue in the motion) constitutes prior art as well as whether CIPH's secondary indicia evidence supports a finding of non-obviousness.  Dkt. 843 at 8.  On this basis, the Court denied GoPro's motion for summary

---

[6] The Court initially granted CIPH's motion for summary judgment of IPR estoppel.  Dkt. 721 at 23. On May 7, 2024, the Federal Circuit decided *Ingenico Inc. v. Ioengine, LLC*, which this Court found was "at odds" with the Court's holding in its Summary Judgment Order.  Dkt. 748 at 8.

[7] In its Order, the Court suggests that there is a dispute as to "the scope of Boland and Ambarella prior art," but does not identify any specific element of claim that is allegedly undisclosed in the references. Dkt. 843 at 8.  A facial review of CIPH's Opposition demonstrates that it raised no such material dispute.  Dkt. 787.  Moreover, GoPro's motion relies only on the sale of Ambarella's A5 platform, therefore the Court's finding that there is a dispute of fact regarding the A5S is also immaterial.  Dkt. 774-3 at i, 1.

1  judgment and the case proceeded to trial.  But at trial, CIPH offered no evidence to substantiate its

2  position on either alleged dispute.

3  **E.    At Trial, CIPH Presented No Evidence Refuting GoPro's Showing of Invalidity**

4  Trial commenced on September 29, 2025.  CIPH's witnesses testified that Ambarella provided

5  both the A5 and A5s chipsets with dual-encoding to the public before the alleged priority date of the

6  claimed inventions.[8]  *See, e.g.*, Dkt. 871 at 302:22-303:12 (citing Dkt. 881-52); 320:3-13, 391:21-

7  392:14; Dkt. 872 at 435:16-19, 544:3-10.  Ambarella co-founder, Didier Legall, testified that the A5

8  platform was publicly available by no later than Q4/2008 and the A5S was on sale by November 2009.

9  Dkt. 875 at 1006:15-1007:3, 1016:6-1019:7 (Dkt. 881-115 shows sales of both the A5 and A5S

10  platforms by November 2009).  Mr. Legall further confirmed that both the A5 and A5S had "dual

11  encoding" capability – i.e., the ability to simultaneously generate a higher and lower resolution video

12  stream from the same video image data – as well as the "technical capability . . . of outputting a lower

13  resolution stream for wireless transmission" (e.g., via an accessory chip such as the Atheros wireless

14  transmitter that was commercially available at the time).  Dkt. 875 at 1008:18-1009:11, 1015:6-1016:5

15  (referencing Dkt. 881-84), 1024:10-1027:15.

16  In its case-in-chief, GoPro called Dr. Kevin Almeroth who testified that the Boland prior art

17  disclosed every limitation of Claim 11 except the ability to generate a higher and lower resolution

18  video "in parallel," which Dr. Almeroth opined was provided by the Ambarella prior art.  Dkt. 875 at

19  1105:5-1115:25, 1116:16-1119:13. Dr. Almeroth walked through each limitation of Claim 11 and

20  showed where it was disclosed in the combination of Boland and Ambarella.  *Id.*  In his testimony,

21  Dr. Almeroth identified the specific disclosure in Boland that teaches both recording and sending video

22  wirelessly to a remote computing device.  *See, e.g.*, Dkt. 875 1091:17-2, 1094:18-25, 1107:4-16,

23  1108:9-1109:7, 1109:11-20, 1110:9-20.  Dr. Almeroth also explained that Boland teaches that

24  different camera processors could be utilized in the portable, POV digital video camera it teaches,

25  which would motivate a person of ordinary skill in the art to combine Boland's camera with wireless

26  transmission capabilities with Ambarella's dual encoder.  Dkt. 875 at 1114:11-1115:25; *see also id.* at

27

28  [8]While Dr. Hu testified that the conception date of the claimed invention should be December 2009, she did not offer any element-by-element analysis to establish a conception date earlier than the date of the 2010 provisional application.  Dkt. 872 at 446:2-11.

1095:19-1096:21, 1097:7-18; Dkt. 876 at 1216:5-1223:6, 1224:2-1224:19. Finally, Dr. Almeroth testified that there were no secondary indicia of non-obviousness that would overcome his conclusion that Boland and Ambarella render the asserted claims invalid. *Id*. at 1119:23-1122:10, 1229:6-1231:14.

In neither cross-examination nor direct testimony did CIPH ever refute that Boland and Ambarella disclose the constituent elements of Claim 11. *See* Dkt. 876 at 1192:18-22, 1193:2-1195:2. Indeed, ***CIPH's expert, Dr. Hu, provided no substantive testimony regarding the combination of Boland and Ambarella***. She mentions Boland twice in her rebuttal testimony—testifying only that she considered the reference but not challenging the sufficiency of its disclosure. *Id*. at 1324:2-18.

CIPH also called GoPro's founder, Nicholas D. Woodman, in its case-in-chief. Mr. Woodman testified that he independently conceived of a "Wi-Fi based solution" to provide a live video preview while recording years before GoPro became aware of Contour's Contour+ products in 2011. Dkt. 872 at 555:22-557:10. Mr. Woodman published a patent application (Dkt. 881-93) that disclosed the ability to "wirelessly transmit [a] live preview to a smart phone" and GoPro sold a camera with this capability in June 2012.[9] *See* Dkt. 873 at 600:14-23 (citing Dkt. 881-99), 650:18-655:7, 659:24-660:11. Dr. Almeroth explained how each of the elements of Claim 11 were conceived of by Mr. Woodman before December 2009, as evidenced by contemporaneous documents including the Woodman Patent (Dkt. 881-93) the GoPro HERO HD camera specification (Dkt. 881-27), and 2009 emails between Mr. Woodman and Ambarella (Dkt. 881-32). Dkt. 875 at 1122:12-1128:2. Mr. Woodman, Mr. Donovan, and Dr. Almeroth all provided substantial evidence regarding diligence in reduction to practice as well. Dkt. 873 at 688:22-690:9; Dkt. 868-6 at 73:03-73:22; Dkt. 877 at 1425:7-1427:13. In her rebuttal, Dr. Hu did not raise any challenges to the conception evidence but only testified that GoPro faced "challenges" in developing a working product and later abandoned the RF-chip project (in favor of Wi-Fi). Dkt. 876 at 1325:3-1330:22. Mr. Woodman explained, however, that GoPro was exploring several wireless transmission standards at the same time to determine which would be most suitable for a commercial implementation of live preview. Dkt. 873 at 611:10-614:2, (discussing TX-2387),

---

[9]GoPro released the app that supported live preview in October 2012 but Claim 11 does not require an application running on a remote mobile device (or a personal portable computing device) at all because it is directed only to camera system. Dkt. 555 at 17.

616:25-617:10.  GoPro ultimately opted for a Wi-Fi implementation compatible with the A5S.  *Id.*

CIPH also failed to present any evidence of secondary indicia of non-obviousness with a nexus to the claimed invention.  CIPH's expert identified one secondary indicia factor in her direct rebuttal testimony: "failure of others," Dkt. 876 at 1324:19-1325:6, 1331:17-1332:10.[10]  However, as Dr. Almeroth pointed out, CIPH made no effort to tie any secondary indicia evidence to the claimed invention (i.e., to establish the requisite nexus to render secondary evidence relevant).  *Id.* at 1202:24-1207:19; 1229:6-1231:14; Dkt. 877 at 1418:5-1422:8.

Following deliberations, the jury returned a verdict finding that Claim 12 of the '954 Patent and Claim 6 of the '694 Patent are invalid as anticipated and obvious.  Dkt. 865 at 6-7.  The verdict form also says that Claim 11 of the '954 Patent, from which Claim 12 depends, was not proven invalid.  *Id.*  While the jury correctly concluded that Claims 6 and 12 are invalid, the verdict with respect to Claim 11 is irreconcilable with the evidence presented at trial and the jury's other conclusions.

## III.   LEGAL STANDARD

### A.    Judgment As a Matter of Law

The Federal Circuit "reviews decisions on motions for JMOL, motions for a new trial, and evidentiary rulings under the law of the regional circuit." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014).  In the Ninth Circuit, judgment as a matter of law is appropriate where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002); *see also Asyst Techs., Inc. v. Empak, Inc.*, No. C 98-20451, 2007 U.S. Dist. LEXIS 59100, at *11 (N.D. Cal. Aug. 3, 2007) ("A Rule 50(b) JMOL is proper when the evidence allows only one reasonable conclusion as to the verdict.").  This standard requires a court to uphold a jury verdict "supported by substantial evidence," *i.e.*, "evidence that a reasonable mind would accept as adequate to support a conclusion." *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005).  However, neither speculation nor a "mere scintilla" of evidence is

---

[10]  On cross-examination, Dr. Hu also referred to the same evidence as evidence of "copying." However, she agreed that there was no evidence that GoPro had any access to Contour's confidential information nor would GoPro's incorporation of Ambarella's prior art camera processing platform into its products constitute copying.  Dkt. 876 at 1332:17-1333:18.

1    sufficient to inoculate a verdict against a motion for JMOL. *Illumina, Inc. v. BGI Genomics Co.*, No.

2    19-cv-03770, 2022 U.S. Dist. LEXIS 54832, at *12-13 (N.D. Cal. Mar. 27, 2022) (Orrick, J.).

3        **B.    Obviousness Is Reviewed De Novo**

4        "A patent is invalid for obviousness if the differences between the subject matter sought to be

5    patented and the prior art are such that the subject matter as a whole would have been obvious at the

6    time the invention was made to a person having ordinary skill in the art to which said subject matter

7    pertains." *Metso Minerals, Inc. v. Powerscreen Int'l Distribution*, 526 F. App'x 988, 997 (Fed. Cir.

8    2013) (finding the challenged claims obvious as a matter of law on motion for JMOL) (additional

9    citations omitted).  The Federal Circuit "reviews a jury's conclusion on obviousness, a question of

10   law, without deference, and the underlying findings of fact, whether explicit or implicit within the

11   verdict, for substantial evidence." *Osseo Imaging, LLC v. Planmeca USA Inc.*, 116 F.4th 1335, 1344

12   (Fed. Cir. 2024) (quoting *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1353

13   (Fed. Cir. 2001)).  Factual considerations underpinning obviousness may include "(1) the scope and

14   content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the

15   level of ordinary skill in the art, and (4) any relevant secondary considerations." *Agrizap, Inc. v.

16   Woodstream Corp.*, 520 F.3d 1337, 1343 (Fed. Cir. 2008); *Graham v. John Deere Co.*, 383 U.S. 1,

17   17-18 (1966).  However, "the ultimate conclusion of obviousness is a question of law," and it is the

18   duty of the Court to ensure that the law has been correctly applied to the facts.  *Id.*

19       **C.    Motion For a New Trial**

20       Where it is legally impossible to reconcile a jury's verdict then a new trial is required unless

21   judgment as a matter of law is appropriate.  *Impinj, Inc. v. NXP USA, Inc.*, No. 19-cv-03161-YGR,

22   2023 U.S. Dist. LEXIS 236150, at *13-14 (N.D. Cal. Sep. 28, 2023) (citing *Callaway Golf Co. v.

23   Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009)).  Reconciliation of inconsistent verdicts must be

24   consistent with the evidence and theories adduced at trial.  *Id.*  If only one conclusion is supported by

25   substantial evidence, JMOL is appropriate.   If the Court finds that either conclusion would be

26   supported by sufficient evidence, then the only option is a new trial.  *Id.*

27   **IV.    ARGUMENT**

28       **A.    The Jury's Verdict Is Inconsistent as a Matter of Law**

The jury's verdict on invalidity is inconsistent as a matter of law because it finds Claim 11 of the '954 Patent valid while finding narrower claims with the same or substantially similar elements invalid. *See* Dkt. 865 at 6-7. As the jury was properly instructed (and GoPro's expert explained at trial), Claim 12 depends from Claim 11 of the '954 Patent and, therefore, has all the limitations of Claim 11 as well as additional limitations. Dkt. 872 at 489:24-490:6; Dkt. 875 at 1082:21-1083:4; Dkt. 859 at Instruction No. 15. Thus, the jury's verdict finding dependent Claim 12 of the '954 Patent invalid as anticipated and obvious but finding independent Claim 11 not invalid is inconsistent as a matter of law because "[a] broader independent claim cannot be nonobvious where a dependent claim stemming from the independent claim is invalid for obviousness." *Callaway*, 576 F.3d at 1344. Similarly, the jury's conclusion that Claim 6 of the '694 Patent is invalid as anticipated and obvious is inconsistent with its verdict regarding Claim 11 because both parties' experts treated the claims as overlapping except as to the additional elements of the '694 Patent. Dkt. 872 at 456:23-457:3; Dkt. 875 at 1106:16-25.

"Reconciliation of inconsistent verdicts must be consistent with the evidence and theories adduced at trial." *Callaway*, 576 F.3d at 1344 (additional citations omitted); *see also Alves v. Cty of Riverside*, 135 F.4th 1161, 1169 (9th Cir. 2025) (holding that the court "must search for a reasonable way to read the verdict as expressing a coherent view of the case"). In *Callaway*, the jury found a dependent claim of one asserted patent invalid as obvious, but five remaining asserted claims from the same and other patents not obvious. *Callaway*, 576 F.3d at 1344. The Federal Circuit rejected the argument that minor differences in claim language justified the jury's disparate conclusions regarding the claims' validity. *Id*. Instead, based on the evidence and theories adduced at trial, the Federal Circuit found the jury verdicts to be irreconcilably inconsistent because the asserted patents, which shared essentially the same specification and claimed priority to the same parent application, "were presented to the jury as a group." *Id*. Moreover, the *Callaway* court highlighted that the "evidence and theories at trial were also advanced concerning the patents as a group, not on a claim-by-claim basis." *Id*.

Like *Callaway*, the '954 and '694 Patents in this case share a common specification and parent application, and the evidence and theories adduced at trial presented the patents together. *See* Dkt.

881-128, 881-129. For example, when first presenting the asserted claims to the jury, CIPH's technical expert, Dr. Hu, mapped the elements of Claim 11 of the '954 Patent to the corresponding elements of Claim 3 of the '694 Patent addressing individually only the additional claim elements contained in Claim 3 of the '694 Patent. She then concluded that that accused products included the elements of Claim 3 "for the same or very similar reasons, that those claims corresponding to these – those elements in Claim 11 are met[.]" *Id.* at 457:7-458:23. Similarly, Dr. Almeroth's opinions that the Asserted Patents are obvious over Boland in view of Ambarella were presented by grouping corresponding elements of both patents and mapping those elements to the relevant disclosures of Boland and Ambarella. Dkt. 875 at 1107:19-1119:13. In rebuttal, Dr. Hu did not advance any opinion or argument that any specific element of either patent was non-obvious; rather, she characterized both patents as a single invention. Dkt. 876 at 1320:20-23, 1324:2-18. CIPH never identified any limitation of Claim 11 that would uniquely salvage its validity if the other asserted claims were found invalid. *Compare* Dkt. 875 at 1107:19-1119:13 *with* Dkt. 876 at 1320:19-1324:18. Accordingly, the trial record is devoid of any evidence that would give the jury an evidentiary basis to support a unique finding as to Claim 11 of the '954 Patent and the only way to reconcile the jury's verdict is to hold Claim 11 invalid.

### B.    The Unrebutted Evidence Demonstrates Clearly and Convincingly That Claim 11 of the '954 Patent Is Obvious as a Matter of Law

The trial record presents no evidence from which a jury could reasonably conclude that Claim 11 is not obvious over the combination of Boland and Ambarella. Boland is a U.S. Patent Application filed on November 5, 2009 (that claims priority to a provisional application filed on November 7, 2008). Dkt. 881-92 (TX-2351). "Ambarella" is a camera processor platform that includes the "dual-encoding" feature, sometimes called "dual-recording," that the parties agree was publicly available before the priority date of the claimed invention and that meets the "generate" limitations of Claim 11. *See* Section II.E *supra*.[11] It is undisputed that Boland and Ambarella are prior art to the '954 Patent. Dkt. 875 at 1105:22-1106:2; *see* Dkt. 876 at 1332: 6-10.

---

[11] Ambarella sold at least two platforms – A5 and A5S- that had dual-encoding functionality before the priority date of the claimed invention. Either A5 or A5S would offer sufficient evidence that the "generate" limitations are in the prior art as a matter of law. *See* Section II.E *supra*; *see also* Dkt. 445 at 10; Dkt. 673; Dkt. 624-4 at 9-12. Indeed, Dr. Mander testified that Ambarella's provision of dual-

### 1.    The Disclosure of Boland in View of Ambarella Is Unrebutted

At trial, CIPH did not dispute the content of Boland and Ambarella, including their scope, content and what they teach to a person of ordinary skill in the art.  Dr. Almeroth provided an element-by-element comparison of Claim 11 to Boland with Ambarella, that was underpinned by robust disclosure from the references providing ample evidence that clearly and convincingly demonstrates Claim 11's obviousness.  The chart below contains exemplary evidence from trial demonstrating that each limitation of Claim 11 is disclosed by Boland and Ambarella.

| Claim 11 of '954 | Exemplary Evidence and Disclosure |
|---|---|
| [11.pre] A portable, point of view digital video camera, comprising:<br><br>[11.a] a lens;<br><br>[11.b] an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene; | Dr. Almeroth testified that Boland (Dkt. 881-92 (TX-2351)) discloses these limitations at, for example, Figure 2A, Abstract, ¶ 0033.  Dkt. 875 at 1107:25-1108:11.<br><br>Dr. Hu did not contest that Boland discloses these limitations.  Dkt. 876 at 1320:19-1324:18.  Additionally, both Dr. Mander, an inventor of the '954 Patent, and Dr. Hu conceded that portable point of view cameras and cameras that had a lens and an image sensor were known in the art prior to the alleged invention date. Dkt. 872 at 542:16-543:4; *see also* Dkt. 872 at 431:23-432:8. |
| [11.c] a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and | Dr. Almeroth testified that Boland (Dkt. 881-92) discloses limitation [11.c] at, for example, ¶¶ 0073, 0079, 0046.  Dkt. 875 at 1108:12-1109:10; *see also* Dkt. 886-4 at DDX-05.59.<br><br>Dr. Hu did not contest that Boland discloses limitation [11.c].  *See* Dkt. 876 at 1320:19-1324:18.  Additionally, Dr. Hu acknowledged that wireless protocol devices that could be used to send video and receive control signals were described prior to the invention. *See* Dkt. 876 at 1342:2-12. Dr. Mander testified that he did not invent wireless protocol Bluetooth devices. Dkt. 872 at 432:9-433:25. |
| [11.d] a camera processor configured to: | Dr. Almeroth testified that Boland (Dkt. 881-92) discloses limitation [11.d] at, for example, Fig. 2A, ¶¶ 0049, 0045.  Dkt. 875 at 1109:11-23; Dkt. 886-4 at DDX-05.60.<br><br>Dr. Hu did not contest that Boland discloses limitation [11.d].  *See* Dkt. 876 at 1320:19-1324:18. |

encoding technology to Contour that led him to develop a Bluetooth-based preview capable of sending 5-7 JPEG frames per second.  Dkt. 871 at 302:12-303:12, 336:11-337:15; Dkt. 872 at 429:13-430:15.

| | Additionally, Dr. Hu admitted that "[c]ameras that had an image sensor, a lens, and an image processor" were known in the art. Dkt. 872 at 543:2-4. |
|---|---|
| [11.e] receive the video image data directly or indirectly from the image sensor, | Dr. Almeroth testified that Boland (Dkt. 881-92) discloses limitation [11.e] at, for example, Figure 2A (signal line 209) as well as ¶¶ 0049, 0045. Dkt. 875 at 1109:11-23; Dkt. 886-4 at DDX-05.60.<br><br>Dr. Hu did not contest that Boland discloses limitation [11.e]. *See* Dkt. 876 at 1320:19-1324:18. |
| [11.f] generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream, | Dr. Almeroth testified that Ambarella's "dual recording" or "dual encoding" feature discloses limitation [11.f] at for example Dkt. 881-81 at 29, Dkt. 881-114 at 1. Dkt. 875 at 1115:14-25, 1117:20-1118:23; Dkt. 886-4 at DDX-05.72.<br><br>Dr. Hu admitted that the Ambarella A5 and A5s platforms with dual encoding capability was available prior to the invention, and embodied the functionality described in the "generate" limitations. Dkt. 876 at 1322:3-17, 1344:11-19; *see also* Dkt. 875 at 1007:4-1008:2. |
| [11.g] cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, | Dr. Almeroth testified that Boland (Dkt. 881-92) discloses limitation [11.g] at, for example, Fig. 3B, ¶ 0074. Dkt. 875 at 1110:8-20; Dkt. 886-4 at DDX-05.62.<br><br>Dr. Hu did not contest that Boland discloses limitation [11.g]. *See* Dkt. 876 at 1320:19-1324:18. |
| [11.h] wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting | Dr. Almeroth testified that Boland (Dkt. 881-92) discloses limitation [11.h] at, for example, ¶¶ 0011, 0063, 0059. Dkt. 875 at 1110:22-1111:25; Dkt. 886-4 at DDX-05.63.<br><br>Dr. Hu did not contest that Boland discloses limitation [11.h]. *See* Dkt. 876 at 1320:19-1324:18. |
| [11.i/j] receive the control signals from the personal portable computing device, and adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device. | Dr. Almeroth testified that Boland (Dkt. 881-92) discloses limitation [11.i/j] at, for example, ¶ 0059. Dkt. 875 at 1112:1-9, 1111:17-20; Dkt. 886-4 at DDX-05.64.<br><br>Dr. Hu did not contest that Boland discloses limitation [11.i/j]. *See* Dkt. 876 at 1320:19-1324:18. |

Dr. Almeroth's robust, element-by-element testimony demonstrates that there are no material differences between Claim 11 of the '954 Patent and the combination of Boland and Ambarella.

1    The identified disclosure of Boland and Ambarella also overlaps completely with the "three

2    key components" that Dr. Hu testified were "Contour's invention." Dkt. 876 at 1320:20-1321:8 ("One

3    is the generate term, record two videos in parallel, one of a higher quality than the other. The second

4    is wirelessly transmitting the lower-quality video directly to the smartphone. And the third component

5    is to adjust the camera settings remotely from that same smartphone.").   For example, with respect to

6    the generate term, the jury heard unrebutted evidence that the Ambarella A5 and A5s platforms both

7    enable recording a higher quality and lower quality video in parallel.  Dkt. 875 at 1117:20-8; Dkt. 881-

8    81 at 29; Dkt. 881-114 at 1.   The jury also heard unrebutted evidence that Boland discloses the ability

9    to transfer video data wirelessly from a buffer 220 or file storage 221 on the camera to a "personal

10    computing platform" such as a "desktop, laptop, [or] handheld device" via packet-based protocols

11    such as "WiFi, WiMax, etc."  Dkt.  885-5 at DDX-5.62 (citing Dkt. 881-92 at Fig. 3B, ¶ 0074); Dkt.

12    875 at 1110:8-20 ("Video data 216B may be transferred from the headset to a personal computing

13    platform, and it describes the use of WiFi between the headset and the handset.").[12]  And the jury heard

14    evidence that Boland discloses "a method of configuring a wireless communication handset to control

15    a wireless headset and receiving headset control commands issued from the handset[.]"  Dkt. 875 at

16    1110:22-1111:12; Dkt. 881-92 at ¶¶ 0011, 0059; *see also id*. at 1108:12-1109:10.

17    CIPH failed to introduce any rebuttal evidence from which the jury could reasonably conclude

18    that Boland and Ambarella did not disclose every limitation of Claim 11.  Its expert, ***Dr. Hu, never***

19    ***substantively addressed, much less disputed, the disclosure of Boland and Ambarella***.  Dkt. 876 at

20    1324:2-18.  That failing is fatal to the validity of Claim 11.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348

21    (Fed. Cir. 2007).  In *Pfizer*, the Federal Circuit made clear that once a challenger establishes a prima

22    facie case of obviousness, the patentee cannot rest on the presumption of validity alone to avoid

23    invalidity.  *Id*. at 1360 ("It is true that once a challenger has presented a prima facie case of invalidity,

24    the patentee has the burden of going forward with rebuttal evidence.").   The requirement that the

---

[12] Dr. Almeroth also testified that Boland discloses wirelessly "streaming the video frames in real time as they are recorded."  Dkt. 875 at 1108:13-1109:7; Dkt. 885-5 at DDX-5.59 (citing ¶¶ 0073, 0074, 0079, 0046) ("[W]here the wireless connection between headset 100 and the handset 201 is of sufficient bandwidth (e.g., WiFi), the video data 216A may include video frames streamed from the headset 100 (e.g., as an output from the recorded video data buffer 229 or directly from the encoded stream generated by the processor without first creating a clip file 231) which may be viewed and/or recorded to the handset 201 in substantially real time).

patentee adduce admissible rebuttal evidence is not tantamount to burden shifting but merely reflects the requirement that "the trial court . . . consider the totality of the evidence" when making a legal determination of obviousness. *Id*. Where, as in *Pfizer* and in this case, there is no rebuttal evidence as to the level of ordinary skill or the scope and disclosure of the prior art, the Court should find that the claims are obvious as a matter of law.

Similarly, where the only differences between the prior art and the claimed invention are slight or immaterial, the Federal Circuit has held that JMOL of obviousness is appropriate. For example, in *Asyst Techs., Inc. v. Empak, Inc.*, this Court entered and the Federal Circuit affirmed JMOL of obviousness based on its findings that the primary reference (Hesser) – which had been previously examined by the PTO – disclosed every element of the claimed invention except that it used a bus (rather than a multiplexer) to carry out the claimed two-way communication. No. C 98-20451 JF (HRL), 2007 U.S. Dist. LEXIS 59100, at *10, 18 (N.D. Cal. Aug. 3, 2007) (*aff'd* 544 F.3d 1310 (Fed. Cir. 2008)). Asyst did not claim to have invented a multiplexer, which was disclosed in the prior art, and its argument that it uniquely applied the claimed elements to wafer processing was immaterial to the obviousness determination. *Id*. at 17-18. Similarly, that Asyst identified certain differences in its implementation and Hessler's was insufficient to overcome a finding of obviousness because those details were not part of the asserted claims. *Id*. at 18 (finding Hesser's induction coil was "separate and apart" from the "sensing means" required by the patent); 21 (Hesser's disclosure of a means for connecting the bus to the transducer stations did not foreclose a finding that a POSITA would also know how to connect a multiplexer to Hesser's claimed system);[13] *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1245 (Fed. Cir. 2010) (finding patent invalid as a matter of law despite "slight" differences between the claimed invention and the prior art); *Metso Minerals*, 526 F. App'x at 996-97 (granting JMOL of obviousness where the only disputed limitation was not required by the claim).

This case is similar to *Asyst* insofar as CIPH's rebuttal rests exclusively on arguing that Boland was already considered by the PTO and found not to disclose a single claim limitation – i.e., it

---

[13]The Court also rejected Asyst's argument that there was no motivation to combine Hessler with the multiplexer art because Hessler already disclosed a means of communication – i.e., a bus. *Id*. at *21. The Court held that *KSR* does not require that the primary reference itself provide the motivation to combine nor can a patentee claim a "structure already known in the prior art" by "the mere substitution of one element for another known in the field." *Id*. at *21-22.

generates its lower resolution video "in serial" rather than "in parallel."  But, as in *Asyst*, CIPH does not claim to have invented generating a first and second image data stream "in parallel," and admits that this functionality was available in the prior art and present in the combination of Boland with Ambarella's A5 and A5s processors.  Dkt. 876 at 1345:9-14.  Thus, as in *Asyst*, CIPH's claims are directed to "a structure already known in prior art that is altered by the mere substitution of one element for another known in the field" without yielding any unpredictable results and, as such, is invalid as a matter of law.  *Asyst*, 2007 U.S. Dist. LEXIS 59100, at *22.

## 2.    The Motivation To Combine Is Unrebutted

The motivation to combine Boland and Ambarella is also undisputed.  Boland discloses that its processing functions, including controlling "the video data from the imaging pipeline to convert it to a compressed format that can be recorded" can be performed by a commercially available camera processor like CL9020 from CoreLogic or "any number of different application processing platforms" and "is not limited in this respect." Dkt. 875 at 1114:11-1115:13; Dkt. 885-5 at DDX-5.70 (quoting Dkt. 881-92 at ¶ 0049, ¶ 0050); *see also* Dkt. 876 at 1221:19-1222:23. As Dr. Almeroth testified, with this express teaching in mind, "a person of skill in the art would have looked across the state of the art to see what other kinds of camera processors existed" and would have recognized that both the Ambarella A5 and A5S platforms offered "dual record with preview capability." Dkt. 875 at 1114:11-1115:13; 1117:8-1118:8.  Moreover, a POSITA would have understood that Ambarella would be useful to implement Boland's live preview functionality to resolve the wireless "bandwidth" constraints identified in Boland. Dkt. 876 at 1216:5-1220:14. Indeed, both Dr. Almeroth and Dr. Hu opined that a POSITA would have sought to address wireless bandwidth limitations by sending a lower resolution video. *Id*. at 1343:7-1343:22.

This known solution to a well-understood problem was expressly articulated in Ambarella's product documentation.  By November 2008, Ambarella was selling A5 and A5S evaluation kits throughout the world that included the ability to interoperate with a wireless transmitter. Dkt. 875 at 1018:24-1020:8; Dkt. 881-100.  It was also publicly promoting the ability to "record at two resolutions and output the lower resolution over the internet" wirelessly.  Dkt. 875 at 1020:5-8.  While GoPro does not rely on Ambarella for teaching wireless transmission of video content (because Boland

discloses it), the fact that Ambarella was marketing its processor for the purpose of being used for wireless preview offers further support for motivation to combine.

The unrebutted state-of-the-art evidence further supports the motivation to combine Boland and Ambarella. Dr. Almeroth testified that the concept of live preview while recording was well established in the field of art by December 2009 and that a POSITA would have been able implement a camera processor (Ambarella) in a camera system (Boland) for the purpose of wirelessly sending video and controlling camera functionality without undue experimentation. Dkt. 875 at 1094:4-1095:10, 1114:11-1115:25; Dkt. 877 at 1417:22-1418:4. In support of his opinion, Dr. Almeroth introduced evidence of prior art products like Sony Ipela and publication art like Pressler and Boland that show that a POSITA would know both the idea of live preview while recording and the implementation details such as how to combine a camera processor with the other camera system components and how to wirelessly transmit video. [14] *Id*; *Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1366, 1375 (Fed. Cir. 2020); *Asyst*, 2007 U.S. Dist. LEXIS 59100, at *22. The state-of-the-art evidence supports a finding that a POSITA would have been motivated to use the Ambarella A5 or A5S (one of a limited number of commercially-available SOCs) to generate multiple video streams of varying qualities in Boland's system, which discloses saving/recording, wirelessly transmitting, and using the video as a preview,[15] with a reasonable expectation of success. A reasonable jury could only have concluded that a POSITA would have been motivated to combine Boland and Ambarella to reach the claimed invention.

### C.    The Trial Record Requires a Finding That Claim 11 Is Anticipated and/or Obvious in View of Woodman

The evidence presented at trial also demonstrates that Claim 11 of the '954 Patent is invalid in view of Mr. Woodman's prior invention ("Woodman"). Under 102(g), a patent may be invalidated if "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). Here, CIPH never challenged Woodman's disclosure of the claim

---

[14] Dr. Mander alsotestified that the concept of wirelessly transmitting video was known in the art and further testified that the A5 chip, which was invented by Ambarella, provided the ability to output a higher-quality video stream and a lower-quality video stream. Dkt. 872 at 434:11-17, 435:10-19.

[15] The claims do not expressly require live preview while recording and CIPH has argued that the video generated by the camera processor never has to be streamed in real time. *See* Section II.D.

limitations (nor could they since the Court found that the HERO2 + WiFi BacPac practices the claimed invention as a matter of law). It only disputed whether Woodman constitutes relevant prior art - *i.e.*, whether Woodman conceived of the invention before the Contour inventors and thereafter diligently reduced it to practice. The jury resolved that question when it found Claim 12 of the '954 Patent and Claim 6 of the '694 Patent invalid as anticipated by Woodman.[16] Necessarily implicit in the jury's conclusion is that Woodman predates the claimed invention was not abandoned, suppressed or concealed. Thus, the only way to reconcile the jury's verdict is to find Claim 11 invalid as well.

### 1.    The Evidence of Prior Conception Is Unrebutted

Holding Claim 11 invalid is the only conclusion consistent with the evidentiary record. At trial, Dr. Almeroth showed how Mr. Woodman's testimony and the contemporaneous documents clearly and convincingly demonstrated prior conception on an element-by-element basis. *See, e.g.*,

| Claim 11 of '954 | Exemplary Evidence and Disclosure |
|---|---|
| [11.pre] A portable, point of view digital video camera, comprising:<br><br>[11.a] a lens;<br><br>[11.b] an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene; | Dr. Almeroth testified that Mr. Woodman conceived elements 11.pre through 11.b, based on Mr. Woodman's testimony and as shown in the Woodman Patent as well as GoPro's earlier camera products. Dkt. 875 at 1123:7-20; Dkt. 881-93 at Face; Dkt. 886-4 at DDX-05.79; *see also* Dkt. 873 at 650:18-651:12. |
| [11.c] a wireless connection protocol device configured to send real time image content by wireless transmission directly and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and | Dr. Almeroth testified that Mr. Woodman conceived elements [11.c] based on Mr. Woodman's testimony and as shown in the Woodman Patent. Dkt. 875 at 1124:2-24; Dkt. 881-93 at 7:20-33, Fig. 6, 7:34-52; Dkt. 886-4 at DDX-05.81; *see also* Dkt. 873 at 651:6-22, 652:19-653:22. |
| [11.d] a camera processor configured to:<br><br>[11.e] receive the video image data directly or indirectly from the image sensor,<br><br>[11.f] generate from the video image data a first image data stream and a second image data stream, | Dr. Almeroth testified that Mr. Woodman conceived the processor limitations in elements [11.d] through [11.g] based on Mr. Woodman's testimony and as shown in the January 2009 GoPro Hero HD camera system proposal ("GoPro Spec") as well as emails showing Mr. Woodman's contemplation of the use of the Ambarella |

---

[16] The jury found all asserted claims except Claim 11 invalid as anticipated, and Woodman is the only anticipatory ground presented by GoPro at trial.

| | |
|---|---|
| wherein the second image data stream is a higher quality than the first image data stream, [11.g] cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device, | platform. Dkt. 875 at 1124:25-1126:5; Dkt. 881-27 at 7, 20; Dkt. 881-32 at 1-2; Dkt. 881-93 at 7:20-33; *see also* Dkt. 873 653:3-655:22, 656:12-657:5, 666:4-667:17. |
| [11.h] wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting [11.i/j] receive the control signals from the personal portable computing device, and adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device. | Dr. Almeroth testified that Mr. Woodman conceived elements [11.h] through [11.j] based on Mr. Woodman's testimony and as shown in the GoPro Spec and GoPro emails with Ambarella. Dkt. 875 at 1126:21-1127:1; Dkt. 881-27 at 7, 20; Dkt. 881-32 at 1-2; Dkt. 881-93 at 7:34-52; *see also* Dkt. 873 at 665:235-23, 659:6-660:11. |

CIPH and its expert failed to rebut Dr. Almeroth's mapping of Woodman (as evidenced by the disclosures of the Woodman Patent and GoPro specification) to the claims. At most, Dr. Hu opined that a GoPro remote control product specification (Dkt. 881-96) suggests that GoPro was also working on a "picture preview," and not just a video preview. Dkt. 876 at 1325:18-11; Dkt. 881-96 at 1. Dr. Hu's opinion is irrelevant because the cited document relates to a remote control, and not to the GoPro camera or Wi-Fi BacPac module that forms the basis of the Woodman prior invention. Dkt. 876 at 1353:20-1354:17. Additionally, the explicit disclosure of video preview in the Woodman Patent and GoPro specification makes any additional discussion of separate "picture preview" functionality irrelevant to conception as a matter of law. Dkt. 877 at 1433:6-1434:6; *see also* Dkt. 873 at 600:14-601:10 (describing "video" and "picture" preview as two alternatives being explored by GoPro).

## 2. GoPro Introduced Substantial Evidence of Diligence

In addition to proving earlier conception, GoPro also demonstrated that it was diligent in reducing Mr. Woodman's invention to practice. To establish diligence in reduction to practice, the "basic inquiry" is whether the record reflects "reasonably continuing activity to reduce the invention to practice." *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 975 (Fed. Cir. 2014). Diligence does not require the inventors to work on their invention every day; "periods of

1    inactivity within the critical period do not automatically vanquish" a claim of reasonable diligence. *Id.*

2    (citations omitted).  Nor is diligence "negated if the inventor works on improvements and evaluates

3    alternatives while developing the invention."  *In re Jolley*, 308 F.3d 1317, 1328 (Fed. Cir. 2002).

4        GoPro presented testimony from Mr. Woodman and Mr. Donovan, a multiplicity of

5    documents, including engineering specifications and emails, as well as physical devices showing

6    GoPro's ongoing efforts to reduce the claimed invention to practice.  *See, e.g.*, Dkt. 881-107, Dkt.

7    881-32, Dkt. 881-103, Dkt. 881-98, Dkt. 881-97, Dkt. 881-111. For example, Mr. Woodman testified

8    that after conception in or around January 2009, GoPro continued to work on developing the idea of a

9    wireless preview and remote control until GoPro was able to introduce HERO2 with the Wi-Fi Bac

10   Pac in June 2012.  Dkt. 873 at 669:21-691:22. Mr. Donovan further explained that initial efforts

11   focused on adding an RF transceiver to transmit a low-resolution preview via radio, but GoPro later

12   decided that using a different wireless transmission standard (Wi-Fi) would allow it to establish a more

13   robust, sustainable connection.  Dkt. 868-6 at 73:03-73:22. Both of those efforts show diligence

14   because the claims are not limited to any particular wireless protocol.

15       At trial, CIPH's counsel argued that GoPro failed to introduce evidence to show ongoing

16   diligence in 2010, but that conjecture defies the unrebutted testimony of Mr. Woodman and Mr.

17   Donovan as well as the documentary evidence such as the WiFi BacPac Product Requirements

18   Document. Dkt. 873 at 688:22-690:9; Dkt. 881-94; Dkt. 868-6 at 73:03-73:22. CIPH's own expert

19   stated that she had examined prototypes from 2010, belying any finding that GoPro had stopped

20   working on implementing wireless capability in its cameras.  Dkt. 876 at 1349:9-15.  CIPH's fact

21   witnesses also testified that it was not unusual to take several years to develop a product from an idea

22   – and that failure to commercialize a product in 3-4 years is not evidence of lack of diligence.  Dkt.

23   868-3 at 43:02-43:09, 51:19-52:15, 53:12-16; Dkt. 872 at 516:3-10.[17]  Thus, the jury had a reasonable

24   basis to conclude that Mr. Woodman was diligent in reducing his prior invention to practice.

25       **3.    There Is No Basis to Find Abandonment or Concealment of Woodman**

26   _____

27   [17] As Dr. Almeroth pointed out, the absence of substantial documentary evidence from 15 years ago
     does not undermine a finding of diligence because a person in the industry would understand that work
     had to be ongoing during that period of time in order to result in the HERO2 + Wi-Fi BacPac, released

28   in June 2012.  Notably, CIPH did not produce any of its original prototypes or introduce more than
     three contemporaneous documents to support its conception of the claimed invention either.

1    Finally, there is no evidence that Mr. Woodman abandoned his prior invention.  Since GoPro

2   established a prima facia case of prior invention, the burden shifts to CIPH to produce evidence of

3   abandonment, suppression or concealment of the invention.  *Dow Chem. Co. v. Astro-Valcour, Inc.*,

4   267 F.3d 1334, 1339 (Fed. Cir. 2001) (citing *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1037-

5   38 (Fed. Cir. 2001)).  CIPH offered no such evidence.

6    CIPH's argument that GoPro "abandoned" the invention merely because it coextensively

7   considered other design options and developed other products is unsupported by law or logic.  As

8   explained in *Dow Chemical*, abandonment, suppression or concealment requires either an active effort

9   to withhold the invention from the public or circumstantial evidence of "unreasonable delay in making

10  the invention publicly known."  *Dow Chem.*, 93 F.3d at 1342.  Where, as here, the evidence shows

11  that a prior inventor not only filed public disclosures (*e.g.*, patent applications) but also eventually

12  released a commercial product "two and one half years" after conception, the Federal Circuit has found

13  that the prior invention invalidating as a matter of law.  *Id*. at 1343.

14          **D.    There Is No Secondary Indicia Evidence That Overcomes Obviousness**

15   The minimal secondary indicia evidence adduced by CIPH at trial cannot overcome the strong

16  showing that Claim 11 is obvious over Boland and Ambarella and/or the Woodman Invention.

17  *Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010) (quoting

18  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007)) ("Here, where the inventions represented no

19  more than 'the predictable use of prior art elements according to their established functions,' . . . the

20  secondary considerations . . . are inadequate to establish nonobviousness as a matter of law.").  This

21  is particularly true because CIPH made no effort to establish the requisite nexus between any

22  secondary indicia evidence and the claimed invention.  Secondary indicia is irrelevant absent a legally

23  and factually sufficient connection between the evidence and the patented invention.  *Henny Penny*

24  *Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von*

25  *Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)).[18]  CIPH has not carried its burden

26

27

28
_____
[18] The evidence of the CES award, notebooks.com award, and Red Dot award also cannot overcome
the strong showing of obviousness because there was no evidence proffered to create a nexus between
these awards and the Asserted Claims.  *See, e.g.*, Dkt. 871 at 365:23-370:25.

1    to identify *any* relevant secondary indicia, much less evidence sufficient to overcome the strong

2    showing of obviousness in the record.

3        During her direct testimony, the only secondary indicia factor that Dr. Hu expressly identified

4    was "failure of others." Dkt. 876 at 1331:17-1332:10. Her only support for this factor is that GoPro's

5    first accused product was sold in 2012, approximately a year after Contour introduced its first

6    practicing product. *Id*. at 1331:11-22. Dr. Hu's conclusion is inconsistent with the law, which requires

7    that "failure of others" evidence demonstrate directly or indirectly some "significant defect in the prior

8    art." *Eurand, Inc. v. Mylan Pharms., Inc.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012). Here, there is no

9    defect in the prior art – to the contrary, Dr. Hu never rebutted Dr. Almeroth's extensive presentation

10   of state-of-the-art evidence showing that video cameras with wireless preview and remote-control

11   functionalities were well established in the field. Dkt. 875 at 1094:24-17; 1094:18-1095:11; Dkt. 881-

12   92 at Fig. 3A, ¶ 0009; Dkt. 881-120 at Fig. 12. It is undisputed that both the idea of live preview as

13   well as wireless control of camera settings were well-known in the field and were available in various

14   different implementations including in Sony and Pressler. Moreover, the "difficulty" that Dr. Hu

15   identified relates exclusively to unclaimed elements such as developing a Bluetooth driver and

16   overcoming Apple's security limitations. Dkt. 876 at 1322:21-25. Thus, this alleged indicia cannot

17   outweigh the overwhelming evidence of obviousness. *See Wyers*, 616 F.3d at 1242.

18       CIPH's counsel also argued that GoPro "copied" the Contour GPS+. Notably, CIPH's expert

19   did not render any opinion tying the alleged copying evidence to any showing of non-obviousness.

20   Absent any nexus between the alleged evidence of copying and the patent claims, CIPH's lawyer-

21   based allegations must be disregarded. *See, e.g.*, Dkt. 876 1324:19-1332:10; *Henny Penny*, 938 F.3d

22   at 1332. Moreover, there is no cognizable evidence of "copying" at all. At most, CIPH can show that

23   GoPro purchased the ContourGPS+ from the market and took it apart– a practice Contour's own

24   founder testified was common in the industry and something Contour itself did with GoPro products.

25   Dkt. 868-2 (Green) 90:12-91:10. CIPH does not identify any particular invention that GoPro copied –

26   nor could it because GoPro's products use a different wireless standard to transmit video and control

27   signals ***and*** both parties use Ambarella camera processors in their products (which CIPH does not

28   claim to have invented). Dkt. 875 at 1221:25-1122:5. As this Court already found, at most, a jury

could perhaps infer from the evidence that GoPro was interested in Contour's implementation of wireless preview – but those implementation details are not claimed in the Asserted Patents.  Dkt. 673 at 13.  CIPH's own witnesses acknowledged that there is no evidence that GoPro copied any proprietary aspect of Contour's products such as its source code or confidential designs. Dkt. 872 at 426:2-427:5. In the absence of evidence that GoPro copied the claimed invention, evidence that GoPro purchased Contour products does not support any allegation of copying and fall short of overcoming the compelling showing of invalidity.

### E.    In The Alternative, The Court Must Order a New Trial on Invalidity

The evidence in the trial record compels the conclusion that Claim 11 is invalid as a matter of law.  However, to the extent the Court finds the evidence at trial was such that "the jury could have rationally reached either verdict"—that Claim 11 is valid or invalid – then a new trial on invalidity is required. The Federal Circuit squarely addressed this circumstance in *Callaway,* 576 F.3d at 1344. There, the jury verdicts were inconsistent in the same way they were here: the jury found an independent claim not invalid and a dependent claim invalid.  *Id.*  Because the Court concluded that the evidence adduced at trial might support either validity or invalidity, the Federal Circuit held the verdict to be irreconcilably inconsistent and remanded for a new trial. *Id*. at 1345.  Here, the record only supports one conclusion (that Claim 11 is invalid) but to the extent the Court finds there is evidence in the record to reasonably support a conclusion that Claim 11 is either invalid or not invalid, then the only appropriate remedy is a new trial on invalidity.[19]

## V.    CONCLUSION

For the foregoing reasons, GoPro respectfully requests entry of judgment as a matter of law that Claim 11 of the '954 Patent is invalid as anticipated and/or obvious. Alternatively, GoPro respectfully requests a new trial on invalidity.

---

[19] GoPro respectfully requests that the court also conditionally grant its motion for a new trial pursuant to Fed. R. Civ. P. 50(c) and Fed. R. Civ. P. 59 in the event that the order granting JMOL is vacated or reversed on appeal.  *Asyst Techs.,* 544 F.3d 1310, 1313 (Fed. Cir. 2008).

1

Dated: December 17, 2025         BY:

**ALSTON & BIRD LLP**
*/s/ Michelle Ann Clark*

2

Michelle Ann Clark (SBN 243777)
Philip C. Ducker (SBN 262644)
Dana Zottola (SBN 346715)

3

**ALSTON & BIRD LLP**
55 Second Street, Suite 2100

4

San Francisco, California 94105-0912
Telephone: (415) 243-1000

5

Facsimile: (415) 243-1001
michelle.clark@alston.com

6

phil.ducker@alston.com
dana.zottola@alston.com

7

8

JOHN D. HAYNES (admitted *pro hac vice*)
Sloane S. Kyrazis (admitted *pro hac vice*)

9

**ALSTON & BIRD LLP**
One Atlantic Center

10

1201 West Peachtree Street
Atlanta, GA 30309-3424

11

Telephone:    404-881-7000
Facsimile:    404-881-7777

12

john.haynes@alston.com
sloane.kyrazis@alston.com

13

Karlee N. Wroblewski (admitted *pro hac vice*)

14

**ALSTON & BIRD LLP**
Bank of America Plaza

15

Suite 4000
101 South Tryon Street

16

Charlotte, NC 28280-4000
Telephone:    (704) 444-1000

17

Facsimile:    (704) 444-1111
karlee.wroblewski@alston.com

18

Elliott C. Riches (admitted *pro hac vice*)

19

**ALSTON & BIRD LLP**
2200 Ross Avenue

20

Suite 2300
Dallas, TX 75201

21

Telephone:    (214) 922-3492
elliott.riches@alston.com

22

23

24

25

26

27

28

1

## **<u>CERTIFICATE OF SERVICES</u>**

2

Pursuant to the Federal Rules of Civil Procedure and Civil L.R. 5, I hereby certify that, on

3

December 17, 2025, all counsel of record who have appeared in this case were served with a copy of

4

the foregoing via ECF.

5

                    */s/ Michelle Ann Clark*

6

                    Michelle Ann Clark

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28