John R. Keville *(Pro Hac Vice)*

*jkeville@sheppardmullin.com*
Michelle C. Replogle (Pro Hac Vice)
*mreplogle@sheppardmullin.com*
Michael C. Krill *(Pro Hac Vice)*
*mkrill@sheppardmullin.com*
Sunny Akarapu *(Pro Hac Vice)*
*sakarapu@sheppardmullin.com*
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
845 Texas Avenue, 25th Floor
Houston, Texas 77002-2791
Telephone: (713) 431-7100
Facsimile: (713) 431-7024

Lai L. Yip (SBN 258029)
*lyip@sheppardmullin.com*
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
Four Embarcadero Center Seventeenth Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 875-6700

Attorneys for Plaintiff,
CONTOUR IP HOLDING, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONTOUR IP HOLDING, LLC,<br><br>            Plaintiff,<br><br>    vs.<br><br>GOPRO, INC.,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CONSOLIDATED**<br>Lead Case No. 17-cv-04738-WHO<br>Consolidated Case No. 21-cv-02143-WHO<br><br>**CONTOUR'S OPPOSITION TO DEFENDANT GOPRO INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR NEW TRIAL**<br><br>Judge: William H. Orrick<br>Date: March 11, 2026<br>Time: 2:00 p.m.<br>Location: Courtroom 2, 17th Floor |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................1

II. BACKGROUND ..................................................................................................2

    A. Yet Again, GoPro Tries To Alter The Court's Construction Of "Generate".................2

    B. GoPro Misrepresents The *Contour III* Case History, Including The Rulings On GoPro's Motion For Summary Judgment Of Invalidity .........................................4

    C. GoPro Ignores The Substantial Evidence At Trial Rebutting Invalidity .....................7

III. LEGAL STANDARDS ........................................................................................7

IV. ARGUMENT ......................................................................................................7

    A. The Verdict Is Wholly Inconsistent and Can Only Be "Reconciled" with a New Trial on All Verdict Issues .........................................................................7

    B. Substantial Evidence Supports The Jury's Verdict That Claim 11 Is Not Obvious Over The Combination Of Boland And Ambarella .......................................9

        1. The Gap In The Prior Art—Boland does not disclose sending "real time image content by wireless transmission directly to … a personal portable computing device," and GoPro does not rely on Ambarella. ..............9

        2. Lack Of Motivation To Combine—A POSITA would not have been motivated to combine Boland and Ambarella and arrive at the claimed invention with a reasonable expectation of success.........................................12

        3. Secondary considerations defeat obviousness .................................................17

            a) Industry Praise ..................................................................................17

            b) Failure of Others ..............................................................................19

            c) Copying.............................................................................................20

    C. Substantial Evidence Supports The Jury's Verdict That Claim 11 Is Not Anticipated Or Obvious Over The Alleged "Woodman Prior Invention"..................21

V. CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Adidas AG v. Nike, Inc.*
  963 F.3d 1355 (Fed. Cir. 2020) ........................................................................13

*Apple Inc. v. Samsung Elecs. Co.*
  839 F.3d 1034 (Fed. Cir. 2016) ......................................7, 10, 13, 17, 18, 19, 21

*Application of Nelson*,
  420 F.2d 1079 (C.C.P.A. 1970) .......................................................................25

*Brown v. Barbacid*
  436 F.3d 1376 (Fed. Cir. 2006) ........................................................................24

*Callaway Golf Co. v. Acushnet Co.*
  576 F.3d 1331 (Fed. Cir. 2009) ..........................................................................9

*Correge v. Murphy*
  705 F.2d 1326 (Fed. Cir. 1983) ........................................................................25

*Creative Compounds, LLC v. Starmark Lab'ys*
  651 F.3d 1303 (Fed. Cir. 2011) ........................................................................24

*Cyntec Co., Ltd. v. Chilisin Elecs. Corp.*
  84 F.4th 979 (Fed. Cir. 2023) .............................................................................7

*Dow Chem. Co. v. Astro-Valcour, Inc.*
  267 F.3d 1334 (Fed. Cir. 2001) ........................................................................25

*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*
  2012 WL 604138 (E.D. Cal. Feb. 23, 2012) ......................................................9

*Eurand, Inc. v. Mylan Pharms., Inc.*
  676 F.3d 1063 (Fed. Cir. 2012) ........................................................................20

*Fitzgerald v. Arbib*
  268 F.2d 763 (C.C.P.A. 1959) ..........................................................................24

*Gould v. Schawlow*
  363 F.2d 908 (C.C.P.A. 1966) ..........................................................................25

*Griffith v. Kanamaru*
  816 F.2d 624 (Fed. Cir. 1987) ..........................................................................24

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*
  70 F.4th 1331 (Fed. Cir. 2023) .........................................................................13

*In re Meyer Mfg. Corp.*
   411 F. App'x 316 (Fed. Cir. 2010) ........................................................................24

*Monroe v. City of Phoenix*
   248 F.3d 851 (9th Cir. 2001) ...............................................................................7

*Morway v. Bondi*
   203 F.2d 742 (C.C.P.A. 1953) .............................................................................25

*Motorola Mobility LLC v. Largan Precision Co.*
   No. 2024-1414, 2025 WL 2642194 (Fed. Cir. Sept. 15, 2025) ............................15

*Regents of Univ. of California v. Broad Inst., Inc.*
   903 F.3d 1286 (Fed. Cir. 2018)......................................................................12, 13

*Sonos, Inc. v. D & M Holdings Inc.*
   297 F. Supp. 3d 501 (D. Del. 2017)....................................................................21

*Symbol Techs., Inc. v. Opticon, Inc.*
   935 F.2d 1569 (Fed. Cir. 1991)..........................................................................20

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*
   699 F.3d 1340 (Fed. Cir. 2012)..........................................................................17

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*
   308 F.3d 1167 (Fed. Cir. 2002)..........................................................................22

**Statutes**

35 U.S. Code § 102(g) ................................................................................1, 2, 21, 22

1   **I.     INTRODUCTION**

2          Recognizing that the jury's verdict is inconsistent, GoPro wrongly urges the Court to

3   "reconcile" the verdict by "find[ing] Claim 11 invalid." Mot. at 1.  But this would not "reconcile" the

4   verdict because the inconsistencies in the verdict go well beyond claim 11.  Further, JMOL cannot be

5   granted simply because GoPro mistakenly believes that it would "reconcile" a wholly inconsistent

6   verdict in its favor.  Rather, JMOL must be denied because there is more than substantial evidence

7   supporting the jury's verdict that claim 11 is valid.

8          In what is a consistent-but-inaccurate refrain, GoPro claims it "presented unrefuted evidence

9   that every claim element is disclosed in the combination of Boland and Ambarella." Mot. at 1.  Not

10  so.  GoPro failed to put forward a prima facie case of obviousness, and the evidence it did put forward

11  was rebutted.  For example, GoPro relies on Boland for "a wireless connection protocol device

12  configured to send ***real time*** image content by wireless transmission ***directly*** to … a personal portable

13  computing device," but GoPro never put in evidence to show that Boland discloses this element.

14  GoPro also failed to show, as required to overturn a jury verdict, that a reasonable juror could only

15  conclude that a POSITA would have been motivated to combine Boland and Ambarella and to further

16  modify the Boland-Ambarella combination to arrive at the claimed invention, much less to do so with

17  a reasonable expectation of success.  Moreover, Contour's expert Dr. Hu expressly rebutted GoPro's

18  evidence and argument concerning Boland and Ambarella, as well as the motivation to combine.  *See*

19  Trial Tr. at 1320:20–1324:18.  From Dr. Hu's testimony and other evidence, there was substantial

20  evidence from which the jury could have and did correctly find that (1) Boland and Ambarella did not

21  disclose all claim elements, (2) a POSITA would not have had a motivation to combine them and

22  modify them in the claimed manner, (3) a POSITA would not have had a reasonable expectation of

23  success, and/or (4) secondary considerations outweigh obviousness.

24         GoPro's second argument, regarding its § 102(g) defense based on the HERO2 with WiFi

25  BacPac—which GoPro reverts to calling the "Woodman prior invention" after walking away from this

26  phrase at trial (*see* Trial Tr. at 1369:5–1370:1)—fails for similar reasons.  Contrary to GoPro's claim,

27  the jury did not find that the HERO2 with Wi-Fi BacPac was a prior invention to claim 11 under

28  § 102(g).  Indeed, the jury was instructed that the HERO2 with Wi-Fi BacPac already met all elements

of claim 11 (Dkt. 859 at 19), so the only question for the jury to resolve on anticipation of claim 11 was whether the HERO2 with Wi-Fi BacPac was a prior invention. Because the jury found that claim 11 was **not** anticipated, the jury necessarily found that the HERO2 with Wi-Fi BacPac was **not** a prior invention, presumably for lack of diligence or abandonment. *See* Dkt. 901 at 14–15. The jury's verdict in this regard is supported by substantial evidence. Indeed, GoPro identifies no evidence that it was working on reducing the invention to practice from at least October 2009 to January 2011. This prolonged period of inactivity is more than substantial evidence supporting the jury's verdict; in fact, it compels a finding that the HERO2 with WiFi BacPac is **not** a prior invention. *See id.* at 22–24.

Accordingly, GoPro's JMOLs that claim 11 is invalid should be denied. Recognizing that possibility, GoPro makes a cursory request for a new trial on validity of claim 11 only. This ignores the multiple other inconsistencies in the verdict and could not result in a consistent final judgment. As just one example, a retrial on claim 11 cannot resolve the inconsistency in the verdict that HERO2 with WiFi BacPac does **not** include all elements of '954 patent claim 12 or '694 patent claim 6 for infringement, but it does include all elements of '954 patent claim 12 and '694 patent claim 6 for anticipation. Hence, a new trial is necessary on all issues. *See* Dkt. 901 at 13–17.

## II.    BACKGROUND

### A.    Yet Again, GoPro Tries To Alter The Court's Construction Of "Generate"

As construed by the Court, claim 11 of the '954 patent recites "a camera processor configured to" (1) "receive **the video image data** directly or indirectly from the image sensor," and (2) "generate [record **in parallel**] from **the video image data** a first image data stream and a second image data stream." *See* Dkt. 251 at 13. As the Court reasoned, "the 'in parallel' language applies to all the claim terms and was a distinguishing trait when overcoming prior art" (*id.*), namely the Boland reference. During the *inter partes* review ("IPR") of the '954 patent, the Board found that the following diagram "accurately depicts the process" recited in the claims, where "low resolution video and high resolution video are both generated from the real-time video image data of the scene," as follows:



1    Dkt. 545-8 at 31.  The Board also found that the following diagram "is consistent with Boland's
2    description of 'preview' video," where the "low resolution "preview" video is generated later in series
3    from the previously-stored encoded video data 225, not from the initial input image signal 209:



7    *Id*.  Hence, Contour's invention generates a high-resolution stream and a low-resolution stream ***in***
8    ***parallel*** "from the same video image data," whereas Boland creates a low-resolution stream from a
9    high-resolution stream ***in series***.  *See id*. at 27–28 (the Board agreeing with Contour that "Boland's
10   preview is created in serial with the encoded video data from the processor—not in parallel").

11         Several times since the Court's 2018 construction, GoPro and its expert Dr. Almeroth have
12   sought to change the generate construction to bolster GoPro's noninfringement and invalidity
13   defenses.  First, during summary judgment, Dr. Almeroth opined there was no infringement because
14   the accused products did not "generate [record in parallel] from the video image data" on account of
15   pre-processing of the "video image data" before the parallel generation of the high-resolution and low-
16   resolution streams, such that the low-resolution stream was not created ***from the video image data***.
17   Dkt. 398-2 at 6–7, 10–16.  The Court rejected Dr. Almeroth's re-interpretation of "generate" and
18   granted summary judgment in August 2020, explaining that:

19         Almeroth's opinion improperly deviates from the plain and ordinary meaning of
           the term "from the video image data" and instead reads in a new limitation that
20         GoPro failed to seek during claim construction in 2018 or advocate at other stages
           of the parties' years-long dispute.  Almeroth's opinion requires that "from" have
21         a specialized meaning that narrows its plain and ordinary meaning; according to
           him, for the generated data to be "from the video image data," it must "correspond"
22         to the video image data and be without material alterations.  In so doing,
           Almeroth's noninfringement opinion implicitly adds a negative limitation to the
23         claim, newly requiring that the video image data not undergo substantial or
           fundamental changes during processing.  Claim 11 says nothing about processing
24         or alteration, and the plain language of "from the video image data" indicates
           nothing about processing or alteration. …
25
26         As further evidence that Almeroth's opinion reads in a negative limitation,
           Almeroth supports his conclusion by citing extrinsic evidence that Contour
27         purportedly narrowed the meaning of claim 11 during IPR. [FN2. Contour disputes
           that it took a contrary position during IPR; instead, it argued that Boland prior art
28         was distinct because it ***stored*** the data before going back to it.]

1    Dkt. 445 at 7–8.  The Court struck "Almeroth's opinions as improper" and granted summary judgment

2    that the *Contour I* products infringe, finding that "[t]he undisputed fact that the video image data is

3    altered during processing does not mean that any claim limitation is not met."  *Id*. at 9–10.[1]

4        Second, in January 2021, the Court granted Contour's Motion *in Limine* ("MIL") No. 1 to

5    preclude GoPro from arguing the "generate" limitation as to infringement.  Dkt. 510 at 1–2.  At the

6    same time, the Court denied GoPro's MIL No. 10 seeking to exclude Dr. Hu's opinion that Boland

7    does not meet the generate term because "Boland uses a serial generation process, not a parallel one."

8    Dkt. 510 at 12–13.  The Court faulted GoPro for raising these issues as "not ideal for a motion in

9    limine," and further found that this distinction between Boland and the invention does not "contradict

10   my rejection of GoPro's no-processing argument at summary judgment."  *Id*. at 13.

11       Third, GoPro sought a "clarification" of the Court's construction of the generate term, arguing

12   that the Court's summary judgment ruling of infringement amended the construction.  Dkt. 545 at 12–

13   25.  According to GoPro, Contour's position that "Boland can be distinguished … rests on an

14   interpretation of the claims, rejected by this Court" when granting summary judgment of infringement.

15   *Id*. at 20.  The Court rejected GoPro's attempt, noting the Court "did not change the construction….

16   To the contrary, I rejected GoPro's attempt to effectively change the construction."  Dkt. 555 at 22.

17       Now, in post-trial, GoPro argues for *at least* the fourth time that the Court's summary judgment

18   ruling altered the construction of "generate" such that under "the Court's construction … there was no

19   material distinction between the practicing products and the prior art [i.e., Boland] as a matter of law."

20   Mot. at 5.  GoPro's latest attempt to change the "generate" construction should be rejected as before.

   **B.    GoPro Misrepresents The *Contour III* Case History, Including The Rulings On GoPro's Motion For Summary Judgment Of Invalidity**

23       GoPro's brief claims that "the Court allowed CIPH to add [HERO11 Black, HERO11 Black

24   Mini, HERO12, HERO13, and HERO 4k] products based on its representation that the products (and

---

[1]    According to GoPro, "the Court recognized that GoPro's accused 'camera processors down-sample' 'the high-resolution video to create the low-resolution video'" (Mot. at 4), but this is false. Instead, the Court **acknowledged** that this was GoPro's argument, and then **rejected** GoPro's argument because no evidence showed that the "high-resolution video" is used to "create the low-resolution video" in series, such as in Boland.  *See* Dkt. 445 at 10.

the infringement theories relating thereto) were the same as the previously accused products." Dkt. 900 at 6-7. That is not accurate. On remand, Contour requested "supplemental fact and expert discovery" on GoPro's products that were released during appeal. Dkt. 690 at 7–8. GoPro objected, arguing that "Contour's proposed addition of a host of new products would, in effect, be an entirely new case." *Id*. at 9. As Contour explained, GoPro made this same argument when Contour sought to add the *Contour II* products in 2020, but "GoPro's newly-accused products [in *Contour II*] were insubstantially different from the already-accused products [in *Contour I*] and infringed the same claims under the same theories." *Id*. at 8. Despite this, "GoPro confirmed that it has performed no investigation whatsoever into whether any of the accused features have been changed or removed in the new GoPro products" in *Contour III*. Thus, whether the *Contour III* products were the same as the *Contour I & II* products was not known, but importantly, GoPro failed to identify any such differences, so GoPro had no basis to claim that adding the new products would be an "entirely new case." *Id*. The Court then held that the new GoPro cameras "will be included in this case." *See* Dkt. 691.

GoPro's recitation of the summary judgment ruling is also inaccurate. After the Court allowed GoPro to amend its invalidity defenses, GoPro moved for summary judgment on the combination of Boland and Ambarella, which the Court denied. Dkt. 843 at 8. GoPro asserts that Contour "did not dispute that Boland discloses all limitations except the generate limitations and that Ambarella discloses the generate limitations" during summary judgment (Mot. at 7), but Contour specifically raised the following additional fact disputes:

- "Dr. Hu made clear that the Ambarella A5 chip does not meet the generate limitation unless the camera maker has the software specifically configured so that the processor operates in this way [recited by the claims]." Dkt. 787 at 14.

- "Dr. Almeroth and Dr. Hu also disagree whether Boland discloses the '954 patent's claim 11 limitation 'cause the wireless connection protocol device to send the first image data stream . . . ,' as well as the corresponding limitation in the '694 patent." *Id*. at 15.

- "Dr. Almeroth and Dr. Hu disagree whether Boland suggests that one can start or stop recording 'while using the preview functionality,'" related to the '694 claim 6. *Id*.

- "Dr. Almeroth and Dr. Hu disagree on the scope of Boland's streaming application, whether Dr. Almeroth mischaracterizes Boland's reference to a single stream that is 'concurrently communicated' to multiple locations, and whether it has any bearing on Contour's patent claims." *Id*. at 16.

- "[T]here is a very significant fact issue as to the scope of what is the Ambarella A5 prior art" given that, "according to GoPro, 'Ambarella' includes 'development and product' for three A5 chips each released on different dates and having different features, plus 'any systems to test and/or demonstrate any of the A5 platform SoC', over a thousand pages of deposition, almost twenty-thousand pages of confidential documents, and an unknown number of unidentified documents, things, source code, and systems." *Id*. at 16–17.

- "[T]he A5S was released too late to be prior art." *Id*. at 17–18.

- GoPro states that "Ambarella had a protocol for transmitting video wirelessly in December 2009," which Dr. Hu rebutted. *Id*. at 18.

The Court denied summary judgment because "too many factual discrepancies exist" including (1) "[t]he parties' experts dispute *the scope* of Boland and Ambarella prior art and whether *either* (or both, combined) discloses *the claim limitations*"; (2) "whether one chip, the Ambarella A5S chip, is prior art in the first instance"; and (3) "secondary indicia highlighted by Dr. Hu tends to demonstrate a lack of obviousness."  Dkt. 843 at 8.  Hence, GoPro is wrong that the only "material dispute" found by the Court was "whether Ambarella's A5S platform … constitutes prior art as well as whether [Contour's] secondary indicia evidence supports a finding of non-obviousness."  Mot. at 7.

GoPro is also wrong that Contour "has no admissible opinions or evidence against the motivation to combine Boland with Ambarella's A5 prior art system—a combination uniquely presented in Dr. Almeroth's July 23, 2025 expert report."  Mot. at 7.  Dr. Hu's June 2020 rebuttal report addressed Boland, Ambarella, and Boland in combination with Ambarella.  Dkt. 787-9 at ¶¶ 105, 304–317.  Dr. Hu's June 2021 rebuttal report also addressed Looxcie (i.e., the commercial embodiment of the Boland patent application), including Boland as evidence of Looxcie, as well as Looxcie/Boland in combination with Ambarella.  Ex. A, Hu 11/19/2021 Report, at ¶¶ 205–207 (Dr. Hu: "Looxcie is cumulative of Boland"); *id*. at ¶¶ 267–272 (Dr. Hu opining on combination of "Looxcie + Ambarella").  Further, GoPro's MIL No. 11 sought to preclude Dr. Hu's opinions "articulated in her withdrawn August 1, 2025 report *that are not otherwise disclosed in her previously submitted expert reports*" (Dkt. 797 at 20), and Contour agreed because Dr. Hu's earlier opinions addressed the combination of Looxcie/Boland and Ambarella (Dkt. 814 at 18).  Moreover, the Court denied summary judgment based on the dispute between "[t]he *parties' experts*" as to the scope and content of "Boland and Ambarella" (Dkt. 843 at 8), showing Dr. Hu's opinions are admissible.

**C.    GoPro Ignores The Substantial Evidence At Trial Rebutting Invalidity**

GoPro wrongly asserts Dr. Hu "provided no substantive testimony regarding the combination of Boland and Ambarella." Mot. at 8. This ignores Dr. Hu's detailed testimony regarding why Contour's invention was not obvious for multiple reasons, which she formed after considering Boland, Looxcie, Ambarella, and "Looxcie with Boland in combination with Ambarella." Trial Tr. at 1320:20–1324:18. In addition to Dr. Hu, other evidence supports the jury's validity verdict, including Dr. Mander's testimony (Contour inventor), Dr. Almeroth's testimony (GoPro expert), and Mr. Woodman's testimony (GoPro alleged prior inventor), among other evidence discussed below.

## III.    LEGAL STANDARDS

"In the Ninth Circuit, JMOL 'is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that of the jury.'" *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1040 (Fed. Cir. 2016) (quoting *Monroe v. City of Phoenix*, 248 F.3d 851, 861 (9th Cir. 2001)). Further, the Ninth Circuit explains that "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.* (quoting *Monroe*, 248 F.3d at 861). A decision to grant or deny JMOL is reviewed de novo. *Id.*

"Obviousness is a question of law based on underlying facts." *Apple*, 839 F.3d at 1047 (citations omitted). On review, "we presume the jury resolved underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if supported by substantial evidence." *Id.* The court then "examine[s] the legal conclusion de novo in light of those facts." *Id.* Those "underlying facts" include: "'(1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) the presence of objective indicia of nonobviousness.'" *Cyntec Co., Ltd. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 984 (Fed. Cir. 2023). And whether there is a motivation to combine is also a fact question. *Id.*

## IV.    ARGUMENT

**A.    The Verdict Is Wholly Inconsistent and Can Only Be "Reconciled" with a New Trial on All Verdict Issues**

The parties agree that the verdict is inconsistent and thus some form of post-trial relief is needed from the Court. However, GoPro myopically focuses on claim 11 of the '954 Patent, wrongly

arguing "the only way to reconcile the jury's verdict is to hold Claim 11 invalid." Mot. at 13. This would not fix the verdict. Nor can JMOL be granted simply to fix an inconsistency—it must be independently appropriate as the only reasonable conclusion based on the evidence. As discussed below, there is more than substantial evidence that claim 11 is valid, and thus that verdict cannot be overturned including, for example, Dr. Hu's testimony that the invention was not obvious (Trial Tr. at 1320:20–1332:10); Dr. LeGall's testimony that Ambarella "shelved" the idea for wirelessly transmitting video until 2011 (*id*. at 1056:4–1057:5; Dkt. 883-5 at 142:24–143:17); and the evidence discussed in Contour's post-trial brief (Dkt. 901 at 3–5, 22–24) and below (§§ IV.B & IV.C). GoPro pretends this evidence does not exist and then repeats a false assertion that Contour somehow forgot to challenge GoPro's invalidity defenses. Of course, repeating a false assertion does not make it true. Since its JMOL request fails, the parties agree a new trial is necessary—the only question is the scope.

Unfortunately for both parties and the Court, there is no "silver bullet" fix to the verdict. As set forth in Contour's post-trial brief at pages 1–2, 14–15, there are multiple inconsistencies in the verdict, such that almost none of the jury's findings can be reconciled with themselves:

| Jury Finding | Inconsistent Jury Finding |
|---|---|
| HERO2 with WiFi BacPac is **NOT a prior invention** to the '954 patent (Question 4, Claim 11) | HERO2 with WiFi BacPac **IS a prior invention** to the '954 patent (Question 4, Claim 12) |
| HERO2 with WiFi BacPac is **NOT a prior invention** to the '954 patent (Question 4, Claim 11) | HERO2 with WiFi BacPac **IS a prior invention** to the '694 patent that has the same priority date (Question 4, Claim 6) |
| HERO2 with WiFi BacPac **does NOT have all elements of claim 12** of the '954 patent (Question 1, Claim 12) | HERO2 with WiFi BacPac **HAS all elements of claim 12** of the '954 patent (Question 4, Claim 12) |
| HERO2 with WiFi BacPac **does NOT have all elements of claim 6** of the '694 patent (Question 1, Claim 6) | HERO2 with Wi-Fi BacPac **HAS all elements of claim 6** of the '694 patent (Question 4, Claim 6) |

Dkt. 901 at 1–2, 14–15. Moreover, a new damages trial is also required because the jury's award did not address infringement of the other claims or infringement by the Group 2 products. *Id*. at 16–19.

GoPro's Motion proves this point and shows exactly why a full new trial is needed. For instance, GoPro claims that "both parties' experts treated ['954 claim 11 and '694 claim 6] as

overlapping except as to the additional elements of the '694 Patent." Mot. at 12. If true, then the jury could not have found claim 11 valid and infringed by HERO 2 with WiFi BacPac, and somehow also find that the same product does not infringe claim 6 yet does invalidate it. Thus, GoPro implicitly agrees that there are more fundamental inconsistencies than just the jury's findings on claim 11 and 12. Indeed, GoPro likens this case to *Callaway*, which only confirms why a full new trial is needed. There, the jury returned a verdict finding that (1) a dependent claim was invalid while the independent claim was valid, (2) another independent claim in the same patent was valid, and (3) four other claims in two other patents were valid. *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1345 (Fed. Cir. 2009). The Federal Circuit recognized that "[n]o party at trial asserted any patentable difference among the asserted clams before the jury." *Id*. Moreover, while "the jury found 'without reservation' that eight claims were not invalid, it is equally true that the jury found claim 5 invalid without reservation," and "the evidence at trial was such that the jury could have rationally reached either verdict with regard to the asserted claims." *Id*. at 1344. Hence, "the verdict form … reflects an irreconcilable inconsistency" such that "a new trial rather than entry of judgment was required." *Id*. at 1345; *see Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 2012 WL 604138, at *4–5 (E.D. Cal. Feb. 23, 2012) ("If an independent claim is not anticipated, any claims that depend upon that claim cannot be anticipated."). Similar to those cases, a new trial is required on all verdict issues.

### B. Substantial Evidence Supports The Jury's Verdict That Claim 11 Is Not Obvious Over The Combination Of Boland And Ambarella

The jury's verdict that claim 11 of the '954 patent is not obvious over Boland and Ambarella is supported by substantial evidence, including (1) Boland and Ambarella did not disclose all claim elements, (2) a POSITA would not have had a motivation to combine, (3) a POSITA would not have had a reasonable expectation of success, and/or (4) significant secondary considerations of non-obviousness. Accordingly, GoPro's JMOL must be denied.

#### 1. The Gap In The Prior Art—Boland does not disclose sending "real time image content by wireless transmission directly to … a personal portable computing device," and GoPro does not rely on Ambarella.

Claim 11 recites "a wireless connection protocol device configured to send ***real time*** image content by wireless transmission ***directly*** to … a personal portable computing device." According to

1  GoPro, "GoPro does not rely on Ambarella for teaching wireless transmission of video content

2  (because Boland discloses it)."  Mot. at 18–19.  Hence, GoPro relies exclusively on Boland for this

3  limitation.  Because a reasonable jury could have found that Boland failed to disclose this limitation,

4  JMOL should be denied.  *See Apple*, 839 F.3d at 1062 (JMOL denied where "there is substantial

5  evidence for a reasonable jury to have found that there was a gap in the prior art that was not filled by

6  the combination," and thus defendant failed to prove obviousness by clear and convincing evidence).

7        Notably, Dr. Almeroth never explained where Boland discloses sending "***real time*** image

8  content by wireless transmission ***directly*** to … a personal portable computing device" as claimed.  *See*

9  Trial Tr. at 1108–1110.  Accordingly, GoPro's Motion does not identify any such testimony.  *See* Mot.

10  at 14–17.  Instead, Dr. Almeroth's testimony and Boland's disclosures show that any such transmission

11  of video was ***indirect***, such as through a WiFi network or router, and was "in ***substantially*** real time."

12  For example, Dr. Almeroth identified ¶¶ 73, 74, and 79 in Boland during his testimony.  Trial Tr. at

13  1108:12–1109:10.  In ¶ 73, Boland teaches that "where the wireless connection ***between*** the headset

14  100 and the handset 201 ***is of sufficient bandwidth*** (e.g., ***WiFi***), the video data 216A may include

15  video frames streamed from the headset 100 … which may be viewed and/or recorded to the handset

16  201 in ***substantially real time***."  In ¶ 74, Boland teaches that "***the computing platform 325*** provides

17  ***internet connectivity*** via packet-based protocols which may be wireless (e.g., ***WiFi***, WiMax, etc.) or

18  wired (Ethernet, etc.)."  Finally, in ¶ 79, Boland teaches "when in the presence of ***the network portal***

19  ***device 326*** (e.g., ***WiFi*** hotspot), the video clip file 231 is downloaded as the video data 216B for

20  further distribution ***via the wireless-enabled network portal device 326***," and in other embodiments

21  "where the video data 216B comprises video frames streamed in ***substantially real time*** as they are

22  recorded, the headset 100 may support live video conferencing capability ***while in communication***

23  ***with the wireless-enabled network portal device 326***."  Hence, Boland discloses an ***indirect***

24  connection to send video data "in ***substantially*** real time," rather than a "direct" connection to send

25  "real time" video data as claimed.  The jury could have relied on this to reject GoPro's invalidity

26  defense as to claim 11.  Further, other disclosures in Boland confirm this.  In ¶ 76, Boland makes clear

27  that Bluetooth can be used for transmitting video "after an event is video recorded" but is insufficient

28  for "real time" video, whereas a Wi-Fi network can be used for transmitting "real time" video.

In other embodiments, the video data 216B is transferred over a wireless communication line, such as a Bluetooth connection … or a WiFi connection … to the computing platform 325. … **Because wired and certain wireless communication modes may provide a faster transfer of the video data 216B than the wireless transfer of video data 216A (e.g., <u>in the case where the handset 201 is Bluetooth enabled</u> but not WiFi enabled), the Video data 216A may be primarily for saving off a video clip file 231 … shortly after an event is video recorded**. …. In other embodiments, **where the video data 216B comprises frames streamed in real time as they are provided to the recorded video data buffer 229 (e.g., <u>in the case where the handset 201 is WiFi enabled</u>),** the headset 100 may support live video conferencing capability or other functions relying on live video feeds ….

Boland at ¶ 76.[2]  Hence, Boland confirms that video can only be streamed "in real time" using an

*indirect* WiFi network connection (such as through a "wireless-enabled network portal device 326"),

but not using a *direct* wireless connection (such as Bluetooth) between the camera and handset.

Providing further evidence the jury could rely on, Dr. Hu testified in rebuttal that one of the

"key components in Contour's invention" was "wirelessly transmit[ting] the lower-quality video

*directly* to the smartphone."  Tr. at 1321:1-6.  As Dr. Hu further explained regarding this limitation:

And then why is it important to wirelessly transmit video *directly* to the phone? Why not going through a home router? Because when you're out and about, using your action cameras, there's no WiFi router out there from your home or from a Starbucks. So that *direct* wireless connection is very important. …

But another very important and universal challenge was that **how do you set up this *direct* connection wirelessly between the camera and the phone <u>without going through a router at all</u>**? And that connection has to have enough bandwidth to support video.

Back then there were two technologies people considered. One was called WiFi Direct and the other called Bluetooth.  WiFi Direct as a concept was known in 2009, and you have seen that coming -- come up in the testimony and documents a little bit, **<u>but the standard itself wasn't set up or launched until October 2010</u>**. That was after the provisional application date of the two Contour patents and also after ContourGPS, the product, was launched.

That's why Dr. LeGall, the co-founder of Ambarella, testified himself that at Ambarella, they didn't consider the wireless obvious addition to the A5 chip. He testified that because of WiFi Direct, **<u>wireless at Ambarella was shelved for two, three years, until 2011</u>**.

---

[2] While ¶ 76 states "the video data 216B comprises frames streamed *in real time*" as opposed to "in *substantially* real time," ¶ 79 explains "where the video data 216B comprises video frames streamed in *substantially* real time as they are recorded, the headset 100 may support live video conferencing capability while in communication with the wireless-enabled network portal device 326."

Trial Tr. at 1321:17–1322:18. Dr. Hu testified that her opinion was that "Contour's invention is not obvious" for these reasons after she considered (1) "Boland," (2) "Looxcie," (3) "Looxcie in combination with Ambarella," and (4) "Looxcie with Boland in combination with Ambarella." *Id.* at 1320:20–23, 1324:2–18. Hence, GoPro's argument that Dr. Hu "provided no substantive testimony regarding the combination of Boland and Ambarella" (Mot. at 9) is false.

Boland was filed in November 2009 (Dkt. 881-92), before WiFi Direct became a "reality." *See, e.g.*, TX-2006.5 (October 2009 email from inventor O'Donnell stating that certain features "become[] really compelling if 'WiFi Direct' … becomes a reality"); Trial Tr. at 1055:23–1056:4 (LeGall testifying that WiFi Direct did not work in 2009). Boland used "any conventional personal area network (PAN) transceiver, such as … a Bluetooth wireless (e.g., IEEE 802.15.1) and/or Wi-Fi (e.g., IEEE 802.11x) compliant radio." Boland at ¶ 47. While Bluetooth was available at the time of Boland, Boland teaches away from using Bluetooth to send "real time" video, as explained above. *See* Boland at ¶ 76. Similarly, Ambarella discouraged Contour's inventors from using Bluetooth to transmit video directly to a phone, but Contour decided to go forward with Bluetooth. *See, e.g.*, Trial Tr. at 1049:3–5 (LeGall testifying that Contour used "Bluetooth" which was "quite a difference"); *id.* at 1034:5–7; 1064:18–1065:4. As Dr. Mander testified, Ambarella "didn't think [Bluetooth] was a good idea" in late 2009 and said it "wasn't supported" (*id.* at 328:8–330:4), and "the Ambarella team was surprised" when Contour demonstrated the prototype in 2010 (*id.* at 343:15–18).

While the claims are not limited to a particular protocol such as Bluetooth or WiFi, a reasonable jury could have found, and apparently did find, that a POSITA would not have understood Boland as disclosing "a wireless connection protocol device configured to send ***real time*** image content by wireless transmission ***directly*** to … a personal portable computing device," as recited in claim 11.

> ## 2. Lack Of Motivation To Combine—A POSITA would not have been motivated to combine Boland and Ambarella and arrive at the claimed invention with a reasonable expectation of success.

Separately, "[a]n obviousness determination ***requires*** finding that a person of ordinary skill in the art [1] would have been motivated to combine or modify the teachings in the prior art ***and*** [2] would have had a reasonable expectation of success in doing so." *Regents of Univ. of California v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018); *see also* Dkt. 859, Jury Charge, at 29–30.

1   Further, "[w]hether a [POSITA] would have been motivated to modify or combine teachings in the

2   prior art, and whether he would have had a reasonable expectation of success, are questions of fact."

3   *Id*.  Here, there was substantial evidence that (1) a POSITA would not have been motivated to combine

4   Boland and Ambarella to arrive at the invention recited by claim 11, ***and*** (2) a POSITA would not

5   have had a reasonable expectation of success in doing so.  Moreover, GoPro's JMOL additionally fails

6   because GoPro identifies no evidence presented to the jury supporting a reasonable expectation of

7   success (*see* Mot. at 18–19), and "the absence of a reasonable expectation of success defeats

8   obviousness." *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1345 (Fed. Cir. 2023).

9       First, a reasonable jury could have found that a POSITA would ***not*** have been motivated to

10  combine Boland and Ambarella.  For example, according to GoPro, "Boland discloses that its

11  processing functions … can be performed by … 'any number of different application processing

12  platforms.'"  Mot. at 18.  At best, this shows that a POSITA ***could*** have combined Boland and

13  Ambarella.  However, "[t]he obviousness inquiry does not merely ask whether a skilled artisan ***could***

14  combine the references, but instead asks whether 'they ***would have been motivated*** to do so.'"  *Adidas*

15  *AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020) (finding that "the Board properly considered

16  the fundamental differences in the seaming techniques of [prior art references]" when rejecting

17  motivation to combine).  Thus, GoPro's reliance on Boland's statement that other processors could be

18  used does not mean that a POSITA ***would have been motivated*** to use the Ambarella A5 processor.

19      Second, even if a POSITA would have been motivated to combine Boland with an Ambarella

20  A5 chip, GoPro must also show that a POSITA would have been motivated to further ***configure*** the

21  resulting Boland-Ambarella combination to arrive at the configuration recited by claim 11.  *See Apple*,

22  839 F.3d at 1052 (affirming denial of JMOL where a reasonably jury "could infer from [the] testimony

23  that an ordinary artisan would not have been motivated to combine elements" in the claimed manner).

24  Indeed, Ambarella provided an unconfigured processor that had to be configured in the claimed

25  manner to arrive at the invention.  For example, Contour's James Harrison testified:

26          Ambarella doesn't -- if you put an Ambarella chip in something, it's not
            going to deliver immediately this invention. Otherwise, GoPro would have
27          been able to just take an Ambarella chip. What they had to do was to rip
            down the Contour, try and work out how the invention had worked. So, you

28

1
2

> know, I -- I think it's a misrepresentation to say that putting an Ambarella chip in makes this work because you needed to be able to actually invent the technology to be able to make it work.

3

Trial Tr. at 281:18–282:9.  Similarly, as Contour's inventor Dr. Richard Mander testified:

4
5
6
7
8
9
10

> To be accurate, I think you're talking about these in a very simplistic hardware fashion. These are very high-level building blocks that we're talking about here. And there are -- the Ambarella system on chip is a -- there's -- it doesn't work without software. And when we build a camera, what's not shown in this picture is that we add value to it. So some of the things that -- at the top here, it says "Contour's Invention." Some of the things that are in the -- you know, in the invention that make the magic happen are things we added that is software and intellectual property knowledge that we -- that we put into -- that sits on and runs on the Ambarella processor -- right? -- on the ARM processor that's inside there, even down at lower levels in the software.

11

*Id*. at 436:1–20.  Furthermore, as GoPro's own alleged prior inventor Mr. Woodman testified:

12
13

> Q. … Fair to say it wasn't obvious to GoPro how to get an Ambarella chip with a dual stream and use it to get WiFi transmission to a phone, because it took you three and a half years?

14

> A. I don't know if "obvious" is the right word. It was a lot of work.

15
16
17

*Id*. at 631:18–632:4.  Hence, the jury reasonably could find that there was no motivation, or at minimum that GoPro failed to show a POSITA would have been motivated to modify the Boland-Ambarella combination to arrive at the claimed configuration.

18
19
20
21
22
23
24
25
26
27
28

In addition, the jury heard unrebutted evidence that Looxcie (the employer of Mr. Boland and the owner of the Boland patent) purchased the Ambarella chips for use in the Looxcie device, yet did not configure the device to generate ***in parallel***.  Trial Tr. at 1192:10–22 (Almeroth); *id*. at 1331:23–1332:5 (Hu testifying that "we could see that A5 chip was provided to many companies," including "Samsung, Canon, Looxcie, to name a few," and "they didn't come up with a product that does live preview while recording").  Likewise, Boland was filed in November 2009, but despite having the Ambarella chip, Boland discloses the use of ***serial*** processing to create a low-resolution video from the stored high-resolution video, rather than creating both videos ***in parallel***.  *Supra* § II.A.  As Dr. Hu testified, the "polar opposite" of generating two streams in parallel is "to generate in serial."  Trial Tr. at 485:23–486:7.  Moreover, Dr. Hu testified that others in the industry were not motivated to combine the Ambarella processor with a POV camera to generate two streams in parallel, as follows:

> But even if we just take one of them, the generate term, we've heard that the A5 chip with dual encoding capability on the hardware itself was available in 2009. Okay. And we've seen evidence that -- from Dr. LeGall himself, who is a co-founder of Ambarella, that Ambarella was going around to all these different companies -- Canon, Samsung, Zoom, Premier -- to tell them that we have this chip that can do dual encoding.
>
> However, based on all evidence that I have seen in this case, the first -- forget about wireless part -- **the first POV camera that could generate two videos in parallel, one of a higher quality than the other, was ContourGPS**. **And now none of the other companies that had the A5 chip and the know-how about the dual encoding came up with that feature alone**.

Trial Tr. at 1320:20–1323:19. From this evidence, the jury reasonably could find that a POSITA would not have been motivated to modify the Boland-Ambarella combination to generate two streams in parallel (e.g., as opposed to in serial), particularly in view of the significant differences between the references and the real-world evidence at the time of the invention. *See Motorola Mobility LLC v. Largan Precision Co.*, No. 2024-1414, 2025 WL 2642194, at *2 (Fed. Cir. Sept. 15, 2025) (rejecting that a POSITA would have been motivated to combine references, where one reference "had the opposite configuration" of the other, explaining that accused infringer's "evidence simply confirms the combination's feasibility—that a skilled artisan *could* apply [one reference's] teaching to [another reference]—not that a skilled artisan *would* have been motivated to do so").

Finally, while "GoPro does not rely on Ambarella for teaching wireless transmission of video content," GoPro argues "the fact that Ambarella was marketing its processor for the purpose of being used for wireless preview offers further support for motivation to combine." Mot. at 18–19. However, GoPro's arguments are based on testimony concerning the A5S chip. *See* Mot. at 18 (citing Trial Tr. at 1018:24-1020:8 (LeGall discussing A5 and A5S), at 1117:8–1118:8 (Almeroth discussing "Ambarella A5 and the A5s" chips)). The A5S chip was not available in 2009 and the not-yet-existing-chip was only promoted to third parties under confidentiality or non-disclosure agreements. *See* Trial Tr. at 1048:8–16 (LeGall: "Nobody was shipping A5s in 2009"); *id.* at 1048:24–1050:2 (every document and communication about A5s was under NDA prior to CES in January 2010). Moreover, GoPro's arguments are contrary to the trial evidence. As Dr. LeGall testified, Ambarella advertised the "Dual Stream HD & Mobile Recording" capability of the A5 chip to Canon (*id.* at 1007:4–21), but Canon did not release a camera with built-in wireless until 2012 (*id.* at 1053:3–13). Ambarella

advertised its chip to Sony, but Sony "wanted a different chip." *Id*. at 1009:12–20.  Ambarella advertised its chip to Samsung (*id*. at 1017:2–14), but Samsung did not release a WiFi-capable camera until 2012 (*id*. at 1048:17–1049:8).  Dr. LeGall testified that the Ambarella chip was provided to Bosch, which had "the capability of storing HD and shipping ***HD over a wireless -- a network***," but Dr. LeGall clarified that "[i]t was ***probably wired*** in the case of Bosch." *Id*. at 1017:23–1018:9.  Ambarella advertised its chip to other companies like Zoom (*id*. at 1011:6–1012:2) and Premier (*id*. at 1013:16–1014:1).  However, prior to Contour, none of these companies released a POV camera configured to generate a low-resolution stream in parallel with a high-resolution stream while transmitting the low-resolution stream "directly" to the phone as a "real time" preview.

Indeed, Dr. Almeroth only testified that the Ambarella chip "was envisioned to be used in a setting where video would be delivered wirelessly ***over a network***," just like Boland.  Trial Tr. at 1117:20–1118:8.  This is confirmed by the testimony of Ambarella's founder Dr. LeGall.  As Dr. LeGall testified, "wireless to a phone device would not work in 2009," so "in 2009, you'd send the data ***over a wireless network***, like, for instance … if you have WiFi ***at home***, you could send to your PCs using WiFi." *Id*. at 1013:4–15.  Even when Ambarella was working with Contour in late 2009 and 2010, Dr. LeGall testified that "[i]t turned out, as Ambarella found out later, that going to the smartphone would be more difficult." *Id*. at 1037:18–1038:5.  As a result, Ambarella "shelved" the idea for wirelessly transmitting video until 2011, well ***after*** Contour's invention. *Id*. at 1056:4–1057:5 (playing Dkt. 883-5 at 142:24–143:17).  As Dr. LeGall further testified on redirect by GoPro's counsel:

> Q. And did Ambarella, prior to December 2009, have the idea of transmitting the lower-resolution stream wirelessly?
>
> A. **I'm not sure because the detail for the wireless were not resolved**.
>
> …
>
> Q. Now, WiFi Direct, is that the same thing as WiFi, or is that a particular implementation of WiFi technology?
>
> A. If you look at your iPhone today, you can use your iPhone to be a WiFi server; and at that time, it was not possible.
>
> Q. Okay. What about WiFi in general and the ability to transmit information over WiFi? Was that available in the 2008-2009 time frame?

1    A. A lot more, **but the product scenario doesn't work very well. You are on a surfing or on a ski trip and you don't have WiFi. <u>Then you may have an iPhone somewhere but you don't have WiFi</u>**.

3    Q. Okay. But WiFi was available for use at this time?

4    A. **Yes. That's why we developed this dual-OS thing, which was a lot of work and eventually didn't yield too many results <u>until 2012</u>**.

6    Trial Tr. at 1072:25–1074:8. Again, the jury was free to find from this real-world evidence, and reasonably appears to have done so, that a POSITA would not have been motivated to combine Boland and Ambarella, and then to modify the combination as specifically recited by claim 11, with any reasonable expectation of success.

10    **3. Secondary considerations defeat obviousness**

11    The jury's non-obviousness verdict as to claim 11 is supported by secondary considerations, which "must be considered in every case where present." *Apple*, 839 F.3d at 1048. Moreover, "objective evidence of nonobviousness … may be sufficient to disprove or rebut a prima facie case of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). As shown below, the secondary consideration evidence at trial alone constitutes substantial evidence supporting the jury's verdict of non-obviousness. *See Apple*, 839 F.3d at 1058 (affirming denial of JMOL where "[t]hese real world indicators of whether the combination would have been obvious to the skilled artisan in this case 'tip the scales of patentability,' or 'dislodge the determination that claim [8 would have been] obvious'").

20    *a)    Industry Praise*

21    Contour introduced substantial evidence of industry praise at trial—GoPro's Motion completely ignores it. *See* Mot. at 23–25 (only discussing copying and failure of others). Specifically, after Contour's patent-practicing ContourGPS was introduced in January 2011, Contour received several awards including the Best Mobile Lifestyle Accessory of CES 2011 and the 2011 Red Dot Product Design Award. TX-442; TX-443; TX-444; Trial Tr. at 511:8–15 (Hu opining ContourGPS practices asserted claims); *id*. at 365:13–371:14 (Mander testifying about awards). Industry publications specifically touted the claimed features of the Contour GPS, including its ability to live preview while recording in "real time" and to remotely adjust settings, providing a nexus to the claims:

- TX-442 ("With Bluetooth enabled, an iPhone can become the viewfinder for a ContourGPS camera. ***This will allow users to adjust the composition and settings before attempting to capture moments that are difficult, if not impossible, to repeat***.");

- TX-443 ("Contour adds Live Viewfinder to its ContourGPS helmet cam, ***real-time*** streaming to smartphones … Contour is unveiling a built-in Bluetooth chip in the ContourGPS and a mobile app that together ***enable your phone to become a live viewfinder***. Now, ***you can see what your camera sees while configuring your settings, all from the most remote locations***.");

- TX-444 ("Contour … a market leader in hands-free video cameras, took home the 2011 red dot product design award for its revolutionary ContourGPS camera. … Delivering the best of function and form, the ContourGPS helps explorers: … Stay Connected Wirelessly: Built-in Bluetooth connects to a mobile phone, ***creating a wireless viewfinder to check and adjust the angle to capture the shot the first time***").

*See* Trial Tr. at 365:13–371:14 (Harrison discussing industry praise and awards). Even Mr. Woodman praised the ContourGPS camera after it was released in January 2011, writing "we should have been smarter and tapped into the fact that they'd be thinking dualstream with this unit." TX-2833.3.

Further, this evidence is specifically tied to the claimed features, including generating a high-resolution stream in parallel with a low-resolution stream, while transmitting the lower-resolution stream to a phone as a "real time" preview. On cross-examination, Dr. Almeroth agreed that the ContourGPS won the Red Dot Award and the CES Award, and agreed that the jury could consider this praise as evidence of non-obviousness "[a]s long as you establish a nexus to the patent claims." *Id.* at 1203:10–20. Further, Dr. Almeroth testified about a Contour press release he considered in forming his opinions, where users commented that "[t]he ability to line up is a nice touch" and "Cool thinking. Innovative way to let you see what you're shooting." *Id.* at 1203:24–1206:17. Dr. Almeroth could only testify that this evidence is "not ***particularly*** tied to the claims" because "[t]here's no mention of remote control functionality." *Id.* at 1206:18–1207:1. However, multiple articles praised the "remote control" feature (e.g., TX-442, 443, 444), and there is no legal requirement that every claimed feature be "praised" for the evidence of industry praise to be relevant.

Instead, "[e]vidence that the industry praised ***a claimed invention*** or ***a product that embodies the patent claims*** weighs against an assertion that the same claimed invention would have been obvious." *Apple*, 839 F.3d at 1053. For example, the Federal Circuit in *Apple* affirmed the district court's denial of JMOL that the claims were obvious, finding that "[t]he jury was presented with

substantial evidence of praise in the industry *that specifically related to features of the claimed invention*, thereby linking that industry praise with the patented invention." *Id*. Here, the evidence of industry praise is specifically linked to the claimed features, proving claim 11 is not obvious.

### b) Failure of Others

There was significant evidence showing the failure of others, including GoPro. As Dr. Hu testified, "[o]ne [secondary consideration] that at front center of this case or this trial is GoPro's own failure of implementing, either in their product or the alleged prototype, a live preview while recording feature." Trial Tr. at 1324:19–1325:6. As Dr. Hu summarized:

- Nick Woodman and GoPro knew of the Ambarella A5 in January 2009. Trial Tr. at 1325:9–17; *see also* TX-426.

- In April 2009, GoPro and Mr. Woodman were focused on making a camera with a picture preview, not a video preview, and noted "TBD" as to whether even picture preview it would work. Trial Tr. at 1325:21–1326:15; *see also* TX-2383.

- In September 2009, Mr. Woodman wrote: "We have decided to cancel the RF board inside of the camera," and "GoPro will know focus on developing a wifi HERO BUS module with Ambarella." Trial Tr. at 1430:12–1431:6; *see also* TX-3127.2; TX-3130.

- In October 2009, GoPro abandoned its attempt to make a POV camera with a picture preview "to keep costs down." Trial Tr. at 1329:13–19; *see also* TX-3116.

- In September and November 2010, GoPro's work on a wireless camera was expressly idled. Trial Tr. at 1329:22–1330:10, 1432:12–21, 1433:6–1435:4; *see also* TX-405.

- The next reference to GoPro working on a live preview camera was in January 2011, when Nick Woodman instructed employees at GoPro to covertly acquire ContourGPS units, stating "we should have been smarter and tapped into the fact that they'd be thinking dualstream with this unit." Trial Tr. at 1330:23–1331:22; *see also* TX-2833.3.

- Ten months later, in October 2011, GoPro began announcing the release of the WiFi BacPac. Trial Tr. at 629:13–630:8 (Woodman).

- Eight months later, GoPro released the HERO2 with WiFi BacPac in June 2012, with the application to enable the wireless feature still not released until October 2012. Trial Tr. at 630:5–12 (Woodman); *id*. at 1331:10–16 (Hu).

As Dr. Hu opined, "GoPro's own failure of developing this feature [a POV camera with wireless preview] supports my opinion that Contour's invention is not obvious." *Id*. at 1331:17–22. Further, there were other companies that tried and failed in this time period, such as "Samsung, Canon, Looxcie, to name a few," so "we could see that A5 chip was provided to many companies, and they didn't come up with a product that does live preview while recording." Trial Tr. at 1331:23–1332:5.

Against this evidence, GoPro merely argues that evidence of the "failure of others" requires that the "evidence demonstrate directly or indirectly some 'significant defect in the prior art.'" Mot. at 24 (quoting *Eurand, Inc. v. Mylan Pharms., Inc.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012)). GoPro misstates the law. As the Federal Circuit explained in the case cited by GoPro, "[t]he purpose of evidence of failure of others is to show 'indirectly the presence of a significant defect in the prior art, while serving as a simulated laboratory test of the obviousness of the solution to a skilled artisan.'" *Eurand*, 676 F.3d at 1082. In that case, the inventors and a competitor "share[d] a central common goal: to create a therapeutically effective product," such that the competitor's "failure to develop a therapeutically effective product … is keyed to the problem that the patents in suit purport to solve," thereby supporting non-obviousness. *Id*. In other words, "[n]onobviousness is suggested by the failure of others *to 'find a solution to the problem which the patent[s] in question purport[] to solve*.'" *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578–79 (Fed. Cir. 1991). Here, the jury heard undisputed evidence that Contour, GoPro, and Looxcie/Boland tried different solutions (e.g., GoPro's picture preview and Boland's serial approach) to solve the same problem in the prior art, specifically how to provide a wireless viewfinder for a POV camera such that the user could see what the camera was seeing and adjust the settings remotely, and the jury could reasonably find that only Contour's invention provided the solution. This is substantial evidence that the claimed invention is not obvious.

### c) Copying

Copying also provides substantial evidence of non-obviousness, including the evidence summarized by Dr. Hu discussed above regarding GoPro's failure. Trial Tr. at 1324:19–1332:10. While GoPro argues Dr. Hu "did not render any opinion tying the alleged copying evidence to any showing of non-obviousness" (Mot. at 24), GoPro's first question on her cross-examination was:

> Q. Let me pick up right where you left off. Let's talk about these allegations of copying. You just talked about that; right?
>
> A. Yes.

Trial Tr. at 1332:16–19; *id*. at 1330:23–1331:22 (Hu opining this evidence supports non-obviousness). Dr. Almeroth then testified that Dr. Hu "did offer two instances of objective evidence of non-obvious" including "copying." *Id*. at 1418:5–15, 1421:8–24. Further, even setting aside that Dr. Hu did opine *ipsis verbis* on copying, expert testimony was not required because the jury had more than sufficient

1    evidence to conclude that GoPro did in fact copy.  *See Sonos, Inc. v. D & M Holdings Inc.*, 297 F.

2    Supp. 3d 501, 521 (D. Del. 2017) (jury "is fully competent to evaluate the evidence and draw its own

3    conclusion about whether [accused infringer] copied [patentee's] technology and products").

4         For example, as summarized under the failure of others above, GoPro stopped working on a

5    wireless camera in late 2009, and did not identify any documents between October 2009 and January

6    2011 showing that GoPro was working on a wireless camera.  The jury saw and heard evidence that

7    the next time GoPro discussed working on a wireless camera was Mr. Woodman's January 2011 email

8    praising the ContourGPS camera, noting "we should have been smarter and tapped into the fact that

9    they'd be thinking dualstream with this unit," and requesting employees to "covertly" obtain

10   ContourGPS units to "disassemble and review."  Trial Tr. at 557:15–559:13 (Woodman); TX-2833.3.

11   As Mr. Woodman testified: "We should have known that they'd be launching a dual-stream live

12   preview feature. Guys, can you get a couple of these, take them apart, and determine how they're

13   doing it."  Trial Tr. at 698:6–10.  The jury saw Mr. Samuel's May 2011 email confirming that a

14   ContourGPS and two Contour+ cameras were ordered under project "secret shopper."  Trial Tr. at

15   558:13–559:24 (Woodman).  The jury also saw that GoPro released the HERO2 with Wireless BacPac

16   in June 2012, which was GoPro's first camera with wireless preview.

17        This was ample evidence from which the jury could have found copying.  *See Apple*, 839 F.3d

18   at 1054 (affirming denial of JMOL where the record contains "substantial evidence of copying"

19   including "multiple internal Samsung presentations given by different Samsung groups at different

20   times stating that the iPhone's slide to unlock feature is better than the various Samsung alternatives,"

21   and "many of these same presentations conclude that the direction for improvement is for Samsung to

22   modify its unlocking mechanism to be like the iPhone").

23   **C.     Substantial Evidence Supports The Jury's Verdict That Claim 11 Is Not
24            Anticipated Or Obvious Over The Alleged "Woodman Prior Invention"**

25        GoPro is wrong that the jury "necessarily" found that the alleged "Woodman prior invention"

26   (the HERO2 with Wi-Fi BacPac) qualifies as § 102(g) art.  Mot. at 19–20.  Instead, the jury was

27   instructed that the HERO2 with Wi-Fi BacPac (among other products) met all elements of claim 11

28   of the '954 patent.  Dkt. 859 at 19.  Hence, the only question left for the jury to resolve on anticipation

1    of claim 11 was whether the HERO2 with Wi-Fi BacPac qualified as prior art under 102(g). Because

2    the jury found that claim 11 was not anticipated despite the Court's instruction that HERO2 with Wi-

3    Fi BacPac met all elements of that same claim, the jury *necessarily* found the HERO2 with Wi-Fi

4    BacPac was *not* a prior invention. *See* Dkt. 901 at 14–15. Thus, the jury's anticipation finding for

5    '954 claim 12 and '694 claim 6 reflects an irreconcilable inconsistency, requiring a new trial. *Id.*

6          Further, the jury's verdict that the "Woodman prior invention" is not § 102(g) prior art and

7    does not invalidate claim 11 is supported by substantial evidence, including the evidence discussed in

8    Contour's JMOL. *See* Dkt. 901 at 22–24. For example, Mr. Woodman agreed that he was "*not*

9    claiming to be the inventor of what's in Contour's patents" and that "the Woodman invention … is

10    *not* the same as the Contour invention." Trial Tr. at 594:7–17; *id.* at 551:19–552:6 (similar). This

11    alone constitutes substantial evidence supporting the jury's verdict. *See Union Carbide Chemicals &*

12    *Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1188–90 (Fed. Cir. 2002) (affirming JMOL of

13    no anticipation under § 102(g) where alleged prior inventor testified "she did not know whether her

14    catalysts contained cesium salts" as recited, and accused infringer "failed to prove that [alleged prior

15    inventor] 'actually prepared the composition' claimed in [patentee's] patents …. as a matter of law").

16          Further, GoPro argued throughout this case and during the first several days of trial that Mr.

17    Woodman's "prior invention" was conceived in January 2009 and reduced to practice by around

18    September 2009 in the form of the "HERO HD prototype." *See* Dkt. 901 at 23; Trial Tr. at 664:22–

19    669:13 (Woodman). Mr. Woodman repeatedly testified that TX-3475 was "an accurate image of what

20    the prototypes that you [Mr. Woodman] built back in -- not you built -- that you observed back in

21    [August] 2009." Trial Tr. at 674:5–675:12, 677:6–10. However, on cross, Mr. Woodman was shown

22    a higher-quality photograph of the same alleged "prototypes" depicted in TX-3475, which confirmed

23    that the circuit board was dated November 16, 2010. *Id.* at 707:21–709:9; TX-1294; TX-1295. Mr.

24    Woodman had "no explanation for that" discrepancy in the dates. Trial Tr. at 709:10–19. Recognizing

25    the prototype theory was hopeless, GoPro pivoted. On Mr. Woodman's redirect, he was told to

26    "pretend that [alleged prototype] never existed" and was asked whether the HERO2 with WiFi BacPac

27    from June 2012 was instead the reduction to practice. Trial Tr. at 710:13–19.

28

1    With GoPro's change in position, GoPro's lack of diligence became more apparent.  Dr. Hu

2    identified documents showing that "GoPro abandoned the work on the wireless remote or the wireless

3    BacPac" by at least October 2009 (TX-3116) through at least November 2010 (TX-405), and explained

4    that the next document referencing the wireless feature is when "Mr. Woodman instructed employees

5    at GoPro to covertly acquir[e] Contour GPS units" in January 2011 (TX-2833).  Trial Tr. at 1330:7–

6    1331:16.  GoPro called Dr. Almeroth to address this, but on cross he could not identify any documents

7    showing work from September 2009 (when GoPro shifted to the WiFi BacPac) to January 2011:

8         Q. Okay. And you agree that the jury has seen not one single document
          showing that GoPro was working on WiFi BacPac between September
9         2009, when Nick Woodman stated GoPro would shift its focus to the
          WiFi BacPac, and this document in 2011; correct?
10
          A. I disagree. I think there were documents in that time frame, and I
11        think they -- some of them were actually shown to the jury by Mr.
          Woodman in his testimony.
12
          Q. I'm sure when your counsel comes back up, she'll point those out. I
13        haven't seen any. Can you identify them for us?

14        A. I don't have the exhibit numbers off the top of my head.

15    *Id*. at 1432:12–21.  On redirect, GoPro failed to identify a single document showing work on the WiFi

16    BacPac in this period.  *See id*. at 1433:6–1435:4.

17    GoPro now asserts that "unrebutted testimony of Mr. Woodman and Mr. Donovan as well as

18    the documentary evidence such as the WiFi BacPac Product Requirements Document" show that

19    GoPro was diligent in this timeframe.  Mot. at 22.  However, the Requirements Document is dated

20    between April and May 2011 (TX-2378.28, Dkt. 881-94), after Mr. Woodman's January 2011 email

21    about tearing down ContourGPS cameras, so the jury was free to disregard this as evidence of

22    diligence at least prior to April/May 2011.  *Supra* § IV.B.3.  Further, when Mr. Donovan was asked

23    whether "the wireless BacPac project stop[ped] completely at some point," he expressly disavowed

24    any knowledge and testified "you would have to ask GoPro on that."  Dkt. 686-6 at 73:3–73:23.  In

25    fact, GoPro tried to distance itself from Mr. Donovan's work at trial.  *See* Trial Tr. at 1426:6–1427:13

26    (Almeroth asserting that Donovan's reports noting the wireless project was "idle" did not indicate lack

27    of diligence because "the wireless aspect was handled by others like Mr. Woodman," not Donovan).

28    Moreover, while Mr. Woodman testified that there were "hundreds" of documents (Trial Tr. at

690:20–691:2), the jury was not shown a single one, and Mr. Woodman's uncorroborated testimony is insufficient as a matter of law.  *See Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006) ("Precedent requires that an inventor's testimony concerning his diligence be corroborated.").

GoPro also argues that Dr. Hu "examined prototypes from 2010" (Mot. at 22), but GoPro cites Dr. Hu's testimony that "the physical prototypes that … Mr. Donovan held up in his deposition are the ones that I have shown pictures of with a November 2010 date or maybe even later date."  Trial Tr. at 1349:9–15.  Mr. Woodman originally testified these prototypes were from August 2009, but as shown in discovery and again at trial, they could not have existed until *at least* November 2010—forcing GoPro's counsel to tell Mr. Woodman to "pretend that [they] never existed."  Trial Tr. at 710:13–19.  GoPro cannot now rely on "prototypes" that it never claimed were from 2010 and even told the jury to pretend never existed to try to back-fill the over one-year period of inactivity.

GoPro also admits that it took GoPro "'two and one half years' after conception" to reduce the invention to practice (Mot. at 23), but argues it is "not unusual to take several years to develop a product from an idea" and "failure to commercialize a product in 3-4 years is not evidence of lack of diligence" (*id*. at 22).  GoPro misses the mark.  The question is not whether taking "several years to develop a product" is "unusual," but whether GoPro "exercised reasonable diligence" in reducing the invention to practice after conception.  *Brown*, 436 F.3d at 1378.  And "[m]erely asserting diligence is not enough; a party must "account for the entire period during which diligence is required.'"  *Creative Compounds, LLC v. Starmark Lab'ys*, 651 F.3d 1303, 1312–13 (Fed. Cir. 2011).  Moreover, the jury's verdict on its face rejected GoPro's position.

GoPro's evidence revealed an ***over one year period*** of inactivity on the WiFi BacPac, from at least September 2009 to January 5, 2011.  As such, the jury's verdict that claim 11 is valid is supported by substantial evidence of a lack of diligence.  Indeed, "[i]t has been held that a party has not exercised reasonable diligence in reducing the invention to practice where there is unexplained inactivity prior to the opponent's entry into the field, for periods as abbreviated as one to two months in duration."  *Fitzgerald v. Arbib*, 268 F.2d 763, 766 (C.C.P.A. 1959) (inactivity for "nearly a month" showed a "lack of diligence"); *see also Griffith v. Kanamaru*, 816 F.2d 624, 627 (Fed. Cir. 1987) (three-month period of inactivity precluded "reasonable diligence"); *In re Meyer Mfg. Corp.*, 411 F. App'x 316,

319–20 (Fed. Cir. 2010) ("an unexplained gap of just over two months" showed no diligence); *Gould v. Schawlow*, 363 F.2d 908, 919 (C.C.P.A. 1966) ("a lapse of nearly two months" defeated diligence); *Application of Nelson*, 420 F.2d 1079, 1081 (C.C.P.A. 1970) (an unexplained gap "during the two-month period" supported no diligence); *Morway v. Bondi*, 203 F.2d 742, 749 (C.C.P.A. 1953) (two separate "hiatus[es] of one and one-half months" did not constitute "reasonable diligence").

Finally, because it is undisputed that Contour reduced its invention to practice by at least September 2010, ***before*** GoPro's WiFi BacPac was reduced to practice in June 2012, GoPro's arguments about "abandonment, suppression or concealment" (Mot. at 23) miss the point. As the Federal Circuit explained, "without an actual reduction to practice there is no invention in existence which can be abandoned." *Correge v. Murphy*, 705 F.2d 1326, 1328 (Fed. Cir. 1983).[3] In this case, because Contour was the first to reduce to practice, GoPro had to prove by clear and convincing evidence that it was ***diligent*** in reducing the invention to practice by June 2012, before any arguments about whether it was abandoned, suppressed, or concealed become relevant.

For the same reasons, GoPro's reliance on *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1343 (Fed. Cir. 2001) is inapposite. There, the prior inventor reduced the invention to practice ***before*** the patentee's conception and reduction to practice, so the only question was whether the prior inventor's delay of two-and-one-half years between reduction to practice and making the invention publicly known showed that the prior invention had been "abandoned, suppressed or concealed." *See Dow Chem.*, 267 F.3d at 1339–1341. As shown above, substantial evidence shows that GoPro failed to prove diligence—which is confirmed by GoPro's admission that it took GoPro "'two and one half years' after conception" to reduce the invention to practice (Mot. at 23) and ultimately by the jury's verdict on claim 11.

## V.    CONCLUSION

Respectfully, the Court should deny GoPro's JMOLs and order a new trial in this case.

---

[3]    In any event, GoPro's argument that Mr. Woodman "filed public disclosures (e.g., patent applications)" in 2008 (Mot. at 23) is irrelevant because it was well before GoPro's reduction to practice in June 2012. *See Dow Chem.*, 267 F.3d at 1342 (where "the potentially invalidating invention is contained in the 1984 activities of AVI, not in the [1974] disclosure of the [AVI] patent," finding that the 1974 patent "has no bearing on whether [inventor] abandoned, suppressed, or concealed").

1

2

3    Dated:  January 28, 2026          /s/ John R. Keville

      Lai L. Yip (SBN 258029)
4     *lyip@sheppardmullin.com*
      SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
5     Four Embarcadero Center Seventeenth Floor
      San Francisco, CA 94111
6     Telephone: (415) 434-9100
      Facsimile: (415) 875-6700
7

8     John R. Keville *(Pro Hac Vice)*
      *jkeville@sheppardmullin.com*
9     Michelle C. Replogle (Pro Hac Vice)
      *mreplogle@sheppardmullin.com*
10    Michael C. Krill *(Pro Hac Vice)*
      *mkrill@sheppardmullin.com*
11    Sunny Akarapu *(Pro Hac Vice)*
      *sakarapu@sheppardmullin.com*
12    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
      845 Texas Ave., 25th Floor
13    Houston, Texas 77002-2791
      Telephone: (713) 431-7100
14    Facsimile: (713) 431-7024

15    Counsel for Plaintiff
      CONTOUR IP HOLDING LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2       I certify that a true and correct copy of the above and foregoing document has been served via

3  email on January 28, 2026 to all counsel of record via email and via the Court's CM/ECF system.

4

5       I certify under penalty of perjury that the above is true and correct.

6       Executed on January 28, 2026, at Houston, Texas.

7

8                                    */s/ John R. Keville*
                                     John R. Keville
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28