# EXHIBIT A

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CONTOUR IP HOLDING, LLC,<br><br>　　　　　Plaintiff,<br>　v.<br>GOPRO, INC.,<br>　　　　　Defendant. | Case No.: 17-cv-04738-WHO<br>Case No.: 21-cv-02143-WHO<br><br>**REBUTTAL EXPERT REPORT OF DR. JING HU REGARDING ISSUES OF VALIDITY OF U.S. PATENT NOS. 8,890,954 AND 8,896,694**<br><br>Judge: Honorable William H. Orrick |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................11

II. COMPENSATION .............................................................................................................12

III. QUALIFICATIONS ............................................................................................................12

IV. LEGAL PRINCIPLES ........................................................................................................13

    A. Person of Ordinary Skill in the Art.........................................................................13

    B. Applicable Legal Standards for Issues of Validity .................................................14

        1. Priority of Invention ....................................................................................14

        2. Conception ...................................................................................................15

        3. Reduction to Practice ..................................................................................15

        4. Diligence, Abandonment, Suppression, or Concealment ...........................15

        5. Anticipation .................................................................................................16

        6. Obviousness ................................................................................................19

        7. Inventorship ................................................................................................23

        8. Materiality ...................................................................................................23

V. PERSON OF ORDINARY SKILL IN THE ART .............................................................24

VI. CLAIM CONSTRUCTION ...............................................................................................24

    A. The Court's Claim Constructions ...........................................................................25

    B. The Parties' Agreed Constructions .........................................................................27

VII. SUMMARY OF OPINIONS ..............................................................................................28

VIII. OVERVIEW OF THE ASSERTED PATENTS ................................................................29

IX. CONTOUR'S CONCEPTION ...........................................................................................29

X. STATE OF THE ART ........................................................................................................31

XI. GOPRO'S ALLEGED PRIOR INVENTION ....................................................................37

    A. Anticipation / Obviousness.....................................................................................40

        1. '954 Patent, Claim 11 ..................................................................................40

|   |   |   |
|---|---|---|
| | 2. | '954 Patent, Claim 12 .................................................................................. 42 |
| | 3. | '954 Patent, Claim 14 .................................................................................. 42 |
| | 4. | '954 Patent, Claim 15 .................................................................................. 42 |
| | 5. | '954 Patent, Claim 20 .................................................................................. 42 |
| | 6. | '694 Patent, Claim 4 .................................................................................... 42 |
| | 7. | '694 Patent, Claim 6 .................................................................................... 42 |
| XII. | SONY | .................................................................................................................................. 42 |
| | A. | Dr. Almeroth Has Failed to Show that the Sony System is Prior Art ................... 42 |
| | B. | My Inspection of the Sony Products ..................................................................... 44 |
| | C. | No Motivation to Combine .................................................................................... 48 |
| | D. | '954 Patent, Claim 11 ............................................................................................ 54 |
| | | 1. "A portable, point of view digital video camera" ....................................... 54 |
| | | 2. "[a camera processor configured to] generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" ... 56 |
| | | 3. "cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device" ................................. 59 |
| | E. | '954 Patent, Claim 12 ............................................................................................ 60 |
| | | 1. "wherein the first image data stream comprises first video image content and the second image data stream comprises second video image content, wherein the first video image content and the second video image content comprise substantially the same video image content at different resolutions or different frame rates" ................................................................................. 60 |
| | F. | '954 Patent, Claim 14 ............................................................................................ 60 |
| | | 1. "wherein based at least in part on a record command, the camera processor is further configured to cause the first image data stream to be stored in a storage device at the video camera as a first video file and cause the second image data stream to be stored in the storage device at the video camera as a second video file" (claim 13) .................................................................... 60 |
| | | 2. "wherein following an end record command, the camera processor is further configured to: receive a request to view the video image data, and cause the wireless connection protocol device to wirelessly communicate content from |

the first video file directly to the personal portable computing device for display on the display of the personal portable computing device." ......... 61

G. '954 Patent, Claim 15 ............................................................................................ 62

H. '954 Patent, Claim 20 ............................................................................................ 62

I. Allegation that the '954 Claims are Obvious Combination of Known Elements in the Prior Art ............................................................................................................ 63

J. '694 Patent, Claim 4 .............................................................................................. 63

    1. "A point of view digital video camera system" (claim 3) .......................... 63

    2. "a hands-free compact portable video camera, comprising" (claim 3) ..... 63

    3. "a mounting interface coupled to the video camera for mounting the video camera to a user of the video camera" (claim 3) ........................................ 64

    4. "a camera mount configured to be mounted to at least one of the body, a garment, and a vehicle of the user of the video camera, the camera mount configured to couple to the mounting interface to mount the video camera on at least one of the body, the garment, and the vehicle of the user of the video camera, wherein the camera mount is further configured for manual adjustment of the video camera with respect to the user of the video camera," (claim 3) ........................................................................................ 64

    5. "[wherein the camera processor is configured to] generate first video image content and second video image content corresponding to the video image data representing the scene, wherein the second video image content is a higher quality than the first video image content" (claim 3) ...................... 65

    6. "cause the wireless connection protocol device to send the first video image content directly to the personal portable computing device for display on a display of the personal portable computing device" (claim 3) .................. 65

    7. "wherein the first video image content comprises at least one of a first image resolution that is lower than a second image resolution of the second video image content and a first frame rate that is lower than a second frame rate of the second video image content" (claim 4) ............................................... 65

K. '694 Patent, Claim 6 .............................................................................................. 66

L. Allegation that the '694 Claims are Obvious Combination of Known Elements in the Prior Art ............................................................................................................ 66

XIII. LOOXCIE ........................................................................................................................... 66

A. Looxcie is Cumulative of Boland .......................................................................... 66

B. Dr. Almeroth Improperly Relies on Mr. Pereira Despite His Lack of Knowledge and Unauthenticated Looxcie Documents ...................................................................... 67

C. My Inspection of the Looxcie Product .................................................................. 75

D. Conception ............................................................................................................ 78

  1. The "generate" terms .............................................................................. 80

  2. The wireless transmission terms ............................................................. 86

  3. The "control signals" terms .................................................................... 87

E. Reduction to Practice ............................................................................................ 89

F. No Motivation to Combine .................................................................................. 90

G. '954 Patent, Claim 11 ........................................................................................... 96

  1. "[a camera processor configured to] generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" ... 96

  2. "cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting" ..................................................................................... 97

H. '954 Patent, Claim 12 ........................................................................................... 99

  1. "wherein the first image data stream comprises first video image content and the second image data stream comprises second video image content, wherein the first video image content and the second video image content comprise substantially the same video image content at different resolutions or different frame rates" ............................................................................. 99

I. '954 Patent, Claim 14 ........................................................................................... 99

  1. "wherein based at least in part on a record command, the camera processor is further configured to cause the first image data stream to be stored in a storage device at the video camera as a first video file and cause the second image data stream to be stored in the storage device at the video camera as a second video file" (claim 13) .............................................................. 100

  2. "wherein following an end record command, the camera processor is further configured to: receive a request to view the video image data, and cause the

wireless connection protocol device to wirelessly communicate content from the first video file directly to the personal portable computing device for display on the display of the personal portable computing device." ....... 101

J. '954 Patent, Claim 15 ................................................................................... 102

K. '954 Patent, Claim 20 ................................................................................... 102

L. Allegation that the '954 Claims are Obvious Combination of Known Elements in the Prior Art ................................................................................ 103

M. '694 Patent, Claim 4 ..................................................................................... 103

    1. "[wherein the camera processor is configured to] generate first video image content and second video image content corresponding to the video image data representing the scene, wherein the second video image content is a higher quality than the first video image content" (claim 3) ................... 103

    2. "cause the wireless connection protocol device to send the first video image content directly to the personal portable computing device for display on a display of the personal portable computing device" (claim 3) ................ 103

    3. "wherein the personal portable computing device generates the control signals for the video camera based at least in part on input received from a user of the personal portable computing device, wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, data acquisition, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting," (claim 3) ..... 104

    4. "wherein the first video image content comprises at least one of a first image resolution that is lower than a second image resolution of the second video image content and a first frame rate that is lower than a second frame rate of the second video image content" (claim 4) ............................................. 104

N. '694 Patent, Claim 6 ..................................................................................... 104

O. Allegation that the '694 Claims are Obvious Combination of Known Elements in the Prior Art ................................................................................ 105

XIV. CANON ................................................................................................................... 105

A. Dr. Almeroth Has Failed to Show that the Canon System is Prior Art ............... 105

B. My Inspection of the Canon Products ................................................................ 106

C. No Motivation to Combine ................................................................................. 109

D. '954 Patent, Claim 11 ....................................................................................... 113

    1. "a wireless connection protocol device configured to send real time image

### K. '694 Patent, Claim 6

202. In my opinion, GoPro has failed to show that claim 6 is invalid. I incorporate my analysis of claim 3, which claim 6 depends on. Because GoPro has failed to show that each and every element of claim 3 is rendered obvious, it has likewise failed to show that each and every element of claim 6 is rendered obvious.

### L. Allegation that the '694 Claims are Obvious Combination of Known Elements in the Prior Art

203. Dr. Almeroth appears to contend that the '694 patent is rendered obvious by various prior art in ¶¶ 624–35. He does not address any of the specific claim language, and apparently purports to apply this analysis to every asserted claim from the '694 patent. And his analysis is substantially identical to the analysis he provided for the '954 patent in ¶¶ 529–540. I disagree with that analysis for the reasons I stated above, which I incorporate by reference here. *See supra* at ¶¶ 189–191.

## XIII. LOOXCIE

204. For the reasons I explain below, I disagree that Looxcie, alone or in combination, anticipates or renders obvious any of the asserted claims. I further disagree that a POSITA would be motivated to combine Looxcie with any of the references Dr. Almeroth identifies.

### A. Looxcie is Cumulative of Boland

205. Mr. Pereira's testimony, which Dr. Almeroth relies on, shows that Looxcie is cumulative of Boland.

206. For example, with respect to preview functionality, Mr. Pereira testified that Boland's description "seems accurate to me" in terms of describing how the Looxcie product works. Pereira Dep. Tr. at 239:25–242:3. As noted below, I have substantial doubts about Mr. Pereira's testimony in light of his admissions to not being familiar with the technology. But Dr. Almeroth relies on this testimony, and if one does that, one must also consider Mr. Pereira's admission that Boland accurately describes the preview functionality.

207. As I explained in my prior report, Boland does not anticipate or render obvious

any asserted claim, particularly with respect to the preview functionality Mr. Pereira confirmed was the same as Boland. And my analysis is consistent with the PTAB's, who rejected GoPro's invalidity arguments based on Boland, again based on Boland's preview functionality. I incorporate my analysis here, and Dr. Almeroth's Looxcie theory thus fails to anticipate or render obvious any claim. *See* Hu *Contour I* Validity Report, ¶¶ 124–361.

### B. Dr. Almeroth Improperly Relies on Mr. Pereira Despite His Lack of Knowledge and Unauthenticated Looxcie Documents

208. Mr. Pereira did not join Looxcie until November 2009. Pereira Dep. Tr. at 221:11–17. He was deposed in his personal capacity.

209. Mr. Pereira testified that he was responsible for the LX2 and LXHD products (which are not part of Dr. Almeroth's theory). *Id.* at 37:11–18. For the LX1 product, he stated "I was less involved as the product development leader." *Id.* at 37:19–20. Mr. Pereira also confirmed that the LX1 work was done prior to his joining the company: "Prior to my joining the company in 2009, there was extensive efforts by -- by people to design and develop this product and this concept for the marketplace." *Id.* at 62:18–21.

210. He also clarified that his knowledge was limited, as he was familiar with the "mechanical side of the product, the physical side that's non- -- nonelectrical." *Id.* at 38:3–4. He further stated that he did not have "deep technical knowledge" of "the electrical area" or "inner workings of the chip." *Id.* at 225:5–14. He further stated that with respect to dual encoding, he "do[es]n't know the inner workings of where the video frames, so to speak, flow within the chips. And I -- I can speak more at a system level, not -- like does it go to the buffer first and then go somewhere else, I -- I don't know." *Id.* at 244:20–23. And he did not know whether the alleged second stream is generated from the buffer. *Id.* at 245:6–19.

211. When describing the LX1 product, Mr. Pereira repeatedly relied on hearsay from unspecified persons or simply guessed. For example, he stated "I'm giving anecdotal information because that all occurred before my time during the original incarnation of the product." *Id.* at 62:2–5. When asked if the LX1 went through certain development phases, Mr.

### E. Reduction to Practice

259. Dr. Almeroth alleges that Looxcie reduced to practice "by no later than September 2010." Almeroth Report, ¶ 669. I note initially that this is insufficient for invalidity. As I explained in my priority analysis above and in my first report, Contour constructively reduced its inventions to practice by the filing of its provisional application on September 13, 2010. Dr. Almeroth's allegation of reduction to practice in September 2010 does not clearly fall before that date, and thus fails to show reduction to practice.

260. Dr. Almeroth relies on Mr. Pereira's testimony that he used prototypes. Almeroth Report, ¶¶ 671–73. He further alleged that Mr. Pereira testified to using "live preview." *Id.*, ¶ 673. But Mr. Pereira admitted he did not know the "inner workings" or "flow within the chips" and did not know where the second stream was generated from. Pereira Dep. Tr. at 244:20–23, 245:6–19. Thus, Mr. Pereira cannot testify as to reduction to practice of the "generate" limitation because he does not know whether there are two streams generated in parallel. That he may have used some form of live preview is insufficient to prove reduction to practice.

261. Dr. Almeroth further alleges that Mr. Pereira mentioned "setting resolution and compression." Almeroth Report, ¶ 673. But Dr. Almeroth does not allege, and Mr. Pereira did not testify, to any reduction to practice involving lighting, color, or audio settings.

262. Dr. Almeroth next alleges that Looxcie had "DV" products. Almeroth Report, ¶ 674–75. But he does not have any evidence relating to any alleged generation of two streams in parallel, transmission of the lower quality stream, or remote control signals for lighting, color, or audio, and thus has failed to show reduction to practice.

263. Dr. Almeroth next alleges that "Looxcie also developed, marketed, and sold its *final* Looxcie LX1 product, which included each of the claimed elements." Almeroth Report, ¶ 676. First, he does not identify any evidence that each of the claim limitations were practiced. Second, he relies on the manuals VIDCIE001056 and VIDCIE001019, which both have modified dates of June 2011, long after Contour's reduction to practice. As such, even if the

manuals did show every claim limitation, it would be too late for Looxcie to qualify as prior art.

264. Dr. Almeroth alleges sales of the LX1 in by September 8, 2010. Almeroth Report, ¶ 678. But he does not identify the features of the product as of that time, and thus does not show conception of the "generate" term, the wireless transmission terms, or the "control signals" terms.

265. Regarding the generate term, Dr. Almeroth relies on Mr. Pereira's testimony and then alleges that "this is precisely what Dr. Hu accused of infringement in her opening expert report in the *CIPH I* case. There, Dr. Hu identified two different encodings as providing the alleged "generating" of the video streams." Almeroth Report, ¶ 679. I disagree and this grossly mischaracterizes my opinions. I did not rely on the testimony of a lay witness who expressly admitted he did not know the "inner workings" or "flow within the chips" and did not know where the second stream was generated from, as Mr. Pereira has admitted. Pereira Dep. Tr. at 244:20–23, 245:6–19. Mr. Pereira's agreement at a deposition to the meaning of dual encoding does not mean that he had knowledge of whether Looxcie actually reduced to practice dual encoding. His admissions make clear he cannot answer that question. Dr. Almeroth has thus failed to show reduction to practice of the "generate" limitation.

266. Dr. Almeroth next alleges obviousness by combining with Ambarella. It is unclear why he references this in his reduction to practice analysis. Nevertheless, I disagree that it would be obvious to combine Looxcie and Ambarella, for the reasons I explain in my motivation to combine section below. *See infra* ¶¶ 270–272.

F. **No Motivation to Combine**

267. I disagree with Dr. Almeroth that a POSITA would have been motivated to combine Looxcie with any other reference he identified, which I have reproduced below:

| | **Invalidity Ground** |
|---|---|
| 1 | Looxcie |
| 2 | Looxcie + Ambarella |
| 3 | Looxcie + US2006070111 (Kurosawa) |

| 4 | Looxcie + EP0895623 (Loveman) |
|---|---|
| 5 | Looxcie + Sony |
| 6 | Looxcie + JP2004328700A (Eguchi) |
| 7 | Looxcie + US20100111489 (Presler) |

268. First, Dr. Almeroth fails to explain precisely what these proposed combinations are. For example, how would one combine Looxcie's camera with Sony's camera? Which camera, lens, camera processor, etc. would be used? Dr. Almeroth never specifies. Instead, his combinations all seem to be part of arguments that the references should be combined to the extent necessary. *See, e.g.*, Almeroth Report, ¶ 693 ("To the extent one or more limitations of the asserted claims are not expressly or inherently disclosed by the Looxcie System, it would have been obvious to combine the references found in the chart above because a person of ordinary skill in the art would have recognized that applying the teachings of these references would have led to predictable results without significantly altering or hindering the functions performed by the video recording camera system."). This is an improper hindsight argument: the extent and nature of the combination is being determined by the claims of the asserted patents themselves, which is improper.

269. Next, Dr. Almeroth alleges "[a] person of ordinary skill in the art in view of designing a point of view camera would have been motivated to look at other cameras available at the time of the alleged invention of the '954 patent. There were many cameras available in the market. A person of ordinary skill in the art would have been particularly interested in looking at other portable, point of view cameras because they were solving similar problems and provided alternative designs and implementations of camera components and functionality." Almeroth Report, ¶ 694. This analysis is flawed in at least two critical ways. First, he starts by assuming that a POSITA is "designing a point of view camera" but that is quoting directly from the claim language and thus an example of improper hindsight. Second, Dr. Almeroth offers absolutely no reason why someone in possession of the Looxcie camera would look to any other camera given

they already have the Looxcie camera in front of them.

270. Next, Dr. Almeroth alleges it would be obvious to combine with Ambarella "because Looxcie did in fact purchase and consider Ambarella for its products, and as Mr. Pereira testified, dual encoding in parallel was important to its products as it was incorporated into every version of those products." Almeroth Report, ¶ 695–96. As I described above, this mischaracterizes Mr. Pereira's testimony given his admission that he did not know the "inner workings" or "flow within the chips" and did not know where the second stream was generated from. Pereira Dep. Tr. at 244:20–23, 245:6–19. Additionally, the fact that Looxcie actually purchased Ambarella products does not support obviousness. Just the opposite, the fact that it was apparently considered and not done supports that it was not obvious.

271. Dr. Almeroth next alleges that "not only would a person of skill in the art have considered Ambarella an option to implement the claimed video 'generating,' Looxcie did in fact consider Ambarella as such as option and actively evaluated and worked with the Ambarella products for incorporation with Looxcie." Almeroth Report, ¶ 697. Here again, Dr. Almeroth is relying on hindsight by improperly starting with the claim language and assuming a POSITA is looking to implement "generating" without any explanation of why.

272. Dr. Almeroth continues that Ambarella would have been appropriate because it is "used for low power devices exactly like the Looxcie device and within small form factor devices" and "the Ambarella chipsets, just like the Core Logic chipsets, provided the functionality that Looxcie demanded, including dual-streaming and remote control." Almeroth Report, ¶ 697. I disagree. First, Dr. Almeroth does not have evidence of the functionality of the Core Logic chipsets, much less evidence to show they are "just like" the Ambarella chipsets. Second, if the chips were in fact "just like" one another, Dr. Almeroth offers no reason a POSITA would look for the Ambarella chip if already in possession of another chip. Finally, Dr. Almeroth is wrong that Looxcie "demanded … dual-streaming." As I discussed above, Looxcie neither conceived nor reduced to practice the "generate" limitations, and thus Dr. Almeroth has failed to show a motivation to combine.

273. Next, Dr. Almeroth alleges a POSITA would be motivated to combine Looxcie with Kurosawa because:

> *Looxcie also discloses displaying videos in real-time through its security cameras, which are also connected to a network. Both inventions are also in the late 2000s timeframe, which makes it even more apparent that a person of ordinary skill in the art would combine these references. Such a combination is further confirmed by the background of Kurosawa, which states that "already established isa technology for distributing a live video taken by a camera via the Internet and the like [like Looxcie] and instructing the camera for a camera setting and a camera operation such as panning, tilting, zooming, and backlight compensation for image taking." Id. at [0003].*

Almeroth Report, ¶ 698.  I disagree.  Looxcie is not a "security camera" and it appears Dr. Almeroth simply copied his Sony rationale to this prior art theory, confirming that he has failed to identify a specific motivation to combine with respect to Looxcie.  Moreover, the mere fact that references are from a similar timeframe is not a motivation to combine.  Furthermore, the fact that Kurosawa references "already established" technology does not provide a motivation to combine.  If anything, the fact that Kurosawa was aware of that "already established" technology and opted for a different design is evidence against the combination being obvious for if it were obvious, Kurosawa would have done it.  Moreover, Kurosawa itself fails to disclose claim limitations, including no two streams of different quality generated in parallel, no direct wireless transmission to a personal portable device, and not the claimed settings.  This combination therefore would not invalidate.

274. Next, Dr. Almeroth alleges a POSITA would be motivated to combine Looxcie with Loveman because:

> *Like the Looxcie, Loveman specifically references generating video from various sources, such as cameras, and "preview[ing] audio/video footage." Id. at [0008]. Indeed, Loveman discloses that even prior to its invention—and with respect to live previewing—that "the live feed of these new developments will be lost unless the live feed is recorded simultaneously on a second tape using a second" storage device or file. Id. at [0010]. To the extent that Looxcie does not already disclose this functionality, it is my opinion*

> *that it would have been obvious to combine the Looxcie and Loveman, as both existed around similar timeframes and both relate to streaming videos in real time, for example*

Almeroth Report, ¶ 699.  I disagree with this analysis, which is simply conclusory, hindsight based analysis arguing for the combination "[t]o the extent that Looscie does not already disclose this functionality."  Such a combination would not be considered, given the vastly different architectures between Loveman and Looxcie.  Looxcie is a small, wearable camera.  Loveman, by contrast, relates to a television news broadcasting system.  *E.g.*, Loveman at ¶¶ [0002]–[0013].  And the encoding in Loveman is part of a "disk-based digital recording workstation." *Id.*, ¶ [0059].  Loveman also does not disclose wireless transmission of any kind.  Given their very different disclosures, it would not be obvious to combine these systems, and Dr. Almeroth does not even attempt to explain how such a combination would be feasible or how it would result in the same thing claimed in Contour's patents (i.e., a "[portable,] point of view digital video camera [system]").

275.   Next, Dr. Almeroth alleges a POSITA would have been motivated to combine Sony with Looxcie because "[b]oth disclose point of view cameras that operate wirelessly with portable computing devices for both remote control and live preview. Although Sony is generally deployed as a security camera, the designers of Looxcie's cameras also designed and manufactured security cameras and therefore would have looked to those designs for inspiration."  Almeroth Report, ¶ 700.  This is another highly conclusory motivation, and I do not agree Dr. Almeroth has shown any specific reason someone with Looxcie would look to Sony.  Even if Dr. Almeroth had shown a motivation, he fails to explain what the combination would even entail.  And, as I noted in my analysis of the Sony theory above, Sony fails to disclose or render obvious numerous limitations of the claims, including some of the same limitations Looxcie is missing, meaning this theory would not invalidate.

276.   Next, Dr. Almeroth alleges a POSITA would have been motivated to combine Looxcie with Eguchi because: "Eguchi set out to 'provide a remote monitoring system utilizing a general telephone line in which remote operation of an imaging apparatus can be appropriately

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

references, and thus this information would not be material.

514. Thus, in my opinion, any allegedly withheld information was not material in light of the other information already pending before the Patent Office related to Ambarella, and in light of the examiner's express statement that the claims were allowed due to lack of motivation to combine.

## XX. CONCLUSION

515. Based on the above evidence and rationale, it is my opinion that GoPro has failed to show invalidity, by clear and convincing evidence, of any asserted claim.

Executed at Santa Barbara, California this 19th day of November, 2021.

Jing Hu, Ph.D.