John R. Keville *(Pro Hac Vice)*
*jkeville@sheppardmullin.com*
Michelle C. Replogle (Pro Hac Vice)
*mreplogle@sheppardmullin.com*
Michael C. Krill *(Pro Hac Vice)*
*mkrill@sheppardmullin.com*
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
845 Texas Avenue, 25th Floor
Houston, Texas 77002
Telephone: (713) 431-7100
Facsimile: (713) 431-7024

Lai L. Yip (SBN 258029)
*lyip@sheppardmullin.com*
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
Four Embarcadero Center Seventeenth Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 875-6700

Attorneys for Plaintiff,
CONTOUR IP HOLDING, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONTOUR IP HOLDING, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>GOPRO, INC.,<br><br>Defendant. | ) **CONSOLIDATED**<br>) Lead Case No. 17-cv-04738-WHO<br>) Consolidated Case No. 21-cv-02143-WHO<br>)<br>) **PLAINTIFF CONTOUR IP HOLDING,**<br>) **LLC'S MOTION FOR PARTIAL**<br>) **SUMMARY JUDGMENT OF**<br>) **INFRINGEMENT**<br>)<br>) **UNREDACTED VERSION OF**<br>) **DOCUMENT(S) SOUGHT TO BE**<br>) **SEALED**<br>)<br>) Judge: William H. Orrick<br>) Date: September 19, 2025<br>) Time: 2:00 p.m.<br>Location: Courtroom 2, 17th Floor |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACTS RELATED TO INFRINGEMENT...........................................................2

       A.     Overview of GoPro's Accused Cameras ..................................................2

       B.     GoPro's Accused Cameras in *Contour III* ............................................5

       C.     Dr. Almeroth Failed To Create Any Genuine Disputes Of Material Fact ...................8

III.   LEGAL STANDARDS .........................................................................................8

IV.    ARGUMENT.......................................................................................................10

       A.     The Hero 11, Hero 12, and Hero 13 Model Cameras Infringe Claim 11 ...................10

              1.     There is no dispute that the cameras include the recited "image sensor … configured to … produce real time video image data of the scene." ..........10

              2.     There is no dispute that the accused cameras include the recited "wireless connection protocol device." ............................................11

              3.     There is no dispute that the accused cameras meet the "generate" limitation. ...................................................................................13

       B.     The Hero 4k Camera Infringes Claim 11 ...............................................15

V.     CONCLUSION...................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)............................................................................................................8

*Apple, Inc. v. Samsung Elecs. Co.*
No. 12-cv-00630-LHK, 2014 WL 660857 (N.D. Cal. Feb. 20, 2014) ..................................9

*Athletic Alternatives v. Prince Mfg.*
73 F.3d 1573 (Fed. Cir. 1996)............................................................................................9

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*
715 F.3d 1363 (Fed. Cir. 2013)..........................................................................................9

*Bai v. L & L Wings*
160 F.3d 1350 (Fed. Cir. 1998)..........................................................................................9

*Cordis Corp. v. Bos. Sci. Corp.*
561 F.3d 1319 (Fed. Cir. 2009)..........................................................................................9

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*
424 F.3d 1168 (Fed. Cir. 2005)..........................................................................................9

*Eli Lilly & Co. v. Hospira, Inc.*
933 F.3d 1320 (Fed. Cir. 2019)..........................................................................................9

*Innovention Toys, LLC v. MGA Ent., Inc.*
637 F.3d 1314 (Fed. Cir. 2011)..........................................................................................9

*Markman v. Westview Instruments, Inc.*
517 U.S. 370 (1996)............................................................................................................9

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005)..........................................................................................9

*Strattec Sec. Corp. v. Gen. Auto. Specialty Co.*
126 F.3d 1411 (Fed. Cir. 1997)..........................................................................................8

Other Authorities

FED. R. CIV. P. 56(a) ............................................................................................................8

## TABLE OF EXHIBITS

| Ex. No. | Description |
|---|---|
| 1 | Excerpts from Dr. Almeroth's Aug. 2025 Non-Infringement Report (Aug. 1, 2025) **FILED UNDER SEAL** |
| 2 | Excerpts from Dr. Hu's *Contour III* Infringement Report (March 31, 2025) **FILED UNDER SEAL** |
| 3 | Excerpts from Deposition of Dr. Jing Hu (June 26, 2025) **FILED UNDER SEAL** |
| 4 | Excerpts from Deposition of Dr. Kevin Almeroth (August 15, 2025) **FILED UNDER SEAL** |
| 5 | Excerpts from Exhibit 3 to the Deposition of Dr. Jing Hu (June 26, 2025) **FILED UNDER SEAL** |
| 6 | Excerpts from GOPRO_251101 **FILED UNDER SEAL** |
| 7 | Excerpts from GOPRO_254410 **FILED UNDER SEAL** |

## I.    INTRODUCTION

In August 2020, this Court granted Contour's motion for summary judgment that GoPro's accused cameras in *Contour I* infringed claim 11 of U.S. Patent No. 8,890,954 ("the '954 Patent"). *See* Dkt. 445. Contour relied on the following demonstrative to illustrate the parallel generation of the low-resolution live preview stream (purple) and the high-resolution video stream (orange):



Dkt. 376-3 at 17. In March 2025, this Court granted Contour's motion for summary judgment that GoPro's accused cameras in *Contour II* with live preview infringed claim 11 because there was "no material dispute that [these] devices have the same live preview functionality as the cameras for which [the Court] previously granted summary judgment in *Contour I*." Dkt. 721 at 12.

Contour now moves for summary judgment that the *Contour III* cameras with the same "live preview functionality" infringe claim 11, including the Hero 11, 12, 13, and 4k camera models. As illustrated by the following demonstrative, these *Contour III* cameras generate a low-resolution live preview stream (purple) in parallel with a high-resolution video stream (orange) just like the *Contour I* and *Contour II* cameras—and also generate a third parallel low-resolution "LRV'" stream (green):



*See* Section II.B, *infra*. Thus, these *Contour III* cameras have the same live preview functionality as the *Contour I* and *II* cameras for which the Court previously granted summary judgment, and only add a third parallel low-resolution stream—which does not affect infringement of claim 11. *See id.*

GoPro's expert, Dr. Almeroth, simply re-raises the same "image processing" arguments that this Court rejected multiple times when granting summary judgment of infringement. For example, GoPro (relying on Dr. Almeroth) previously argued on summary judgment that "the [GP1] camera

processors … only use a single encoder" such that the video streams "are not recorded in parallel, from the same source – but instead reflect a serialized processing pipeline." Dkt. 398-2 at 7 (citing Dkt. 398-3 at Section X.B); *see* Dkt. 398-3 at ¶¶ 249–250 (Almeroth opining that "there is only a single H.264 encoder" so "[t]he video content in the accused products is processed sequentially, not in parallel"). The Court squarely rejected GoPro's argument because "[t]he undisputed fact that the video image data is altered during processing does not mean that any claim limitation is not met," noting "GoPro did not request that any processing-related requirements be included in the construction of the generate term." Dkt. 445 at 9–10. Dr. Almeroth ignores the Court's express rejection of this argument and opines that the *Contour III* products do not infringe **for the same reason**—because they utilize "a single video codec block to process the high- and low-resolution videos in sequence, not in parallel from the same source." *See* Ex. 1 at ¶ 153. Dr. Almeroth's other arguments simply repackage this "image processing" dispute and/or improperly raise claim construction disputes.

Accordingly, as shown below, there is no genuine dispute of material fact that the *Contour III* cameras configured for "Live Preview while Recording" have the same relevant live preview functionality as the cameras for which the Court previously granted summary judgment. Thus, the Court should grant summary judgment that the following accused *Contour III* cameras infringe claim 11 of the '954 Patent: Hero 4k, Hero 13 Black, Hero 12 Black, Hero 11 Black, and Hero 11 Mini.[1]

## II.     FACTS RELATED TO INFRINGEMENT

### A.     Overview of GoPro's Accused Cameras

The *Contour I* accused cameras include the Hero 2, Hero 3, Hero+, Hero 4, Hero Fusion, Hero 5, and Hero 6 models. *See* Dkt. 739-5, Hu *Contour I* Report at ¶ 41. These cameras can all "generate" or "record in parallel" two video streams at different resolutions, where the lower-resolution stream can be transmitted to a mobile phone for display and the higher-resolution stream can be saved to a memory card (referred to as "Live Preview while Recording"). *See id*. at ¶ 86; *id*. at ¶¶ 80–86.

---

[1] Contour's Motion is limited to the Hero 11 models after GoPro released a firmware update to configure the processors for Live Preview while Recording, which was March 14, 2024 for Hero 11 Black, and May 9, 2024 for Hero 11 Mini. *See* Ex. 2 at ¶ 224 (Hu); Ex. 1 at ¶ 53 (Almeroth).

In August 2020, the Court held that the *Contour I* cameras infringed claim 11 of the '954 Patent. *See* Dkt. 445 at 10. In so doing, the Court rejected Dr. Almeroth's argument that GoPro did not infringe because "before the data gets to the camera processor, it is so materially altered that a POSITA would not consider it to be data 'from the video image data.'" *Id*. at 7. As this Court explained, "[t]he undisputed fact that the video image data is altered during processing does not mean that any claim limitation is not met." *Id*. at 9. The Court also rejected GoPro's argument that the cameras did not meet the "generate" or "record in parallel" limitation because "the [GP1] camera processors … only use a single encoder" (Dkt. 398-2 at 7), finding that "[a]lthough GoPro uses different claim language as the basis for its argument, it still argues that the manner in which the low-resolution video is *processed* means that its products do not infringe the claim." Dkt. 445 at 10.

The *Contour II* accused cameras include the Hero 7, Hero 8, Hero MAX, and Hero 9 models. *See* Dkt. 739-6, Hu *Contour II* Report at ¶ 50. Dr. Hu analyzed all *Contour II* cameras and found "the Hero 8 Black is generally representative … in most respects." *Id*. at ¶ 54. For example, Dr. Hu explained that (1) all *Contour II* cameras **except for the Hero 9** supported Live Preview while Recording like the *Contour I* accused cameras, and (2) most of the *Contour II* cameras **including the Hero 9** now supported Live Streaming while Recording. *Id*. at ¶¶ 64–65.

In March 2025, the Court held that the *Contour II* cameras configured for Live Preview while Recording (i.e., the Hero 7, Hero 8, Hero MAX) infringed claim 11, but found a fact issue as to the Hero 9 camera configured only for Live Streaming while Recording. *See* Dkt. 721 at 10–16. In so doing, the Court rejected GoPro's argument that it avoided infringement after it "'removed the ability to change certain settings' from the GoPro App," reiterating "the claims are directed toward a video camera . . . not toward a video camera plus a personal portable computing device." *Id*. at 10–11. Further, "there is no material dispute that [these] devices 'have the same live preview functionality as the cameras for which [the Court] previously granted summary judgment in *Contour I*." *Id*. at 12. As to the Hero 7 White and Silver, the Court found that "Dr. Almeroth … fails to contradict the material facts that form the basis of [Dr. Hu's infringement] conclusions." *Id*. at 13.

The *Contour III* accused cameras include the Hero 10, Hero 11, Hero 12, Hero 13, and Hero 4k models. *See* Dkt. 738-5, Hu *Contour III* Report at ¶ 54. Dr. Hu noted the Court's ruling that the

"*Contour II* accused products … infringe claim 11," except for the Hero 9 which "only supported Live Streaming While Recording (but not Live Preview While Recording)." *Id*. at ¶ 53. Dr. Hu explained that, like the *Contour II* accused cameras, the *Contour III* accused cameras supported "transmit[ting] the low resolution video to a smartphone app while recording (live preview)" and/or "live streaming … while saving." *Id*. at ¶¶ 69–70. Hence, like the *Contour II* cameras, (1) all *Contour III* cameras *except for the Hero 10* supported Live Preview while Recording, and (2) most of the *Contour III* cameras *including the Hero 10* supported Live Streaming while Recording. *Id*. at ¶¶ 69–70.

Accordingly, all accused cameras in *Contour I, II,* and *III* are configured for Live Preview while Recording *and/or* Live Streaming while Recording, as shown by the table below.

| | Accused Products | Live Preview + Recording | Live Streaming + Recording |
|---|---|---|---|
| Contour I | Hero 2 w/ Wi-Fi BacPac | X | |
| | Hero 3 White/Silver/Black | X | |
| | Hero 3+ Silver/Black | X | |
| | Hero+ / Hero+ LCD | X | |
| | Hero 4 Session/Silver/Black | X | |
| | Fusion | X | |
| | Hero 5 Session/Black | X | |
| | Hero 6 Black | X | |
| Contour II | Hero 7 Silver/White | X | |
| | Hero 7 Black | X | X |
| | Hero 8 Black | X | X |
| | MAX | X | X |
| | Hero 9 Black | | X |
| Contour III | Hero 10 Black/Bones | | X |
| | Hero 11 Black/Mini (post-update) | X | X |
| | Hero 12 Black | X | X |
| | Hero 13 Black | X | X |
| | Hero 4k/2024 | X | |

*See* Dkt. 739-6, Hu *Contour II* Report at ¶¶ 64–65; Dkt. 738-5, Hu *Contour III* Report at ¶¶ 69–70. As Dr. Hu confirmed, "my opinion has always been that … live preview during recording or … live streaming during recording, either one is necessary for the infringement." Ex. 3, Hu Dep. 6/26/2025 at 201:6–10; *see also id*. at 18:20–19:8; 27:2–19 ("My opinion is that, to satisfy [the asserted claims], within the accused GoPro products, the live preview during recording and live streaming during recording feature, either one has to be supported"); *id*. at 27:21–28:6 ("either the live preview during

recording or live streaming during recording is required for any … GoPro product to infringe."); *id*. at 98:18–99:7; 120:21–121:3; 157:12–158:13; 182:9–18.

Indeed, GoPro cannot dispute that all accused cameras in *Contour I*, *II*, and *III* are configured for Live Preview while Recording ***and/or*** Live Streaming, as Dr. Almeroth provided a substantively identical table in his report (twice) showing all cameras are so configured. *See* Dkt. 739-8, Almeroth 5/2/2025 Report at ¶ 48; Ex. 1, Almeroth 8/1/2025 Report at ¶ 51. Further, Dr. Almeroth confirmed at his deposition that the tables were accurate, and that "all of the cameras, at a feature level, have one or the other," referring to Live Preview while Recording or Live Streaming. *See* Ex. 4, Almeroth 8/15/2025 Dep. at 18:24–19:23; *id*. at 48:8–51:14 (confirming that only the Hero 9, Hero 10, and Hero 11 (pre-update) cameras were not configured for Live Preview while Recording).

Accordingly, as both experts confirmed, GoPro's representation that Dr. Hu "now alleges that the claims do not require preview while recording" or "live streaming while recording" (Dkt. 731 at 1–4) was unsupported and incorrect.

**B.    GoPro's Accused Cameras in *Contour III***

Contour's expert, Dr. Hu, explained in her report that all limitations of claim 11 of the '954 Patent are met by each *Contour III* accused camera. *See* Ex. 2 at ¶¶ 147–273. Claim 11 recites:

> 11. A portable, point of view digital video camera, comprising:
>
> [a] a lens;
>
> [b] an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene;
>
> [c] a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and
>
> [d] a camera processor configured to:
>
> [e] receive the video image data directly or indirectly from the image sensor,
>
> [f] generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream,
>
> [g] cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for

> display on a display of the personal portable computing device, wherein the personal portable computing device generates the control signals for the video camera, and wherein the control signals comprise at least one of a frame alignment, multi-camera synchronization, remote file access, and a resolution setting, and at least one of a lighting setting, a color setting, and an audio setting,
>
> [h] receive the control signals from the personal portable computing device, and
>
> [i] adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device.

Dkt. 374-3 at claim 11.  This Motion only addresses the *Contour III* cameras having the Live Preview while Recording functionality, as identified above.

For Live Preview while Recording, Dr. Hu explained that the *Contour III* accused cameras have a "minor difference" in that the *Contour III* cameras "generate[] … three parallel streams" as compared to two streams (Ex. 3 at 194:12–195:6), which Dr. Hu labeled in the diagram below:

Ex. 5, Hu Dep. Ex. 3 at 19; Ex. 3, Hu Dep. at 195:11–197:17, 199:9–201:22.  These parallel streams are identified below and annotated in the drawing further below:

- Record Stream (orange) to SD Card, high resolution (labeled by Dr. Hu as stream 'B'/'Y');
- LRV Stream (green) to SD Card, low resolution (labeled by Dr. Hu as stream 'X'); and
- Phone Preview Stream (purple) to WiFi, low resolution (labeled by Dr. Hu as stream 'A').

Ex. 2, Hu Report at ¶¶ 217, 231 (annotations added to figure); *see* Ex. 6, GOPRO_251101 at 251137 (confirming that accused cameras are configured for "Multiple Encoding … Up to 3 stream[s]").

In relevant part, Dr. Hu opined that these *Contour III* cameras include "a wireless connection protocol device" that is "configured to send real time image content [the Phone Preview Stream (purple)] by wireless transmission directly to … a personal portable computing device" as recited by limitation [c], and include "a camera processor configured to … generate from the video image data a first image data stream [the Phone Preview Stream (purple)] and a second image data stream [the Record Stream (orange)] … [and] cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display" as recited by limitations [f] and [g]. *See* Ex. 2 at ¶¶ 217–218; *see also* Ex. 3 at 100:8–13 (Dr. Hu testifying that the "second image data stream" is always the high-resolution "Stream B"); *id*. at 183:16–185:2 ("For independent Claim 11, when we don't talk about the LRV files in the scenario of live preview during recording, Stream A [Phone Preview] is both the *real-time image content* … that the wireless connection protocol device configured to send by wireless transmission directly to the personal portable computing device *as well as the first image data stream* of lower quality.").

Accordingly, the *Contour III* cameras with the Live Preview while Recording are configured to record two streams in parallel while wirelessly transmitting the lower-resolution stream in substantively the same way as the other cameras that the Court has already found to infringe.[2]

**C.     Dr. Almeroth Failed To Create Any Genuine Disputes Of Material Fact**

Dr. Almeroth's August 2025 Non-Infringement Rebuttal Report purports to dispute whether the *Contour III* accused cameras include three limitations, including the following:

> [b] an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene;
>
> [c] a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application; and
>
> [f] a camera processor configured to … generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream ….

Dkt. 374-3 at claim 11. However, as shown below, Dr. Almeroth's opinions are almost entirely based on arguments that this Court has already rejected either on claim construction or on summary judgment. Thus, Dr. Almeroth's opinions fail to create any genuine disputes of material fact as to any claim element for the *Contour III* cameras configured for Live Preview while Recording.

**III.    LEGAL STANDARDS**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To literally infringe, each of the claim limitations must be found in the accused product, i.e., "the properly construed claim [must] read[ ] on the accused device exactly." *Strattec Sec. Corp. v.*

---

[2] As explained in Contour's Motion to Strike filed herewith, Dr. Hu also opines that claim 11 (and dependent claims 13–14) are infringed by the *Contour III* cameras configured for Live Preview while Recording, specifically where the "real time image content" is still the Phone Preview Stream (**purple**), but where the "first image data stream" is the LRV Stream (**green**). *See* Contour's Motion to Strike at Section IV.A; Ex. 3 at 196:16–19.

*Gen. Auto. Specialty Co.*, 126 F.3d 1411, 1418 (Fed. Cir. 1997); *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019). "[I]nfringement is a question of fact." *Eli Lilly*, 933 F.3d at 1328. However, the question of infringement becomes a question of law where the parties do not dispute any relevant facts regarding the structure or operation of the accused device. *Athletic Alternatives v. Prince Mfg.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996). "Thus, a literal infringement issue is properly decided upon summary judgment when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai v. L & L Wings*, 160 F.3d 1350, 1353 (Fed. Cir. 1998); *see also Innovention Toys, LLC v. MGA Ent., Inc.*, 637 F.3d 1314, 1318–19 (Fed. Cir. 2011) (same).

As this Court previously explained in this case regarding claim construction disputes raised by the parties and their experts during summary judgment:

> Claim construction is a matter of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). Where parties do not seek construction of a term, the words are given their ordinary and customary meaning: "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (internal quotation marks omitted); *see Apple, Inc. v. Samsung Elecs. Co.*, No. 12-cv-00630-LHK, 2014 WL 660857, at *3 (N.D. Cal. Feb. 20, 2014) ("*Apple II*"). To ascertain the plain and ordinary meaning, it is appropriate to look to "[t]he written description and other parts of the specification" for "contextual light." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).
>
> Experts can present evidence about how a POSITA would understand a term, but they may not make claim construction arguments to the jury. *Apple II*, 2014 WL 660857, at *3. "[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (quoting *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172–73 (Fed. Cir. 2005)).

Dkt. 445 at 6–7. As shown below, Dr. Almeroth's opinions (as before) are based on improper claim construction arguments that cannot defeat summary judgment.

## IV.   ARGUMENT

### A.   The Hero 11, Hero 12, and Hero 13 Model Cameras Infringe Claim 11

#### 1.   There is no dispute that the accused cameras include the recited "image sensor … configured to … produce real time video image data."

Claim 11 recites "an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene."  The Court construed "real time" to mean "without perceived delay."  Dkt. 251 at 5.

Dr. Hu showed that the Hero 11, 12, and 13 cameras include a Sony IMX677L image sensor based on GoPro internal documents including source code and third-party documents.  Ex. 2 at ¶¶ 98 n.49, 171.  Dr. Hu opined that the image sensors were configured to "produce real time video image data of the scene," citing her review of the source code, internal documents, and her testing of the Hero 12 camera where she "did not observe any perceivable delay."  *Id*. at ¶¶ 175–177.

In rebuttal, Dr. Almeroth argues that "there is user-perceptible delay in the video image data in both Live Preview while recording and Live Streaming."  Ex. 1 at ¶ 114.  However, Dr. Almeroth cites only "Section VIII.B.2" (*id*.), which does not exist in his report but apparently refers to Section IX.B.2 addressing his testing of "Live Streaming," ***not*** Live Preview while Recording (*id*. at ¶¶ 63–71).  Further, Dr. Almeroth's rebuttal opinions are based only on "perceived delay" in the transmission of the video from the camera to the phone, not based on whether the "image sensor" can "produce real time video image data of the scene" as recited.  *Id*. at ¶ 114.  At his deposition, Dr. Almeroth could identify no evidence of "perceivable delay" between "when an image sensor captures light propagating through the lens and representing a scene and when the image sensor produces realtime video image data of the scene," but instead could only identify statements in his report discussing "delays" he allegedly observed in "live streaming."  Ex. 4, Almeroth 8/15/2025 Dep. at 55:8–61:15.  Thus, Dr. Almeroth's opinions cannot create a fact issue as to whether the cameras include the claimed "image sensor."[3]

---

[3] Dr. Almeroth's new opinions also contradict his earlier opinions that the claimed "image sensor" was a "foundational component[] of a digital video camera," and that the claimed functions of the

Further, Dr. Almeroth cites "GOPRO_254410" as allegedly "confirm[ing]" that regardless of the configuration used for Live Preview or Live Streaming, there is likely to be some latency." Ex. 1 at ¶ 123. However, as Dr. Hu explained, GOPRO_254410 confirms the opposite because this GoPro document states that the "live processing flow" for the Phone Preview Stream "is used to live display and phone preview, meaning that it must g[u]aranty *mini[m]al latency*," and "is implementing real time stabilization and lens reprojection." Ex. 2 at ¶ 175 (citing Ex. 7, GOPRO_254410 at 4). Dr. Almeroth could not reconcile his opinions regarding the Live Preview Stream with these documents. Ex. 4, Almeroth 8/15/2025 Dep. at 61:16–78:2. He also testified, "Everything that I saw in that source code was that they were attempting to keep the latency as low as possible." *Id.* at 64:7–25.

In fact, this same document (GOPRO_254410) says that the "Live Processing" used for the Phone Preview Stream has " ███████████████████ " processing blocks shown in the diagram in Section II.B above. Ex. 7 at Slide 16. When asked whether a "1 frame delay" as reflected in this document was "perceivable," Dr. Almeroth testified: "Perceivable by what or who? … Your question doesn't have any context to it, so the answer is: Possibly. In some scenarios, yes; in other scenarios, no." Ex. 4, Almeroth 8/15/2025 Dep. at 78:24–79:13. Dr. Almeroth could not answer whether there was any "perceived delay" in the Live Preview Stream sent to the phone during Live Preview while Recording. *Id.* at 56:7–61:23, 78:24–79:13.

Accordingly, there is no genuine dispute of material fact regarding whether the Hero 11, Hero 12, and Hero 13 cameras include this limitation.

> **2.** **There is no dispute that the accused cameras include the recited "wireless connection protocol device."**

Claim 11 recites "a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application." The Court construed "real time" to mean "without perceived delay." Dkt. 251 at 5.

---

"image sensor" (i.e., that it "'captures light' and 'produces *real time video image data*'") were "conventional, generic functionalities in essentially any digital camera environment including POV cameras." *See* Dkt. 613-24 at ¶¶ 1229–1230 (Almeroth *Contour II* invalidity report).

Dr. Hu identified the "wireless connection protocol device" as the Qualcomm QCA9377 for Hero 11 & 12 and as the Broadcom BCM4381 for Hero 13 & 4k, citing GoPro's internal documents including source code and third-party documents. Ex. 2 at ¶¶ 118, 183, 193. Dr. Hu also tested the accused products to confirm that they were "configured to send real time image content by wireless transmission directly to" a mobile device, and to "receive control signals or data signals by wireless transmission directly from" a mobile device. *Id*. at ¶¶ 187, 189.

In rebuttal, Dr. Almeroth stated "Dr. Hu has not shown that this element is met for the same reasons as the prior element [regarding 'image sensor']." *See* Ex. 1 at ¶ 126. Hence, Dr. Almeroth's opinions do not create a fact issue for the same reasons discussed above. Further, at his deposition, Dr. Almeroth could not answer whether the accused cameras include "a wireless connection protocol device configured to send real time image content." Ex. 4, Almeroth 8/15/2025 Dep. at 25:23–27:23.

Dr. Almeroth also asserted that Dr. Hu "does not identify a particular device (as opposed to a collection of components) that she contends meets the requirements of the claimed 'wireless connection protocol device' configured to both send real time image content wirelessly and receive control signals," asserting that "the settings Dr. Hu identifies as control signals … may be controlled by Bluetooth but not Wi-Fi, whereas Wi-Fi is used to send video in cameras capable of Live Preview." Ex. 1 at ¶ 127. However, Dr. Almeroth ignores that Dr. Hu identified the "particular device" (QCA9377 or BCM4381) meeting this limitation, which have "a Wi-Fi and/or Bluetooth transceiver." Ex. 2 at ¶ 183. Dr. Almeroth also ignores that this Court found the Hero 7, Hero 8, and Hero MAX models infringed claim 11, which also used a QCA9377 device. *See* Dkt. 606-5 at ¶ 179 (Hu *Contour II* Report); Dkt. 721 at 8–14 (order granting summary judgment of infringement). Hence, although Dr. Almeroth opines that the *Contour III* cameras "use … different wireless devices … one for WiFi 802.11 and then one for Bluetooth" (Ex. 4, Almeroth 8/15/2025 Dep. at 85:6–16), there is one "wireless device" (QCA9377 or BCM4381) that has a WiFi transceiver and a Bluetooth transceiver. *See, e.g.*, Ex. 1 at ¶ 127 (showing diagram of wireless device); Ex. 2 at ¶ 183.

Finally, Dr. Almeroth's arguments wrongly advance a new claim construction. Under Dr. Almeroth's new interpretation, the "wireless connection protocol device" must be configured to use the same method of "wireless transmission" (Wi-Fi *or* Bluetooth) to ***both*** "send real time image

content by wireless transmission directly" *and* "receive control signals or data signals by wireless transmission." However, Dr. Almeroth identifies no language in claim 11 supporting this reading of the claim. Ex. 1 at ¶¶ 127–128. In fact, Dr. Almeroth testified that the claim language "doesn't limit it [the wireless connection protocol device] to specifically WiFi or Bluetooth." Ex. 4, Almeroth 8/15/2025 Dep. at 86:2–20. Moreover, GoPro never sought a construction of "wireless transmission" that would limit the claims to using Bluetooth or using Wi-Fi (but not both) for "wireless transmission." Indeed, such a construction would be directly contrary to the teachings of the specification, which makes clear that using Bluetooth for wireless transmission is only a preferred embodiment. *See* '954 Patent at 19:38–47 ("Implementing digital video camera 10 with a wireless connection protocol enables remote control of the operation of and remote access to image data stored in digital video camera 10. *In preferred embodiments*, the integration of Bluetooth® wireless technology in the wearable digital video camera 10 facilitates implementation of several features, including …."); *id*. at 1:57–61. Thus, the Court should reject Dr. Almeroth's improper claim construction arguments regarding this limitation. Ex. 1 at ¶¶ 129–142.

There is no genuine dispute of material fact regarding whether the Hero 11, Hero 12, and Hero 13 cameras include this limitation.

### 3. There is no dispute that the accused cameras meet the "generate" limitation.

Claim 11 also recites the "generate" limitation, which this Court construed to mean "*record in parallel* from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream." Dkt. 251 at 9–10.

Dr. Hu showed how the *Contour III* accused cameras in the Live Preview while Recording configuration meet this limitation. Ex. 2 at ¶¶ 215–230. As Dr. Hu explained with respect to the diagram shown in Section II.B above, the Record Stream (orange) represents the "second image data stream" and is generated in parallel with the Phone Preview Stream (purple), which represents the "first image data stream" that "can be streamed via Wi-Fi." Ex. 2 at ¶¶ 217–218.

In rebuttal, Dr. Almeroth contends that the Hero 11, 12, and 13 cameras (which use the GP2 processor) utilize "a single video codec block to process the high- and low-resolution videos in

sequence, not in parallel from the same source." *See* Ex. 1 at ¶ 153. Dr. Almeroth also opines that "the high resolution video is also not created *from the real time video image data*" due to "[t]he sequential processing of the full resolution and lower resolution video streams." *Id*. at ¶ 171.

However, the Court already considered and rejected these same arguments on summary judgment, where GoPro argued that the first and second streams were not generated "from the video image data" or "in parallel" because there were "material alterations that occur during processing of the data." Dkt. 445 at 7–9. Specifically, GoPro argued on summary judgment that "the [GP1] camera processors … only use a single encoder" such that the video streams "are not recorded in parallel, from the same source – but instead reflect a serialized processing pipeline." Dkt. 398-2 at 7. In support, GoPro cited Dr. Almeroth's report that "the GP1 chipset uses a single H.264 encoder" (Dkt. 398-3 at ¶ 236) such that "[t]he video content in the accused products is processed sequentially, not in parallel" (*id*. at ¶ 250). Rejecting GoPro's argument, the Court explained:

> Almeroth's opinion improperly deviates from the plain and ordinary meaning of the term "from the video image data" and instead reads in a new limitation that GoPro failed to seek during claim construction in 2018 or advocate at other stages of the parties' years-long dispute. Almeroth's opinion requires that "from" have a specialized meaning that narrows its plain and ordinary meaning; according to him, for the generated data to be "from the video image data," it must "correspond" to the video image data and be without material alterations. In so doing, Almeroth's noninfringement opinion implicitly adds a negative limitation to the claim, newly requiring that the video image data not undergo substantial or fundamental changes during processing. … Claim 11 says nothing about processing or alteration, and the plain language of "from the video image data" indicates nothing about processing or alteration. Yet Almeroth's opinion impliedly adds a processing- and alteration-related requirement. GoPro cannot obscure the specialized meaning and new claim limitation that underlie Almeroth's opinion behind the label of "POSITA." Almeroth is not opining that a POSITA would understand the technology in a certain way; again, there is no dispute on that question. Instead he is opining that a POSITA would understand the claim term in a certain way.

Dkt. 445 at 7–8. Thus, "[t]he undisputed fact that the video image data is altered during processing does not mean that any claim limitation is not met." *Id*. at 9. Finally, the Court explained that GoPro "still argues that the manner in which the low-resolution video is *processed* means that its products do

not infringe," but "GoPro did not request that any processing-related requirements be included in the construction of the generate term." *See id*. at 10.

Despite the Court's clear ruling, Dr. Almeroth still opines that the video image data is "altered" during "processing" such that the cameras do not infringe. *See* Ex. 1 at ¶ 161 n.78 (Dr. Almeroth opining that "buffering *modifies* the data so that it is not the same data as prior to buffering" and that "[t]here are buffering steps before and after the processing step identified as the 'codec' which *alters the data*"). However, as the Court already found, "[t]he undisputed fact that the video image data is altered during processing does not mean that any claim limitation is not met." Dkt. 445 at 9. Thus, the Court should reject Dr. Almeroth's repackaged improper claim construction attempt here.

Finally, Dr. Almeroth argues that "the 'phone preview' is never being *recorded* by the camera and therefore cannot meet the Court's construction of 'generating' as requiring recording." Ex. 1 at ¶ 168. But Dr. Almeroth also opined that with the *Contour III* cameras "[t]here are buffering steps before and after the processing step identified as the 'codec'" (Ex. 1 at ¶ 161 n.78), and he previously opined that "it is undisputed that the image content/data is *recorded* (i.e., *stored*) in *at least one data buffer* before it can be displayed on the portable computing device." Dkt. 376-6, Almeroth 6/16/2020 Report at ¶ 281. Further, as he confirmed at his deposition, the Phone Preview Stream passes through a "DDR buffer" before being wirelessly transmitted via Wi-Fi. *See* Ex. 4, Almeroth 8/15/2025 Dep. at 127:24–128:25. Thus, there can be no dispute that the Phone Preview Stream meets the Court's construction for the "generate" limitation.

Accordingly, there is no genuine dispute of material fact regarding whether the Hero 11, Hero 12, and Hero 13 cameras include this limitation.

### B.   The Hero 4k Camera Infringes Claim 11

Dr. Almeroth separately quibbles whether Dr. Hu established that GoPro's Hero 4k infringes claim 11. However, the sole basis for Dr. Almeroth's nitpicking is his protest that Dr. Hu did not cite sufficient evidence regarding the Ambarella H22 processor used with the Hero 4k. *See* Ex. 1 at ¶ 122 (Dr. Almeroth asserting that "Dr. Hu offers no evidence in support of her conclusions regarding the functionality of the image sensor (if any) in the HERO4K"); *id*. at ¶¶ 145–150 (similar). Because Dr. Hu did cite ample evidence to support her opinions, and because Dr. Almeroth mischaracterizes Dr.

Hu's opinions without identifying any contradictory evidence—despite citing multiple undocumented and unrecorded discussions with GoPro engineers (*id*. at ¶¶ 155, 156, 159, 168, 207, 209, 218)—Dr. Almeroth's opinions cannot create a genuine dispute of material fact.

Indeed, Dr. Almeroth's opinions here for the Hero 4k mirror his opinions in *Contour II* for the Hero 7 Silver and White, where Dr. Almeroth raised similar criticisms about Dr. Hu not citing sufficient evidence but without citing any contradictory evidence. *See* Dkt. 627-3 at 9–10 (GoPro's summary judgment opposition raising similar arguments, such as "[Dr. Hu] does not cite to a single document produced by [processor manufacturer]"). As this Court explained when rejecting GoPro's argument: "Dr. Almeroth misrepresents the substance of Dr. Hu's report—she does supply the facts that support her conclusions—and he fails to contradict the material facts that form the basis of her conclusions." Dkt. 721 at 13. Likewise, here, Dr. Almeroth fails to contradict the material facts that form the basis of Dr. Hu's conclusions regarding the Hero 4k.

Regarding limitation [b], Dr. Hu showed that the Hero 4k included a Sony IMX688 image sensor based on GoPro internal documents (including source code) and public third-party documentation. Ex. 2 at ¶¶ 98 n.49, 171. Further, Dr. Hu explained that her review of the source code showed that "there is no programmed delay in the image sensor or in the wireless transmission of video." *Id*. at ¶ 177. Dr. Hu also cited her testing of cameras showing that there was no latency (*id*. at ¶ 176), including her testing of the Hero 4k during Live Preview while Recording (*id*. at ¶ 79). In rebuttal, Dr. Almeroth simply says "Dr. Hu offers no evidence in support of her conclusions." Ex. 1 at ¶ 122. However, as shown above, Dr. Hu does offer evidence in support of her opinions—Dr. Almeroth just ignores it without offering or citing any contradictory evidence in rebuttal. *See id*. Further, as Dr. Almeroth testified at his deposition:

> Q. Okay. Does the Hero4K have an image sensor configured to capture light propagating through the lens and representing a scene and produce realtime image -- video image data of the scene?
>
> MR. DUCKER: Object to the form of the question.
>
> **THE WITNESS: I don't recall being asked to offer an opinion on that limitation.**

Ex. 4, Almeroth 8/15/2025 Dep. at 101:5–13. Thus, Dr. Hu's opinions are unrebutted.

Regarding limitation [c], Dr. Almeroth incorporates his same arguments for the "image sensor" limitation, but otherwise does not dispute Dr. Hu's showing that the Hero 4k includes the recited "wireless connection protocol device." *See* Ex. 1 at ¶¶ 126–142.  For this limitation, Dr. Almeroth confirmed that "[t]he way that the Hero4K works is the same with respect to the characterization that I've provided [for the other products]." Ex. 4, Almeroth 8/15/2025 Dep. at 101:15–102:20.  Thus, Dr. Almeroth fails to create a fact issue for the same reasons discussed above.

Regarding limitation [f], Dr. Hu opined that the Hero 4k includes an Ambarella H22 processor (Ex. 2 at ¶ 199) that is configured to "record in parallel two video streams substantially similar to the *Contour I & II* accused products" (*id*. at ¶ 214).  Dr. Hu cited her "review of the source code" which showed that "various functions are called to begin parallel video encodings." *Id*. at ¶ 219; *id*. at ¶¶ 113–117 (identifying functions that "configure three video streams and for them to be encoded in H.265, H.264 and H.264," and function that "executes to set dual file saving for video streams").  Dr. Hu also cited an Ambarella product sheet stating that "H22 delivers up to 4K video recording at 60fps or equivalent performance while streaming a second, live, mobile-resolution video over a WiFi network for preview or sharing," and that it generates "simultaneous second stream" and includes "[d]ual encode for on the fly mobile resolution streaming." *Id*. at ¶ 227.

In rebuttal, Dr. Almeroth repeatedly asserts that "Dr. Hu provides no evidence." Ex. 1 at ¶¶ 145, 147.  However, as shown above, Dr. Hu does offer evidence and analysis (including of GoPro's source code and Ambarella documentation) in support of her opinions, whereas Dr. Almeroth offers *zero* evidence to contradict Dr. Hu's opinions or the evidence she relies on.  *See* Ex. 1 at ¶¶ 146–150.  As Dr. Almeroth confirmed at his deposition, he is aware of no evidence contradicting Dr. Hu's opinion that the Hero 4k camera includes this limitation, and his opinion is simply that "there has not been sufficient evidence" cited by Dr. Hu.  Ex. 4, Almeroth 8/15/2025 Dep. at 105:2–9.

Moreover, Dr. Almeroth asserts that "Dr. Hu offers no analysis regarding the image processing pipeline used by the Ambarella chipset." Ex. 1 at ¶ 145.  However, he ignores that GoPro failed to produce any documents showing "the image processing pipeline." *See* Ex. 3, Hu Dep. at 207:3–208:17 (Dr. Hu explaining that Dr. Almeroth did not cite any contradictory evidence).  Further, at his

deposition, Dr. Almeroth apparently did not know if he had seen "the image processing pipeline" documents or even "what documents that would specifically refer to":

> Q. Okay. Did GoPro produce in this case the 11 image processing pipeline used by the Ambarella 12 chipset for the Hero4K?
>
> MR. DUCKER:  Object to the form of the question.
>
> THE WITNESS:  **I don't recall if they did or not**. And I'm not sure what that characterization could specifically encompass in terms of documents. …
>
> Q. Okay. And have you seen the image processing pipeline documents for the chipset in the Hero4K?
>
> A. **I am not sure what documents that would specifically refer to**. I have seen the documents that Dr. Hu relies on. If they fall within the characterization of your question, then yes.  If your question is about other documents that Dr. Hu did not rely on or have access to, then the answer would be no.

Ex. 4, Almeroth 8/15/2025 Dep. at 105:10–106:10.  GoPro cannot hide behind its failure to produce "the image processing pipeline used by the Ambarella chipset" to defeat summary judgment without producing or even identifying any evidence to contradict the evidence relied on by Dr. Hu.  Thus, Dr. Hu's opinions on this limitation are again unrebutted by Dr. Almeroth.

Accordingly, there is no genuine dispute of material fact that the Hero 4k camera infringes claim 11 of the '954 Patent.

## V.    CONCLUSION

Contour respectfully requests that the Court grant Contour's Motion for Summary Judgment that GoPro's Hero 4k, Hero 13 Black, Hero 12 Black, Hero 11 Black, and Hero 11 Mini[4] camera models infringe claim 11 of the '954 Patent.

---

[4] Contour's Motion is limited to the Hero 11 models after GoPro released a firmware update to configure the processors for Live Preview while Recording, which was March 14, 2024 for Hero 11 Black, and May 9, 2024 for Hero 11 Mini.  *See* Ex. 2 at ¶ 224 (Hu); Ex. 1 at ¶ 53 (Almeroth).

Dated:  August 19, 2025        /s/ John R. Keville

Lai L. Yip (SBN 258029)
*lyip@sheppardmullin.com*
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
Four Embarcadero Center Seventeenth Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 875-6700

John R. Keville *(Pro Hac Vice)*
*jkeville@sheppardmullin.com*
Michelle C. Replogle (Pro Hac Vice)
*mreplogle@sheppardmullin.com*
Michael C. Krill *(Pro Hac Vice)*
*mkrill@sheppardmullin.com*
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
845 Texas Ave, 25th Floor
Houston, Texas 77002
Telephone: (713) 431-7100
Facsimile: (713) 431-7024

Counsel for Plaintiff
CONTOUR IP HOLDING LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served via email on August 19, 2025 to all counsel of record via email and via the Court's CM/ECF system.

I certify under penalty of perjury that the above is true and correct.

Executed on August 19, 2025, at Houston, Texas.

*/s/ John R. Keville*
John R. Keville