# EXHIBIT 1

## FILED UNDER SEAL

ATTORNEYS' EYES ONLY – SOURCE CODE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CONTOUR IP HOLDING, LLC,

        Plaintiff,

   vs.

GOPRO, INC.,

        Defendant.

CASE NO. 17-CV-04738-WHO
CASE NO. 21-CV-02143-WHO

**UPDATED REBUTTAL EXPERT REPORT OF KEVIN ALMEROTH, Ph.D.**

ATTORNEYS' EYES ONLY – SOURCE CODE

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    QUALIFICATIONS ............................................................................................. 4

III.   MATERIALS CONSIDERED ............................................................................. 4

IV.    LEVEL OF ORDINARY SKILL IN THE ART .................................................. 4

V.     LEGAL STANDARDS ........................................................................................ 4

       A.    General Patent Law ................................................................................... 4

       B.    Direct Infringement ................................................................................... 5

             1.    Literal Infringement ........................................................................ 6

             2.    Infringement under the Doctrine of Equivalents ........................... 6

       C.    Indirect Infringement ................................................................................ 7

             1.    Induced Infringement ...................................................................... 7

             2.    Contributory Infringement .............................................................. 8

       D.    Divided Infringement ................................................................................ 9

       E.    Comparable License Analysis .................................................................... 9

       F.    Reverse Doctrine of Equivalence ............................................................ 10

VI.    SUMMARY OF LITIGATION HISTORY ........................................................ 10

VII.   SUMMARY OF OPINIONS .............................................................................. 12

VIII.  THE ASSERTED PATENTS .............................................................................. 12

       A.    Claim Constructions ................................................................................ 13

       B.    Overview of the Asserted Claims ............................................................ 13

       C.    Prosecution of the Asserted Patents at the USPTO ................................. 13

       D.    Prosecution of the Asserted Patents At the PTAB .................................. 13

       E.    Prosecution History Timeline .................................................................. 14

IX.    THE ACCUSED PRODUCTS ............................................................................ 14

ATTORNEYS' EYES ONLY – SOURCE CODE

A.  Identification of the Accused Products ................................................................ 14

B.  Description of the Accused Products ................................................................... 14

    1.  No Live Preview While Recording On HERO9 Black, HERO10 Black, HERO10 Black Bones, HERO11 Black, or HERO11 Black Mini ................................................................................................ 21

    2.  Live Streaming ..................................................................................... 28

    3.  Ambarella Chipsets ............................................................................. 62

X.  NO DIRECT INFRINGEMENT ................................................................................ 65

A.  Overview ............................................................................................................. 65

B.  General Flaws in Dr. Hu's Analysis ................................................................... 65

C.  "A portable, point of view digital video camera, comprising" ........................... 66

D.  "an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene" ................................................................................................................... 67

    1.  HERO 4K (2024) ................................................................................. 73

    2.  GP2-Based Accused Products ............................................................. 73

E.  "a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application" ........................................................ 77

    1.  Live Preview Without Recording ......................................................... 78

    2.  Live Streaming ..................................................................................... 80

        a)  Real Time Image Content Is Not Sent *Directly* or *Wirelessly* To A Personal Portable Computing Device ......................................... 80

        b)  The Alleged Wireless Connection Protocol Device is not Configured As Claimed ............................................................... 85

ATTORNEYS' EYES ONLY – SOURCE CODE

F.      "generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" ('954 Pat. Cl. 11) / "generate first video image content and second video image content corresponding to the video image data representing the scene, wherein the second video image content is a higher quality than the first video image content" ('694 Pat. Cl. 3 – incorporated into asserted claims 4 and 6)................ 87

        1.      Ambarella H22:  No Evidence Of Recording "In Parallel" or "From The Video Image Data"................................................. 87

        2.      GP2 Products Do Not Record "In Parallel" or "From the Video Image Data" ....................................................................... 93

        3.      GP2 Products – No Live Preview While Recording (HERO10/11 Cameras) ............................................................................. 115

        4.      Live Streaming (Except HERO 4K (2024))........................................... 120

G.      "cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device" ('954 Pat. Cl. 11) / "cause the wireless connection protocol device to send the first video image content directly to the personal portable computing device for display on a display of the personal portable computing device" ('694 Pat. Cl. 3 – incorporated into asserted claims 4 and 6)............................................. 121

        1.      GP2 Products – No Preview While Recording (HERO10/11 Cameras) ............................................................................. 121

        2.      Live Streaming Does Not Infringe........................................... 126

                a)      "Directly".................................................................... 126

                b)      Not Wireless............................................................... 130

                c)      Not "For Display".................................................... 130

        3.      Divided Infringement – No Direction or Control ................................. 131

H.      No Adjusting Settings or Receiving Adjustments to Settings For Live Streaming ...................................................................................... 133

I.      No Infringement of Claims 12, and 14 by the HERO12 and HERO13 Cameras....................................................................................... 135

iii

ATTORNEYS' EYES ONLY – SOURCE CODE

XI.      '694 PATENT ................................................................................................ 140

XII.    NO INDIRECT INFRINGEMENT OF THE ASSERTED PATENTS ......................... 141

XIII.   RESPONSE TO DR. UGONE'S TECHNICAL ASSERTIONS .................................. 143

XIV.   OTHER COMMENTS ........................................................................................ 157

ATTORNEYS' EYES ONLY – SOURCE CODE

I, Kevin Almeroth, Ph.D., declare as follows:

## I.      INTRODUCTION[1]

1.      I have been retained by counsel on behalf of GoPro, Inc. ("GoPro") as an expert in this litigation.  I have prepared this report at the request of the GoPro and its counsel.  This report provides my opinions on non-infringement of the claims of U.S. Patent Nos. 8,890,954 (the "'954 Patent") and 8,896,694 (the "'694 Patent") (collectively, "the Asserted Patents") asserted by Plaintiff Contour IP Holding, LLC ("CIPH" or "Plaintiff").  This report also contains my responses to the Expert Reports of Dr. Keith R. Ugone and Dr. Jing Hu served on March 31, 2025.  I expect to testify at trial regarding the matters set forth in this Report, if asked about those matters by the Court or the parties' attorneys.

2.      I previously served expert reports regarding non-infringement on June 16, 2020 ("*Contour I* Infringement Report"), November 19, 2021 ("*Contour II* Infringement Report"), and May 2, 2025 (*Contour III* Infringement Report) providing my opinions regarding CIPH's allegations that GoPro infringes certain claims of U.S. Patent Nos. 8,890,954 (the "'954 patent") and 8,896,694 (the "'694 patent") (collectively, the "Asserted Patents").  I understand that following service of my May 2, 2025 Report, GoPro was afforded leave by the Court to serve an additional supplement to address the new infringement theory proposed by CIPH and Dr. Hu in her March 31, 2025 report.  This report constitutes an updated and amended report for that purpose.

---

[1]  Headings in this document and in my opening report are not intended to limit the scope of my opinions within those sections.  Section headings are inserted for the purpose of convenience only and are not intended to affect the meaning or interpretation my opinions.  For example, the headings are not intended to limit my opinions, evidence, or analysis to a particular legal issue.

ATTORNEYS' EYES ONLY – SOURCE CODE

3.      The Court has issued opinions on infringement, which are discussed below, and I do not intend to offer any opinions at trial that have been stricken, or which are inconsistent with issues upon which the Court has already ruled.  In all other respects, I incorporate by reference the analysis and opinions set forth in my prior expert reports.

4.      I provide this report to respond to opinions by Drs. Hu and Ugone regarding GoPro products released after October 2021 (the *Contour III* opening reports).  Specifically, this report provides my opinion regarding allegations by CIPH that certain of GoPro's products infringe claims 11, 12, 14, 15, 20, and 30 of the '954 patent and claims 4 and 6 of the '694 patent (the "Asserted Claims") and that CIPH should be compensated for that infringement.  In her report, Dr. Hu offers opinions regarding the following products and asserted claims (*see* 3/31/2025 Hu Rpt. at Table 3):

| Accused Products Identified In Dr. Hu's 3/31/2025 Report ("Accused Products") | | |
|---|---|---|
| HERO (4k/2024) | '954 Patent Cls.: 11, 12, 14 | '694 Patent:  Not asserted |
| HERO13 Black | '954 Patent Cls.: 11, 12, 14, 15, 20 | '694 Patent:  4, 6 |
| HERO12 Black | '954 Patent Cls.: 11, 12, 14, 15, 20 | '694 Patent:  4, 6 |
| HERO11 Black Mini | '954 Patent Cls.: 11, 12, 14, 15, 20 | '694 Patent:  4, 6 |
| HERO 11 Black | '954 Patent Cls.: 11, 12, 14, 15, 20 | '694 Patent:  4, 6 |
| HERO10 Black | '954 Patent Cls.: 11, 12, 14, 15, 20 | '694 Patent:  4, 6 |
| HERO10 Black Bones | '954 Patent Cls.: 11, 12, 14, 15, 20 | '694 Patent:  Not asserted |

5.      This report also provides my opinion regarding allegations by CIPH that GoPro customers and end users infringe the Asserted Claims of the Asserted Patents.  As explained below, I have reached the conclusion that CIPH and its experts have not demonstrated that the Accused Products infringe the Asserted Claims of the Asserted Patents and, therefore, that GoPro and its customers and end users do not infringe the Asserted Claims of the Asserted Patents.

2

ATTORNEYS' EYES ONLY – SOURCE CODE

6.      I am being compensated at my standard billing rate of $800 per hour for time spent on this matter, plus reasonable out-of-pocket expenses.  I have received no additional compensation for my work in this litigation, and my compensation does not depend upon the contents of this report, any testimony that I may provide, or the ultimate outcome of this litigation.

7.      In forming my opinions, I have relied on my knowledge and experience and on the documents and information described below.  I also have an understanding of GoPro's technology based on my own use of GoPro's commercial products. For instance, I have personally used numerous of the Accused Products as well as GoPro cameras addressed in my prior reports.  I have used GoPro cameras to perform various operations, including taking video, uploading my video to the cloud, live streaming, and changing settings on the GoPro camera.  As part of my evaluation, I extensively used and tested the operation of the Accused Products.  My testing of the Accused Products consisted of using an iPhone and/or Android device paired with the Accused Products for this case.  *See, e.g.*, Appx A-D.

8.      I reserve the right to modify and supplement my analysis and conclusions set forth in this report based upon any additional discovery performed by the parties or in response to any reports by experts for Plaintiff.  I also reserve the right to modify and supplement my analysis and conclusions set forth in this report based upon any change to any of the applicable legal standards explained to me by GoPro's counsel.

9.      At trial I may rely on visual aids and/or analogies concerning elements of the asserted patents or other aspects of my opinions or the material in this report.  At trial I may also use as exhibits various documents produced in this case that relate to the matters discussed in this

3

ATTORNEYS' EYES ONLY – SOURCE CODE

### E.    Prosecution History Timeline

47.    I incorporate by reference my discussion of the prosecution history timeline for the Asserted Patents from my prior reports issued in this case.

## IX.    THE ACCUSED PRODUCTS

### A.    Identification of the Accused Products

48.    In her *Contour III* report, which I respond to herein, Dr. Hu identifies the accused products as "Hero (4k/2024), Hero13 Black, Hero 12 Black, Hero 11 Black Mini, Hero 11 Black, Hero10 Black, and Hero 10 Black Bones" ("Accused Products").  *See* 3/31/2025 Hu Rpt. ¶54.

49.    Dr. Hu concludes that certain of the Accused Products infringe certain of the asserted claims, as set forth below.

| Table 3: Summary of Infringement Conclusions By Product & Claim | | | | | | | |
|---|---|---|---|---|---|---|---|
| | '954 Patent Claims | | | | | '694 Patent Claim | |
| Camera | 11 | 12 | 14 | 15 | 20 | 4 | 6 |
| Hero (4k/2024) | ✓ | ✓ | ✓ | | | | |
| Hero 13 Black | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Hero 12 Black | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Hero 11 Black Mini | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Hero 11 Black | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Hero 10 Black | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Hero 10 Black Bones | ✓ | ✓ | ✓ | ✓ | ✓ | | |

*Id.*

### B.    Description of the Accused Products

50.    I describe below certain characteristics and features of the Accused Products that are relevant to Dr. Hu's infringement theories.  In particular, I focus below on the differences

14

ATTORNEYS' EYES ONLY – SOURCE CODE

among the Accused Products and the differences between the products accused in this case and the HERO6 Black, which I discussed in my original *Contour I* report, and the HERO7 Black, HERO8 Black, and Max, HERO7 Silver, HERO7 White, and HERO 9 Black products, which I discussed in my *Contour II* report. I offer these opinions for the purpose of correcting and rebutting Dr. Hu's characterizations of the products at issue and not because I understand Dr. Hu's analysis to comport with the law, which I understand requires a finding that every requirement of the asserted patent claim (known as "claim elements") be included in the accused product. Additionally, by offering the following opinions, I am not agreeing (and do not agree) that any of the cameras at issue could plausibly represent the universe of accused cameras in this case.

51.     The cameras at issue in *Contour I*, *Contour II*, and *Contour III* span over a decade of product development and include different lenses, image sensors, camera processors, wireless transmitters, firmware, and dozens of other components. The products have materially different feature sets and capabilities that are implemented in substantively different manners. A summary of the universe of accused products, asserted claims, and accused features is set forth below with the express understanding that the asserted claims require specific components configured to meet the claim limitations and that infringement cannot be shown merely by determining whether a particular camera has (or does not have) one or more of the relevant functionalities.

| All Products Addressed In The Above-Entitled Litigation | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | '954 Patent Claims | | | | | | '694 Patent Claims | | | Live Preview + Record | Live Streaming |
| Camera | 11 | 12 | 14 | 15 | 20 | 30 | 4 | 6 | 20 | | |
| HERO2 with Wi-Fi BacPac | X | X | X | — | X | X | X | X | X | YES | NO |
| HERO3 Black | X | X | X | X | X | X | X | X | X | YES | NO |

15

ATTORNEYS' EYES ONLY – SOURCE CODE

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HERO3 Silver | X | X | X | X | X | X | X | X | X | YES | NO |
| HERO3 White | X | X | X | — | X | X | X | X | X | YES | NO |
| HERO3+ Black | X | X | X | X | X | X | X | X | X | YES | NO |
| HERO3+ Silver | X | X | X | X | X | X | X | X | X | YES | NO |
| HERO+ | X | X | X | — | X | X | X | X | X | YES | NO |
| HERO+ LCD | X | X | X | — | X | — | X | — | — | YES | NO |
| HERO4 Session | X | X | X | X | X | X | X | X | X | YES | NO |
| HERO4 Black | X | X | X | X | X | X | X | X | X | YES | NO |
| HERO4 Silver | X | X | X | X | X | — | X | X | — | YES | NO |
| HERO5 Session | X | X | X | X | X | X | X | X | X | YES | NO |
| HERO5 Black | X | X | X | X | X | — | X | X | — | YES | NO |
| Fusion | X | X | X | — | X | X | X | X | X | YES | NO |
| HERO6 Black | X | X | X | X | X | — | X | X | — | YES | NO |
| HERO7 Silver | X | X | X | — | — | — | — | — | — | YES | NO |
| HERO7 White | X | X | X | — | — | — | — | — | — | YES | NO |
| HERO7 Black | X | X | X | X | X | — | X | X | — | YES | YES |
| HERO8 Black | X | X | X | X | X | — | X | X | — | YES | YES |
| MAX | X | X | X | X | X | — | X | X | — | YES | YES |
| HERO9 Black | X | X | X | X | X | — | X | X | — | NO | YES |
| HERO10 Black Bones | X | X | X | X | X | — | — | — | — | NO | YES |
| HERO10 Black | X | X | X | X | X | — | X | X | — | NO | YES |
| HERO11 Black | X | X | X | X | X | — | X | X | — | NO* / YES | YES |
| HERO11 Black Mini | X | X | X | X | X | — | X | X | — | NO* / YES | YES |
| HERO12 Black | X | X | X | X | X | — | X | X | — | YES | YES |

16

ATTORNEYS' EYES ONLY – SOURCE CODE

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HERO13 Black | X | X | X | X | X | — | X | X | — | YES | YES |
| HERO (4k/2024) | X | X | X | — | — | — | — | — | — | YES | NO |

X - Alleged to Infringe

— - Not Alleged to Infringe

* Feature not available until March 2024 (HERO11 Black) and May 2024 (HERO11 Mini)

52.     I disagree with Dr. Hu's generalization that "The [*Contour III*] accused products operate very similar[ly] to the Hero 6 Black and to the Hero 8 Black.[3]" 3/31/2025 Hu Rpt. at ¶ 54. The *Contour III* Accused Products have different hardware and software than the products addressed in my *Contour I* and *Contour II* reports. The Accused Products rely on materially different image processing technology and components than the *Contour I* and *Contour II* products. For example, the HERO12 Black, HERO13 Black, HERO11 Black, HERO11 Black Mini, and HERO10 Black (including HERO10 Black Bones) include a new GP2 chip, which contains a Socionext processor.[4] The HERO (4k/2024) uses an Ambarella H22 chip. None of the *Contour III* Accused Products or their constituent camera processors and other components were analyzed or accused of infringement in Dr. Hu's prior reports.

---

[3] I have been informed by GoPro's counsel that there is no representative product stipulation in this case as of the date of submission of this report.

[4] https://investor.gopro.com/press-releases/press-release-details/2021/GoPros-New-HERO10-Black-Camera-Delivers-Breakthrough-Image-Quality-and-2X-Speed-with-Ease/default.aspx.; GOPRO_255965 - GOPRO_256714 (PRD and Product Manuals for *Contour III* Accused Products); *see also*https://www.goprodb.com/comparisons/vs/gopro-hero-12-black-vs-gopro-hero-2024; *see also* GOPRO_258857 - GOPRO_258924.

17

ATTORNEYS' EYES ONLY – SOURCE CODE

53.    Further, HERO10 Black / HERO10 Black Bones does not support Live Preview while recording.  Additionally, HERO11 Black and HERO11 Black Mini were not initially sold with the ability to Live Preview while recording.  GoPro made a programming update for HERO11 Black available to users to download on March 14, 2024 that allowed users to continue accessing Live Preview on the GoPro App (Quik) during recording (among other updates and bug fixes).  GoPro made a firmware update for HERO11 Black Mini available to users to download on May 9, 2024 that allowed users to continue accessing Live Preview on the GoPro App (Quik) during recording (among other updates and bug fixes).[5]  Dr. Hu agrees that HERO11 Black and HERO 11 Mini cameras sold before the firmware update did not infringe the asserted claims based on their preview capabilities – and, for those products, Dr. Hu's claims are limited to live streaming. 6/26/2025 Hu Dep. Tr. at 161:6-162:9.

54.    Additionally, I understand that CIPH admitted in its Opposition to the Motion to Amend that the *Contour III* products are materially different from the *Contour I* and *Contour II* products because GoPro allegedly "add[ed] a third parallel stream."  Dkt. 738-3 at 1, 5 ("Contour III products now generate **three** streams in parallel, whereas the *Contour I & II* products generated **two** streams in parallel.") (emphasis original), 9-10.  Based on the record I have before me, it is my opinion that CIPH misinterprets certain process flow diagrams produced by GoPro.  Those process flows do not show GP2 used in HERO10, HERO11, HERO12, and HERO13 models is

---

[5] *See* https://community.gopro.com/s/article/GoPro-Quik-Live-Preview?language=en_US (last visited April 21, 2025); https://community.gopro.com/s/article/Software-Update-Release-Information?language=en_US#h11b (last visited April 21, 2025); 2025-05-01 Conversation with Mr. Gandhi (regarding update for both versions of the HERO11).

18

ATTORNEYS' EYES ONLY – SOURCE CODE

configured to record a low-resolution preview that is streamed to the remote handset while recording a high-resolution video.

55.     The demonstrative image included in CIPH's Opposition does not appear anywhere in Dr. Hu's report and mischaracterizes the process flow (and the hardware) of the GP2 processor. Dkt. 738-3 at 9.  I understand that Dr. Hu has offered no opinions in support of this diagram, and I address it herein for completeness.



56.     I understand based on discussions with GoPro engineers that CIPH's process flow is incorrect at least because there is only one hardware encoder in the GP2 processing pipeline and that the encoder is configured to encode in both H.264 (AVC) and H.265 (HEVC).[6] GOPRO_251101 at 24; *see also* Section X.F.2 *infra*.  The GoPro engineers stated that the two "processing" blocks shown in the diagram did not make sense and do not accurately reflect the process flow of the data.  While data originating from the image sensor is both processed and buffered (multiple times) in order to create the MRV/HRV, LRV, live stream, etc, GoPro engineers

---

[6] 7/29/2025 Telephone Call with O. Ghandi and D. Liu.

ATTORNEYS' EYES ONLY – SOURCE CODE

further explained that the diagram incorrectly suggests, for example, that there is processing <u>only</u> in the blocks labeled "Processing" , which is untrue.[7]  Additionally, there is no implementation in any GoPro camera in which those three (or four) data types (e.g., HRV, LRV, and Live Preview Stream) are all generated in parallel by the camera processor.[8]  In HERO10 Black and HERO10 Black Bones, as well as in HERO11 Black / HERO 11 Black Mini units sold before the 2024 firmware update, the camera processor is capable of transmitting video over Wi-Fi only before or after recording, but not while recording a higher resolution video file.  *Compare* Dkt. 738-3 at 9 *with* Section IX.F.2 *infra*.[9]

57.    For all *Contour III* cameras with GP2 processors, the video that is transmitted wirelessly from the camera processor is not saved or stored (e.g., to an SD card).[10]  I understand that the MRV and LRV files are created via a "delayed processing" pipeline where the files undergo substantial image processing and lossy buffering before and after they pass through the Video Codec block.  A Codec is a combination of a "coder" and "decoder," meaning it can encode video data for storage or transmission and can decode it for playback. In general, codecs process video files to make them smaller for storage, sharing, and streaming.  Additionally, while live streaming, there is no preview video that can be transmitted via Wi-Fi.  When a user wishes to retrieve the files saved to the camera's SD card, the GoPro App accesses the SD card directly using a "GET" request that initiates transfer on a byte-by-byte basis.[11]

---

[7] *Id*.

[8] *Id*.  By way of example, but not limitation, if a user initiates live-streaming, then GoPro's GP2-based cameras are not capable of also sending a live preview or making the LRV file.  *Id*.

[9] *Id*.

[10] *Id*.

[11] *Id*.

ATTORNEYS' EYES ONLY – SOURCE CODE

### 1. No Live Preview While Recording On HERO9 Black, HERO10 Black, HERO10 Black Bones, HERO11 Black, or HERO11 Black Mini

58.    The record evidence demonstrates that, like HERO9 Black (accused in *Contour II*), HERO10 Black and HERO10 Black Bones do not support live preview while recording.  *See, e.g.*, Gandhi Dep. Tr. at 66:13-68:13; 10/27/2021 Hu Rpt. ℙ65; 10/27/2021 Hu Rpt. ¶70 (excluding HERO10 from the list of "cameras [that] transmit the low resolution video to a smartphone app while recording (live preview).").[12]  From their commercial release until March and May 2024 respectively, HERO11 Black and HERO11 Mini did not support live preview while recording.[13] In these products (collectively "HERO10/11 cameras"), when the user initiates recording from the GoPro App, any local Wi-Fi connection is terminated and the camera is therefore not capable of wirelessly transmitting any video data to the camera for display.[14]  *See also* GOPRO_225250. I understand that approximately 900,992 units of HERO 11 Black and HERO 11 Mini were sold without live preview while recording and approximately 110,029 units were sold after the firmware update was released.[15]

---

[12] *See also* 2025 2025-03-24 Summary Judgment Order at 14 ("All previously discussed products (both the *Contour I* and *Contour II* products), provide the user with the ability to "live preview," where a video image can be sent from the camera processor directly to the user's personal portable computing device for live display and adjustments. For the HERO9 Black, "Contour's infringement allegation is based on live streaming," which CIPH admits "is similar to live preview" without performing the exact same function."); 3/31/2025 Hu Rpt. ¶53 ("I understand that the Court has issued a ruling granting summary judgment that all *Contour II* accused products (listed above) infringe claim 11 of the '954 patent, except for the Hero 9 Black. See Ex. F (*Contour II* Ruling). Specifically, the Hero 9 Black only supported Live Streaming While Recording (but not Live Preview While Recording)").

[13] 2025-05-01 Conversation with Mr. Gandhi (regarding update for both versions of the HERO11).

[14] My testing of the accused products; 2025-05-01 Conversation with Mr. Gandhi (regarding update for both versions of the HERO11).

[15] 5/2/2025 Kennedy Rpt. Supplemental Schedules 1.1 and 1.2.

ATTORNEYS' EYES ONLY – SOURCE CODE

59.    I tested the HERO10 Black (which I understand has the same relevant functionality as HERO10 Black Bones) and confirmed that it does **not** "support live preview during recording into video files on the SD card."[16]  According to my testing, the user can record video, or the user can select to preview.  Once the user begins recording video, however, the preview is discontinued and "Preview not Available" is shown to the user.

---

[16] 2025-05-01 Conversation with Mr. Gandhi.

22

ATTORNEYS' EYES ONLY – SOURCE CODE



23

ATTORNEYS' EYES ONLY – SOURCE CODE



ATTORNEYS' EYES ONLY – SOURCE CODE



60.     Dr. Hu does not appear to dispute that HERO10 Black does not support live preview while recording, though she notes that HERO10 Black and HERO10 Black Bones supports live preview prior to and after recording ends.  3/31/2025 Hu Rpt. ¶ 75[17].  CIPH has repeatedly asserted that the asserted claims "cover cameras that can record at a high quality (e.g., high resolution)

_____

[17] It is also undisputed that many of GoPro's cameras do not utilize live preview while recording for high resolution and/or frame rate modes.  *See, e.g.*, 2/28/2020 Hu Rpt. ℗ 99, 205, 209; 10/27/2021 Hu Rpt. ¶ 75.

ATTORNEYS' EYES ONLY – SOURCE CODE

while wirelessly streaming to a separate device a "real time" preview image, at a lower quality, and receiving control signals from that device." Dkt. 232-4 Claim Construction Brief at 4; *see also* Dkt. 234 (Tech Tutorial) at 9:12-17, 10:18-21 ("The patented invention can stream the current video while recording and allow control."); *see also* 10/27/2021 Hu Rpt. at ¶¶ 65, 70, 137, 181. That is, the claim language requiring that the claimed camera both "send real time image content by wireless transmission directly to . . . a personal portable computing device" and "generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" require that a covered device be capable of streaming the lower quality image data stream while recording the higher quality image data stream. '954 Patent at Cl. 11; *see also* IPR2015-01080, 07/30/2015 PO Preliminary Response, Atty Dkt. 111968-0001-652 at 2 ("These features enable, inter alia, the camera to save both high quality and low quality video at the camera, and also permits streaming real-time video to the mobile device."), 30-31, 32 n. 13, 38; 8/16/2022 Appellant's Opening Brief at 5 ("Contour's invention allowed users for the first time to preview in real-time the camera's video recordings and adjust the camera settings remotely from a personal computing device."), 42, 56, 57 ("Here, the 'generate' limitation recites a specific technique for configuring the processor . . . which allowed users for the first time to preview their recordings"), 58.[18]  *See also* Section IX.G.1; 7/23/2025 Almeroth Rpt. at §VII.B at 44 *et seq*.

61.    I understand that the Federal Circuit found that the camera processor element of the Asserted Claims requires that a wireless preview be transmitted while the camera records a higher

---

[18] I understand that different claims of the Asserted Patents require that the lower resolution video also be streamed prior to recording. *See, e.g.*, '954 Patent cl. 1, '694 Patent cl. 1, 11; *see also* IPR2015-01080, 7/13/2016 Record of Oral Argument at 54:15-21.

ATTORNEYS' EYES ONLY – SOURCE CODE

quality video such that "the user can see what is being recorded by the camera" and "can also make real time adjustments to the recording settings, such as light level and audio settings, before and during an activity":

> To address these problems, the patents describe implementing wireless technology in the video camera 10 that allows the camera to send real time information to a remote device, such as a cell phone. *Id*. at 19:48–50. From this remote device, the user can see what is being recorded by the camera. *Id*. at 20:41–44. The user can also make real time adjustments to the recording settings, such as light level and audio settings, before or during an activity. *Id*. at 20:44–47. The skier, for example, can ensure that his descent down the ski slope has been recorded to his preferences. *See, e.g., id*. at 20:41–44 ("This wireless connection capability enables a user to configure camera settings in real time and preview what digital video camera 10 sees."); *see also id*. at 22:66–22:53 (describing procedures for adjusting camera position, lighting level, and color settings on the remote device).

*Contour IP Holdings, LLC v. GoPro, Inc.*, Appl. No. 22-1654, Dkt. 66, Slip Op. at 3 (Fed. Cir. September 9, 2024); *see also id*. at 10 ("the claimed POV camera processor [is] configured to record low and high-quality data streams in parallel, followed by the low-quality data stream's wireless transfer to a remote device"); *id*. at 10 (Claim 11 requires a POV camera that allows a user to "remotely view and adjust the desired recording in real time.").

62.     Dr. Hu previously defined "live preview" as "transmitting the low-resolution video to a smartphone app *while* recording." 10/27/2021 Hu Rpt. ¶¶ 65, 70, 137, 181 (emphasis added). However, as discussed herein, Dr. Hu's current theory is that the camera processor limitations of the Asserted Claims can be met by a processor that never records a lower resolution preview stream and/or never wirelessly transmits that stream directly to the remote personal portable computing device during recording. This new infringement theory contradicts Dr. Hu's prior opinions and the definition of "live preview" she used throughout her prior reports. I address her new theory herein to the extent possible despite the Court's finding that CIPH's explanation "for the three

27

ATTORNEYS' EYES ONLY – SOURCE CODE

streams" is not consistent with or supported by the opinions articulated in Dr. Hu's March 31/ 2025 Report. *See* Dkt 748 at 11; *see also* 7/23/2025 Almeroth Rpt. at §VII.B ("CIPH's New Theory) at 44 *et seq.*[19]

### 2.    Live Streaming

63.    Live streaming is the process of transmitting video content in real-time from the camera over the internet to remote viewers/subscribers. Live streaming is generally used to transmit video to a multitude of remote users who can access the video through their web browsers.[20] Live streaming is available to GoPro users who have a HERO7 Black or subsequent generations of GoPro cameras (except HERO (4K/2024)) and who have purchased GoPro's Premium service.

---

[19] I note that Dr. Hu appears to apply the term "record" inconsistently in her reports. To the extent "recording" requires that the video image data stream / video image content be saved either off the camera processor (e.g., to an SD card) or on the camera processor (e.g., in a buffer capable of saving all or substantially all of the recorded content), then GP2 is not capable of "recording" the wireless preview that it causes to be streamed to the remote personal portable computing device. To the extent that "recording" simply requires any buffering, regardless of the amount of data held in the buffer, then all camera processors create video image streams from recorded video. 6/26/2025 Hu Dep. Tr. at 46:8-51:16. Dr. Hu opined that preview stream is recorded (stored) based on buffering in limited capacity buffers that she acknowledges would not store the entirety of the first image or second image data stream. *Id.*

[20] *See, e.g.*, GOPRO_233259; https://www.youtube.com/watch?v=jGmiYzCPnSE (HERO10 BLACK launch video; last viewed April 21, 2025).

28

ATTORNEYS' EYES ONLY – SOURCE CODE



64.    The live streaming feature is only available with a "Premium" or "Premium+" subscription.  Dr. Hu did not analyze whether any GoPro user has purchased either subscription *and* performed live streaming, nor did she analyze how common it is for GoPro users to purchase the ~$50/year subscription required.

ATTORNEYS' EYES ONLY – SOURCE CODE

65.     As discussed in my prior report, live streaming is materially different than the accused "live preview with record" functionality.[21]  Indeed, as a user sets up a live stream on his or her device, the user is notified that "Preview Not Available" or an equivalent message for prior devices, according to my testing and GoPro documents I reviewed.



(Images taken 4/20/2025 from iPhone 15 ProMax running GoPro Quik v. 13.13 with HERO13 Black.)  With live streaming, no preview stream is sent to the Quik App or otherwise displayed on

---

[21] The live preview functionality is described by Dr. Hu in her prior report at 10/27/2021 Hu Rpt. ¶¶ 65, 70, 137, 181.

ATTORNEYS' EYES ONLY – SOURCE CODE

the mobile device. Instead, the live streaming camera sends video data directly to remote servers where it is processed, re-encoded, and made available to anyone who has access to those servers.



GOPRO_233280.

66. Dr. Hu describes the process of setting up a live stream in her report when using the GoPro.com website. 10/27/2021 Hu Rpt. ¶110. I note that even in Dr. Hu's own report, the "preview not supported during live streaming" message is present.

67. When Live Streaming is selected on Quik, the user is prompted to select a platform for the live stream and then an available network connection, which may be a WiFi router, mobile hotspot, or other available Internet hub. Illustrative images below:

31

ATTORNEYS' EYES ONLY – SOURCE CODE



32

ATTORNEYS' EYES ONLY – SOURCE CODE



33

ATTORNEYS' EYES ONLY – SOURCE CODE



68.    Once a network connection has been established, the user is prompted to "Go Live." The default page does not include the ability to view the live stream. Once the user starts the live stream, the Quik app provides an option to "View Your Stream."

ATTORNEYS' EYES ONLY – SOURCE CODE



ATTORNEYS' EYES ONLY – SOURCE CODE



69.     When View Your Stream is chosen, the user exits the Quik app and is taken to the

website GoPro.com.  After some delay, the user can view video previously recorded by the camera.

ATTORNEYS' EYES ONLY – SOURCE CODE



70.     In the live streaming scenario, the video displayed on the mobile device is **not** received directly from the camera.  10/27/2021 Hu Rpt. ₱ 174 (emphasis added) ("for live streaming, where there is some latency, that latency is a result of the video being transmitting over the Internet to the live streaming service (e.g. GoPro.com, Facebook, or other service) and then back to the device.").  The video displayed on the mobile device is sent from the camera to a remote server (*e.g.*, cloud or web server) via the internet and then, if prompted by the user, the video is encoded and the stream is retrieved by the user to be viewed on a webpage or in a third party application.  *See, e.g.*, 10/27/2021 Hu Rpt. ₱ 110.  It is clear from the testing I conducted as well as the images Dr. Hu uses in her report that any video displayed on the mobile device is being

ATTORNEYS' EYES ONLY – SOURCE CODE

retrieved by the user from servers hosted at GoPro.com or other streaming services such as Facebook. *See* 10/27/2021 Hu Rpt. ⁋ 110.

72.    I performed several live streaming tests using a GoPro HERO 11 Black and GoPro HERO12 Black and version 13.14.1 of the GoPro Quick Ap on a Google Pixel 8 Pro connected to the T-Mobile network acting as a hotspot. Videos of those tests are attached as Appendices B-D. I viewed the live stream on both the Pixel 8 Pro phone and on a PC. For all tests, I followed the steps shown in the images above. The Pixel 8 Pro was running Android version 15.

72.    Technical documents produced by GoPro confirm this functionality.  GoPro's feature specification for live streaming (titled "BOSS Feature – Live Streaming") describes the design overview of the gpLiveStream functionality (GoPro Live Streaming).  That document makes clear that the "on camera executable" merely "accepts an rtmp url," "takes the preview stream from the [real time operating system," and packages it using RTMP and sends it via the Wi-Fi network. RTMP refers to "real time messaging protocol," which is a standard protocol used for streaming data over the internet.

> **BOSS Design Overview**
> gpLiveStream is an on camera executable that accepts an rtmp url and takes the preview stream from RTOS, packages it using RTMP and sends it via the connected wifi network.

GOPRO_254476.   Notably, the gpLiveStream functionality does not require or differentiate between different Wi-Fi networks; it instead merely takes a target URL, packages the video data from the operating system, and sends it to the target URL.  It is not sending the data directly to a Wi-Fi access point or to a mobile hotspot for display.

ATTORNEYS' EYES ONLY – SOURCE CODE

73.    This is further confirmed by GoPro's technical specifications, which I have annotated in yellow highlighting below to show the path of information for data being live streamed to the internet.



GOPRO_254480.  When the live stream is set up, GoPro's documentation makes clear that the data is being transmitted from the real time operating system (RTOS) on the camera running firmware (FW) to the RTMP server.  The mobile device running a Quik app is only being used, through the Bluetooth SDK to set up the live stream.  It is instead the gpLiveStream functionality on the camera that transmits the data to the internet.

39

ATTORNEYS' EYES ONLY – SOURCE CODE

74.    I have created an example demonstrative showing the scenario of live streaming in conjunction with mobile hotspot, below.  This diagram summarizes and provides a simplified visual representation of this live streaming functionality.



75.    Other documents are consistent with the operation of live streaming that I discussed above.  For example, GoPro's request and response diagrams for live streaming show that the live streaming mode can be set, the status may be requested, and the user may set desired settings.  However, none of these figures indicate that live streaming is sent directly to a mobile hotspot for display.  Rather, these documents are consistent with sending video to the internet so that the video can be live streamed to different devices.

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_254411.

76.     GoPro's technical documentation further confirms that the configuration settings

for live streaming do not include any indication of the access point being used for live streaming.

Rather, the available fields include the URL used for live streaming, whether to save media, the

resolution, and bitrate and lens settings.  This is consistent with my opinion that live streaming

41

ATTORNEYS' EYES ONLY – SOURCE CODE

video is transmitted to the RTMP web address. These documents do not show that any live streaming video is sent directly for display to a mobile device acting as a wireless hotspot.

**WSDK_RequestSetLiveStreamMode**

Configure Live Streaming

Response: ResponseGeneric

| field | typespec | value | summary |
|---|---|---|---|
| url | string | 1 | RTMP(S) URL used for live stream |
| encode | bool | 2 | Save media to sdcard while streaming? |
| window_size | WSDK_EnumWindowSize | 3 | Resolution to use for live stream<br><br>The set of supported resolutions is only available from the *live_stream_window_size_supported_array* in WSDK_NotifyLiveStreamStatus. |
| reserved1 | string | 4 | Reserved |
| reserved2 | string | 5 | Reserved |
| cert | bytes | 6 | Certificate for servers that require it in PEM format |
| minimum_bitrate | int32 | 7 | Minimum desired bitrate (may or may not be honored) |
| maximum_bitrate | int32 | 8 | Maximum desired bitrate (may or may not be honored) |
| starting_bitrate | int32 | 9 | Starting bitrate |
| lens | WSDK_EnumLens | 10 | Lens to use for live stream<br><br>The set of supported lenses is only available from the *live_stream_lens_supported_array* in WSDK_NotifyLiveStreamStatus. |
| reserved3 | int32 | 11 | Reserved |

GOPRO_255699 at 58-59.

77.    GoPro's customer facing documentation likewise indicates that live streaming, for example to Facebook, allows a user to "stream **directly** to your Facebook profile and Facebook pages" using RTMP. *See, e.g.*:

42

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_233230; *see also*

ATTORNEYS' EYES ONLY – SOURCE CODE

Using the GoPro app, **GoPro Subscribers can live stream to an audience of their choosing via a private link.** You can also **live stream direct to Twitch, YouTube™ and Facebook** as well as to sites that accept RTMP URLs, which we'll discuss later. YouTube and Facebook require initial setup steps (listed below) for the first time you go live, so plan accordingly.

All-in GoPro live streaming is compatible with the platforms below:

- Direct Streaming:
    - GoPro Subscription
    - Facebook profiles
    - Facebook pages (https://www.facebook.com/help/337881706729661?helpref=faq_content)
    - Twitch
    - YouTube
- Streaming Via RTMP URL:
    - Vimeo
    - Workplace by Facebook
    - Facebook groups (https://www.facebook.com/help/337881706729661?helpref=faq_content)
- Streaming in China:
    - HUYA
    - Douyu
    - BILIBILI
    - INKE

GOPRO_233246 at -47.

78.    I further note in GoPro's documentation, the advertised use of live streaming was set up with a user's home access point Wi-Fi connection:

44

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_233230 at -33.  This is consistent with my opinions that a hotspot implementation is significantly less desirable than a Wi-Fi access point implementation for power, bandwidth, battery life, streaming quality, latency, cost, mobile cellular availability and quality issues, and other reasons, which I discuss in this Report.

79.     When I tested GoPro HERO12 Black with Quik App v13.14.1 on a Pixel 8Pro, I recorded the following latency between the camera recording and the image being displayed through Live Preview while Live Streaming (following connection, which often took several seconds).  For example:

| Latency of HERO12 Black Testing | Live Streaming via Pixel hotspot |
|---|---|
| Test 1 | ~4-5 seconds |

ATTORNEYS' EYES ONLY – SOURCE CODE

In this test, I established a connection with Live Streaming to GoPro.com before testing latency. To test the latency, I compared the image on my GoPro camera to the image accessible on the GoPro Quik App on Android (for Live Streaming). The videos I have attached to this report as Appendices B-D display delays in live streaming up to 9 seconds.

80.     The user's view of the live stream often appears noticeably different from the scene being recorded by the camera for several reasons. For example, network conditions can degrade the stream or inject latency. GoPro notifies users that the livestream may **not** look like the video being recorded, which is why GoPro implemented a "stream health" indicator:

> ˅ Description
>
> As a user, I want the ability to see the health of my live stream bandwidth so that I can better determine if the live stream will be consistent and if it will hold up and not drop connectivity during my streaming session. This will better set expectations for how the stream will look to my viewers based on available bandwidth at the time.

GOPRO_233280.

As shown in the screenshot above, the "stream health" identifies the instantaneous video bitrate that is being used, confirming that the encoding/bitrate/video is being monitored and changing continuously according to network conditions.

81.     Livestreaming works by sending video data from the camera to an Amazon Web Services (AWS) remote server codenamed "starfruit." *See also* Sections IX.E.9, IX.EF.4, and IX.G.2 for more discussion regarding the live streaming scenario. AWS is a widely-adopted cloud computing platform offered by Amazon that allows business to store and process data remotely on AWS global data centers.[22] Amazon Interactive Videos Service (IVS) encodes the video received

---

[22] https://aws.amazon.com/what-is-aws/ (last visited April 20, 2025).

ATTORNEYS' EYES ONLY – SOURCE CODE

from the camera.[23]   The video is processed on the AWS server to which it is sent and then distributed to partner social networking services (SNS) such as Facebook, YouTube, or GoPro's own GoPro.com.  The partner SNS then processes the media for display via its channels to users with access to the platform.  If the streamer has access to the SNS, the streamer can elect to view video from that SNS's platform via the Internet.  Viewing can be done on a PC, Smart TV, or mobile device.  The general process flow of data from the camera during Live Streaming is illustrated by GoPro internal documentation:

---

[23] GOPRO_233259.

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_233274.

82.     The documentation GoPro produced indicates that GoPro's cloud services partner (Amazon) modifies and re-encodes the video captured by the camera.  GOPRO_233259.  In other words, what is displayed in this scenario on the mobile device is not the video transmitted originally by the camera to the cloud services provider, but a modified version thereof.  As explained in GoPro's documentation, GoPro uses Amazon IVS (Interactive Videos Service) to "encode the high quality video from its HERO line of cameras."

48

ATTORNEYS' EYES ONLY – SOURCE CODE

> Utilizing Amazon IVS to encode the high-quality video from its HERO line of cameras, GoPro empowers its subscribers to livestream directly to their account at GoPro.com via the Quik App – without needing a third-party channel that may require additional steps for authentication or a requirement for a minimum follower threshold. It's a simple solution for streamers looking to share special moments with family and friends outside of traditional social media networks.

*Id.* Amazon's encoding of the video not only changes the video using Amazon's proprietary technology, but it allows Amazon to dynamically re-encode the video to meet different bandwidth situations.

83.    Amazon further explains that video ingestion happens in a geographically local server.  That is done to improve performance.  Amazon notes that once the video is ingested, the video stream is "processed and transcoded in one of several Amazon IVS datacenters." Transcoding is the process of converting a digital media file from one format to another.  In other words, the video uploaded to the Amazon IVS datacenter is then modified by Amazon, including through transcoding, before Amazon streams that video to consumers.

49

ATTORNEYS' EYES ONLY – SOURCE CODE

## Amazon IVS Video Data Plane

Video ingestion and distribution run over a global content delivery network (CDN) optimized for low-latency video. This enables Amazon IVS to provide customers with end-to-end, high quality video served to a global audience with minimal delay. The video CDN has global Points-of-Presence (PoPs), allowing broadcasters and viewers to be geographically dispersed.

Regardless of the AWS region where you chose to configure your Amazon IVS resources:

• Streamers automatically ingest video to a PoP geographically close to their location.

Logging and Monitoring                                                                        266

Amazon IVS                                                        Low-Latency Streaming User Guide

• Viewers stream video via the global video CDN.

Once ingested, video streams are processed and transcoded in one of several Amazon IVS datacenters. Amazon IVS does not provide automated failover for ingestion or transcoding failures. Instead, streamers should configure their encoders or broadcasting clients to automatically re-ingest on any broadcasting failures.

\* \* \*

## Amazon IVS Streaming Configuration

Amazon Interactive Video Service (IVS) allows developers to easily deliver low-latency video to viewers worldwide. With Amazon IVS, streamers need to handle only stream production, then send the stream to Amazon IVS. Amazon IVS handles video processing (ingesting and transcoding), delivery, and playback to viewers using the Amazon IVS player.

\* \* \*

50

ATTORNEYS' EYES ONLY – SOURCE CODE

| Term | Description | LL | RT | Chat |
|---|---|---|---|---|
| IAM | Identity and Access Management, an AWS service that allows users to securely manage identitie s and access to AWS services and resources, including IVS. | ✓ | ✓ | ✓ |
| Ingest | IVS process for receiving video streams from a host or broadcaster for processing or delivery to viewers or other participants. | ✓ | ✓ | |
| Ingest server | Receives video streams and delivers them to a transcoding system, where streams are transmuxe d or transcoded into HLS for delivery to viewers.<br><br>Ingest servers are specific IVS components that receive streams for channels, along with an ingestion protocol (RTMP, RTMPS). See the information on creating a channel in Getting Started with IVS Low-Latency Streaming. | ✓ | | |

https://docs.aws.amazon.com/pdfs/ivs/latest/LowLatencyUserGuide/ivs-low-latency-ug.pdf.

84. Amazon receives the stream and "handles video processing (ingesting and transcoding), delivery, and playback to viewers." *See id*. As an initial step, Amazon receives the video stream at the ingest server that delivers the stream to a transcoding system where streams are transmuxed and/or otherwise transcoded prior to delivery to viewers. *Id*.

85. I understand that all of the live streamed video would be, at a minimum, transmuxed (along with other processing). It is my opinion that transmuxing includes transcoding and that this process "changes the format of an audio and/or video file" and "converts to a different container format." Accordingly, Amazon IVS, even for files that are not re-encoded, changes the video data that was received before broadcasting that video data to consumers.

51

ATTORNEYS' EYES ONLY – SOURCE CODE

| Term | Description | LL | RT | Chat |
|---|---|---|---|---|
| Transcoding | Converts video and audio from one format to another. An incoming stream may be transcoded to a different format at multiple bitrates and resolutions, to support a range of playback devices and network conditions. | ✓ | ✓ | |
| Transmuxing | A simple repackaging of an ingested stream to IVS, with no re-encoding of the video stream. "Transmux" is short for transcode multiplexing, a process that changes the format of an audio and/or video file while keeping some or all of the original streams. Transmuxing converts to a different container format without changing the file contents. Distinguished from transcoding. | ✓ | ✓ | |

https://docs.aws.amazon.com/pdfs/ivs/latest/LowLatencyUserGuide/ivs-low-latency-ug.pdf.

86.     Amazon's description of its live streaming functionality confirms that the camera is not sending the video directly to the mobile device acting as a Wi-Fi hotspot for display.  Instead, the camera sends the video to Amazon, which Amazon processes and modifies, and Amazon then makes available *different* video to any live streaming participant.  That video has been changed by Amazon either through transmuxin and/or other transcodingprocessing.  That video may also change based on bitrate that the live streaming participant can accept.

87.     The GoPro Quik App UI gives users the option of enabling the phone to act as a hotspot for transmitting video data to the remote server.  However, the use case is so rare  the product manual, PRD, and other GoPro documents I reviewed relating to the Accused Products did not expressly address it.  I understand from Pablo Lema, Vice President of Product Management, that this use case is not one that is often considered by GoPro because it appears to

ATTORNEYS' EYES ONLY – SOURCE CODE

be very infrequently used.[24]  Mr. Lema noted that GoPro does not have any control over the phone's operating system, so it is not an optimal configuration for live streaming.[25]  Mr. Lema explained that cellular service providers often impose resolution or bandwidth caps on some streaming data plans that would make it difficult or impossible to use a mobile device as a hotspot for Live Streaming.

88.     Additionally, from a technical perspective, GoPro has no data that differentiates how many users live stream via a hotspot versus a traditional router.[26]  The reason that no data is available is because the GoPro camera is agnostic to the data connection (as discussed above, it just identifies the available connection and addresses the encoded video packets to the remote server, e.g., the GoPro server hosted on AWS).  For the same reason, GoPro does not have data regarding how many users live stream via a hotspot and then access the streamed video on the same device.  The camera itself is not involved in that functionality, which is controlled entirely by the user accessing the encoded video from a remote server.[27]

89.     My review of the source code for the camera's firmware as well as the Quik App application code confirm that the camera does not directly transmit video data to the mobile device for display.  In particular, the cameras are configured to address video data packets to the remote server, not to the Quik App or mobile device, which I discuss in part below.  The live streaming

---

[24] 2025-05-01 telephone conference with P. Lema.

[25] 2025-05-02 telephone conference with P. Lema.  For example, Mr. Lema noted that because GoPro does not control the phone's operating system, the phone is constantly checking for a different wireless connection option (other than the phone itself) that will be less of a battery drain.  As a result, when the user is attempting to live stream using the phone as a hot spot, it drops frequently.

[26] 2025-05-02 telephone conference with P. Lema.

[27] 2025-05-02 telephone conference with P. Lema.

53

ATTORNEYS' EYES ONLY – SOURCE CODE

services only provide the camera with identifying information for the URL target of the RTMP server (e.g., Amazon IVS). *See, e.g.*:

**WSDK_RequestSetLiveStreamMode**

Configure Live Streaming

Response: ResponseGeneric

| field | typespec | value | summary |
|---|---|---|---|
| url | string | 1 | RTMP(S) URL used for live stream |
| encode | bool | 2 | Save media to sdcard while streaming? |
| window_size | WSDK_EnumWindowSize | 3 | Resolution to use for live stream<br><br>The set of supported resolutions is only available from the *live_stream_window_size_supported_array* in WSDK_NotifyLiveStreamStatus. |
| reserved1 | string | 4 | Reserved |
| reserved2 | string | 5 | Reserved |
| cert | bytes | 6 | Certificate for servers that require it in PEM format |
| minimum_bitrate | int32 | 7 | Minimum desired bitrate (may or may not be honored) |
| maximum_bitrate | int32 | 8 | Maximum desired bitrate (may or may not be honored) |
| starting_bitrate | int32 | 9 | Starting bitrate |
| lens | WSDK_EnumLens | 10 | Lens to use for live stream<br><br>The set of supported lenses is only available from the *live_stream_lens_supported_array* in WSDK_NotifyLiveStreamStatus. |
| reserved3 | int32 | 11 | Reserved |

GOPRO_255699 at 58-59. Any information regarding the hotspot address is merely being used for routing / directing packets for purposes of forwarding to the ultimate destination. Indeed, while I discuss in this report that there are many hops for the data to reach Amazon, including base stations, routers, and switches in the core network, the target address remains Amazon.

ATTORNEYS' EYES ONLY – SOURCE CODE

90.     My analysis of the source code confirms that live stream video is sent to the live

streaming    service,    and    not    to    any    mobile    device.    In    ███████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████ ███ ████ ██ ███████ ████ ███ ███████ ██████ ████ ████ ████

████████████████████████████    The    source    may    be    downloaded    using    the    git    clone

git://git.ffmpeg.org/rtmpdump command,    or    a    mirror    of    the    relevant    file    is    located

at https://github.com/mirror/rtmpdump/blob/master/librtmp/rtmp.c.

91.     ███████████████████████████████████████████████████████████████

████████████████████████████████████    ████████████████████████

███████████████████████████████████████████████████████████████████████████████

████ ████████ █ ██████████ ████████████ ██ ██ ██ █

██████████████████████████████████████

92.     The connection for the stream is embodied as part of the RTMP structure,

specifically a member of type ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

93.    Quik source code likewise shows that there is no direct transmission of the video for display on the mobile device.  The method called when tapping on the view stream button is in



94.    The

56

ATTORNEYS' EYES ONLY – SOURCE CODE



95.     In the case of YouTube, it comes from ███████████████████████

96.     The process for redirecting users out of the Quik App and to a URL is the same for the   other   services ██████████████████████████████████████

████████████████████████                                        ███████████

█████████████████████

ATTORNEYS' EYES ONLY – SOURCE CODE

97.     GoPro also includes source code that hides the ███████████████████

█ ██ ███ ████ █████ ████ █ ███ █████ ████ █

███████████████



███████████████████████████████████████

98.     The last line in the source code excerpted above ████████████████

██████████████████████████ confirming that the video for display on the

mobile device is not received directly from the camera, but is retrieved from a URL based on user

action (not a configuration of the camera).

99.     GoPro's witnesses also testified that live streaming video is not sent directly to the

mobile device for display.

> Q.   All right.  Let's go to the livestream functionality.  When -- when a GoPro
> camera is livestreaming, where is the livestream sent from the

ATTORNEYS' EYES ONLY – SOURCE CODE

camera?

THE WITNESS:  The livestream from the camera is actually packaged up in the transport stream that we receive from the firmware side -- from the RTOS side.  It's packaged up into an RTOS. Like from the RTOS, it's packaged up in an RTMP like container, right, from the camera and sent directly to the destination that the mobile app tells the camera to send it to.

So, for example, like, if the user goes to the mobile app, right, and says he wants to livestream, he would select the livestream button, right.  And what happens there is that, like, you would get a list of options, one of which there is an RTMP option.  There is a gopro.com option. There's a YouTube option.  There is a -- there is a -- which one is the other one?  Facebook is a popular one we have on there, right.  So what happens there is that that destination is sent over to the camera.  **The camera takes that and then it -- it negotiates with the cloud, like, directly.  It connects to the home network and then over whatever AP that you have it hooked up to.**

 **It sends up the information directly to the cloud over to the other side, the destination. And then it sets up the connection and then it starts sending the packets directly to the cloud, right.  So to the destination, which would be Facebook, gopro.com, YouTube, or like any other**, you can actually customize it very specifically with the RTMP option.  So there are dedicated RTMP servers that aren't like those ones listed on the mobile app that they can send directly to.  They go up to the cloud.

Liu Dep. Tr. 18:15-20:3 (emphasis added).

100.    As GoPro's witnesses testified, the video is *not* sent directly to the mobile device because it is being directed to the *cloud*.  The destination or the termination of the live streaming is not the mobile device and of course is not intended to be the mobile device, as the mobile device has no ability to stream video to other users.

 Q.   All right.  So as part of your answer you said the camera sends the stream to like your home network or another access point.  How does livestream work if the user is outdoors and there's no Wi-Fi networks around to connect to?

 THE WITNESS:  So there is the ability, of course, like on the camera like the -- the mobile app tells the camera, like, which home networks or, like, networks to connect to, one of which, you know, could be the phone's mobile hotspot, right.

ATTORNEYS' EYES ONLY – SOURCE CODE

So in that case, if you were outside and then you could, you know, very well, like, you know, turn on -- you would have to turn on your phone's mobile hotspot -- or I think there's an option -- there is an option to actually turn it on from the

livestream setup, right. I think you can switch to the settings, enable your -- your phone's, like, mobile hotspot. And then you -- and then you would direct the camera to connect to the phone's mobile hotspot.

But the destination of the video, of course, does -- like, you know, does not terminate on the phone. In fact, it passes through the phone's mobile hotspot and then goes up to the cloud, YouTube, Facebook.com, gopro.com, or whatever RTMP server you've designated from the mobile app.

Liu Dep. Tr. at 20:18-21:20.

Q. In the scenario where livestreaming is using the phone's mobile hotspot, the livestream video is transmitted directly from the camera to the phone, correct?

THE WITNESS: I'm going to say that, like, the data, like, you know -- when you say that the data -- maybe I need to, like, understand the question more.
Because it's not to the phone, right. It is going through the phone, right. The phone is acting as a hop -- it's a hop, right. So it's basically a transport to get out to the Internet, right. I hope you -- maybe I can explain that part.

Liu Dep. Tr. at 24:18-25:9.

THE WITNESS: Okay. **So if I was – so what I heard you say was the data goes directly to the phone, which is not correct because it's not terminating at the phone, right. The data goes through the hotspot, right. It's using the hotspot as a transport to get out to the Internet, right**.
So actually is that part understood? Maybe I'm not making that part clear.
So the phone itself is acting -- it's as if, like, you know, I connected my computer to my phone's hotspot. When I connect my computer to my phone's hotspot, I'm not trying to get to the phone. I'm trying to get to YouTube or I'm trying to get to, you know, like Twitch or Twitter, whatever, right. I'm not actually going to anything that's on the phone. I'm actually going through the phone out to the Internet.
So anybody -- you can use any device, right. For example, like, you could take – you could take another mobile phone and connect to another mobile phone hotspot. You could take a computer and connect to a mobile home -- hotspot. And that's what the camera is doing in this case, right. **It's using that mobile phone hotspot to get out to the Internet.**
So it's actually -- it's actually a jump. It could do the exact same thing with a home network, right. **So it's acting -- so that phone is not acting as a -- as a spot**

60

ATTORNEYS' EYES ONLY – SOURCE CODE

**where it stops.  It's acting as a place like -- as a place to get to the Internet.  It's an access point, right.**

Liu Dep. Tr. at 26:11-27:16.

101.    When Dr. Hu was describing the live streaming functionality, she relied on the two

quotations below, but I note that these quotations lacked the context above and do not state that

the video is transmitted directly to the mobile device for display.

*Q.  Mr. Liu, in the scenario where the live streaming is using a mobile hotspot, is the video stream transmitted directly from the camera to the phone?*

*A.  It is going to the phone's mobile hotspot, right, yeah.*

Liu (ROUGH) Dep. at 24:8-13.

*Q.  My question is it's going from the camera to the phone direct, correct?*

*THE WITNESS:  So it goes directly to the phone's mobile hotspot…*

Liu (ROUGH) Dep. at 25:5-15.

10/27/2021 Hu Rpt. ¶ 186.

102.    Mr. Liu actually testified that the video is being sent directly to the cloud, which

the ellipses in the second quote obscures.  The full answer from Mr. Liu is provided below:

Q. My question is: It's going from the camera to the phone direct, correct?

THE WITNESS: So it goes directly to the phone's mobile hotspot and then it, like, it --like, so I just want to, you know -- **I'm going to have to say that, yeah, it goes to the phone's mobile hotspot and then it goes out to YouTube.com where we told it to go, right.** So that's -- that's my answer to the question.

Liu Dep. Tr. at 29:14-30:4.

ATTORNEYS' EYES ONLY – SOURCE CODE

### 3.    Ambarella Chipsets

103.    Dr. Hu's opinions regarding the HERO (4k/2024) product is flawed for two reasons.  First, Dr. Hu has not met her burden to prove infringement of this product, which uses an Ambarella chipset.  Second, by opining on infringement without any supporting evidence or analysis, Dr. Hu's opinion does not appear to distinguish the accused functionality from the unclaimed prior art methods of dual video generation and the allegedly novel video generation claimed in the asserted patents.[28]  Nor has Dr. Hu has demonstrated, in her report, the "key limitations" CIPH contends reflect the point of novelty in their claimed inventions – i.e., that the two video image data streams are "generated in parallel" and "from the same image data."  The breadth of Dr. Hu's opinions therefore has a significant impact on the invalidity analysis as well.

104.    Dr. Hu has not met her burden of proof.  Dr. Hu acknowledges that GoPro Hero (4k/2024) relies on a camera processor from Ambarella, but she does not substantively analyze any documents regarding the Ambarella chipsets in her March 31, 2025 Report.  *See* 3/31/2025 Hu Rpt. ¶60.  Dr. Hu appears to rely on a single publicly available product sheet that CIPH produced.  For the Ambarella chipset, Dr. Hu did not cite any design specifications, software specifications, or specifications of components.  Dr. Hu made no technical analysis of the

---

[28] *Compare id*. at 44-45 ("Using 'dual-streaming' as generalized shorthand for what the claim is directed to rather than what the full claim construction requires" ignores the claim construction that "not only specifies that the so-called dual-streaming occurs but specifies how it occurs").

ATTORNEYS' EYES ONLY – SOURCE CODE

similarities and differences between the H22 chip and any other Ambarella chipset, such as the A5, A7, and A9. *E.g.*, 2020-02-28 Hu Rep. ¶148.[29]

105.    In Dr. Hu's March 31, 2025 report, I note that for each of the camera processor limitations, Dr. Hu does not cite to any Ambarella documentation or source code she contends discloses the constituent limitations. *See, e.g.*, 3/31/2025 Hu Rpt. ¶¶ 207, 209, 216-223. For HERO (4K/2024), Dr. Hu acknowledges that a different camera processor and vendor is used rather than Socionext, specifically the Ambarella H22. *See, e.g.*, 3/31/2025 Hu Rpt. ¶ 227. However, she simply states that the "Ambarella Product "generates two streams in parallel while recording" based on the "Ambarella Product Sheet (CONTOUR_IP0021075)" that states the processor offers "dual encode for on the fly mobile resolution streaming." (*Id.*) She offers no opinions or evidence regarding whether the Ambarella H22 processor "shows that the image data originally comes in from the sensor," what "processing" modules it goes through," whether "two separate video files [are created] in parallel," or whether the lower quality stream "is created from the video image data that was obtained from the sensor." (*Compare id.* at ¶¶ 217-218.)

106.    Dr. Hu's opinions regarding the Ambarella H22 chip that lack factual support contrast with her opinions regarding the Socionext GP2 chip, which are allegedly based on her review of multiple technical documents and source code. Although I disagree with her opinions regarding the GP2 chip for the reasons set forth in this report, I recognize that she has cited technical materials that allegedly support her positions, unlike her opinions regarding the Ambarella H22 chipset.

---

[29] Notably, the A5 is admitted prior art and also provides "dual recording capability" ("both HD and mobile video are recorded at the same time"). https://www.ambarella.com/news/ambarella-a5-hybrid-camera-platform-puts-high-quality-photos-and-video-on-a-chip/. \"

ATTORNEYS' EYES ONLY – SOURCE CODE

107.    Dr. Hu's opinions are also flawed because they mischaracterize and broaden the claimed invention.  I understand that CIPH characterizes its invention as directed to a "specifically claimed configuration for the camera processor" that requires "a specific camera and technique for configuring the processor" to "improve video camera functionality."[30]  For example, in its Federal Circuit briefing, I understand that CIPH argues that its claimed camera processor configuration requires recording "high- and low-resolution video . . . from the same real-time video image data" and not from "encoded video data.[31]"  I understand CIPH contends that analysis of the claims require showing "what is received . . . by what component from what other component" in the camera.[32]  CIPH stated that the "patents do not simply state 'record and stream' video in any manner, but specifically claim a particular technique" nor "do they just say use a camera processor.[33]"  The claims require "implementing a specific configuration for the camera processor" and "not all methods for recording and streaming video" using a camera processor.[34]  CIPH stated that the "key" elements of its claimed invention are "the two video streams . .  be generated 'in parallel' and from the same image data.[35]"  That is, "the claim not only specifies that the so-called

---

[30] CIPH Appellant's Opening Brief at 7.

[31] CIPH Appellant's Opening Brief at 22; *see also id. At* 30 ("[T]he two video streams required to be generated at different resolutions must also be generated "in parallel" and "from the same video image data.").

[32] *Id*. at 24.

[33] *Id*. at 30.

[34] *Id*. at 36-37.

[35] *Id*. at 39; *see also id*. at 40 ("Contour made technical design choices in determining how to configure Ambarella's processor to generate high- and low resolution video streams in parallel with wireless streaming and claimed that specific resulting configuration."); *id*. at 55 ("the recited "generate" limitation was construed by the court (and the PTAB) to require the specific technique of generating two image data streams in parallel from the same video image data where one stream has a higher resolution than the other."); *id*. at 57 ("Here, the "generate"

ATTORNEYS' EYES ONLY – SOURCE CODE

'dual-streaming' occurs but specifies how it occurs - by generating first and second video images at different resolutions where both are generated in parallel from the same source while sending only the low-resolution stream to the computing device.[36]"  None of the documents produced by CIPH that it claims  were created by Ambarella nor the source code that GoPro produced to show how the camera processor interoperates with the other components of the HERO (4k/2024) elucidate anything about the manner in which the identified first and second image data stream / content are created.

## X.    NO DIRECT INFRINGEMENT

### A.    Overview

108.    I fully incorporate herein my description of the Accused Products (Section VIII).  I further incorporate my discussion regarding other limitations and asserted claims from my prior reports in this case.

109.    As set forth above, it is my opinion that Dr. Hu has failed to provide sufficient technical evidence of infringement for the Accused Products identified in her March 31, 2025 report.  In the following section, I provide additional detail regarding why the Accused Products do not infringe the Asserted Patents including why certain claim elements are not met.

### B.    General Flaws in Dr. Hu's Analysis

110.    Dr. Hu mischaracterizes the evidence she cites relating to GP2 and therefore relies on a flawed factual understanding of the cameras' functionality as a predicate for her infringement

---

limitation recites a specific technique for configuring the processor (generating two videos at different resolutions in parallel from the same video data) that departs from prior art approaches.").

[36] *Id*. at 44-45.

ATTORNEYS' EYES ONLY – SOURCE CODE

findings.  Additionally, Dr. Hu's infringement opinions diverge materially from the manner in which she interprets the claims for the purpose of validity.  *See, e.g.*, 7/23/2025 Almeroth Rpt. at §VII *supra*.

111.    As I noted above, Dr. Hu provides virtually no evidence for how the Ambarella chipsets operate and therefore has not proven infringement of the HERO 4K (2024).

112.    Dr. Hu also selectively relies upon testimonial evidence that she believes supports her opinions, yet discounts that same evidence when it contradicts her views.  For example, Dr. Hu ignored the testimony from Mr. Gandhi and Mr. Liu that live streaming does not and cannot directly send video for display to the mobile device.

**C.    "A portable, point of view digital video camera, comprising"**

113.    HERO10 Black/Black Bones, HERO11 Black / Mini, HERO12 Black, and HERO13 Black all offer expanded field of view capabilities there were unavailable in their predecessors.  The cameras now offer linear as well as GoPro standard wide-angle views that permit users to capture both taller and wider fields of view beyond the standard "point of view." HERO11, HERO12, and HERO13 offer both standard 16:9 and 4:3 aspect ratios as well as 8:7 aspect ratio, which increases the linear field of view by 13%.[37] The broader field of vision requires less user alignment and limits (or eliminates) the need for pre-recording alignment.[38]  Dr. Hu's opinion that the "user aligns the camera and then it records based on that field of view" is

---

[37] 2025-05-01 Telephone Call with Pablo Lema; *see also* https://community.gopro.com/s/article/HERO11-Black-Digital-Lenses-FOV-Information?language=en_US (last visited April 20, 2025); The Ultimate Guide to HERO11 Black | GoPro (last visited April 20, 2025); https://community.gopro.com/s/article/HERO10-Black-Digital-Lenses-FOV-Informations?language=en_US (last visited April 20, 205).

[38] *Id.*

ATTORNEYS' EYES ONLY – SOURCE CODE

inconsistent with the features of the Accused Products that permit users to select wider (and taller) capture angles than depicted in the Live Preview.[39]

      **D.     "an image sensor configured to capture light propagating through the lens and representing a scene, and produce real time video image data of the scene"**

114.    Dr. Hu's opinion that this claim element is met by the Accused Products relies on her conclusion that there is no "perceivable delay between the image [the user] was recording and the image appearing on [the user's] phone in the GoPro smartphone app.[40]" 3/31/2025 Hu Rpt. ¶ 176; *see also id.* at ¶ 177 ("[T]here is no programmed delay in the image sensor or in the wireless transmission of video."). However, the factual predicate for Dr. Hu's conclusion is demonstrably false. The product documentation, source code, and both parties' testing demonstrates that there is user-perceptible delay in the video image data in both Live Preview while recording and Live Streaming. *See* Section VIII.B.2 *supra*.

115.    Dr. Hu states that "I also observed in operation of the Hero 12 Black with the GoPro app during live preview and live streaming that video was being streamed to the phone in real time as construed by the Court. I did not observe any perceivable delay between the image I was recording and the image appearing on my phone in the GoPro smartphone app." 3/31/2025 Hu Rpt. ¶ 176. Dr. Hu provided no evidence to support this opinion, and it is strongly contradicted by the universe of documentation I have reviewed and my own testing. As shown in the videos I have attached to this report as Appendices B-D, I observed delays in live streaming up to 9 seconds.

---

[39] https://projectgo.pro/gopro-field-of-view/  As noted, the wider field of view results in distortion (a fisheye effect) when previewed, but can be fixed post-production.

[40] No video image appears in the GoPro app during Live Streaming. To view the live stream, the user must leave the GoPro app and view the live stream on a supported platform.

ATTORNEYS' EYES ONLY – SOURCE CODE

I have also observed significantly longer delays where the hotspot scenario is used and cellular connectivity is less ideal.  (The cellular connection in the videos in Appendices B-D was full bars.)

116.    A person of ordinary skill in the art would find Dr. Hu's conclusion that there is no discernible delay from the time of capture to when a live stream is available technologically impossible given the on-camera processing, transmission, relay through a hot spot, further processing on a cloud server, and then re-transmission.  All of this needs to occur before the live stream is remotely accessible.  For example, Facebook cautions users that live streams typically have a delay of 1-15 seconds, which Facebook touts as the "fastest" HD streaming service available today.[41]  Facebook encourages users to connect via a wired connection or Wi-Fi rather than a cellular data connection to mitigate latency and states that latency of more than 20 seconds may be the result of unstable or slow internet connection.[42]  GoPro.com, Twitch, and YouTube all report similar levels of latency in their live streaming feature.[43]

117.    Additionally, Dr. Hu herself has acknowledged that testing of live streaming showed "some latency."  10/27/2021 Hu Rpt. ¶ 173.[44]  In Dr. Hu's prior reports, she acknowledged

---

[41] https://www.facebook.com/business/help/698535488117624; *see also* https://mashable.com/article/facebook-live-debate (last visited July 29, 2025).

[42] https://www.facebook.com/business/help/698535488117624 (also noting that upload speed plays a more significant role in Facebook Live latency than download speed)

[43] https://www.reddit.com/r/gopro/comments/1f50bjk/live_streaming_lag_solution/; https://support.google.com/youtube/answer/7444635?hl=en (last visited July 29, 2025); Twitch Stream Delay: Everything to Know in 2024 - Fairly Odd Streamers (last visited July 29, 2025).

[44] Dr. Hu suggests that this latency is "a result of the video being transmitted over the Internet to the live streaming service (*e.g.*, GoPro.com, Facebook, or other service) and then back to the device."  10/27/2021 Hu Rpt. ¶ 174.  As an initial matter, Dr. Hu does not cite to any evidence regarding where the latency is interjected into the processing.  Moreover, as Dr. Hu acknowledges, both the image sensor and wireless connection protocol device limitations have a real time requirement.  *Id*.  In particular, the wireless connection protocol device has to be configured "to send real time video image content by wireless transmission directly to . . . a

ATTORNEYS' EYES ONLY – SOURCE CODE

that live streaming does not provide "live" video. *See, e.g.*, 10/27/2021 Hu Rpt. ¶¶ 396-398 (characterizing live streaming as an alternative that "would increase latency by introducing additional steps in the transmission from the camera to the phone" that "would make the live preview **not 'live.'** Instead, the video would be stale and out of date."). She opined that "users would be able to notice a difference between reality and the delayed 'live' preview, which would be confusing and would worsen the experience for users." *Id.*

118.    The significant, readily perceptible delay in live streaming is an inherent consequence of the feature's architecture. As I have discussed in my prior reports, after the GoPro camera is set up for live streaming (4a), the live stream begins and transmits video to Amazon (5), the stream event is created ("Stream Events"), and communication with the media service is performed to create a channel ID and stream key (3), only then can HTTP Live Streaming (HLS) begin. Then, a user may access the transmitted stream using a web player (such as Facebook, YouTube, or GoPro.Com).

---

personal portable computing device executing an application." Therefore, to the extent that there is latency in the image data that is caused by either the processing or transmission of the displayed video, it would not be "real time."

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_233274.  At each step in this process there is endemic latency created – contrary to Dr.

Hu's opinion that she has "seen no processing that would cause any perceivable delay." 3/31/2025

Hu Rpt. ¶¶ 175-77.

119.    The delay that I observed in my testing has also been widely experienced by

users, confirming my opinions.  *See, e.g.*:

https://www.reddit.com/r/gopro/comments/1f50bjk/live_streaming_lag_solution/?rdt=51950

("I'm experiencing a 10-second lag between what I'm seeing and the live stream when streaming

wirelessly. . . . Is there any way to fix this? If not, could you recommend a camera similar in size

ATTORNEYS' EYES ONLY – SOURCE CODE

to a GoPro that can live stream wirelessly without this lag?");

https://community.gopro.com/s/question/0D53b00008BtMKkCAN/lagging-while-streaming?language=en_US ("I have a Hero 8.  I would like to stream to facebook live using the 8 as my webcam.  When i select the gopro in the facebook camera options, everything is great.  As soon as I GO LIVE, the camera starts to lag.  If I wave my hand in front of the camera, it takes about 25-30 seconds to see it come across the monitor.  When it does, it's happening in super slo-mo."); https://stackoverflow.com/questions/35457851/gopro-live-stream-over-wifi-pretty-laggy ("I am trying to use the official GoPro API, using python, in order to capture live stream from my GoPro Hero 3 Camera.  I saw that when connected to GoPro wifi, stream is also available through an HTTP url : http://10.5.5.9:8080/live/aamba.m3u8.  I opened this video stream through VLC, so I can watch it directly. There is a pretty big latency (~5/6 seconds). The stream is also pretty laggy, it often crashes or lag.") https://streamster.io/blog/how-to-preview-your-gopro-live-video-remotely-on-any-device/ ("Another simple way of watching video from GoPro remotely is to stream it to a streaming platform: Youtube or Facebook. According to your privacy settings, this video may be visible just to you or to a wider audience.  . . . Cons: The video latency of your preview is about 5-8 seconds which may be unacceptable for certain needs.").

120.    GoPro has also acknowledged the issue of significant delay during live streaming. https://gopro.github.io/OpenGoPro/faq (identifying at **minimum** over a one-second delay with stabilized video).[45]  *See, e.g.*, https://gopro.github.io/OpenGoPro/faq:

---

[45] *See also* GOPRO_233096 (March 2021 LiveStream Satisfaction Benchmarking & Max Diff Study) (noting that live stream connectivity and stability are "major use problems").  I confirmed

ATTORNEYS' EYES ONLY – SOURCE CODE

**STREAMING**

What are the differences between the streaming options for GoPros?

There are currently 3 different options on how to stream out of GoPro cameras. They are available either via Wi-Fi, USB, or both.

| | Wifi | | USB | | |
|---|---|---|---|---|---|
| | ViewFinder Preview | LiveStream | ViewFinder Preview | Webcam Preview | Webcam |
| Orientation | Floating or Fixed | Landscape facing up | Floating or Fixed | Landscape: Floating or Fixed | Landscape: Floating or Fixed |
| Streaming Protocols | UDP (MPEG-TS) | RTMP | UDP (MPEG-TS) | UDP (MPEG-TS) RTSP | UDP (MPEG-TS) RTSP |
| Connection Protocol | Wifi - AP Mode | WiFi - STA Mode | NCM | NCM | NCM |
| Resolution | 480p, 720p | 480p, 720p, 1080p | 480p, 720p | 720p, 1080p | 720p, 1080p |
| Frame Rate | 30 | 30 | 30 | 30 | 30 |
| Bitrate | 2.5 - 4 mbps depending on model | 0.8 - 8 mbps configurable | 2.5 - 4 mbps depending on model | 6 mbps | 6 mbps |
| Stabilization | Basic Stabilization | HyperSmooth or none | Basic Stabilization | None | None |
| Image Quality | Basic | Same as recorded content | Basic | Basic | Same as recorded content |
| Minimum Latency | 210 ms | > 100ms (un-stabilized) > 1,100ms (stabilized) | 210 ms | 210 ms | 210 ms |

121. Moreover, while there is user discernible delay in the live stream regardless of what connection hub is used, transmission via a mobile hotspot would result in greater latency than transmission via a Wi-Fi router. Mobile hotspots typically offer slower internet speeds compared to WiFi routers because they rely on cellular networks, which can be affected by factors such as signal strength, network congestion, and device location.[46] By comparison, WiFi routers are

_____

with GoPro engineers Dicky Liu and Ojas Ghandi that the 1 second processing delay is a minimum (it may be longer) and that the delay serves the purpose of efficiently using processing resources and permitting the video to go through necessary processing steps such as image stabilization and color correction.

[46] Mobile hotspot speed also depends on the cellular network it is connected to and the data plan of the user. Many carriers limit or cap data transmission via hotspots and will throttle (reduce the speed) of transfers or otherwise restrict data transfer under certain plans. The average speed for a mobile hotspot ranges from 5 Mbps to 50 Mbps whereas the average speed for a WiFi router ranges from 100 Mbps to 1 Gpbs. (https://techsynchron.com/difference-between-mobile-

ATTORNEYS' EYES ONLY – SOURCE CODE

connected directly to a broadband modem through an Ethernet cable which allows for higher bandwidth and faster data transfer speeds. WiFi routers also typically have a larger connection range compared to mobile hotspots. Overall, transmitting data via a mobile hotspot is typically more costly (both in terms of data plan cost and power usage), less reliable in terms of connection quality, and slower than transmitting data via WiFi router.

### 1. HERO 4K (2024)

122. Dr. Hu offers no evidence in support of her conclusions regarding the functionality of the image sensor (if any) in the HERO4K (2024). Dr. Hu cites to a single document that she alleges supports her opinions regarding the HERO4K (2024) image sensor – a third-party document that identifies the Sensor of the HERO 4K (2024) as "Sony IMX688?" CONTOUR_IP00021031. The document does not purport to correctly identify the sensor in the HERO 4K, much less provide any details regarding its functionality. Additionally, Dr. Hu offers no opinions or evidence regarding the image processing pipeline of the HERO4K, which relies on the Ambarella H22 processor.

### 2. GP2-Based Accused Products

123. With respect to HERO10 Black/Bones, HERO11 Black/Mini, HERO12 Black and HERO13, Dr. Hu's cited evidence does not support her conclusion that there is no user perceptible delay in the image processing. Instead, the cited documents show that, while limiting latency is a goal of the design, there remains user perceptible delay in the image processing. GOPRO_254341 (cited at 3/31/2025 Rpt. ¶ 175). For example, Dr. Hu cites to CPK Use Case Flow v.1.8

---

hotspot-and-wifi-router/, last visited April 22, 2025). Depending on the wireless standard used, 802.11ac and 802.11ax (Wi-Fi 6) provide maximum theoretical speeds of up to 1.3 Gbps and 9.6 Gbps respectively.

ATTORNEYS' EYES ONLY – SOURCE CODE

(GOPRO_254341), which I understand addresses different potential process flows relying on the GP2 processor.[47] In each process, the diagrams show one or more buffers that may be relied on to delay processing certain types of data, including the LRV or FB Streaming (Live Streaming).[48] This document contradicts Dr. Hu's opinion that she has "seen no processing that would cause any perceivable delay." *Compare* 3/31/2025 Hu Rpt. ¶ 175. GOPRO_254410 confirms that regardless of the configuration used for Live Preview or Live Streaming, there is likely to be some latency (lower latency in the live processing flow is noted to compromise image quality provided by the delayed processing flow). GOPRO_254410 at Slide 5 (cited at 3/31/2025 Hu Rpt. ¶ 175).[49] The exemplary processing pipelines reflected in GOPRO_254410 (such as the one excerpted below) show multiple buffers and processing requirements that can intentionally or unintentionally inject delay in the image processing pipeline. *Id*. at Slide 16:

---

[47] 2025-05-01 Discussion with Mr. Gandhi.

[48] *Id*.

[49] *Id*. 2025-05-01 Discussion with Mr. Gandhi (explaining that the green box identifies an intentional delay of 1 second or more while the data is being subject to additional processing and buffering to modify the data including to add video image stabilization).

74

ATTORNEYS' EYES ONLY – SOURCE CODE



124.    To the extent Dr. Hu is relying on the "FB Streaming" portion of this document, it does not support her assertion that there is no delay in Live Streaming. This document does not analyze any wireless transmission delay, but merely identifies process flows that may take place **inside** the camera processor. The document provides no information on latency or timing in the chip or outside the chip. There are, for example, no studies showing the timing regarding images being captured at the sensor, processed, or output, let alone any information or even structural diagrams showing the transmission process for data or other information once it leaves the chip. To the extent Dr. Hu believes the indications of "live processing" and "delayed processing" in this diagram are relevant, they tend to show that there **is** delay in the "FB streaming" output because that has "delayed processing" whereas the other processing chains in yellow are indicated as "live processing." Indeed, the document indicates that "delayed processing" potentially includes a 60

ATTORNEYS' EYES ONLY – SOURCE CODE

frame or 1 second delay. *Id*. at Slide 16. 1 second of delay would, at least in many circumstances, be "perceivable."

125. Additionally, the HERO 10/11 Cameras do not support Live Preview while recording. GOPRO_225250; GOPRO_254341. Accordingly, Dr. Hu's contention in her report that these products produce "real time image data of the scene" because there is no "perceivable delay between the image I was recording and the image appearing on my phone in the GoPro smartphone app" is incorrect. *E.g.*, 3/31/2025 Hu Rpt. ¶ 176. GoPro developers recognized that supporting Live Preview while encoding would significantly slow down transfer time thereby obviating the value of the Live Preview stream due to processing limitations.[50] GOPRO_225250. In addition, Live Preview while encoding imposed other trade-offs such as increased processing load, power drain, and thermal risks due to having to leave the Wi-Fi connection active between the camera and the mobile device (Quik App). *Id*. Therefore, once the user initiates recording via the Quik App, the local Wi-Fi connection between the HERO10/11 Cameras is severed and there no wireless preview can be sent. It is not until after recording is concluded and the user takes action to either download the content from the camera wirelessly or through a wired connection that the user is able to view the recorded content (which, by that point, is neither live nor "real time image content"/ "real time video image data").

---

[50] The process of "recording" would likewise be slowed down due to the processing limiations.

76

ATTORNEYS' EYES ONLY – SOURCE CODE

        **E.**        **"a wireless connection protocol device configured to send real time image content by wireless transmission directly to and receive control signals or data signals by wireless transmission directly from a personal portable computing device executing an application"**

126.    Dr. Hu has not shown that this element is met for the same reasons as the prior element.

127.    Additionally, in her analysis, Dr. Hu does not identify a specific wireless connection protocol device that she contends "sends real time image content by wireless transmission directly to" **and** "receive[s] control signals or data signals by wireless transmission directly from a personal portable computing device executing an application." *See* 3/31/2025 Hu Rpt. ¶ 183. Dr. Hu opines that the Accused Devices have "a Wi-Fi and/or Bluetooth transceiver." *Id*. But she does not identify a particular device (as opposed to a collection of components) that she contends meets the requirements of the claimed "wireless connection protocol device" configured to both send real time image content wirelessly and receive control signals. GoPro documentation and source code make clear that the settings Dr. Hu identifies as control signals ("resolution, frames per second, field of view, and various lighting/color/audio settings") may be controlled by Bluetooth but not Wi-Fi, whereas Wi-Fi is used to send video in cameras capable of Live Preview. *Id*. ¶ 193.[51] The chipsets identified by Dr. Hu in her report have separate 802.11 Wi-Fi and Bluetooth devices (*e.g*., transmitters) requiring different driver programing for each wireless standard. *See, e.g*.:

---

[51] *See also* GoPro_226946 (BLE Based Camera Control); GOPRO_227295 at 227333 (Kongs PRD confirming that all communications between Kongs and GoPro App are via Bluetooth except showing a video preview). I confirmed that *Contour III* cameras cannot be controlled via WiFi using either the iOS or Android versions of the GoPro App. 7/29/2025 Telephone Call With D. Liu and O. Ghandi. Further, the use of Bluetooth for mobile control is enabled whether or not Wi-Fi is available or connected.

ATTORNEYS' EYES ONLY – SOURCE CODE



[52]

128.     Dr. Hu's opinion that her smartphone "wirelessly transmitted the desired control signal (*e.g.*, to change the resolution)" to the camera does not specify the means or manner in which the camera's alleged "wireless connection protocol device" received the control signal, if at all.     *See* 3/31/2025 Hu Rpt. ¶ 190, 192-193.     Similarly, the HERO12 Black Manual (CONTOUR_00020823) that Dr. Hu cites states only that camera settings can be changed using the GoPro Quik app, it does not identify the wireless protocol device that is used for that transmission. *Id*.

### 1.     Live Preview Without Recording

129.     Dr. Hu's opinion that "all of the accused cameras have [the] live preview functionality" is incorrect.  The HERO10 Black, HERO10 Black Bones, HERO11 Black (sold before March 2024), and HERO11 Mini (sold before May 2024) (collectively "HERO10/11

---

[52] https://docs.qualcomm.com/bundle/publicresource/87-YB797-1_REV_E_QCA9377_Product_Brief.pdf (last visited 4/28/2025).

ATTORNEYS' EYES ONLY – SOURCE CODE

Cameras") do not have the ability to send real time image content wirelessly to a mobile device (personal portable computing device) while recording. For those HERO10/11 Cameras, GoPro developers determined that Live Preview while encoding was not feasible because of the processing and power usage as well as thermal dissipation caused by leaving the Wi-Fi connection between the camera and the mobile device (Quik App) active. GOPRO_225250. Therefore, when the user initiates recording (encoding), the Wi-Fi connection is severed, and the wireless connection protocol device is not configured to send real time image content by wireless transmission directly to the personal portable computing device executing an application.

130. For all GP2 products, the .LRV is transmitted to the SD card and not "directly to a personal portable computing device executing an application." The low-resolution video is never transmitted in real time to the personal portable computing device, much less streamed to a personal portable computing device.[53] Instead, it is saved to the SD card until it is called by the GoPro App (or other compatible software application), which causes the data to be sent as a file to the specified remote location. Of note, delay is injected into the process of transmitting the .LRV from storage by the connection time, processing requirements, and connection limitations. The degree of latency would be user discernible and sending a file from the SD Card would not be "real time image content."

131. Additionally, as explained by Mr. Gandhi and shown in the SNI documentation, when no preview is sent to the camera (as is the case with HERO10/11 Cameras while recording), GP2 injects delay in the image processing to afford more efficient processing and allow for the

---

[53] The .LRV is not generated when the live streaming functionality is being used. 7/29/2025 Telephone Call with O. Ghandi and D. Liu.

79

ATTORNEYS' EYES ONLY – SOURCE CODE

application of additional processing modules such as image stabilization.[54]  In other words, there is no "real time image content" because there is an intentional processing delay of at least one second before any video image content is generated (recorded).

### 2.    Live Streaming

132.    To the extent Dr. Hu contends that the Live Streaming functionality meets this claim limitation, I disagree because the wireless connection protocol device of the Accused Products is not "configured to send real time image content by wireless transmission directly to . . . a personal portable computing device executing an application."  As set forth above, when live streaming is initiated, the Accused Products are configured to transmit video data to a remote servers, which then processes the data and transmits it to the social media networking service.  For an individual to stream or download video from the Accused Products, the video data stream goes to remote servers (*e.g.*, the cloud) and not directly to the personal portable computing device. *Compare* Dkt. 708 at 14-15; GOPRO_233259; GOPRO_233274.

#### a)    Real Time Image Content Is Not Sent *Directly* or *Wirelessly* To A Personal Portable Computing Device

133.    The claim language requires a configuration to "send real time image content by wireless transmission directly to a personal portable computing device executing an application." This claim language is not met by live streaming.

134.    First, any image content is not sent **wirelessly** to a personal portable computing device.  The alleged personal portable computing device is the cellular phone acting as a mobile

---

[54] GOPRO_254410; 2025-05-01 Discussion with Mr. Gandhi.

ATTORNEYS' EYES ONLY – SOURCE CODE

hotspot. But the path that the data takes to arrive at the alleged personal portable computing device is not wireless.

135.    A cellular device (e.g., "UE" or user equipment in the diagram below) communicates with a base station, which includes a radio head mounted on a tower or building. The radio head ("RRH" for remote radio head in the diagram below) then communicates via a wired Common Public Radio Interface (CPRI) with a baseband unit (BBU). The baseband unit then processes the received signals and transmits them over a wired connection (called "backhaul") to the "core network."[55]

---

[55] https://www.nokia.com/thought-leadership/articles/5g-wireless-future-begins-with-fiber/ ("It's true that the future of communications is wireless, but the future of wireless is fixed. 5G mobile technology is going to be the star, there's no doubt about that. But without fiber supporting it, 5G's star will not shine nearly as bright nor as far as it should. The technical arguments for why 5G needs fiber have been well documented and, fundamentally, come down to the simple math of needing high-capacity backhaul for the massive amounts of low-latency, high-bandwidth traffic that 5G will create.");
https://onestore.nokia.com/asset/206508?_gl=1*1ijwucm*_ga*MTA1OTYzNTIzNy4xNzQ1ODYyMjY4*_ga_D6GE5QF247*MTc0NTg2MjI2Ny4xLjAuMTc0NTg2MjM1Ny4wLjAuMTQ0NjA5MjkxNA; https://www.ericsson.com/en/reports-and-papers/white-papers/optimized-optical-solutions-for-mobile-transport-networks.

ATTORNEYS' EYES ONLY – SOURCE CODE



56

136.    From the "Core Network," the data is routed through a set of connected servers, switches, and other network devices until the data makes its way to Amazon's servers, and to Amazon's specific IVS servers.  The architecture of Amazon's services is described in more detail below, and I also discussed these services in Section VIII.B.2, which I incorporate by reference herein.  Those services include using Amazon's content delivery networks or third party content delivery networks, which further include a network of "edge servers" that use localization to enhance the efficiency and performance of content delivery.[57]  All of these communications

---

[56] https://www.sdxcentral.com/5g/ran/definitions/radio-access-network/.

[57] https://www.cloudflare.com/learning/cdn/glossary/edge-server/;
https://www.akamai.com/blog/edge/everything-you-need-to-know-about-edge-networks;
https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-edge-computing; https://www.akamai.com/glossary/what-is-an-edge-server;
https://drivenets.com/resources/education-center/what-is-a-core-network/;
https://www.meter.com/resources/fiber-backhaul; https://medium.com/blockcast-network/the-many-flavors-of-content-delivery-networks-09d663fc96f4; https://www.fs.com/blog/the-ultimate-guide-to-content-delivery-network-cdn-12226.html;

ATTORNEYS' EYES ONLY – SOURCE CODE

happen over wired communication links.  As described by Amazon, it generally uses wired fiber optic network connections to ensure that the necessary bandwidth is available.[58]





https://www.cloudflare.com/learning/cdn/what-is-a-cdn/; https://cloud.google.com/blog/products/networking/google-cloud-networking-in-depth-cloud-cdn; https://www.splunk.com/en_us/blog/learn/cdns-vs-load-balancers.html; https://cloud.google.com/blog/topics/developers-practitioners/googles-subsea-fiber-optics-explained;

[58] https://aws.amazon.com/blogs/networking-and-content-delivery/growing-aws-internet-peering-with-400-gbe/; https://aws.amazon.com/about-aws/global-infrastructure/ ("The AWS Global Infrastructure is built for performance. AWS Regions offer low latency, low packet loss, and high overall network quality. This is achieved with a fully redundant 400 GbE fiber network backbone, often providing many terabits of capacity between Regions.").

[59] https://aws.amazon.com/developer/application-security-performance/articles/video-streaming-architectures/.

[60] https://aws.amazon.com/medialive/?c=ms&sec=srv.

ATTORNEYS' EYES ONLY – SOURCE CODE



137.    The foregoing is only a description of the wired links being used to transport video data *to* Amazon.  When data is transported back to a mobile device, the same or related wired links are again used until finally a base station transmits data to the mobile device.  Accordingly, *wired* connections are used for transmission of the image content.

138.    Second, as just described, the transmission of image content does not happen "directly to a personal portable computing device."  Rather, the image content is passed (at least) via CPRI to a baseband unit, to a core network, through servers, routers, and switches, to one or more Amazon servers, to Amazon's IVS servers, which process the image content, and then the image content is passed through Amazon's servers, contend delivery networks, edge servers, core

---

[61]

https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf at 10.

ATTORNEYS' EYES ONLY – SOURCE CODE

networks, and baseband and CPRI units at a base station.  Some of this network architecture is opaque because Amazon does not detail exactly how many servers and how many databases and switches are involved in its content reception and delivery; however, the information available clearly shows that there is no "direct" transmission to a personal portable computing device.

**b)  The Alleged Wireless Connection Protocol Device is not Configured As Claimed**

139.    The claim requires that the wireless connection protocol device be "configured to send real time image content by wireless transmission directly to . . . a personal portable computing device executing an application."  This claim element is not met in the live streaming context.

140.    Wi-Fi transmitters send data by generating a carrier wave at a particular frequency. The wireless network adapter converts the electronic data into a pulse that is also a wave form, which merges with the carrier wave for transportation.  This is called "modulation."  When the receiving network adapter picks up the wave, it removes the carrier wave and converts the recovered data wave into binary data for the computer or router.  This is call "demodulation."  The process by which the camera transmits data via a wireless hub (*e.g.*, router or hotspot) to a remote server destination is governed by the applicable 802.11 standard (*e.g.*, 802.11ac for QCA9377).

141.    As set forth in the IEEE Standard definition, the AP is agnostic as to whether its signal is received by one or multiple receivers (STAs).  Instead, the receiving STA accesses the transmitted data by sending a JOIN request that includes certain authenticating information such as country, operating class, and channel number, but does not identify the STA as a WiFi router,

ATTORNEYS' EYES ONLY – SOURCE CODE

mobile hotspot, etc.[62]  Once the STA has access to the transmitter, it can access information sent by the transmitter for a certain period of time.  The data from the transmitter includes required information such as the destination address, size, whether it is a first frame or continuation, format, etc.  In other words, while the phone acting as a hotspot may, in some circumstances, connect itself to the Accused Products for the purpose of acting as a conduit for video data, the camera itself (and any wireless connection protocol device therein) is not "configured" to "send" video content wirelessly "directly to . . . a personal portable computing device executing an application" as required by the claim language.  The camera's wireless transmitter has no configuration that identifies the phone as either an ultimate or interim destination for the video data.

142.    Additionally, the claims require that the wireless connection protocol device be "configured to send real time image content by wireless transmission directly to . . . a personal portable computing device **executing an application**."  However, there is no configuration of the wireless connection protocol device to communicate video data to **any** application running on the iPhone or Android smartphone during Live Streaming, whether GoPro or a third party application. With live streaming, the Wi-Fi transmitter sends video data packets addressed to a remote server – the transmitter does not connect to any application nor does it access any information regarding whether the personal portable computing device is running any application.  In other words, the configuration of the wireless transmitter is agnostic as to the nature of the Internet hub/router as long as the hub/router conforms to the applicable wireless standard and is certainly agnostic as to

---

[62] Std 802.11ac-2013 Amendment at 25, 40-44 (format of transmitted frames), 86-87 (SSID required values) (*available* at https://schupen.net/lib/wifi/802.11ac-2013.pdf); *see also* https://www.tek.com/en/documents/primer/wi-fi-overview-80211-physical-layer-and-transmitter-measurements

ATTORNEYS' EYES ONLY – SOURCE CODE

whether the hub/router is a personal portable computing device executing an application.  To find that such a wireless transmitter would meet the limitation is tantamount to concluding that *any* wireless transmitter would meet the limitation, without any specific configuration, programming or hardware implemented to direct real time image content to a personal portable computing device executing an application (as distinguished from any other component capable of acting as an 802.11 router or hub for wireless data).

**F.** **"generate from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image data stream" ('954 Pat. Cl. 11) / "generate first video image content and second video image content corresponding to the video image data representing the scene, wherein the second video image content is a higher quality than the first video image content" ('694 Pat. Cl. 3 – incorporated into asserted claims 4 and 6)[63]**

143.    For this claim element, I apply the Court's construction of the "generate" terms as: "record in parallel from the video image data a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image stream." Dkt. 251.[64]

144.    This claim element is not met for the reasons set forth below.

**1.    Ambarella H22:  No Evidence Of Recording "In Parallel" or "From The Video Image Data"**

145.    Dr. Hu opines that HERO (4K/2024) uses an Ambarella H22 processor includes "dual encode" that generates a "simultaneous second stream." 3/31/2025 Hu Rpt. ¶ 227.  Based

---

[63]  For these elements as well as those addressed in Sections D and E, GoPro cannot infringe claims depending from these independent claims for the same reason.

[64] *See also* IPR2015-01080, 01/19/2016 PO Response at 33, Attorney Docket No. 111968-0001-652; IPR2015-01080, June 22, 2016 Record of Oral Hearing at 80:6-81:8; IPR2015-01080, Decision on Remand at 31-33.

ATTORNEYS' EYES ONLY – SOURCE CODE

on the H22 Product Sheet alone, which identifies the "dual encode" functionality, Dr. Hu concludes that "the H22 processor generates two streams in parallel while recording." *Id*. Dr. Hu offers no analysis regarding the image processing pipeline used by the Ambarella chipset nor does she identify how the chipset records in parallel a first and second image data stream from the video image data.[65]

146.   Dr. Hu also does not analyze any source code or "dual-stream configurations available" for the HERO 4K (2024). *See* 3/31/2025 Hu Rpt. ¶ 73 (identifying alleged dual stream modes for other Accused Products, but not HERO 4K). The source code that Dr. Hu does analyze is unrelated to the image processing pipeline. Instead, Dr. Hu opines on how the camera connects to the Quik App (¶ 91), "powers on the image sensor" (¶ 97), calls the video streams from the camera processor (¶¶ 90, 94-95), and "initializes the camera settings" (¶¶ 90-92). None of the code cited by Dr. Hu relates to how recording is performed. For example, the code identified by Dr. Hu calls the functions for starting/stopping recording but does not disclose any functionality regarding how recording occurs. *Id*. at ¶¶ 107-108, 117, 120.[66]

---

[65] Dr. Hu also fails to identify any specific evidence that the HERO 4K (2024) meets the requirement that the camera processor be configured to "receive the video image data directly or indirectly from the image sensor." *Compare See* 3/31/2025 Hu Rpt. ¶ 207 (identifying Socionext documentation but not Ambarella documentation).

[66] It does not appear that Dr. Hu believes Live Streaming is accused for HERO 4K. Her testing and analysis of live streaming is limited to Hero 12 Black, Hero 13 Black, Hero 11 Black, Hero 11 Black Mini, and Hero 10. 3/31/2025 Hu Rpt. ¶¶ 121, 123, 127-29, 130-35. I understand that there were no infringement contentions served for the Accused Products, so for the sake of completeness, I note that Dr. Hu has not analyzed any documentation, source code, testing associated with HERO 4K relating to live streaming. Based on GoPro's publicly-available documentation, it is clear that HERO 4K (2024) does not support live streaming. https://www.goprodb.com/comparisons/vs/gopro-hero-12-black-vs-gopro-hero-2024/ (last visited April 22, 2025).

ATTORNEYS' EYES ONLY – SOURCE CODE

147.    The source code that Dr. Hu reviews under the heading "start two parallel video encodings and storages" (3/31/2025 Hu Rpt. at § IX.B.5) simply identifies the GoPro source code calling functions to start recording or start encoding, it does not provide any disclosure regarding how those processes are implemented on the chipsets and Dr. Hu admits that she did not review any of the firmware code of the processors themselves.  *See, e.g.*, 06/26/2025 Hu. Dep. Tr. at 124:22-125:12.  Thus, the conclusions that Dr. Hu draws regarding the chipset functionality are unsupported by any source code evidence.  By way of example:

- Dr. Hu asserts that a █████████████████████ ██████████████████████████ ██████ 03/31/2025 Hu Rpt. at ¶114. To support this statement, Dr. Hu cites to SC_GOPRO_3311-3318 (for a definition of █████████████████████████ ), to SC_GOPRO_3303-3310 (for a definition of █████████████████ ), and to SC_GOPRO_3405-3420 (alleging that the Ambarella firmware API function █████████████ ██████████████████████████ " there). *Id.*; see also 03/31/2025 Hu Rpt. at n80, n81, n82, respectively.  Dr. Hu provides no evidence or explanation as to the operational details of Ambarella firmware API function █████████████ let alone any evidence to support her conclusion that it creates video encoder instances. Indeed, a review of the cited source code including the header file contained at SC_GOPRO_3405-3420 confirms there are no details regarding the underlying functionality of █████████████ especially as the header file serves as a mere interface with the Ambarella firmware. Accordingly, it is not possible for Dr. Hu to conclude what the Ambarella firmware API function "████████████ does, much less how it operates.

- Dr. Hu asserts that ████████████████████████ function █████████████████████████████████ █████████████ to start live preview using one of the three encoder instances," citing to SC_GOPRO_3319 for supporting evidence. See 03/31/2025 Hu Rpt. at ¶114, n83. Here, too, Dr. Hu's analysis falls short. Nowhere in SC_GOPRO_3319 is it explained what "████████████ " does, just that it is called. Dr. Hu provides no evidence or explanation of the operational details of Ambarella firmware API function █████████████ let alone any evidence to support the conclusion that it "start[s] live preview using one of the

ATTORNEYS' EYES ONLY – SOURCE CODE

three encoder instances." Accordingly, it is not possible for Dr. Hu to conclude what the Ambarella firmware API function ████████████████████" does, much less how it operates.

- Dr. Hu also asserts that, similar to the Hero GP2 cameras, to start recording to files and to start live preview, function ████████████████████



████████████    03/31/2025 Hu Rpt. at ¶115. To support this conclusion, Dr. Hu cites to SC_GOPRO_3323-3334. 03/31/2025 Hu Rpt. at n84. Again, nowhere in SC_GOPRO_3323-3334 is it explained what the Ambarella firmware API function ████████████████████ does. Dr. Hu provides no evidence or explanation as to the operational details of Ambarella firmware API function ████████████████████ let alone any evidence to support the conclusion that it assigns buffer addresses, i.e. "the memory locations that save the encoded video data of each video encoder instance before it is saved to a video file in the SD card, and/or transmitted to a personal portable computing device for live preview and live streaming, very similar to those for the Hero GP2 cameras." Id. Accordingly, it is not possible for Dr. Hu to conclude what the Ambarella firmware API function ████████████████████ does, much less how it operates.

- Dr. Hu asserts that ████████████████████



o start parallel encoding of all three video streams." 03/31/2025 Hu Rpt. at ¶117. To support this conclusion, Dr. Hu cites to SC_GOPRO_3334-3336 and CONTOUR_IP00021075. 03/31/2025 Hu Rpt. at n86, n87. As mentioned before, CONTOUR_IP00021075 is a high-level, two page product brief associated with the Ambarella H22 that provides no firmware level details. Neither SC_GOPRO_3334-3336 nor CONTOUR_IP00021075 provides any explanation as to what the Ambarella firmware API function ████████████████████ does. Dr. Hu also provides no further evidence or explanation as to the operational details of "████████████████████ let alone any evidence to support the conclusion that it would "start parallel encoding of all three video streams." *Id.* Accordingly, it is not possible for Dr. Hu to conclude what the

ATTORNEYS' EYES ONLY – SOURCE CODE

Ambarella firmware API function ███████████████ does, much less how it operates.[67]

148.    Dr. Hu's approach to the Ambarella chipsets diverges materially from her approach to the GP2 chipset.  For the latter, she analyzed and discussed internal product documentation and testimony from knowledgeable engineers.  *See supra* Section VIII.B.3.  Dr. Hu did not cite to or analyze image processing pipelines produced by Ambarella nor did she seek any feedback from either Ambarella or GoPro engineers regarding the processing modules applied to the video data by H22.

149.    Dr. Hu appears to opine that any chipset that "generates 'simultaneous second stream,' and includes '[d]ual encode for on the fly mobile resolution streaming'" meets the claim language.  I disagree because her current opinion is inconsistent with her prior reports as well as the litigation history.  The Court construed this claim term as follows:  "record *in parallel from the video image data* a first image data stream and a second image data stream, wherein the second image data stream is a higher quality than the first image stream."  Dr. Hu was required to show that the recording happened "in parallel" and that the recording took place "from the video image data" not some other source of data.  Dr. Hu has not shown that either of these elements is met.  As discussed below, in contrast, Dr. Hu argued that based on specific image processing pipeline

---

[67] To the extent that Dr. Hu contends that the source code that merely calls the functionality of the camera processor is all that is necessary to meet the "generating" limitations, this position eviscerates any basis for distinguishing the Ambarella prior art as well as her motivation to combine arguments.  *See, e.g.*, 11/19/2021 Hu Rpt. at ¶ 174, 210-220, 237-38, (arguing Looxcie's disclosure of "dual recording" is insufficient because the witness could not say for certain "whether the alleged second stream is generated from the buffer), 248 (arguing that a document "does not describe generating two streams in parallel" if it does not show "the inner workings" or "flow within the chips").  The cited source code neither discloses nor impacts the manner in which the camera processor processes data, it simply calls the outputs of the camera processor.

ATTORNEYS' EYES ONLY – SOURCE CODE

documents relevant to the GP2 chipset, the video generation took place "in parallel" and "from the video image data." For the Ambarella chipsets, there is no such evidence in the case. Rather, Dr. Hu ignores those claim limitations and opines that **any** creation of multiple video streams would infringe the asserted claims.

150.    CIPH has argued that dual streaming may be achieved in many different, unclaimed ways such as generating preview data from previously recorded or stored video data – according to CIPH "the claim not only specifies that the so-called dual-streaming occurs but specifies how it occurs." 8/16/22 Appellate Brief at 44-45. I understand CIPH argued on appeal – and the Federal Circuit agreed – that the claims do not cover all ways that a processor might generate multiple video streams of varying qualities, but that they are directed to a specific method of recording the high and low resolution streams in parallel:

> The claims thus require specific, technological means—parallel data stream recording with the low-quality recording wirelessly transferred to a remote device—that in turn provide a technological improvement to the real time viewing capabilities of a POV camera's recordings on a remote device.
>
> Importantly, the district court construed "generate" in representative claim 11 to require recording multiple video streams "in parallel." Claim Construction Order, 2018 WL 3428606, at *5. Thus, the claims do not cover other ways that a camera processor might generate multiple video streams of varying quality for wireless transmission, such as streams created "in sequence." *See id*. at *7. Rather, the claims are drawn to a "specific means or method that improves the relevant technology." *McRO*, 837 F.3d at 1314; *see also CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1368 (Fed. Cir. 2020).

*Contour IP Holding LLC v. GoPro, Inc*., 2022-1654, 2022-1691, Slip Op. at 10 (Fed. Cir. Sept. 9, 2024). I understand that the Federal Circuit held that "the claims do not cover other ways that a camera processor might generate multiple video streams of varying quality for wireless

ATTORNEYS' EYES ONLY – SOURCE CODE

transmission." *Id*. at 10.[68]   Thus, to demonstrate infringement, Dr. Hu would have to show the way that the camera processor generates multiple video streams – not just that it does so.  Dr. Hu has failed to demonstrate infringement of this element.

### 2.   GP2 Products Do Not Record "In Parallel" or "From the Video Image Data"

151.   The HERO12 Black, HERO13 Black, HERO11 Black, HERO11 Black Mini, and HERO10 Black (including HERO10 Black Bones) use a new GP2 chip, which contains a Socionext processor.   None of these products meet this claim element for the reasons below.

152.   I understand that the Court construed the word "generate" as "record in parallel from the video image data.[69]"  I understand that this construction was supported, in part, because CIPH asserted that the claims require both data streams be generated from the video sensor data as distinguished from prior art systems with streams created "in sequence.[70]" That is, I understand that "the claims do not cover other ways that a camera processor might generate multiple video streams of varying quality for wireless transmission such as streams created in sequence.[71]"

---

[68] *See also* 8/16/2022 Appellate Brief at 18, 19 ("Contour did not just claim an idea no matter how implemented; Contour claimed a specific technique resulting from configuring the processor in a particular way"), 56 ("The inventive concept is the **orderly combination of discrete claimed steps** for configuring the camera processor; *i.e.*, (1) generate (2) in parallel (3) two image data streams (4) from the same video image data (5) where one stream has a higher resolution than the other and (6) send only the lower-resolution stream to the personal portable computing device."); 57 ("Here, the "generate" limitation recites a specific technique for configuring the processor (generating two videos at different resolutions in parallel from the same video data)").

[69] *Contour IP Holding, LLC v. GoPro, Inc.*, 2022-1654, 2022-1691, Slip Op. at 6 (Fed. Cir. Sept. 9, 2024).

[70] *Id*.

[71] *Id*. at 10.

ATTORNEYS' EYES ONLY – SOURCE CODE

153.    Unlike the GP1 chipset, GP2 relies on a single video codec block to process the high- and low-resolution videos in sequence, not in parallel from the same source.  The GP2 architecture is significantly different than the GP1 chipset.  I described the GP1 chipset architecture in my prior reports, which I incorporate herein by reference.  Unique to the GP2 chipset design is that its efficient architecture allows the use of a **single** video codec block.  That block can be sequentially shared to create multiple video streams.  It cannot, however, be used to create parallel video streams because there is no hardware available for parallel video creation.

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_251101 at 24.

ATTORNEYS' EYES ONLY – SOURCE CODE

154. This is confirmed in other places in the technical specifications for the GP2 chipset, which show a single video processing block that creates, in sequence, the video output including the higher and lower resolution video streams.



GOPRO_244524 at 7.

155. The single video block sequentially processes the high and low resolution video streams, which I confirmed with GoPro engineers.[72] GoPro engineers explained that as part of an effort to create a more efficient video processing chip at a lower cost, GoPro received specifications from Socionext that use a time-sharing sequential video processing system. It is a common understanding in the art, which was confirmed by GoPro's witnesses (and the documents I reviewed) that by using a sequential processing scheme, power can be reduced because lighting up different portions of hardware in parallel will increase instantaneous power draw. *See, e.g.*, https://www.naukri.com/code360/library/parallel-processing ("Disadvantages of Parallel

---

[72] 2025-05-01 Discussion with Mr. Gandhi.

ATTORNEYS' EYES ONLY – SOURCE CODE

Processing:   Increases the cost of computers since more hardware is required; Multicore architectures consume higher power.").

156.   GoPro's focus on reducing power, and the new design of the GP2 chip to reduce power draw through sequential video processing, is supported by my observation of Socionext's design decisions to ██████████████████████████ to reduce idle power draw, which would increase battery life on the GoPro.  GoPro's engineers confirmed for me that battery life is a key design consideration for GoPro.[73]



GOPRO_251101 at 271.

157.   As I explain below, Dr. Hu has a different and incorrect understanding of the video generation architecture of the GP2 chipset.[74]  Dr. Hu primarily uses the figure (annotated by Dr. Hu) below to allege that the Accused Products meet this claim limitation:

---

[73] 2025-05-01 Discussion with Mr. Gandhi.

[74] I note that throughout her report, to show infringement, Dr. Hu improperly compares the Accused Products against products that the Court previously found infringed. *E.g.*, 3/31/2025 Hu Rpt. ¶ 217 ("The GoPro cameras having a Socionext GP2 processor generate two streams in

ATTORNEYS' EYES ONLY – SOURCE CODE



GOPRO_254410 at Slide 19 (red and orange-dashed annotations added)

3/31/2025 Hu Rpt. ¶ 217 (as annotated by Dr. Hu).

158.    Dr. Hu mischaracterizes this document and diagram in her report.  *See, e.g.,* 3/31/2025 Hu Rpt. ¶ 218.  As an initial matter, nothing in the diagram, which shows potential programming options for the GP2 chip, shows duplicative hardware.  As the Socionext hardware specification provides, there is no duplicative hardware encoder that can process image data in parallel.  GOPRO_251101.

---

parallel in substantially the same way as the GP1 processors").  I understand that the appropriate methodology to evaluate infringement is to compare the accused instrumentalities to the asserted claims, not to other products.

ATTORNEYS' EYES ONLY – SOURCE CODE

159.     Additionally, the cited document shows illustrative use cases, *i.e.*, different ways the chip can be used, not how it is actually implemented.  GOPRO_254410 at 5.[75]  I discussed this issue with GoPro's engineers who confirmed my understanding of these documents; I also discussed with those engineers the limited use of the document that Dr. Hu excerpted and relied upon for her infringement opinions.[76]  GoPro confirmed that the exemplary use cases do **not** show the implementation of the GP2 chip, nor do they show any implementation details that could be interpreted as parallel processing of the video data.  By way of example but not limitation, I understand that various processing pipelines proposed in the example above are mutually exclusive of one another such that there is no implementation in which all of the outputs would be instantiated.[77]

160.     The diagram above discloses two different types of processing that the GP2 chip is capable of: live processing where data is handled without accumulation and delayed processing (also sometimes called batch processing) which accumulates the data in a manner that allows for more efficient processing, particularly when the data constitutes images or pixels that include substantial overlap/identicalities.  As set forth in the document's various use cases, the GP2 chip is capable of processing the recorded (high resolution), LRV, and streaming outputs in either delayed processing or live processing modes.  A person of ordinary skill in the art would understand that the diagram relied on by Dr. Hu does not, as she suggests show that "the two video streams are encoded" by two different encoders ("the H.265 and by the H.264 encoder").  3/31/2025 Hu Rpt. ¶ 218.  But instead supports the finding that the high and low resolution video

[75] 2025-05-01 Discussion with Mr. Gandhi.
[76] 2025-05-01 Discussion with Mr. Gandhi.
[77] 2025-07-29 Discussion with O. Gandhi and D. Liu.

ATTORNEYS' EYES ONLY – SOURCE CODE

may be encoded in sequence whereby a "phone preview" is created while the high resolution, LRV, and streaming videos are buffered for efficiency before they are processed using the shared encoder. Indeed, the differences in the two processing methodologies identified in the diagram only underscore that the high and resolution video is not generated in the same manner, in parallel, from the same source or the same data. Instead, additional processing is applied to the data subject to delayed processing to allow it to be processed more efficiently.

161. Dr. Hu also attempts to rely on her review of the source code to bolster her opinions regarding the alleged "parallel" video generation. The source code Dr. Hu cites, however, does not disclose the functionality of the camera processor's hardware at all, much less show that there is "parallel" recording. Dr. Hu opines that "[t]he encoder instances are then configured and various functions are called to begin parallel video encodings of the two streams." 3/31/2025 Hu Rpt. ¶ 219. But I have reviewed the source code that Dr. Hu cited, and nowhere in that source code is parallel video generation indicated. To the contrary, although two encoder instances are identified in the source code, that does not indicate that they are called or executed in parallel, and there is **no** source code indicating that this is the case. Doing so would be contrary to the intentional, power-saving design of the GP2 processor. Although Dr. Hu uses the phrase "parallel encoding," all that she really finds in the code is that the GP2 process is capable of producing "two different video streams at two different qualities," which is insufficient to meet the requirement that the processor record, in parallel, the first and second data streams. *Compare* 3/31/2025 Hu Rpt. ¶ 219. Rather, the source code does not indicate how the video streams are created by the GP2 chip—in parallel or some other way—but simply that function calls are placed to create them. As discussed

ATTORNEYS' EYES ONLY – SOURCE CODE

above, the hardware documentation provided by Socionext answers this question because it shows

the ████████████████████████████████████████████████.[78]

162.    Dr. Hu acknowledges that there is only a single video codec block in the GP2 chip,

but she argues that "time sharing from a single video codec block" does not avoid infringement

because "the streams are recorded in parallel even if there is a delay in processing the high

resolution stream." 3/31/2025 Hu Rpt. ¶ 222. Dr. Hu's opinion misses the point. The streams are

processed sequentially because that is the way the hardware is designed – *i.e.*, there is no hardware

available to generate video in parallel. The fact that there is a delay is the result of the different

hardware architecture, not the reason that the architecture is not parallel. That is, while the delay

may be evidence that processing in sequence is occurring, a person of ordinary skill in the art

would not equate sequential processing to a temporal limitation. Instead, it is the product of the

chip's design that intentionally processes the two different videos in materially different ways, at

different times.

163.    Dr. Hu's comparison of the GP2 chip to the GP1 chipset only highlights the

differences in the processing architecture. While I do not understand that the proper way to analyze

infringement is to compare an accused product with an allegedly infringing product (but rather to

compare an accused product to the asserted claims), I nonetheless note that Dr. Hu ignores the

---

[78] Dr. Hu makes a claim construction argument that the buffering of video image data is irrelevant because of claim differentiation over dependent Claim 13. 3/31/2025 Hu Rpt. ¶¶ 220-21. This appears to be an untimely argument that should have, if ever, been presented to the Court for resolution during claim construction. However, for the sake of completeness, I note that buffering modifies the data so that it is not the same data as prior to buffering. Therefore, a person of ordinary skill in the art, would at least consider the buffering steps in determining whether the claim language is met. There are buffering steps before and after the processing step identified as the "codec" which alters the data such as by dropping or reordering packets when the egress port is over a certain data capacity.

ATTORNEYS' EYES ONLY – SOURCE CODE

relevant differences between the products.  For example, technical documents regarding the GP1

chipset show that for " ███████████████████████████████████

██████████████████████████████████.



ATTORNEYS' EYES ONLY – SOURCE CODE



SOCIONEXT-00001870 at -1940.  This is the architecture accused by Dr. Hu to attempt to prove

"parallel" video creation for dual streams for the GP1-based products.  This contrasts with the

single video encoder architecture described for the GP2-based products above.

ATTORNEYS' EYES ONLY – SOURCE CODE

164.    As another example, the ARM interrupt controller documentation describes how interrupts ███████████████████████████████████

█



SOCIONEXT-00002576 at -2596.  But the GP2 architecture, as described above, is different in that only a single hardware encoder is available.

165.    As another example, the Socionext GP1 documentation shows that ██████████

████████████████████████

ATTORNEYS' EYES ONLY – SOURCE CODE



ATTORNEYS' EYES ONLY – SOURCE CODE





ATTORNEYS' EYES ONLY – SOURCE CODE

SOCIONEXT-00003211 at -3225, -3217, -3230. To be clear, these are hardware descriptions, not "use cases," which is what Dr. Hu used to analyze the GP2 chipset. As discussed above with respect to the GP2, however, there is only a single encoder block.

166. As another example, the GP1 Socionext documentation likewise shows "



SOCIONEXT-00004555 at -4562. This contrasts with the structure of the single hardware encoder used in the GP2 chipset. I also note that there are two completely separate H264 (SOCIONEXT-00006324) and H265 (SOCIONEXT-00006333) macro specifications. This

107

ATTORNEYS' EYES ONLY – SOURCE CODE

again is consistent with the differences between the GP1 and GP2 chipsets with respect to the hardware encoder architecture.

167.    As another example, Socionext GP1 documents indicate that unlike the GP2 chip, which has a single power domain and single codec block for the video encoder, the ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮This is consistent with the differences between the GP1 and GP2 chipsets I have discussed, and with the information I learned from GoPro's witnesses regarding the new architecture of the GP2 chipset discussed in this report.

ATTORNEYS' EYES ONLY – SOURCE CODE



SOCIONEXT-00007085 at -7085 (annotations in original).  The annotation in the image above

showing a "video codec engine" does not change my opinion, because there is a difference

between a single video codec "block" (GP1), which is a single piece of hardware, and a video

109

ATTORNEYS' EYES ONLY – SOURCE CODE

codec "engine" in this context.  In this context, "engine" may and often does refer to a combination of processes running on multiple cores or discrete hardware elements.[79]

168.    As another example, Dr. Hu's comparison of the "use cases" for the GP1 and GP2 chipsets only highlights the significant architectural differences between these two chipsets.



2025-03-31 Hu Rep. ¶216 (GP1)

---

[79] *E.g.*, https://www.sonnetsoftware.com/products/sonnet-suites/multi-threaded-EM-engine-v13.html ("The EM analysis engine creates multiple processes, or threads, each of which solves a different part of the solution matrix on a different CPU core—all at the same time."); https://cloud.google.com/compute/docs/cpu-platforms ("A CPU platform offers multiple physical processors, and each of these processors is referred to as a core. For the processors available on Compute Engine, a single CPU core can run as multiple hardware threads through Simultaneous multithreading (SMT), which is known on Intel processors as Intel Hyper-Threading Technology."); https://macaulay2.com/doc/Macaulay2/share/doc/Macaulay2/Macaulay2Doc/html/_parallelism_s pin_spengine_spcomputations.html ("Some computations in the engine can run using multiple cores on your computer.").

ATTORNEYS' EYES ONLY – SOURCE CODE



2025-03-31 Hu Rep. ¶217 (GP2).  As shown in the GP2 chipset, there are "live processing" use cases and "delayed processing" use cases.





.[80]  Accordingly, there are significant differences between the "delayed processing" video streams and "live processing"

---

[80] 2025-05-01 Discussion with Mr. Gandhi.

ATTORNEYS' EYES ONLY – SOURCE CODE

video streams.[81]  Here, where the claims require that the two image data streams be "recorded in parallel," the diagram illustrates why the GP2 system is incapable of that type of processing.[82] That is, the "phone preview" is never being recorded by the camera and therefore cannot meet the Court's construction of "generating" as requiring recording.  Dkt. 251 at 12.[83]  Instead, there is a sequential, delayed processing implementation that modifies the video image data to create the recorded medium that is saved to the camera's SD card.  GOPRO_254410 at Slide 19.  The Court's construction of the "generate" terms require that the first image stream and second image data stream be **recorded** in parallel.  Dkt. 251 at 11-12 ("'Generating' is synonymous with 'recording' the video image content.").  The Court distinguished recording from streaming or playing back

---

[81] *E.g.*, https://community.gopro.com/s/article/What-is-HyperSmooth?language=en_US; https://www.youtube.com/watch?v=iqu2mWns3cM&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg %3D; https://www.youtube.com/watch?v=7ap9PLmR-nE&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg%3D; https://www.youtube.com/watch?v=0XN4epYD2AE&pp=ygURZ29wcm8gaHlwZXJzbW9vdG g%3D.

[82] Countenancing CIPH's previous argument that claim requirement "receive the video image data directly or indirectly from the image sensor" means that the processing pipeline prior to encoding is not limited by the "generate" term, it is still notable that "the video image data" has as its antecedent basis the "real time video image data of the scene" produced by the image sensor.  Dkt. 376-3.  Thus, whether it is a requirement of the "generating" language or the "receive the video data directly or indirectly from the image sensor," my analysis is the same. With respect to GP2, the evidence shows that the data used to create the high resolution video data is not the same as the data used to produce the preview stream and, at least with respect to the delayed processing configuration, it is not "the real time video image data of the scene" because it is both intentionally delayed and substantially modified through processing, such as image stabilization.

[83] To the extent that Dr. Hu now opines that "recording" can be met by buffering any portion of the data, I refer back to my opinions regarding invalidity wherein I show that the prior art clearly discloses and/or renders obvious this type of buffering in the image processing pipeline.  *See, e.g.*, 7/23/2025 Almeroth Rpt. at §§ VII, VIII.3.e-g, VIII.4.h, VIII.E.g-h, VIII.E.j-k, X.C.4, X.C.10. Dr. Hu cannot, on one hand, distinguish the prior art on the basis that the video streams are created from stored data and then also accuse the GoPro cameras, which store the video image data, of meeting the claim limitations.

ATTORNEYS' EYES ONLY – SOURCE CODE

(pre-recorded data). *Id*. at 12.[84] Thus, Dr. Hu's reliance on the "phone preview" (which she shows in orange) is misplaced. *See* 3/31/2025 Hu Rep. ¶217 (GP2). The preview that is sent to the phone, is never recorded but is only streamed. [85] ███████████████████████████

███████████████████████████████████.

169.  Finally, Dr. Hu argues that for products other than the HERO10 Black (and Bones) "when the primary video stream ███████████████████████████

███████████████████████████████████████████

█████████████████ 3/31/2025 Hu Rpt. ¶ 222. This opinion is a non-sequitur. As Dr. Hu herself opined (in the very same paragraph), it is not the number of codecs that defines whether processing is parallel or sequential, it is the design of the video coding block as a whole. Here, as set forth above, the hardware documentation provided by Socionext makes clear ██████████████

███████████████████████████████████████████

████████████████████████████████████. A person of ordinary skill in the art would understand sequential processing to be based on whether there is a single input to the video coding block or multiple and here, it is clear from Socionext's design, that there is only a single input, which intentionally processing video outputs in sequence rather than in parallel.

170.  I note that CIPH during its appeal brief offered various alternatives to the claimed invention. For example, CIPH argued that the "serial" technique from the Boland patent, streaming in a "fast photo mode," "file sectioning" a stream by breaking it into "small files and

---

[84] *See also id.* at 14 ("CIPH argues that recording is equal to storing video image data.").
[85] 2025-05-01 Conversation with Mr. Gandhi.

ATTORNEYS' EYES ONLY – SOURCE CODE

transferring each" via a wireless device in near real time, creating a stream using frame sampling, and using two camera processors were alternatives. I note that CIPH's admitted "file sectioning" alternative is substantively similar and similarly non-infringing to the GP2 implementation, which is discussed above. In the GP2 implementation, █████████████████████████ ████████████████████████████, akin to the admittedly non-infringing "file sectioning" approach described by CIPH.

> Ultimately, Contour configured the processor to generate two video streams at different resolutions in parallel from the same video image data as its specific technique for providing a real-time preview image. However, the processor could have been configured to perform multiple other technical solutions, including:
>
> - Boland's patented "serial" technique (Appx15407-15432));
>
> - streaming the first stream in a "fast photo mode" using photographs taken in succession to simulate video playback (Appx71(19:65-20:6));
>
> - file sectioning the first stream by "breaking a recording into small files and transferring each upon completion to allow for viewing via a wireless device in near real time (Appx71(20:7-20)); or
>
> - creating the first stream using frame sampling, which "entails real time video frame sampling (e.g., video compression intraframes (I-frames) only" (Appx71(20:22-26)).
>
> Other possible solutions included streaming the first video stream in reduced frame rate rather than a reduced resolution (Appx71(20:7-26)), or keeping the first and second video at the same resolution. Alternatively, two camera processors could have been used, one creating the first stream for wireless transmission and another

generating the second stream for recording to memory. Contour did not just claim an idea no matter how implemented; Contour claimed a specific technique resulting from configuring the processor in a particular way.

2022-08-16 2022-1654 Brief for Plaintiff-Appellant at 18-19.

114

ATTORNEYS' EYES ONLY – SOURCE CODE

171.    Additionally, not only does GP2 fail to meet the claim requirement of recording a high resolution stream while sending a preview to the personal portable computing device in parallel, from the same source, but the high resolution video is also not created from the real time video image data.   The sequential processing of the full resolution and lower resolution video streams forecloses a finding that camera processor is configured to record a first image data stream and a second image data stream "in parallel," "from the video image data" because the processing configuration implemented by GoPro on GP2 prioritizes creation of and streaming of the preview, while buffering the data that will eventually be used for the recorded, high resolution image. GOPRO_244524.   That is, the higher resolution video is not produced from the "real time video image data of the scene" as required by the generate limitations (requiring generating "from the video image data," which has its antecedent basis in the phrase "**real time** video image data of the scene").

### 3.    GP2 Products – No Live Preview While Recording (HERO10/11 Cameras)

172.    Dr. Hu's opinion that "the hardware of HERO10 and HERO11 was always capable of supporting live preview while recording" is immaterial and also incorrect.  3/31/2025 Hu Rpt. ¶ 224.  As Dr. Hu notes, the HERO10/11 Camera processor is specifically configured to precluding creating or sending a lower resolution preview stream when the camera is recording higher resolution video.  When recording is initiated, the local Wi-Fi connection is severed and the lower resolution video is not generated in parallel.  As set forth above, I understand that this camera processor configuration is a pragmatic design choice necessitated by processing limitations of the hardware. *See* Section VIII.B; IX.D.2; IX.F.2 *supra*.  That is, for the HERO10/11 Cameras, when

115

ATTORNEYS' EYES ONLY – SOURCE CODE

recording is initiated there is no live processing pipeline active on the camera processor. GOPRO_254410 at Slide 19.

173.    Dr. Hu also opines that all the Accused Products "create both a high resolution 'record' stream . . . and a low resolution LRV stream' whether they are capable of Live Preview while recording or not.  3/31/3025 Hu Rpt. ¶¶ 231, 234.  This is false.  The HERO10/11 Cameras that are not configured to permit the user to view the preview while recording do **not** record both a high resolution and low resolution video in parallel.  Instead, the preview is stopped when recording in higher resolution is initiated by the user.  There is no "first image data stream" that is recorded in parallel (with the second image data stream) and sent directly to the personal portable computing device for display on the personal portable computing device.

174.    Dr. Hu's reliance on an exemplary, potential process flow is irrelevant and misleading.  3/31/2025 Hu Rpt. ¶¶ 217, 231.  As discussed above, the configuration Dr. Hu analyzes makes clear that when a "phone preview" is available, GP2 is not recording (*i.e*, not generating) at all.  Dr. Hu appears to concede that the high and low resolution video is only available on the HERO10/11 Cameras when the live streaming feature (discussed further below) is used.  While, for the reasons stated below, I do not believe that the live streaming feature meets this claim limitation either, it is further my opinion that this limitation is not met by the preview available before recording starts for HERO10/11 Cameras.

175.     Up until Dr. Hu's most recent infringement report served on March 31, 2025, I understand that CIPH's infringement theory relating to Live Preview was limited to the cameras capable of sending a preview stream to the camera while recording a higher quality video to the

116

camera's SD card.[86]  I understand that the Court found that Dr. Hu offered a new infringement theory whereby the camera processor limitations do ***not*** require the camera processor to be configured to support streaming a lower resolution preview video while recording.  Dkt. 748 at 11 ("[Dr. Hu's] expert report provides no support for Contour's explanation in opposition for the three parallel streams—or even that her view is that those three streams exist."); *id*. ("Her report therefore includes an opinion that a product infringes upon the asserted patents even when a user views a video file *after* the file has been recorded); *id*. at 12 ("That Contour alleges the *Contour III* products infringe in previously raised ways does not account for its newly raised contention that they also infringe through the Playback functionality.").

176.    As an initial matter, I note that both parties have characterized the claims as directed to live preview while recording only (and not live preview without recording), which is consistent with CIPH's position that the claims require that the camera record both the high and low resolution video image data stream and also send the first image data stream directly to the personal portable computing device for display.  In the scenario proposed by Dr. Hu where the high and low resolution streams are hypothetically recorded to the cameras SD card and then later retrieved by the user wirelessly (a configuration that I do not believe to be accused or supported

---

[86] I have been informed of this position by counsel for GoPro and provided with the following exemplary citations. *See, e.g.*, *Contour IP Holding LLC v. GoPro, Inc*., 2022-1654, 2022-1691, Slip Op. at 13 (Fed. Cir. Sept. 9, 2024); 8/16/22 Appellate Brief at 5 ("Contour's invention allowed users for the first time to **preview in real-time** the camera's video **recordings**); *id*. at 56 (characterizing the claims as "ordered steps"), *id*. at 57; Dkt. 690 at 6 (stating that the claims require that the camera processor be configured to **record** low- and high- quality data streams in parallel **followed by** the low-quality data stream's wireless transfer to a remote device); *id*. at 8 (characterizing its claims against the new products as "the same claims under the same theories). I do not have any opinion regarding the legal ramifications of introducing a new infringement theory at this stage of the litigation, but only note that this opinion is materially different from the theories expressed by Dr. Hu in her prior reports.

by HERO10/11 Cameras), the recorded lower resolution video would not meet the requirement for being recorded "in parallel" from the "video image data" or the claim requirement that the camera processor be configured to "cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display." For example, the first image data stream has the same antecedent basis in both claim elements – *i.e.*, it has to be the same "first image data stream" recorded in parallel from the video image data. But this Court's construction (and the intrinsic record) make clear that "you are not dealing with the same data . . . coming out of the processor" once that data has been "stored in your storage medium" or sent to another place. (IPR2015-01078, IPR2015-01080, June 22, 2016 Record of Oral Hearing at 80:6-81:8.) In Dr. Hu's scenario where the LRV is saved to the SD card and then later retrieved for viewing, the camera processor is not configured to send the first image data stream because "in that scenario . . . it is now something else." *Id*.

177.    I also understand that CIPH has argued (and both the Court and Federal Circuit) have adopted its argument that the "generate" limitation requires that the "camera processor be configured to record low and high-quality data streams in parallel, followed by the low-quality data stream's wireless transfer to a remote device" such that "user can remotely view and adjust the desired recording **in real time**.[87]" In other words, the requirement that the two video streams be recorded in parallel requires "recording two video streams in parallel and wirelessly transferring the lower quality video stream to a remote device **for real time viewing <u>and</u> adjustment**.[88]" The Court distinguished this claim interpretation from streaming prior to recording or playing back

---

[87] *Contour IP Holding LLC v. GoPro, Inc*., 2022-1654, 2022-1691, Slip Op. at 10 (Fed. Cir. Sept. 9, 2024).
[88] *Id*. at 12.

118

after the recorded action has taken place.[89]   To the extent that Dr. Hu is now arguing that the

Court's use of the term "recording" in its construction means something other than streaming the

lower resolution video while recording the higher resolution video, such an opinion is materially

different from the claim interpretation CIPH and Dr. Hu have offered to support the validity of the

asserted claims.[90]   Additionally, as set forth above, even under this interpretation the *Contour III*

products do not infringe because they do not record one video image stream at a lower resolution

in parallel to a second image stream of higher resolution.   To the extent that "recording" can mean

buffering of any portion of the data, then the image data is buffered multiple times before and after

encoding (and other forms of processing), such that both the first and second image data streams

are created from previously-recorded data and not from the image sensor data.

178.   Throughout this litigation, CIPH and Dr. Hu have taken the position that the

"generating" limitation requires that recording two streams of differing qualities/resolutions in a

particular manner and wirelessly transmitting one stream.   *See, e.g.*, 7/23/2025 Almeroth Rpt. at

§VII; *see also* 6/16/2020 Hu Rpt. at ¶¶ 96, 103 (arguing that there is insufficient evidence that the

Looxcie preview clips are generated in a way that meets the claim limitation), 110 (Sony

handycam), 111-113 (Sony, Smartvue, and Panasonic), 116 (NASA), 133 (Woodman), 134

(finding that the cited Woodman disclosure does not meet the "generate" limitation because "[a]

---

[89] Dkt. 251 at 12; *see also id. at* 13 ("prior art could either record or stream video image content but not both and it could only wirelessly transmit a single video stream but not parallel streams").

[90] Notably, the claims expressly distinguish the image data stream that has to be wirelessly communicated to meet the requirements of Claim 11 from a first video file that comprises the first image data stream that has been stored in a storage device at the video camera.  Cl. 13-14. Similarly, the claims expressly define the first image data stream as comprising the video image content that has to be sent real time by the wireless connection protocol device.  *See* Cl. 11, 12.

ATTORNEYS' EYES ONLY – SOURCE CODE

POSITA would understand this paragraph to mean that images are captured first and only then 'downloaded' from the phone's memory via wireless transmission to the peripheral"); 11/19/2021 Hu Rpt. at ¶¶ 152 ("Eguchi does not disclose two streams of different quality generated in parallel. Eguchi also does not use direct wireless transmission, instead transmitting indirectly through a telephone system, e.g. through a 'terrestrial base station.'", 167-169 (Sony) 177-178 (distinguishing Sony on the basis that the identified first image data stream is allegedly not streamed to the personal portable computing device while recording).  Because Dr. Hu contends that the .LRV can serve as the first image data stream that must be both recorded and transmitted wirelessly directly to the personal portable computing device, she must also necessarily concede that a file that is stored prior to wireless transmission in the prior art also discloses this claim limitation.  Her opinions distinguishing the claims from the prior art on the basis that the disclosed video outlets "cannot qualify as the first stream under the generate limitations" and therefore "transmission of those streams would not satisfy the wireless transmission claim terms either" are directly contrary to her current position that the camera processor claims limitations can be met by saving and then wirelessly transmitting the .LRV.  *Compare* 6/16/2025 Hu Rpt. at ¶¶ 139-141.[91]

### 4.  Live Streaming (Except HERO 4K (2024))

179.    As an initial matter, I note that Dr. Hu's opinion regarding live streaming when "SAVE A COPY" is enabled is new and not disclosed in her prior reports or in CIPH's infringement contentions relating to Live Streaming.  I reserve the right to address any new theory

---

[91] Part of Dr. Hu's opinions regarding the "generate" limitation rests on her analysis of Claim 11's requirement of "a first image data **stream**," which she distinguishes from a file or set of individual frames. *See, e.g.*, 11/19/2021 Hu Rpt. at ¶¶ 110, 141, 174.  As set forth in my supplemental opening report, there is no basis to distinguish the alleged "picture" or "image" file types under Hu's new interpretation of the claims.

of infringement that Dr. Hu may be permitted to offer based on the SAVE A COPY feature whereby the .LRV is allegedly saved to the SD Card. 3/31/2025 Hu Rpt. ¶ 238. For the reasons stated above, I do not agree that saving an LRV file to the SD card meets the generating limitations. It is notable that, absent modifying the camera and Quik app settings to SAVE A COPY, the live stream is not "recorded" by Accused Products, but is simply streamed to a remote server.

G.     **"cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device" ('954 Pat. Cl. 11) / "cause the wireless connection protocol device to send the first video image content directly to the personal portable computing device for display on a display of the personal portable computing device" ('694 Pat. Cl. 3 – incorporated into asserted claims 4 and 6)**

1.     **GP2 Products – No Preview While Recording (HERO10/11 Cameras)**

180.    As set forth above, I understand that Dr. Hu is now offering a materially different opinion regarding this limitation. While she previously opined that "wireless transmission generally or of previously recorded clips . . . is not enough to meet this claim limitation" (11/19/2021 Hu Rpt. at ¶251), now Dr. Hu contends that the camera processor limitations including this limitation can be met by the .LRV file, which the parties agree is saved to the SD Card before it is ever transferred (wirelessly or via wired connection) off the camera. *See* 6/26/2025 Hu Dep. Tr. at 17:18-25, 21:9-22:5, 22:12-24, 70:6-24.

181.    I disagree with Dr. Hu's opinion that retrieving a lower resolution video file "after recording has ended" and the file is "saved to the SD card" could meet the requirement that the camera processor is configured to "cause the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on the a display of the personal portable computing device" for at least three reasons. 3/31/2025 Hu Rpt. ¶¶ 233-234. First, in that hypothetical scenario, the camera processor is not "sending the first image data

121

stream directly to the personal portable computing device for display." It is sending the lower resolution file directly to the SD card, where it is saved and stored. It is only potentially later, and indirectly, that the lower resolution file is sent to the personal portable computing device for display. Thus, the lower resolution file is not generated from the image data, it is generated from previously stored video and is never transferred from the camera processor to a remote portable computing device for display.

182. Second, the LRV file that has been encoded and then saved to the SD card is not the "first image data stream." That term has its antecedent basis in the previous elements requiring that the "first image data stream" be the one recorded in parallel by the camera processor from the video image data in real time. But the "preview" that is being sent in Dr. Hu's scenario is neither a real-time low resolution preview as CIPH has stated is required by the claim language nor is it the same data that is coming out of the processor once the camera has encoded and compressed it for storage on a storage medium.[92] Nor is the LRV sent from the SD card to the personal portable computing device for display. As Dr. Hu showed above, instead the LRV is sent, upon request of the mobile device, to be downloaded by the mobile device from the SD card.

---

[92] During the *inter partes* review proceedings, CIPH described "the shortcomings of prior art point-of-view cameras, which were generally not hands-free products and/or lacked the benefits of a view screen that could be used to adjust the image before storing video data." (IPR2015-01080, 01/19/2016 PO Response at 4, Attorney Docket No. 111968-0001-652.) To address these alleged shortcomings, CIPH claimed its invention disclosed "streaming a real time low resolution preview from the headset while also generating a video at a second resolution." (*Id*. at 31.) (emphasis original). That is, CIPH characterized its "solution" as a camera capable of streaming the low-resolution preview while also recording a video a higher resolution.

ATTORNEYS' EYES ONLY – SOURCE CODE

183.    Third, under Dr. Hu's scenario, the recorded file is sent, upon request of the mobile device, to be downloaded by the mobile device.  It is not being sent from the camera processor to a personal portable computing device for display.

184.    The asserted claims do not cover belatedly downloading a recorded video from the camera to the mobile device under their plain meaning as informed by the intrinsic evidence, under the arguments made by CIPH during claim construction and on appeal, and/or under the reverse doctrine of equivalents.  Reading the claim language to cover the transmission of preview before recording (i.e., before any full resolution video is recorded) or after recording (i.e., after multiple resolutions of video have been saved to the camera's SD card) would vitiate the stated purpose of the claimed inventions – to "allow users . . . to preview in real-time the camera's video recordings and adjust the camera settings remotely from a personal computing device (*e.g.*, a cell phone or table)."  *See, e.g.*, 8/16/22 Appellate Brief at 5; *see also Contour IP Holding LLC v. GoPro, Inc.*, 2022-1654, 2022-1691, Slip Op. at 10 (Fed. Cir. Sept. 9, 2024) ( "With the claimed POV camera, a user can remotely view and adjust the desired recording in real time . . . . The claims thus require specific, technological means—parallel data stream recording with the low-quality recording wirelessly transferred to a remote device—that in turn provide a technological improvement to the real time viewing capabilities of a POV camera's recordings on a remote device."); 2022-02-02 Hearing Tr. at 8-11 ("Remember, one of the big problems in the prior art was if I had my point-of-view camera and I wanted to use it -- say, I'm skiing, and I attach it to my helmet, if the camera has a viewfinder, once I put it up there, I can't see what the shot I'm getting is. I can't preview it. And that was a problem. . . . So Contour had to make changes to the firmware for the processor in order for it to be configured to respond to the app, right, in order to receive the control signal. And

123

ATTORNEYS' EYES ONLY – SOURCE CODE

that enabled a user to configure the camera settings in realtime, and preview what digital video camera sees. That was something that had never been done before. . . . The improvement, the patent goes on to say, allows the users to properly align and set up their recordings, even when the point-of-view cameras are in use and mounted.").



'954 patent, 20:38-47

© 2022 Winston & Strawn LLP    12

124

ATTORNEYS' EYES ONLY – SOURCE CODE



Dkt. 659 Ex. 1 at 12-13.

185.    Dr. Hu's opinion directly contradicts the alleged technological benefit of the invention that saved the patentability of the claims at the Federal Circuit.  Instead of requiring remote viewing and adjustment of the recording in real time, and real time viewing capabilities on a remote device, Dr. Hu has turned the invention upside down, attempting to cover a situation where a recording is made and that recording can then be sent somewhere else at some later date. This use case would have no relevance to the situation described in the patent regarding alignment or real time adjustment of the video stream.  Under this infringement theory, the claim limitations are not literally met but even if they were, the device is substantially changed from the patented article that it performs the claimed function in a substantially and fundamentally different way. Thus, there would be no infringement literally or, alternatively, under the reverse doctrine of equivalents.  Even if a recording at a lower resolution could be later transferred to a remote device,

125

ATTORNEYS' EYES ONLY – SOURCE CODE

this has no relation to the alleged invention that was intended to aid and assist the process of recording video, not reviewing that video at some later date.

### 2.    Live Streaming Does Not Infringe

186.    Dr. Hu has not proven that the Accused Products, through the use of live streaming, meet this claim element.  I fully incorporate my analysis from my *Contour II* report by reference herein.  Of note, HERO 4K (2024) does not support live streaming and is therefore not subject to Dr. Hu's infringement theory based on this feature.

187.    All of the asserted claims require that the camera processor be "configured to . . . cause the wireless connection protocol device to send the first image data stream/first video image content directly to the personal portable computing device for display on a display of the personal portable computing device."  However, none of the Accused Products are configured to use a mobile hotspot as and when sold.  I describe the configuration process in Section VIII.B.2 to setup the mobile hotspot with live streaming scenario, which is not a configuration of the camera itself.  Furthermore, the Accused Products do not meet this limitation for at least three reasons.

### a)    "Directly"

188.    The asserted claims require the wireless connection protocol device to send the first image data stream "directly" to the personal portable computing device for display.  This is not practiced by the accused live streaming instrumentalities.  I describe this process and explain why it is not direct in Section IX.D.2.a.

189.    Further, the camera processor is not configured to send the first image data stream / first video image data directly to a personal portable computing device.  *See* Section VIII.B.2; IX.D.2.  As discussed above, GoPro's witnesses uniformly testified that in live streaming mode, the camera processor is configured to cause the wireless connection protocol device to send the

ATTORNEYS' EYES ONLY – SOURCE CODE

live stream to a remote server (not to a personal portable computing device). The process whereby the video data is addressed and transmitted to a remote server is described in greater detail above. As set forth therein, neither the camera processor nor the wireless transmitter identifies a personal portable computing device for receipt of the video data. Instead, the camera processor addresses the live stream to an appropriate remote server and makes it available for transmission via any available wireless network. Indeed, the camera processor receives no information and is agnostic to the transmission mechanism of the live stream to the remote server. I discuss the technical documents and source code confirming this operation in Section VIII.B.2.

190.    To confirm my opinion, I live streamed a video from a GoPro 12 Black camera using a mobile phone as a hotspot and viewed the live stream on the same mobile phone.[93]

---

[93] The test was performed using a Google Pixel 8 Pro mobile phone running version 15 of Android and operating on the T-Mobile network as the hotspot.

ATTORNEYS' EYES ONLY – SOURCE CODE



During the live stream, I captured packet data for the transmission using PCAPdroid v.1.8.5 and I analyzed the data using wireshark.  That packet data capture confirmed that the camera processor does not identify a personal portable computing device for receipt of the video data during the live stream.



In addition, I also live streamed a video from a GoPro 12 Black camera using a mobile phone as a hotspot and viewed the live stream on a separate pc at GoPro.com. Again, I captured packet data

ATTORNEYS' EYES ONLY – SOURCE CODE

for the transmission using PCAPdroid v.1.8.5. That packet data capture confirmed that the camera processor does not identify a personal portable computing device for receipt of the video data during the live stream. In fact, the wireshark analysis identified the same destination when viewing the live stream on a pc as was identified when viewing the live stream on the mobile phone.



191.    When live streaming, video is sent to the cloud, and then only after the video is received by the cloud, is it sent to the devices streaming the video (which in narrow circumstances may be the mobile device). *See id.* The camera negotiates with the cloud to set up the streaming process, as Mr. Liu testified, and then that video is provided to the cloud, which is its destination. *See id.*; Liu Dep. Tr. at 18:15-20:3 (". . . So what happens there is that ***that destination is sent over to the camera. The camera takes that and then it -- it negotiates with the cloud, like, directly***. It connects to the home network and then over whatever AP that you have it hooked up to. It sends up the information directly to the cloud over to the other side, the destination. And then it sets up the connection and then it starts sending the packets directly to the cloud, right. So to the destination, which would be Facebook, gopro.com, YouTube, or like any other, you can actually customize it very specifically with the RTMP option. . . ."). Once the video is received by the cloud, then users with access to the remote server may access the live stream via the Internet.

129

ATTORNEYS' EYES ONLY – SOURCE CODE

### b)    Not Wireless

192.    The asserted claims require the "wireless connection protocol device" to send the first image data stream directly to the personal portable computing device for display.  This is not practiced by the accused live streaming instrumentalities.  I describe this process and explain why it is not wireless in Section IX.D.2.a.

### c)    Not "For Display"

193.    The asserted claims require the wireless connection protocol device to send the first image data stream directly to the personal portable computing device "for display."  This is not practiced by the accused live streaming instrumentalities.

194.    I describe this process and explain why the video image data is not sent to the personal portable computing device "for display" in Section VIII.B.4, which is fully incorporated herein.

195.    Further, even if the video is sent via a mobile hotspot to a remote AWS server (and then to the social media platform server) for live streaming, it is not being sent directly to the personal portable computing device for display.  Rather, the mobile device is used, at most, as a conduit for the video to be sent to the cloud and there is no configuration of the camera processor or the Quik App that would permit that video to be displayed.  *See id.*; Liu Dep. Tr. at 18:15-23:15 (". . . I would say that the – the data goes through the mobile hotspot and over to the cloud. . . ."). Rather, prior to any one being able to see the video, it has to be received and processed by remote servers which then make it available over the Internet to users with the link to the remote server location where the video is stored.  The cloud streaming service encodes the video and then streams it to mobile devices.  Thus, in the live streaming case, the video provided by the camera is not the video that is sent "for display" because the video sent "for display" is the video as processed by

ATTORNEYS' EYES ONLY – SOURCE CODE

the cloud. *See* Section VIII.B.4; *e.g. id* (citing GOPRO_233259 (noting that the cloud service encodes the video)).

196.    Moreover, none of the streaming services compatible with the GoPro camera use the GoPro app for display, again showing that video is not provided to the mobile application for display. *See* Section VIII.4 (describing Facebook, YouTube, Twitch, and RTMP); Liu Dep. Tr. at 19:10-11 ("Facebook is a popular one we have on there, right."). Rather, to access the live stream, a user has to exit the Quik app and access the stream via a different website (depending on what social media platform is being used for streaming). If a GoPro user is streaming to Facebook, for example, the live stream can only be access by users on the Facebook application. If a GoPro user streams via GoPro.com, then the user has to exit the Quik app and access the stream from GoPro's remote servers via GoPro.com.

197.     In her prior opening report in this case (*Contour II*), Dr. Hu opined that there were particular classes that accepted the "live preview" video and that immediately played back that same "live preview" video. Dr. Hu does not contend here that there is any such receipt and playback of the same video by the mobile device.

### 3.    Divided Infringement – No Direction or Control

198.    Here, the camera processor is not reasonably capable of causing the wireless connection protocol device to send the first image data stream directly to the personal portable computing device for display on a display of the personal portable computing device because there is no capability for displaying data transmitted to the remote servers that process the live stream even when the stream is transmitted via the mobile device configured as a hotspot. However, to the extent that the live stream is ever displayed on the personal portable computing device, it is

131

ATTORNEYS' EYES ONLY – SOURCE CODE

only displayed due to the user leaving the Quik App and accessing a substantially modified version of the live stream data from a remote server. Any display of the live stream on the personal portable computing device is **not** a configuration (or capability) of the camera processor, but requires further action by third party servers that process and encode the data as well as by the user that must then retrieve the data from remote servers to view the live stream.

199.   None of the steps required for reencoding the data or viewing it on the mobile device are taken by the claimed camera processor or even involve the claimed camera processor. There is no hardware or firmware comprising the accused camera processors capable of causing the live stream to be displayed on the personal portable computing device acting as a mobile hotspot. Rather, the camera processor addresses the live stream directly to the remote server for further processing before that video image data can be viewed by anyone, on any device. There is no capability, for example, for the user to display the live stream on the user's phone until it has been transmitted to the cloud for further processing **and** the user takes action to retrieve the processed stream from the cloud server.

200.   Even if it were true that the video data that the camera processor is sending out to the cloud for processing passes through phone because the phone is configured to be a mobile hotspot, diverting the video stream and viewing on the mobile device would require material alteration of the data, the camera processor, the wireless protocol device and the mobile operating system. In other words, if the data being streamed by the camera were to be viewed on the personal portable computing device, such viewing would not be enabled or controlled by GoPro.[94]

---

[94] To the extent that CIPH contends that the user is directed to access the livestream by GoPro because there are instructions in Quik App for doing so (albeit that require the user to exit the

ATTORNEYS' EYES ONLY – SOURCE CODE

**H.    No Adjusting Settings or Receiving Adjustments to Settings For Live Streaming**

201.    The asserted claims require that the camera processor be configured to "receive the control signals from the personal portable computing device" and "adjust one or more settings of the video camera based at least in part on at least a portion of the control signals received from the personal portable computing device."   *See, e.g.*, '954 Patent, Cl. 11.   As the Federal Circuit described:

> [T]he patents describe implementing wireless technology in the video camera 10 that allows the camera to send real time information to a remote device, such as a cell phone. *Id*. at 19:48–50. **From this remote device, <u>the user can see what is being recorded by the camera</u>. *Id*. at 20:41–44. <u>The user can also make real time adjustments to the recording settings</u>, such as light level and audio settings, before or during an activity. *Id*. at 20:44–47.** The skier, for example, can ensure that his descent down the ski slope has been recorded to his preferences. *See, e.g., id*. at 20:41–44 ("This wireless connection capability enables a user to configure camera settings in real time and preview what digital video camera 10 sees."); *see also id*. at 22:66–22:53 (describing procedures for adjusting camera position, lighting level, and color settings on the remote device).[95]

---

application), I note that this Court has already held that the claim is directed only to the video camera (or camera system) and not towards the personal portable computing device.  Dkt. 555 at 17; Dkt. 708 at 8-9 ("I have already concluded that the claims at issue are directed toward a video camera . . . not toward a video camera plus a personal portable computing device. Likewise, the claims are not directed toward a video camera plus a mobile application.").  Therefore, it would seem immaterial that the Quik App may be used to provide the user with a link to the site from which the live stream can be retrieved and viewed.  Either the personal portable computing device can be used to meet the claim limitations or it cannot, but not both. Here, there is nothing in the camera or the camera processor itself that would enable the live stream being sent to a remote server to be viewed on the mobile device configured as a hotspot.

[95] *Contour IP Holding LLC v. GoPro, Inc*., 2022-1654, 2022-1691, Slip Op. at 3 (Fed. Cir. Sept. 9, 2024) (emphasis added); *see also id*. at 3-4 ("Separate from the use of wireless technology itself, the patent also discloses modifications to the camera's system for processing recordings and permitting **real time playback**. . . . Using the lower quality recording, the **skier gets to see real time progress on the remote device and make adjustments accordingly**."); 12 (holding that the claims require "both recording multiple video streams in parallel and wirelessly transferring only one video stream, a lower quality stream, to a remote device").

ATTORNEYS' EYES ONLY – SOURCE CODE

202. The asserted claims require adjusting settings of the video camera or receiving setting adjustments at the video camera. However, live streaming does not permit such adjustment, sending, or receiving of any such adjustment. Instead, image settings including frame alignment/orientation, resolution, and other settings are locked down during live streaming. According to my testing, the "control settings" accused by Dr. Hu are not settable, requestable, or changeable for her alleged live streaming instrumentalities. Access is not allowed for changing control settings at the personal portable computing device for the accused live streaming functionality. I show this in my video Appendix A to this Report. As shown therein, there is no capability that would permit the user to make real time adjustments to the recording settings while streaming. Instead, the user would have to stop the live stream and then return to the Quik App menu that permits modifying presets or other available settings.

ATTORNEYS' EYES ONLY – SOURCE CODE



Similarly, to the extent CIPH is allowed to argue that HERO10/11 cameras are capable of meeting these claim elements, I disagree. In those cameras, there is no preview stream available while recording. Therefore, it is not possible to view what is being recorded and make real time adjustments to the recording setting. When the camera is recording, there is no preview available at all, much less a preview that would allow the user to view the scene being recorded and adjust the identified settings in real time.

I.   **No Infringement of Claims 12, and 14 by the HERO12 and HERO13 Cameras**

203.   Asserted claim 12 requires:

135

ATTORNEYS' EYES ONLY – SOURCE CODE

12. The point of view digital video camera of claim 11, wherein the first image data stream comprises first video image content and the second image data stream comprises second video image content, wherein the first video image content and the second video image content comprise substantially the same video image content at different resolutions or different frame rates.

204.    Asserted claim 14 requires:

13. The point of view digital video camera of claim 11, wherein based at least in part on a record command, the camera processor is further configured to cause the first image data stream to be stored in a storage device at the video camera as a first video file and cause the second image data stream to be stored in the storage device at the video camera as a second video file.

14. The point of view digital video camera of claim 13, wherein following an end record command, the camera processor is further configured to:
receive a request to view the video image data, and
cause the wireless connection protocol device to wirelessly communicate content from the first video file directly to the personal portable computing device for display on the display of the personal portable computing device.

205.    Asserted claim 15 requires:

15. The point of view digital video camera of claim 11, wherein the control signals comprise the color setting and the camera processor is configured to adjust a video camera color setting based at least in part on the color setting from the control signals.

206.    As described in Section IX.F.2, the accused "live preview" is significantly different from the high resolution accused video stream.  The image below depicts Dr. Hu's assertions regarding the accused "live preview" and high resolution video streams.

136

ATTORNEYS' EYES ONLY – SOURCE CODE



2025-03-31 Hu Rep. ¶217 (GP2).

207.    As shown in the GP2 chipset, there are both "live processing" use cases and "delayed processing" use cases.  Live processing differs from delayed processing because, in part, delayed processing includes image stabilization.  ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████  Accordingly, there are significant differences between the "delayed processing" video streams and "live processing" video streams.[97]

---

[96] 2025-05-01 Discussion with Mr. Gandhi.

[97] *E.g.*, https://community.gopro.com/s/article/What-is-HyperSmooth?language=en_US; https://www.youtube.com/watch?v=iqu2mWns3cM&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg

ATTORNEYS' EYES ONLY – SOURCE CODE

208.   Asserted claim 12 is not infringed because "first video image content and the second video image content" do not "comprise substantially the same video image content at different resolutions or different frame rates."  As shown, GoPro's image stabilization does not result in "substantially the same video image content" as an unstabilized image because the resulting video is substantially different.[98] ██████████████████████████████

███████████[99] GoPro's modifications to the video image content through video stabilization has been lauded and awarded, which is consistent with its substantial modification to the video image content.[100]

209.   Asserted 14 (which depends from claim 13) is not infringed because the low resolution video that Dr. Hu accuses of meeting the first image data stream is not stored in a storage device at the video camera as a second video file.  As shown below, the accused "phone preview" (Dr. Hu's alleged "first image data stream") is not stored at the SD card.  Other video stream use cases are sent to an SD card—as indicated in blue "SD" boxes in the figure—but the "phone preview" is only indicated as being sent to Wi-Fi as a "Phone Preview."  I confirmed this

---

%3D; https://www.youtube.com/watch?v=7ap9PLmR-nE&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg%3D; https://www.youtube.com/watch?v=0XN4epYD2AE&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg%3D.

[98] *E.g.*, https://community.gopro.com/s/article/What-is-HyperSmooth?language=en_US; https://www.youtube.com/watch?v=iqu2mWns3cM&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg%3D; https://www.youtube.com/watch?v=7ap9PLmR-nE&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg%3D; https://www.youtube.com/watch?v=0XN4epYD2AE&pp=ygURZ29wcm8gaHlwZXJzbW9vdGg%3D.

[99] https://community.gopro.com/s/article/HERO10-Black-HyperSmooth-4-0?language=en_US.

[100] https://gopro.com/en/us/news/gopro-wins-second-emmy-award.

ATTORNEYS' EYES ONLY – SOURCE CODE

understanding with GoPro's engineers.[101]  For all GP2 products, there is no first image data stream that both meets the requirements of being sent directly to the personal portable computing device for display and also being stored in a storage device at the video camera as a first video file (or communicated as a first video file to the personal portable computing device for display).  As set forth above, to the extent that Dr. Hu relies on the LRV to meet this claim limitation, the LRV is neither generated in parallel nor does the camera processor cause the wireless connection protocol device to send the .lrv directly to the personal portable computing device for display.  As the "first image data stream" of Claim 13 (and Claim 14 which depends from Claim 13) has its antecedent basis in the "first image data stream" of Claim 1, from which Claim 13 depends, Dr. Hu has not identified any "first image data stream" that meets all of the requisite limitations of being generated in parallel with the second image data stream, being sent wirelessly by the camera processor directly to the personal portable computing device for display, and being saved as a file (first video file).  Instead, she contorts her reading of the limitations to read out the requirement that the camera processor be capable of recording the high resolution video while wirelessly streaming a lower quality / resolution video entirely.

---

[101] 2025-05-01 Discussion with Mr. Gandhi.

ATTORNEYS' EYES ONLY – SOURCE CODE



## XI.    '694 PATENT

210.    While my responsive opinions regarding non-infringement are set forth on an element by element basis above, I note that Dr. Hu does not offer any analysis or explanation that reconciles her new infringement theory with the claim limitations of the '694 Patent.  For example, Claim 3 of the '694 Patent does not refer to "real time image content."  That is, unlike the '954 Patent that refers to the "first image data stream" / "second image data stream" generated by the camera processor as well as the "real time image content," the '694 Patent specifies that the camera processor is configured to "generate first video image content and second video image content corresponding to the video image data representing the scene" and also a "wireless connection

140

protocol device  . . configured to send video image content." The "first video image content" and "second video image content" must "correspond to **the** video image data," which has as its antecedent basis the "**real time** video image data of the scene." Claim 3 further requires that the first video image content comprise a preview image of the scene. Thus, Dr. Hu's analysis of Claim 11 and her theory that the camera processor limitations are not tethered to the wireless connection protocol device limitations is inapplicable to Claim 3 of the '694 Patent, from which asserted Claim 4 depends. Instead, this claim clearly ties the real time requirement and the wireless transmission requirements of the claim to the video image content generated by the claimed camera processor. Additionally, it requires that the camera processor be capable of receiving enumerated control signals during recording / generating, a limitation that Dr. Hu admits is not met at least in the accused live streaming functionality. While the reasons I set forth above on a limitation by limitation basis for why the claims are not met are still applicable, it is further my opinion that Dr. Hu has offered no evidence or opinion to support infringement by the *Contour III* accused products of the unique limitations of the asserted '694 Patent claims.

## XII.   NO INDIRECT INFRINGEMENT OF THE ASSERTED PATENTS

211.   I incorporate by reference my opinions regarding indirect infringement as set forth in my prior reports in this case. As an initial matter, Dr. Hu has failed to identify any evidence showing a GoPro customer has performed live streaming using their phone as a hotspot. Live streaming is available to GoPro users who have a HERO7 Black or subsequent generations of GoPro cameras (except HERO (4K/2024)) and who have purchased GoPro's Premium service. The live streaming feature is only available with a "Premium" or "Premium+" subscription. Dr. Hu did not identify any GoPro user that has purchased either subscription and performed live

ATTORNEYS' EYES ONLY – SOURCE CODE

streaming. As a result, Dr. Ho has failed to identify any infringing live streaming use of the accused systems by GoPro's customers and thus failed to identify a direct infringer. I understand a showing of direct infringement is a prerequisite to a finding of indirect infringement.

212.    I have also been asked to consider whether there are any substantial noninfringing uses for the accused products. In my opinion, the accused products have many substantial non-infringing uses. For example, live streaming over a Wi-Fi network other than the phone as a hotspot is a substantial non-infringing use. Such a non-infringing use is neither theoretical nor insubstantial.

213.    Additionally, I understand that Dr. Hu has admitted that the HERO11 Black / HERO 11 mini products that were sold before the firmware update do not include any allegedly infringing live preview functionality.   Thus, any allegation would be limited to indirect infringement after the point of sale, but Dr. Hu does not cite to any evidence (or offer any opinions) whatsoever that would substantiate indirect infringement for HERO11 Black or HERO11 mini units sold without live preview.   Instead, I note that the application release notes associated with the firmware update do not include any reference to the live preview functionality.   Moreover, the firmware update is optional and there is no evidence in the record that any user(s) updated the firmware.   I have been informed by GoPro that CIPH did not seek such evidence during discovery. There is also no evidence that a single user ever uploaded the firmware update **and** proceeded to configure a previously-purchased HERO11 Black or HERO11 mini to enable the ability to live preview while recording.   Because I understand, a finding of indirect patent infringement requires there to be at least one direct infringer, in my opinion, Dr. Hu has failed to show GoPro induced infringement of the Asserted Patents with respect to the HERO11 Black / HERO 11 mini products.

ATTORNEYS' EYES ONLY – SOURCE CODE

and for the reasons set forth below, I have preliminarily reached the conclusions and opinions in this Report.

238.    At a hearing or at trial I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this Report. I have not yet selected the particular exhibits that might be used. I may also rely on visual aids and may rely on analogies concerning elements of the patents discussed above, CIPH's alleged practicing products, the Accused Products, the references cited in this report, or any related technologies. In addition, I may create or assist in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so, such as demonstrations of devices and software to further support the positions in this Report.

ATTORNEYS' EYES ONLY – SOURCE CODE

DATED:  August 1, 2025

Kevin C. Almeroth, Ph.D.