# EXHIBIT 6

## UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CONTOUR IP HOLDING, LLC, )

      PLAINTIFF,    )

    VS.       ) CASE NO. 17-cv-04738-WHO

GOPRO, INC.,     )    21-cv-02143-WHO

     DEFENDANT.   )

_____ )


** C O N F I D E N T I A L **

(FOLLOWING TRANSCRIPT AND EXHIBITS HAVE BEEN

DESIGNATED CONTOUR CONFIDENTIAL INFORMATION)


VIDEOTAPED DEPOSITION OF JING HU, PH.D.

THURSDAY, JUNE 26, 2025


REPORTED BY:

DAYNA HESTER, C.S.R. 9970

JOB NO. 7400562


PAGES 1 - 214

Page 1

CONFIDENTIAL VIDEOTAPED DEPOSITION OF

JING HU, PH.D., TAKEN ON BEHALF OF DEFENDANT, AT

9:14 A.M., THURSDAY, JUNE 26, 2025, AT LAW OFFICES

OF SHEPPARD MULLIN, 350 SOUTH GRAND AVENUE, 40TH

FLOOR, LOS ANGELES, CALIFORNIA, BEFORE DAYNA HESTER,

C.S.R. NO. 9970.


APPEARANCES OF COUNSEL:

FOR PLAINTIFF:

      ALSTON & BIRD, LLP

      BY: JOHN HAYNES, ESQ.

      350 SOUTH GRAND AVENUE

      51ST FLOOR

      LOS ANGELES, CALIFORNIA   90071

         (404) 881-7737

      JOHN.HAYNES@ALSTON.COM


FOR DEFENDANT:

      SHEPPARD MULLIN, LLP

      BY:  MICHAEL KRILL, ESQ.

      700 LOUISIANA STREET

      SUITE 2750

      HOUSTON, TEXAS   77002

         (713) 431-7116

      MKRILL@SHEPPARDMULLIN.COM


         -- APPEARANCES CONTINUED ON NEXT PAGE --

Page 2

CONFIDENTIAL

APPEARANCES (CONTINUED):


        AND


        QUINN EMANUEL URQUHART & SULLIVAN, LLP

        BY:  NATHAN HAMSTRA, ESQ.

             (NOT PRESENT)

        50 CALIFORNIA STREET

        22ND FLOOR

        SAN FRANCISCO, CALIFORNIA 94111

        (312) 705-7400

        NATHANHAMSTRA@QUINNEMANUEL.COM


ALSO PRESENT:

        NICHOLAS ZAMBRANO, VIDEOGRAPHER

Page 3

CONFIDENTIAL

Please raise your right hand.

THE WITNESS:  [Witness did as requested].

THE REPORTER:  Do you affirm the testimony you are about to give in the cause now pending will be the truth, the whole truth, and nothing but the truth?                                                        09:16

THE WITNESS:  I do.                                       09:16

THE REPORTER:  Thank you.                                 09:16


                        JING HU, PhD

              having been first duly sworn, was

              examined and testified as follows:


                        EXAMINATION

BY MR. HAYNES:

     Q.   Good morning, Dr. Hu.                           09:16

     A.   Good morning.                                   09:16

     Q.   You have in front of you two exhibits that     09:16
have been marked as Hu Exhibit 1 and Hu Exhibit 2.       09:16

          (Deposition Exhibit 1 and Exhibit 2 were       09:16

          marked for identification and are              09:16

          attached hereto.)                              09:16

BY MR. HAYNES:                                            09:16

     Q.   Could you please confirm with -- to me         09:16

that Hu Exhibit 1 is a copy of your expert report        09:16

                                                    Page 8

Secondly, with the recording -- recording two streams, and second stream being saved as the LRV file, that would only satisfy these two claim elements that I listed in Paragraph 234 of my report.  But without live streaming during recording or live preview during recording, the -- the accu- -- any accused camera wouldn't satisfy the Claim 11 as a whole.

BY MR. HAYNES:

Q.  Okay.  So you would agree with me that the HERO10 Black camera does not satisfy the claims based on preview using the LRV file; correct?

MR. KRILL:  Object to form.

THE WITNESS:  I disagree with that because the HERO10 camera supports live streaming during recording.  And my opinion is that that is infringing use-case with regard to the two asserted patents.

BY MR. HAYNES:

Q.  Okay.  I understand that.

I'm trying to separate out whether you have an opinion that if a camera had just LRV preview, no live preview while recording and no live streaming, would the LRV preview and recording of a high resolution stream satisfy the claim elements,

Page 18

CONFIDENTIAL

in your view?                                              09:37

A.   In my view, the situation you just raised,        09:37
it wouldn't satisfy the claims of the two asserted        09:37
patents.  And the -- the two asserted patents will        09:37
require -- within the context of the accused GoPro        09:37
products, they would require either live streaming        09:37
during recording or live preview during recording in      09:37
order to infringe.                                        09:37

Q.   Okay.  So am I correct, then, that your           09:37
opinions with respect to the HERO10 Black are             09:38
limited to your opinion that the -- that it               09:38
infringes as a result of its live streaming feature       09:38
while recording?                                          09:38

A.   That's correct.                                   09:38

Q.   Okay.                                             09:38

A.   When we talk about the asserted claims            09:38
as -- as a whole, not individual elements.                09:38

Q.   Sure.                                             09:38

So in Paragraph 234, you were just noting      09:38
that for this particular element, it would be             09:38
satisfied by the HERO10, but there are other              09:38
elements that would not be satisfied; correct?            09:38

A.   That's correct.                                   09:38

Q.   Okay.                                             09:38

A.   And, as I said, part of this whole section        09:38

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

BY MR. HAYNES:                                          09:52

Q.   So is it your opinion that the Claim 11          09:52

can be satisfied by having a wireless connection       09:53

protocol device that is capable of sending real-time   09:53

data, but there is no requirement that the             09:53

point-of-view camera actually send low resolution      09:53

real-time data to the portable device?                 09:53

MR. KRILL:  Object to form.             09:53

THE WITNESS:  I don't believe that's my   09:53

opinion.                                                09:53

My opinion is that, to satisfy Claim 11 of   09:53

the 5- -- '954 patent and the Claim 4 and 6 of the     09:54

'694 patent, for example, within the accused GoPro     09:54

products, the live preview during recording and live   09:54

streaming during recording feature, either one has     09:54

to be supported, which means that the live preview     09:54

or live streaming video is sent through the wireless   09:54

connection protocol device to the personal portable    09:54

computing device.                                       09:55

BY MR. HAYNES:                                          09:55

Q.   Okay.  In your opinion, does Claim 11       09:55

require that the image content that is sent to the     09:55

portable device for display be real time?              09:55

A.   In my opinion, that element, by itself,      09:55

does not require the first image data stream to be     09:55

Page 27

real time.  But other elements of the claim requires    09:55

the image content sent to the personal portable    09:55

device to be real time.  Hence, either the live    09:56

preview during recording or live streaming during    09:56

recording is required for any -- any accused    09:56

GoPro -- GoPro product to infringe.    09:56

Q.    Okay.  So looking at Claim 11, as a whole,    09:56

do you agree that to satisfy Claim- -- all the    09:56

limitations of Claim 11, that the image content that    09:56

is sent to the portable device for display must be    09:56

real time image content?    09:56

A.    My opinion is that looking at, for    09:56

example, Claim 11 of the '954 patent, as a whole,    09:57

the image content sent to the personal por- --    09:57

portable computing device has to be real time.  But    09:57

the first image data stream sent directly to the    09:57

personal portable comp- -- computing device for    09:57

display does not require to be real time because the    09:57

real-time limitation is not within that specific    09:57

claim of -- el- -- element.    09:57

Q.    I don't think that asked my -- answered my    09:57

question.    09:57

If -- so let me ask you -- see if I can    09:57

break it down.    09:57

If I have a point-of-view camera and that    09:57

Page 28

CONFIDENTIAL



term that is -- that requires generating two              11:55

parallel streams.                                          11:55

                                                           11:55

        Q.                                                 11:56

        MR. KRILL:  Object to form.                        11:56

        THE WITNESS:                                       

                                                           11:57

                                                           11:57

BY MR. HAYNES:                                             11:57

        Q.    But you agree -- you would -- your opinion   11:57

Page 76

CONFIDENTIAL

is that the [REDACTED]

[REDACTED] -- as required by the generate term 11:58

of Claim 11? 11:58

Q. Now that we switched to look at a live 11:58

streaming while recording feature, [REDACTED]

11:58

Q. Okay. Now, let me ask you -- well, are 11:59

you familiar with transcoding? 11:59

A. Yes. I'm familiar with transcoding. 11:59

Q. You understand that transcoding can 11:59

essentially take data that's been encoded with one 11:59

codec, de-encode it or decode it and then re-encode 11:59

it into a different format. 11:59

You're familiar with that process? 11:59

A. Generally speaking, that is one form of 11:59

transcoding. 11:59

Q. Okay. Now, this is a hypothetical. I 11:59

Page 77

CONFIDENTIAL

Claim 11 viewed as a whole.  And I believe that we                13:26

agreed that, viewed as a whole, in order to infringe             13:26

Claim 11, the first image data stream must be                    13:26

transmitted in real time.                                         13:27

       MR. KRILL:  Object to form.                13:27

BY MR. HAYNES:                                                    13:27

    Q.    Is that fair?                           13:27

    A.    I don't think so.                       13:27

    Q.    Well, so the first image data stream that    13:27

is sent to -- from the point-of-view camera to the               13:27

portable device at the time of transmission must be              13:27

transmitted -- or the image -- what is transmitted               13:27

must be real-time image data stream; correct?                    13:27

       MR. KRILL:  Object to form.                13:27

       THE WITNESS:  I don't believe that's what     13:28

we agreed on.                                                     13:28

BY MR. HAYNES:                                                    13:28

    Q.    All right.  Let me -- let me just try a       13:28

different question.                                               13:28

       What do you identify in the live streaming     13:28

scenario as the first image data stream?                         13:28

    A.    If we use Slide 19 of Exhibit 3 as a        13:28

visual aid for our discussion for live streaming in              13:28

the Accused GoPro Products that support live                     13:28

streaming during recording for Contour 3, ▮▮▮▮▮▮▮              13:28

Page 98

CONFIDENTIAL

13:29

Q.   Okay.

13:30

MR. KRILL:  Object to form.

THE WITNESS:  Sorry.  Could you repeat the -- just the last bit.

BY MR. HAYNES:

Q.   Actually, let's just make it easy.

Can you just label, with an "X," what you have identified as the first image data stream in the live streaming scenario?

A.   [Witnesses marks on exhibit].

Q.   Just -- just hold it up.

A.   [Witness complies].

Q.   Okay.

And then with a "Y," will you identify

Page 99

CONFIDENTIAL

what you are relying on as being the second image    13:30

data stream of the claims in the live streaming    13:30

scenario.    13:30

    A.    [Witness marks on exhibit].    13:30

       [Witness indicates document]. ▮▮▮    ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    13:30

▮▮▮▮    13:31

    Q.    ▮▮▮ ▮▮▮▮▮▮▮    ▮▮▮

▮▮▮▮▮▮▮▮▮▮    ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮

▮▮▮▮▮▮▮▮▮    13:31

    A.    That's correct.    13:31

    Q.    Okay.  Okay.  So focusing on the first    13:31

image data stream that you identified --    13:31

    A.    Now we go back to live streaming during    13:31

recording only.  We are not talking about live    13:31

preview to --    13:31

    Q.    Correct.  Just live streaming --    13:31

    A.    Yeah.    13:31

    Q.    -- during recording.    13:31

    A.    Okay.    13:32

    Q.    In that -- in your opinion, the output of    13:32

the -- well, is the -- withdraw that question and    13:32

try it again.    13:32

Page 100

CONFIDENTIAL

In your opinion, is the -- what you identified as the first image data stream being sent to a phone hotspot for display on that phone?

A.    Yes.  The purpose of live streaming the first image data stream at least include for display on a display of the personal portable computing device, and I have only accused the hotspot scenario of live streaming during recording feature of the Accused GoPro Products in all phases of the case.

Q.    Okay.  What format is the image data in when it is received by the portable device when it is operating in a hotspot mode in the live streaming scenario?

MR. KRILL:  Object to form.

THE WITNESS:

Page 101

CONFIDENTIAL

comes back to the user's device, in this case 14:09

without being transcoded, and the display happens at 14:09

that time point. But it doesn't mean that the 14:09

real-time image -- video image data transmitted 14:10

initially is not for display. 14:10

Q. But you agree with me that if the -- in 14:10

the situation where the camera transmits -- the 14:10

point-of-view camera transmits first to an internet 14:10

server and then back down to a portable device, that 14:10

would not satisfy the claim limitation of 14:10

Claim 11 -- Claim 11; right? 14:10

A. I believe you are asking about the Wi-Fi 14:11

access point use-case of live streaming. 14:11

If you are asking about that, then I would 14:11

agree that's not an infringing use-case of the live 14:11

streaming. 14:11

Q. And that's because the image data stream 14:11

does not go directly to the portable device for 14:11

display; correct? 14:11

A. I think so, maybe for that reason. 14:11

Q. In your live streaming scenario, am I 14:12

correct that you are only accusing live streaming in 14:12

the context where you are recording at the same time 14:12

as live streaming; is that right? 14:12

A. I believe that's the case. 14:12

Page 120

CONFIDENTIAL

To clarify, by "recording," you would mean generating a higher quality video stream that is saved on the SD card on the camera.

Q.   Okay.  All right.  Let's talk a little bit about HERO9.

Okay.  That's one of the products that you have accused of infringement based solely on a live streaming scenario; correct?

A.   I believe that's the case.  And HERO9 is a previously accused GoPro camera.  Yeah.

Q.   Right.

But the -- the Court has determined that there's an issue of fact as to whether or not live streaming on that camera infringes; correct?

A.   I just want to be accurate.

I include in my report that the Court found that there is a dispute whether the need to send any video data to the phone through use of the portable device, as a hotspot qualifies as an infringing use of the device.

I think it's the same thing as what you were saying.

Q.   Okay.

(Deposition Exhibit 5 was marked for identification and is attached hereto.)

Page 121

CONFIDENTIAL

THE WITNESS:  Thank you.                           14:15

BY MR. HAYNES:                                     14:15

Q.   I have marked as Exhibit 5 a copy of your     14:15
October 27th, 2021, report regarding issues of     14:15
infringement of the two asserted patents.          14:15

And I want to ask you to look at -- turn           14:15
to Paragraph 72 of that report.                    14:15

A.   Can we take a break after you finish this     14:15
line of questioning?                               14:15

Q.   Sure.  Sure.  Happy to.                       14:15

A.   Okay.  I'm at Page 72.                         14:16

Q.   Okay.                                          14:16

MR. KRILL:  I'm sorry, John.  Did you say           14:16
Page 72 or Paragraph 72?                            14:16

BY MR. HAYNES:                                     14:16

Q.   Paragraph 72.                                 14:16

A.   Oh.  Sorry.                                    14:16

Okay.                                              14:17

Q.   Okay.  So in the HERO9 product, the only      14:17
thing you are accusing is live streaming and the   14:17
scenario we have been discussing today where the   14:17
data is sent from a point-of-view camera, to a     14:17
portable device acting as a hotspot, up to a server, 14:17
and comes back; is that right?                     14:17

A.   On the high level, I think that is right.     14:17

Page 122

CONFIDENTIAL

Q.   And so we have been talking about the    14:17
Contour 3 products.    14:17

Is the testimony that you have provided    14:17
with respect to live streaming in the context of    14:18
Contour 3 products equally applicable to the HERO9    14:18
for the specific live streaming scenario you accuse    14:18
of infringement?    14:18

MR. KRILL:  Object to form.    14:18

THE WITNESS:  On the high level, yes.    14:18

BY MR. HAYNES:    14:18

Q.   Okay.  And just one follow-up and then    14:18
we'll break.    14:18

So there's nothing unique about the HERO9    14:18
that would alter your opinions on infringement with    14:18
respect to the live streaming while recording    14:19
feature?    14:19

A.   As compared to the other accused GoPro    14:19
cameras that also support that feature?    14:19

Q.   Correct.    14:19

A.   The answer is yes.    14:19

MR. HAYNES:  Okay.  Let's take a break.    14:19

THE VIDEOGRAPHER:  Okay.  So we are off    14:19
the record.  The time is 2:20 p.m.    14:19

(Brief recess.)    14:19

THE VIDEOGRAPHER:  Okay.  So we are back    14:35

Page 123

CONFIDENTIAL

that the POSITA would potentially, in some                15:57

use-cases, consider such a camera as a point-of-view      15:58

camera.                                                   15:58

        The one scenario that I can think of right        15:58

now is that the user mounts a -- an accused GoPro         15:58

camera on his or her vehicle that is able to capture      15:58

point-of-view that the user is unable to.                15:58

        In that use-case, I would still think that        15:58

the POSITA will consider such an accused GoPro video      15:58

camera to be a point-of-view video camera.                15:58

BY MR. HAYNES:                                           15:59

    Q.   Do you agree that the asserted claims            15:59

require parallel data stream recording with the low       15:59

quality recording wirelessly transferred to a remote      15:59

device?                                                   15:59

    A.   Sorry.  Could you repeat your question.          15:59

    Q.   Do you agree that the claims require             15:59

parallel data stream recording with a low quality         15:59

recording wirelessly transferred to a remote device?      15:59

        MR. KRILL:  Object to form.                       15:59

        THE WITNESS:  I think that's just                 15:59

paraphrasing some of the relevant claims.                 15:59

        I don't see why not.                              16:00

BY MR. HAYNES:                                           16:00

    Q.   Okay.  So you agree?                             16:00

Page 157

A.    Can you repeat your question one more    16:00
time.    16:00

Q.    You agree that the claims require parallel    16:00
data stream recording with the low quality recording    16:00
wirelessly transferred to a remote device?    16:00

MR. KRILL:  Object to form.    16:00

THE WITNESS:  Okay.  I guess my only    16:00
disagreement, if I disagree with that statement, is    16:00
because I don't believe the remote device is recited    16:00
in any of the claims.  So I wouldn't agree with    16:00
that.  The claims require a personal portable    16:00
computing device.  It doesn't require the device to    16:01
be remote.    16:01

BY MR. HAYNES:    16:01

Q.    Okay.  Do you agree that there are    16:01
unclaimed ways a processor might generate multiple    16:01
video streams of varying qualities for wireless    16:01
transmission?    16:01

MR. KRILL:  Object to form.    16:01

THE WITNESS:  Could you repeat your    16:01
question.    16:01

BY MR. HAYNES:    16:01

Q.    Do you agree that there are unclaimed ways    16:01
a processor might generate multiple video streams of    16:01
varying qualities for wireless transmission?    16:01

Page 158

CONFIDENTIAL

the recorded scene.                                    16:56

MR. HAYNES:  Okay.  Let's take a break.        16:56

THE VIDEOGRAPHER:  Okay.  So we're going       16:56

off the record.  The time is 4:57 p.m.                 16:56

(Brief recess.)                                16:56

THE VIDEOGRAPHER:  Okay.  So we are back       17:07

on record.  The time is 5:08 p.m.                      17:07

BY MR. HAYNES:                                         17:07

Q.   Okay.  I think we have covered this, but I   17:08
just want to make sure that we're clear.               17:08

In the live streaming scenario that you        17:08
accuse of infringement, you are only accusing live     17:08
streaming while recording; correct?                    17:08

A.   That's correct.                              17:08

Q.   And same for live preview.  You are only    17:08
accusing of infringement the live preview feature      17:08
while recording; correct?                              17:08

A.   That's correct.                              17:08

Q.   And earlier this morning, we were talking    17:08
about that LRV file that gets stored in the SD card.    17:08

Do you recall that?                            17:08

A.   I do.                                        17:08

Q.   You are not relying on that LRV file that   17:08
is stored in the SD card for purposes of               17:08
demonstrating infringement of Claim 11 of the          17:08

Page 182

requires generate from the video image data of first image data stream and the second image data stream. Okay? Because this minor difference.

In the GP2-based GoPro cameras, that it generates, according to what I have reviewed, three parallel streams.

Q. Okay.

A. Okay.

Q. All right. So can I --

A. Can I finish? I -- I --

Q. Can you label those for me? Can we just label the three streams?

We've got our first, the second, the third. Okay?

A. So we have -- I don't want to use "first" and "second," "third," because the -- the -- the claim language used "first" and "second." So it might be confusing. But we clearly have A, X, and B --

Q. Okay.

A. -- in the marking. Okay?

Okay. Then I wonder if this clears it up for you, that a first data stream first appears in the generate claim limitation. Okay?

So according to the claim, it doesn't

17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:28
17:29
17:29
17:29
17:29
17:29
17:29
17:29

Page 195

CONFIDENTIAL

necessarily need to be the same real-time image content that the wireless connection protocol device is configured to send.

So that element in the wireless connection protocol device claim limitation is not necessarily as required by the claim to be the first image data stream.  Okay?

So my opinion is that if we put live streaming during recording aside, the only infringing feature within the context of the accused GoPro cameras is that there can be -- so whatever happens, the real-time image content of the wireless connection protocol device claim limitation, that's not part of the generate claim limitation.  That's always A.  Okay.

So before I get to the Dependent Claims 13 and 14, there is a very minor variation because the three multiple -- the three parallel streams are generated in the example that we were looking at.

The first image data stream can be A.  But, as we discussed, A is not stored as LRV file in the SD card.  So, in that way, live preview during recording only infringes the Claim 11, if we're just talking about '954 patent, but not 13 and, hence, not 14.

Page 196

CONFIDENTIAL

However, the same live preview during recording feature, when I consider the infringement and 13 and 14, which depend on independent Claim 11, the image -- the first image data stream that I accuse is X.

And X is generated in parallel in relation to B as well on a very high level.  It's just saved as LRV, so it's not transmitted real time to the personal portable computing device, but it is transmitted wirelessly directly to the personal portable device for display.

So that -- that minor difference will carry on to Claim 13 and 14.

And this -- this subtlety is only because there is that minor change in the January -- the -- the -- the multiple parallel streaming of the -- the Accused Products.

Q.   All right.  Let me see if I can get this straight.

For purposes of your infringement opinion that identifies the first image data stream as A to satisfy Claim 11, Claims 13, and 14 would not be infringed; is that correct?

A.   That's correct.

Q.   Okay.  Now in the live preview versus

Page 197

streaming scenario -- well, let me just -- in any   17:34
scenario, are you accusing the LRV stream as being a   17:34
first image data stream that satisfies Claim 11?   17:34

A.   Yes.   And I can break it down for you.   17:34

Q.   Okay.   So forget Claims 13 and 14.   17:34

Is it your opinion that Claim 11 is   17:34
infringed, where the first image data stream is the   17:34
input to the SD card labelled, you know, in the LRV   17:34
box?   I think you labelled that X; right?   17:34

A.   Yes, X.   17:34

Q.   Okay.   So that input to the SD card, LRV,   17:34
is it your opinion that that input, combined with --   17:35
is a first image data stream that would meet the   17:35
limitations of Claim 11?   17:35

A.   In some, reads within some scenarios.   17:35

Q.   Well, I -- I just want to focus on what   17:35
your infringement opinions are.   Because I thought   17:35
this morning we established that you were not   17:35
accusing in live preview versus -- live preview   17:35
during recording that -- that LRV stream.   17:35

Is that right?   17:35

A.   Okay.   You are mischaracterizing my   17:35
opinions.   17:35

Okay.   So for live streaming only.   Okay?   17:35

Q.   Okay.   Put live streaming to the side.   17:35

Page 198

then stored as an LRV file in the SD card.                    17:39

So that variation -- that's only slightly           17:39
different from the first one because I'm still               17:39
accusing the same feature, but that will carry out           17:39
to 13 and 14.                                                17:39

So my opinion has always been that live --           17:39
live preview during recording or live preview --             17:40
live streaming during recording, either one is               17:40
necessary for the infringement of Claim 11 if we are         17:40
talking about '954 alone.                                    17:40

And just because there is this slightly              17:40
different way that the multiple, parallel recording          17:40
of video streams is carried out in the GP2 base              17:40
products, hence, there is this subtlety in my                17:40
analysis.                                                    17:40

The rest of it, it's exactly the same as             17:40
my analysis and opinions for the previously Accused          17:40
Products -- and for live streaming because what's            17:41
been live streamed and saved in LRV file is the same         17:41
stream.                                                      17:41

So the live streaming scenario is exactly            17:41
the same as previously Accused Products as well.             17:41

Q.   Okay.   In this scenario where the LRV          17:42
file -- or LRV stream labelled "X" is the first              17:42
image data stream, you would agree that that data            17:42

Page 201

stream is not used to generate a live preview on the    17:43
portable device; correct?    17:43

A.    That's correct.    17:43

Q.    Now, under that view -- and now I want --    17:43
now I want to put aside -- let's put aside the phone    17:43
preview stream for now and just talk about what you    17:44
have labelled as "X" and "B" in that scenario.    17:44

In Claim 11, the wireless connection    17:44
protocol device that is configured to send real-time    17:44
image content, what you identify as the real-time    17:44
image content that is sent by wireless that must    17:44
be -- that the -- let me try that again.    17:44

The real-time image content for which the    17:44
wireless communication protocol device must be    17:44
configured to send is in the scenario involving the    17:44
LRV stream, different from the first image data    17:44
stream; correct?    17:45

A.    That's correct except that A is still    17:45
there.  So A is the -- the real-time image content.    17:45
So there is only one feature that's being accused    17:45
here, that's live preview during recording.    17:45

Q.    But your view is that the first image data    17:45
stream that -- that the first image data stream does    17:45
not have to be real time; is that right?    17:45

A.    That's correct.  It just needs to be    17:45

Page 202

CONFIDENTIAL

generated from -- sorry.                                    17:46

It just has to be generated from video    17:46
image data, and the video image data is directly or    17:46
indirectly received from the image sensor.    17:46

And if we go back to the image sensor,    17:46
that video image data of the scene when leaving the    17:46
image sensor has to be real time.    17:46

Q.   Okay.  So let me see if I understand this.    17:46

In your view, Claim 11 requires that the    17:46
wireless device be configured to send real-time    17:47
image content but that that real-time image content    17:47
need not be the first image data stream that is    17:47
generated in the generating step; correct?    17:47

A.   That's generally correct.    17:47

Q.   Okay.    17:47

MR. HAYNES:  How much time do we have?    17:47

THE VIDEOGRAPHER:  Left time?    17:47

MR. HAYNES:  How much time are we on?    17:47

THE VIDEOGRAPHER:  Five minutes.    17:48

MR. HAYNES:  I've got five minutes left?    17:48

He let him go, like, 25 minutes over last    17:48
time -- or I guess two times ago.    17:48

All right.    17:48

BY MR. HAYNES:    17:48

Q.   So since the last time you were deposed,    17:48

Page 203

CONFIDENTIAL

STATE OF CALIFORNIA                    )

COUNTY OF LOS ANGELES                  ) SS.

        I, Dayna Hester, C.S.R. No. 9970, in and for the State of California, do hereby certify:

        That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

        That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript {  } was {  } was not required;

        I further certify that I am not interested in the event of the action.

        Witness my hand this 14th day of July, 2025.


        Certified Shorthand Reporter

        for the State of California


Page 210